UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| **G.R.X.** through his next friend H.R.X., **J.S.X.** through his next friend D.S.X., **C.P.X.** through his next friend S.P.X., and **K.N.X.** through his next friend Rachel Antonuccio, for themselves and those similarly situated,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Jerry Foxhoven** in his official capacity as Director of Iowa Department of Human Services; **Richard Shults** in his official capacity as Administrator of the Division of Mental Health and Disability Services; **Mark Day** in his official capacity as Superintendent of the Boys State Training School.<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 4:17-cv-00417<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

AMENDED CLASS ACTION COMPLAINT

<u>NATURE OF THE CASE</u>

1. This action arises out of the unconstitutional and illegal practices at the Boys State

Training School in Eldora, Iowa (the "School"), with respect to children residing at the School

who have significant mental illness. Defendants fail to provide these children with adequate

mental health care, administer dangerous psychotropic medication without adequate oversight or

informed consent, and unlawfully subject these children to solitary confinement and mechanical

restraints as physical punishment for minor infractions of the rules that are symptomatic of their

1

illness. Even children suffering from acute psychosis or other mental health emergencies will not receive the prompt psychiatric care they need. Instead, they are often confined to a filthy cell and kept in solitary confinement for days before they are seen by any mental health professional.

2. The School is home to boys as young as 12 years of age. They have been incarcerated at the School because they have been adjudicated "juvenile delinquents" in a civil proceeding under Iowa law and placed in the custody of the State. The School's stated mission is to provide its residents with "a program which focuses upon appropriate developmental skills, treatment, placements and rehabilitation." The State also has an affirmative duty *in loco parentis* to keep those children placed at the School safe and free from harm.

3. The majority of the School's residents suffer from some form of mental illness for which there is a compelling need for treatment. In many cases, the child's mental illness will be severe and his mental health needs will be highly complex. Common diagnoses include bipolar disorder, posttraumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), oppositional defiant disorder ("ODD"), psychotic disorders, attention deficit hyperactivity disorder ("ADHD"), anxiety disorders, and depression. Many residents exhibit suicidal behaviors. Many residents have been diagnosed with borderline intellectual function. Many residents have suffered trauma, or repeated trauma, contributing to their need for mental health services. Many are victims of abuse and neglect or other forms of violence. The claims here are asserted on behalf of the class of children residing at the School (now or in the future) with significant mental illness, as defined more particularly in this Complaint.

4. As described more fully below, the School regularly fails to provide these children with the mental health services they so manifestly need. The School fails to employ an adequate number of mental health professionals necessary to meet the needs of its residents. As a result,

children with significant mental illnesses typically receive only cursory, non-therapeutic "counseling" instead of the comprehensive mental health therapy and other services that they should be receiving. The School likewise fails to provide emergency mental health treatment for children exhibiting suicidal behavior, acute psychosis, self-harm, severe side effects of psychotropic medications, or other emergencies. The School fails to provide individualized therapy plans tailored to the needs of each particular child and does not engage in adequate planning for the mental health needs of its residents upon their discharge.

5. In place of adequate mental health services, the boys at the School are subjected to powerful psychotropics, often used as a chemical straight-jacket to control behavior. These drugs are administered without the consent of the child's parent or next-of-kin, without appropriate oversight, and without adequate monitoring of the effect of the medication on the child. The School makes no effort to ensure that the potential risks, benefits, adverse side effects, and alternatives are reviewed with the youth's parents and it gives the boy no meaningful choice other than to take the drugs. The School also makes no effort to ensure that these medications are prescribed as part of a comprehensive treatment plan addressing all the mental health needs of the child, thereby subjecting the boys in its care to substantial risk of serious harm.

6. Children at the School also are improperly subjected to the physical punishments of solitary confinement and the use of restraints for minor disciplinary offenses, without regard for the child's mental illness. For instance, children have been subjected to the use of solitary confinement for raising their voices, arguing with other children, talking while taking a shower, or failing to clean up. In one instance, a boy was placed in solitary confinement for more than 70 hours because some unspecified "negative writings" were found in the child's notebook. Boys placed in solitary confinement may also be placed in the "wrap," a fourteen-point restraint that

3

immobilizes children. The School makes excessive and unnecessary use of these extreme punishments, in situations where they are wholly unnecessary for the safety of the child or others, resulting in the substantial risk of serious harm to children, particularly those already suffering from mental illness.

7. As a result of these practices, all residents of the School are subjected to serious harms and substantial risk of serious harm. Plaintiffs assert violations of their right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution; their right to be free from cruel and unusual punishment, as guaranteed by the Eighth Amendment to the United States Constitution; and their rights under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. As relief, Plaintiffs seek an order of the Court enjoining these unlawful practices.

## JURISDICTION AND VENUE

8. This action is brought under 42 U.S.C. § 1983 because Defendants, and each of them, acting under the color of state law, have deprived Plaintiffs, and the members of the class of persons they represent, of rights secured by the United States Constitution and federal statutory law.

9. This action arises under the Eighth and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Accordingly, this Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants maintain their principal offices within this district, in Des Moines, Iowa.

4

## PARTIES

### I.  THE NAMED PLAINTIFFS

#### A.   Plaintiff J.S.X.

11. J.S.X. is a sixteen-year-old Caucasian boy from Muscatine, Iowa. He was placed at the School on December 8, 2016 at the age of 15.

12. He has been diagnosed with ADHD, Combined Presentation, Childhood Onset Conduct Disorder, Cannabis Use Disorder – Moderate to Severe, and displays symptoms of OCD, social anxiety, and generalized anxiety, as well as possible panic features. He has reported auditory hallucinations, including hearing people calling his name.

13. J.S.X. has continued to show signs of mental illness while at the School. For example, J.S.X. has exhibited suicidal ideations and behaviors, including an incident in which he tied a pillow case around his neck and threatened suicide. He had not expressed suicidal thoughts or exhibited suicidal behavior prior to his placement at the School. Records indicate that he has reported obsessive-compulsive symptoms, social phobia, possible panic attacks, and possible claustrophobia.

14. Despite the compelling need, J.S.X. has been consistently denied access to adequate mental health care, including the therapy and other services he needs. J.S. is not provided with the necessary therapeutic environment at the School, where there are no licensed mental health professionals providing mental health therapy to J.S.X. on a regular basis. His purported Interdisciplinary Care Plan is not an individualized plan for any type of therapeutic services and does not include any mental health professional on the "interdisciplinary" team that supposedly will be considering his treatment. Its recommendations for treatment are boilerplate. There is no planning for his mental health needs upon discharge. He is subject to rigid behavioral

guidelines that do not take into account his mental illness, despite the effect of that illness on J.S.X.'s ability to comply with the School's many rules.

15.  In the absence of a comprehensive treatment plan addressing the entirety of J.S.X.'s mental health needs, the School has relied almost exclusively on the administration of psychotropic medications, including Adderall, a stimulant, for treatment of ADHD, and Quetiapine, an antipsychotic, for mood stabilization, anxiety, and sleep. His mother is not consulted regarding changes in his medication or his mental health.

16. Upon incarceration, the School solicited J.S.X.'s signature on a form purporting to acknowledge the "voluntary" administration of psychotropic medication, but J.S.X. had no real choice to do anything other than sign the form. J.S.X. did not have an opportunity to consult with his mother or obtain any independent advice before being required to sign the document. The form contained boilerplate language that J.S.X. supposedly had been "informed about the possible risks and benefits of the above medication(s)," but the risks, benefits, and alternatives were not adequately disclosed. As new medications were administered, the School did not request that J.S.X. sign a new form, but merely added the new medications to a previously-signed form, creating the false impression that J.S.X. supposedly had consented to the new medication. Far from being "voluntary," J.S.X. was subject to discipline under School rules if he failed to take his medications.

17. The Iowa Department of Human Services ("DHS") did not even attempt to obtain the consent of J.S.X.'s mother before administering these medications. Instead, it routinely mailed a letter to J.S.X.'s mother listing the medications that she received only after the drugs had been administered. As described more fully in this Complaint, DHS does not adequately monitor the effect of these medications on J.S.X.

18. Those medications pose substantial risks and have many serious adverse side effects. For example, the potential side effects of Quetiapine (also known as Seroquel) include mood or behavior changes, drowsiness, dizziness, trouble sleeping, tiredness, headaches, increased appetite, and weight gain. At times, J.S.X. has complained that the Quetiapine has made him so tired that he cannot "think straight" at bedtime, which results in him disrupting his nighttime routine and being subjected to discipline.

19. Since his placement in the School, J.S.X.'s mental health has deteriorated. As a result, J.S. has been placed on suicide watch at least three times for a total of 13 days. Each of these periods followed self-harm that occurred while he was in solitary confinement. J.S.X.'s mother typically does not receive timely notice that her son has been placed on suicide watch, depriving J.S.X. of the opportunity to have his mother involved during these moments of crisis. During a period of eleven months, December 2016 through September 2017, J.S.X. was placed in solitary confinement 81 times for a total of over 580 hours. J.S.X. has also been subject to the overuse of restraints. During a ten-month time period, from December 2016 through September 2017, J.S.X. was subject to restraints 22 times.

20. J.S.X. does not feel safe at the School because he does not feel as though the staff come to him immediately when he is in need of a mental health intervention.

21. Defendants' actions and inaction, policies, and practices have violated and continue to violate J.S.X.'s constitutional rights. Defendants have failed to protect him from harm and a substantial risk of serious harm while in their care by subjecting him to inadequate mental health care, the administration of psychotropic drugs without adequate oversight and informed consent, and the unlawful use of solitary confinement and the overuse of restraints.

22. J.S.X. is a "qualified individual with a disability" as defined in 42 U.S.C. § 12102 and § 12131, and in 29 U.S.C. § 705(9)(A) and (B). Defendants' conduct violates the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the regulations thereunder.

23. J.S.X. has exhausted his available administrative and other remedies.

24. J.S.X. appears through his next friend D.S.X. pursuant to Federal Rule of Civil Procedure 17(c). D.S.X. is J.S.X.'s mother. D.S.X. is familiar with the harms and substantial risks of serious harm that J.S.X. has suffered in Defendants' custody. D.S.X. is capable of and dedicated to representing J.S.X.'s best interests in this litigation.

**B.   Plaintiff C.P.X.**

25. Plaintiff C.P.X. is a sixteen-year-old Caucasian boy from Sioux Center, Iowa. He was placed at the School on July 11, 2016 at the age of fifteen.

26. According to multiple psychiatric evaluations, C.P.X. is diagnosed with ADHD, anxiety, PTSD, ODD, and OCD, and he has a history of showing depressive symptoms and reported suicidal ideation. He has multiple medical conditions that make his mental health treatment even more complex: Hypoplastic Left Heart Syndrome, Cirrhosis, Hepatosplenomegaly, Pulmonary Hypertension, Esophageal Varices, Asthma, Sleep apnea, severe psoriasis, Gastroesophageal reflux disease, and Bilateral hearing loss. He has a history of treatment with at least Strattera, Trazodone, Mirtazapine, and Remeron.

27. C.P.X. continues to experience mental health issues at the School. He has been placed on suicide watch at least six times for a total of 15 days, and has engaged in self-harm, including banging his head against the wall. C.P.X.'s mother typically does not receive timely notice that her son has been placed on suicide watch, depriving C.P.X. of the opportunity to have his mother involved during these moments of crisis. Although his mother has advocated for him

to receive Exposure Response Prevention Therapy, a type of Cognitive Behavioral Therapy, the School staff have not taken steps to ensure that this therapy is considered as part of his treatment plan, and have instead simply stated that the School does not offer this treatment.

28. Despite the compelling need, C.P.X. has been consistently denied access to adequate mental health care, including the therapy and other services that he needs. C.P.X. is not provided with the necessary therapeutic environment at the School. There are no licensed mental health professionals providing mental health therapy to C.P.X. on a regular basis. His purported Interdisciplinary Care Plan is not an individualized plan for any type of therapeutic services and does not include any mental health professional on the "interdisciplinary team" that supposedly will be considering his treatment. Its recommendations for treatment are boilerplate. There is no planning for his mental health needs upon discharge. He is subject to rigid behavioral guidelines that do not take into account his mental illness, despite the effect of that illness on C.P.X.'s ability to comply with many rules.

29. C.P.X.'s records indicate that he is routinely administered psychotropics at the School, and he has suffered severe side effects. Upon admission, C.P.X. was just 5'4" and weighed about 185 lb. Since his admission to the School, C.P.X. has lost over 30 lb. The School staff has informed his mother that the weight loss is due to medication. After being put on Vyvanse, a stimulant in August 2016, C.P.X. also developed a facial tic. He constantly licks his lips, which his mother worries is a symptom of dyskinesia. In addition to Vyvanse, C.P.X. is also administered Guanfacine, an anti-anxiety drug, and Escitalopram, an antidepressant.

30. Upon incarceration, the School solicited C.P.X.'s signature on a form purporting to acknowledge the "voluntary" administration of psychotropic medication, but C.P.X. had no real choice to do anything other than sign the form. C.P.X. did not have an opportunity to consult

with his mother or obtain any independent advice before being required to sign the document. The form contained boilerplate language that C.P.X. supposedly had been "informed about the possible risks and benefits of the above medication(s)," but the risks, benefits, and alternatives were not adequately disclosed. As new medications were administered, the School did not request that C.P.X. sign a new form, but merely added the new medications to a previously-signed form, creating the false impression that C.P.X. supposedly had consented to the new medication. Far from being "voluntary," C.P.X. was subject to discipline under School rules if he failed to take his medications.

31. It was only after he was placed on Vyvanse that C.P.X.'s mother received notice in the mail from the School staff that the change in medication occurred. His mother, a nurse, called the School and asked to speak with the psychiatrist, in order to inform him that it was unsafe for C.P.X. to be administered Vyvanse, because he has a heart condition. The more serious risks associated with Vyvanse include psychiatric problems and heart complications, including sudden death in people who have heart problems or heart defects, and stroke and heart attack.

32. Despite this concern, staff continuously refused to permit C.P.X.'s mother to speak with the psychiatrist. The School staff continues to administer Vyvanse to C.P.X. despite other available treatment options.

33. In the absence of mental health services and behavioral supports, C.P.X. also has been frequently locked in solitary confinement and restrained. During a period of fourteen months, from July 2016 through September 2017, C.P.X. was placed in solitary confinement 125 times, totaling approximately 800 hours. C.P.X., who has fallen victim to bullying, complains frequently that he feels lonely when placed in solitary confinement, where he says he is deprived of reading, and where the School takes away his puzzle books.

34. C.P.X. was placed in restraints 51 times during a thirteen-month time period, from August 15, 2016 through September 24, 2017.

35. Defendants' actions and inaction, policies, and practices have violated and continue to violate C.P.X.'s constitutional rights. Defendants have failed to protect him from harm and a substantial risk of serious harm while in their care by subjecting him to inadequate mental health care, the administration of psychotropic drugs without adequate oversight and informed consent, and the unlawful use of solitary confinement and the overuse of restraints.

36. C.P.X. is a "qualified individual with a disability" as defined in 42 U.S.C. § 12102 and § 12131, and in 29 U.S.C. § 705(9)(A) and (B). Defendants' conduct violates the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the regulations thereunder.

37. C.P.X. has exhausted his available administrative and other remedies.

38. C.P.X. appears through his next friend, S.P.X. S.P.X. is C.P.X.'s mother. She is aware of the harms and substantial risks of serious harm that C.P.X. has suffered in Defendants' custody. S.P.X. is a registered nurse with over 15 years' experience caring for patients in hospital and community settings. S.P.X. is dedicated to and capable of representing C.P.X.'s best interests in this litigation.

**C.   Plaintiff K.N.X.**

39. Plaintiff K.N.X. is a sixteen-year-old Caucasian boy from a small rural town in Western Iowa. He was admitted to the School at the age of 14. K.N.X. has experienced complex childhood trauma, including domestic violence within his home and the loss of his mother who died from a drug overdose. Due to his parents' drug use, K.N.X. was removed from his parents' care, and spent much of his childhood in and out of multiple foster care placements, with only brief returns home.

40. K.N.X. has been diagnosed with Childhood Onset Conduct Disorder and Attention Deficit Hyperactivity Disorder. Since K.N.X. was placed at the School, he has exhibited self-harming behaviors, such as cutting his forearm and legs, and has communicated suicide plans to staff. Prior to placement at the School, K.N.X. had not exhibited these behaviors.

41. Despite the compelling need for mental health treatment, K.N.X. has consistently been denied access to adequate mental health care and has yet to receive a comprehensive mental health evaluation, with a treatment plan tailored to his individual needs. K.N.X. is not provided with the necessary therapeutic environment at the School, where there are no licensed mental health professionals providing mental health therapy to K.N.X. on a regular basis. His purported Interdisciplinary Care Plan is not an individualized plan for any type of therapeutic services and does not include any mental health professional on the "interdisciplinary" team that supposedly will be considering his treatment. Its recommendations for treatment are boilerplate. There is no planning for his mental health needs upon discharge. He is subject to rigid behavioral guidelines that do not take into account his mental illness, despite the effect of that illness on K.N.X.'s ability to comply with the School's many rules.

42. Since placement in the School, K.N.X.'s mental health has deteriorated. As a result, K.N.X. was placed on suicide watch nine times over a thirteen-month period, between September 2016 and October 2017, totaling 21 days. During a period of approximately 11 months from September 5, 2016 to July 31, 2017, K.N.X. was placed in solitary confinement at least 66 times for a total of over 842 hours. In addition, for approximately four months in the latter half of 2017, K.N.X. was placed in solitary confinement for 22 hours each day, regardless of his behavior. During that time, K.N.X. was not permitted to go to school and was only permitted two hours of out-of-cell time per day. K.N.X. has also been subject to the overuse of

restraints. During an eleven month time period, from November 6, 2016 to October 8, 2017, K.N.X. was restrained at least 29 times for a total of 10.92 hours.

43. As a result of the overuse and excessive use of restraint at the School, K.N.X. suffered a broken arm between his elbow and shoulder during a physical restraint that took place in his solitary confinement room on February 12, 2018. The staff at the hospital informed him that he will need a plate, pins, and casting to correct the break and that this will need to be performed at the University of Iowa Hospital.

44. In the absence of a comprehensive treatment plan addressing the entirety of K.N.X.'s mental health needs, the School has administered Vyvanse, a psycho-stimulant, and Clonidine, which is prescribed off-label to treat post-traumatic stress disorder and other psychiatric disorders.  The School's records indicate that he has a prior history of treatment with such medications as Ritalin, Concerta, Strattera, and Risperdal. These records appear incomplete, however, as they also indicate that he may have been administered drugs other than those listed. In addition, the School's records do not reflect the dosages administered or side effects experienced by K.N.X. prior to placement at the School, although his records indicate that K.N.X. was first administered medication for ADHD at an early age.

45. Despite this history of medication, K.N.X. was not informed of the target symptoms, likely benefits of treatment, potential risks of treatment, and risks of not pursuing the treatment in question. Although his grandparents had been engaged in his treatment prior to his placement at the School, they were not consulted about, or informed of the risks of, the administration of psychotropic medication prior to K.N.X. being administered those drugs, or when K.N.X.'s dosages or medications were changed.

46. At the time of the filing of the Amended Complaint, the School had stopped administering all psychotropic medications to K.N.X., after school employees alleged that K.N.X supposedly was "oppositional" with respect to his medication. Here again, neither K.N.X. nor his grandparents were advised as to the potential effects of stopping the medication. The School has not provided K.N.X. with any alternative therapeutic treatment in lieu of the medications K.N.X. is no longer receiving.

47. Defendants' actions and inaction, policies, and practices have violated and continue to violate K.N.X.'s constitutional rights. Defendants have failed to protect him from harm and a substantial risk of serious harm while in their care by subjecting him to inadequate mental health care, the administration of psychotropic drugs without adequate oversight and informed consent, and the unlawful use of solitary confinement and the overuse of restraints.

48. K.N.X. is a "qualified individual with a disability" as defined in 42 U.S.C. § 12102 and § 12131, and in 29 U.S.C. § 705(9)(A) and (B). Defendants' conduct violates the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the regulations thereunder.

49. K.N.X. has exhausted his available administrative and other remedies.

50. K.N.X. appears through his next friend Rachel Antonuccio pursuant to Federal Rule of Civil Procedure 17(c). Ms. Antonuccio is a public defender with the Johnson County Public Defender's Office in Iowa City and has represented numerous youth in juvenile and adult court proceedings, including boys who were placed at the School. Ms. Antonuccio has met with K.N.X. and is familiar with the harms and substantial risks of harm that K.N.X. has suffered in Defendants' custody. She is capable of and dedicated to representing K.N.X.'s best interests in this litigation and meets the requirements of Rule 17.

### D.   Plaintiff G.R.X.

51. Plaintiff G.R.X. is a sixteen-year-old African-American boy from Des Moines, Iowa. He was first admitted to the School at the age of 14. G.R.X. has experienced complex childhood trauma, including his removal from the custody of his biological parents, and the subsequent termination of his mother's parental rights when G.R.X. was one year old.

52. G.R.X. has been diagnosed with Childhood Onset Conduct Disorder and Unspecified Mood Disorder. In 2017, he was also diagnosed with ADHD and Unspecified Mood Disorder that he primarily exhibits with poor anger control. His records indicate that he might suffer from bipolar disorder, for which he has exhibited certain symptoms, PTSD, and Borderline Intellectual Function. He has also exhibited certain symptoms associated with Psychotic Disorder.

53. G.R.X. was first placed at the School for eleven months, from July 2015 to June 2016, and was discharged after it was determined that an out-of-state placement might benefit his needs more than placement at the School. Beginning in June 2016, G.R.X. was placed at a specialized treatment program in Illinois for four months where he made progress. Following discharge from the treatment program in Illinois, G.R.X. was again placed at the School for a second stay of approximately eleven months, from January to December 2017. Staff at the Illinois placement indicated that G.R.X. would not benefit from traditional talk therapy, but that individual therapeutic sessions would be effective if they were more tailored to G.R.X.'s needs. This type of therapy was not provided by the School.

54. A recent evaluation recommended that G.R.X. be provided with intensive therapy to address maladaptive ways of thinking, feeling, behaving, and relating to others. The evaluation indicated that these issues stem from early childhood trauma and that these

15

experiences would need to be explored by a licensed therapist or psychologist with special training or expertise in this area if there was going to be any change in his behaviors. But here again, this type of therapy was not provided by the School.

55. Despite the compelling need, G.R.X. was consistently denied access to adequate mental health care, including the therapy and other services he needs. G.R.X. was not provided with the necessary therapeutic environment at the School. There were no licensed mental health professionals providing mental health therapy to G.R.X. on a regular basis, except that in late September 2017, G.R.X. began receiving telephonic "sessions" with a licensed mental health professional. These "sessions" did not follow any of the previous recommendations regarding his therapeutic needs. His purported Interdisciplinary Care Plan was not an individualized plan for any type of therapeutic services and did not include any mental health professional on the "interdisciplinary" team that supposedly would be considering his treatment. The Interdisciplinary Care Plan's recommendations for treatment were boilerplate. There was no planning for G.R.X.'s mental health needs upon discharge. He was subject to rigid behavioral guidelines that did not take into account his mental illness, despite the effect of that illness on G.R.X.'s ability to comply with the School's many rules.

56. G.R.X.'s records indicate that he has historically been prescribed psychotropics during his placements at the School and that he has suffered severe side effects. For instance, while placed at the School, he was administered Zyprexa, Vyvanse, and Lithium. Records note that treatment with Vyvanse, a stimulant, made him more agitated, aggressive, and manic, and caused sleep deprivation. Moreover, his records indicate that during his first stay he was administered Lithium, an antipsychotic that caused "significant Lithium-induced polyuria" and hypothyroidism, and Quetiapine, another antipsychotic that caused him to be overweight.

16

Records indicate that more recently, he was administered Aripiprazole, yet another antipsychotic, and Guanfacine, a non-stimulant.

57. Upon incarceration, the School solicited G.R.X.'s signature on a form purporting to acknowledge the "voluntary" administration of psychotropic medication, but G.R.X. had no real choice to do anything other than sign the form. G.R.X. did not have an opportunity to consult with his father or paternal grandmother or obtain any independent advice before being required to sign the document. The form contained boilerplate language that G.R.X. supposedly had been "informed about the possible risks and benefits of the above medication(s)," but the risks, benefits, and alternatives were not adequately disclosed. As new medications were administered, the School did not request that G.R.X. sign a new form, but merely added the new medications to a previously-signed form, creating the false impression that G.R.X. supposedly had consented to the new medication. Far from being "voluntary," G.R.X. was subject to discipline under School rules if he failed to take his medications.

58. Neither his father, nor his paternal grandmother, nor any other guardian or family member was consulted or informed of the risks of the administration of psychotropic medication prior to G.R.X. being placed on those drugs. As described more fully in this Complaint, DHS does not adequately monitor the effect of these medications on youth at the School, including G.R.X.

59. During his second stay at the School, G.R.X.'s mental health deteriorated. As a result, he was placed on suicide watch at least 27 times during his stay, usually after he tied clothing around his neck and threatened to kill himself. G.R.X.'s father typically did not receive timely notice that his son had been placed on suicide watch, depriving G.R.X. of the opportunity to have his father involved during these moments of crisis. G.R.X. also was restrained at least

141 times from February 1, 2017 to August 23, 2017, for a total of 77.53 hours. Of those 77.53

hours in restraints, G.R.X. was placed in the wrap 68 times, for a total of 67 hours. In 90% of

these instances, School personnel placed G.R.X. in the wrap to punish him for self-harming

behaviors.

      60. During a period of less than seven months, from February 1, 2017 to August 23,

2017, G.R.X. was placed in solitary confinement at least 53 times for a total of approximately

1,000 hours. During his most recent stay at the School, he was required to live in a solitary cell

for weeks at a time rather than in cottages with the other boys. This occurred on five separate

occasions.

      61. On December 11, 2017, the Juvenile Court ordered that G.R.X. be discharged from

the School into the custody of his father. His delinquency case was subsequently closed on

February 9, 2018. The Juvenile Court may in the future remand G.R.X. back into the custody of

the School for any subsequent delinquent act. G.R.X. was initially released from the School in

June 2016, was placed back at the School seven months later, and remains at risk of being sent

back to the School a third time.

      62. The claims of children placed at the School are inherently transitory in that the

class representatives likely will be released from the School's custody before class certification

or the case's merits can be decided. Between 2015 and 2017, the average length of stay for boys

at the School ranged from eight to ten months. Under the legal doctrine of "capable of repetition

yet evading review," G.R.X.'s standing to maintain this action as a class representative should be

determined as of November 27, 2017, the date the original Complaint in this action was filed,

when G.R.X. remained incarcerated at the School. At that time, G.R.X. was at substantial risk of

serious harm as a result of Defendants' conduct and, absent relief from this Court, G.R.X. remains at substantial risk of serious harm in the event he is sent back to the School.

63. Defendants' actions and inaction, policies, and practices have violated and continue to violate G.R.X.'s constitutional rights. Defendants have failed to protect him from harm and a substantial risk of serious harm while in their care by subjecting him to inadequate mental health care, the administration of psychotropic drugs without adequate oversight and informed consent, and the unlawful use of solitary confinement and the overuse of restraints.

64. G.R.X. is a "qualified individual with a disability" as defined in 42 U.S.C. § 12102 and § 12131, and in 29 U.S.C. § 705(9)(A) and (B). Defendants' conduct violates the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the regulations thereunder.

65. G.R.X. has exhausted his available administrative and other remedies.

66. G.R.X. appears through his next friend H.R.X. pursuant to Federal Rule of Civil Procedure 17(c). H.R.X. is G.R.X.'s father. H.R.X. is familiar with the harms and substantial risks of serious harm that G.R.X. has suffered in Defendants' custody. H.R.X. is capable of and dedicated to representing G.R.X.'s best interests in this litigation.

## II.  THE CLASS

67. This action is brought on behalf of all persons who are confined to the Boys State Training School in Eldora, Iowa, now or in the future, and who have a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of Iowa (the "Class"). All residents of the School who have a diagnosis for a mental health condition specified in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (the "DSM-IV") or Fifth Edition (the "DSM-5") are members of the Class. All residents of the School receiving psychotropic medications also are members of the Class.

## III. DEFENDANTS

68.   Defendant Jerry Foxhoven is the Director of DHS, the Iowa state agency designated to oversee the Boys State Training School. Director Foxhoven is sued in his official capacity. As Director of DHS, Defendant Foxhoven has general and full authority given under the statute to control, manage, direct, and operate the Boys State Training School. Defendant Foxhoven is authorized to delegate his powers and authorities within the department.

69. Defendant Richard Shults is the Administrator of the Division of Mental Health and Disability Services. Administrator Shults is sued in his official capacity. As Administrator of the Division of Mental Health and Disability Services, Defendant Shults is responsible for preparing and administering "the comprehensive mental health and disability services plan . . . for the provision[s] of disability services" including those at Eldora State Training School. Defendant Shults is also responsible for "[e]stablishing a comprehensive community-based mental health services system for children and youth" as part of "fulfilling the requirements of the division . . .  to facilitate a comprehensive, continuous, and integrated state mental health and disability services plan."

70. Defendant Mark Day is the Superintendent of the Boys State Training School. Superintendent Day is sued in his official capacity. As Superintendent of the School, Defendant Day "has charge and custody of the juveniles committed to the state training school." Defendant Day is tasked with administering "the state training school and direct[ing] the staff in order to provide a positive living experience designed to prepare the juveniles for a productive future." Defendant Day oversees staff at the School, including the treatment program administrator, treatment services director, business manager, education administrator, human resources, and the nurse supervisor. Defendant Day is responsible for the security and discipline of boys at the

School. He is also charged with making final determinations as to any grievances filed by youth or on their behalf at the School.

**FACTUAL ALLEGATIONS**

## I.  THE BOYS STATE TRAINING SCHOOL

71. The Boys State Training School is a secure facility operated by DHS, where boys aged 12 to 19 who have been adjudicated delinquents can be incarcerated. The facility consists of five cottages and multiple other structures on one plot of land in Eldora, in Hardin County, Iowa.

72. Youth involved in the juvenile justice system are different from adults in the criminal justice system; youth who are adjudicated delinquent are not convicted of crimes. Youth are adjudicated delinquent in civil proceedings and are not provided with the same procedural protections as adults. The primary goal of delinquency proceedings is to further the best interests of the child, not to punish, and to provide care and education to the child.

73. The Iowa Code governs the civil juvenile delinquency proceedings, and the appropriate placement for a child who is adjudicated to be a delinquent. The Code requires that, preferably, a child adjudicated delinquent should remain in his or her home. If a child is removed from the control of the parents, however, "the court shall secure for the child care as nearly as possible equivalent to that which should have been given by the parents." If certain specific criteria are met, the Code allows for the placement of a child in a "secure facility" under the supervision of DHS, including the School.

74. The statutory mission of the School is "to provide to juvenile delinquents a program which focuses upon appropriate developmental skills, treatment, placements, and rehabilitation." According to an accreditation report for the School, its mission includes "provid[ing] a continuum of supervision and rehabilitation programs which meet[] the needs of

the adjudicated delinquent male in a manner consistent with public safety." The Iowa Code requires that the agency "provide a positive living experience." Specifically, "[t]he education and training programs provided to the juveniles" must "reflect the age level and extended period of stay by focusing upon appropriate developmental skills to prepare the juveniles for productive living."

75. The Code allows youth to be placed at the School for an "indeterminate" time period. The average reported length of stay for a youth placed at the School is approximately ten months, but many with mental illness linger there for longer periods, sometimes for two or three years. When they are placed at the School, youth and their families are told that they need to complete their "program," without further explanation of timeframe or requirements.

76. A maximum of 130 boys can be placed at the School. In the past year, the daily population at the School has ranged from 110 to 120 and approximately 110 boys are currently held there.

77. Almost 40% of the boys held at the School are African-American.

78. Youth placed in juvenile detention suffer serious mental health issues at grossly disproportionate rates. Nationally, between 65% to 70% of children and adolescents involved in the juvenile justice system have a mental health disorder. Ninety-three percent of these youth reported exposure to adverse childhood experiences, including child abuse, violence, and serious illness. At the School, approximately 66% of the boys have been on psychotropic medications in recent years.

79. The boys at the School have complex needs and the majority of them suffer from some mental health illness for which there is a compelling need for mental health treatment. Youth at the School are diagnosed with, among other things, PTSD, OCD, ODD, severe ADHD,

mood disorders, substance abuse, and other significant mental health impairments, as well as symptoms of Bipolar Disorder, Psychotic Disorder, and depression.

80. The School is not subject to State regulations that restrict the use of restraints or solitary confinement in other juvenile detention facilities. It is the only juvenile facility in Iowa that is not subject to the State's regulations. DHS has the authority to promulgate regulations deemed necessary for the treatment, care, custody, and education of residents, but has not done so for the administration of the School.

81. Moreover, the School is not licensed by the state Department of Inspections and Appeals. It is the only facility housing youth adjudicated delinquent in the State of Iowa that lacks licensure and oversight by a separate government agency.

## II. DEFENDANTS FAIL TO PROVIDE BOYS AT THE SCHOOL WITH ADEQUATE MENTAL HEALTH TREATMENT.

82. Defendants have a practice and policy of subjecting children at the School to grossly inadequate mental health treatment, thereby posing a substantial risk of serious harm to these residents.

83. As alleged more fully below, Defendants fail to employ adequate mental health care staff and resources to meet the needs of the Named Plaintiffs and class members. They fail to provide sufficient emergency mental health treatment for boys suffering from acute psychosis, self-harm, thoughts of suicide and suicidal actions, severe side effects of psychotropic medications, and other emergencies. They fail to provide individualized therapy plans and treatment tailored to the needs of each boy, instead providing cookie-cutter, one-size-fits-all treatment plans and treatments that do not meet the actual mental health needs of the Named Plaintiffs and Class members. And they do not conduct adequate planning for the mental health

needs of boys being discharged from the school, leaving them without critically-needed mental health resources when they leave.

84.   Tellingly, Defendants' themselves have recognized these shortcomings. For example, after one child at the School indicated that he needed therapy, Defendant Day, superintendent of the School, responded simply "you should have stayed at your last placement," where mental health therapy apparently had been provided.

> **A.    Defendants Fail to Maintain Adequate Professional Mental Health Staff Necessary to Meet the Needs of Boys at the School.**

85. Defendants have a practice and policy of failing to ensure adequate mental health care staffing for children at the School. As alleged below, the mental health staff employed by the School consists primarily of a sole, unlicensed School psychologist, and a part-time psychiatrist who sees children only two mornings a week, which is substantially insufficient to meet the mental health needs of the boys who reside there.

86.   **The Sole Unlicensed School Psychologist.**  Defendants employ one psychologist, who does not even have a license to practice psychology in Iowa, who is the sole psychologist on Staff at the School, and who provides most of the mental health services to the children. This individual has only a masters-level mental health degree and would not be eligible to practice as a psychologist in private practice under Iowa state law, which requires such professionals to hold a PhD.

87. This sole, unlicensed psychologist has wide-ranging responsibilities for the mental health needs of all children at the School, far beyond his capabilities. According to Boys State Training School Policy 4C-01, this single staff member is responsible for detection, diagnosis, and treatment of mental illness; crisis intervention and management of acute psychiatric episodes; stabilization of residents with mental illness and the prevention of psychiatric

deterioration; referral to outside mental health facilities when necessary; and the obtaining of informed consent. Thus, he is assigned to treat and respond to the routine mental health needs of all of the boys at the School (as many as 130), and also to respond to the more imminent mental health needs of any children who are experiencing thoughts of suicide, acute psychosis, and severe reactions to psychotropic drugs. The responsibilities of this unlicensed psychologist also include administering psychological tests that typically only psychologists with doctorate degrees are permitted to administer. The unlicensed psychologist has the assistance of one full-time assistant, who is not required to have a college degree, but who nevertheless is required to perform tasks requiring considerable expertise, including administering and scoring psychometric tests and measurements, completing functional assessments, and developing behavior support plans.

88. **The Part-Time Two-Mornings-A-Week Psychiatrist.** In addition to the unlicensed psychologist, the School makes use of one part-time psychiatrist, who works only two mornings per week at the School. In 2014, over a span of 12 months, approximately 500 children were referred to be seen by this part-time psychiatrist. This part-time psychiatrist is not able to devote sufficient attention to all the boys at the School in need of his services, and the mental health needs of these children remain inadequately addressed.

89. According to Boys State Training School Policy 4B-05, this part-time psychiatrist is responsible for providing medication evaluations and orders for all of the boys prescribed psychotropic medication. He must therefore monitor medication for side effects and benefits, and provide assessments, examinations, evaluations, and treatment for all youth with significant mental illness, including those at risk of suicide and self-harming behaviors. Given his numerous responsibilities, and the serious and complex mental health needs of boys at the School, the sole

part-time psychiatrist is unable to attend adequately to the complex mental health needs of these children.

90.   Although Defendants apparently plan on replacing the part-time psychiatrist with a part-time psychiatric nurse and a part-time licensed therapist, this will still leave the School with grossly insufficient mental health resources. On or about June 20, 2017, DHS issued a request for proposal to replace the current part-time psychiatrist with a part-time psychiatric nurse who will work eight hours per week, and a part-time licensed therapist to provide individual and group sessions, also limited to just eight hours per week in the aggregate. But this arrangement too would be grossly inadequate to meet the complex mental health needs of all the children in substantial need of therapy and other mental health services.

91. The remainder of the medical team at the School consists solely of one registered nurse and three nurse practitioners who have general nursing skills, but who are not psychiatric nurses or mental health professionals. The nurses begin work at 5:30 A.M. and end at 8 P.M., after which time no medical professionals are present at the School.

92. **The Untrained "Youth Counselors."**  The School also employs so-called "youth counselors," who typically have high school or high school equivalency diplomas and minimal work experience. Although they have no license to provide medications, these counselors are responsible for administering all medications that youth at the School are provided after 8 P.M., including sedatives at bedtime. In addition to administering medication, youth counselors are responsible for providing purported "group counseling" to boys at the School. The counselors leading the groups do not have the specialized training required to adhere to and teach evidence-based mental health strategies, and these group counseling sessions are not an appropriate

substitute for necessary therapeutic mental health treatment provided by a qualified mental health professional.

93. In sum, the School does not employ a sufficient number of mental health professionals to meet the needs of the Named Plaintiffs and Class members, subjecting them to substantial risk of serious harm.

94. In addition, Defendants substantially depart from accepted professional standards requiring that juvenile detention facilities should only employ health care professionals who would be eligible to work in a community, non-prison setting. In particular, the National Commission on Correctional Health Care ("NCCHC"), a non-profit organization that develops standards for health services in correctional facilities, issued a position statement asserting that "correctional systems should not employ licensed health care professionals whose licenses are restricted to government institutions, including corrections." By employing an unlicensed psychologist who would not otherwise be permitted to practice in Iowa, and by using unlicensed, untrained assistants and youth counselors as described above, Defendants substantially depart from these accepted professional standards.

## B. Defendants Fail to Provide Adequate Emergency Mental Health Treatment to Meet the Needs of Boys at the School.

95. Defendants have a practice and policy of failing to provide adequate emergency mental health treatment for boys experiencing mental health emergencies, including suicidal behavior, acute psychosis, self-harm, and severe side effects of psychotropic medications.

96. Children experiencing such symptoms or otherwise needing emergency mental health care typically require around-the-clock acute care by a treating psychiatrist in a hospital setting in the event of a psychiatric emergency. In a community setting outside of the School, children showing such symptoms would receive just such care. At the School, however, boys

experiencing suicidal thoughts, acute psychosis, self-harm, severe side effects of psychotropic medications, or other medical emergencies are typically placed in solitary confinement without the supervision of a psychiatrist and do not receive timely, emergency medical attention. If the emergency mental health problem occurs outside of the two mornings when the psychiatrist is on-site, the boys often languish in solitary and in restraints for excessive periods, with no meaningful mental health intervention.

97. Children with severe mental illness who are identified as being on suicide watch are strip searched, forced to wear a suicide smock, and placed in solitary confinement. As a result, boys suffering from suicide attempts and suicidal thoughts linger in solitary, unclothed and without mental health treatment, conditions that are humiliating and degrading, and which serve no therapeutic purpose. It is the supervisor on duty, not a mental health professional, who determines when the child is required to wear a suicide smock. Boys exhibiting warning signs of suicide in the evening hours often wait days to see a psychiatrist for treatment, if they are provided with treatment from a psychiatrist at all.

98. Defendants' failure to ensure adequate emergency mental health treatment substantially departs from well-accepted professional standards. For example, the Juvenile Detention Facility Standards published by the Juvenile Detention Alternatives Initiative ("JDAI"), a project by the Annie E. Casey Foundation that works with states and jurisdictions to safely reduce the number of incarcerated youth, state that incarcerated youth should be provided with "[a]ccess to . . . emergency health and mental health care." In particular, the standards require that staff contact "a qualified mental health professional in order to develop an emergency intervention plan for [youth identified as needing evaluation for suicide risk or other

acute mental health conditions]" and that "a qualified mental health professional conducts an assessment within 24 hours."

### C. Defendants Fail to Provide Individual Therapy Plans or Necessary Treatments Tailored to the Mental Health Needs of the Child.

99.  Defendants have a practice and policy of failing to create individual treatment plans for boys with significant mental health needs and failing to provide necessary treatment tailored to their specific needs.

100. Despite the complex mental health needs of many of the youth placed at the School, the purported treatment plans for these children (referred to as Interdisciplinary Care Plans) are routinely uniform, cookie-cutter documents recommending the same course of treatment regardless of differing individual needs. The plans are typically prepared by the so-called "youth counselors," with no mental health training, and little to no relevant job experience or education at all. Nevertheless, these youth counselors are responsible for planning and reviewing the treatment programs. These Interdisciplinary Care Plans do not address the strengths, needs, capacities, and abilities of the particular child.

101. Boys at the school are routinely denied individualized treatment no matter how compelling the need. Even when youth request specific types of mental health treatment, such as improving anger management or coping with emotions, their requests are routinely denied. They are often not placed in special groups focused on those goals, or otherwise provided with individual mental health therapy aimed at ameliorating those issues. Boys at the School are not offered individualized therapy, such as Dialectical Behavior Therapy, Cognitive Behavioral Therapy, Eye Movement Desensitization and Reprocessing, and Exposure Response Prevention Therapy, even when a medical professional indicates that such therapy is needed. For youth

29

diagnosed with depression, for example, the same regimen is often prescribed, despite the fact that symptoms vary from child to child.

102. Defendants' practice substantially departs from accepted professional standards. JDAI standards, for example, provide that staff should develop special individualized programming for each young person or consult with a qualified mental health professional about whether a youth's behavior requires that he or she be transported to a mental health facility. These standards also require that mental health services should "meet or exceed the community level of care" and should be "tailored to be appropriate for the length of time the youth is expected to stay in the facility." These standards provide that there should be a determination of whether the type or level of services can be provided in the detention center, and, if services cannot be provided, a plan for securing such services or transferring the youth to a different setting. The American Psychiatric Association likewise supports "the principle that juveniles with mental illness and neurodevelopmental disorders should have the opportunity to obtain appropriate psychiatric assessment and treatment."

### D. Defendants Fail to Provide Adequate Discharge Planning for the Mental Health Needs of Boys Exiting the School.

103. Defendants have a practice and policy of failing to engage in meaningful planning for the mental health needs of boys about to be discharged from the School, which results in youth transitioning back to the communities with no mental health supports in place.

104. It is well-established that discharge planning is an essential part of mental health care for youth, so that after release from the correctional setting to the community the child will have access to necessary mental health treatment. Discharge planning requires the engagement of the youth's family, who typically is responsible for ensuring the child receives the needed treatment upon discharge. The family needs to know what treatment the child needs, where the

child will receive the treatment, and when, as well as the child's needs for medication. To provide adequate guidance to the mental health professionals treating the child after discharge, the family needs to be knowledgeable about the mental health symptoms and treatments the child experienced while at the School.

105.   Despite this need, the School routinely fails to perform adequate discharge planning or engage the youth's family. For example, one boy who self-harmed often and suffered from serious mental illness was suddenly discharged home without any connections to community mental health services and only a week's notice provided to the family. No planning was done with the family to ensure a successful transfer.

106. The School routinely fails to provide parents with information necessary for the family to provide continued mental health support after discharge. Parents do not receive timely notice of their children being put on suicide watch; in one case, a parent received a suicide note in the mail from their child, with no communication from the School until several days later. Children are often denied access to their families, where parents are unable to pay for transportations for family visits or telephone calls to the School.

107.   Here again, Defendants' practice substantially departs from accepted professional standards, including those governing accreditation of the School. Standards published by the American Correctional Association ("ACA"), a national non-governmental organization that accredits correctional facilities, require that each child receive assistance in successfully transitioning from a custody environment back into the community as a productive and law-abiding citizen. Specifically, the ACA standards require that all youth have access to a program of release preparation prior to their return to the community and that these programs include the following: (1) lectures and discussions addressing children's concerns regarding education,

employment, housing, family issues, and so forth; (2) individual counseling focusing on the

child's needs; (3) family counseling sessions; and (4) where statutes permit, graduated release

through short furlough.

> **E.   Defendants are Deliberately Indifferent to Known Substantial Risks of Serious Harm that Result from Inadequate Mental Health Treatment at the School.**

108. As a result of the Defendants' failure to provide adequate mental health care, the

Named Plaintiffs and Class members are subject to a known substantial risk of serious harm to

which Defendants are deliberately indifferent. Inadequate mental health treatment is likely to

cause serious psychological deterioration in youth with mental illness. For example, failure to

provide necessary treatment has caused youth at the School to engage in increased symptomatic

behaviors, such as violent or assaultive conduct; acts of self-mutilation and self-harm; attempts

of suicide; depression, isolation, and withdrawal; failure to keep clean and other unhygienic

behavior; smearing feces on themselves and their cells; screaming; hoarding or refusing food;

and flooding their cells with water from the toilet. Moreover, in the absence of adequate mental

health treatment, children are frequently subjected to periods of isolated confinement for

engaging in such symptomatic conduct.

109. As a consequence of the symptoms of their illnesses, many children with mental

illness are incapable of conforming to the rules and regimen at the School. Without adequate

mental health treatment, youth are instead subjected to the overuse of restraints, solitary

confinement, and the use of psychotropic medication with inadequate oversight.

110. In 2015, an independent consultant retained by DHS, Dr. Kirk Heilbrun, advised

the School that it did not have adequate mental health staff and that one psychologist for 130

boys was insufficient. The consultant also recommended increasing the School's mental health

capacity. DHS, however, did not increase its psychiatric staff.

111. The 2015 consultant report also advised DHS that it was not adequately engaging the families of children at the School and recommended that DHS adopt a number of practices to facilitate communication and contact between the boys and their families. Specifically, the report indicated that DHS expand the use of technology such as Skype and FaceTime to ensure personal contact between the youth and their families. The report noted that this contact is an "important part of rehabilitating antisocial youth" and that youth should be allowed to call home if they do not have money in their state accounts. Despite their own consultant's recommendations, DHS did not implement these reforms.

112. In August 2017, Next Steps Counseling Services ("NSCS"), a mental health agency that serves central Iowa, provided a report to Defendant Foxhoven that concluded that there is "no evidence of adequate or evidence based mental health services being provided" at the School, and that the mental health services that are provided appear to be grossly inadequate. In addition, the report noted that the unlicensed psychologist's caseload is too high and that youth receive inadequate psychological attention—only 15 minutes of time with the psychologist. The NSCS report highlighted the harmful effects of DHS's failure to ensure that youths' relationships with their families are maintained during their placement at the School, and the adverse impact those practices can have on discharging youth to their families in the communities in which they are from.

III. DEFENDANTS SUBJECT THE BOYS AT THE SCHOOL TO POWERFUL PSYCHOTROPIC DRUGS WITHOUT APPROPRIATE CONSENT, WITHOUT A COMPREHENSIVE TREATMENT PLAN, AND WITHOUT ADEQUATELY MONITORING FOR ADVERSE EFFECTS OF THE MEDICATION

113. In place of adequate mental health services, Defendants rely on powerful psychotropic medications in an effort to control the behavior of boys at the school. Under Defendants' policies and practices, however, these potentially dangerous and harmful

medications are administered without the consent of the child's parent or next-of-kin, without any effort to ensure that the potential risks, benefits, adverse side effects and alternatives are reviewed with the youth's parents, and without any other meaningful form of informed consent. Further, the School gives the youth no meaningful choice other than to take the drugs. Defendants also fail to ensure that these medications are prescribed as part of a comprehensive treatment plan addressing all the mental health needs of the child, as required by well-accepted professional standards. Defendants likewise administer these medications without appropriate oversight and without adequately monitoring the effects of the medications on the child.

### A. The School Relies Extensively on Powerful and Potentially Harmful and Dangerous Psychotropic Medications to Control Children's Behavior.

114. As noted above, approximately 66% of the boys at the School have been on psychotropic medications at any given time.

115. Psychotropic medications are powerful drugs that directly affect the central nervous system. Antipsychotics are one of the most powerful and frequently prescribed classes of psychotropic drugs given to children exhibiting symptoms of mental illness. Psychotropic medications can change brain functions and can result in alterations in perception, mood, or consciousness. Serious adverse effects are common for children given psychotropic medications.

116. For many children, including residents of the School, psychotropic drugs are being administered to treat a diagnosis—*e.g.* conduct disorder, ADHD—that the drug was never even designed to address. Such practices, referred to as "off-label" usage, include the use of a drug to treat symptoms of a mental illness for which it has not been tested, the use of a drug to treat patients with conditions for which the drug is contraindicated, and the use of a drug in combination with another drug or drugs that are contraindicated in the label. The federal Food and Drug Administration considers off-label usage to mean the "[u]napproved use of an

34

approved drug." Off-label usage of psychotropic pharmaceuticals is a common practice at the School and compounds the risk to the children to whom the medications are administered.

117. Many psychotropic medications are accompanied by strict warning labels provided by the manufacturer, referred to as "Black Box" warning labels, indicating that the medication has serious (or potentially life-threatening) side effects. For example, the Black Box label for antidepressants warn that these drugs may increase the risk of "suicidal thinking and behavior (suicidality) in children, adolescents, and young adults," and that patients starting these drugs should be "monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior."

118. There are many other well-documented, adverse side effects associated with the use of psychotropic medications, including those that may be immediately apparent and those that develop over time. Patients at times experience drowsiness, dizziness, restlessness, weight gain, dry mouth, constipation, nausea, vomiting, blurred vision, low blood pressure, uncontrollable movements such as tics or tremors, seizures, and a low number of white blood cells, which fight infections. Less immediate side effects that can develop over time include irreversible movement disorders (such as tardive dyskinesia), rigidity, tremors and tics, seizures, weight gain, diabetes, high cholesterol, and kidney, thyroid, liver, and pancreas damage.

119. The risks associated with psychotropic medications are compounded by the practice of administering multiple psychotropic drugs to a patient, a practice known as polypharmacy. The practice of polypharmacy is often used as a chemical straight-jacket to control the behaviors of adolescents, and is employed by the School. Combining psychotropics, however, entails substantial risk. Each medication has its own side effects, and the total number of likely side effects increases when multiple medications are prescribed. Moreover, the side

effects of polypharmacy are not simply cumulative. Taking one drug can alter the side effects of another.

120. The practice of administering psychotropic medications to adolescents entails substantial additional risks. As adolescents' brains and bodies are continuing to develop, these medications also may induce adverse effects more frequently with greater severity. A recent study published in the Journal of Child and Adolescent Psychopharmacology and funded by the U.S. Department of Health and Human Services investigated the adverse effects of psychotropics on children and adolescents given one or more psychotropic medications. It found:

- The number of adverse effects increased with the number of medications being used. In comparison with children and adolescents taking one medication, those taking two drugs reported on average 17% more adverse effects while those taking three or more medications reported on average 38% more adverse effects.

- The side effect profile shifted for children depending upon the number of medications taken. Suicidal thoughts and behavior and self-harm became more frequent with increasing numbers of medication. Increased appetite, sleepiness/fatigue, and tics and tremors were approximately 200% to 300% more prevalent among children taking three or more medications than those taking only one drug.

- The number of adverse effects increased the longer the child was on the medication.

- Polypharmacy regimens including SSRI antidepressants or antipsychotics were especially associated with adverse effects.

121. Professional standards warn that multiple psychotropic medications— polypharmacy—should be used judiciously because of numerous potential risks and possible medication interactions and side effects. Newly detained youth who are taking one or more psychiatric medications require careful assessment and monitoring, and attempts should be made to serially reevaluate the youth or gradually reduce the need for multiple medications.

122. Psychotropic pharmaceuticals may have additional long term adverse effects on adolescents that may not yet be fully understood. As one expert noted in a publication by the

American Bar Association's Center on Children and the Law, "[c]hildren are not just 'mini adults'; they cannot just be given a smaller dose because they have smaller bodies." The little information that is known regarding the long-term effects of these drugs include a delay in physical growth, in both weight and height. Adolescents' unique characteristics can amount to differences in how their bodies process powerful psychotropic drugs. For instance, higher metabolism rates in adolescents can amount to faster elimination of the drugs by the body, meaning a higher likelihood of withdrawal symptoms upon discontinuation during repeated administration.

123. Given the substantial risks associated with the administration of psychotropic pharmaceuticals to children, widely accepted professional standards govern the usage of these drugs. The American Academy of Child and Adolescent Psychiatry ("AACAP"), the leading national professional medical association dedicated to treating and improving the quality of life for children and adolescents, states that "[b]est practice does not involve psychotropic medication as the sole intervention for youth with complex mental health needs. Psychosocial interventions, particularly those that are evidence-based and systematically monitored, are also essential."

124. AACAP practice guidelines also makes clear that a comprehensive psychiatric evaluation of a child should be completed before any pharmacological intervention is considered. Such an evaluation "increases the likelihood that medication interventions will be well conceptualized and hopefully reduces the likelihood of treatment failure and poor adherence."

**B. Defendants Fail to Obtain Informed Consent for the Use of Psychotropic Medications on Children at the School.**

125. Informed consent is a prerequisite to the administration of any medical treatment to a child. Ordinarily, a child's parent or guardian is authorized to consent and the child must

assent to the treatment. But the administration of psychotropic drugs is not an ordinary medical treatment. As noted earlier, these drugs can have extraordinary and life-altering adverse effects that are irreversible. Their effects on the mind and body of a child can be profound. Decisions about whether or not to administer a psychotropic medication to a child require a rigorous decision-making process.

126. Professional standards reflect that psychotropic medications should be used with great caution and only after reviewing the potential risks, benefits, side effects, and alternatives and obtaining informed consent for their use.  AACAP standards state that "[a]lthough particularly important at the time of psychotropic medication initiation, informed consent and assent are ongoing processes. Informed consent involves discussion of target symptoms, likely benefits of a potential treatment, potential risks of treatment, and risks of *not* pursuing the treatment in question. Documentation of the discussion is essential, to provide clear evidence of what occurred."

127. Even in the juvenile justice context, professional standards reflect the need for informed consent for the use of psychotropic medications. AACAP's Guide for Community Child Serving Agencies on Psychotropic Medications for Children and Adolescents provides that juvenile justice detention facilities, like other child-serving agencies, should follow the following guidelines with respect to the administration of psychotropic medications:

- "[p]arents and guardians and the youth must be informed about the potential risks as well as the benefits when giving consent and assent for initiation of a trial of psychotropic medications";

- "[i]nformed consent and assent for the use of medication is necessary. This means that the prescriber provides feedback about the diagnosis and educates the youth and family regarding the youth's diagnosis and the proposed treatment and monitoring plan. The parents must be informed and have a full understanding of the risks and benefits of any medications as well as options for alternative or

complementary treatments before they give their consent to the prescriber for a medication trial"; and

- "[y]outh and families and the professionals working with them need to have an understanding of the medication options that are recommended."

128. The ACA's Commission on Accreditation, in a report issued to the School, likewise recognized that the "standard of practice in the community" requires informed consent for the administration of psychotropic medications in a juvenile justice detention facility, and recommended that the School adopt a "more formal process" for obtaining and documenting informed consent. The School failed to adopt this recommendation, although many states have strict requirements that juvenile justice facilities obtain signed informed consent from a minor's parents before treating the youth.

129. Offering lip service to the importance of informed consent, the School's written policies include a requirement that a licensed mental health professional, in conjunction with the treatment services director at the School, ensures that informed consent is obtained and documented. But the School has never implemented this policy and routinely disregards it.

130. Indeed, notwithstanding its formal policy, the School's actual practice is to administer these powerful and potentially dangerous medications to youth at the School without obtaining the consent of the child's parents and without providing his parents with any information about the medication or its risks. Even the School itself, acting in its capacity of legal guardian for the children, fails to document any measure of informed consent or meaningful oversight over the use of psychotropic medications.

131. If they are advised of the medications at all, parents of boys at the School are typically informed of their child's psychotropic regimen only after the fact; they are typically notified by mail more than a week after the medication is administered. Parents are routinely denied access to the part-time psychiatrist on the phone and told that they are not permitted to

speak with the psychiatrist, even when parents call to inquire as to reasons for a change in medications, to indicate that they are not consenting to the medications, or to provide information as to the young person's past experiences on the medication. No information is provided to the parents about the nature of the medication, the risks, the potential side effects, or the alternatives.

132. Further, the School does not obtain appropriate assent from the youth. Youth to whom drugs are administered are required to sign a form purporting to acknowledge their supposed "consent" to the medications, but the boys at the School have no real choice other than to sign the form. The form contains boilerplate language stating that the boys supposedly have "been informed about the possible risks and benefits" of the medication, but there is no documentation indicating that the youth are in fact given an adequate explanation of the purpose, risks, and alternatives to the prescribed psychotropic drugs. When new drugs are administered, the School routinely does not require the boys to sign a new form, but instead simply adds the newly administered drugs to the previously-signed form, creating the false impression that the child has supposedly consented to the new medication.

133.  Boys at the School are also not given a meaningful choice about whether to take the prescribed medications. While the form contains boilerplate language stating that the youth supposedly "has the right to change my mind and stop medication," boys at the School are routinely disciplined for refusing to take the medication. Failure to take the prescribed medication can result in a deduction of points needed to advance toward release from the School. Boys who refuse to take their medication may also be placed in solitary confinement as punishment.

134. Similarly, the School fails to take any meaningful action with respect to the administration of psychotropic pharmaceuticals in its role as legal guardian for the boys in its custody. The School maintains no documentation reflecting any oversight by the School over the administration of pharmaceuticals or any inquiry by School officials into the nature of the psychotropic pharmaceuticals that have been prescribed for any of the boys, the risks associated with those pharmaceuticals, the alternatives, or any of the other information necessary to make a knowledgeable decision with respect to each child as to whether consent should be granted. Indeed, there is no documentation reflecting that any person at the School acting in the capacity as guardian has provided any measure of informed consent for the administration of these dangerous drugs.

**C.   Defendants Improperly Administer Psychotropic Medications Without a Comprehensive Treatment Plan for Each Child and Without the Ability to Adequately Monitor for and Treat Adverse Effects.**

135. Given the many substantial risks associated with psychotropic medications, AACAP standards make clear that psychotropic medications should only be used for incarcerated youth as part of a comprehensive treatment plan. Accepted professional standards of practice recognize that psychotropic drugs should not be used as the "sole intervention for youth with complex mental health needs" and that "[p]sychosocial interventions, particularly those that are evidence-based and systematically monitored, are also essential." AACAP practice guidelines also state that a comprehensive psychiatric evaluation of a child should be completed *before* any pharmacological intervention is considered; such an evaluation "increases the likelihood that medication interventions will be well conceptualized and hopefully reduces the likelihood of treatment failure and poor adherence."

136. Contrary to these accepted professional standards, the School's practice is to use psychotropic medications as a behavioral management tool, without any comprehensive

treatment plan, without the necessary psychosocial therapy and, often, without a comprehensive psychiatric examination. As previously alleged, the School does not have sufficient mental health staff or other resources to provide the type of comprehensive treatment and the types of therapies that these boys need.

137. The School also does not have sufficient mental health staff or other resources to monitor for adverse effects of the medications or to take appropriate action when such adverse effects occur. It is standard practice at juvenile detention facilities to seek the resources of an in-patient psychiatric facility in the event that a child becomes suicidal or otherwise experiences severe side effects from psychotropic drugs. The practice of the School, by contrast, is to house children in solitary confinement and not seek hospitalization, even where the child is suicidal, experiencing acute psychosis, or engaging in self-harm. In such cases, the child is typically housed overnight in solitary confinement, without the oversight of a psychiatrist or medical doctor.

### D. Defendants are Deliberately Indifferent to Known Substantial Risks of Serious Harm that Result from Their Practices with Respect to Psychotropic Medications.

138. Defendants' practices with respect to the administration of psychotropic medications, as alleged above, subject the boys at the School to a substantial risk of serious harm to which Defendants are deliberately indifferent. These children are provided with powerful, potentially dangerous drugs that can change brain functions and result in altered perception, mood, or consciousness, without any informed consent. The children are exposed to the risk of serious side effects, including acute psychosis, suicidal thoughts and behavior, self-harm, and a host of potential other side effects, likewise without any informed consent. The risk of harm is greatly heightened by Defendants' failure to provide these drugs in conjunction with a comprehensive treatment plan, appropriate psychiatric examinations, and necessary therapy. The

risk of harm is also heightened by Defendants' inability to appropriately monitor for adverse effects of the medication or to take appropriate action when adverse effects occur.

139. In 2015, the Commission on Accreditation for Corrections ("CAC"), an accrediting body for corrections facilities and agencies, audited the School and advised that the School's failure to implement an informed consent policy reflected a departure from the standard practice in the community. Two years later, in August 2017, DHS was provided with a report compiled by NSCS, which also criticized DHS for failing to have a practice to obtain and document informed consent before administering psychotropic pharmaceuticals.

140. In the context of the foster care and Medicaid systems, DHS has recognized the dangers inherent in providing psychotropic medications to children and has implemented oversight procedures and safeguards. No such protection or oversight, however, is provided for youth incarcerated at the School.

## IV. DEFENDANTS IMPROPERLY AND UNNECESSARILY SUBJECT BOYS AT THE SCHOOL TO HARMFUL PHYSICAL PUNISHMENTS WITHOUT REGARD TO THEIR DISABILITIES AND MENTAL ILLNESS

141. Defendants have a practice and policy of subjecting children at the School, including children with significant mental illnesses, to the physical punishment of solitary confinement—often in filthy, foul-smelling seclusion cells—for minor violations of School rules. Boys placed in solitary confinement may be subjected to a further punishment, known at the School as the wrap, a fourteen-point restraint that makes movement nearly impossible. The School makes excessive and unnecessary use of these extreme punishments where they are wholly unnecessary for the safety of the child or others, without regard to the child's mental illness or disability.

142. Many children with mental illness often cannot conform their conduct to the School's disciplinary rules because of their illness; in consequence, youth are often placed in

solitary confinement or subjected to the wrap as a result of their illnesses. Defendants' failure to provide sufficient mental health services to these youth also results in symptomatic behavior giving rise to punishment, instead of the treatment that is needed. These punishments result in long-lasting and substantial harm to all children and are particularly harmful to children already suffering from significant mental illness. Defendants' practices with respect to these punishments substantially depart from accepted professional standards for juvenile justice facilities and expose children at the School to substantial risks of serious harm.

### A. Defendants Use Solitary Confinement as a Harsh and Excessive Punishment for Children.

143. For many years, the School has had a practice of punishing residents by placing them alone in locked cells. Defendants have used various terms for this use of solitary confinement over the years, including the "behavioral stabilization unit," "administrative segregation," "segregation," "disciplinary segregation unit," "special treatment unit," and "isolation program."

144. Twenty-six locked, single-person cells used for punishment purposes are located in Corbett-Miller Hall, a building in the center of the School campus. Any boy incarcerated at the School can be confined in one of these cells. Twelve of the cells are referred to as "solitary cells" and another twelve are referred to as "staffing cells." Although these cells are identical, boys confined to the solitary cells typically have fewer privileges, and are intended to be punished more severely, than the boys confined to the staffing cells.

145. The remaining two cells sit apart from the solitary and staffing cells and are used for the boys who the School intends to punish most severely. One cell is referred to as the "seclusion cell." The other cell contains the wrap. Both cells are windowless. The seclusion cell contains a stainless steel sink and toilet combination. The water is often not turned on. The

seclusion cell is filthy and smells like urine. There are no hygiene products or other amenities within the cell. Boys are routinely placed in the windowless seclusion cell at the discretion of the staff.

146. Each cell at Corbett-Miller is approximately six feet across and nine feet wide. The cell is entered through a large steel door. There is one bolted lock and one handle on the outside of the door, facing the hallway. The door has a small window made of reinforced glass. There is a tiny air gap between the door and the floor. There are no air gaps between the wall and ceiling. There is no slot in the door for food. At mealtime, staff unlock the bolt lock to hand the boys food to eat in their cells. The youth in these cells eat food while sitting on the bed stone, the sitting stone, or the toilet.

147. The solitary and staffing cells are bare. In each cell there is a window that is about three inches wide and two and a half feet tall, a bed stone, and a concrete sitting stone. There is a metal sink and toilet in some of the cells. In other cells, there is a porcelain sink or toilet. The cells have no other furnishings. There is one security camera in a corner of the cell. The seclusion cell does not have a window, but is otherwise identical.

148. The cells at Corbett-Miller Hall used for solitary confinement typically do not have mattresses. At night, guards deliver a mattress pad that is roughly five inches thick to each of the cells. The bed stones on which the youth sleep are approximately one foot off the ground.

149. Youth placed in solitary confinement are routinely denied hygiene products. They are not given soap or hand sanitizer. Youth in the cells are not permitted to use the bathroom outside of the cell. There are no other hygiene products in the cells. Water in the cells is routinely turned off, leaving boys without drinking water, water to wash their hands, or water with which to flush the toilet.

150. Cells at Corbett-Miller Hall remain lit 24 hours a day. At night, a dimmer light is used instead, but the light is never turned off.

151. Boys at Corbett-Miller Hall are routinely strip searched down to their boxers upon placement in solitary confinement. They must wear orange flip flops as shoes.

152. Boys will routinely pass the time in solitary confinement by sitting on the toilet, sitting stone, or bed stone for 22 or 23 hours per day.

153. In order to get the attention of staff, boys in the unit often must scream, pound on the doors, kick the doors, or cover their cameras while screaming to request attention from staff. When those methods prove unsuccessful, boys with mental illness will sometimes resort to self-harming in order to seek staff attention. In particular, while in solitary confinement, children with mental illnesses have tied clothing around their necks, hit themselves in the face, banged their heads on the floor, swallowed sharp objects, and cut themselves.

154. Almost all personal items are banned within the cells at Corbett-Miller Hall. Sometimes boys in the staffing cells are permitted a book, a cup for drinking water, and limited bedding. They are not, however, permitted to have other personal belongings, computers, games or toys like tennis balls, or therapeutic tools like stress balls.

155. Defendants routinely deny youth placed in Corbett-Miller Hall phone calls and family visits. Boys in solitary confinement are routinely denied schooling, as well as access to paper, writing utensils, and educational resources. Aside from one hour of indoor recreation time, they are not permitted any other out-of-cell time except for ten minutes of shower time, and five minutes of hygiene, including shaving.

156.  Youth placed in solitary confinement are routinely denied access to therapeutic programming. As a result, children with mental illness frequently exhibit heightened

symptomatic behavior while at Corbett-Miller Hall, which often results in longer stays, including in the windowless seclusion cells.

**B. Defendants Impose Solitary Confinement for Minor Infractions of the Rules, Without Regard to a Child's Mental Illness and Disability.**

157. Under DHS's written policy, solitary confinement can be imposed on children for a wide range of non-violent and minor infractions. These include "Inappropriate or Inflammatory Language," "Horseplay," "Insubordination," "Lying, Contempt, Misrepresentation," "Interference with Staff in the Course of their duty," "Unsanitary Acts/Conditions," "Contraband/Knowledge of Contraband," and "Tampering."

158. DHS policy also provides examples of the infractions that can result in solitary confinement.  Here too, the examples include a range of minor violations such as "[s]tatements utilizing profanity," "arm-wrestling," "shadow boxing," "[s]moking cigarettes," "placing hair in food products," "grandstanding in front of other students," possessing "pornographic material," and failing to "behave in an orderly manner when a staff member is attending to another situation."

159. In accordance with these policies, Defendants' actual practice is to impose solitary confinement for minor infractions. For example, one boy was placed in solitary confinement for refusing to take a shower. Another youth was placed in solitary confinement for over 36 hours for "Insubordination" and "Failure to comply" after he refused a staff member's instruction to sit by the wall for 15 minutes. Another was confined in solitary confinement for over 40 hours, including two nights, for "Failure to comply" and "Inappropriate language" after he failed to follow staff directions to stop talking and laughing.

160. The vast majority of youth placed at the School have spent at least some time in solitary confinement. Between November 2016 and April 2017, almost three quarters of the

youth confined at the School were placed in solitary confinement at least once. In this six-month

period, 124 youth were placed in solitary confinement for a total of over 9,458.27 hours for all

youth in 1,045 separate stays.

161. The use of solitary confinement for these purposes is particularly inappropriate for

children with mental illnesses, who often are unable to conform their conduct to the School

disciplinary rules because of their illnesses. As a result, youth with mental health diagnoses are

often placed in solitary confinement as a result of behavior that is symptomatic of their illnesses.

The School's failure to adequately provide for the mental health care needs of the boys in its care

makes it likely that children with mental illnesses will spend time in solitary confinement.

162. Youth with mental health illnesses are therefore at a disproportionate risk of

placement in solitary confinement. Youth with mental health illnesses will often spend longer

periods of time in solitary confinement.

### C. Defendants' Use of Solitary Confinement Substantially Departs From Accepted Professional Standards.

163. Defendants' use of solitary confinement at Corbett-Miller Hall substantially

departs from accepted professional standards, which significantly limit any use of solitary

confinement for youth.

164. A number of national organizations have concluded that solitary confinement

should never be used for minors. For example, standards published by NCCHC require that

youth "should be excluded from solitary confinement of any duration." The American Medical

Association and the AACAP similarly oppose the use of solitary confinement for children and

adolescents.

165. The U.S. Department of Justice has also recommended that the use of solitary

confinement for juveniles in federal prisons be prohibited after it found, in a 2012 report, that

"[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."

166. JDAI has published comprehensive standards that prohibit the use of solitary confinement as a disciplinary measure or for any reason "other than as temporary response to behavior that threatens immediate harm to a youth or others." These standards state that detention facilities should "not use room confinement as a substitute for special individualized programming," including educational services and treatment plans developed with mental health staff and the youth's family members. If a young person is placed in solitary, JDAI standards require that the confinement last no longer than four hours and that staff develop individualized programming for the youth or "consult with a qualified mental health professional about whether a youth's behavior requires that he or she be transported to a mental health facility." Moreover, while in solitary, youth must be provided with "reasonable access to water, toilet facilities and hygiene supplies."

167. The Council of Juvenile Correctional Administrators ("CJCA"), an organization comprised of juvenile justice administrators and directors from across the country, advocates that solitary confinement be used with youth only in "situations involving a serious threat by a youth to harm oneself or others."

## D. Defendants' Use of the Wrap Restraint as Punishment is also Unnecessary and Improper.

168. Defendants also have a policy and practice of subjecting youth incarcerated at the School to harmful and unnecessary restraints known as the wrap as additional punishment when they are placed in solitary confinement. The wrap is used inappropriately, where restraint is unnecessary for the safety of the child or others, and without regard to a child's mental illness or

disability. It is disproportionately used as punishment for children engaged in behavior that is symptomatic of their mental illness.

169. The wrap is a fourteen-point mechanical restraint. It is comprised of a bed with three Velcro straps for each leg, two Velcro straps for each wrist, one strap that goes over the midsection of the torso and upper arms, and three larger cloth pieces used over the top of the body of the boy. The wrap bed is depicted in the photograph shown here.



170. If a boy is already restrained in the wrap, guards may strap a second boy to a separate mobile restraint board. The mobile restraint board consists of two restraints for each arm, one across the shoulders, three restraints for each leg, and two Velcro pieces that wrap the full body. Once the wrap bed becomes available, the boy can be dragged there while still strapped to the mobile restraint board.

171. Though the population of boys at the School has not increased in recent years, use of the wrap has. Staff at the School placed youth in the wrap 86 times in 2015, 94 times in 2016, and 109 times during the first seven months of 2017.

172. The School's practice is to use the wrap as punishment when no restraint is otherwise necessary to protect either the child or others. For example, a child who refuses a command to go to the seclusion cell may be carried into the room and placed in the wrap. Children have been placed in the wrap as punishment for spitting on a guard.

173. Staff at Corbett-Miller Hall review a boy's status in the wrap periodically. Once a boy has been restrained in the wrap for an hour, guards will release him from restraints. If the boy commits an infraction while being released, such as cursing, he is subjected to further restraint in the wrap consecutively, sometimes for hours on end.

174. Boys in the wrap are denied requests to use the bathroom, which has caused some boys to have accidents while restrained as evidenced by urine stains reportedly on the wrap.

175. Boys who are held in Corbett-Miller Hall can hear the screams of the boys in the wrap from their cells.

176. Defendants' use of restraints at Corbett-Miller Hall substantially departs from accepted professional standards, which ban the use of such mechanical restraints in juvenile justice facilities.

177. The JDAI's Juvenile Detention Facility Standards, for example, prohibit the use of most mechanical restraints inside facilities. Specifically, they require that "[t]he only mechanical restraints that staff may use in the [juvenile detention] facility are handcuffs," and that restraints should only be used after less restrictive methods have been exhausted and "for the

amount of time necessary to bring the situation under control." This prohibition would include the use of a four or five-point mechanical restraint, as well as the fourteen-point restraint bed.

178. Article 64 of the U.N. Rules for the Protection of Juveniles Deprived of their Liberty states that restraints, when used, should only be used in the following circumstances: "(a) As a precaution against escape during a transfer, provided that they shall be removed when the prisoner appears before a judicial or administrative authority; (b) On medical grounds by direction of the medical officer; (c) By order of the director, if other methods of control fail, in order to prevent a prisoner from injuring himself or others or from damaging property; in such instances the director shall at once consult the medical officer and report to the higher administrative authority."

**E.  Defendants are Deliberately Indifferent to Known Substantial Risks of Serious Harm that Result from Their Practices with Respect to Solitary Confinement and Restraints.**

179. Youth placed in solitary confinement and restraints suffer a substantial risk of serious physical, psychological, and developmental harms to which Defendants are deliberately indifferent.

180. Incarceration practices used in the adult prisons, such as solitary confinement, can have a particularly devastating impact when applied to minors. The NCCHC, among other organizations, has recognized that "children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. They experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation." AACAP has similarly concluded that, "due to their 'developmental vulnerability,'" adolescents are at particular danger of adverse reactions, including depression, anxiety, and psychosis, when exposed to prolonged isolation and solitary confinement.

52

181. Children and adolescents can suffer myriad and severe harms when placed in solitary confinement. Studies have repeatedly demonstrated that youth can suffer severe psychological, developmental, and even physical harm, including depression, anxiety, psychosis, self-mutilation, retraumatization, suicidal ideation, and other serious mental health illnesses. The CJCA has indeed recognized that "[s]ubjecting developing adolescents to isolation can cause permanent psychological damage and multiple studies suggest it is highly correlated with suicide."

182. The National Association of State Mental Health Program Directors, a membership organization comprised of state health officials, has similarly found that the use of seclusion and restraint creates significant risks which include "serious injury or death, re-traumatization of people who have a history of trauma, and loss of dignity and other psychological harm." Defendant Shults, as the Division Administrator for the Department of Human Services Division of Mental Health and Disability Services, is a commissioner for the association.

183. These risks are particularly great for youth with mental health illnesses. Placement in solitary confinement for youth with a history of mental illness or who have experienced traumatic life events can impede cognition, impact behavior, and result in severe exacerbation of previously existing mental conditions. Studies have found that youth with a history of development disabilities are more susceptible to the most severe psychiatric illnesses resulting from solitary confinement and that for youth with a history of mental illness or traumatic life events solitary can impede cognition, impact behavior, and result in severe exacerbation of previously existing mental conditions.

184. International non-governmental organizations have also concluded that solitary confinement is harmful to youth and should not be used. For example, the World Health Organization has recognized that solitary confinement is particularly detrimental to the psychological well-being and cognitive development of children, and the United Nations has deemed the practice "cruel, inhuman, or degrading treatment." A United Nations Special Rapporteur concluded that "the imposition of solitary confinement, of any duration, on children constitutes cruel, inhuman or degrading treatment or punishment or even torture."

185. Solitary confinement also is antithetical to the goal of maintaining safety and security in juvenile detention facilities. When a child is experiencing anger as a symptom of mental illness, use of solitary confinement often results in additional anger, and additional time in solitary confinement. According to the CJCA, "[a]cademic research continues to show that placing incarcerated youths in isolation has negative public safety consequences, does not reduce violence and likely increases recidivism." Further, "[t]here is no research showing the benefits of using isolation to manage youths' behavior." By contrast, facilities that have reduced or eliminated the use of solitary confinement have seen a reduction in violence and infractions. These facilities have ensured that separation only occurs after multiple attempts to defuse tensions, and not as an alternative for controlling the manifestations of mental illness.

186. In 2013, DHS was provided with evidence-based studies that documented the harmful effects of restraints and solitary confinement at the Iowa Juvenile Home, otherwise known as the Girls State Training School. An investigation by the *Des Moines Register*, for example, detailed the significant dangers of solitary confinement and improper restraints for youth at this facility. Governor Branstad convened the Iowa Juvenile Home Protection Task Force, which included among its members Defendant Foxhoven and the former director of DHS,

Charles Palmer. The Task Force concluded, among other things, that the solitary "control rooms" at the facility "contribute to the creation of the 'corrections culture'" and that "the placement of the rooms away from the living units does not reflect current practice." The Iowa Juvenile Home was subsequently closed.

187. On or about August 7, 2017, Disability Rights Iowa, co-counsel for Plaintiffs here, provided Defendants with a copy of its report on the treatment of boys at the School, presenting detailed evidence of the School's improper use of solitary confinement and restraints, and providing Defendants with additional notice of the substantial risks of serious harm that Class members suffer as a result.

188. Also on or about August 7, 2017, Defendants were provided with the report compiled by NSCS that reviewed, among other practices, the use of restraints and solitary confinement at the School. The NSCS report discussed the harmful effects of restraints, solitary confinement, inadequate mental health treatment, and inadequate oversight of the administration of psychotropic drugs at the School.

189. The NSCS report also concluded that restraints and solitary confinement are particularly harmful for youth suffering from mental illness and for those who have experienced trauma. The report noted that these harmful practices lead to an "increase [in] mistrust of mental health professionals, causing harm to the relationship, as well as post-traumatic symptoms like intrusive thoughts, nightmares, and an increased startle response following restraint triggers."

190. The NSCS report recommended the decrease of restraints and solitary, indicating that these practices were harmful to youth at the School and evidence a lack of adequate mental health treatment. Additional recommendations for improvement included placing a stronger emphasis on relationship improvement with residents, improving the environment to help build

those relationships, building evidence-based practices, and additional mental health staff and alternative treatment facilities.

191. The NSCS report indicated the harmful effects caused by the overuse of restraints, finding that youth subjected to the overuse of restraints are at risk of traumatization and re-traumatization. It found, for example, that of 10 youth interviewed who had been subject to restraints, 9 had been physically injured. Further, the report found that there "was no evidence of debriefing [following the use of restraints] with a goal of reduction in restraints through staff modifications or with a focus to reduce post-traumatic responses to an extreme stressor." Noting that youth who have been victims of sexual abuse might experience restraint as a sexual violation by the staff person using the restraint, the report indicated that such practices are especially harmful to children and adolescents who are victims of sexual abuse.

192. In a May 2012 report, the CAC expressed similar concern that the restraint bed had been used 80 times in the previous year at the School—far fewer times than the wrap has been employed in recent years, including 109 times in the first seven months of 2017. The report urged the School to review its use of restraints, especially in light of national trends away from the use of restraints.

## CLASS ALLEGATIONS

193. Plaintiffs properly maintain this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

194. The Class is defined as all boys and youth who are confined to the Boys State Training School, in Eldora, Iowa, now or in the future, and who have a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of Iowa. All residents of the School with diagnoses for a mental health condition

specified in the DSM-IV or DSM-5 are members of the Class. All residents of the School receiving psychotropic medications also are members of the Class.

195. The Class is sufficiently numerous to make joinder impracticable. As many as 130 boys can be placed at the School. There are currently approximately 110 boys housed there. Between January 1, 2013 and May 9, 2017, the School housed 893 different youth. Approximately 66% of the residents at the School have been administered psychotropic medications. The majority of youth at the School had a diagnosis as specified in the DSM-IV or DSM-5. Further, the fluid nature of the class, with boys entering, being discharged, and in some cases returning to the School, as well as the unknown identity of future residents make joinder impracticable.

196. Plaintiffs raise questions of fact and law that are common to all members of the Class.

197. Questions of fact and law common to the Class include:

    a. Whether Defendants, through their actions and inaction, have a practice and policy of failing to provide adequate mental health treatment that result in harm and substantial risks of serious harm to the Class;

    b. Whether Defendants, through their actions and inaction, have a practice and policy of failing to adequately monitor and oversee the administration of psychotropic medications, and to obtain informed consent, that result in harm and substantial risks of serious harm to the Class;

    c. Whether Defendants, through their actions and inaction, have a practice and policy of subjecting youth at the School to unnecessary stays in solitary confinement that result in harm and substantial risks of serious harm to the Class;

    d. Whether Defendants, through their actions and inaction, have a practice and policy of subjecting youth at the School to harmful mechanical restraints that result in harm and substantial risks of serious harm to the Class;

    e. Whether Defendants' actions and inaction with respect to the Class violate the Eighth and/or Fourteenth Amendments to the U.S. Constitution;

     f.   Whether Defendants' actions and inaction with respect to the Class violate Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and

     g.   Whether the Class is entitled to declaratory and injunctive relief to vindicate the rights that they have been denied.

198. The claims that Named Plaintiffs raise, and the resulting harms and substantial risks of serious harm, are typical of those of the Class.

199. The Named Plaintiffs will fairly and adequately represent the interests of the Class. There are no conflicts among the Named Plaintiffs and any members of the Class. The Next Friends are dedicated to representing the best interests of the Named Plaintiffs, and the undersigned counsel have ample experience in litigating civil rights and class action lawsuits.

200. Defendants have acted or refused to act on grounds that are generally applicable to the Class and injunctive and declaratory relief are appropriate respecting the Class as a whole.

## FIRST CAUSE OF ACTION

**(Substantive Due Process Under the Fourteenth Amendment to the U.S. Constitution; Asserted by All Named Plaintiffs and the putative Class, Against All Defendants)**

201. Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

202. When the state takes a child into its custody, it assumes a duty under the Fourteenth Amendment to protect the child from harm and substantial risks of serious harm.

203. Plaintiffs have a substantive due process right that includes, but is not limited to: the right to be free from and protected from physical, psychological, and emotional harm; the right to necessary treatment, care, and services; the right not to deteriorate physically, psychologically, or emotionally while in state custody; and the right to be free from substantial risks of the above-mentioned harms.

204. Defendants have a practice and policy of failing to provide members of the Class with necessary mental health treatment, subjecting them to the inadequate provision of mental health care, the administration of dangerous psychotropic medication without adequate oversight or informed consent, and the unnecessary use of solitary confinement and mechanical restraints as inappropriate physical punishment, as alleged above, in a manner that infringes on their substantive due process right to safety while in care.

205. Defendants' acts and omissions constitute a substantial departure from accepted professional judgment, practice, and standards with respect to the treatment of youth in juvenile justice settings.

206. Moreover, Defendants know of a substantial risk of serious harm that these youth will suffer as a result of these practices and policies. Defendants' actions and inaction shock the conscience and are in deliberate indifference to serious, known health and safety needs of residents, and create substantial risks of serious harms in violation of the Named Plaintiffs and Class members' rights under the Fourteenth Amendment.

## SECOND CAUSE OF ACTION

**(Prohibition on Cruel and Unusual Punishment Under the Eighth Amendment to the U.S. Constitution, as applied through the Fourteenth Amendment; Asserted by All Named Plaintiffs and the putative Class, Against All Defendants)**

207. Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

208. The Eighth Amendment prohibits the imposition of cruel and unusual punishment on convicted inmates and incarcerated juveniles, including by exercising deliberate indifference to substantial risks of serious harm, inhumane conditions, and inadequate medical and mental health care.

209. Defendants have a practice and policy of failing to provide members of the Class with necessary mental health treatment, subjecting them to the administration of dangerous psychotropic medication without adequate oversight or informed consent, and the unnecessary use of solitary confinement and mechanical restraints as inappropriate physical punishment, as alleged above, in a manner that infringes on their Eighth Amendment rights.

210. Moreover, Defendants know of a substantial risk of serious harm that these youth will suffer as a result of these practices and policies. Defendants' actions and inaction are in deliberate indifference to serious, known health and safety needs of residents in violation of the Named Plaintiffs and Class members' rights under the Eighth Amendment.

## THIRD CAUSE OF ACTION

**(The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; Asserted by all Named Plaintiffs and the putative Class, Against All Defendants)**

211. Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

212. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

213. The Named Plaintiffs and members of the Class have mental impairments that substantially limit one or more major life activities, or have a record of such impairments, and therefore have a disability as defined by the ADA, 42 U.S.C. § 12102, and its implementing regulations, 28 C.F.R. § 35.108.

214. The Named Plaintiffs and members of the Class are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its implementing regulations, 28 C.F.R. § 35.104.

215. Defendants, named in their official capacities, are each a public entity as defined by the ADA, 42 U.S.C. § 12131, and its implementing regulations, 28 C.F.R. § 35.104.

216. Defendants violate Plaintiffs' rights under Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, and its implementing regulations.

217. Defendants deny Plaintiffs the opportunity to participate in the School's programming and services on the basis of their disability. 28 C.F.R. § 35.130(b)(1).

218. Defendants utilize criteria and methods of administration that have the effect of discriminating against Plaintiffs on the basis of their disability, and that defeat or substantially impair the accomplishment of the School's objectives with respect to Plaintiffs. 28 C.F.R. § 35.130(b)(3).

219. Defendants fail to make reasonable modifications to their policies, practices, and procedures that are necessary to avoid discrimination against Plaintiffs on the basis of their disability. Such reasonable modifications would not fundamentally alter the nature of the Defendants' services, programs, or activities, and instead would further the School's mission. 28 C.F.R. § 35.130(b)(7).

220. Defendants fail to administer services, programs, and activities for Plaintiffs in the most integrated setting appropriate to their needs, including by placing them in Corbett-Miller Hall. 28 C.F.R. § 35.130(d), § 35.152(b)(2).

221. Defendants' inadequate provision of mental health care, the administration of dangerous psychotropic medication without adequate oversight or informed consent, and the

unnecessary use of solitary confinement and mechanical restraints as inappropriate physical punishment do not constitute legitimate safety requirements necessary for the safe operation of the School's services, programs, or activities.

## FOURTH CAUSE OF ACTION

**(Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Asserted by all Named Plaintiffs and the putative Class, Against All Defendants)**

222. Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

223. Section 504 of the Rehabilitation Act provides in relevant part that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

224. The Named Plaintiffs and members of the Class have mental impairments that substantially limit one or more major life activities, or have a record of such impairments, and therefore have a disability for purposes of the Rehabilitation Act and its implementing regulations, 45 C.F.R. § 84.3(j).

225. The Named Plaintiffs and members of the Class are "qualified individuals with disabilities" for purposes of the Rehabilitation Act and its implementing regulations, 45 C.F.R. § 84.3(l)(4).

226. Defendants each operate a "program or activity" that receives federal financial assistance for purposes of the Rehabilitation Act, 29 U.S.C. § 794(b), and its implementing regulations, 45 C.F.R. § 84.3.

227. Defendants violate Plaintiffs' rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

228. Defendants deny Plaintiffs the opportunity to participate in the School's programming and services on the basis of their disabilities. 45 C.F.R. § 84.4.

229. Defendants fail to afford Plaintiffs' aids, benefits, and services in the most integrated setting appropriate to their needs, including by placing them in Corbett-Miller Hall. 45 C.F.R. § 84.4(b)(2).

230. Defendants utilize criteria and methods of administration that have the effect of discriminating against Plaintiffs on the basis of their disability, and that defeat or substantially impair the accomplishment of the School's objectives with respect to Plaintiffs. 45 C.F.R. § 84.4(b)(4).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

    a.   Assert subject matter jurisdiction over this action;

    b.   Order that Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure and appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

    c.   Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful Defendants' conduct as alleged herein as a violation of the Plaintiffs' right to be free from harm and substantial risks of serious harm under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution or as a violation of Plaintiffs' right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, as a violation of Plaintiffs' rights under the Americans with Disabilities Act, and as a violation of Plaintiffs' rights under the Rehabilitation Act;

    d.   Grant permanent injunctive relief to enjoin Defendants from subjecting Plaintiffs to policies and practices that violate their constitutional and federal statutory rights, including as follows:

    i.   Order Defendants to ensure the provision of adequate mental health care at the School including by, but not limited to, ensuring adequate mental health staffing, the provision of emergency mental health treatment, individualized therapy plans and treatment, and adequate discharge planning;

    ii.   Order Defendants to ensure appropriate oversight of the administration of psychotropic medications, including by, but not limited to, obtaining and documenting informed consent for the use of psychotropic medications, administering psychotropic medications only as part of comprehensive treatment plans, and adequately monitoring for and treating adverse side effects that result from the administration of psychotropic medications;

    iii.   Enjoin Defendants from placing members of the Class in solitary confinement for disciplinary or punitive purposes or for any reason other than a rare and temporary response to avoid imminent serious physical harm to persons; and

    iv.   Enjoin Defendants from employing mechanical restraints within the institution except as rare and temporary responses necessary to prevent imminent and serious physical harm to persons and as ordered by a medical or mental health professional.

e.   Appoint a monitor to oversee implementation of this injunctive relief.

f.   Award reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 12205, 42 U.S.C. § 1988 and Federal Rules of Civil Procedure 23(e) and (h); and

g.   Grant such other relief as the Court may deem just and proper.

Dated: February 16, 2018

CHILDREN'S RIGHTS, INC.

/s/ Harry Frischer
Harry Frischer, *admitted pro hac vice*
Joshua Rosenthal, *admitted pro hac vice*
Catherine Frizell, *admitted pro hac vice*
88 Pine Street, Suite 800
New York, NY 10005
212-683-2210
212-683-4015 (fax)
hfrischer@childrensrights.org
jrosenthal@childrensrights.org
cfrizell@childrensrights.org

DISABILITY RIGHTS IOWA

/s/ Nathan Kirstein
Nathan Kirstein (AT0010967)
Jane Hudson (AT0011646)
400 E. Court Avenue, Suite 300
Des Moines, IA 50309
515-278-2502
(515) 278-0539 (fax)
jhudson@driowa.org
nkirstein@driowa.org

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of Notice of Electronic Filing to the following CM/ECF registrants:

Gretchen Witte Kraemer
Anagha Dixit
Matthew Gillespie
Assistant Attorneys General
Attorney General of Iowa
Hoover State Office Building, 2nd Floor
Des Moines, IA 50319
Telephone: 515/281-8330 Fax: 515/281-7219

Respectfully submitted,

CHILDREN'S RIGHTS, INC.

/s/ Harry Frischer
Harry Frischer, *admitted pro hac vice*
88 Pine Street, Suite 800
New York, NY 10005
212-683-2210
212-683-4015 (fax)
hfrischer@childrensrights.org