1

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE SOUTHERN DISTRICT OF IOWA
                             CENTRAL DIVISION


- - - - - - - - - - - - - - - X
G.R.X., Through His Next Friend :
H.R.X; J.S.X., Through His Next :
Friend D.S.X.; C.P.X., Through  :
His Next Friend S.P.X.; K.N.X., :
Through His Next Friend Rachel   :
Antonuccio, For Themselves and  :
Those Similarly Situated,        :
                                 :
        Plaintiffs,              :
                                 :
vs.                              :     Case No. 4:17-cv-00417
                                 :
JERRY FOXHOVEN, in his Official  :
Capacity as Director of Iowa     :
Department of Human Services;    :
RICHARD SHULTS, in his Official  :
Capacity as Administrator of     :
the Division of Mental Health    :
and Disability Services; and     :
MARK DAY, in his Official        :
Capacity as Superintendent of    :
the Boys State Training School,  :     HEARING TRANSCRIPT
                                 :
        Defendants.              :
- - - - - - - - - - - - - - - X



                              Judge's Chambers, Fourth Floor
                              U.S. Courthouse
                              123 East Walnut Street
                              Des Moines, Iowa
                              Wednesday, March 14, 2018
                              9:01 a.m.


BEFORE:  THE HONORABLE HELEN C. ADAMS, Chief Magistrate Judge.



                   KELLI M. MULCAHY, CSR, RMR, CRR
                      United States Courthouse
                   123 East Walnut Street, Room 115
                       Des Moines, Iowa 50309

2

```
APPEARANCES:

For the Plaintiffs:         NATHAN D. KIRSTEIN, ESQ.
(Via Telephone)             Disability Rights Iowa
                            400 East Court Avenue, Suite 300
                            Des Moines, Iowa  50309

                            HARRY FRISCHER, ESQ.
                            CATHERINE McGUIRE FRIZELL, ESQ.
                            Childrens Rights
                            88 Pine Street, Suite 800
                            New York, New York  10005

For the Defendants:         MATTHEW K. GILLESPIE, ESQ.
(Via Telephone)             ANAGHA DIXIT, ESQ.
                            Assistant Attorneys General
                            Hoover State Office Building
                            1305 East Walnut Street
                            Des Moines, Iowa  50319
```

1          P R O C E E D I N G S

2          (In chambers with counsel present via telephone.)

3          THE COURT:  Good morning.  This is Judge Adams, and

4    we're here this morning in G.R.X., et al. vs. Foxhoven, et al.,

5    and that is Civil Case No. 4:17-417.

6          First thing I would like to do is take a roll call.  Who do

7    I have on the phone on behalf of the plaintiffs?

8          MR. FRISCHER:  Good morning, Your Honor.  This is

9    Harry Frischer from Childrens Rights, and with me on the phone

10   is Katherine Frizell.

11         THE COURT:  All right.  And, Mr. Frischer, are you

12   going to argue?

13         MR. FRISCHER:  Yes, Your Honor.

14         THE COURT:  Okay.

15         MR. KIRSTEIN:  Your Honor, this is Nathan Kirstein

16   with Disability Rights Iowa.

17         THE COURT:  All right.  And then who do I have on the

18   line on behalf of the defendants?

19         MR. GILLESPIE:  Good morning, Your Honor and counsel.

20   This is Matthew Gillespie on behalf of Defendants with Ana

21   Dixit.

22         THE COURT:  And, Mr. Gillespie, are you going to

23   argue?

24         MR. GILLESPIE:  Yes, Your Honor.

25         THE COURT:  All right.  I do have a court reporter

4

1    here with me so what I'm going to ask is that before you say

2    anything, you please state your name first so that she can make

3    sure she gets down the correct person and what they're saying.

4         Also, I would ask that you speak slowly so that she can

5    also capture everything that you say, and I would appreciate

6    that.  And also, wait until everybody else is finished before

7    you start to talk so she's not trying to capture two voices.

8         So what I have in front of me for today is a hearing with

9    respect to a motion for independent medical examination under

10   Federal Rule of Civil Procedure 35, and that motion was filed by

11   the defendants.  I have had an opportunity to review the filings

12   in the case related to the motion so I have had an opportunity

13   to review the actual motion and supporting documents, the

14   plaintiffs' resistance to that, and also the reply that the

15   defendants have filed in that regard.

16        Just so everybody knows, we need to be done by a little bit

17   before 10 because the court reporter has another assignment at

18   10 o'clock, and I want to make sure and get her there on time.

19        So we'll go ahead and get started.  It's Defendants'

20   motion, so I'm going to let you go ahead and argue.

21        A couple of questions that I have for both parties.  Number

22   one, I just want to make sure on the record that the issue about

23   whether or not the plaintiffs' mental condition is in

24   controversy is undisputed here.  I assume it is from the

25   briefings, but I just want to make sure that that's the case.

1    Secondly, I would like Defendants to specifically address

2  the issue of what the good cause is for the examinations.  And

3  then I also would like to have some understanding about this

4  particular examiner and why Defendants think that she would be

5  an appropriate examiner with respect to all of the individuals

6  that would be evaluated by her.

7    And then also same questions for the plaintiff, obviously,

8  with the reverse being why they don't think she would be an

9  appropriate examiner.

10    And then also I would like to know from the plaintiffs if

11  there are any specific conditions that you believe would be

12  appropriate if the Court were to allow an examination under Rule

13  35.

14    All right.  With those questions, and I may have more as we

15  go, but I just at least wanted to set those out for you, we'll

16  go ahead with the defendants.

17    Mr. Gillespie, you can go ahead with your argument.

18      MR. GILLESPIE:  Thank you, Your Honor.  Again, this is

19  Matthew Gillespie for the defense.

20    This hearing today is about our Rule 35 motion for mental

21  health examinations for the named plaintiffs in this case.  The

22  crux of the lawsuit against the State Training School is that

23  the plaintiffs and putative class members have serious health

24  issues, mental health issues.

25    Plaintiffs, from our view, have conceded that the mental

1   health of their clients is in controversy by not contesting that

2   in our reading of their resistance, but regardless, under the

3   facts alleged in the amended -- first amended complaint, it's

4   clear that mental health is a foundation to their claims.

5       Defendants are seeking comprehensive mental health

6   evaluations of the named plaintiffs.  Attempts to reach a

7   cooperative solution have been unsuccessful.  Now, although

8   we've determined that Dr. Thomas is the expert in the field,

9   should be given the flexibility to develop a psychologically

10  meaningful assessment, our motion reflects that this evaluation

11  would give us a comprehensive review of the plaintiffs' mental

12  health history, it would offer Dr. Thomas' impressions, it would

13  assess the students' needs, it would offer recommendations, and

14  it would offer her opinion regarding some of the facts in the

15  complaint.

16      Now, the decision to order a mental health evaluation is in

17  the Court's discretion upon a showing of good cause, which I'll

18  talk about here in a minute.  We believe that such showing has

19  been made here.

20      Nonetheless, while a Rule 35 should be construed liberally

21  in favor of granting discovery, its application is left to the

22  sound discretion of the court.  And I have a citation for that,

23  which is Simpson vs. University of Colorado, 220 F.R.D. 354,

24  page 362.

25      So the good cause analysis is a two-step analysis, as we

1   mentioned in our initial brief, and the first step of that

2   analysis is the need for the information, and, as our brief

3   reflects, the nature of the plaintiffs' claims, we feel,

4   fulfills this requirement.

5       Mental health is front and center in their claim.  They

6   allege that their clients have suffered serious -- or that their

7   clients have serious mental health needs that are not being met

8   by the school and that the school's practices have actually been

9   harmful to their mental health.

10      Now, it's our position that we cannot meaningfully rebut

11  either of these premises without a comprehensive evaluation of

12  the plaintiffs, and the scope of the evaluation, as we've set

13  out in our motion, reflects this purpose.

14      Allowing the same mental health professional to conduct

15  assessments on each of the named plaintiffs allows us to have

16  kind of a baseline standard by which we can compare the mental

17  health needs of the individuals using common criteria.

18      The second step of the good cause analysis is the lack of a

19  means of obtaining the information elsewhere, and this was a

20  focus of Plaintiffs' resistance.  Plaintiffs are correct that

21  the named plaintiffs here have undergone previous evaluation;

22  however, their claim is based on very specific allegations of

23  harm resulting from the school's actions or inactions.  None of

24  the previous evaluations have been done with that purpose in

25  mind.

1       Regardless, almost all of the evaluations that Plaintiffs

2   cite that have taken place previously are quite dated.  Most are

3   over a year old.  And given the nature of this case, Defendants

4   are entitled to an up-to-date evaluation.  This is particularly

5   true given the fact that Plaintiffs -- the relief that they're

6   seeking is prospective in nature.  It's important to get a

7   current look at the mental health issues of the named

8   plaintiffs.

9       Regardless, we think it's informative here there's a number

10  of cases that say that even within a single lawsuit, courts are

11  free to order multiple evaluations upon a showing of good cause,

12  and I have a couple of citations for that as well.  One is from

13  the Middle District of Louisiana, Sadler vs. Acker, which is 263

14  F.R.D. 333, page 336; and from the Southern District of Texas,

15  Ornelas vs. S. Tire Mart, L.L.C., which is 292 F.R.D. 388, page

16  392.

17      From our perspective, it would be extremely prejudicial to

18  the defense to require us to defend this lawsuit based on mental

19  health evaluations that were performed for entirely different

20  purposes.

21          THE COURT:  Can you tell me --

22          MR. GILLESPIE:  Now, in their --

23          THE COURT:  Mr. Gillespie, can you tell me how these

24  tests would be different than the ones that have been conducted?

25  Do you have a sense of how they'll be different?  Is it

1  different tests that will be done or can you give me some idea

2  in that regard?

3       MR. GILLESPIE:  So with the disclosure that I do not

4  have a background in psychology, my understanding is that this

5  evaluation would be more in-depth, it would be more targeted in

6  some respects with regard to some of the allegations in the

7  complaint, just understanding the cause and effect there, and it

8  would be -- the idea here is that it would be comprehensive.

9     Right now we have a lot of information about the mental

10  health history of the named plaintiffs, and, as Plaintiffs point

11  out, there have been previous mental health evaluations, but

12  this would help us to organize the historical narrative of their

13  mental health into something that can be looked at and serve as

14  kind of a comprehensive resource for us, Your Honor.

15       THE COURT:  And do you have any idea from the expert

16  that you're proposing, Dr. Thomas, how long these examinations

17  would take for each of the plaintiffs?

18       MR. GILLESPIE:  So our request as it is right now is

19  for an entire day, with appropriate breaks in between there, for

20  the named plaintiffs.  My guess would be that in actuality it

21  could end up being less time than that, but I think that as part

22  of the goal of having something that's kind of this level of

23  depth that a day the expert felt was appropriate.

24       THE COURT:  And based on what you know from Dr. Thomas

25  at this point, would the evaluation consist of both her asking

1  questions of the plaintiffs as well as having those plaintiffs

2  take certain psychological or other types of tests?

3          MR. GILLESPIE:  Yes, Your Honor, that's my

4  understanding.

5          THE COURT:  Okay.  Thank you.

6          MR. GILLESPIE:  Absolutely.

7          THE COURT:  You can go ahead.

8          MR. GILLESPIE:  There were a couple of points that

9  Plaintiffs had raised in their resistance that I wanted to

10  address as well, the first being the concern that the proposed

11  evaluation, the examination, would not be in line with best

12  practices.  In support of that argument, they submitted an

13  affidavit from a Mr. Koch.

14      With all due respect to Mr. Koch, I think that in this

15  context his affidavit is entitled to very little weight.  As an

16  initial matter, it appears that his background is in social work

17  and not psychology, and, comparatively, Dr. Thomas is a

18  board-certified forensic psychologist.  She has both her

19  master's and her Ph.D. in clinical psychology, and she has

20  substantial experience in her field.

21      As the court in Kansas, the district court in Kansas,

22  stated in Hertenstein, which is 189 F.R.D. 620, page 624, the

23  court can assume that an expert will conduct the exam in a

24  professional and ethical manner, and Plaintiffs have no basis

25  that they've articulated to date to suggest that Dr. Thomas

1  would do anything otherwise.

2      And as I mentioned before, speaking, since you had raised

3  this, Your Honor, about Dr. Thomas' appropriateness in this

4  context, her background is in forensic psychology, which is a

5  field of psychology which I can't speak incredibly intelligently

6  to because, again, my background is not in psychology, but that

7  intersects psychology with the justice system.  So she has

8  substantial experience involved with psychological matters that

9  go before the courts and that relate to the criminal justice

10 system, which we think is appropriate here.

11      And on that note, there are not many board-certified

12 forensic psychologists in the state of Iowa, and Dr. Thomas is

13 one, which speaks to her -- which speaks to her expertise here.

14          THE COURT:  And can you --

15          MR. GILLESPIE:  Regardless, though, I would

16 reiterate -- I'm sorry.

17          THE COURT:  Mr. Gillespie, one more question for you

18 along this line.

19          MR. GILLESPIE:  Yes, Your Honor.

20          THE COURT:  Can you tell me what is her experience

21 breakdown with respect to dealing with minors versus adults in

22 forensic psychology?

23          MR. GILLESPIE:  Your Honor, you know, I don't know

24 specifically what her specific experience dealing with juveniles

25 is, but I do know that she has extensive experience dealing with

1  people who have serious mental health issues and concerns and

2  she knows how to and has been trained with how to address those

3  individuals with the appropriate sensitivity.

4      To that regard, I would also mention again that she was the

5  evaluator for Plaintiff G.R.X. in September, which came upon the

6  request of Plaintiffs' counsel in this case, and there was no

7  objection made at that time, and, as far as I'm aware, there

8  were no concerns that were -- that have been raised at that time

9  or have been raised since regarding her ability to evaluate a

10  juvenile.

11         THE COURT:  What were the -- can you tell me what the

12  circumstances were regarding that evaluation?  Why was that

13  evaluation requested, if you know?

14         MR. GILLESPIE:  Yes, Your Honor.  So in our reply

15  appendix, we include the correspondence that precipitated that

16  evaluation, and that came from Plaintiffs' counsel that was

17  concerned that there were -- and I'm sure they'll correct me if

18  I'm misstating anything here.  They were concerned there were

19  contradictory diagnoses and there hadn't been kind of a baseline

20  evaluation by which to evaluate G.R.X.'s mental health needs.

21      So this evaluation was ordered by the juvenile court, and

22  Dr. Thomas provided the evaluation on behalf of DHS, and those

23  documents are provided as a part of our reply appendix.

24         THE COURT:  Okay.  Thank you.

25         MR. GILLESPIE:  Yes, Your Honor.

1    One thing that I wanted to reiterate here too is that the

2  plaintiffs are the ones that have placed their mental health at

3  issue, and the defendants are entitled to discovery on that.

4  The issues that Plaintiffs raised would be more appropriate, in

5  our view, in an argument as to the weight of the evidence, when

6  the time comes for that, rather than whether to if the

7  defendants are entitled to the discovery.

8    Defendants [sic] have also argued that we have not

9  specified enough detail about our proposed examination.  To that

10  we say that we have -- we have proposed times, which we have not

11  yet heard a response to, which is March 19th through the 23rd.

12  We have indicated that these will be day-long evaluations.  We

13  have indicated the place for the student center at the school,

14  that the Eldora school would be an appropriate location, and

15  that we are willing to reach an agreement with regards to

16  G.R.X., the student who has been discharged from the school.

17    And we have -- excuse me -- indicated the manner,

18  conditions, and scope; that they will be full psychological

19  evaluations that will provide a history for the named plaintiffs

20  that will be conducted one-on-one with Dr. Thomas and within the

21  parameters that I mentioned earlier.

22    Other courts have similarly looked at Rule 35 requests that

23  contain similar amounts of detail and found them sufficient; the

24  Kansas case that I cited earlier, the Hertenstein case, and then

25  the case that we cited in our brief, and then additionally there

1    is a case from the District of -- the United States District

2    Court for the District of Columbia called Smith vs. Cafe Asia,

3    which the citation is 724 F.Supp. 2d 125, pages 126 to '28,

4    which we think provides a very analogous analysis of the issue.

5        And the final issue that I wanted to address here just

6    initially had to do with concerns regarding the independence of

7    Dr. Thomas, and that goes to the previous evaluation that we

8    were just speaking about, Your Honor.

9        Dr. Thomas, to be clear, has never served G.R.X. or any of

10   the named plaintiffs in a therapeutic capacity.  The reply

11   appendix shows that this was done -- that the evaluation that

12   was done in September for G.R.X. was done upon Plaintiffs'

13   counsel's request and was done on behalf of DHS, not on behalf

14   of the student, G.R.X., and that the purpose of that evaluation

15   was not therapeutic in nature either.

16       And in the purpose and non-confidentiality statement to her

17   report, she makes clear that she has told G.R.X. about the scope

18   of the evaluation and that the evaluation itself was not

19   confidential, so there is no concern here about independence.

20       And so, Your Honor, we would ask that you grant our motion

21   for this Rule 35 mental health examination.

22           THE COURT:  All right.  Thank you very much.

23       All right.  We'll go ahead now and have Mr. Frischer argue

24   on behalf of the plaintiffs.

25           MR. FRISCHER:  Thank you, Your Honor.  This is Harry

1   Frischer.

2        We oppose the Rule 35 exam for a number of independent

3   reasons.  First and foremost is that the training school's

4   already subjected these boys to psychological examination after

5   psychological examination after psychological examination.

6   There's no shortage of examinations here, and we've submitted a

7   long list of them for each class representative.

8        With respect to G.R.X., for example, the examination that

9   Defendants themselves annex to their reply shows that it was

10  done in September 2017.  There is no showing, certainly, on the

11  motion papers as to why that examination is deficient, why the

12  other examinations are deficient, or why the State needs yet

13  another examination now, six months, only six months, after the

14  last comprehensive examination was done.

15       And let me address the first question Your Honor asked as

16  to whether the mental condition of these boys is at issue, and

17  the answer is it's in issue in some respects, and the respects

18  that it's in issue are important here, Your Honor.

19       The fact that these boys were diagnosed with mental illness

20  comes from the very evaluations that the defendants themselves,

21  that the school itself has done.  It's from those evaluations

22  that the allegations of the complaint were taken, and it's those

23  evaluations make clear that these boys were diagnosed with

24  serious mental illness while in the custody of the school by

25  mental health professionals chosen by the school and, in some

1  cases, on staff employed by the school.

2       What we allege in the complaint is that these boys, and the

3  class more generally, did not get the treatment that they needed

4  based on these diagnoses for reasons that are alleged in the

5  complaint; mainly, that the school has not employed a sufficient

6  array of professionals, has not provided a sufficient array of

7  mental health treatments for the boys that they themselves

8  evaluated.

9       That's what's at issue, and that issue does not indicate

10  that the boys need yet another duplicative examination at this

11  time, six months after the last evaluation, which Mr. Gillespie

12  said the purpose of which was to provide a baseline evaluation

13  to see what treatment these boys needed.

14       And, frankly, the reply that Defendants have submitted is

15  remarkable in a number of respects.  It attaches the report of

16  Dr. Thomas, which shows that G.R.X. had certain diagnoses,

17  needed a certain form of treatment, and then shows extensive

18  correspondence after that report showing that G.R.X. didn't get

19  the treatment that Dr. Thomas said specifically was necessary.

20       Now, we've submitted a line of authority showing a couple

21  of things.  One is that Rule 35 exams should be denied where

22  it's duplicative of prior exams and unnecessary, and, second,

23  that the Rule 35 exams should be denied when the information is

24  available by less intrusive means, such as reviewing the medical

25  records of the existing diagnoses and treatment of the boys,

1  taking testimony from the medical professionals who previously

2  treated and diagnosed the boys.  And, frankly, that line of

3  cases fits the facts here exactly.

4       There's no shortage of available evidence as to what the

5  mental condition of these boys are and what the treatments that

6  they received, and there's nothing in the moving papers or the

7  reply, nothing before the Court, to show why that's not the case

8  or why another examination is necessary given the extensive

9  examinations the school has already provided.

10      So, now, in addition to that, Your Honor, in addition to

11 the fact that the exam is duplicative, it's unnecessary, and the

12 information is available by other means, we've submitted

13 affidavit on the motion which is uncontested, no reply to it at

14 all, showing that the proposed examination is way outside of

15 professional norms for evaluating adolescents, particularly

16 adolescents like the boys here who have experienced trauma, and

17 that the examination that's proposed here is potentially

18 harmful.

19      We have submitted the affidavit of Mike Koch.  He is a

20 clinical director of an organization that does work with

21 children.  He has extensive experience working with children in

22 the juvenile justice system, providing diagnoses and treatment

23 for children in the juvenile justice system, and he's outlined

24 very clearly how the proposed examination is outside of

25 professional norms and is potentially harmful.

1    Number one, it's long.  It's far too long.  They propose a

2    full day.  Mr. Koch makes clear the professional norms are two

3    hours is the standard for evaluating adolescents.

4        The proposed request doesn't include the standard tools for

5    evaluating adolescents.  There's no provision for a safe,

6    neutral setting, which is particularly important to evaluate

7    adolescents, and, again, particularly adolescents who've

8    experienced trauma.

9        Mr. Koch also describes how these types of evaluations have

10   a risk of retraumatizing the child who often in these cases the

11   children have an adverse reaction to discussing traumatic

12   events.  There's got to be a plan in place for treating the

13   children, if necessary, during the course of the examination.

14   There's no such plan in place with respect to the request that's

15   made here.

16       As Your Honor asked Mr. Gillespie, the papers they've

17   submitted show that this examiner does not have specialized

18   knowledge about working with children, which, as we've shown in

19   our papers, is important.  The papers that we've shown that

20   we've -- that we've submitted show the risk of harm, the danger

21   of retraumatizing the child, producing a situation that's

22   fear-inducing rather than therapeutic, all of which will also

23   lead to inaccurate results.

24       Very simply, Your Honor, there is no evidence to the

25   contrary of these facts.  Defendants did submit a reply, but,

1   tellingly, there was no reply explaining or purporting to

2   explain why this is an evaluation within professional norms

3   and how children can be protected from harm, no evidence of that

4   at all, and from on this record, on this record, Your Honor, the

5   motion should be denied.

6       I do want to add one -- a couple of other things, Your

7   Honor, and make sure I've answered all your questions.  I did

8   want to address the fact that Dr. Thomas examined G.R.X.

9   previously, which makes it particularly inappropriate for

10  Dr. Thomas to be the examiner here.

11      The prior examination was under very different

12  circumstances.  And, by the way, the fact is that Dr. Thomas was

13  chosen by -- not by DRI, not by Plaintiffs, it was chosen by the

14  school or DHS, and DRI certainly didn't have a say in who was

15  selected.

16      But that was, as I said, under different circumstances.  It

17  was to help G.R.X., to help identify his needs and to help

18  identify the treatment that he needed, not for the purposes of

19  developing a case adverse to G.R.X.

20      And if you look at the introductory portions of the report

21  that have been permitted, it's clear that G.R.X. was

22  specifically told the evaluation was to help him.  He was told

23  it was to evaluate his treatment needs, he was told that he

24  didn't have to answer any questions, and he was told about the

25  limits of confidentiality, which -- and the document explains

1   what it means, that it meant that Dr. Thomas was obligated to

2   report intent to harm himself or others and that the report

3   would be shared with the court.

4       But the thrust of the disclosure was that the evaluation

5   was to help him and to identify his therapeutic needs, and the

6   evaluation was requested by DRI because G.R.X. wasn't receiving

7   adequate mental health treatment, and both G.R.X. and his

8   lawyers wanted him to receive it.

9       So under those circumstances, G.R.X. made a decision to go

10  forward with the evaluation, to share the details of his

11  personal life that are private and traumatic, and he shared them

12  with Dr. Thomas for the purpose of getting help, of identifying

13  the treatment is needed.

14      And this examination, unlike the prior examination, this

15  Rule 35 examination, is not to help him at all.  It's to be

16  adverse to him, to help the State build the case against him,

17  and in these circumstances, Your Honor, it's just inappropriate.

18  It's absolutely inappropriate for Dr. Thomas to turn around and

19  now be adverse to G.R.X. in this case.

20      And with respect to all of the named plaintiffs,

21  Dr. Thomas' purpose here is to be adverse to the boys, to act

22  contrary to their interests, and our professional affidavit

23  shows that the examination that she proposes is contrary to

24  professional norms, it's potentially hurtful to the boys.  The

25  affidavit is uncontradicted, and, once again, that's a reason

1   the Court should deny the request that Dr. Thomas provide an

2   evaluation for any of these boys.

3         I'll just say one other thing, Your Honor, and then I'll

4   stop and make sure I've answered your questions; that, you know,

5   another reason that the Rule 35 application is deficient is that

6   it really doesn't specify the time, place, manner, conditions,

7   and scope of the examination.  All that they say is that we're

8   going to examine these boys for a day, and we're not going to

9   tell you what we're going to do particularly.

10        The case law is actually contrary to that, and there's two

11  cases I'll point your attention to.  The first is the Supreme

12  Court's decision in the -- and I'm not going to pronounce any of

13  these names right, but in the Schlagenhauf case, where the

14  Supreme Court made clear that a party seeking an examination

15  must show good cause for each particular examination that's

16  sought, and if the party proposing the examination doesn't say

17  what particular examinations are sought and just gives a

18  general, "We're going to examine the mental health condition,"

19  that the court can't determine whether that standard is met for

20  each of the tests that are proposed.

21        The other case I'll call your attention to, which is cited

22  also in Defendants' brief, Defendants cited for the exact

23  opposite of what it stands for, is the Morris against Barideaux

24  case, which held that the party opposing the examination had a

25  right to the list of the examinations that the defendants were

1  going to perform so that the opposing party would have the right

2  to formulate objections to particular examinations.

3      The Court in Barideaux distinguished the other cases that

4  Defendants rely on and say in those situations the -- whether

5  the tests were appropriate or not was not in issue.  Here, based

6  on Mr. Koch's affidavit, they're very much in issue, and, you

7  know, if, if any examination goes forward, we do need to know

8  what those tests are so we have an opportunity to look at them

9  and come back to the Court and say, "Well, some of these tests

10  are inappropriate and here's why."

11      Your Honor mentioned conditions, and, frankly, we can't

12  tell what conditions would be appropriate without knowing more

13  particularly what tests are going to be performed so that our

14  expert can look at them and say, you know, no, Your Honor, that

15  these tests would be unnecessarily harmful, or so on, and here's

16  why, or, Your Honor, with respect to these tests, here are some

17  safeguards that need to be done.

18      We can't -- we can't know that without knowing more

19  particularly what tests they're going to perform.  Those tests

20  have not been specified in the motion, they've not been

21  specified in reply, and that's another ground, Your Honor,

22  another independent ground, under which, in our view, you ought

23  to deny the motion.

24      And with that I'll stop, Your Honor, and make sure I've

25  answered the questions that you had at the outset.

1          THE COURT:  I have a couple extra ones, and I want to

2    start there.

3          MR. FRISCHER:  Yeah.

4          THE COURT:  The first of those is you said one of the

5    things you'd need to know would be what the tests would be that

6    would be conducted.  Are there other pieces of information that

7    you need -- you believe need to be in place in order to have an

8    appropriate safeguard if the Court were to grant -- and I know

9    you're saying some of those would depend on what the tests were,

10   but set the tests aside and safeguards related to those.  Would

11   there be other safeguards that you think would have to be in

12   place if the Court were to allow an independent medical exam

13   under Rule 35?

14         MR. FRISCHER:  Your Honor, like Mr. Gillespie, I am

15   not a mental health expert myself, but we -- in order for our

16   mental health expert to opine more particularly on that, we do

17   have to know more, you know, what the tests are, and, you know,

18   we do need more specification of what's required in the rule;

19   the time, place, manner, conditions, and scope of the

20   examination.

21       So with respect to the manner, conditions, and scope, you

22   know, we need more detail on that.  You know, what are the

23   arrangements that our plaintiffs are making for a safe,

24   appropriate, neutral space for the examination?  What provisions

25   are they making to avoid retraumatization?  What plan do they

1  have in place to provide care and treatment in the event the

2  boys are retraumatized by the examination?  That's what we need

3  to know more of.

4      And what Mr. Koch is very clear is, you know, in the

5  absence of that kind of information, and none of that

6  information is in the moving papers, these examinations are

7  outside professional norms and run the risk of harm.

8          THE COURT:  All right.  Next question for you, can you

9  tell me what the current age is of the four named plaintiffs?

10         MR. FRISCHER:  We may, Your Honor.  If I can have one

11 moment to double-check that.

12         THE COURT:  Yep.  I'll come back to you on that.  One

13 other question I have for you, and then I'll go ahead and let

14 Mr. Gillespie do his reply, then I'll come back to you on the

15 ages, do you anticipate -- setting aside the independent medical

16 exam issue, if that is not an issue even, do you anticipate that

17 Dr. Thomas would be a witness in the case from your perspective?

18         MR. FRISCHER:  I would think probably, yes.

19         THE COURT:  Okay.  All right.  I'm going to go ahead

20 and let Mr. Gillespie do any additional reply that he wants.

21     Mr. Gillespie, that would be an additional question I'd

22 like you to address for me as well about Dr. Thomas is whether,

23 setting aside the Rule 35 issue, whether you anticipate that

24 Dr. Thomas would be a witness in the case.

25         MR. GILLESPIE:  Thank you, Your Honor.

1       In all honesty, I'm not certain at this stage.  You know,

2   the purpose that we reached out to Dr. Thomas is to be able to

3   speak intelligently to the individual needs of the named

4   plaintiffs with the details that a full psychological assessment

5   would offer.  In the absence of that, I'm not -- I imagine

6   that -- I imagine that we may bring her in as a witness

7   regardless, but that would greatly reduce the scope of that

8   testimony, certainly.

9           THE COURT:  Okay.  Go ahead.  You can go ahead with

10  any reply you want to make.

11          MR. GILLESPIE:  Thank you, Your Honor.

12      One thing that I want to point off -- point out on the

13  offset is that this process began a few weeks back just with an

14  informal conversation concurrent with our discovery discussion

15  with opposing counsel, and we notified them very early on that

16  this was something that we wanted to do and that there would be

17  some time restraints that came with that and with the

18  availability of Dr. Thomas, and here we are today, five days

19  before the availability that we have set aside for Dr. Thomas to

20  perform these mental health evaluations.

21      From that perspective, Your Honor, we would posit that it's

22  rather a late time for Plaintiffs to be saying that they need

23  sorts of specific information to go back and evaluate and

24  discuss and determine what else they need.

25      We've been trying to have a cooperative process in getting

1   this determined, but in the absence of that being provided to us

2   earlier, it seems inequitable for us to go through that whole

3   process again.

4        With regard to the substance of Plaintiffs' arguments, I

5   say that I disagree with the characterization that this would be

6   subjecting them to another evaluation.  Initially, this is --

7   again, it's very important, I think, for the purposes of this

8   motion that this is a class action that the named plaintiffs

9   have voluntarily subjected themselves to.  They have decided

10  that they wanted to pursue this and that they wanted to pursue

11  this not as putative class members but as class representatives,

12  and in doing so, I think that the defense is entitled to

13  discovery when their mental health, as Plaintiffs concede, is

14  such a big part of their claims here.

15       Regardless, with regard to these previous exams, we're

16  not -- our position is not that they are deficient; our position

17  is that they were merely done with a different purpose.

18       You know, the complaint is littered with allegations about

19  actions or inactions that the school has taken and policies that

20  the school has that have resulted in harm to the mental health

21  of the class, and I think that we are entitled as defense to

22  discovery to that point.

23       And notwithstanding that fact, when there's a close

24  scrutiny of the evaluations that are cited by the plaintiffs in

25  their resistance, many of those, again, are incredibly dated,

1  going back to 2014, many of them were not conducted by the

2  school, and all of them were not conducted in the context of the

3  allegations in the complaint, and we think that that makes a

4  very big difference in the actual scope of the evaluation.

5       In addition, I would also point out that the implication to

6  Plaintiffs' argument, as we see it, is this concern that

7  Dr. Thomas is switching sides from being on DRI's side with the

8  September evaluation to now being against Plaintiffs' side, and

9  I think that's an unfair characterization.

10      The purpose of these evaluations -- while this evaluation

11  is being done for a litigation, the purpose of these evaluations

12  is not bias, it's not partisan.  Dr. Thomas is a forensic

13  psychologist, and her obligations are to the ethics and

14  professionalism of her profession, and she would not, and I

15  don't think that Plaintiffs can assume that she would, act

16  counter to that, which is, from our perspective, kind of the

17  underlying argument here.

18      In addition, with concerns about having a safe environment

19  and not retraumatizing the students, again, I think that goes to

20  the Kansas case that I cited earlier, which is that the Court

21  can safely assume that Dr. Thomas will perform these evaluations

22  ethically and professionally and within those standards.  I

23  don't think there's any basis that's been proposed, other than a

24  general what-if, to suggest that Dr. Thomas would not conduct

25  these evaluations with the absolute respect for the mental

1 health issues and trauma of the students.

2     And I'll be brief here because I know we're getting close

3 to our timeline.  With regard to the testimony of Mr. Koch,

4 again, I just wanted to emphasize his testimony regarding the

5 professional best standards, I don't think are competent; not in

6 a general sense, but specifically as to this issue, because,

7 again, Mr. Koch's background is not in clinical psychology,

8 which is really what we're talking about.  His background is in

9 social work.  And even though there's a lot of overlap and there

10 are, you know, some parallels between the two, they are two very

11 different fields.

12     Dr. Thomas, again, is a board certified forensic

13 psychologist, and I think in the absence of some sort of

14 competent testimony that something that we've said would be

15 contrary to the professional standards, I don't think that we

16 can assume that the evaluation would be contrary.

17     But, again, you know, the concerns, the concerns are valid,

18 but there's no basis for them at this time.  You know, the

19 evaluations of the students, we have already suggested, will be

20 in a neutral, safe setting.  It will be at the school, which is

21 where the previous evaluations that have been done by the school

22 have been done, and no objections have been raised there.

23     But, again, I really want to emphasize the importance of

24 the fact that Dr. Thomas -- and as Plaintiffs point out,

25 Dr. Thomas did provide this previous evaluation to student

1   G.R.X., but Dr. -- but Plaintiffs' counsel did not object at

2   that time.  The concerns about a safe setting, the concerns

3   about her ability to evaluate a juvenile, they were not raised

4   at that time, and so it seems slightly off to us at this point

5   for those concerns to be raised.

6        So, Your Honor, again, we would ask that you would grant

7   our motion 35 -- our Rule 35 motion.

8        In addition, we also have the ages of the plaintiffs, if

9   that would be helpful as well.

10            THE COURT:  Yes.  That would be fine.

11            MR. GILLESPIE:  And Plaintiffs' counsel, please

12   correct me if I'm mistaken.  J.S.X. is 16, as is C.P.X.

13            THE COURT:  Sixteen?

14            MR. GILLESPIE:  And -- yes.

15            THE COURT:  Okay.

16            MR. GILLESPIE:  K.N.X. is also 16.

17            THE COURT:  Okay.

18            MR. GILLESPIE:  G.R.X. is 17.

19            THE COURT:  Okay.  All right.  Thank you.

20        And, Mr. Frischer, do you agree with those ages?

21        Mr. Frischer?

22            MR. FRISCHER:  I'm sorry.  I was on mute.  I've just

23   unmuted, Your Honor.

24        Your Honor, I'm not sure of when the birthdays are exactly,

25   but we had 17 for K.N.X. and J.S.X.

1          THE COURT:  Oh, okay.  All right.

2          MR. KIRSTEIN:  Your Honor, if I may, this is Nathan

3  Kirstein with DRI.

4          THE COURT:  Yes.

5          MR. KIRSTEIN:  I do have the birth dates in front of

6  me.  G.R.X. just turned 17; J.S.X. just turned 17 on March 6th;

7  C.P.X. is almost 17 and will be on the 19th, so in five days;

8  and then K.N.X. is 16.

9          THE COURT:  Okay.  Thank you.  I appreciate that.

10  Thank you.

11      All right.  Counsel, I appreciate your argument, both in

12  your briefs and here during the hearing today.  I'm going to

13  take the matter under advisement.  I will do my best to get an

14  order out this week.  I just will be honest with you; I've got

15  criminal duty.  I cannot absolutely guarantee that.  We're

16  working on it, but we'll do our best.  I know you're trying to

17  do these next week, and it's possible that's not going to

18  happen, even if I do grant them, and I haven't made a final

19  determination in that regard.  So I do at least want you to be

20  aware of that.

21      All right.  I have got the matter under advisement, and I

22  appreciate it.  Thank you all very much.

23          (Proceedings concluded at 9:51 a.m.)

24

25

1                    C E R T I F I C A T E

2          I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3  the State of Iowa and Federal Official Realtime Court Reporter

4  in and for the United States District Court for the Southern

5  District of Iowa, do hereby certify, pursuant to Title 28,

6  United States Code, Section 753, that the foregoing is a true

7  and correct transcript of the stenographically reported

8  proceedings held in the above-entitled matter and that the

9  transcript page format is in conformance with the regulations of

10  the Judicial Conference of the United States.

11          Dated at Des Moines, Iowa, this 24th day of April,

12  2018.

13

14

15                              /s/ Kelli M. Mulcahy
                                Kelli M. Mulcahy, CSR, RMR, CRR
16                              Federal Official Court Reporter

17

18

19

20

21

22

23

24

25