1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION


- - - - - - - - - - - - - - - X
G.R.X., Through His Next Friend :
H.R.X; J.S.X., Through His Next :
Friend D.S.X.; C.P.X., Through  :
His Next Friend S.P.X.; K.N.X., :
Through His Next Friend Rachel  :
Antonuccio, For Themselves and  :
Those Similarly Situated,       :
                                :
     Plaintiffs,                :
                                :
vs.                             :        Case No. 4:17-cv-00417
                                :
JERRY FOXHOVEN, in his Official :
Capacity as Director of Iowa    :
Department of Human Services;   :
RICHARD SHULTS, in his Official :
Capacity as Administrator of    :
the Division of Mental Health   :
and Disability Services; and    :
MARK DAY, in his Official       :
Capacity as Superintendent of   :
the Boys State Training School, :        <u>HEARING TRANSCRIPT</u>
                                :
     Defendants.                :
- - - - - - - - - - - - - - - X



                        Judge's Chambers, Fourth Floor
                        U.S. Courthouse
                        123 East Walnut Street
                        Des Moines, Iowa
                        Wednesday, May 2, 2018
                        10:00 a.m.


BEFORE:  THE HONORABLE HELEN C. ADAMS, Chief Magistrate Judge.



                KELLI M. MULCAHY, CSR, RMR, CRR
                   United States Courthouse
                123 East Walnut Street, Room 115
                   Des Moines, Iowa 50309

APPEARANCES:

For the Plaintiffs:          TIMOTHY R. FARRELL, ESQ.
(Via Telephone)              CHARLES D. ZAGNOLI, ESQ.
                             Ropes & Gray, LLP
                             191 North Wacker Drive
                             32nd Floor
                             Chicago, Illinois  60606

                             NATHAN D. KIRSTEIN, ESQ.
                             Disability Rights Iowa
                             400 East Court Avenue, Suite 300
                             Des Moines, Iowa  50309

                             HARRY FRISCHER, ESQ.
                             CATHERINE McGUIRE FRIZELL, ESQ.
                             Children's Rights
                             88 Pine Street, Suite 800
                             New York, New York  10005

For the Defendants:          ANAGHA DIXIT, ESQ.
(Via Telephone)              GRETCHEN WITTE KRAEMER, ESQ.
                             MATTHEW K. GILLESPIE, ESQ.
                             Assistant Attorneys General
                             Hoover State Office Building
                             1305 East Walnut Street
                             Des Moines, Iowa  50319

Also Present:                AMANDA SEITZ
(Via Telephone)

1       P R O C E E D I N G S

2           (In chambers with counsel present via telephone.)

3           THE COURT:  Good morning.  This is Judge Adams.  We're

4   here today in the case of G.R.X., et al., vs. Foxhoven, et al.,

5   which is Case No. 4:17-417.

6       First order of business, let me take roll call.  Who do I

7   have on the phone on behalf of Plaintiffs?

8           MR. FARRELL:  Good morning, Your Honor.  This is

9   Timothy Farrell at Ropes & Gray, pro bono counsel for the

10  plaintiffs.

11          MS. FRIZELL:  And Harry Frischer and Catherine Frizell

12  from Children's Rights are on the phone.

13          THE COURT:  All right.  And who do I have on the phone

14  on behalf of Defendants?

15          MS. DIXIT:  Good morning, Your Honor.  This is Ana

16  Dixit on behalf of the defendants, and in the room with me I

17  have Gretchen Kraemer and Matthew Gillespie.

18          THE COURT:  Did someone just join us?

19          MR. KIRSTEIN:  Yes, Your Honor.  This is Nathan

20  Kirstein with Disability Rights Iowa for the plaintiffs.

21          THE COURT:  All right.  Ms. Dixit, can you tell me

22  again, was it Matthew Gillespie and Gretchen Kraemer you said

23  you had in the room with you?

24          MS. DIXIT:  Yes, Your Honor.

25          THE COURT:  Okay.  Thank you.

4

1          MR. FARRELL:  Your Honor, this is Tim Farrell.  For

2    the record, I just wanted to note that I have two colleagues in

3    my office with me.  It's Amanda Seitz and Charles Zagnoli.

4          THE COURT:  Can you spell both of those last names for

5    me?

6          MR. FARRELL:  Yes.  It's S-e-i-t-z, and Zagnoli is

7    Z-a-g-n-o-l-i.

8          THE COURT:  All right.  Thank you.

9       All right.  We have the defendants' motion for protective

10   order up for hearing today.  Let me tell you the information I

11   have and what I have reviewed so far.

12      I have the defendants' motion and brief, which was filed in

13   the court docket at No. 64.  I also have the appendix that was

14   filed at No. 65.  I also have the plaintiffs' opposition and

15   exhibits filed at Docket 68.  I've had an opportunity to review

16   those, as well as I've had an opportunity to go back and review

17   the protective order that was entered in the case earlier, so I

18   have had the opportunity to review that document as well, which

19   is in the case at Docket No. 23.

20      I do have a court reporter here with me so what I'm going

21   to ask of you is that before you speak every time you state your

22   name and that you each speak slowly so that we can all hear you

23   and we can get everything recorded appropriately.

24      As I indicated, I have had a chance to review the papers

25   that have been filed, and what I'd like to start with is an

1  issue that I believe is not an issue in the case any longer and

2  just want to get through that first, and that is my

3  understanding is that one of the items that Defendants had

4  requested in their motion for protective order was an order that

5  other students and parents of students that are involved in the

6  litigation could not review each others' records, they can only

7  review their own records or their own child's records, unless

8  there's written consent for that.

9      As I read the papers that have been filed, it appears to me

10  that everybody's in agreement that that is the appropriate

11  mechanism, that nobody should be reviewing anybody else's

12  records that's a party in the case unless there is a written

13  consent or specific order of the Court.

14      Having said that, I just want to confirm that.  On behalf

15  of the plaintiffs, did I correctly interpret your response?

16          MR. FARRELL:  This is Timothy Farrell, Your Honor,

17  and, yes, absolutely, that's one of a number of issues that we

18  could have addressed in negotiations with Defendants.

19  Unfortunately, it was raised in this briefing.  We have no -- we

20  have no issue with that and are in agreement and are happy to

21  comply with that.

22          THE COURT:  All right.  And then let me just ask

23  Defendants, it seems to me that that issue has been taken off

24  the table.  Would you agree with that?

25          MS. DIXIT:  Yes, Your Honor.

1        THE COURT:  Okay.  All right.  Next issue that I want

2   to address has to do with the issue that the defendants raised

3   about whether or not an appropriate next friend has been found

4   for K.N.X.

5        Again, as I read the papers that I have here, what I

6   understand about that situation is that the person who has

7   appeared as the next friend for K.N.X. is not related to him but

8   is a lawyer who does handle juvenile cases and does have some

9   understanding of those and that she has met with K.N.X. and has

10  talked with him about the situation.

11       I further understand from the plaintiffs' response that

12  K.N.X. does not have any immediate family members available to

13  be a next friend for him.  As I understand the situation, his

14  mother is deceased; his biological father is not in the picture

15  and no one has been able to find appropriate contact information

16  for him; and there is a grandmother who has had a relationship

17  with K.N.X., but there has been conversation with the

18  grandmother about the situation and she has no objection to the

19  attorney being the next friend of K.N.X. and does not feel she

20  would be appropriate to serve in that role.

21       So let me stop there and ask the plaintiffs if I have

22  correctly stated the facts as they know them.

23       MR. FARRELL:  Your Honor, this is Timothy Farrell

24  again.  Those are the facts as you described as I understand

25  them as well.  I would only add that Ms. Antonuccio, the next

1  friend or proposed next friend, has also met with K.N.X.

2  himself, who also consents to her representing him.

3       THE COURT:  All right.  So let me turn to Defendants

4  then.  Is there anything further you would like to say or make a

5  record of with respect to that issue?

6       MS. DIXIT:  Yes, Your Honor.  This is Ana Dixit, and

7  we do still have concerns about the appropriateness of

8  Ms. Antonuccio serving as next friend as I can either discuss

9  now, if Your Honor would wish, or I can do as part of my oral

10  argument.

11       THE COURT:  No.  Go ahead and talk about them now.

12       MS. DIXIT:  Certainly, Your Honor.  The concerns that

13  we have about Ms. Antonuccio serving as a next friend are that

14  the email that was provided to us by Mrs. Paulsen is

15  insufficient authorization because there's no signature or sworn

16  statement from Ms. Paulsen that actually authorizes

17  Ms. Antonuccio to act as a next friend.

18      As to the Court's analysis here, there's a two-step

19  analysis that the Court needs to make in order to find that a

20  next friend is appropriate.  Defendants concede that the first

21  step here is met; that K.N.X. is a real party that cannot bring

22  suit for himself.

23      However, Defendants raise issue with the lack of evidence

24  that Ms. Antonuccio is actually dedicated to K.N.X.'s interests.

25  The only thing we have on the record is a two-page affidavit by

1  Ms. Antonuccio that states she is a public defender that

2  represents youth in delinquent acts.  Nothing in the affidavit

3  speaks to her experience in mental health issues.

4      Her interests and concern are to the general well-being of

5  the youth incarcerated at the school, not focused on the best

6  interests of K.N.X.  A next friend needs to have a genuine

7  concern for that child's well-being and personal interest as

8  opposed to simply an ideological stake in the child's

9  litigation, which is what appears to be the case here.

10     Ms. Antonuccio has no significant relationship with K.N.X.

11  She herself admits she has only met with K.N.X. a handful of

12  times and that she met with other students at the same time.

13  She was also not K.N.X.'s public defender in his delinquency

14  case.

15     Thank you, Your Honor.

16         THE COURT:  All right.  Anything further that

17  Plaintiffs would like to say?  And you guys don't need to repeat

18  your briefs to me, okay, but anything in addition you want to

19  say on this issue?

20         MR. FARRELL:  This is Tim Farrell, Your Honor.  I

21  would only add, number one, Ms. Paulsen, while the grandmother,

22  her consent is compelling and indicates that it would be in the

23  best interests for Ms. Antonuccio to represent K.N.X., she's not

24  his custodian so her consent's not required.  It's up to the

25  Court to determine what's in the best interest of K.N.X.

1      Defendants would have K.N.X. have no representation

2  whatsoever, as compared to our position, which is we think that

3  Ms. Antonuccio, who has demonstrated herself as dedicated to the

4  best interests of K.N.X. -- she has met with him and she has

5  affirmed in her affidavit that she's dedicated to representing

6  in his best interests -- is certainly materially better than the

7  young man having no representation at all.

8          THE COURT:  And my understanding, Mr. Farrell, is that

9  the grandmother is not a guardian either.  There is no appointed

10  individual guardian, other than the State, with respect to his

11  time at the Boys School; is that correct?

12          MR. FARRELL:  That's my understanding as well, Your

13  Honor.

14          THE COURT:  All right.  Anything additional responding

15  to that on behalf of Defendants --

16          MS. DIXIT:  Yes, Your Honor.

17          THE COURT:  -- on that issue?

18          MS. DIXIT:  Again, this is Ana Dixit in response.  The

19  first is that we did not receive Ms. Paulsen's email despite our

20  repeated requests to receive that information prior to our

21  filing the motion for protective order.

22      And the second, just to clarify opposing counsel's

23  position, it is not our position that we don't want K.N.X. to

24  have any next friend or any representation, only that we are in

25  a position where we require the Court to decide what is

1   appropriate and what is not appropriate and for the Court to do

2   that analysis.

3          THE COURT:  All right.

4          MS. DIXIT:  Thank you, Your Honor.

5          THE COURT:  And I will take care of that.  So that

6   takes care of that issue for now.

7      All right.  Let's turn to I think what is the predominant

8   issue here, and that has to do with the document production

9   requests that have been served on the State.

10     As I understand it from the plaintiffs' response, the

11  plaintiffs are agreeable at this time to prioritizing those

12  document production requests.  And I understand that the

13  plaintiffs, by agreeing to make that priority, are not agreeing

14  to waive any additional discovery or the remainder of the

15  discovery.

16      The priority that the plaintiffs have suggested is listed

17  in Appendix A to Plaintiffs' opposition to the defendants'

18  motion for protective order, which is in the docket at 68-3.

19  There are a number of bullet-pointed items that are listed

20  there.

21     So let me stop there and ask Plaintiffs if, again, I'm

22  correctly interpreting your position with respect to the

23  document production requests.

24         MR. FARRELL:  That's exactly right.  You've

25  articulated exactly correctly, Your Honor.

1        THE COURT:  Okay.  So what I'd like to do, then, is

2   really just focus at this point in time on the prioritized

3   document production requests, and I'd like to talk with defense

4   counsel about each of those.

5        One of the questions I have as we look at those, I cannot

6   tell from the record in front of me which of these document

7   requests would be information that would be contained on the --

8   make sure I get the name right -- I think it's RiteTrack.  Is

9   that right?  Did I get the name right?

10        MS. DIXIT:  Yes, Your Honor.

11        THE COURT:  I can't tell which of these document

12   requests would be information that would be contained on that

13   software program versus some other type of documents, whether

14   they be hard documents or something separate from that.  So

15   that's a question that I will have with respect to each of those

16   as we walk through them.

17        Now, I understand Defendants' position, number one, is that

18   your position, if I understand correctly, again, is that

19   Plaintiffs should not get any discovery at this stage relating

20   to putative class members, only to the named plaintiffs, but set

21   that aside for the moment because I understand that.

22        If the Court grants some discovery related to the putative

23   class members at this time, what I'd like to do, Ms. Dixit, is

24   go through these and have you tell me what your concern is with

25   respect to each of them and also tell me where those documents

1  reside; what format, what form they're in; where are they; that

2  type of thing.

3     All right.  So let's start with the first one which is on

4  Appendix A, and that is identified here simply as "Restraint

5  reports."

6          MS. DIXIT:  Your Honor, this is Ana Dixit for the

7  defendants.  The restraint reports are going to be located in

8  the RiteTrack system.  And just as like an overview of all of

9  the documents that have been requested, obtaining these

10  documents just for the three named plaintiffs resulted in each

11  student having at least 5500 pages of documents, and the last

12  production of documents that we gave to the plaintiffs was over

13  25,000 pages of documents.

14     So although it may appear that the Appendix A is actually a

15  narrower form of their request, these documents alone will also

16  easily go into the thousands if required to provide all of them

17  for all of the putative class members.

18          THE COURT:  All right.  Let me stop you for just a

19  minute.  When you say that discovery of the records resulted in

20  approximately 5500 pages of documents for each of the named

21  plaintiffs, when you say that, do you mean all of the documents

22  being requested?  You're not just saying that about the

23  restraint reports, or are you?

24          MS. DIXIT:  No, not just the restraint reports.

25          THE COURT:  Okay.

1      MS. DIXIT:  This is the culmination of all the

2  bullet-pointed documents that are listed here.

3      THE COURT:  Okay.  Go ahead.  I'm sorry.  I just

4  wanted to get that clear.

5      MS. DIXIT:  Not at all, Your Honor.  As far as the

6  restraint reports, those would be contained within the RiteTrack

7  system.

8      And, I'm sorry, what other information did you need as to

9  that bullet point?

10      THE COURT:  Were there other specific objections to

11  the restraint reports beyond the fact that, one, you don't

12  believe they should get any records relating to the putative

13  class members; two, that we have the issue related to the

14  RiteTrack system that has to be sorted through; and then I also

15  understand you're objecting to the temporal scope being

16  requested?  But are there any other objections specific to those

17  restraint reports beyond those more general objections?

18      MS. DIXIT:  The concerns for the restraint reports in

19  particular, as will be repeated through these bullet points, is

20  the confidentiality concerns that we have, the fact that the

21  state and federal laws of confidentiality require the Department

22  of Human Services and the Boys State Training School to keep

23  these records confidential unless there is a waiver from the

24  individual student or a court order allowing the release of

25  those particular records.

1    And, yes, those are our concerns, in addition to everything

2  that you have stated, Your Honor.

3         THE COURT:  Okay.  But, I mean, if I enter a court

4  order, that takes care of that issue from the State's

5  perspective because that is an exception to the confidentiality

6  requirements set forth in those statutes that you've identified,

7  correct?

8         MS. DIXIT:  I'm sorry.  Could you please repeat that

9  question, Your Honor?

10        THE COURT:  Sure.  If I do enter a court order with

11  respect to some or all of these documents indicating that they

12  need to be produced, that would take care of that last concern

13  because that would fit within one of the exceptions allowed in

14  those state statutes requiring confidentiality, correct?

15        MS. DIXIT:  Yes, that's correct.  The court order

16  would then overrule the confidentiality requirements, that that

17  is one of the exceptions.

18        THE COURT:  Okay.  Let's go to the next bullet point.

19  And you may have to help me a little bit because I may not know

20  what these are.  But "BSU/DSU reports...seclusion records, and

21  timeout or other room confinement records."

22    Kind of the same questions I've had for you.  I understand

23  the temporal scope issue, I understand the confidentiality

24  issue, and I understand, you know, your general objection to the

25  discovery.  But, again, would these be documents that would be

1   contained in that RiteTrack system as well?

2           MS. DIXIT:  Yes, Your Honor, they would be contained

3   in the RiteTrack system.  Each search would have to be done

4   according to each individual student to obtain the individual

5   reports or a general report about their time spent there.

6       And just for clarification, the BSU is a behavioral

7   stabilization unit, and DSU is the name that they used to have

8   for that unit, which was the destabilization unit.

9           THE COURT:  All right.  And then I noticed in the

10  information that Defendants provided to me in your appendix

11  there were a variety of summary -- what I'm going to call

12  summary spreadsheets.  Can you tell me how those were created?

13      So, for example, there's one on page 50 to 54, which is a

14  BSU Programming and Rec Time.  There's also some Incident

15  Reports at 36 to 41.

16      So can you just tell me, what are those documents, and how

17  were they created, and what do you believe those documents

18  actually show?

19          MS. DIXIT:  Certainly, Your Honor.  Those documents

20  were created by Lynn Allbee or another individual at the Boys

21  State Training School to keep track of their statistical

22  information regarding the information that's contained in those

23  spreadsheets.  They generally provide information about the

24  individuals, just population-wise which students are in -- or

25  how many students are in the different cottages, what is the

1  rate or the number of individuals that have been restrained, the

2  aggregate number of hours spent in restraint, or the aggregate

3  number of hours spent in segregation or seclusion.

4      It's essentially the way that the school keeps track of

5  their own statistical information and the information that's

6  applied to all of the population of the school as opposed to

7  identifying information about individual students.  And this

8  information can be -- we purport or we assert that this

9  information is essentially the same information that Plaintiffs

10  are requesting when they request to see the individual records

11  that do contain identifying information.

12          THE COURT:  Are these spreadsheets created from the

13  RiteTrack system or does somebody have to go in and literally

14  look at information in the RiteTrack system to create these

15  spreadsheets?

16          MS. DIXIT:  An individual would go into the RiteTrack

17  system and individually look at how many students have been

18  restrained, how many students have been secluded, and then they

19  would create this spreadsheet.  This is not a spreadsheet that's

20  contained within the RiteTrack system.  It's created based on

21  information that is contained in the RiteTrack system.

22          THE COURT:  And then how frequently would they create

23  those spreadsheets?  Is it a quarterly thing, is it a yearly

24  thing?  How frequently?

25          MS. DIXIT:  Our belief is that it is monthly updated.

1          THE COURT:  Okay.

2          MS. DIXIT:  Some of them are at least updated monthly.

3          THE COURT:  And then what happens with those?  Are

4    they just internal documents after they're created or are they

5    used externally as well?

6          MS. DIXIT:  They are simply internal documents, Your

7    Honor.

8          THE COURT:  Okay.  Anything else specifically about

9    that set of documents that you want me to be aware of?

10         MS. DIXIT:  No, Your Honor.

11         THE COURT:  Okay.  Let's go to the next one, which is

12   the incident reports or other documents relating to use of

13   restraints or solitary confinement, et cetera.  Again, what are

14   the objections to those specific sets of documents?  Anything

15   different than what you've already shared with me about the

16   first two bullet points?

17         MS. DIXIT:  Only to the aspect that it also includes

18   information about suicide ideation, which would go into their

19   mental health, which the defendants purport is subject to even

20   higher scrutiny about information that should be revealed

21   without some kind of waiver or court order.

22         THE COURT:  And are those, again, the mental

23   health-related records, are those maintained within this

24   RiteTrack system or is there some other location where mental

25   health records that might contain this type of information, such

1   as suicide watch information, suicidal ideation, and then

2   probably also into that next category of mental health

3   evaluations, are maintained?

4          MS. DIXIT:  The -- I'm sorry.  I did not mean to

5   interrupt you, Your Honor.

6          THE COURT:  No.  You're fine.

7          MS. DIXIT:  Going into the suicidal ideation, the next

8   bullet point regarding psychological and psychiatric evaluations

9   and records and the progress notes, those would be a mix between

10  documents contained within RiteTrack and paper documents

11  contained within the individual student's medical file or

12  separate documents that are held by any of the counselors or

13  therapists or the psychologist or psychiatrist may have.

14         THE COURT:  Okay.  All right.  Thank you.

15     And then with respect to the next two sets of bullet

16  points, which is the "Psychological, psychiatric, or other

17  mental health evaluations," and then the "Psychiatric progress

18  notes or other documents" relating to mental health, same answer

19  there in terms of those documents?

20         MS. DIXIT:  Yes, Your Honor.

21         THE COURT:  Okay.  And anything else you want to say

22  about bullet points 3, 4, or 5 that's unique to those sets of

23  documents?

24         MS. DIXIT:  No, Your Honor.

25         THE COURT:  Okay.  How about the next one, the "IEPs

1    and 504 plans"?  Again, would those be maintained within the

2    RiteTrack system or is there a separate file for each student in

3    which their IEPs and 504 plans are contained in and then any

4    specific or different concerns that you have with respect to

5    those documents?

6           MS. DIXIT:  Again, for this bullet point, it would be

7    a mix between some documents contained within the RiteTrack

8    system, and a majority of that would be contained within the

9    student's school file, which would be held at the school itself.

10     Additional concerns there would be FERPA concerns regarding

11   the educational material and the confidentiality concerns

12   related to that.

13          THE COURT:  How about the next set, which is the

14   letters to parents or legal guardians relating to either

15   medication, suicide watch?  It sounds like some kind of mental

16   health-related issues.  Again, any specific concerns that are

17   different there, and where are those types of documents

18   maintained?

19          MS. DIXIT:  Those would be contained within the

20   RiteTrack system, but they would also be contained in the

21   main -- in the student's main file, where the correspondence is

22   kept for each of the students.  So this, again, would be a

23   mixture of both RiteTrack and a paper file.

24          THE COURT:  And then in terms of any paper files that

25   you would have, whether it be a medical file or if it would be a

1   correspondence or main file, in order to produce the documents

2   requested, would someone have to physically go through each of

3   those files to pull the relevant documents out?  Is that what

4   you're anticipating would happen?

5          MS. DIXIT:  Absolutely, Your Honor.  That is exactly

6   what would happen.

7          THE COURT:  Okay.  Let's see.  How about consent for

8   voluntary psychotropic medication treatment forms?

9          MS. DIXIT:  This would be contained in the student's

10  medical file.

11         THE COURT:  All right.  And then how about the

12  individual treatment plans, interdisciplinary care plans, and

13  all other treatment plans?  Would that be contained in the same

14  place that the IEPs and 504 plans or somewhere different?

15         MS. DIXIT:  For the individual treatment plans and

16  care plans and other treatment plans, assuming that this is

17  referring to medication treatment or medical treatment, this

18  would be contained in the student's medical file.  Some of these

19  documents would be contained in RiteTrack, and some of them may

20  be contained in the student's school file.

21         THE COURT:  Okay.  What other kinds of treatment plans

22  would there be?  You said there could be some relating to

23  medical treatment.  What other kinds of treatment or care plans

24  would there be relating to a student?

25         MS. KRAEMER:  Your Honor, this is Gretchen Kraemer.

1  When students are first admitted to the Boys State Training

2  School, they also get an interdisciplinary care plan which

3  addresses things like whether they need to be on sexual abuse

4  precaution, whether they need referral from mental health

5  services, and where they should be placed in the school and what

6  cottage they should live in.  So it's a more generalized

7  treatment plan.

8          THE COURT:  And those types of plans, where would

9  those be maintained; do you know?

10          MS. KRAEMER:  It's a good question.  I think the main

11  file.

12          THE COURT:  Okay.  All right.  How about the next

13  category, which is, "Curriculum for group treatment that is

14  provided to class members with mental health diagnosis; i.e.

15  curriculum" and then, within quotes, "Risks and Decisions"?

16      I assume that this is not something that would be related

17  to a specific child but rather would be the curriculum or the

18  teaching areas that they would go over in the group, group

19  treatment meetings that they would have with the kids.  Is there

20  such a thing?

21          MS. DIXIT:  Your Honor, this is Ana Dixit again for

22  the defendants.  As far as the group treatment, those would be

23  contained in cottage files, which are held by the individual

24  cottage counselors that run those risks and decisions.

25      Individual students will have what are called counseling

1  notes, which may refer to how they did in particular group

2  sessions, and those would be contained in the individual

3  student's cottage files or in their main file or counseling

4  file.  As to the curriculum itself, that would be something that

5  the counselor would have.

6          THE COURT:  And is that a standard curriculum that

7  each cottage uses or does it vary from cottage to cottage?

8          MS. DIXIT:  It varies somewhat between cottage to

9  cottage, but it is generally a common curriculum.

10         THE COURT:  And created by whom; do you know?

11         MS. DIXIT:  It was created by a third party.

12         THE COURT:  Okay.  All right.  So I want to go back

13  just one minute.  When an individual comes to the training

14  school and they become a resident there, it sounds like there's

15  a variety of files that are kept on the resident, and I just

16  want to make sure I understand what all those files are.

17      As I understood you, there is a medical file that's kept on

18  a resident, there is a main file that's kept on a resident, and

19  it sounds like there's also a cottage file that's kept on a

20  resident.  Are there any other files that the school maintains

21  on each resident?

22         MS. DIXIT:  Yes, Your Honor.  This is Ana Dixit again.

23  There is the RiteTrack file, which will contain all of the

24  restraint reports, the BSU reports, the incident reports, the

25  suicide reports; and then there is, within the medical file,

1  you'll also find any psychiatric files in addition to any

2  medical concerns or paperwork.

3          THE COURT:  Okay.  So if I'm understanding correctly,

4  though, there's a medical file, just one medical file, but it

5  would contain any sort of general health-related information as

6  well as any psychological or psychiatric medical information; is

7  that correct?

8          MS. DIXIT:  Yes, Your Honor.  And there is also a

9  student file.

10          THE COURT:  A student file.  And that's separate

11  from --

12          MS. DIXIT:  From the school.

13          THE COURT:  Separate from the cottage file?

14          MS. DIXIT:  Yes, Your Honor.  So this is for like

15  their actual the classes they attend, their GED equivalent or

16  high school classes.  That's the school's school file.

17          THE COURT:  Then the RiteTrack file for each student,

18  is that electronic in the RiteTrack system or is that actually a

19  hard copy of information that's in the RiteTrack system put into

20  a file?

21          MS. DIXIT:  That is an electronic copy, and each of

22  the individual type of reports for each student, they have to be

23  accessed differently for each student.  So you can't just click

24  on a student's name and all of their reports appear.  You have

25  to click on a student's name and then go individually to

24

1   incident reports and then click on BSU incident reports, and

2   then each individual circumstance has to be individually

3   downloaded and printed.

4          THE COURT:  Okay.  And then, again, what's normally

5   maintained in the cottage file?  What's its purpose?

6          MS. DIXIT:  The cottage file has the counseling notes,

7   so any interaction that a cottage counselor has with the student

8   will be recorded and then kept in that student's cottage file.

9   It also has a record of how they did in that week.  So they're

10  given steps or levels, and whether they received a merit or a

11  demerit based on that behavior, that's also kept in the cottage

12  file.  So that's basically just a summary of their interactions

13  with the cottage counselors and their behavior in the cottage

14  itself.

15         THE COURT:  And how about the main file?  I know one

16  of the things you indicated was correspondence.  What else would

17  be kept in that main file?

18         MS. DIXIT:  So this is the file -- probably the first

19  file that's created when the student comes in.  It has something

20  that's called a face sheet that just has basically who the

21  student is, their contact information, who their parent or

22  guardian is, who their attorney is, who their JCO is.

23      It also contains all of their court record documents,

24  everything from their delinquency case and correspondence with

25  not only parents and guardians but correspondence with their JCO

1  and correspondence with the court itself.  It also has their

2  interdisciplinary care plan, as well as all of their grievances

3  are contained in the main file.

4          THE COURT:  All right.

5          MS. DIXIT:  And then there's just a few other random

6  documents there that may be contained in other files that are

7  also contained in the main file.

8          THE COURT:  All right.  And you mentioned, just so I

9  have the clear record on it, you used the term "JCO."  Is that

10  juvenile court officer?

11          MS. DIXIT:  Yes.  That's right, Your Honor.

12          THE COURT:  Okay.  And there's just one more bullet

13  point here which is the "Complete set of procedures and policies

14  as of the filing of Plaintiffs' complaint in this litigation."

15      Again, can you tell me, are those hard copies, typically,

16  the procedures and policies of the school?  Are they electronic?

17  Are they some of both?  How are those maintained?

18          MS. DIXIT:  Those have actually already been provided

19  to opposing counsel as part of that 25,000 pages of documents

20  that we produced to opposing counsel already.  And they were

21  actually also provided in the initial disclosures.

22          THE COURT:  And when you say they were provided, how

23  far back were they provided?  I understood that at one point

24  your position was that they should only get the current set of

25  policies and procedures.  Is that what's been provided or

26

1   something --

2          MS. DIXIT:  Yes.

3          THE COURT:  -- more than that?

4          MS. DIXIT:  Sorry, Your Honor.  Yes, the most recent

5   iteration of those procedures and policies have been provided to

6   Plaintiffs' counsel.

7          THE COURT:  All right.  Question for you if you know:

8   How often are those policies and procedures reviewed and/or

9   possibly modified?

10         MS. DIXIT:  Annually, Your Honor.

11         THE COURT:  Okay.  And, again, just so I have it for

12  my information, are those typically hard copy documents or

13  something kept in a manual?  How are those maintained?

14         MS. DIXIT:  It depends on the particular procedure or

15  policy.  For the most part, I believe they're kept

16  electronically, but there may be some versions that are paper

17  copies as well.

18         THE COURT:  Okay.  And when they're revised, is there

19  something noted on them that this was last revised on X date or

20  is it more that once the annual review occurs, a new set gets

21  sent out and they're just all called, you know, 2018 documents,

22  if you understand my question?

23         MS. DIXIT:  I do, Your Honor.  And there is usually a

24  date stamp somewhere, at least on the first page or throughout

25  the policy, that lists when the last revision date was.

1      THE COURT:  Okay.  So there could be, say, ten

2  policies, they were all reviewed annually, but maybe in 2017

3  only two of those policies were revised, and if I'm

4  understanding what you're telling me, those two policies would

5  then have some marking on them indicating that they'd been

6  revised as of that date?

7      MS. DIXIT:  It may not be like that particular policy

8  that was revised.  The whole policy would say that it was last

9  revised on such-and-such date.

10      THE COURT:  Okay.  So I'm not asking a very good

11  question.  Let me see if I can rephrase it.  What I'm trying to

12  find out is if there's -- and I don't know how many policies

13  we're talking about, but I'm just going to use the number ten

14  for simplicity.  If they have a total of ten policies, if, in

15  2017, they reviewed all ten of those policies but they only

16  modified one of the ten policies, would all of the policies

17  indicate they were last revised in 2017 or only the one that had

18  a change made to it?

19      MS. DIXIT:  I am not sure, Your Honor.  I apologize.

20      THE COURT:  No.  That's okay.  All right.  Thank you.

21  I appreciate it.

22    Couple more questions for you.  I know that the defendants

23  take the position that the proposed time frame is too long.

24  What would be the proposed time frame that Defendants believe

25  would be more appropriate with respect to the documents being

1  requested?

2          MS. DIXIT:  To the general documents, Your Honor,

3  going from two years prior to when the complaint was filed, so

4  November of 2015 forward.

5      And as to the policies and procedures, only the most recent

6  iterations should -- would be provided, and the reasoning behind

7  this is that the relief sought by the plaintiffs in this case is

8  prospective and injunctive, and any relief granted by this

9  court, should it choose to grant that, would be based on the

10  policies and procedures in place at the time of trial.

11      So in Plaintiffs' resistance, they claim that they are

12  trying to build a pattern of Defendants' behavior, but they fail

13  to state how the pattern has any nexus to the complaints alleged

14  in their complaint, to the allegations alleged in their

15  complaint.

16          THE COURT:  All right.  And is there anything else

17  that you would like to say at this time on behalf of Defendants

18  with respect to -- and I really want to stay focused on the

19  document categories that are identified in Appendix A, that you

20  don't think that we've talked about or that you don't feel that

21  you've fully briefed?

22          MS. DIXIT:  Yes, Your Honor.  Only to the respect that

23  at the top of the appendix Plaintiffs have requested the

24  defendants produce this on or before May 3rd, 2018.

25          THE COURT:  Well, that won't happen, so --

1          MS. DIXIT:  Okay.

2          THE COURT:  I mean, I appreciate that, but

3    understanding that I'm having the hearing today, that won't

4    happen, so don't worry about that.  But anything else?

5          MS. DIXIT:  And just beyond even the May 3rd, to allow

6    us or grant us a reasonable time to produce these documents.

7          THE COURT:  And in your estimation, what would a

8    reasonable time be?

9          MS. DIXIT:  It would honestly depend on the scope of

10   the production.

11         THE COURT:  Okay.  And then as I understand it, with

12   respect to this RiteTrack system, I want to just spend a little

13   bit of time with you on that.  As I understand what the

14   situation is now, there have been some discussions with the

15   vendor of the system, and there would be some ability, it sounds

16   like, to narrow down the scope of what could be produced through

17   that system.

18      Because as I understand what you can do now, you can

19   actually take an electronic copy of it, but that's an electronic

20   copy of what exists on the system today, the day we take the

21   copy, and it also contains information about other facilities

22   and other people who wouldn't be relevant to this litigation; is

23   that correct?

24         MS. DIXIT:  That is correct, Your Honor.

25         THE COURT:  And so the next sort of step from your

1  perspective with respect to RiteTrack system would be once you

2  knew sort of what the parameters would be of discovery that

3  would be allowed, if I'm understanding correctly, you would go

4  back to them and talk with them, and they would give you an

5  estimate of the cost or fee that they would charge to help with

6  that sort of narrowing process.  Is that correct?

7           MS. DIXIT:  Yes, Your Honor.

8           THE COURT:  Okay.  All right.  And where are they

9  located?  Are they outside the state?

10          MS. DIXIT:  I believe so, yes.

11          THE COURT:  Okay.  All right.  Thank you.

12      What I'd like to do next is turn to Plaintiffs, and I have

13  a couple of questions for you.  The first of those is of these

14  documents that you're requesting in Appendix A at this time as a

15  priority, do you really need all of those documents for purposes

16  of the class certification motion?  Because that's kind of where

17  we are right now.

18      I understand that you want all these records, but I guess

19  my question is do you really need them all for the class

20  certification motion, and, if so, how far back do you really

21  need them for that purpose?

22      And, thirdly, could we do some kind of sampling with

23  respect to the documents that would still get you the

24  information that you would need to do your class certification

25  motion but not require wholesale production at this stage with

1 | respect to the putative class members?

2 | MR. FARRELL:  Well, Your Honor, a couple of things.

3 | First of all, and this is the last time I'll say it, but we'd

4 | really hoped to discuss some of these scope issues and negotiate

5 | them pursuant to, you know, the local rules requiring a

6 | meet-and-confer before these matters were before Your Honor.

7 | We, of course, very much appreciate Your Honor's involvement,

8 | but we'd hoped to narrow these issues somewhat before getting

9 | here.

10 | THE COURT:  Let me stop you for just a second.  Is

11 | this Mr. Farrell?

12 | MR. FARRELL:  This is.  I apologize.

13 | THE COURT:  That's okay.  I just need to make sure I

14 | get your name.  Go ahead.

15 | MR. FARRELL:  So, you know, let me just say that.  And

16 | to the extent that briefing on any of these particular scope

17 | issues hasn't been fully had, you know, we'd like to reserve the

18 | right to, you know, brief time period issues or, at a minimum,

19 | just reserve our rights generally on some of these scope issues.

20 | We haven't had the opportunity to meet and confer with the other

21 | side on them.  They just filed these issues in their brief.  So,

22 | you know, I get that we're triaging here, and to the extent

23 | we're doing that, you know, that's wonderful, and we reserve our

24 | rights.

25 | You know, to put matters into perspective, we have class

1 cert at the end of the month.  We also have expert reports due

2 at the end of the month.  And so some of these documents are

3 required for both; some of them are more focused on getting our

4 experts what they need to render their reports.  So there's time

5 pressure in that regard as to all these documents.

6      In terms of trying to get what we need in time to get a

7 class certification motion on file, you know, just to take a

8 step back, I mean, our class is defined as all persons who are

9 confined to the school who have significant mental illness or

10 emotional impairment, who have a diagnosis for a mental health

11 condition, and residents of the school receiving psychotropic

12 medications.

13      So, for example, the types of aggregated data on incident

14 reports that they appended to their briefing just has nothing to

15 do with that.

16      So, you know, taking the definition of the class for

17 starters and then adding to the fact that our claims surround

18 and are centered on the fact that the use of psychotropic drugs,

19 the use of restraints, the use of solitary confinement for these

20 boys with these issues is a misuse, given their mental state,

21 you know, I'm just providing that for context when then looking

22 to this list of documents.

23      So restraint reports, BSU -- I'll just kind of lump these

24 together -- BSU and DSU reports and incident reports, including,

25 by the way, including grievances that the children, that the

1 boys would file in response to being put in a wrap or put in

2 solitary confinement as a result of their mental illness or

3 otherwise, you know, it's the only way we can show typicality

4 and commonality and numerosity as to the nexus between their

5 mental illness and the extreme measures that are being used to

6 sedate and restrain these children when adequate medical

7 services, adequate mental health services, should, in fact, be

8 being deployed.

9      So those, you know, for example, those three bullets, are

10 really critical.  Understanding the circumstances under which

11 these kids are subject to these various measures is critical to

12 understanding which and how many are fitting into this class and

13 are implicated by our claims.

14      Similarly, I'll take the next two bullets; psychological,

15 psychiatric, mental health evaluations, and psychiatric progress

16 notes.  Without knowing the mental condition and the mental

17 health needs that these kids have, we can't determine whether or

18 not -- how many have these issues and whether or not they're

19 being addressed.

20      We can't tell what their mental health condition was when

21 they started, we can't tell what their mental health

22 condition -- what's happened to that mental health condition

23 after being at the school, after being subject to the use of

24 these extreme psychotropic drugs and the wrap and solitary

25 confinement.

1    So, you know, I would certainly say the first -- those

2    first five bullets I articulated really are critical to our

3    class cert motion and, obviously, to our expert reports as well

4    for the same reason.

5    You know, to the extent we can triage things, and, again,

6    without waiving rights in terms of date range or getting things

7    on a rolling basis, I mean, let me just step back and say that

8    Defendants have produced full records, as far as I can tell,

9    although I haven't been through the records in full, but they've

10   produced the full, complete records for three of the named

11   plaintiffs already, and they did so -- you know, if you read

12   their papers, they had that done -- on page 11 of their brief,

13   "The documents are ready for production to Plaintiffs' counsel,"

14   so they had that done by the beginning of April.

15   So there's no reason that they shouldn't have started

16   pulling these records for the other named plaintiffs or, indeed,

17   at least shouldn't start doing so now on a rolling basis.  In

18   order to prioritize things, they could do it starting with the

19   students they know have mental health issues and do it on a

20   rolling basis in that way.

21   I mean, we're absolutely amenable to working with the

22   defendants.  We're just a little bit between a rock and a hard

23   place in terms of getting what we need to demonstrate to the

24   Court that class certification is appropriate and to get, you

25   know, full expert reports in.  Otherwise, we're going to have to

1  serve expert reports and reserve rights to supplement and, you

2  know, serve additional expert reports once we get all the

3  documents.

4         MR. FRISCHER:  Your Honor, this is Harry Frischer.  If

5  I can just add very briefly, I'd like to point out what we've

6  asked for in Appendix A are the records relating to the kids who

7  have mental illnesses or are class members who are presently

8  residing at BTS; not historical records, not going back in time,

9  not records from kids who were there years ago.  That's part of

10  what we've reserved, and we can talk about that later.

11         So to answer your question, this is the triage, and this is

12  the priority, and, essentially, what we've asked for, you know,

13  just to synthesize the bullets, we've asked for records showing

14  which class members have been subject to restraints and

15  seclusion and the incident reports showing why, documents

16  showing what evaluations and treatment plans there have been

17  made for these kids and whether the kids got the treatment or

18  not, and that's it.  And that's it.  That's what we need.

19         Our experts need that to issue their reports, and what our

20  expectation is or was, that the Court would have the benefit of

21  our expert reports in connection with the class certification

22  motion; that we would submit both the expert reports and the

23  class certification simultaneously so the Court could see the

24  full picture, including our expert reports, in granting class

25  certification.

1        And, you know, I think there are only 100 to 120 kids at

2   the school.  All of them are not class members.  The class

3   members are those subset of those kids, and it's more than half,

4   but so it's, you know, 50, 60, or 70 kids, but not a thousand

5   kids.

6              THE COURT:  So when you say 100 to 120, you believe

7   that's the number of children at the school currently, currently

8   residing there total?

9              MR. FRISCHER:  Correct.

10             THE COURT:  Okay.

11             MR. FRISCHER:  That's exactly right, Your Honor.  And

12  of that, not all of them are class members.

13             THE COURT:  All right.  Let me just ask Defendants'

14  counsel, do you know how many kids are currently residing at the

15  school, and was that number pretty close?  And do you have a

16  sense, and you may not, but I'm going to ask you, how many of

17  those currently residing at the school potentially would be

18  class members under the proposed definition?

19             MS. DIXIT:  Your Honor, I believe at the school

20  there's somewhere between 95 to 100 students, and I really could

21  not give you an estimate of how many of those students would be

22  considered putative class members.

23             THE COURT:  All right.  And is this Ms. Dixit?

24             MS. DIXIT:  Yes.  I'm sorry, Your Honor.  This is

25  Ms. Dixit.

1          THE COURT:  Give me those numbers again.  You said how

2   many, approximately, at the school?

3          MS. DIXIT:  Approximately between 95 and 100 students

4   at the school.  And given their kind of broad definition of what

5   would be a putative class member, I couldn't even begin to

6   estimate how many of those would be putative class members.

7          THE COURT:  Okay.  Thank you.  I appreciate the

8   information.

9      All right.  Let me turn back to Plaintiffs' counsel.

10  Anything further that you want to raise with me that you feel

11  that we haven't adequately discussed or that you haven't fully

12  briefed at this stage?

13     And I understand your argument that you haven't talked with

14  defense counsel about some of these issues, and we'll talk about

15  that here in just a moment, but I just want to make sure that I

16  give you the opportunity to make whatever record on these other

17  issues you think you want to make.

18         MR. FARRELL:  Yeah.  Just a few things, Your Honor.

19  This is Tim Farrell.

20     You know, on the confidentiality regs, Your Honor's

21  absolutely right that an order would resolve that regulatory

22  issue.  I just wanted to make a record that it's our position

23  that the Federal Rules of Civil Procedure trump those

24  regulations and they shouldn't bar the Court in any event, and

25  the, you know, analogous cases we've cited in our briefing make

1  that clear.

2       The other thing I think is important to note is that

3  K.N.X., you know, the issue of Ms. Antonuccio is a bit of a red

4  herring in the sense that, you know, we haven't gotten discovery

5  from him either under the argument that there's been no consent

6  for him.  But we believe discovery from our own client on his

7  records is appropriate for all the same reasons we've already

8  articulated, and so we would obviously ask that the Court's

9  order cover him, certainly, so that we can get his documents

10 when he's in, you know, somewhat of a legal limbo with no one

11 who can act.

12      Hopefully Ms. Antonuccio can act in his stead, but in any

13 event, discovery from him and his records are obviously relevant

14 and critical to us, and so, you know, we would ask that any

15 order that the Court would issue would include, you know,

16 ordering discovery for K.N.X.

17           THE COURT:  And how old is he?  Is he like 16-ish?

18           MR. FARRELL:  Let me check, Your Honor.  I apologize.

19           THE COURT:  Okay.  That's right.

20           MR. FARRELL:  If my colleagues have that information

21 handy, please feel free to -- he's 16, that's right, Your Honor.

22           THE COURT:  Okay.  Thank you.  Go ahead.  I'm sorry.

23 I interrupted you.

24           MR. FARRELL:  You know, Your Honor, beyond the points

25 we've made about relevance and burden, which, again, you know,

1  to the extent the Court has questions about burden, we'd like to

2  brief them, I think that's it.

3      The only other thing we would note is we don't understand,

4  you know, why Defendants appended various videos to a motion

5  to -- a motion for protective order, and so we just want to note

6  for the record our objection to the inclusion of, you know,

7  videos which might be intended to prejudice the Court or

8  otherwise are just irrelevant to the motion practice being

9  injected into something like a discovery dispute.  We just

10  wanted to note that for the record also.

11          THE COURT:  All right.  And just so you know, I have

12  not looked at the videos because I didn't feel that I needed to

13  look at them for purposes of being prepared for today.  I don't

14  know what they're even videos of.  So at this point, I don't

15  intend to look at them.  You know, if it turns out later that I

16  need to review them for some purpose relating to the case, I'm

17  more than happy to do that, but I have not, at this stage,

18  looked at those.

19          MR. FARRELL:  Well, Your Honor --

20          THE COURT:  Go ahead.

21          MR. FARRELL:  I was just going to close the loop.

22  This is Tim Farrell.  It's our position the videos are entirely

23  irrelevant to the motion in front of the Court, and I'd be

24  interested -- if Defendants' position is otherwise, I'd be

25  interested in hearing it.

1          THE COURT:  Let me just ask Defendants, do you think

2   there's any reason I need to review the videos before I rule on

3   the pending motion?

4          MS. KRAEMER:  Your Honor, this is Gretchen Kraemer.

5   You don't need to review the video, but it is something that has

6   been quite time-consuming to duplicate, and we believe that they

7   were asking for the videos since the discovery requests were

8   very broad.  If Plaintiffs don't want the videos, then it's not

9   an issue; we won't bother producing them because it is costly

10  and time-consuming.

11         THE COURT:  Well, I guess I didn't hear that to be the

12  issue.  What I understood the issue that Plaintiffs were raising

13  is that they didn't think the Court needed to review those for

14  purposes of dealing with the pending motion.

15      Did I understand that correctly, Mr. Farrell?

16         MR. FARRELL:  That's right, Your Honor.

17         THE COURT:  Okay.  So here's what I'm going to do.  We

18  have a hearing on the plaintiffs' motion currently set for May

19  8th.  It's currently set for 11 o'clock, but I want to give us

20  adequate time to deal with these, so I can make a change and I

21  can either put you in at 9 o'clock or 10 o'clock that morning so

22  that we'd have a longer period of time to work through these

23  because, in addition to dealing with the plaintiffs' motion at

24  that time, I also am going to give you guys some homework to do

25  with respect to the issues that I have in front of me in the

1   defendants' motion.

2       So let me first ask, are you available on the 8th at 9

3   o'clock in the morning?  That would be Central Standard Time.

4   Or if not 9 o'clock, would you be available starting at 10

5   o'clock on the 8th?

6       Plaintiffs?

7           MR. FARRELL:  Absent objections from my colleagues on

8   the phone, we are available, Your Honor.

9           THE COURT:  All right.

10          MR. KIRSTEIN:  Your Honor, this is Nathan Kirstein

11  with DRI.  I myself and Catherine Frizell from Children's Rights

12  will most probably be on our way up to the State Training School

13  on that day with experts, starting, probably, our travels at

14  8:30 a.m.; however, we may be able to talk amongst ourselves and

15  make some changes if it need be.

16          THE COURT:  Okay.  How about Defendants?

17          MS. DIXIT:  Your Honor, we can be available at the

18  earlier time.  And we would actually request that the hearing be

19  an in-person hearing, if possible.

20          THE COURT:  Let me get my calendar.  Give me just a

21  second while we do that.

22      I have no problem having an in-person hearing.  Sometimes

23  those are more helpful.  But let me start -- let me tell you

24  what I want you to do before the hearing, and so you may tell me

25  you may need additional time, so we can always move it if we

1  need to.

2       So what I want you to do is I would like counsel to have a

3  conference with each other, and I'd like you to talk about a

4  number of issues.  The first of those issues is whether you can

5  agree, at least for prioritizing things, to a limited temporal

6  scope.  And if you can't, that's fine, but I want you to talk

7  about that.

8       So, I mean, for example, could we agree that you're going

9  to produce the documents being requested in Exhibit A for the

10 current residents for a year or a two-year time period at this

11 point?  That doesn't mean that that would be necessarily the

12 only documents that would ever have to be produced, but I'm just

13 trying to figure out a way that we can get this done and try to

14 keep you on track.  I think that's going to be very difficult

15 given where we are in the process, but, having said that, I'd

16 like you to talk about that.

17      I'd like you to talk about search terms for any email or

18 other electronic discovery that you need search terms for.  So I

19 think you need to work through that and see if you can come up

20 with some agreement.  If you can't come up with that agreement,

21 I mean, I'll put search terms together for you, but you're going

22 to be in a better position to do it than I am because I'm going

23 to, you know, be doing it based upon the information I have,

24 which won't be as full of information as you all have.

25      And then additionally, I'd like you to continue to talk

1 about whether or not you can agree with respect to some of these

2 other issues that are out there in terms of the policies and

3 procedures, the things that you have indicated you haven't had

4 an opportunity to fully discuss and evaluate.

5     So I'd like you to have that conference with each other,

6 and it may take more than one, to see if you can narrow the

7 scope of the issues that I need to decide.  In the meantime,

8 I'll go ahead and deal with the issue on K.N.X. and the next

9 friend issue.

10     And additionally, we don't have to worry about the access

11 to each other's records.  We've talked through that.  That

12 appears to be a moot issue, but I can certainly enter an order

13 saying that everybody's in agreement that that's how it's going

14 to be handled under the protective order, and that's no problem.

15     But that's what I'd like you to do, so having said that,

16 and not knowing your schedules, is having the hearing on May 8th

17 going to box you in too tight such that we should bump it out a

18 little bit?  I'd still like to get it in next week, if at all

19 possible, to keep this thing on track and also to get that other

20 motion dealt with, but let me ask that.

21     Plaintiffs' counsel, what's your thought?

22         MR. FRISCHER:  This is Harry Frischer, Your Honor.  I

23 do note that, as Nathan said, there's our expert on-site

24 inspection of the school on May 8th and 9th.  I believe the

25 experts have made travel plans there, you know, and they've

1 reserved their schedule, and they're on their way to do it.  And

2 that will also, on our side of the caption, involve two of our

3 lawyers physically being in Eldora on that day, and I assume

4 there will be lawyers from the other side of the caption that

5 are also in Eldora on that date, so I don't see how that date

6 can be an in-person conference.  Later in the week it can be.

7            THE COURT:  All right.  Defendants?

8            MS. KRAEMER:  This is Gretchen Kraemer.  We can make

9 the 8th work, Your Honor.  We started asking for deposition

10 dates in February.  We sent notices of the depositions on April

11 9th.  So this really didn't need to be an emergency hearing, but

12 to the extent it is, we will have a substantive response on file

13 by Friday.

14     We also note that the plaintiffs are insisting on having

15 the records, the putative class records, available for the

16 inspection on the 8th.  Our position is that we need to wait for

17 the Court's ruling on this.

18     And the reason we would like an in-person hearing is the

19 plaintiffs have offered an affidavit from a witness, and,

20 frankly, we'd like to subpoena him so that he's subject to

21 cross-examination as well.  We think that would be relevant if

22 the Court thinks -- if the plaintiffs think that this

23 information is relevant to the Court, it should be a full record

24 and not just a one-sided affidavit.

25            THE COURT:  So tell me, who do you want to subpoena?

1            MS. KRAEMER:  Plaintiffs forwarded an affidavit from

2    the director of Next Step Counseling Services, and he made some

3    conclusory allegations, and we would like to ask him questions

4    about those.

5            THE COURT:  And that's with respect to the motion that

6    the plaintiffs filed?

7            MS. KRAEMER:  Correct.

8            THE COURT:  Okay.

9            MS. KRAEMER:  Which is what I understood the hearing

10   to be on Tuesday.

11           THE COURT:  Well, it would be on that plus further

12   discussion with you all after you've had a chance to meet and

13   confer on the issues that I've identified in the defendants'

14   motion.

15           MS. KRAEMER:  Okay.

16           THE COURT:  So that's what I'm anticipating that

17   meeting would be, that -- it's not a meeting; it's a court

18   hearing.

19        Plaintiffs, respond for me.

20           MR. FRISCHER:  Nathan, do you want to respond?  I'm

21   happy to respond, but I think you have more of those facts.

22           MR. KIRSTEIN:  Yeah.  Your Honor, this is Nathan

23   Kirstein with Disability Rights Iowa.  I'm thinking about this

24   for a moment.

25        You know, number one, I'm not sure we can make an in-person

1   hearing work on the 8th just because of what was stated by my

2   colleague Harry.  We have a site visit that's been set up.

3   These dates have been agreed upon by both counsel, Plaintiffs'

4   counsel as well as defense counsel, for our experts to go up to

5   the State Training School.  That's going to take resources from

6   our team as well as their team, so I don't see this happening on

7   May 8th in a way that can provide Your Honor the most amount of

8   information possible to make decisions on the issues before Your

9   Honor right now.

10          THE COURT:  I don't have the file in front of me for

11  the plaintiffs' motion.  Where is your individual from who

12  provided the affidavit?  Is he here in Iowa?

13          MR. KIRSTEIN:  Yes, Your Honor.  This is Nathan

14  Kirstein again.  Yes.  He is from Des Moines --

15          THE COURT:  Okay.

16          MR. KIRSTEIN:  -- and could be made available for a

17  hearing, in-person hearing, yes.

18          THE COURT:  Okay.  And with respect to the on-site

19  inspection that your experts are going to be doing on May 8th

20  and 9th, I mean, given where we are, you're not going to have

21  all the records that are being requested in the current motion.

22  You won't have -- you know, other than beyond the ones that

23  you've gotten or the ones related to the named plaintiffs that

24  you've already received, you won't have those because you won't

25  have my ruling by then.  So will that impact the on-site

47

1  inspection, or will you still do it even though you may not have

2  those records at that point in time?

3          MR. FRISCHER:  That's a very good question, Your

4  Honor, and the only answer I can give you right now is that

5  we'll need to discuss that internally.  And we'll have to

6  discuss internally the various deadlines that are in place and

7  see, you know, what extent those are still viable, you know,

8  given where we are and what we need to do to get there.

9          THE COURT:  All right.  Well, let me ask you all

10  this --

11          MS. DIXIT:  Your Honor, this is Ana Dixit for the

12  defendants.  Just for the Court's clarification, the on-site

13  inspection was scheduled after the plaintiffs had received

14  Defendants' notice of depositions.

15          THE COURT:  Okay.  Why is that relevant?

16          MS. DIXIT:  Because, Your Honor, they had the notice

17  of depositions for over a month, over which time period they

18  could have objected to the actual depositions, as they have done

19  now, and in constraining our ability to have an in-person

20  hearing based on their choice to have the inspection on that

21  date, we're prejudiced by that considering they knew well in

22  advance when Defendants were planning on holding these

23  depositions.

24          THE COURT:  Okay.  Well, we are where we are, and I

25  don't think anybody's any more prejudiced than anybody else.

1  We're dealing with some kind of unique issues here, certainly,

2  with respect to the discovery and the individuals that we're

3  dealing with, so I think they deserve appropriate attention from

4  both the lawyers and the Court, so I am not concerned with

5  respect to that.

6       What I'm concerned about is making sure that I can have a

7  meaningful hearing with you and give you all adequate time to

8  deal with these while also giving you adequate time to see if

9  you can talk to each other and narrow the issues that the Court

10 needs to deal with.

11      I mean, if I need to deal with them, I will, but, again, as

12 I've told you guys, you know a lot more about this case and

13 about what can and cannot work in the case than I do.  So you

14 will get my ruling down the road, but I'm trying to see if we

15 can't work through some of these issues in a little bit better

16 way so that we give you the best ruling possible.

17      So let me just ask this question of everybody.  Is

18 everybody available, could you do an in-person hearing on

19 Thursday, which is May 10th, at 9 o'clock?  And what's your

20 sense, given that you're telling me that it would be

21 evidentiary, of how much time you would need, one, with respect

22 to the pending motion that the plaintiffs have filed, but also

23 to get back together and work through the rest of this discovery

24 issue that we have?

25      Let me start again with Plaintiffs' counsel.  One, are you

1    available for an in-person hearing; two, what's your estimate on

2    time frame?

3        MR. FRISCHER:  This is Harry Frischer, Your Honor, and

4    speaking for myself, I am certainly available and can be there

5    at 9 o'clock.  Mr. Koch's affidavit is a very short affidavit.

6    I think it's three or four pages.  I can't imagine the

7    cross-examination of him or any examination would take more than

8    an hour, if that, if that.  Perhaps a half-hour.

9        And I do appreciate the time that you are giving us to work

10   out these issues.  I think we hopefully can work out a number of

11   these issues, and perhaps if, in addition to the time for

12   Mr. Koch's examination, if you give us -- you know, I'm thinking

13   of a half a day, Your Honor, maybe two hours, and that should be

14   sufficient, two and a half hours.

15       THE COURT:  All right.  Defense counsel, one, can you

16   be available; two, your estimate on time frame?

17       MS. KRAEMER:  Yes, we can be available.  That was the

18   first day of our depositions that we had noticed up on April

19   9th.  And I think two hours would be fine, Your Honor.

20       THE COURT:  All right.  Let's set you in, then, let's

21   move your hearing to May 10th at 9 o'clock.  It will be an

22   in-person hearing.  It will be in my courtroom, which is Room

23   460.  And I'll have to move a couple things, but it's not a

24   problem.  I will do that, and we'll make sure that you guys have

25   about 2 1/2 hours.

1     We'll set you in from 9 to 11:30.  If you don't need all

2  that time, don't take it, because I've got plenty of other work

3  I can do.  So I'm not looking for something to fill my time, but

4  I want to make sure I give you adequate time to deal with that

5  and to get that taken care of.

6     But in the meantime, I would like that meet-and-confer to

7  occur.  I'd also like for you to talk about getting Mr. Koch

8  there for purposes of the hearing as well so we get that

9  arranged.

10     All right.  Anything further that anybody thinks we need to

11  talk about yet today or do you have any questions about my

12  expectations between now and May 10th?

13     Defense counsel, I'll start with you guys this time.

14          MS. KRAEMER:  Your Honor, just one minor point.  We

15  have had a difficult time getting deposition dates, and it has

16  always been my practice to agree on those to the extent

17  possible.  We will need to reschedule the plaintiffs' deposition

18  dates.  We would like them to agree and provide us dates.

19     We have also asked for dates for their expert depositions

20  in the month of June so that we can depose them before our

21  expert reports are due.  They have declined, and I guess I would

22  ask that we get dates.  It doesn't make any sense when we're

23  dealing with experts to just subpoena people for random dates.

24          THE COURT:  Well, again, what I'll ask you to do is to

25  have a conference with each other and in that conference discuss

1   potential dates for the depositions of the named plaintiffs.

2   You should be able to get that done prior to that May 10th date.

3        And then secondly, with respect to the expert issue, I

4   understand your position, but I also understand from the

5   plaintiffs that, given where we are procedurally and time

6   frame-wise, they don't know yet whether they think that expert

7   deadline from their perspective is going to be workable, so I

8   think that's another issue I'd like you all to discuss, both

9   first internally amongst yourselves but then with each other.

10       I'd like to talk with you about that on May 10th as well,

11   about where we are in comparison to our original deadlines and

12   what's realistic, and if we need to move those, I think the time

13   to move them is now, but we need to kind of have a good feeling

14   for what that might look like.  And I understand in part it's

15   going to depend on what the Court rules with respect to these

16   two pending motions, and that's why I'm hoping you guys can

17   narrow that down a little bit and start to work together on the

18   issues.

19       Having said that, I think you're bringing up important

20   issues, and I understand the positions you're both taking, and

21   I'm doing my best to help you here, but you guys can, I think,

22   do a lot of this yourselves if you can just have some further

23   ongoing and meaningful communication.

24       All right.  Anything else on behalf of the plaintiffs?

25            MR. FARRELL:  Your Honor, this is Tim Farrell for the

1  plaintiffs.  Just to be abundantly clear, and not to presume

2  Your Honor's ruling, but the conferences we should be having in

3  terms of scope of discovery should assume that there will be

4  some class discovery ordered, correct, because that's been sort

5  of the gating issue that I think has sort of precluded some

6  meaningful issues on scope has been the insistence that we get a

7  gating ruling on class discovery generally.

8       So without presuming Your Honor's ruling, these discussions

9  should be presuming that some class discovery will be ordered --

10           THE COURT:  I think --

11           MR. FARRELL:  -- is that correct?

12           THE COURT:  Let me just say it this way:  Obviously,

13  I'm going to listen to everything that you tell me at the

14  hearing, again, on the 10th with respect to both of the motions,

15  but right now my inclination is that there will be some

16  pre-class certification discovery allowed beyond just the named

17  plaintiffs and with some of the documents that you've requested,

18  and, additionally, I anticipate that there will be depositions

19  of the named plaintiffs as well.

20      So you can use that as you discuss it with each other and

21  presume that so that we are in the best position possible when

22  we get back together on May 10th, okay?

23           MR. FARRELL:  That's very helpful.  Thank you, Your

24  Honor.

25           THE COURT:  All right.  Thank you all for your time.

1    I appreciate it.  As I told you, I'm going to go ahead and deal

2    with the two issues that we've talked about and get those taken

3    care of, but then I want to revisit these discovery issues as

4    well as the plaintiffs' motion for protective order on the

5    depositions of the plaintiffs in -- named plaintiffs.  Excuse

6    me.

7          When we meet on May 10th, that's going to be in person, 9

8    o'clock in the morning in my courtroom, Room 460.  We'll have up

9    until 11:30.  I'll have some criminal matters after that, but I

10   can block off that 2 1/2-hour time period for you, okay?

11               MR. FRISCHER:  Thank you very much, Your Honor.

12               THE COURT:  You're welcome.  Thank you.

13               (Proceedings concluded at 11:18 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

54

1            C E R T I F I C A T E

2            I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3   the State of Iowa and Federal Official Realtime Court Reporter

4   in and for the United States District Court for the Southern

5   District of Iowa, do hereby certify, pursuant to Title 28,

6   United States Code, Section 753, that the foregoing is a true

7   and correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the regulations of

10  the Judicial Conference of the United States.

11           Dated at Des Moines, Iowa, this 7th day of June, 2018.

12

13

14                    /s/ Kelli M. Mulcahy
                      Kelli M. Mulcahy, CSR, RMR, CRR
15                    Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25