1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - X
G.R.X., Through His Next Friend :
H.R.X; J.S.X., Through His Next :
Friend D.S.X.; C.P.X., Through :
His Next Friend S.P.X.; K.N.X., :
Through His Next Friend Rachel :
Antonuccio, For Themselves and :
Those Similarly Situated, :
                                 :
      Plaintiffs, :
                                 :
vs. :          Case No. 4:17-cv-00417
                                 :
JERRY FOXHOVEN, in his Official :
Capacity as Director of Iowa :
Department of Human Services; :
RICHARD SHULTS, in his Official :
Capacity as Administrator of :
the Division of Mental Health :
and Disability Services; and :
MARK DAY, in his Official :
Capacity as Superintendent of :
the Boys State Training School, :    HEARING TRANSCRIPT
                                 :
      Defendants. :
- - - - - - - - - - - - - - - X


                        Courtroom, Fourth Floor
                        U.S. Courthouse
                        123 East Walnut Street
                        Des Moines, Iowa
                        Thursday, May 10, 2018
                        8:54 a.m.


BEFORE:  THE HONORABLE HELEN C. ADAMS, Chief Magistrate Judge.



                  KELLI M. MULCAHY, CSR, RMR, CRR
                     United States Courthouse
                  123 East Walnut Street, Room 115
                     Des Moines, Iowa 50309

2

APPEARANCES:

For the Plaintiffs:        TIMOTHY R. FARRELL, ESQ.
                           Ropes & Gray, LLP
                           191 North Wacker Drive
                           32nd Floor
                           Chicago, Illinois  60606

                           NATHAN D. KIRSTEIN, ESQ.
                           Disability Rights Iowa
                           400 East Court Avenue, Suite 300
                           Des Moines, Iowa  50309

                           HARRY FRISCHER, ESQ.
                           CATHERINE McGUIRE FRIZELL, ESQ.
                           Children's Rights
                           88 Pine Street, Suite 800
                           New York, New York  10005

For the Defendants:        GRETCHEN WITTE KRAEMER, ESQ.
                           MATTHEW K. GILLESPIE, ESQ.
                           ANAGHA DIXIT, ESQ.
                           Assistant Attorneys General
                           Hoover State Office Building
                           1305 East Walnut Street
                           Des Moines, Iowa  50319

3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| For the Plaintiffs: | | | | |
| Mike Koch | 16 (Kirstein) | 28 (Kraemer) | | |

E X H I B I T S

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|----------------------|---------|----------|
| 1 - Notice of deposition | 32 | 32 |
| 2 - Excerpts of Chapter 24 | 34 | 34 |
| 3 - Excerpt from DSM-5 | 49 | 49 |

1                    P R O C E E D I N G S

2              (In open court.)

3              THE COURT:  Please be seated.

4        Good morning.  We are here this morning in G.R.X., et al.,

5   vs. Foxhoven, et al.  That's Civil Case No. 4:17-417.  What I'd

6   like to do first is just get a roll call.

7        So, Mr. Frischer, if you would introduce everybody who is

8   here on behalf of Plaintiffs for me, I would appreciate it.

9              MR. FRISCHER:  Certainly, Your Honor.  I'm Harry

10  Frischer from Children's Rights.  To my right is Nathan Kirstein

11  from Disability Rights Iowa.  To my immediate left is Catherine

12  Frizell from Children's Rights, and just behind Ms. Frizell is

13  Timothy Farrell from Ropes & Gray.

14             THE COURT:  Thank you very much.

15       Ms. Kraemer, if you would introduce everybody who is here

16  on behalf of Defendants, please.

17             MS. KRAEMER:  Thank you, Your Honor.  I am Gretchen

18  Kraemer, and with me are Ana Dixit and Matthew Gillespie.

19             THE COURT:  Thank you very much.

20       All right.  Counsel, we have first thing up is Plaintiffs'

21  motion for protective order, which is in the Court's docket at

22  Docket No. 76.  I think we'll just go ahead and start with that

23  motion.

24       Let me ask this question first:  Does anybody intend to

25  present any evidence with respect to that motion?

1          Anything on behalf of Plaintiffs?

2               MR. FRISCHER:  Your Honor, we have Mr. Koch here, who

3    is our affiant.  At the Court's direction and at Ms. Kraemer's

4    request, we've brought him here.  We've also been able to

5    substantially narrow what we're asking for in the motion.

6          I'm not sure whether it's going to be necessary for the

7    Court to hear Mr. Koch's testimony based on what the issues are

8    remaining in the motion.  Perhaps what makes sense is for

9    counsel to advise the Court where we are, what's not in dispute

10   and what's in dispute, and then we can talk about to the extent

11   to which Mr. Koch's testimony is necessary, Your Honor

12              THE COURT:  Any objection to that, Ms. Kraemer?

13              MS. KRAEMER:  Your Honor, we would like to take

14   Mr. Koch's testimony, but a brief rendition of where each party

15   thinks we are, I think, is fine.

16              THE COURT:  Okay.  Let's do that.

17         And you can both stay seated if you want.  You don't need

18   to stand up during today's oral argument.

19         So, Mr. Frischer, do you want to tell me what you think is

20   left to deal with in the Plaintiffs' motion for protective

21   order?

22              MR. FRISCHER:  Sure.  Thank you, Your Honor.

23         With the Court's guidance in our conference call last week,

24   taking that guidance to heart, our position is we are no longer

25   insisting that the depositions be -- the deposition notices be

1   vacated.  We're prepared to put Mr. Koch up for -- withdrawn.

2   We are prepared to put the named plaintiffs up for depositions

3   with some reasonable accommodations on account of their youth

4   and diagnoses of mental illness.

5       We think we've reached agreement on some of the

6   accommodations, although as I understand it Defendants don't

7   think they're necessary, but they're not insisting that they be

8   blocked.  And Ms. Kraemer can speak for herself, but at least my

9   understanding is that the State would agree to these things.

10      In particular, what we have requested is that a mental

11  health professional be at -- of our choosing be at the

12  deposition, not to interrupt, not to cause disruption, but to be

13  prepared to provide a stabilizing force for the children; to the

14  extent there's disruption, to the extent there's anger, to the

15  extent there's any of these symptoms of mental health illness,

16  to be there and be a resource.

17      We've also asked that that mental health professional have

18  the opportunity to meet with the child beforehand so that the

19  first time they're meeting the boy is not at the deposition

20  itself, but they have some time to spend with the boy before the

21  examination to gain an understanding of what's likely to happen

22  at the deposition, what the risk factors are, and to prepare a

23  plan of how to de-escalate any problems, if they occur, during

24  the breaks.

25      We've also asked for the mental health professional to have

1    the ability to meet with the child again after the deposition to

2    assess the mental health state of the child at that time and to

3    form a recommendation, if one is necessary, as to whether any

4    treatment is necessary.  And, again, my understanding is the

5    State does not think it's necessary but is not opposing that

6    accommodation.

7         The State's also agreed that to take reasonable breaks as

8    necessary, given the children's mental health diagnoses and

9    youth.

10        And with those accommodations, Your Honor, if those

11   accommodations are set, we think the depositions for the three

12   boys who are presently incarcerated at the school can take place

13   at the school.  We're not asking that they be transported to

14   someplace else.

15        The boy who is no longer incarcerated at the school, that,

16   I believe, we've reached an agreement as to a neutral location

17   for the deposition of that young man.

18        So that is what I think we can agree to.  Ms. Kraemer can

19   speak for herself.  The areas where we still have some dispute

20   are about the scope of the deposition, the length of the

21   deposition, and when these depositions will take place, and, you

22   know, I can just outline for you what that dispute that remains

23   is.

24        With respect to the -- well, generally, let me say

25   generally, to the extent the State intends to ask questions

1 about the experiences these boys have had at the school, what

2 the school did to them, what happened to them at the school, we

3 think that is an appropriate area of inquiry.

4      To the extent that -- what we think is not an appropriate

5 area of inquiry is to the extent the State intends to ask about

6 the underlying acts for which the boys were initially

7 incarcerated at the school or questions about their juvenile

8 record.

9      We think that those -- that those issues are not relevant

10 to the dispute.  They don't bear on whether the school is

11 providing adequate mental health treatment for the boys or

12 improperly punishing the boys for events at the school, and we

13 do think that it's irrelevant.  Particularly given it's

14 potentially prejudicial to their juvenile court proceeding, it's

15 not necessary, and we ask that that be excluded.

16      We also ask that -- at least we understand that Defendants

17 may ask about the boys' experience at other facilities; what

18 happened to you there, what happened at that facility.  We think

19 that is equally irrelevant.  You know, the question, again, here

20 is whether the State, at this facility, whether their policies

21 and practices with respect to mental health, punishment,

22 restraints, and seclusion, whether those practices at this

23 facility violate the constitutional rights of these boys.  You

24 know, what happened at other facilities isn't relevant to that.

25      Your Honor, I would just say two very quick things.  First

1    is that "other places did it too" is not a defense, and, number

2    two, even perhaps more importantly, that the anecdotal evidence

3    of these boys is not evidence of what standard practices and

4    policies in the field are; that if Defendants intend to prove

5    that, they prove that through expert testimony, not in some

6    anecdotes about what happened to particular boys at other

7    facilities.

8         The third issue we're concerned about, I think we have

9    resolved.  We have expressed concern about questioning the boys

10   about their underlying childhood traumas before they attended

11   the school; the loss of the parent, the removal from the home,

12   things like that.  And there, I believe, we have Defendants'

13   agreement not to ask about those things.

14        So those are the areas where we still have disputes about

15   the scope of the deposition.

16        We have a deposition -- we have a dispute about the length

17   of the deposition.  You know, as we understand it, Defendants

18   have not committed to anything other than the seven hours

19   they're entitled to under the federal rules.  Well, they said

20   they might not use it.  And, frankly, given the age of these

21   boys, given the nature of the case, we think there should be

22   some reasonable limitation on the scope, on the length.

23        We suggested an hour, and, you know, if it's an hour, two

24   hours, some reasonable time.  These, I believe, are limited

25   depositions about limited issues in this case, which at its

1  heart, Judge, at its heart is a class-wide case about the

2  policies and procedures of the institution.

3       To the extent there's going to be examination of these

4  boys, which we will agree to, we'll make them available, but

5  there needs to be some, you know, reasonable length.  You know,

6  we have not heard from Defendants how long they really need and

7  why, and I would ask that the Court set a reasonable amount of

8  time for these depositions to be concluded.

9       The last issue, Your Honor, the last issue, is when these

10 depositions take place.  Defendants' position is right away,

11 right away, right away, you know.  And this is tied in, to a

12 large extent, Your Honor, on the other motion that we have to

13 talk to you about; the sequencing and an orderly sequencing of

14 discovery to get us -- to get both sides the information that's

15 needed for the class certification motion, to oppose class

16 certification, and to move forward with the case.

17      We have also narrowed the issues on those motions and have

18 a proposal on exactly that kind of orderly sequencing, and our

19 view is that the depositions of these boys should be part of

20 that orderly sequence.  And we think, you know, that the highest

21 priority now is to get these Appendix A documents produced; to

22 have some of them, a subset, produced right away, to have the

23 rest of them produced sometime later.

24      We think the depositions of the boys should be slotted in,

25 you know, after not all the documents are produced in this case,

1  not even -- we're not asking to wait until, you know, a huge

2  amount of documents, but we think let's get these Appendix A

3  documents on the table.  Let's focus on that first, and then we

4  can slate those depositions in.  We've given some dates.

5      I don't propose to explain now, until we move on to that

6  motion, where we are in terms of that timing and how we see

7  structuring discovery.  Perhaps the discussion on when the

8  depositions of these boys should take place can fit into that

9  discussion, and we can talk now about, you know, A, whether the

10  agreement I think we have on accommodations is an agreement or

11  not and whether we can set any sort of limitations on the

12  subject matter, scope, and time limit.

13          THE COURT:  All right.  Ms. Kraemer, let's start

14  there.  With respect to these accommodations, let's go there,

15  that have been outlined.

16      The mental health professional being at the deposition of

17  each of the named plaintiffs, and that would be someone chosen

18  by the plaintiffs' counsel:  The purpose of that person's

19  appearance at the depositions would be they would not be

20  speaking or disrupting the deposition, making objections, but

21  would be there to provide resources for the youth if they become

22  upset or, things escalate, to calm things down, number one.

23      Number two, the mental health professional meeting with the

24  child before the actual examination so they can at least have an

25  opportunity to get to know the child and the child isn't meeting

1   them for the first time walking into the deposition.

2       Number three, mental health professional meeting with the

3   child after the deposition just to see -- kind of do a debrief

4   is almost what it sounds like to me and to make a recommendation

5   if there's any further treatment or things necessary as a result

6   of any anxiety that the child has had as a result of the

7   deposition.

8       Number four, taking reasonable breaks during the deposition

9   as necessary to be determined by counsel, certainly under good

10  faith standards.

11      And then number five, the location of the depositions with

12  the three named plaintiffs who are still residing at the school

13  to be deposed at the school, and then the fourth individual who

14  is no longer residing at the facility, a neutral location to be

15  determined between counsel.

16      Do Defendants have any objections to those accommodations

17  as outlined?

18          MS. KRAEMER:  Your Honor, our position in these

19  discussions was that they're not necessary, and then we engaged

20  in conditional negotiation beyond that.  So I would like to

21  examine Mr. Koch, who is the affiant, whose work supports the

22  request for these accommodations, before agreeing to the

23  accommodations.

24      If the Court finds that these accommodations are

25  appropriate after hearing from Mr. Koch, then, yes, we are in

1   agreement, but it was intended to be a conditional discussion.

2       The first piece of evidence I would like to offer the Court

3   is actually the notices of the deposition, which are not yet in

4   the record, but --

5           THE COURT:  Let me stop you for just a second before

6   we go there.  I just want to make sure.  And then do you agree

7   that still at issue beyond -- it sounds like the accommodations

8   issues are still at issue, then, until you depose -- or until

9   you examine him, but do you also agree that still at issue with

10  respect to the pending motion would be the scope of the

11  deposition, the length of the deposition, and the scheduling of

12  the depositions?

13          MS. KRAEMER:  Yes.  With respect to the scope of the

14  deposition, we did agree not to go into the underlying child

15  trauma.  The concern with agreeing to some of these limitations

16  in advance is, as Your Honor knows, when you're questioning

17  somebody, it's an organic process, and we don't want to be

18  unduly limited in discussing these things.

19      To the extent that the plaintiffs have concerns about this

20  information being prejudicial, that can be remedied with a

21  motion in limine in whatever court process that information is

22  relevant in, but usually discovery is intended for just that

23  purpose, to ascertain facts as they are.  So that is the

24  objection to the scope issues.

25      On the length issue, we did agree to hold the depositions

1   over subsequent days if there needs to be a break, but we have

2   not agreed to waive our rights under the Federal Rules of

3   Procedure to take as long as we need to take.

4        It's a very lengthy complaint, and we would ask to have

5   leave to go through it.  We certainly intend to do so in a

6   professional manner and an expedient manner.  I have never taken

7   a seven-hour deposition in my life, but this might be the first

8   case where it becomes necessary, and we would like the Court's

9   leave to do that.

10       With respect to the timing of the depositions, obviously,

11  they're not going to happen tomorrow.  Plaintiffs have proposed

12  that they occur in a week in August.  We would like the

13  depositions to be available to our experts for the purpose of

14  preparing their reports.  We would like the depositions to be

15  transcribed so that they are available for the purpose of

16  resisting any motions, and, honestly, we would like the

17  information to consider as we develop the defense in this case,

18  and I think the federal rules expressly permit that.

19       Allowing us to take the depositions in August, after class

20  certification and expert reports are already produced, I think

21  is just too late, and I don't think that that's reasonable.  We

22  started asking for depositions in February.  We noticed them up

23  in April.  Obviously, they were supposed to take place today and

24  tomorrow, and that's not going to happen, but I think June is a

25  very reasonable estimate, and I think we should all be able to

1  find some time in our schedule to accomplish that in June.

2         THE COURT:  All right.  So given, then, where we are,

3  it sounds like there may be some things that the defendants can

4  agree to after we have the testimony from Mr. Koch.  Am I

5  understanding that correctly?

6         MS. KRAEMER:  Yes, Your Honor.

7         THE COURT:  Okay.  Mr. Frischer, do you intend to put

8  on any evidence from Mr. Koch at this point or are you just

9  going to rely, at least initially, on his affidavit, let the

10  State cross-examine him, and then you'll do redirect?  Is that

11  what you're thinking?

12         MR. FRISCHER:  We would request the opportunity to do

13  a fairly short direct examination to highlight the issues that

14  are at issue now.

15         THE COURT:  All right.

16         MR. FRISCHER:  And with the Court's permission,

17  Mr. Kirstein will examine Mr. Koch.

18         THE COURT:  Is Mr. Koch here?

19         MR. FRISCHER:  Yes.

20         THE COURT:  Let's get him in and let's get him

21  started, then.

22         THE LAW CLERK:  Please raise your right hand.

23         MICHAEL KOCH, PLAINTIFFS' WITNESS, SWORN

24         THE COURT:  Please be seated.

25         MR. KIRSTEIN:  Your Honor, may I be seated --

1          THE COURT:  You may.

2          MR. KIRSTEIN:  -- while I'm questioning then?

3          THE COURT:  You certainly can.

4          MR. KIRSTEIN:  Thank you.

5                         DIRECT EXAMINATION

6  BY MR. KIRSTEIN:

7  Q.  Mr. Koch, can you please state your full name and spell it

8  for the court reporter, please.

9  A.  Yes.  My name is Mike Koch.  Last name is K-o-c-h.

10  Q.  What's your occupation, Mr. Koch?

11  A.  I am currently the clinical director and mental health

12  therapist at my agency, Next Step Counseling Services.

13  Q.  What does clinical director mean?  Can you talk about that

14  role?

15  A.  Sure.  Part of my responsibility as clinical director is

16  that I am certified with the State of Iowa to be able to provide

17  supervision for provisional licensed individuals that are

18  working towards their independent license.  I also provide

19  trainings for staff, and I have done some in the community as

20  well.  That's pretty much the main role of the clinical part of

21  it that I provide.

22  Q.  Okay.  Do you carry a caseload?

23  A.  I do.  I have a caseload.  Mainly work with adolescents --

24  well, and young adults between the ages of 13 and 24 with all

25  different kinds of diagnoses and issues.

1  Q.  How long have you been in that role at Next Step Counseling?

2  A.  I have been in the role -- let's see.  We incorporated in

3  2007.  I gained my independent license in 2005.

4  Q.  Okay.  So about 11 years?

5  A.  Thirteen years I've been -- since I gained my independent

6  license, was able to begin some supervision for staff, so...

7  Q.  What type of caseload do you carry in that role at Next

8  Step?

9  A.  In regards to clients?

10  Q.  Correct.

11  A.  Okay.  I've got clients with a range of needs that have

12  fairly significant, you know, depression, anxiety, bipolar

13  disorder, oppositional defiant disorder.  ADHD is one of --

14  probably one of the main diagnoses that I treat.  You know, mood

15  disorders, anxiety, that's probably the core of the individuals

16  that I treat.

17  Q.  What are the ages?

18  A.  Between 13 and 24.

19  Q.  Okay.  Have any of them experienced early childhood trauma?

20  A.  I would say every one of them has experienced early

21  childhood trauma.

22  Q.  What type of licensure do you have?

23  A.  I'm a licensed independent social worker.

24  Q.  And how long have you had that licensure again?

25  A.  I've been a licensed independent social worker since May of

1  2005.

2  Q.  Can you please compare the role of a licensed independent

3  social worker to that of a licensed psychologist?

4  A.  Absolutely.  Most of the time both have private practices or

5  in some type of practice.  We both provide psychosocial

6  evaluations, to include gathering the social history, mental

7  status exams, risk assessments, abuse history, developmental

8  issues that may occur.

9     We also have the ability to gather information from the

10  symptoms to diagnose mental disorders, treatment planning,

11  progress notes, discharge planning, resource and referral.

12  Q.  Thank you.  You mentioned trainings earlier that you

13  provide --

14  A.  Uh-huh.

15  Q.  -- that you're actually the trainer.

16  A.  Correct.

17  Q.  Can you give the Court a taste of what those trainings might

18  be?

19  A.  Sure.  Yeah.  Some of my trainings that I've done is I've

20  done some trauma-informed different diagnoses around ADHD,

21  depression, mood disorder, oppositional defiant disorder,

22  bipolar, aggression replacement training, engagement of clients.

23  Along with the aggression replacement there's another component

24  called social Skillstreaming.  Those are probably some of the

25  main trainings that I've done over the years or co-facilitated.

1  Q.  What's your educational background?

2  A.  I have a bachelor's in child and family services and then my

3  master's in social work.

4  Q.  When did you receive your bachelor's?

5  A.  1995.

6  Q.  And when did you receive your master's?

7  A.  2001.

8  Q.  Before we begin to talk about the case before the Court

9  today, could you please describe any other relevant experience

10  you might have for the Court?

11  A.  Sure.  I've -- first part of my career was mainly behavior

12  modification.  I did some residential work as well as a lot of

13  community-based work, skill building.  Worked a great deal with

14  DHS, Department of Human Services, juvenile court services.

15      After I obtained my master's, that's when I really started

16  doing more mental health work.  I worked at Broadlawns Medical

17  Center as the -- over the child and adolescents department.

18  Worked at -- I'm sorry.  Sometimes I get a little disorganized.

19  I try to keep myself some bullets here, but I've already gone

20  off track.

21      During my undergrad I worked for an agency called Four Oaks

22  here in the state of Iowa as well, and we did day treatment

23  programming, did our core work with delinquents and DHS.  During

24  that time, that's when I got my master's and after that went to

25  Broadlawns Medical Center.

1      From there, Youth Emergency Shelter Services, helped them

2   open up a -- start their mental health program, and then I went

3   into private practice, and Next Step Counseling is my practice,

4   so...

5   Q.  Very good.  Thank you.  So what is your familiarity with the

6   case in front of the Court today?

7   A.  Sure.  My -- we obviously -- well, we've been working with

8   Disability Rights Iowa back in, I believe it was -- it was May

9   of 2017 there was a request for us to kind of go and review some

10  files as well as do some interviews with some of the young men

11  that were identified, as well as reviewing the policy and

12  practice at the Boys State Training School.

13      So we made four visits total to gather that information and

14  then render a recommendation to explore the concerns and needs

15  for mental health services at the training school.

16  Q.  And could you please explain who "we" is?

17  A.  Oh, I'm sorry.  Yeah.  It was myself and two other licensed

18  independent social workers; Tony Raymer and Janell Aldrich.

19  Q.  And there was a published report, correct?

20  A.  Correct.  Yes.  We -- Tony did the lion part of putting

21  together the report with strengths, needs, the information that

22  we gathered around mental health concerns, medication, you know,

23  some of the -- and made some recommendations as well to

24  hopefully help, you know, with better serving those young men up

25  there and their mental health needs.

1  Q.  What about any recent familiarity with the case before the

2  Court today?

3  A.  Yes.  I had an opportunity to review the document that was

4  filed on February 16th and then the opportunity to, you know,

5  obviously, put together the affidavit with some of my concerns

6  in regards to that report and to hopefully better assist these

7  young men with being able to assure that, you know, we do no

8  harm for these young men in gathering the information that

9  sounds as though we're going to move forward to gather.

10           THE COURT:  Can I stop you for just a second?

11           THE WITNESS:  Sure.

12           THE COURT:  When you said you reviewed the document --

13           THE WITNESS:  Yeah.

14           THE COURT:  -- filed on February 16th, does that

15  document have a name on it?

16           THE WITNESS:  It is Document 33.

17           THE COURT:  33.  Okay.  That's all I need.  Thank you.

18           THE WITNESS:  Not a problem.

19  BY MR. KIRSTEIN:

20  Q.  Did you review anything else from the defendants?

21  A.  Let's see.  I don't believe so.  I've got -- if I did, I'm

22  not recalling it at this time.

23  Q.  Thank you.  What is your understanding of the mental health

24  conditions of the named plaintiffs?

25  A.  Well, my understanding is from what I reviewed, you know,

1   clearly, from their diagnoses, you can glean some of the

2   concerns that these young men are having.  And, you know, just

3   from our review of the files that we did review, there were some

4   very common themes across, you know, the residents that are

5   there around the traumas that they had suffered as well as the

6   struggles that they were having with managing mental health and

7   limited supports and services that were available for their

8   mental health to be addressed adequately and appropriately.

9   Q.   Where did you receive the information regarding the

10  diagnoses of the named plaintiffs here today?

11  A.   From that Document 33 is where, from that information that

12  was reviewed.

13  Q.   Okay.  So with that small amount of understanding, what

14  makes you qualified to give an opinion on concerns, harms, and

15  then recommendations?

16  A.   Sure.  Well, I mean, I think having the ability to go and

17  review the files.  You know, we reviewed 15 files.  We

18  interviewed 11 young men; we reviewed some policy, practice.

19  The similarities to what I saw in Document 33, the theme was

20  very much the same in regards to the young men that are bringing

21  the suit.

22      You know, I've got a great deal of experience in the field.

23  Even though I've only been independently licensed since 2005,

24  I've been working in human services for 27 years, so it's not as

25  though I haven't seen and worked with these type of young men

1  before, so I feel like I have a pretty good base to be able to

2  render my opinion in regards to the concerns that we reported on

3  back in 2017 but also the review of the information from the

4  Document 33 that led to the affidavit on May 1st.

5  Q.  Okay.  So from your experience in working with teenagers

6  with similar mental health conditions, histories of trauma, you

7  know, what harms, if any, are likely to occur to the named

8  plaintiffs based on the defendants' requests for deposition?

9  A.  My greatest concerns would just be that there has not --

10 historically, the young men that are being served up at the Boys

11 State Training School do not have adequate mental health care,

12 and to have them to then be deposed, in my opinion, will create

13 a great deal of stress.  It could create as well -- you know,

14 retraumatize them.

15      I mean, I could see them struggling under that stress with

16 moods being escalated, shutdown behavior, defiant behavior.  You

17 know, if the Court's hope is to, you know, be able to get from

18 these young men open and honest dialogue, I think there needs to

19 be some mindfulness of their needs, the setting that they're in,

20 the lack of care that they've had in regards to their mental

21 health.

22 Q.  So I'd like to specifically talk about retraumatization

23 first.

24 A.  Okay.

25 Q.  Why do you think they'll be retraumatized, specifically

1    these named individuals here in this complaint and what you know

2    about them?

3    A.   Okay.

4    Q.   Why?

5    A.   Well, I mean, from what I -- you know, from looking through

6    these young men's information and what was shared in regards to

7    their diagnoses, if we've got young men with, you know, ADHD,

8    there's potentially that struggle with focus, with being able to

9    be in long periods of questioning, you know, potential shutdown.

10       If we're talking about conduct disorder and oppositional

11   individuals, you know, there's concerns, and I would have

12   concerns and issues in regards to, you know, whether they'll

13   just be flat-out defiant versus not, you know, discussing or

14   talking through different issues.

15       I mean, it's more of that stress level that's raised that

16   recreates that trauma.  You know, if there's not that support

17   for them, that's what's going to raise that stress level that's

18   going to create that retraumatization for them, you know,

19   especially, I believe, from the young men coming from the State

20   Training School or being interviewed from the State Training

21   School because there's not that support that we would see for

22   most individuals that may be dealing with the courts or part of

23   juvenile court or in court in front of attorneys or judges or of

24   that nature.

25   Q.   So you keep mentioning the lack of support.  What support

1  would these boys need if they were going to be deposed?  What

2  would they need in order to lessen the harm?

3  A.  Well, you know, I think, you know, first and foremost that

4  there is someone, you know, a mental health professional, that

5  truly can understand, you know, before the deposition what some

6  of their concerns and needs, helping them understand, you know,

7  kind of if they're being triggered what will be, you know, kind

8  of the coping strategies or what will be the break or signal or

9  whatever for them to be able to take a break; that, you know,

10  during that deposition, that there's availability in case

11  there's that need for these young men.

12      And then afterwards as well, just the follow-up to see if

13  there is further concerns or recommendations needed that can,

14  you know, help them navigate through whatever, you know,

15  stressors or feelings or frustrations that they have in regards

16  to, you know, this situation that they're in.

17  Q.  What do you think about subject matter in terms of what's

18  discussed at the depositions?  What are some -- what are your

19  thoughts on that?

20  A.  Well, I mean, I think, you know, obviously, my understanding

21  is the concern is the ongoing lack of mental health care.  I

22  think that that should be, obviously, the scope and the focus

23  but still being mindful of the stress and the trauma this may

24  create for them.

25      But, you know, again, you know, staying, I think, focused

1  in a time frame that's going to be, you know, helpful to what --

2  you know, what their focus can be and what their stress level

3  can manage, you know, would be most appropriate.

4      I personally think having written questions available

5  before the deposition would be most appropriate, you know, for

6  these young men.  That could limit some of the stress or worry

7  that they have going into it.  I mean, in my opinion, I'd feel

8  confident in saying that would limit some of the stress and

9  concern that they may have.

10  Q.  So you mentioned a time frame.  You know, I know what you do

11  is not an exact science.

12  A.  Sure.

13  Q.  So what about total time frame of the deposition?  Are there

14  any thoughts on that?

15  A.  You know, I would hope that we are talking an hour versus

16  hours, you know, for these young men.  If what diagnoses are

17  correct, you know, in the documents that I reviewed, I would

18  believe that they would be fairly -- their stress level, their

19  attention span, their -- you know, is going to only tolerate,

20  you know, so much.

21  Q.  So just to be clear about a few different things, number

22  one, to be clear with the Court, you did not diagnose any of

23  these students, correct?

24  A.  Correct.

25  Q.  And you've taken the diagnoses from Document 33 as to be

1  true and correct, right?

2  A.  Correct.

3  Q.  And you did not interview any of the named plaintiffs?

4  A.  Not to my knowledge.

5  Q.  Why not?

6  A.  Well, they weren't offered when we went to do our interviews

7  at the Boys State Training School.  I would have been happy to,

8  more than happy to, talk to every one of them and staff, but we

9  didn't get that opportunity.

10 Q.  But how about more recently?  Why didn't you interview the

11 named plaintiffs?

12 A.  I didn't have the opportunity.

13 Q.  Would you need to interview the named plaintiffs to come up

14 with the conclusions you're talking about here today?

15 A.  I don't believe I would, only because of the review that we

16 did and the information that I reviewed, but also, you know, the

17 time that I've spent working in the field with clients with very

18 similar needs for a long period of time.

19 Q.  And you did not review any individual mental health records

20 for these named plaintiffs, correct?

21 A.  Correct.

22 Q.  And would you say that would have made a difference in your

23 conclusions here today?

24 A.  I think it would have helped me maybe gather some more

25 understanding of their needs, but, again, reviewing what we did

1   last year and looking over the information that I reviewed and,

2   you know, being -- doing the work as long as I have, I felt

3   pretty comfortable giving my opinion.

4   Q.  So would it be correct to say that this is just the basics

5   that you're asking for?

6   A.  Very much so.  I mean, there's -- absolutely.

7              MR. KIRSTEIN:  Okay.  Thank you, Mr. Koch.

8              THE WITNESS:  Thank you.

9              MR. KIRSTEIN:  No further questions, Your Honor.

10             THE COURT:  Thank you.

11        Ms. Kraemer, cross-examination.

12             MS. KRAEMER:  Thank you.

13                        CROSS-EXAMINATION

14   BY MS. KRAEMER:

15   Q.  Initially, Mr. Koch, you have a number of documents sitting

16   before you, and you've been looking down and moving them around

17   throughout your testimony.

18   A.  Yep.

19   Q.  Could you identify those documents for the record, please?

20   A.  Absolutely.  I have with me Document 76.

21   Q.  And is that your affidavit?

22   A.  Excuse me?

23   Q.  Is that your affidavit?

24   A.  Correct.  Yes.  Yes.

25        I also have -- I'm ADHD, so if I don't put things down on

1  paper, I will be scattered and all over the place and talk way

2  too much, so I just have my kind of cheat sheet of who I am,

3  what I do, as well as just kind of somewhat of a summary of some

4  of our findings, some of the tools that we used, as well as, you

5  know, kind of the information that I just shared with you folks;

6  some facts about the DSM-5 and the diagnoses, also from SAMHSA,

7  the Substance Abuse and Mental Health Services Administration;

8  some principles around trauma and informed care, unless somebody

9  wanted me to talk more about that; and then just some of my own

10 bullet points around trainings that I've attended or information

11 I've shared with staff in regards to trauma, stress-related, how

12 it can affect young men, some bullet points.

13      These are the main documents I'm looking at.  Do you want

14 to know everything I have up here?

15 Q.  I do, please.

16 A.  Okay.  Absolutely.  I have majority of our report to -- that

17 we compiled after we did our review at Disability Rights.

18      I have my licensure.  I don't leave home without it when I

19 testify because I've not remembered to do that and got myself in

20 trouble.

21      I've got my resume, which I just realized is not updated,

22 but I do have it.

23      I have as well an agreement of the work we do with

24 Disability Rights Iowa.

25      I have as well, from the Minnesota Association of Child

1   Mental Health, a symptoms list of the different diagnoses in

2   case we wanted to talk further about that.

3        And then I also have Document 33 that I had reviewed and

4   based the affidavit off, and then I as well have my subpoena

5   that I got from the courts.

6   Q.   Thank you.  May I have the agreement with DRI and your cheat

7   sheet so that my colleagues can review those while we continue

8   to discuss?

9   A.   Sure.

10            MS. KRAEMER:  May I approach, Your Honor?

11            THE COURT:  You can.

12        Let me just ask this:  Is the witness going to need those

13   to assist in providing his testimony?

14            THE WITNESS:  I would, yes, likely.

15            THE COURT:  We can make a copy, then.

16            MS. KRAEMER:  That would be fine.

17            THE COURT: Yeah.  Let's do that.

18        Peter, can you do that for me.

19            MR. FRISCHER:  Perhaps if we could ask for a copy for

20   us as well so we all have the same documents when they're being

21   discussed.

22        Thank you.

23            THE COURT:  You may have to take them in chambers.

24   Why don't you make a set for me too just so we have them.

25        Thank you.

1          MS. KRAEMER:  And, Your Honor, a brief housekeeping

2  matter.  I would like to offer --

3          THE COURT:  Wait until he comes back because he's

4  keeping notes.

5          MS. KRAEMER:  Oh, okay.

6          THE COURT:  Thank you.  But you may, as soon as he's

7  done, as soon as he's back.

8          MS. KRAEMER:  Very well.

9          THE COURT:  If you need water, that's fresh water in

10 there.

11         THE WITNESS:  Yes.  Thank you.

12         THE COURT:  You're welcome.

13         (Short break.)

14         THE COURT:  All right.  Ms. Kraemer, you had a

15 housekeeping matter you wanted to deal with, so I'll go ahead

16 and let you do that, and then we'll go ahead and go on on

17 cross-examination.

18         MS. KRAEMER:  Thank you, Your Honor.  I wanted to

19 offer the notice of the deposition into evidence as an exhibit.

20 BY MS. KRAEMER:

21 Q.  I believe this is something you refer to in your affidavit

22 that you reviewed?

23 A.  Which is this?

24 Q.  Go ahead and look at that.

25         THE COURT:  Let's get that marked.

1        Any objection?

2              MR. KIRSTEIN:  No objection, Your Honor.

3              THE COURT:  Let's get that marked as an exhibit.

4     We'll just mark that as Defendants' Exhibit 1.

5        All right.  It's admitted.

6                        (Defendants' Exhibit No. 1 was

7                         offered and received in evidence.)

8              MS. KRAEMER:  Thank you, Your Honor.

9     BY MS. KRAEMER:

10    Q.  Mr. Koch, when you meet with 17-year-olds and 16-year-olds,

11    how do you refer to them?  Do you refer to them as children,

12    adolescents?

13    A.  Adolescents.

14    Q.  And how many students do you see a week?

15    A.  How many do I see a week?

16    Q.  Yes.

17    A.  I see probably around 20.

18    Q.  Okay.  How many of those are justice-involved, students who

19    might be involved in the delinquency system for some reason?

20    A.  Currently on my caseload, I've got three.

21    Q.  Three?

22    A.  Uh-huh.

23    Q.  And is that representative of your typical caseload?

24    A.  Well, now in my career, yes, but not historically.

25    Q.  Okay.  And do you ask your students about their justice

1  involvement during the course of your work with them?

2  A.   When it's relevant to their treatment, yes.

3  Q.   How do you begin work with a student?   What's the first

4  thing you usually do?

5  A.   Build a rapport, get to know them.

6  Q.   Do you do an assessment?

7  A.   Absolutely.

8  Q.   Even if you have records available to you?

9  A.   Yes.   Still an assessment has to be done for us to render

10  services per our contract with the State of Iowa insurance

11  companies, but the records are definitely valuable to, you know,

12  help continue to -- for the treatment process.

13  Q.   Your organization is Chapter 24-accredited; is that correct?

14  A.   That is correct, yes.

15          MS. KRAEMER:   And may I approach with another exhibit,

16  Your Honor?

17          THE COURT:   Yes.

18  BY MS. KRAEMER:

19  Q.   These are the first 15 pages from Chapter 24, which is in

20  the Iowa Administrative Code at 441, Chapter 24.   Is this

21  something that you've read before?

22  A.   Yes.   Yeah.   I don't read it all the time, but I am familiar

23  with the document, yes.

24  Q.   Very good.

25          MS. KRAEMER:   I would offer this as Exhibit 2, Your

1    Honor.

2              THE COURT:  Objection?

3              MR. KIRSTEIN:  No objection, Your Honor.

4              THE COURT:  What's your objection?

5         I'm sorry.  Did you say no objection?

6              MR. KIRSTEIN:  No objection, Your Honor.

7              THE COURT:  I'm sorry.  Okay.

8         Normally, you know, as an exhibit, you don't put in copies

9    of the law.  I will accept it as an exhibit for the limited

10   purpose that it's not evidence but that I can take judicial

11   notice of this particular chapter, Chapter 24.

12                        (Defendants' Exhibit No. 2 was

13                         offered and received in evidence.)

14             MS. KRAEMER:  Okay.  And, Your Honor, I mainly wanted

15   to use it as a basis for discussion, so to the extent it's in

16   front of us all, I think that is of assistance.

17             THE COURT:  All right.  We'll call that Defendants'

18   Exhibit 2.

19        Peter, you can hand some of those to defense counsel, and

20   they can mark them themselves before they hand them up to us if

21   there's other exhibits.

22             MS. KRAEMER:  That would be great.  Thank you.

23             THE COURT:  Thank you.

24   BY MS. KRAEMER:

25   Q.  If I could invite your attention to page 8, there is a

1  standard there that talks about both "Social history" and

2  "Assessment."

3      Under Chapter 24, are you required to perform an assessment

4  before you begin work with an individual?

5  A.  I'm sorry.  Could you restate that?

6  Q.  Under Chapter 24, are you required to perform an assessment

7  before you begin working with an individual?

8  A.  Yes.  That's my understanding is that we have to have an

9  assessment in place.

10  Q.  And it provides a little bit of information about that at

11  sub b, sub (1).  "The assessment includes information about the

12  individual's current situation, diagnosis, needs, problems,

13  wants, abilities, and desired results gathered with the

14  individual's involvement."  Is that your understanding?

15  A.  Yes.

16  Q.  And also you're required to complete an annual reassessment?

17  A.  That is -- that is correct for Medicaid clients.

18  Q.  And under "Social history," do you also take a social

19  history for each of the students that you work with?

20  A.  Correct.

21  Q.  And social history is defined to include relevant

22  information regarding the onset of the disability; family,

23  physical, psychosocial, behavioral, cultural, environmental, and

24  legal history?

25  A.  Uh-huh.  Yes.

1   Q.   Is that correct?

2   A.   Yes.

3   Q.   And developmental history for the children?

4   A.   Yes.

5   Q.   And any history of substance abuse; domestic violence;

6   physical, emotional, or sexual abuse?

7   A.   Correct.

8   Q.   So any student who is in your services routinely has to talk

9   about their history?

10   A.   Correct.   In an outpatient setting.

11   Q.   Okay.   And that would be something that would be standard of

12   practice?

13   A.   In an outpatient setting, absolutely.

14   Q.   And do you find that traumatic to the students who come to

15   see you?

16   A.   There are times that they can be retraumatized from the

17   treatment that we talk about, but we try to safeguard against

18   that, you know, with the information and from the treatment plan

19   that we are following with them.

20   Q.   How often do you believe students are traumatized by the

21   assessment process?

22   A.   The assessment process?

23   Q.   Correct.

24   A.   I think it depends on the student or the youth or the

25   adolescent.   I mean, I couldn't say for every one of them.

1    Those that have greater trauma, those that don't have support,

2    are in an environment that is unhealthy or not supportive, can

3    typically have a higher -- I'd have a higher concern for them in

4    retraumatization than those that are in a supportive environment

5    getting treatment.

6    Q.   And I apologize if I didn't ask a clear question.   I was

7    asking, in your experience, for the students that you have

8    worked with, how many have experienced trauma as a result of the

9    assessment process?

10   A.   Gotcha.   I couldn't give you an exact number.   I would say

11   that over the course of my career I've probably had, probably

12   more so at Broadlawns when I worked there for five years than

13   anywhere I've seen, I don't know, maybe a dozen individuals.

14   Q.   In the course of your career?

15   A.   Correct.

16   Q.   Okay.   So would it be fair to say that's not a typical

17   experience?

18   A.   Again, I think it depends on the individual and then what

19   their needs are and the support that they have.

20   Q.   Okay.   Well, you gave us an estimate of about a dozen in the

21   course of your career.   Can you also give us an estimate of the

22   number of people that you have conducted an assessment on so we

23   have a way to gauge?

24   A.   Hundreds.   And since I've began being able to start

25   diagnoses -- diagnosing in 2002, I'd say easily hundreds, maybe

1   close to a thousand.

2   Q.   Close to a thousand.   And of those, 12 have experienced an

3   adverse result?

4   A.   Well, during -- you're talking during the time that the

5   intake occurred?   Yes.   I mean, definitely issues more so for

6   individuals after the session have occurred more so than during.

7        But, again, I'm trained to recognize these things, and if

8   I'm concerned that they might have a traumatization during the

9   intake process, then we try to safeguard for that and address --

10  ask the questions maybe differently or we might -- I might

11  gather the information from a parent beforehand so I have an

12  idea of what might trigger their -- their trauma.

13  Q.   So I used Chapter 24 as an example, and you mentioned being

14  on insurance panels; is that correct?

15  A.   Correct.

16  Q.   Do insurance panels also require an assessment when you

17  begin to serve somebody?

18  A.   Yeah.   Most private insurance is every three years.

19  Q.   Okay.   The affidavit that you provided to the Court, who

20  drafted that?   Who actually did the typing and the writing?

21  A.   Nathan assisted me in putting that together.   I gave him

22  kind of the core of the information.

23  Q.   Did you actually type it?

24  A.   No.

25  Q.   Okay.   And who is Jean Herrity, the notary who signed this?

ROCH _ CROSS

39

1  A.   She is in the Disability Rights office.

2  Q.   Okay.  And did you go there to the office?

3  A.   Uh-huh.  Correct.  Yes.

4  Q.   How many times have you been deposed in your life?

5  A.   How many times have I been deposed?

6  Q.   Correct.

7  A.   This type of setting or family court?  I mean, I've been

8  to -- in this type of setting, this is probably my second or

9  third time, but I've been many times to court with Department of

10  Human Services and families, juvenile court services.  Not as

11  much now in my career as I was early in my career, but --

12  Q.   Fair enough.  This is actually a hearing because there's a

13  judge.  A deposition is typically a little less formal.

14  A.   Oh, deposition.  I apologize.

15  Q.   The attorneys and the person being deposed and a court

16  reporter.

17  A.   Yeah.  Okay.

18  Q.   Have you been deposed?

19  A.   Yes, actually, I have, twice.

20  Q.   Okay.  And were you afforded reasonable breaks during your

21  deposition?

22  A.   It -- if requested.

23  Q.   Okay.  Is your understanding that that's typical or do you

24  think that that's unusual that you would get a break if you

25  requested?

1  A.  I would assume you would be able to get a break if

2  requested, although I'm an adult versus being an adolescent

3  being deposed.

4  Q.  And do you have any familiarity, in your experiences with

5  hearings and depositions of all sorts, do they typically take a

6  break for the court reporter?

7  A.  Do they typically take a break for the court reporter?

8  Q.  Yes.

9  A.  I'm unaware if they do or not.  I couldn't speak to that.

10  Q.  Okay.  Have you ever served as a mental health advocate

11  during a deposition?

12  A.  Have I ever served -- yes, I have.

13  Q.  Okay.  How often have you done that?

14  A.  I've done that once.

15  Q.  Okay.  What was the nature of the student's needs and why

16  did you serve as a mental health advocate?

17  A.  There was a lawsuit against a doctor who the family felt had

18  created undue trauma.

19  Q.  Okay.  That's the nature of the lawsuit.  Who did you

20  support during the deposition?

21  A.  The individual that I was doing counseling with.

22  Q.  Okay.  And what --

23  A.  The child.

24  Q.  That was a child?  How old was the child?

25  A.  The child was 10.

1   Q.   And what were the nature of the child's needs?

2   A.   What are the nature of the child's needs?  The child had --

3   was suffering from the traumatic event that occurred with the

4   doctor, anxiety, a lot of depression.  Those were the main

5   issues that I was addressing.  Fear of being around doctors or

6   going to the doctor.

7   Q.   Was the child the person being deposed?

8   A.   I was not part of that.  There was -- I can't remember for

9   sure if the child was deposed or not.  I know that I was working

10  with the child in regards to not only the mental health but it

11  going to court, and I guess my assumption was there was a

12  deposition or that the child was talked to.

13  Q.   Okay.  So I'm unclear, then.  What deposition did you

14  attend?

15  A.   Well, I'm assuming this was a deposition.  I was there with

16  the mother, the child's attorney, and then there was a court

17  reporter and then two other attorneys across the table.  Is that

18  not a deposition?

19  Q.   Who was the person answering the questions?

20  A.   I was being asked questions by the attorneys.

21  Q.   Okay.  Okay.  Have you ever served as an advocate where you

22  were present in a deposition --

23  A.   Oh.

24  Q.   -- and someone else was being asked the questions?

25  A.   Oh, no.  No, I have not.

1   Q.   So one of the things that is being requested by the

2   plaintiffs --

3   A.   Uh-huh.

4   Q.   -- is that a person, yourself or someone else, would be

5   present in a deposition to serve as an advocate.

6   A.   Sure.

7   Q.   Have you ever done that before?

8   A.   No, I have not.

9   Q.   Do you know anybody who has done that before?

10  A.   No, I do not.

11  Q.   Okay.  Since this is sort of a novel circumstance, how would

12  you envision the advocate's role in this situation?

13  A.   Are we talking before, during, and after, or just --

14  Q.   Well, let's just start with at the deposition, and then --

15  A.   Okay.

16  Q.   You're right on track, though.  We'll ask the before and

17  after questions too.

18  A.   During the deposition?

19  Q.   Yes.  What do you envision that to be?

20  A.   Well, I would hope that that person would have the

21  opportunity to be able to see if there was something changing

22  mood-wise, behaviorally, to then be able to alert whoever is

23  deposing that, you know, this might be a time for a break.

24  Q.   But even in the case that you talked about earlier, where

25  you felt the student had anxiety, you weren't present when that

1  student was deposed?

2  A.   Correct.

3  Q.   Okay.

4  A.   But that's a much different situation than what we're

5  talking about here, a lawsuit versus -- his mental health needs

6  were being met.  I don't believe the Boys State Training School

7  young men needs are being met.

8  Q.   How do you come to that conclusion, that the Boys State

9  Training School needs are not being met?

10  A.   From the records we reviewed, from the interviews that we

11  did.

12  Q.   What interviews did you do?  Because I thought you testified

13  that you weren't able to do interviews.

14  A.   Yeah.  We interviewed 11 students up at Boys State Training

15  School of the 15 that we reviewed files of.

16  Q.   And when did this occur?

17  A.   Back in May, May of 2017.

18  Q.   Okay.  And were any of these students the named plaintiffs

19  who are at issue here?

20  A.   Not -- not to my knowledge.

21  Q.   Okay.  And you testified earlier that you did not visit with

22  the named plaintiffs before preparing this affidavit?

23  A.   Not to my knowledge.

24  Q.   Okay.  Then you were going right where I was headed next.

25  What do you envision appropriate mental health support before

1  and after a deposition?

2  A.  Well, before, you know, I would believe that someone who was

3  able to gauge with these young men what their concerns may be;

4  understanding what, you know, the goal, I guess, of what the

5  deposition is too; understanding from that young man, you know,

6  do situations like this create stress.  I mean, all of them have

7  obviously been, you know, in the courts before, and so what kind

8  of stress that that might raise to the level of feeling

9  victimized again or retraumatized by the event.

10      So I would say someone who can gain an understanding and

11  hopefully assist, you know, during that deposition with if it

12  looks -- it appears as though that young man is struggling with

13  whatever stress level they're at or if they're shutting down or

14  reacting negatively.

15      And then, of course, afterwards, just trying to have -- you

16  know, being able to -- I think I heard the word "debrief,"

17  somewhat, that student of what they just were a part of to, you

18  know, share that if there are further concerns or stressors,

19  that those can be, you know, discussed and recommendations made

20  to accommodate them, you know, to help them manage that, those

21  concerns that they may have.

22  Q.  You mentioned in your testimony that it's your understanding

23  that all of these students have testified before.

24  A.  My assumption is that they've had an opportunity to speak in

25  front of a judge at some point.

1    Q.  And do you know whether the types of accommodations that are

2    requested here were provided?

3    A.  To those --

4              MR. KIRSTEIN:  Objection, Your Honor.

5              THE COURT:  He can answer.

6              MS. KRAEMER:  He may or may not know.

7              THE COURT:  To the extent you know, you can answer the

8    question.

9    A.  Sure.  I mean, I guess my own personal -- let me come back.

10   Your question was in regards to whether breaks were -- no?  I'm

11   sorry.

12             THE COURT:  Why don't you ask the question again.

13             THE WITNESS:  My train of thought I lose sometimes,

14   so --

15             MS. KRAEMER:  No worries.

16   BY MS. KRAEMER:

17   Q.  To your knowledge, were these students given the

18   accommodations in these other circumstances that are requested

19   here?

20   A.  Have they been?  I can't speak to depositions, but I know

21   when we've been in court there has been times that they've been

22   allowed breaks.  Typically, before court there was meetings, at

23   least I did sessions before and meetings with my clients before

24   court.  If I was there during there, there would be breaks as

25   necessary.  And then even if they were retained to -- by the

1    courts to go to the youth shelter or detention, I was typically

2    given permission to go visit with them afterwards as well.

3    Q.   And these are students that you have served in your

4    practice, but I was asking about the named plaintiffs.

5    A.   Oh, I'm sorry.  The named plaintiffs?  You're asking me if

6    I'm aware that they -- if they have had these accommodations in

7    the past?

8    Q.   Correct.

9    A.   Not to my knowledge.

10   Q.   Okay.  And are you aware of any adverse events that have

11   occurred as a result of them not having these accommodations?

12   A.   And we're talking about the plaintiffs?

13   Q.   The named plaintiffs.

14   A.   Right.  No.  Not to my knowledge.

15   Q.   Thank you.

16   A.   Okay.

17   Q.   You mentioned some of the students you work with, you have

18   the opportunity to meet with them before court or after court.

19   Does that happen all the time?

20   A.   I've -- if they're my client, yes, I absolutely try to.  Can

21   I every time?  No.  But if they are my client, then I absolutely

22   do.  I feel like there is a duty to try and assist them through

23   the proceedings as I believe it can be a very stressful and

24   traumatic event for the young folks I've served.

25   Q.   At page 3, you predict that combative behaviors, defiance,

1  and uncooperative actions will likely occur with the named

2  plaintiffs, but yet you recommend that they be deposed outside

3  of the school.  Can you explain that?

4          THE COURT:  Are you on page 3 of the affidavit?

5          MS. KRAEMER:  I am, Your Honor.

6          THE COURT:  Okay.  Thank you.

7  A.  The question was what again?  I'm sorry.

8  BY MS. KRAEMER:

9  Q.  You're predicting that there is a combative, defiant, or

10  uncooperative result, and yet you recommend that these students

11  be deposed outside of the Boys State Training School setting,

12  and I'm just asking you to explain that because it seems

13  incongruous to me.

14  A.  Why I made that recommendation?

15  Q.  Correct.

16  A.  Why I made that recommendation is from the information that

17  we gathered and the young men that we interviewed, we heard a

18  great deal of feeling as though their mental health was very

19  much unsupported.  It wasn't an environment -- to me, it was an

20  environment that would -- that could potentially impact how

21  open, how honest they would feel and concerns around -- we heard

22  concerns from students about retaliation; not these plaintiffs,

23  obviously, but from other students.

24      So that is -- that's what formulated my opinion there was

25  that an environment that was neutral might give a better

1  opportunity for -- to gain some of the information that is

2  trying to be gleaned by these proceedings.

3  Q.  There would also be less backup if an adverse event

4  occurred; would you agree with that?

5         THE COURT:  Counsel, it's my understanding that that

6  issue is no longer in dispute about where the boys are going to

7  be deposed, so unless I'm wrong, I think we can move on.

8     Am I correct?

9         MR. FRISCHER:  That's correct, Your Honor.

10        MR. KIRSTEIN:  Correct.

11        THE COURT:  So let's just move on, then.

12        MS. KRAEMER:  May I approach?

13        THE COURT:  You may.

14        MS. KRAEMER:  This is Exhibit 3.

15        THE COURT:  Okay.

16        MS. KRAEMER:  These are pages from the DSM.  And I did

17  bring my book if anybody wants to verify that they did actually

18  come from the DSM.

19        THE COURT:  Which version of that are we on today?

20        MS. KRAEMER:  5, DSM-5.  And I would offer this as

21  Defendants' Exhibit 3.

22        THE COURT:  Any objection?

23        MR. KIRSTEIN:  No objection, Your Honor.

24        THE COURT:  All right.  It's admitted.

25

1          (Defendants' Exhibit No. 3 was

2              offered and received in evidence.)

3          MS. KRAEMER:  Thank you.

4  BY MS. KRAEMER:

5  Q.  Mr. Koch, I'd like to start with a discussion of ADHD.

6  A.  Okay.

7  Q.  Attention-deficit/hyperactivity disorder.

8  A.  All right.

9  Q.  I like the DSM because it has these prevalence estimates.

10 If you look at page 61, which is the third page of your exhibit,

11 it says, "Population surveys suggest that ADHD occurs in most

12 cultures in about 5 percent of children and 2.5 percent of

13 adults."

14     Is that your understanding of the prevalence as well?

15 A.  Not in our practice.  We see a much higher number in our

16 practice than what is in the DSM-5.

17 Q.  How many of the students you personally serve have ADHD?

18 A.  I would say probably 60 percent.

19 Q.  Okay.  If you look on the next page, on page 62 --

20 A.  Uh-huh.

21 Q.  -- it talks about the "Development and Course" of ADHD, and

22 it talks about, "In preschool, the main manifestation is

23 hyperactivity," and as people become older the symptoms being

24 inattention.  Is that your understanding?

25          MR. KIRSTEIN:  Objection, Your Honor; relevance.

1          MS. KRAEMER:  I'm getting there.

2          THE COURT:  What is the relevance?

3          MS. KRAEMER:  My next question, Your Honor, I should

4     be able to show that.

5          THE COURT:  Well, answer my question, and then we'll

6     go on and I'll rule on the objection.  What is the relevance of

7     this issue?

8          MS. KRAEMER:  On page 4 of the affidavit, Mr. Koch

9     decides that, "Most teenagers diagnosed with ADHD will have a

10    difficult time maintaining focus...without having behavioral

11    outbursts or losing focus," and what I would like to know is why

12    he's predicting that behavioral outburst when the course and

13    scope of ADHD for teenagers is more likely to be losing focus.

14         THE COURT:  All right.  I will overrule the objection.

15    I'll let you ask a couple questions here.

16        I'm just going to point out, counsel, it's 10:10 right now;

17    we need to be done by noon.  I set aside two hours for -- three

18    hours for our hearing.  So I just want to keep us on track

19    because we have not only this motion to deal with, but we've got

20    to go back and deal with the other motion, so I'd like to stay

21    as focused as we can on the key issues that we need to deal with

22    that are still primarily in dispute on the plaintiffs' motion

23    for protective order.

24        You can answer the question, but would you like to have it

25    read back first?

1          THE WITNESS:  Please.

2          THE COURT:  All right.  Let me have the court reporter

3    read it back to you.

4          THE WITNESS:  Okay.  Thank you.

5          THE COURT:  You're welcome.

6          (Question read by the reporter.)

7          THE WITNESS:  That was the question, correct?

8    A.  Here's what I would -- I'm basing everything off of my

9    practice and the adolescents that I have served over the years,

10   even before diagnosing that -- have I seen that decrease?

11   Absolutely.  But typically that decrease occurs when treatment

12   occurs for the young men, at least that I have served.

13       So is that the case, what's laid out in the DSM-5?  I mean,

14   I don't dispute the DSM-5.  It's my -- you know, it's the book

15   of books for anybody in my field.  But a combination of the

16   setting that these young men are in, the treatment that they

17   currently have, I would have great concerns that their ADHD, if

18   that diagnosis is correct, would decline due to the setting that

19   they're in.

20   BY MS. KRAEMER:

21   Q.  But my question, which you know now, on page 4 of your --

22   A.  Uh-huh.

23   Q.  -- affidavit you predict that students who are questioned

24   for a longer period of time than an hour will have a behavioral

25   outburst or lose focus, and I'm wondering why you're predicting

1  a behavioral outburst instead of just losing focus.

2  A.  Well, my experience is that's what's occurred for students

3  with this diagnosis under what I'm -- what I believe will be the

4  stress and duress that they may feel.

5  Q.  So why isn't a break a sufficient remedy?  Why do we have to

6  limit the questioning to an hour?

7  A.  You know, in my opinion and from -- and some of what -- in

8  my opinion of what my point of view was for these young men, I

9  took into account the bigger picture of the information that we

10  gathered, the common themes that look to be across the board.

11      I just have great concerns for these young men that -- and

12  in some of the interviews we did, that we could see some of the

13  agitation, we could see some of the concerns, so in my opinion,

14  I believe that this could occur.

15      Could a break be of value to move forward?  Absolutely, it

16  could be.  But this isn't -- you know, to me, this is -- what's

17  being asked of these young men with the limited support they

18  have, I would like to see -- I believe what would be most

19  helpful and healthy to them is to make sure that there is the

20  adequate supports there for them.

21  Q.  Your affidavit says, "Most teenagers diagnosed with ADHD" --

22  you don't limit it to the named plaintiffs.  You say, "Most

23  teenagers diagnosed with ADHD will have a difficult time

24  maintaining focus in any time period longer than an hour without

25  having behavioral outbursts or losing focus."

1    Have you ever requested this kind of accommodation for a

2  student in school?

3  A.  Yes, I have.

4  Q.  And what result?  Did they only have to go to school for an

5  hour?

6  A.  No.  No.  I mean, what we would do is we would -- we always

7  had an individual identified, whether that be the clinician, the

8  school-based therapist, the school social worker, that they

9  could utilize if they needed that kind of support.

10  Q.  If they needed a break?

11  A.  Well, correct.  Yes.

12  Q.  Not that they didn't have to go to school anymore?

13  A.  Right.  Absolutely.

14  Q.  Okay.

15  A.  And I don't think that's in dispute about where they're at.

16  Q.  And I am going to try to be brief.  If you look at the next

17  two pages, those are just the table of contents for Trauma- and

18  Stressor-Related Disorders.

19        THE COURT:  Are we back on Exhibit 3 now?

20        MS. KRAEMER:  We are.  Thank you.

21        THE COURT:  Okay.  And just for the record, those page

22  numbers are?

23        MS. KRAEMER:  Xix.

24  BY MS. KRAEMER:

25  Q.  And just to clarify, of the four named plaintiffs --

KOCH - CROSS

54

```
 1              THE COURT:  I'm lost.  I'm sorry.  Tell me where you
 2    are again, Ms. Kraemer.
 3              MS. KRAEMER:  Looking at Defendants' Exhibit 3 --
 4              THE COURT:  Okay.
 5              MS. KRAEMER:  -- if you go through the materials on
 6    ADHD, and I didn't number these --
 7              THE COURT:  Just at the top of the pages, it's got
 8    page numbers at the top of the page.  Just tell me what page
 9    we're on.
10              MS. KRAEMER:  Xix.
11              THE COURT:  Okay.  I'm just not tracking with you.
12    The page numbers I have start with 50-something.
13              MS. KRAEMER:  If you keep working through the exhibit,
14    Your Honor.
15              THE COURT:  How far back am I going?
16              MS. KRAEMER:  In the middle.
17              THE COURT:  Okay.
18              THE WITNESS:  It's the sixth page.
19              THE COURT:  Thank you.
20              THE WITNESS:  You're welcome.
21              THE COURT:  All right.  Thank you.  Go ahead.
22    BY MS. KRAEMER:
23    Q.  My only point here is this is the list of trauma-related
24    disorders, and only one of the four students has a qualifying
25    diagnosis; would you agree with that?
```

1    A.   I'd have to look back at the information, but, I mean, my

2    assumption is that's correct.

3    Q.   And is your opinion -- you referred a lot to Document 33,

4    which is a statement of the allegations in this case.  What if

5    the information in any of those allegations turned out to be

6    different than what is represented; would that change your

7    opinion?

8    A.   Potentially.

9    Q.   Thank you.  How are your services funded?

10   A.   Services that I provide in my practice?

11   Q.   I apologize.  That was a bad question.  How are your

12   services to DRI funded?

13   A.   We have a contract to -- working with them currently.

14          MS. KRAEMER:  Thank you.

15       I have no additional questions.  Thank you.

16          THE COURT:  All right.  Any short redirect?

17          MR. KIRSTEIN:  No, Your Honor.

18          THE COURT:  Okay.

19          MR. KIRSTEIN:  Thank you.

20          THE COURT:  You can step down, sir.

21          THE WITNESS:  Thank you.

22                              (Witness excused.)

23          THE COURT:  Okay.  Any other evidence that either side

24   wants to present?

25       Any other evidence from Plaintiffs?

1    MR. FRISCHER:  Your Honor, we have no additional

2 evidence.  I do think the testimony of Mr. Koch has demonstrated

3 extraordinarily the need for mental health support before the

4 deposition, mental health support at the deposition to diffuse

5 any situations as they arise, mental health after the

6 deposition.

7    With those supports, as we said before, we're prepared to

8 conduct the examination at the school within reasonable time.

9 And I think, you know, just as in any deposition, Your Honor, as

10 in any deposition, the Court has the power and the authority and

11 the need to set reasonable constraints.

12    Here we absolutely need a reasonable constraint as to time.

13 It just doesn't do for Defendants to say, "We have the right to

14 do it for seven hours.  I probably won't need seven hours, but

15 this might be the day that I do need seven hours."  There

16 absolutely needs to be a reasonable time limit.  We've not heard

17 any reason why this deposition needs to go on more than an hour

18 or two.

19    Thank you, Your Honor.

20    THE COURT:  All right.  Ms. Frizell, who are you

21 proposing would be the mental health professional that would be

22 in the depositions?

23    MR. FRISCHER:  Is that addressed to us, Your Honor?

24    THE COURT:  Yes.  Who are you proposing that

25 individual would be?

1          MR. FRISCHER:  We don't have a name right now, but it

2    would be someone under the supervision Mr. Koch.

3          THE COURT:  Okay.  You're not envisioning it would be

4    Mr. Koch, I take it?

5          MR. FRISCHER:  Probably not.

6          THE COURT:  When you say "under the supervision," does

7    that mean someone who works with him through his organization?

8          MR. FRISCHER:  Yes.  At Next Step, Your Honor.

9          THE COURT:  All right.  Thank you.

10      Defendants, I'm going to give you -- first of all, can you

11   tell me, before I give you time to argue, have we limited, are

12   we able to limit the issues that are in dispute after you've

13   heard from Mr. Koch's testimony?

14         MS. KRAEMER:  Your Honor, Mr. Koch testified that he's

15   never done anything like this before, that he's never heard of

16   anyone doing anything like this before, and even in the one

17   situation he gave an example where he was a support person to a

18   10-year-old, he didn't attend that deposition.

19      This is a very unusual request, and so we would ask Your

20   Honor to rule on that.  If Your Honor is inclined to rule

21   against the defendants on that regard, then we agree to the

22   limitations.

23         THE COURT:  Okay.  Any further argument you want to

24   make?

25         MS. KRAEMER:  No.  Thank you.

1          THE COURT:  Okay.  And, Plaintiffs, any further

2    argument you guys want to make with respect to the plaintiffs'

3    motion for protective order?

4          MR. FRISCHER:  No, Your Honor.  Other than to ask once

5    again that the question of when the depositions occur be

6    deferred to our discussion on the schedule and adjustments we

7    have proposed to the schedule in general.

8          THE COURT:  All right.  Well, I will enter a written

9    ruling with respect to the motion, so I'm not going to rule from

10   the bench, so I'm going to take that matter under advisement at

11   this time.

12        Let's go ahead and see where we are, then, on the

13   defendants' motion for protective order.  We had a conversation

14   earlier about that particular motion.  We dealt with two issues

15   that were in the motion at that time, and then I instructed

16   counsel to have further conversations to see if you could narrow

17   the scope of what the issues were that the Court needed to

18   address with respect to the defendants' motion for protective

19   order.

20        I know one of the things Defendants were going to try to do

21   was to see if you could find out any further information on the

22   RiteTrack status, so let's start there.

23        Let me ask this:  Have you been able to narrow the scope of

24   the defendants' motion or do I need to rule on all the remaining

25   issues?

1            MR. FRISCHER:  No.  We have been able to --

2            THE COURT:  Okay.

3            MR. FRISCHER:  -- narrow the scope substantially, I

4    think.  I think.  And I hope it's not the situation where the

5    scope is narrowed, but only if you rule against us; if you rule

6    for us, it's not narrowed.

7        But I think we've been able to develop an orderly,

8    sequential way to get the documents and other discovery that we

9    need when we need it with some concomitant adjustments to the

10   schedule.

11       So if I can just take a few minutes, Judge, and I can be

12   brief, to outline I think what the proposal is overall, what

13   we've tentatively or conditionally agreed to, and where we still

14   have areas of disagreement.

15           THE COURT:  Please do that.  And, again, you can stay

16   seated if you want.

17           MR. FRISCHER:  Thank you, Your Honor.

18       You know, when we were before you last time we had

19   presented an Appendix A, which was a narrower list of priority

20   documents that we had asked for to be produced prior to class

21   certification motion and prior to our expert reports.

22       One of the things you asked us is to go back and see if we

23   could narrow the narrower -- to make it a narrower list, you

24   know, can we do a sampling, can we narrow it in some way to get

25   the documents we need in particular.  And the short answer is

1   yes, and we were able to do that.

2        What we developed is in order for us to do our expert

3   reports and do class certification, we think we can do that with

4   a sample of the Exhibit A documents, the Appendix A documents,

5   for 30 class members and a procedure before that, an initial

6   procedure, to get us the documents we need in order to figure

7   out who are the 30 that we want to do that sampling of.

8        What we've talked about to Defendants, and what I think

9   Defendants can live with, subject to hearing otherwise today, is

10  a process where we get relatively quickly, and I think my

11  understanding is that June 1 is a reasonable time for Defendants

12  to give us, two things that we would use to generate the list of

13  the 30 names.

14       The two things are reports of psychotropic medication for

15  kids at the school so we know who is taking what medication,

16  which is a shorthand way of seeing some of the diagnostic

17  information or what these kids are being treated for, what

18  medications they're taking; and then also some indication,

19  either the BSU reports or the RiteTrack system -- we're talking

20  about some -- we're still talking about exactly what that form

21  would be, but I do believe Defendants have said they can get us

22  the information we're going for in whatever form by June 1st to

23  tell us which, of all the kids at the school now, who's been in

24  the restraints for how long, who's been in seclusion for how

25  long.  So that's a very narrow subset of Appendix A.

1    Armed with that information, we will give Defendants a list

2   of 30 names as a sample, and we think we can do that relatively

3   quickly.  We're proposing June 15th for that.

4    And then for those 30 names, Defendants -- we are asking

5   for Defendants to give us all the Exhibit A -- Appendix A

6   documents for those 30 names by July 6th, which, again, we think

7   is a reasonable time frame.  I think Defendants think it's a

8   reasonable time frame, something they can do.  If the Judge

9   orders them to do it, they can do it within that time.  Maybe

10   that's the better way to characterize it.

11        THE COURT:  Let me just ask you one quick question.

12   The 30 names for the sampling, does that include the four named

13   plaintiffs or would that be 30 in addition to the four named

14   plaintiffs?

15        MR. FRISCHER:  I think it would be 30 in addition.  I

16   think we have the data for three of the named plaintiffs.  We

17   don't have the data yet for one of the named plaintiffs, but I

18   hope that will be forthcoming.

19        THE COURT:  Okay.

20        MR. FRISCHER:  The idea, then, is with those Appendix

21   A documents for the 30 names, we would do our initial round of

22   expert reports, we would do our motion for class certification.

23   And we propose doing that in short order, by August 3rd, which

24   requires an extension of the schedule and a concomitant

25   extension of the rest of the dates in the scheduling order.

1       To keep everything with the same time periods, what we've

2   proposed, our expert reports and class certification motion

3   would be due August 3rd.  Defendants have asked for two months

4   for their rebuttal -- responsive expert reports.  We've agreed

5   to that.  We have agreed to that in the initial scheduling

6   order.  We'd agree to that again, which would put their response

7   due October 28.  We would do a quick turnaround on any reply.

8   The reply would be by October 19th.

9       And, again, keeping the same relative time periods in the

10  original -- as in the original scheduling order, we would

11  propose that discovery then conclude November 2, dispositive

12  motions November 30th.

13      So that's our big picture proposal, Your Honor.  And I

14  think -- and, again, I don't want to mischaracterize Defendants'

15  position, but I think they stand on their objection that we're

16  not entitled to anything, we should get no class-wide discovery

17  other than the named plaintiffs, but if Your Honor orders

18  class-wide discovery, they can do these things by these

19  timetables.

20      The area where we don't yet agree is a few things, but,

21  frankly, I think the few things that we don't agree on are

22  smaller in magnitude than the larger overall schedule that we

23  have contingently agreed to.

24          THE COURT:  Let me stop you before you go there

25  because I want to make sure I've got these dates right.

1        The deadline that you're proposing for the plaintiffs'

2   initial expert disclosures and motion for class certification,

3   August 3rd?

4              MR. FRISCHER:  Yes, Your Honor.

5              THE COURT:  Then what did you say would be the

6   defendants' new deadline to respond to the class certification

7   and do their expert reports?

8              MR. FRISCHER:  September 28th.

9              THE COURT:  September 28th, okay.  And then your reply

10  by October what?

11             MR. FRISCHER:  19th.

12             THE COURT:  October 19th.  And then discovery closing

13  November 2nd?

14             MR. FRISCHER:  Yes.

15             THE COURT:  And dispositive motions November 30th?

16             MR. FRISCHER:  Correct.

17             THE COURT:  Okay.  Now go ahead and go on.

18             MR. FRISCHER:  What I have just outlined is they're

19  going to give us initial stuff for which we can pick 30 in short

20  order.  We'll give them the 30 names; we'll get documents, the

21  Appendix A documents on the 30 names.  We'll do our expert

22  report.

23        The things that we don't agree on are three short things.

24             THE COURT:  Okay.

25             MR. FRISCHER:  One is when the balance of the Appendix

1  A documents will be due.  We proposed August -- August 10th for

2  that, but apparently we had a misunderstanding.  I thought that

3  was acceptable but learned it's not.  We will need to have some

4  other date which we can talk about as to when the remainder of

5  the Appendix A documents will be produced.  We don't need them

6  before our class certification motion.  We'll need them sometime

7  in short order thereafter.  That's number one.

8       The second area that we dispute is when our experts'

9  depositions will be taken.  The way I think I've generally done

10  it before -- I want to say "always," but I may be

11  cross-examined, but I think it's always -- is expert depositions

12  are held after all of the expert reports are in.  You have some

13  expert depositions, and the experts are deposed once, and at the

14  time they're deposed, all three reports are in, and the experts

15  have the whole kit and caboodle, and they can be asked questions

16  about it.

17       What Defendants would like to do is to take the depositions

18  of our experts shortly after the report is filed.  I think that

19  doesn't make sense.  If they want to do that, you know, okay,

20  but, and the "okay, but" is, and there's plenty of law on this,

21  they can't take depositions twice.  If they take them then, they

22  don't get them again after the second round of expert reports.

23       So that's the second dispute.  Frankly, we don't need to

24  resolve that now, but that's out there and percolating as a

25  dispute.

1       The third dispute is when the children will be deposed.

2   And I think Ms. Kraemer said their position is, if not tomorrow,

3   then shortly thereafter.  I think she said June

4           THE COURT:  And we're talking about the named

5   plaintiffs?

6           MR. FRISCHER:  The named plaintiffs, the deposition of

7   the named plaintiffs.

8           THE COURT:  Okay.

9           MR. FRISCHER:  Our thinking is, as I mentioned this

10  morning, that we really want and we think that in the next few

11  weeks all of the attention should be devoted to getting these

12  documents out as soon as possible and having a realistic,

13  livable date for the production of the remainder of the Exhibit

14  A documents after the 30.

15      So what we proposed as an orderly way to proceed is

16  depositions of the kids -- and I wrote down a date here; I'm

17  going to come to it in a minute -- the week of August 13th.  So

18  that would be shortly before -- shortly after we get the 30 --

19  that's shortly after we submit our motion for class

20  certification, shortly after we submit the expert reports.

21  Defendants will have those depositions shortly thereafter.

22      They'll have them in plenty of time to respond to the class

23  certification motion, in plenty of time for their expert

24  reports, and in plenty of time to plan additional discovery

25  based on what they say.

1      I think it's an eminently reasonable place for them in the

2   scope of the timeline.  And to the extent Defendants say, well,

3   we want those depositions in June, part of my thinking is

4   let's -- you know, don't tell me on the one hand you can't give

5   me the Appendix A documents until a long time from now but you

6   want these depositions.  Let's concentrate on getting the

7   documents out.  We will provide the named plaintiffs, hopefully

8   with reasonable accommodations, shortly thereafter at the right

9   place in the schedule.

10      So that's where we are.  That's the three areas of dispute.

11          THE COURT:  Okay.  Thank you.

12      All right.  Ms. Kraemer, let's talk about, first, the

13   proposal that Plaintiffs' counsel has outlined to the Court with

14   the dates, the new dates in it.  Are Defendants in agreement

15   with that proposal, assuming that I say that there will be class

16   certification discovery?

17          MS. KRAEMER:  So just to be clear, on the

18   precertification class-wide discovery, what we're looking for

19   from the Court is just a very clear order saying you must

20   disclose things that we don't have a release for, and what that

21   does is give the State a safe harbor.

22          THE COURT:  Sure.  I appreciate that.

23          MS. KRAEMER:  And with that in mind, and that is the

24   predominant reason for requesting the protective order is so

25   that we can get an order and move forward, we can get the

1  initial documents.  And just to be clear, they have been

2  requested for all of the students currently at the school --

3            THE COURT:  Correct.

4            MS. KRAEMER:  -- but a narrower set within three

5  weeks, which is by June 1st.

6       And currently, we are sort of double-tracking that.  We're

7  pulling them and copying hard copies and printing hard copies,

8  and we're also still investigating the RiteTrack option.  So we

9  will have it done by June 1st in whichever form ends up being

10 the most efficient.

11           THE COURT:  And let me just stop you there to make

12 sure I'm tracking you.  When you say you'll have it done by June

13 1st, are you referencing the two pieces of information that

14 Mr. Frischer commented on, which was the report of

15 psychotropical medications for the kids at the school and some

16 kind of a report, although we didn't know exactly what form it

17 would be in, that would indicate which of the students had been

18 in restrictions and for how long and which had been in seclusion

19 and for how long by June 1?  Are those the documents you're

20 referencing?

21           MS. KRAEMER:  Yes.  This is a draft that was prepared

22 by Plaintiffs' counsel, and they asked for the medication

23 administration record --

24           THE COURT:  Okay.

25           MS. KRAEMER:  -- and either individualized BSU,

1   restraint, and seclusion files, so they're not asking for

2   aggregate data, they're asking for the actual documents --

3            THE COURT:  Right.

4            MS. KRAEMER:  -- or access to RiteTrack.

5            THE COURT:  So that information would be provided by

6   June 1?

7            MS. KRAEMER:  Correct.

8            THE COURT:  And then from that information, the

9   plaintiffs would come back with the 30 for the sampling?

10           MS. KRAEMER:  Yes.  That is their proposal.  And then

11  we would, under their proposal, have three weeks to pull all 30

12  files and produce those.  We did agree to it.  It's going to be

13  rough, but we did agree to it, so...

14           THE COURT:  All right.  And let me just ask you a

15  question.  With respect to the documents that would be produced

16  by June 1, would those documents be produced with the actual

17  students' names on them?  Is that how they are kept?  Let me ask

18  it that way first.

19           MS. KRAEMER:  It is.

20           THE COURT:  So because I'm just trying to think in

21  terms of the order I would write, how I would write it and what

22  I need to put in there to make sure that you have the

23  information you need from the Court and the specifics in the

24  order for what you're producing.

25       So I'm just going to ask this question, and you may tell me

1  it would be ridiculous to do this, and that's fine.  I just want

2  to know the answer.  How difficult would it be to code those

3  documents?

4         MS. KRAEMER:  Very.

5         THE COURT:  Okay.

6         MS. KRAEMER:  They had to do the first set if you want

7  to give some more specifics.

8         MS. DIXIT:  Very difficult, Your Honor.

9         THE COURT:  No.  That's fine.  That's what I'm trying

10 to -- so from a standpoint of trying to meet the needs of, you

11 know, getting the information out in a timely manner, it would

12 be very difficult and a hardship upon the defendants if you had

13 to go in and redact out specific identifying information off of

14 each of those documents and just provide it in a coded form?

15        MS. KRAEMER:  Correct.  We could do it if that's the

16 Court's order, but I don't think we could make the June 1st

17 deadline.

18        THE COURT:  Okay.  And that's fine because that helps

19 me kind of know how I need to write the order for you to make

20 sure you have the appropriate information in the order.

21     So what I'm hearing you say is that if I'm going to order

22 that that information be produced by June 1, I need to be

23 specific that it be produced in the format in which it's

24 maintained, which would contain specific identifying

25 information, and then that information would all be under our

1  current protective order.

2      And then when the 30 names are selected, those names would

3  come back to you, and then you would provide the information for

4  those 30 individuals?

5          MS. KRAEMER:  Correct.

6          THE COURT:  Is that fair?

7          MS. KRAEMER:  Yes.

8          MR. GILLESPIE:  And, Your Honor, if I can, just to the

9  extent it helps with your order, some of these files will also

10 contain references to the names of students that will not be in

11 the sample.  If there's an incident or something like that,

12 sometimes those are included in those files as well.

13         THE COURT:  Well, they certainly -- the first batch of

14 them is going to be everybody, right, everybody who is at the

15 school currently who's had seclusion or restraints, right, and

16 anybody who is on medication?

17         MS. KRAEMER:  Correct.  I think what Mr. Gillespie, if

18 he's right on this, if there is an incident that leads to

19 restraint, two students are in a dispute, both students will be

20 named.

21         THE COURT:  Once we get down to the group of 30; is

22 that what you're referencing?

23         MR. GILLESPIE:  Yes, Your Honor.  I apologize.

24         THE COURT:  I'm tracking with you.  What I'm thinking

25 is initially the records you're going to provide by June 1 will

1  be records for any student who is currently there who fits onto

2  one of those two reports, and those students may not be chosen

3  ultimately as a group of 30, but then when we get down to the

4  group of 30 and you produce the Appendix A documents relating to

5  those, there might be information in those records that

6  references another student who's not in the 30 because they were

7  involved in some sort of incident with the student who is in the

8  group of 30?

9          MR. GILLESPIE:  Yes, Your Honor.

10          MS. KRAEMER:  Correct.

11          THE COURT:  Okay.  I'm tracking you good.

12      Okay.  Go ahead, Ms. Kraemer

13          MS. KRAEMER:  I don't know that I had anything

14  further.

15          THE COURT:  Okay.  I just wanted to walk back with

16  you.  So we get the sample 30 picked, and right now the proposal

17  would be that Defendants would produce the records for those 30

18  by June 15th -- excuse me -- by July 6th, July 6th.

19          MS. KRAEMER:  Correct.

20          THE COURT:  And then proposal would be, then,

21  Plaintiffs' motion for class certification and expert

22  disclosures by August 3rd, yours by September 28th, reply by

23  Plaintiffs by October 19th.  Discovery closes November 2nd,

24  dispositive motion by November 30th.

25      Are you guys in agreement with that portion of the proposal

1  as well?

2      MS. KRAEMER:  So the one issue that I highlighted

3  previously is there's only two weeks between the disclosure of

4  Plaintiffs' reply expert reports and the conclusion of

5  discovery.  That's pretty tight, and it's going to require us to

6  cooperate with a fairly high degree of cooperation.  So I guess

7  with that caveat, yes, we are in agreement.

8      THE COURT:  Okay.  Well, and that raises, actually, a

9  follow-up question I had, which goes to one of the issues that I

10 understand still may be in dispute, and that's when you would

11 take the plaintiffs' expert deposition.

12    So if, under the theory that the plaintiffs' proposing,

13 those depositions would occur after all of the experts had

14 produced their reports, it seems to me like that is extremely

15 tight that you guys would get those depositions done in that

16 two-week period between October 19th and November 2nd.

17     MS. KRAEMER:  I think it's entirely unreasonable

18 because that doesn't even consider whether the experts have

19 something going on within that time frame.

20     THE COURT:  No.  I appreciate that.  So my question to

21 you is, and I'm going to jump into one of the dispute issues, is

22 it your position that you need the plaintiffs' expert's

23 deposition for purposes of class certification motion?

24     MS. KRAEMER:  We wanted it for that, and we wanted to

25 be able to give it to our Defendants' -- or defense experts for

1   the purposes of preparing their report.

2           THE COURT:  Before their report, okay.

3       All right.  Let me now ask you a couple more questions.  So

4   the three issues still in dispute, we just talked about one,

5   which was the experts' deposition timing.  How about the first

6   one, which was the when you would produce the balance of the

7   Appendix A documents?

8       So as I understand that, that would be Appendix A documents

9   that would be relevant to the people who would be students

10  currently at the school who would have appeared on one of those

11  two reports that you're going to do, the medication report or

12  the seclusion and restraint reports, but they would not be

13  within the sampling group of 30.  They would be however many

14  other students there would be.

15      Let's say there were 60 students that fit that definition.

16  We've already taken 30 of them out, so then this would be the

17  Appendix A documents for the other 30 who are not chosen as the

18  sample; is that your understanding?

19          MS. KRAEMER:  Yes.  My understanding is that they're

20  asking for the balance of the class --

21          THE COURT:  Okay.

22          MS. KRAEMER:  -- before class certification is

23  ordered.

24          THE COURT:  Okay.  And what is your position as to

25  when you believe would be an appropriate time frame to produce

1  those documents?

2          MS. KRAEMER:  After the Court orders, the Court

3  resolves the class certification issue.

4          THE COURT:  So after the motion is ruled on, okay.

5      I know we talked about this at the earlier hearing.  Do you

6  have any better sense of how many likely people would fit within

7  that class definition as it currently stands?

8          MS. KRAEMER:  Your Honor, we intend to challenge it as

9  overly broad and vague.

10          THE COURT:  But do you have a sense of what it would

11  be right now?  I'm just curious.

12          MS. KRAEMER:  My understanding is that their position

13  is any student taking any type of psychotropic, whether it be

14  for ADHD or for sleep, would qualify, and they believe that

15  that's about two-thirds of the students in the school.  They

16  also seek a higher level of mental health care, and we think

17  there are about six or seven students at any one time who might

18  need that.  So it really depends on what class you're talking

19  about.

20          THE COURT:  But how many kids are in the school at any

21  given time, approximately?

22          MS. KRAEMER:  About 95.

23          THE COURT:  About 95.  And under the proposal that --

24  the definition that Plaintiffs' have proposed for the class,

25  you're saying that would be about 60 --

1          MS. KRAEMER:  I believe that's right.

2          THE COURT:  -- under that definition is your belief?

3      And under your definition that you think would be a more

4  appropriate class definition, that would be a much smaller size?

5          MS. KRAEMER:  I think that's fair, yes.

6          THE COURT:  Okay.  All right.  I'll come back to you

7  guys in just a minute on these issues.

8      Anything more on the children, okay, the named plaintiffs'

9  depositions?  That's the third issue.  Again, is it your

10  position that you need those depositions for purposes of the

11  class certification motion?

12          MS. KRAEMER:  Yes.  For purposes of class

13  certification, for purposes of preparing the experts and

14  generally preparing the defense.

15      Under Plaintiffs' proposal, we would not even be able to

16  begin those sorts of discovery until August 13th, and then they

17  are proposing that discovery be concluded by November 2nd.

18  That's a fairly restricted timeline for us to do anything.

19          THE COURT:  Okay.  All right.  Anything else that you

20  think we need to get on our list of things to talk about

21  relating to the defendants' pending motion for protective order?

22          MS. KRAEMER:  I would like clarification that they are

23  only seeking records for the students who are at the school now

24  because their discovery request was from 2013 forward, and I am

25  just not clear on whether we've resolved that issue or not.

1        THE COURT:  I think we have, but I will ask

2   Plaintiffs' counsel.

3        MS. KRAEMER:  And the only other thing sort of

4   pending, and I think we're in the middle of discussions, are the

5   emails.  We did receive search parameters on Tuesday.  They are

6   very extensive and will yield like hundreds of thousands of

7   documents, so we may have further negotiation to do on that.

8        THE COURT:  Okay.  And that sounds to me like

9   something you guys should consider to meet and confer on, and if

10  you get to a point where you're stuck and you need further Court

11  intervention, happy to do it, but it sound like at least you're

12  making some progress, so having some conversations back and

13  forth might help narrow the issues as well.

14        MS. KRAEMER:  Right, Your Honor.

15        THE COURT:  All right.  Let me ask Plaintiffs' counsel

16  a couple of questions.  The first one is it's my understanding,

17  and I just want to verify for defense counsel, that the records

18  we're talking about are, and you've agreed, for the kids who are

19  currently at the school?

20        MR. FRISCHER:  That's exactly right, Your Honor, with

21  respect to the Appendix A documents, the documents we are going

22  to zero in on for the purposes of these motions and initial

23  round of reports.

24      As Your Honor very plainly confirmed on the first call,

25  this is without prejudice to our rights to seek other documents,

 1   but we're not pressing that right now.  We would like to press

 2   full steam ahead on getting the set of Appendix A documents,

 3   which right of the beginning of Appendix A talks about the kids

 4   at the school.

 5         THE COURT:  Does that get you what you need,

 6   Ms. Kraemer, for perspective now?

 7         MS. KRAEMER:  It does.

 8         THE COURT:  Because I'm not going to rule on anything

 9   that might get asked for in the future at this point in time.  I

10   have enough to do here.

11       Anything further from Plaintiffs' counsel with respect to

12   any of the other issues that we've still got, either the

13   proposal or the three remaining issues in dispute; the balance

14   of the Appendix A docs, when the experts' depositions will

15   occur, and then when the named plaintiffs will be deposed?

16   Anything further you guys want to add that you haven't already

17   told me about?

18         MR. FRISCHER:  The only thing I would add, which might

19   not be ripe for today but it was raised in the last call and I

20   want to raise it again, is the notion of how far back we have to

21   go, not for the Appendix A documents, you know, but for the

22   policies and procedures and, more importantly, for the email

23   requests that were done, how far back do we have to go for

24   emails.

25       I think that was raised on Defendants' motion for a

1   protective order.  You know, it doesn't directly correlate to

2   what we're talking about now, but I do want to point out, I just

3   want to make very clear, that the reason we are asking for

4   policies and procedures back to 2003 and -- 2013 and emails back

5   to 2013 is that in 2013 there were some very important events in

6   Iowa that Your Honor may recall.

7        There were facts brought to Defendants' attention,

8   including Mr. Foxhoven in his capacity at the time, about the

9   problems with seclusion and restraints at the Girls State

10  Training School, and out of that there were investigative

11  reports, there were studies commissioned by the State.  There

12  was a lot of information out at that time as to the problems

13  caused by restraints and seclusion.  As a result, the Girls

14  State Training School was closed.

15       As part of our proof of deliberate indifference that the

16  State knew about a substantial risk at the Boys State Training

17  School as early as 2013 and failed to take reasonable steps to

18  mitigate that risk, you know, the constitutional standard of

19  deliberate indifference, we are requesting to see did the State

20  change any procedures with respect to the Boys State Training

21  School in 2013 and thereafter, and we are going to be looking at

22  emails.

23       And we can talk more about exactly what the search terms

24  are, but we want to see from 2013 on what response, if any, was

25  made with respect to the Boys State Training School in respect

1   to the hue and cry that arose from these same issues at the

2   Girls State Training School.  That's where we are at on that

3   issue

4           THE COURT:  Well, that sounds like something you guys

5   are going to continue to do some meet-and-confer with.  Again,

6   on that, if you get to a point where you want me to get involved

7   and need Court intervention, I'm happy to do it.  It sounds

8   like -- and I appreciate very much what you have done to narrow

9   the issues since our last conversation.  Just keep that

10  conversation going.  I find when you talk to each other, it

11  helps things immensely, and you don't need me to interpret for

12  you.  So if you could keep that up, I would greatly appreciate

13  it.

14      All right.  I have taken both of these motions under

15  advisement.  We'll get a ruling out just as soon as we possibly

16  can with respect to the issues that we've got in front of us,

17  and my hope is that we'll be able to get it out this week.  I've

18  got criminal duty this week so that kind of messes with things a

19  little bit, but if we don't have it out this week, I'm sure

20  we'll have it out by Monday at the latest.  But I know we're on

21  a time crunch.  We're trying to meet that, but we also have to

22  deal with the other business that we occasionally get asked to

23  deal with as well.

24      So I appreciate your time today and I appreciate your

25  argument from both of you, and I do, again, appreciate your

1   abilities to continue to talk with each other and try to narrow

2   issues.

3       You guys know the case, you know the facts much, much

4   better than I ever will because you're living it day to day, and

5   so it's better for you to try to work through those things, to

6   the extent you can, than for me.  And I certainly know it's my

7   job to help you do that, and I'll do it when needed, but I think

8   you can work through some of those issues and provide more

9   explanation.  I know the RiteTrack thing throws a kind of wrench

10  in there for us that we're trying to work through that too.

11      If there's other issues that come up, let me know.  We will

12  have periodic status conferences.  I don't know.  Peter might be

13  able to tell me when our next one is just so I can let you know.

14          MS. KRAEMER:  May 29th.

15          THE LAW CLERK:  Yes.  May 29th.

16          THE COURT:  What was it, Peter?

17          THE LAW CLERK:  May 29th.

18          THE COURT:  May 29th.  But if you need something

19  before then, don't hesitate to call my office, and we'll get you

20  scheduled in.

21      Let me make sure I have all the exhibits.  I have here,

22  Peter, 2 and 3.  Do you have 1?

23          THE LAW CLERK:  Yes.

24          THE COURT:  Okay.  So I think we're good with that.

25      Anything further on behalf of Plaintiffs?

1          MR. FRISCHER:  No, Your Honor.

2          THE COURT:  Anything further on behalf of Defendants?

3          MS. KRAEMER:  No.  Thank you.

4          THE COURT:  Thank you all very much.

5          (Proceedings concluded at 10:53 a.m.)

82

1                          C E R T I F I C A T E

2              I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3     the State of Iowa and Federal Official Realtime Court Reporter

4     in and for the United States District Court for the Southern

5     District of Iowa, do hereby certify, pursuant to Title 28,

6     United States Code, Section 753, that the foregoing is a true

7     and correct transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the regulations of

10    the Judicial Conference of the United States.

11             Dated at Des Moines, Iowa, this 7th day of June, 2018.

12

13

14                          /s/ Kelli M. Mulcahy
                            Kelli M. Mulcahy, CSR, RMR, CRR
15                          Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25