IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| J.S.X. through his next friend D.S.X., C.P.X. through his next friend S.P.X., and K.N.X. through his next friend Rachel Antonuccio, for themselves and those similarly situated, | ) ) ) ) | Case No. 4:17-CV-00417-SMR-HCA |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| JERRY FOXHOVEN in his official capacity as Director of the Iowa Department of Human Services; RICHARD SHULTS in his official capacity as Administrator of the Division of Mental Health and Disability Services; MARK DAY in his official capacity as Superintendent of the Boys State Training School, | ) ) ) ) ) ) ) ) ) | ORDER ON MOTIONS FOR CLASS CERTIFICATION AND EVIDENTIARY HEARING |
| Defendants. | ) ) | |

Plaintiffs J.S.X., C.P.X., and K.N.X. brought this action on behalf of a putative class of

individuals at the Boys State Training School ("the School") in Eldora, Iowa.[1] Plaintiffs allege

Defendants Jerry Foxhoven, Richard Shults, and Mark Day[2] maintain unconstitutional and illegal

treatment practices with respect to the juveniles at the School who have significant mental

illnesses. Before the Court are Plaintiffs' Motion for Class Certification, [ECF No. 114], and

---

[1] The original Plaintiffs were J.S.X., C.P.X., and a different third individual, G.R.X. *See* [ECF No. 1]. Plaintiffs subsequently added K.N.X. as a named Plaintiff and voluntarily dismissed G.R.X. from this case. *See* [ECF Nos. 33; 108].

[2] Defendants are state officials with various responsibilities for the School's operations. Jerry Foxhoven is the Director of Iowa's Department of Human Services; Richard Shults is the Administrator of the Division of Mental Health and Disability Services; and Mark Day is the Superintendent of the School.

Defendants' Motion for an Evidentiary Hearing on the issue of class certification, [ECF No. 136]. The parties requested oral argument on Plaintiffs' motion, but the Court finds the issues can be resolved without it. *See* L.R. 7(c). The matters are fully submitted and ready for decision. For the reasons stated herein, Plaintiffs' Motion for Class Certification is GRANTED. Defendants' Motion for an Evidentiary Hearing is DENIED.

## I. BACKGROUND[3]

The Court previously discussed the background of this matter in its February 19, 2019 Order on Defendants' Motion for Summary Judgement. [ECF No. 190]. For the purpose of this Order, the Court will focus on the background relevant to the instant motions. The School is a state institution for male juveniles that have been adjudicated delinquent. *See* Iowa Code § 232.52. The School's focus is on the development and rehabilitation of the juveniles committed there. Juveniles at the School are to be provided programs "which focus[] upon appropriate developmental skills, treatment, placements, and rehabilitation." *Id.* § 233A.1(1). Students have generally been through multiple placements through the juvenile court before being ordered to the School. [ECF No. 132 at 11].

The School offers health care services to its students, including mental health care services. A large portion of the School's students receive some form of mental health care treatment. According to statistics by the Iowa Department of Human Services ("DHS"), sixty-six percent of the 174 students placed at the School between November 1, 2016, and April 30, 2017, required

---

[3] The facts are drawn from the parties' respective evidentiary submissions in support of, or resistance to, Plaintiffs' Motion for Class Certification. At the class certification stage, the Court does not weigh evidence except where necessary to determine whether class certification is warranted. *See Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005) ("[W]e believe the district court's findings as to the experts' disputes were properly limited to whether, if appellants' basic allegations were true, common evidence could suffice, given the factual setting of the case, to show classwide injury."); *Mehl v. Can. Pac. Ry. Ltd.*, 227 F.R.D. 505, 509 (D.N.D. 2005).

psychotropic medications. *See* [ECF No. 116-17 at 2–3]. The present dispute largely concerns the adequacy of the mental health care services at the School. Plaintiffs contend these services are unconstitutionally inadequate because they create risks of substantial harm to students with mental illnesses. Plaintiffs' criticisms extend to numerous aspects of the School's practices and procedures—including its screening and evaluation programs, medication oversight and administration, therapeutic services, medical recordkeeping, and crises services. *See generally* [ECF Nos. 116-1; 119 at 16–19].

Plaintiffs also challenge the constitutionality of the School's use of isolation and restraints. The School contains one secure building with single occupancy rooms, Corbett Miller Hall ("CMH"). [ECF No. 132 at 16]. CMH is a secure residential building with twenty-four individual locked rooms. *Id.*; [ECF No. 116-66]. Twelve of these rooms make up a wing within CMH known as the Behavioral Stabilization Unit (the "BSU"). *See* [ECF Nos. 116-66; 132 at 17]. Rooms in the BSU are alleged to be "utterly barren," containing only a concrete slab (where a mattress is placed in the evening and removed during the day), a concrete stool, a sink, and a toilet. [ECF No. 116-4 at 21]. CMH also contains a "seclusion room," and a room containing a mechanical restraining device known as "the wrap." [ECF No. 132 at 16–17].

The School uses the BSU to "segregate" students in certain circumstances. School policy defines segregation as "[c]onfinement of a student to an individual room separated from the general population." [ECF No. 116-68 at 2]. Segregation is ostensibly appropriate "when the student's behaviors are such that the safety or security of other students or staff is threatened." *Id*. However, School policy allows for segregation in response to rule violations not clearly related to safety or security. For example, "serious violation[s] of conduct regulations" warranting segregation include "[s]hadow boxing" and "arm-wrestling." *Id*. at 9. Other evidence also suggests students

are subject to isolation in the BSU for reasons unrelated to safety and security. For example, in a progress report to the Iowa state court, J.S.X.'s juvenile court officer ("JCO") reported that J.S.X. had been admitted to the BSU for reasons such as "Inappropriate Language, Insubordination" and "Horseplay." [ECF No. 132-1 at 41]. Plaintiffs' expert opines that the stress caused by placement in solitary confinement, especially acute in youth with mental illnesses, can have adverse physiological effects on a juvenile's brain. *See* [ECF No. 116-4 at 13–16].

Plaintiffs allege the School "employs solitary confinement extensively." *Id*. at 6; [ECF No. 119 at 20]. Admissions to the BSU increased steadily from 2013 (780 admissions) to 2015 (1160 admissions), and markedly increased in 2016 (1630 admissions). [ECF No. 116-67 at 2–3]. In the first six months of 2017, there were 1241 BSU admissions, for a total of over 9422.94 hours (approximately 7.6 hours per admission). *See id*. at 3–5. Plaintiffs claim at least two-thirds of the students at the School had been placed in isolation at least once as of May 6, 2018. [ECF No. 119 at 20]. Defendants attribute most BSU admissions to a small number of "frequent users," including Plaintiffs, whom they describe as particularly violent and resistant to authority. *See* [ECF Nos. 134 at 14–15; 132-2 at 57–58]. Defendants claim the BSU is a "short term intervention (typically 1 hour or less)." [ECF No. 132 at 17]. However, Plaintiffs allege when students are "staffed" to CMH—meaning they reside in rooms similar to those in the BSU, but have greater privileges than students sent to the BSU on a temporary basis—they can be left in their rooms for twenty-three hours per day. *See* [ECF Nos. 116-4 at 21; 117-8 at 4].

According to School policy, the School's mechanical security restraints "shall only be used as a last resort for the management of immediate violent or self-destructive behavior to ensure the immediate physical safety of a student, other students, an employee, or others . . . and for protection of property destruction that could lead to a safety or security risk." [ECF No. 116-15 at 2].

-4-

Plaintiffs' expert opines that mechanical restraints "are potentially dangerous to incarcerated youth." [ECF No. 116-3 at 7]. He alleges they can "cause injuries, asphyxiation, and cardiac arrest, and can traumatize (or re-traumatize) a youth, especially those with histories of abuse." *Id.* He adds, "[y]outh with pre-existing medical or mental health conditions face even higher risks when subject to these restraints, especially when those risks are unknown or disregarded by staff." *Id.* Another of Plaintiffs' experts criticized the School's policies governing the use of mechanical restraints as they relate to the involvement of mental health staff. She alleges the School improperly allows mental health staff to authorize the use of restraints,[4] does not require mental health staff to be notified when a student is restrained, and does not require a mental health professional to meet with the student subject to the restraint. [ECF No. 116-1 at 28]. DHS statistics show the School used its wrap restraint 107 different times, for a total of roughly eighty-four hours, in the first seven months of 2017. [ECF No. 116-69 at 3, 5]. More broadly, the School's use of physical restraints—of which the wrap and other mechanical restraints are a subset—has increased since 2013.[5] *See id.* at 2–3.

Plaintiffs J.S.X., C.P.X., and K.N.X. are current or former students at the School.[6] Each has been diagnosed with various mental health conditions, and the School prescribed each of them psychotropic medication. *See* [ECF No. 119 at 12–15]. Plaintiffs allege their mental health

---

[4] The concern here is that "involving the School's mental health professionals in the use of custody-ordered restraints confuses the role of mental health staff with those of correctional staff," thus potentially risking "further deterioration of mental health." [ECF No. 116-1 at 28].

[5] According to DHS statistics, "[a]ll restraints start with physical restraint." [ECF No. 116-69 at 2]. Use of the wrap is tracked as a subset of physical restraints and does not "represent additional incidents of restraint." *Id.*

[6] J.S.X. and K.N.X. left the School in 2018. C.P.X. is still a student there.

deteriorated while in the School's custody. J.S.X. and K.N.X. claim they had no history of suicidal ideation prior to their placement at the School, but the School put both on suicide watch during their respective placements. *See* [ECF Nos. 117-30 at 2; 117-31 at 2; 117-49 at 2–3]. The School also put C.P.X. on suicide watch. *See, e.g.*, [ECF No. 117-18 at 2]. Plaintiffs' expert reviewed their School medical files and concluded they received inadequate mental health care at the School. Specifically, she found Plaintiffs suffered, *inter alia*, from the School's failure to consider and pursue mental health therapies, failure to provide adequate crises services by assessing self-harming behavior and developing a safety plan, and failing to properly manage Plaintiffs' psychotropic medications. *See* [ECF No. 117-1 at 24–29].

Plaintiffs were subject to isolation and restraints at the School. *See* [ECF No. 119 at 12–15]. Based on Defendants' records, Plaintiffs estimate C.P.X. was placed in isolation at least 120 times, totaling over 800 hours, for disciplinary infractions over the course of seventeen months; in 2017, J.S.X. was placed in isolation at least 100 times for over 800 hours; and over a nineteen-month period, K.N.X. was placed in isolation over 110 times for over 1400 hours. *Id.* at 13–15. Some of these placements appear to have been related to violent behavior. *See, e.g.*, [ECF No. 132-1 at 41] (describing J.S.X. placement in BSU for "Assault Upon Staff"). Evidence suggests Plaintiffs may have, in some instances, deliberately misbehaved in order to be placed in isolation or restraints, possibly in furtherance of this lawsuit. *See* [ECF No. 132 at 176] (describing statements by K.N.X. that he was going to try and get restrained while Disability Rights Iowa[7] was at the School); [ECF No. 132-1 at 152] (J.S.X.'s JCO stating her

---

[7] As discussed further *infra*, Disability Rights Iowa is acting as co-counsel for Plaintiffs. They are also a protection and advocacy system under the Developmental Disabilities Assistance and Bill of Rights Act of 2000, and the Protection and Advocacy for Mentally Ill Individuals Act.

opinion that J.S.X. was coercing staff to restrain him or send him to the BSU). However, Plaintiffs have been subject to isolation on at least some occasions for behavior that does not appear to have posed a security or safety threat. *See, e.g.*, [ECF No. 117-24 at 2] (C.P.X. readmitted to BSU for throwing berries under his door).

On behalf of themselves and those similarly situated, Plaintiffs allege causes of action under: (1) the Due Process Clause of the Fourteenth Amendment; (2) the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); and (3) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("RA"). [ECF No. 33].[8] They allege Defendants violated the Fourteenth Amendment: (1) by failing to provide minimally adequate mental health care at the School; and (2) through the School's use of isolation and restraints. As to their ADA and RA claims, Plaintiffs assert that, because of their mental health conditions, they are subjected to seclusion and restraints under the School's policies and are thus illegally separated from students without such disabilities and excluded from recreation and schooling.

Plaintiffs seek to certify a class consisting of all students confined to the School since the filing of the Complaint who, now or in the future, have received psychotropic medications or a diagnosis for a mental health disorder specified in either fifth or fourth editions of the Diagnostic and Statistical Manual of Mental Disorders. They seek to be appointed as class representatives. Their counsel—Children's Rights, Disability Rights Iowa ("DRI"), and Ropes & Gray—seek appointment as class counsel.

---

[8] Plaintiffs also asserted a claim for violation of the Eighth Amendment's Cruel and Unusual Punishments Clause, but the Court granted summary judgment to Defendants on that claim. *See* [ECF No. 190 at 11–12].

## II.  ANALYSIS

### A.  *Evidentiary Hearing*

Defendants ask for an evidentiary hearing to present testimonial evidence on the issue of class certification.  *See* [ECF No. 136 at 1].  When deciding whether to certify a class, "[t]he District Court must have before it 'sufficient material . . . to determine the nature of the allegations, and rule on compliance with the Rule's requirements.'"  *Walker v. World Tire Corp., Inc.*, 563 F.2d 918, 921 (8th Cir. 1977) (citation omitted).  However, "[s]ecuring this material does not always require a formal evidentiary hearing."  *Id.*  Instead, where "the pleadings themselves do not conclusively show whether the Rule 23 requirements are met, the parties must be afforded the opportunity to discover and present documentary evidence on the issue."  *Id.*

Plaintiffs do not rely on the pleadings alone in seeking class certification.  The parties conducted discovery and, collectively, submitted over 1800 pages of exhibits in support of their respective positions.  These exhibits include expert reports, various School records, deposition testimony, and affidavits.  Defendants make no showing as to the evidence they seek to present at a hearing.  They have not specified the witnesses they would call, to what issues the witnesses would testify, why the evidence could not be added to the record by other means, or whether that evidence is duplicative of the voluminous evidence the parties have already submitted.  They simply ask for a hearing.  The record is more than sufficient for the Court to determine "the nature of the allegations, and rule on compliance with the Rule's requirements."  *Id.*  Therefore, Defendants' Motion for an Evidentiary Hearing is DENIED.

### B.  *Class Certification*

#### 1.  General principles

Plaintiffs moves to certify a plaintiff class consisting of:

> [A]ll boys confined to [the School] since the filing of the Complaint, now, or in the future, who have received psychotropic medications or a diagnosis for a mental health disorder specified in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") or Fourth Edition ("DSM-IV"), as determined by a mental health professional . . . .

(the "Proposed Class") [ECF No. 114 at 1]. A motion for class certification under Rule 23 involves a two-part analysis. First, under Rule 23(a), the proposed class must satisfy the requirements of "numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Plaintiffs seeking class certification "must affirmatively demonstrate [their] compliance" with Rule 23 and "be prepared to prove that" its requirements are "*in fact*" satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). When deciding a class certification motion, courts may need "to probe behind the pleadings," as the analysis will "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 350–51 (citation omitted); *see also Luiken*, 705 F.3d at 372 ("The preliminary inquiry of the class certification stage may require the court to resolve disputes going to the factual setting of the case . . . ." (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005))). However, courts may consider "[m]erits questions . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (citation omitted). Courts have broad discretion in deciding whether to certify a class. *Rattray v. Woodbury Cty.*, 614 F.3d 831, 835 (8th Cir. 2010). But certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 564 U.S. at 350–51.

2.  Overbreadth and vagueness

Before turning to the factors enumerated in Rule 23, the Court will address objections that Defendants raise based on the rule's implicit requirements—namely, that the Proposed Class is overbroad and vague.

Overbreadth concerns whether the class is defined such that it captures a significant number of people who could not have been harmed by the defendant's alleged misconduct. *See Messner v. Northshore Univ. Healthsystem.*, 669 F.3d 802, 824 (7th Cir. 2012) ("If . . . a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification."); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 942–43 (D. Minn. 2018) (finding that a proposed class in a Title IX action was overbroad because it included individuals who were "effectively accommodated" by the defendant-university's athletic programming); *Mayo v. USB Real Estate Secs., Inc.*, No. 08-00568-CV-W-DGK, 2012 WL 4361571, at *3 (W.D. Mo. Sept. 21, 2012) ("A class is defined too broadly only when a large number of members could not have been harmed by the defendant's conduct." (citing *Messner*, 669 F.3d at 824)).

Defendants advance five reasons why the Proposed Class is overbroad: (1) for most students, the School's services, including its mental health services, are effective; (2) there is no guarantee that additional mental health interventions will help students like Plaintiffs control their "assaultive and destructive behaviors"; (3) Plaintiffs cannot determine the specific mental health care needs of future students; (4) some DSM mental health conditions are not sufficiently serious to warrant the relief Plaintiffs seek; and (5) some students' mental health care needs are adequately served by psychotropic medication alone. *See* [ECF No. 134 at 8–13]. In advancing these reasons, Defendants appear to misconstrue Plaintiffs' claims. Plaintiffs are not challenging their individual

treatment.  Rather, they are challenging  what they allege to be systemic failures with the overall mental health care program at the School—failures that have caused not disappointing results, but have created an unconstitutional risk to class members' health and safety.  In this regard, Defendants' stated concerns about overbreadth fail to address the relevant issue—that is, whether any of these individualized factors remove class members from the risk of harm brought about by Defendants' policies and procedures.  There is sufficient evidence in the record for the purpose of class certification to show that all Proposed Class members are or will be exposed to those risks. Accordingly, the Proposed Class is not overbroad.

Turning to Defendants' vagueness argument, Rule 23 implicitly requires that a class be "adequately defined and clearly ascertainable." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (citation omitted).  This only requires that class members can "be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017).  "Ascertainability does not require that a plaintiff must be able to identify all class members at the time of class certification; rather, a plaintiff need only show that class members can be identified." *Planned Parenthood of Ark. & E. Okla. v. Selig*, 313 F.R.D. 81, 92 (E.D. Ark. 2016).  However, when ascertaining the class, "[t]he Court should not be required to resort to speculation, or engage in lengthy, individualized inquiries." *Brown v. Kerkhoff*, 279 F.R.D. 479, 496 (S.D. Iowa 2012) (alteration in original) (citation omitted).

Defendants' vagueness claim is narrow.  They allege "[b]ecause Plaintiffs cannot show a link between the presence of *any* DSM-IV or DSM-V diagnosis and their allegations, the class as pled is unsupportable, vague, and overbroad." [ECF No. 134 at 13].  The absence of this link is irrelevant to ascertainability.  Applying the appropriate standard, the Proposed Class is defined with reference to three objective criteria: (1) placement at the School; (2) receiving psychotropic

medications; and (3) a DSM diagnosis.  If ever there is uncertainty as to whether an individual is a member of the Proposed Class, the issue can be resolved quickly by reviewing the School's records, cross-referenced against either the DSM-IV or DSM-V.  *See* [ECF No. 117-55 at 2] (psychiatric progress note for K.N.X. describing diagnosed mental health conditions and prescribed medications); [ECF No. 134 at 13] (stating the School "tracks what it considers psychotropic medication").  Therefore, the Proposed Class is sufficiently ascertainable.

### 3.   Rule 23(a) factors

#### a.   Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  When determining whether numerosity is satisfied, courts consider the number of persons involved in the class, "the nature of the action, the size of individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members."  *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559–60 (8th Cir. 1982).  "No arbitrary rules regarding the necessary size of classes have been established."  *Id.* at 559.  Indeed, the United States Court of Appeals for the Eighth Circuit has affirmed the certification of classes with as few as twenty members. *See, e.g.*, *Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765–66 (8th Cir. 1971) (upholding class of seventeen to twenty members).

The Proposed Class is fluid in nature. The average stay at the School is less than one year.[9] Students may also become class members at various times after their arrival at the School,

---

[9] Defendants assert that students complete the School's program in six to nine months. [ECF No. 132 at 12].  Plaintiffs disagree, noting that DHS materials state the average stay at the School is 10.5 months.  *See* [ECF No. 159-6 at 186].

depending on when they are diagnosed with a DSM condition or prescribed psychotropic medication. Further, the Proposed Class includes future members who are currently unidentifiable. These features of the Proposed Cass, however, do not defeat numerosity. When a proposed class size is fluid, courts in this circuit assess numerosity based on the plaintiff's reasonable estimate of the class size. *See M.B. v. Corsi*, 327 F.R.D. 271, 278 (W.D. Mo. 2018) (assessing the size of a proposed class of children in foster care that were administered psychotropic drugs based on state statistics of the total number of children in the state foster care system, and estimates by the plaintiffs' expert as to the percentage of those children administered psychotropic medication); *Postawko v. Mo. Dep't of Corrs.*, No. 2:16-CV-04219-NKL, 2017 WL 3185155, at *5 (W.D. Mo. July 26, 2017) (assessing the size of a proposed class of prison inmates not receiving treatment for their hepatitis-C infections based on the plaintiff's estimate as supported by media and medical journal publications, and data maintained by the defendant). Also, courts in this circuit take the view that, when the class size is otherwise sufficiently numerous, joinder of all class members is impracticable when the class includes future members who are unidentifiable. *See M.B.*, 327 F.R.D. at 278; *Portz*, 297 F. Supp. 3d at 944; *Postawko*, 2017 WL 318155, at *5.

According to Plaintiffs, there were 102 students at the School as of May 6, 2018. [ECF No. 119 at 24]. At least fifty-five of those students are members of the Proposed Class because approximately fifty-five of them received psychotropic medications from the School. [ECF No. 116-1 at 4]. Plaintiffs' expert reviewed the School medical files of thirty-three of those students[10] and found each had been diagnosed with a DSM-IV or DSM-V condition. *Id.*

---

[10] This figure includes the named Plaintiffs (including G.R.X., who has since been terminated from this case) and a sample of twenty-nine other students receiving psychotropic medication.

DHS statistics show that, of the 174 students placed at the School between November 1, 2016, and April 30, 2017, sixty-six percent (or roughly 115 students) required psychotropic medications. *See* [ECF No. 116-17 at 2–3]. Plaintiffs suggest that most, if not all, of the students at the School who are prescribed psychotropic medication likely have a DSM diagnosis. They base this suggestion on their expert's observation that "multiple studies have demonstrated that there is a very high incidence of substance abuse disorders, cognitive impairment and/or serious mental illness" among juveniles in detention. [ECF No. 116-4 at 16–17].

Even if the Proposed Class never exceeds fifty-five individuals, it is sufficiently numerous for certification. As already noted, the Eighth Circuit has approved smaller classes. *See Ark. Educ. Ass'n*, 446 F.2d at 765–66. Additionally, because the Proposed Class includes unidentified future class members, joinder of all class members is impracticable. *See, e.g., M.B.*, 327 F.R.D. at 278. The Proposed Class thus satisfies Rule 23's numerosity requirement.[11]

### b. Commonality

Rule 23(a)(2) provides that a class may only be certified if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Plaintiffs cannot accomplish this by merely showing that "they have all suffered a violation of the same provision of law." *Id.* at 350. Instead, "[t]heir claims must depend upon a common

---

[11] Defendants argue the class is insufficiently numerous because only a small subgroup of five to ten students are "atypically disruptive and dangerous," and thus subject to isolation and restraint more frequently than other students with mental illnesses. [ECF No. 134 at 15]. But Plaintiffs do not seek to certify a class consisting of this subgroup, and the Court must analyze the size of the class that has been proposed.

contention . . . [that] must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* For this purpose, "'[e]ven a single [common] question' will do." *Id.* at 359 (alterations in original) (citation omitted). However, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation omitted).

Plaintiffs assert claims on behalf of the Proposed Class for violations of the Due Process Clause of the Fourteenth Amendment, the ADA, and the RA. They allege Defendants violated the Fourteenth Amendment: (1) by failing to provide minimally adequate mental health care at the School; and (2) through the School's use of isolation and restraints. Plaintiffs can establish this claim in several ways. For example, they can show Defendants were deliberately indifferent to a substantial risk of serious harm to the class members. *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009); *see also Doe v. Washington Cty.*, 150 F.3d 920, 922 (8th Cir. 1998) (applying the Eighth Amendment "deliberate indifference" standard to the claim of a pre-trial detainee, reasoning that "the due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner"); *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) (finding that the Due Process Clause "implicitly incorporates the cruel and unusual punishments clause standards as a constitutional minimum"). Alternatively, they can show Defendants' policies are "not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)).

As to their ADA and RA claims, Plaintiffs assert that, because of their mental health conditions, they are subjected to seclusion and restraints under the School's policies and are thus separated from students without such disabilities and excluded from recreation and schooling. To establish these claims, "a plaintiff must show: 1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). For RA claims specifically, a plaintiff must also show "the program or activity from which he is excluded receives federal financial assistance." *Id.*

These claims all involve common questions. For example, regarding Plaintiffs' Due Process Claim, there are numerous questions of fact as to the risks posed by the School's various policies and practices—applicable to all class members—governing mental health treatment. These include risks posed by the School's policy of delegating treatment planning to unlicensed counselors, and the School's failure to have onsite licensed mental health professionals. *See* [ECF No. 116-1 at 14, 21]. Additionally, there are common questions as to whether the School employs isolation and restraints as forms of punishment, and whether the School's policies and procedures with respect to these mechanisms—which, on their face, allow for their use in response to seemingly benign behaviors—create a risk of harm to class members. *See* [ECF No. 116-68 at 9] (listing "[s]hadow boxing" and "arm wrestling" as "examples of serious violation[s] of conduct regulations" warranting placement in the BSU).

A similar common question arises with respect to Plaintiffs' ADA and RA claims. Defendants can show the School's use of isolation and restraints does not discriminate based on class members' disabilities if, instead, their use reflects "legitimate safety requirements necessary for the safe operations of [the School's] services, programs or activities." 28 C.F.R. § 35.130(h).

-16-

There is a tailoring aspect to this defense, however, in that "the public entity must ensure that its safety requirements are based on actual risks, not mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.* Thus, if Defendants can show the School's use of isolation and restraints targets the actual risks presented by class members' mental illnesses, they could defeat the ADA and RA claims "in one stroke." *Dukes*, 564 U.S. at 350.

Defendants argue various individual issues defeat commonality, such as the differing mental health conditions of the class members, the varied types and amount of treatment they require, and the frequency with which they are placed in isolation or restraints. Again, this misconstrues Plaintiffs' claims. Plaintiffs allege the mental health care at the School and the overarching policies and practices regarding isolation and restraints create unconstitutional *risks* to the health and safety of the class members. It is well-established that when policies and practices "uniformly subject members of the putative class to a *substantial risk of serious harm*," *M.B.*, 327 F.R.D. at 280, commonality is satisfied even if the "presently existing risk may ultimately result in different future harm for different [class members] ranging from no harm at all to death." *Postawko*, 2017 WL 3185155, at *8 (quoting *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014)).

There is ample evidence that such risks apply to all class members. For example, a School psychologist testified in a deposition that mental health staffing would be inadequate to serve the needs of the students if staffing levels were merely maintained. *See* [ECF No. 139-4 at 6–7]. Another School psychologist testified that neither the BSU, the seclusion room, nor the wrap were "good for a student's mental health." [ECF No. 139-5 at 3]. He was "adamant" that "[n]o one should be" placed in the BSU. *Id.* These are not statements that turn on individualized treatments or conditions; they apply to any student who receives mental health care or is subject to School policies governing isolation and restraints.

For these reasons, the Court finds the Proposed Class satisfies Rule 23's commonality requirement. [12]

c.   Typicality

Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Thus, a plaintiff must show "there are other members of the class who have the same or similar grievances as the plaintiff." *Paxton*, 688 F.2d at 562 (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)).  Although a plaintiff's burden is "not an onerous one . . . [t]he court must be shown that the representative is not alone in his or her dissatisfaction with the . . . unlawful practices so as 'to assure that there is in fact a class needing representation.'" *Id.* at 562 (citation omitted).  When establishing typicality, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996).  However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006).

Plaintiffs' claims are typical of those of the class.  As students who are undergoing (or who have undergone) mental health treatment at the School, they are exposed to the same policies and practices they allege create substantial health and safety risks.  They allege to have been subject to

---

[12] Defendants also argue commonality is not satisfied here because, contrary to Rule 23(b)(3), there is no predominance of common issues and, therefore, class resolution is not the superior method of resolving this matter. [ECF No. 134 at 16].  But commonality under Rule 23(a)(2) is not the same as predominance under Rule 23(b)(3). For commonality, there need only be a single common question. *See Dukes*, 564 U.S. at 359.  Also, Plaintiffs seek to certify the Proposed Class under Rule 23(b)(2), not Rule 23(b)(3).

isolation and restraints, often due to behavioral manifestation of their mental health conditions, and they allege to have consequently missed out on educational and other opportunities at the School.

Defendants argue Plaintiffs are atypical of the students in the Proposed Class because they are part of a "frequent users" subgroup that are "aggressive and self-harming to a much higher degree, resulting in demonstrably higher use of restraint and seclusion." [ECF No. 134 at 17]. They assert that "[s]tudents outside the 'frequent user' group experience restraint on an average of less than twice during their 6–9 month stay at [the School]." [ECF No. 134 at 18]. Defendants undermine their own argument. Plaintiffs are not challenging particular instances of isolation or restraint; they are challenging the School's policies and practices as to their use. This includes the School's pervasive use of these tools. *See* [ECF No. 116-3 at 15] (Plaintiffs' expert observing that "all residents [at the School] are at risk of placement in solitary confinement at any given time"); [ECF No. 116-4 at 6] (Plaintiffs' expert observing that "the reality is that [the School] actually employs solitary confinement extensively").

However, many of Plaintiffs' concerns are unrelated to the frequency with which isolation and restraints are used. For example, Plaintiffs' expert argues that the use of such tactics to punish behavior that is symptomatic of mental illnesses is contrary to national standards and norms. *See* [ECF No. 116-1 at 25–26]. She also criticizes the School's policies for failing to consider whether a student's mental health needs make isolation inappropriate or necessitate other accommodation. *Id.* at 27. Another of Plaintiffs' experts has described how isolation can exacerbate a youth's "intense emotional reactivity and poor impulse control," which, in turn, can put intense physiological strain on his or her brain. *See* [ECF No. 116-4 at 13–16]. And as noted above, one School psychologist testified that he believes isolation and restraints are not good for

a student's mental health.  *See* [ECF No. 139-5 at 3].  These concerns apply equally to "frequent users" and students who are subjected to these practices only rarely.  In similar circumstances, other courts in this circuit have found typicality to be satisfied.  *See M.B.*, 327 F.R.D. at 281 (finding typicality satisfied, even though named plaintiffs had "mental or physical health problems that [were] unusually severe," where named plaintiffs challenged state policies and practices for administering psychotropic medications to children in foster care).

Defendants also argue Plaintiffs cannot establish typicality because they "appear to be acting out purposefully to provoke the use of restraint and seclusion and . . . appear unusually resistant to authority."  [ECF No. 134 at 18].  In support of this allegation, they cite the affidavit of Defendant Day, which recounts various instances of students at the School making comments that suggest they were misbehaving in order to be restrained. *See, e.g.*, [ECF No. 132 at 23] (stating that K.N.X. said he "was going to be as violent as possible in order to get restrained in hopes that DRI could witness it").  They also highlight the deposition testimony of Lynn Fitzgerald, J.S.X.'s JCO, who believed J.S.X. was coercing staff to restrain him or send him to the BSU.  *See* [ECF No. 132-1 at 152].  They argue the presence of this "defense" against the named Plaintiffs can destroy typicality.  *See In re GenesisIntermedia, Inc. Secs. Litig.*, 232 F.R.D. 321, 329–30 (Minn. 2005) (finding that a possible "unjustified reliance" defense against the named plaintiffs in a proposed securities class action precluded a finding of typicality).

Defendants do not articulate what their defense is or how it might apply here, but even if the allegation is true, it would not defeat typicality in this case.  The "unique defense" bar to typicality is concerned with "[t]he fear . . . that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer."  *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999

(7th Cir. 1980); *see also In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999) ("A proposed class representative is not adequate or typical if it is subject to a unique defense that threatens to play a major role in the litigation.").

That fear is not at issue in this case. Plaintiffs have raised numerous concerns over the health and safety risks of the School's policies governing isolation and restraints. Among them are the policies' departures from accepted professional standards, the inadequate consideration of mental heath issues before their use, and their use for benign conduct. None of those concerns are called into question by Plaintiffs' alleged behavior. Issues such as the policies' adherence to professional standards and the lack of medical oversight when restraints are used relate to the structure of the policies and routine elements of the School's practices, such that they would apply to all class members even if they had never personally been put in restraints or isolation. Further, the record shows Plaintiffs have been placed in isolation for seemingly benign conduct (regardless of their motives), and that their misbehavior is due in part to their mental health conditions. *See* [ECF No. 117-45 at 2] (J.S.X. sent to BSU for being disruptive in class and, after leaving, refusing to quietly return); [ECF No. 117-27 at 2] (psychiatric progress note for J.S.X. observing that he was placed at CMH "due to poor behavior but it is unclear how much of that might be ADHD and how much of it is oppositional and conduct disorder"); [ECF No. 117-55 at 2] (psychiatric progress note for K.N.X., observing that "his conduct disorder symptoms get him into as much or more trouble as his ADHD and it is questionable whether he will make progress in the long run because of this").

Additionally, to the extent there must be "legitimate" instances of Plaintiffs being put in isolation or restraints, Defendants do not allege Plaintiffs were always subject to these practices due to behavior calculated to trigger their use. Nor would such an allegation be credible.

As previously noted, DHS data shows a sharp increase in the number of admissions to the BSU during the last five years. Admissions increased steadily from 2013 (780 admissions) to 2015 (1160 admissions), but markedly increased in 2016 (1630 admissions). [ECF No. 116-67 at 2–3]. In the first six months of 2017, there were 1241 BSU admissions. *Id.* at 3–4. Plaintiffs claim that at least two-thirds of the students at the School were placed in isolation at least once as of May 6, 2018. [ECF No. 119 at 20]. There was a similar increase in the use of restraints at the School. Defendants observe that 157 physical restraints were used in 2011, but that number rose by a factor of nearly five to 759 in 2017. [ECF No. 132 at 21]. To the extent Defendants seek to assign blame to DRI for the increase in physical restraints—an allegation they have made and that the Court will address below—this is failing, as 355 of the physical restraints in 2017 were of students who were not working with DRI. *See id.* That figure alone is just short of the 364 physical restraints in 2012–2014 combined. *See id.* Perhaps on at least one occasion each Plaintiff deliberately violated the School's rules in hopes of being punished through isolation or restraints. But it strains credibility—given how widespread the use of these tactics appears to have been—that such motivations account for every instance of their use against Plaintiffs. Instead, these figures demonstrate that the use of isolation and restraints is so pervasive at the School that Plaintiffs are typical of the Proposed Class.

### d. Adequate representation

Finally, the Court must consider whether Plaintiffs will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives

will vigorously prosecute the interests of the class through qualified counsel." *Paxton*, 688 F.2d at 562–63 (8th Cir. 1982).

Plaintiffs clearly share common interests with the Proposed Class. They are challenging broad policies and practices that apply equally to all class members. They seek declaratory relief to remedy alleged unconstitutional health and safety risks brought about by those policies and practices. There is nothing about Plaintiffs' positions or circumstances whereby such relief would somehow put them at an advantage over other class members. The Court is also satisfied Plaintiffs will vigorously prosecute the interests of the class. Plaintiffs have been exposed to the alleged risks at issue and will or would have benefited from the amelioration of those risks. Each Plaintiff appears through his next friend, and Defendants do not dispute whether they are capable and committed.[13] Further, the Court finds Plaintiffs' counsel are adequately qualified to pursue the interests of the class. They have ample experience in class actions and civil rights matters, and they have substantial expertise as to legal issues involving child welfare and individuals with mental illnesses. *See* [ECF Nos. 116-74; 116-75; 116-76].[14]

However, Defendants argue Plaintiffs would not be adequate representatives of the Proposed Class. They first argue J.S.X. and K.N.X. are inadequate representatives because they are no longer students at the School and thus lack the incentive to vigorously prosecute the interests of the class. However, "where a named plaintiff's claim is 'inherently transitory,' and becomes moot prior to certification, a motion for certification may 'relate back' to the filing of the

---

[13] In their Answer, Defendants denied that Rachel Antonuccio was qualified to serve as K.N.X.'s next friend due to insufficient information at that time regarding their relationship. [ECF No. 39 ¶ 50]. Defendants have not renewed this objection or articulated other objections as to Plaintiffs' respective next friends.

[14] The Court further analyzes the adequacy of Plaintiffs' counsel in section II.C, *infra*.

complaint." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 n.2 (2013); *see also Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) ("That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction. . . . In [cases involving inherently transitory claims], the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution.").

The Court previously determined Plaintiffs' claims are inherently transitory and that the discharge of a named Plaintiff from the School does not moot his claims. *See* [ECF No. 104 at 3–7]. The Court need not repeat that analysis here. Defendants do not argue J.S.X. and K.N.X. lacked the necessary interest in this matter when the Complaint was filed, and there is nothing in the record that warrants such a conclusion.

Defendants also argue C.P.X. will not vigorously prosecute the interests of the class because he requested to stay at the School to complete his education. Without citing any additional evidence, Defendants imply this shows C.P.X. does not sincerely believe his allegations regarding the conditions at the School. The Court disagrees with this conclusion. C.P.X.'s decision to remain at the School may just as well reflect his calculation that the benefits of completing his education outweigh the health and safety risks to which he is allegedly exposed. On its own, C.P.X.'s request does not indicate he is less entitled, or less incentivized, to remedy those risks. Absent additional supporting evidence, the Court rejects Defendants' argument.

Additionally, Defendants argue Plaintiffs' interests are not common to those of the class because Plaintiffs are more problematic and will thus require greater interventions than other class members. They claim that "[m]easuring the service needs of the class by the most problematic students will skew the resource allocation and disadvantage those students without named plaintiffs' unique needs." [ECF No. 134 at 21–22]. But the measures Plaintiffs seek—including

additional mental health staffing; the provision of emergency mental health treatment; individualized therapy plans; and various changes to the way the School administers psychotropic medications and employs seclusion and restraints—would apply equally to the entire class. Nothing about Plaintiffs' requested relief turns on the severity of a class member's mental health condition. More fundamentally, Plaintiffs challenge the mental health care at the School as falling below constitutional minimum standards for health and safety. They do not seek, nor are they entitled to, optimal care. *See Elizabeth M.*, 458 F.3d at 788 (finding that although individuals who have been involuntarily, civilly committed have a "substantive due process right to reasonably safe custodial conditions," they do not have a "broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement"). The Court understands Defendants face challenges in operating the School on a limited budget, but this does not excuse them from their constitutional duty to provide minimally adequate care—which Plaintiffs allege they have failed to do.

In sum, the Court finds Rule 23's adequacy requirement is satisfied.

### 4. Rule 23(b)

Having found Plaintiffs satisfy the prerequisites under Rule 23(a), the Court turns to whether Plaintiffs can satisfy any of the three requirements in Rule 23(b). Plaintiffs seek certification under Rule 23(b)(2), which is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "If the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) (citation omitted). Moreover, "[b]ecause

one purpose of Rule 23(b)(2) was to enable plaintiffs to bring lawsuits vindicating civil rights, the rule 'must be read liberally in the context of civil rights suits.'" *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980) (citation omitted). However, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360.

Here, Plaintiffs allege the School fails to operate a minimally adequate mental health care treatment program. They allege systemic failures in that program, applicable to all class members, create unconstitutional risks to class members' health and safety. These alleged failures have been discussed at length in this Order, but they include the inadequate staffing of mental health care professionals, screening policies that fail to require certain inquiries, and delegating the implementation of treatment planning to unlicensed counselors. *See* [ECF No. 116-1 at 4, 12, 14]. Some of these alleged failures are memorialized in School policies. *See* [ECF No. 116-13 at 4] (stating that "[i]mplementation of the [treatment] plan shall be the responsibility of the student's assigned counselor in the living unit"). Other concerns are not directly reflected in written policies, but evidence indicates they are systemically applicable to the entire class. *See, e.g.*, [ECF No. 116-1 at 17] (Plaintiffs' expert observing that none of the thirty-three medical files reviewed indicated that the students received adequate therapy). Plaintiffs' claims as to the School's use of isolation and restraints, and their resultant harms, are similarly based on policies and broadly applicable practices. *See* [ECF No. 116-68 at 5] (School policy allowing for BSU placement for "[d]isciplinary" purposes); [ECF No. 116-3 at 13–14] (Plaintiffs' expert observing that School policy allowed for placement in the BSU for non-dangerous behaviors and opining that "subjecting youth to solitary confinement when they do not pose imminent danger is not reasonably related to the restoration of facility discipline or security"); [ECF No. 116-4 at 13–16] (Plaintiffs' expert

describing the potential physiological harm to juveniles subject to solitary confinement). Because of the broad reach of these disputed policies and procedures, Defendants' actions in forming, overseeing, and implementing them are actions on grounds that apply generally to the Proposed Class.

Defendants argue, however, that class certification under Rule 23(b)(2) is inappropriate because it is unnecessary. They claim "the requested declaratory or equitable relief may be obtained from an individual action and would automatically accrue to the benefit of other putative class members." [ECF No. 134 at 23]. In support of this contention, they cite various authorities, primarily from the United States District Court for the District of Columbia, holding that "when . . . 'the relief being sought can be fashioned in such a way that it will have the same purpose and effect as a class action,' the certification of a class action is unnecessary and inappropriate." *Gray v. Int'l Bhd. of Elec. Workers*, 73 F.R.D. 638, 640 (D.D.C. 1977) (citation omitted).

There is a circuit split regarding a necessity requirement for class certification. *See Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 309–310 (3d Cir. 2016) (collecting cases). The United States Court of Appeals for the Seventh Circuit has held that class certification cannot be rejected because it is unnecessary, but the United States Courts of Appeals for the Second, Fourth, Fifth, Sixth, Ninth, and Tenth Circuits have all upheld lower court decisions denying class certification on that ground in the Rule 23(b)(2) context. *See generally id.*; *United Farmworkers of Fla. Hous. Project, Inc. v. City of Delray Beach*, 493 F.2d 799, 812 (5th Cir. 1974).

The Eighth Circuit has not recently expressed a view on this issue. However, in the past, it has both upheld the denial of class certification where it would serve "[n]o useful purpose," *Ihrke v. N. States Power Co.*, 459 F.2d 566, 572 (8th Cir. 1972), *vacated on other grounds*, 409 U.S. 815 (1972), and found that a district court improperly denied class certification as unnecessary when

-27-

"the risk of mootness [was] great in [the] litigation." *Hoehle v. Likins*, 538 F.2d 229, 231 (8th Cir. 1976) (per curiam).  These precedents do not show the Eighth Circuit has adopted a freestanding necessity requirement; instead, it appears the necessity of class certification is a factor that the district court may consider in appropriate circumstances.

This approach resembles that articulated by the United States Courts of Appeals for the First and Third Circuits.  In *Dionne v. Bouley*, 757 F.2d 1344, 1356 (1st Cir. 1985), the First Circuit observed that Rule 23(b)(2) clearly states that "whether the action should be maintained as a class action depends on the *appropriateness* of injunctive or corresponding declaratory relief with respect to the class as a whole."  The court noted that "when the same relief can be obtained without certifying a class, a court may be justified in concluding that class relief is not 'appropriate.'"  *Id.* The court cautioned, however, "[t]here may . . . be situations where a class certification under Rule 23(b)(2) will arguably be unnecessary, but where other considerations may render a denial of certification improper."  *Id.*  Such considerations include "where there is a danger that the individual claim might be moot[,] where the good faith of the loser cannot be fairly presumed, or where class certification does not impose any significant burden on the court."  *Id.* (citations omitted).  The court stressed it was not adopting a "necessity requirement" under Rule 23(b)(2); "rather, in cases like this where the district court denies certification, we shall look to the discretion that the district court enjoys under the rule to deny class certification should it reasonably determine that class relief is not 'appropriate.'"  *Id.*

The Third Circuit took a similar approach in *Gayle*.  There, the court held that "necessity is not a freestanding requirement justifying the denial of class certification.  However, it may be considered to the extent it is relevant to the enumerated Rule 23 criteria, including 'that final injunctive relief or corresponding declaratory relief [be] appropriate respecting the class as a

whole.'" *Gayle*, 838 F.3d at 310 (alteration in original) (footnote omitted) (citation omitted). As an example, the Third Circuit said, "there may be circumstances where class certification is not appropriate because in view of the declaratory or injunctive relief ordered on an individual basis, there would be no meaningful additional benefit to perspective class members in ordering classwide relief." *Id.* It cautioned, however, that such circumstances "will be rare, and courts should exercise great caution before denying class certification on that basis." *Id.* The court then articulated five factors that lower courts "should scrutinize with care" when a party asserts that classwide relief is unnecessary:

> (1) the nature of the claims and of the parties; (2) the relief available to an individual plaintiff and the extent to which that relief would benefit putative class members; (3) the strength of the evidence that a defendant will abide by a court's ruling on an individual plaintiff's claim with respect to others who are similarly situated; (4) the ease with which putative class members would be able to vindicate their rights following a defendant's noncompliance; and (5) whether there are other circumstances, such as impending mootness of the individual claims, that nonetheless render classwide relief "appropriate."

*Id.* at 312 (footnote omitted).

The Court finds *Dionne* and *Gayle* to be persuasive and consistent with the limited Eighth Circuit precedents discussed above. There is no express requirement in Rule 23 that class certification be necessary. At the same time, however, Rule 23(b)(2) requires injunctive or declaratory relief to be "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, the Court finds the requested injunctive and declaratory relief is appropriate with respect to the entire class. Plaintiffs seek injunctive relief that would impose systemic changes on the polices and practices at issue such that they would provide relief to all class members. *See* [ECF No. 33 at 63–64]. Certainly, some of the relief Plaintiffs seek would benefit the putative class even if only granted to Plaintiffs individually. For example, if the Court found the School could

not constitutionally use isolation to punish misbehavior, that would, in theory, apply to every student at the School.  However, the Court has only limited confidence that Defendants are capable of extrapolating broader required changes to its mental health care program based on a holding involving only three students, two of which are no longer at the School.  In their arguments challenging class certification, Defendants have repeatedly misconstrued Plaintiffs' claims as concerning their individual treatment, when in reality their claims target alleged systemic faults with the School's policies and procedures.  If Defendants subsequently failed to meet their constitutional obligations, other putative class members would have no redress except to file a new lawsuit.  Perhaps the Court's rulings in an individual suit would help future plaintiffs secure a preliminary injunction, but that is far from certain and would be of little comfort to individuals who suffered injuries.

Ultimately, the Court finds Plaintiffs' claims are based on Defendants' alleged actions on grounds applicable to the entire class, and that the requested injunctive relief is appropriate on a classwide basis.  Plaintiffs have met the requirements of Rule 23(b)(2), and they are entitled to class certification.

### C.  Appointment of Class Counsel

The appointment of class counsel is governed by Rule 23(g).  The operative provision is Rule 23(g)(2), which provides that, "when [an] applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)."  Fed. R. Civ. P. 23(g)(2).  Rule 23(g)(4) broadly requires that class counsel "fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  Rule 23(g)(1) lists numerous other factors the Court must consider when appointing class counsel, namely, the work they have done in "identifying or investigating potential claims in the action," their experience in handling class

actions or other complex matters, their knowledge of the applicable law, the resources they will "commit to representing the class," and "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(A)–(B).

Plaintiffs' counsel—attorneys from Children's Rights, DRI, and Ropes & Gray—seek appointment as class counsel. There is no real dispute that counsel collectively have the knowledge, experience, and resources to satisfy Rule 23(g). DRI spent several years investigating problems and claims related to the School's treatment of children with significant mental and emotional impairments. [ECF No. 116-75 at 4]. Since 1984, DRI has been a designated "protection and advocacy system," tasked with, among other duties, "investigat[ing] incidents of abuse and neglect of Iowans with a significant mental illness or emotional impairment" who reside in various public and private facilities. *Id.* at 3. As they are also authorized to "pursue administrative, legal and other remedies" on behalf of those individuals, DRI has developed an expertise "in the various areas of law that affect individuals with disabilities and/or mental illness." *Id.* Similarly, Children's Rights has extensive experience litigating child welfare issues in federal courts across the country. *See* [ECF No. 116-74 ¶¶ 3–4]. They assisted DRI in investigating the claims in this matter. *See id.* ¶ 6. Counsel from Ropes & Gray have significant resources, experience litigating constitutional matters, and extensive experience in class actions and complex litigation. *See* [ECF No. 116-76 ¶¶ 5–8]. Defendants raise no objections to proposed class counsel on these grounds.

Yet Defendants urge the Court to consider "other matter[s]" under Rule 23(g)(1)(B), specifically their allegation that DRI encouraged students at the School to engage in a range of misbehavior to prompt disciplinary measures in order to strengthen Plaintiffs' claims. *See* [ECF No. 134 at 24–27]. In support of these allegations, they point to statistics indicating the use of

restraints and seclusion has increased since DRI began visiting the School. *See* [ECF No. 132 at 21]. Defendants also rely on Defendant Day's affidavit, in which he provides examples of various instances where students at the School commented that DRI was suing the School, or that DRI was somehow protecting them from disciplinary action. *See id*. at 23 (stating that in October 2017, K.N.X. "reported he was going to be as violent as possible in order to get restrained in hopes that DRI could witness it"); *id*. at 26 (stating that in February 2018, J.S.X. "refused to be redirected" and told School staff, "I'm a DRI kid, you know what that means"). Defendants also allege the Youth Law Center ("YLC"), who had been representing G.R.X. in his state court proceedings, had to withdraw because of unspecified comments made by DRI attorneys. *See* [ECF No. 134 at 26]. They also claim Lynn Fitzgerald, J.S.X.'s JCO, "was so concerned about the impact of DRI's involvement with J.S.X. that she informed the Iowa court of her concerns." *Id*. Finally, Defendants cite comments made by DRI attorney Nathan Kirstein[15] challenging a therapist's view of the School's treatment of G.R.X.,[16] and G.R.X.'s and J.S.X.'s resistance to working with the School's psychologist on the grounds that he is not a licensed therapist. *Id*. at 26–27.

Defendants argue this behavior shows DRI lacks the ability to fairly and adequately represent the interests of the class and, thus, DRI should not be appointed as class counsel. These are extraordinary claims and are relevant to the Court's consideration of DRI's adequacy to

---

[15] Kirstein is one of Plaintiffs' counsel of record.

[16] Defendants allege Kirstein's comments "undermined the authority of professionals working with [the School's] students." [ECF No. 134 at 26]. The Court has reviewed the email chain on which Defendants base this allegation and finds this description grossly misrepresents the interaction between Kirstein and the community therapist in question. *See* [ECF No. 132 at 124].

represent the class. *See Smith v. SEECO, Inc.*, No. 4:14-CV-00435 BSM, 2017 WL 2390640, at *2 (E.D. Ark. June 1, 2017) (noting that conduct indicating class counsel has engaged in unethical behavior is relevant to determining the adequacy of counsel's representation).

The Court begins its assessment of Defendants' allegations by providing relevant background. In 1975, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act, Pub. L. No. 94-103, 89 Stat. 486 (1975). The law allotted federal funding to the states to improve services and facilities for persons with developmental disabilities. *See* Pub. L. No. 94-103, § 110, 89 Stat. 486, 489. However, as a condition of receiving such funding, states had to implement "system[s] to protect and advocate the rights of persons with development disabilities." *Id.* § 203, 89 Stat. at 504. Those systems ("P&A Systems") were required to "have the authority to pursue legal, administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State." *Id.*

That statute and its amendments were eventually repealed and replaced by the Developmental Disabilities Assistance and Bill of Rights Act of 2000, Pub. L. No. 106-402, § 401, 114 Stat 1677, 1737 (2000) (codified as amended at 42 U.S.C. § 15001 *et seq.*) (the "Act"). Under the Act as amended, funding to states is still conditioned on their establishing P&A Systems for individuals with developmental disabilities. 42 U.S.C. § 15043(a)(1). Like in previous iterations of the Act, those systems must have the authority to pursue "legal, administrative, and other appropriate remedies," but they must also "have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." *Id.* § 15043(a)(2)(A). Through the Protection and Advocacy for Mentally Ill Individuals Act, Pub. L. No. 99-319, 100 Stat. 478

(1986) (codified as amended at 42 U.S.C. § 10801 *et seq.*) ("PAMII"), Congress granted these same powers to P&A Systems to protect and advocate for individuals with mental illnesses. *See* 42 U.S.C. § 10805.

DRI is a P&A System under PAMII and the Act. *See Iowa Prot. & Advocacy Servs., Inc. v. Rasmussen*, 206 F.R.D. 630, 632 (S.D. Iowa 2001).[17]  It is thus tasked both by Congress and the State of Iowa with protecting and advocating for individuals with mental illnesses and developmental disabilities.  Most of the evidence Defendants cite in support of their allegations against DRI focuses on the organization's advocacy for the civil rights of the School's students. For example, the crux of Fitzgerald's concerns with J.S.X.'s interaction with DRI was that "[h]e was doing less looking forward" and developed a "false sense of empowerment."  [ECF No. 132-1 at 149–50].  She observed he "continues to feel he is treated unfairly and that he is a victim of the [School] doing things that were against his rights."  *Id.* at 150–51.  In a progress report to the Iowa state court, she said, "[t]he decline I have seen in the last three months seems to surround [J.S.X.'s] belief that he will not need to make changes and is a victim of the [School]." *Id.* at 41.  Although it is clear Fitzgerald and others did not view DRI's advocacy as helpful to the School's efforts to rehabilitate its students, nothing in that advocacy alone warrants disqualifying DRI from acting as class counsel given the organization's legislative mandate.

In many respects, Defendants' arguments against DRI's adequacy confuse correlation with causation.  Defendant Day's declaration cites statistics suggesting DRI is responsible for increased misbehavior at the School.  [ECF No. 132 at 21].  His declaration recites numerous examples of

---

[17] *Rasmussen* identifies "Iowa Protection and Advocacy Services, Inc." as a P&A System. *See Rasmussen*, 206 F.R.D. at 632.  Iowa Protection and Advocacy Services, Inc. has since been incorporated as DRI.  *See* [ECF No. 116-75 at 3].

statements made by students at the School suggesting DRI encouraged them to misbehave. *See generally id.* at 22–26. But when asked during his deposition if he believed "DRI is actually inciting students to self-harm or to [incite] themselves to be restrained or put in the BSU for . . . some purpose," Defendant Day replied that he "believe[s] that the outcome of what DRI does is exactly that. I do not believe it is their intent." [ECF No. 139-7 at 3–4]. He criticized DRI as "naïve in regards to how their words and their message to their Plaintiffs are interpreted and manipulated by those students," but he repeated, "[t]he intent I believe is no, that is not their intent." *Id.* a 4. Similarly, although Fitzgerald believed students at the School who were in contact with DRI were overly focused on their civil rights and resistant to the School's programs, she would not attribute those students' problems to their contact with DRI. *See* [ECF No. 132-1 at 156]. She said she believed DRI's "intentions are good." *Id.* Contrary to Defendants' allegations, Fitzgerald did not complain to the Iowa courts about DRI's behavior. In the report to which Defendants cite for that proposition, Fitzgerald reported that J.S.X. had made comments about being represented by DRI and its lawsuit against the School. *See* [ECF No. 132-1 at 41]. But the only criticism she levied at DRI related to the failure of its attorneys to discuss with her their concerns about J.S.X.'s treatment at the School. *See id.*

Defendants vaguely accuse DRI of unethical behavior for failing to contact a YLC attorney, who was representing G.R.X. in his state criminal matters, before speaking to juveniles they were jointly representing.[18] [ECF No. 134 at 26]. Defendants allege the YLC attorney informed DRI of her "objections to their contacting YLC's client," subsequently met with DRI on the issue, and secured DRI's promise to contact YLC before meeting with mutual clients. *Id.* at 26 n.64.

---

[18] It is unclear from the allegation if the mutual client was G.R.X.

Defendants allege that, despite its promise, DRI did not contact YLC before meeting with mutual clients. *Id.* Defendants do not specify what ethical violation they believe DRI committed. There is no ethics requirement in Iowa that lawyers jointly representing a client contact one another before meeting with the client. Generally, however, Iowa lawyers may not "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. of Prof'l Conduct 32:8.4.

Even if the Court accepts as true Defendants' allegation regarding DRI's misrepresentation to YLC, and if it assumes for the sake of argument that this misrepresentation constitutes an ethical violation under the Iowa Rules of Professional Conduct, DRI's disqualification as class counsel is not warranted. Defendants fail to connect the alleged ethical violation to DRI's adequacy to represent the class; as they see it, any ethical violation amounts to inadequacy *per se*. But that is not the law. Various circuit courts have observed that minor attorney misconduct does not require a finding that the attorney is inadequate to represent the class. *See Reliable Money Order, Inc. v. McKnight Sales Co., Inc.*, 704 F.3d 489, 499 (7th Cir. 2013) ("A 'slight' or 'harmless' breach of ethics will not impugn the adequacy of class counsel."); *Bubsy v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323–24 (11th Cir. 2008). Given the requirements of Rule 23(g), the ethical violation in question must somehow impact counsel's adequacy to represent the class. Clearly, "misconduct that prejudices the class or creates a direct conflict between counsel and the class" would warrant such a finding. *Reliable Money Order*, 704 F.3d at 498. However, DRI's alleged misconduct does not give rise to such concerns. It is not clear how an isolated misrepresentation regarding what appears to be a logistical issue, made to a lawyer not involved in this matter, is relevant to this case.

The Court has carefully considered, and rejects, Defendants' arguments as to DRI's adequacy to represent the class. Plaintiffs' counsel satisfy Rules 23(1) and (4).

Finally, Defendants argue "[a]ppointing three law firms is unreasonable and an unnecessary overstaffing of this case." Defendants claim the presence of three law firms "increases the difficulty with coordination, [and] is unnecessarily duplicative," but their main concern is that the potential fee claim will be unreasonable. [ECF No. 134 at 27–28]. Defendants base their argument on Rule 23(g)(2), which states in relevant part that "[i]f more than one adequate applicant [for class counsel] seeks appointment, the court must appoint the applicant best able to represent the interests of the class." Fed. R. Civ. P. 23(g)(2). However, "nothing in the rule restricts or addresses the question whether more than one attorney should be appointed as class counsel." 7B Charles Alan Wright et al., *Federal Practice & Procedure* § 1802.3, p. 324 (3d ed. 2005). As the Advisory Committee observed,

> The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

Advisory Committee's Notes on 2003 Amendments to Fed. R. Civ. P. 23, 28 U.S.C.A., p. 587.

The Court finds appointing Children's Rights, DRI, and Ropes & Gray as class counsel is appropriate. Plaintiffs' counsel have been working together on this matter since before commencing the action. Each firm brings different knowledge and expertise that, cumulatively, establish their adequacy to represent the class. They have zealously pursued this case, and their submissions to the Court reflect the high degree of skill with which they have done so. Defendants' arguments as to the difficulty in coordinating with the various attorneys would be more convincing if they had not already been dealing with this issue since this matter began roughly fifteen months

ago. Trial in this matter is scheduled to begin in three months; Defendants will not be unduly prejudiced in having to deal with three law firms for a little while longer.

The Court understands Defendants' concerns that three law firms will generate an unreasonable fee request. However, the Court believes the proper time for Defendants to raise that concern is if and when class counsel seek attorney's fees and costs under Rule 23(h).

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motion for an Evidentiary Hearing, [ECF No. 136], is DENIED. Plaintiffs' Motion for Class Certification, [ECF No. 114], is GRANTED. Therefore:

1.  The Court certifies a class consisting of all boys confined to the School since the filing of the Complaint, now, or in the future, who have received psychotropic medications or a diagnosis for a mental health disorder specified in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") or Fourth Edition ("DSM-IV"), as determined by a mental health professional.

2.  The Court appoints Plaintiffs J.S.X., C.P.X., and K.N.X. as class representatives.

3.  The Court appoints attorneys from Children's Rights, DRI, and Ropes & Gray LLP as class counsel.

IT IS SO ORDERED.

Dated this 13th day of March, 2019.

STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT