**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | | |
|---|---|---|
| **C.P.X.** through his next friend S.P.X. and **K.N.X.** through his next friend Rachel Antonuccio, for themselves and those similarly situated, | ) | C/A No. 4:17-cv-00417 |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **Jerry Foxhoven** in his official capacity as Director of Iowa Department of Human Services; **Richard Shults** in his official capacity as Administrator of the Division of Mental Health and Disability Services; **Mark Day** in his official capacity as Superintendent of the Boys State Training School. | ) | **PLAINTIFFS' POST-TRIAL BRIEF** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................ 1

THE EVIDENCE ............................................................................................... 4

    1.    The Named Plaintiffs. ...................................................................... 4

    2.    Defendants Fail to Provide Minimally Adequate Mental Health Care to the Class, Placing Class Members at Substantial Risk of Serious Harm. .................... 9

    3.    Defendants Have Known for Years That the Mental Health Services Provided at the School Were Inadequate, Yet Have Not Taken the Required Steps to Address the Substantial Risk of Serious Harm....................... 14

    4.    Defendants' Extensive Use of Solitary Confinement and Restraints to Punish Students for Behavioral Issues, Including Behavior Resulting from Students' Mental Illness. ................................................................. 15

ARGUMENT .................................................................................................. 17

I.      The Legal Standard Under the Fourteenth Amendment. .................................... 17

II.     Defendants' Failure to Provide Minimally Adequate Mental Health Care Violates the Fourteenth Amendment. ...................................................................... 18

III.    Defendants' Use of Solitary Confinement and Restraints Violates the Fourteenth Amendment. .................................................................................... 22

    A.    Defendants Use Solitary Confinement and Restraints to Punish. ......................... 22

    B.    Defendants Are Deliberately Indifferent to the Harms That Solitary Confinement and Restraints Have on Plaintiffs' Mental Health. ......................... 24

IV.    Defendants Violate the ADA and RA When They Place Boys in Solitary Confinement for Behaviors Associated with Mental Health Disabilities and Exclude Them from Schooling and Other Benefits. ...................................................................... 26

        1.    Plaintiffs are Persons with a Disability. ............................................ 27

        2.    Plaintiffs Qualify for the Benefit(s) and Defendants Excluded Them from Those Benefit(s) Because of Their Disabilities. ............ 28

        3.    Plaintiffs Satisfy the Additional RA Element that Defendants Receive Federal Public Funds. .............................................. 31

V.     The Court Should Order Defendants to Remedy Their Violations, Appoint an Independent Monitor, and Retain Jurisdiction Until Defendants Demonstrate Sustained Compliance with Their Legal Obligations. ...................................................... 31

CONCLUSION ................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.T. v. Harder*,
  298 F. Supp. 3d 391 (N.D.N.Y. 2018) .................................................................. 28, 30

*Biselli v. Cty. of Ventura*,
  No. 09-cv-08694 CAS, 2012 U.S. Dist. LEXIS 79326, ECF 119 (C.D.
  Cal. June 4, 2012) ...................................................................................................... 28

*Bradford v. Hanus*,
  No. 14-cv-131, 2017 WL 4872357 (N.D. Iowa Oct. 27, 2017),
  *recommendation adopted sub nom. Bradford v. Avery*, No. 14-cv-131,
  2018 WL 576849 (N.D. Iowa Jan. 26, 2018) ............................................................ 23

*Braggs v. Dunn*,
  257 F. Supp. 3d 1171 (N.D. Ala. 2017) ............................................................. 19, 21

*Braggs v. Dunn*,
  No. 2:14-cv-601-MHT, 2018 WL 7106346 (M.D. Ala. Feb. 20, 2018) ..................... 32

*City of Revere v. Massachusetts Gen. Hosp.*,
  463 U.S. 239 (1983) .................................................................................................. 18

*Clark v. California*,
  739 F. Supp. 2d. 1168 (N.D. Cal. 2010) .................................................................... 30

*Doe v. Hommrich*,
  No. 3-16-0799, 2017 WL 1091864 (M.D. Tenn. Mar. 22, 2017) ............................... 23

*Doe v. Washington Cty.*,
  150 F.3d 920 (8th Cir. 1998) ..................................................................................... 18

*Farmer v. Brennan*,
  511 U.S. 825 (1994) .................................................................................................. 19

*Feliciano v. Barcelo*,
  497 F. Supp. 14 (D.P.R. 1979) .................................................................................. 22

*Goff v. Harper*,
  No. 4-90-CV-50365, 1997 WL 34715292 (S.D. Iowa 1997) ............. 19, 20, 21, 31, 32

*Greason v. Kemp,*
    891 F.2d 829 (11th Cir. 1990) .................................................................. 21

*Henry A. v. Willden,*
    678 F.3d 991 (9th Cir. 2012) ................................................................... 19

*Inmates of Boys' Training Sch. v. Affleck,*
    346 F. Supp. 1354 (D.R.I. 1972).......................................................... 23, 32

*J.H. v. Hinds Cty., Miss.* ("*Hinds*"),
    No. 3:11-cv-327-DPJ-FKB (S.D. Miss. Mar. 28, 2012), ECF 33 ........................ 32, 33

*J.J. v. Litscher* ("*Litscher*"),
    No. 3:17-cv-00047-jdp (W.D. Wis. June 1, 2018), ECF 98-1 .............................. 32, 33

*J.S.X. v. Foxhoven* ("Order"),
    No. 17-cv-00417 (S.D. Iowa Feb. 19, 2019), ECF 190 ........................................passim

*Kingsley v. Hendrickson,*
    135 S. Ct. 2466 (2015) ................................................................ 18, 22, 24

*Madrid v. Gomez,*
    889 F. Supp. 1146 (N.D. Cal. 1995) .................................................... 21, 24

*Morgan v. Sproat,*
    432 F. Supp. 1130 (S.D. Miss. 1977)......................................................... 32

*Nelson v. Corr. Med. Servs.,*
    583 F.3d 522 (8th Cir. 2009) (en banc) .............................................. 18, 19

*Olmstead v. L.C.,*
    527 U.S. 581 (1999)............................................................... 28, 29, 30

*Paykina v. Lewin,*
    No. 9:19-cv-00061, 2019 WL 2329688 (N.D.N.Y May 31, 2019) ...................... 25, 26

*R.G. v. Koller,*
    415 F. Supp. 2d 1129 (D. Haw. 2006) ...................................................... 23

*R.J. v. Bishop* ("*Bishop*"),
    No. 1:12-cv-07289 (N.D. Ill. Dec. 6, 2012), ECF 33 ............................... 32, 33

*Randolph v. Rodgers,*
    170 F.3d 850 (8th Cir. 1999) ...................................................... 26, 27, 29, 30

*Reed v. Palmer*,
　906 F.3d 540 (7th Cir. 2018) ...................................................... 22

*Smith v. Jenkins*,
　919 F.2d 90 (8th Cir. 1990) ................................................. 19, 21

*Thomlison v. City of Omaha*,
　63 F.3d 786 (8th Cir. 1995) ...................................................... 31

*Turner v. Palmer*,
　84 F. Supp. 3d 880 (S.D. Iowa 2015) ...................................... 23

*V.W. v. Conway*,
　236 F. Supp. 3d 554 (N.D.N.Y. 2017) ...................................... 22

**Statutes**

29 U.S.C. § 794(b) .................................................................. 27, 31

42 U.S.C. § 12131 *et seq.* ............................................................ 26

**Other Authorities**

28 C.F.R. § 35.108(a) ................................................................... 28

28 C.F.R. § 35.130(b) ............................................................. 29, 30

28 C.F.R. § 35.130(h) ................................................................... 28

U.S. Dep't of Justice, Findings of Investigation of the State
　Correctional Institution at Cresson and Notice of Expanded
　Investigation ("DOJ Findings") (May 31, 2013) ............................ 29, 30

Eighth Amendment .................................................... 18, 19, 23, 25

Fourteenth Amendment ........................................................ passim

## PRELIMINARY STATEMENT

The evidence presented at trial confirms that youth incarcerated at the Boys State Training School at Eldora (the "School") have a compelling need for mental health services and treatment. Class members typically have been diagnosed with multiple mental health disorders. They often have been subjected to significant childhood trauma, including abuse and neglect from their parents; they themselves are often the victims of crime. Class members repeatedly have engaged in self-harm and expressed ideations of suicide, and they have been placed on "suicide watch" on numerous occasions.

Yet the overwhelming evidence also confirms that the School fails to provide minimally adequate mental health care in multiple respects, and violates well-accepted professional standards regarding mental health care in juvenile correctional facilities. Psychotherapy is virtually non-existent at the School, despite the uncontested evidence that psychotherapy is the primary treatment for the disorders common among the Class, particularly in correctional facilities, and that psychotropic medications should be used only to augment ongoing psychotherapy. The School fails to perform mental health treatment planning, fails to provide minimally adequate treatment to boys experiencing mental health crises, fails to engage a sufficient number of qualified mental health professionals, and fails to provide even the slightest administrative oversight or quality improvement system necessary for a functioning mental health system.

These failures represent a wholesale disregard of professional standards, including those of the National Commission on Correctional Health Care, the American Correctional Association, and others. They also place the Class at tremendous risk of serious harm.

Instead of providing adequate mental health treatment, the evidence demonstrates that the School resorts to the improper use of solitary confinement and restraints, which are particularly inappropriate for youth with mental health disorders. Boys expressing ideations of suicide are

1

punished in the wrap, a fixed mechanical restraint in which boys are immobilized by fourteen straps as their clothing is unnecessarily cut off their bodies.  Boys on suicide watch or experiencing other mental health crises are forced to spend many hours in the punitive "Seclusion Room" or the euphemistically-named "Behavioral Stabilization Unit" ("BSU"), where the undisputed evidence confirms that their mental health deteriorates.

Data from the School reflects that the School routinely disregards its own policy supposedly limiting the time a boy will spend in the BSU, and it confines boys in the Seclusion Room or the BSU for dozens of hours at a time.  Boys "staffed" to Corbett-Miller Hall ("CMH") can spend up to twenty-three hours a day, over a period of many months, locked alone in their cells.   School records also indicate that the School routinely punishes boys with solitary confinement for minor infractions of the rules, often resulting from Class members' mental health disorders.  Boys in solitary confinement are excluded from schooling and other benefits.  All three experts offered by Plaintiffs provided uncontested testimony as to the tremendous harm resulting from Defendants' use of solitary confinement and restraints.

Defendants' failure to adequately provide for the health and safety of the Class is essentially confirmed by Defendants' experts, who offered only narrowly-crafted opinions that did not address, and certainly did not refute, the bulk of Plaintiffs' evidence.  Tellingly, neither of Defendants' experts opined that Class members receive minimally adequate mental health care, or any recognized form of mental health treatment other than psychotropic medications, or that they are free from a substantial risk of serious harm.  Neither expert disputed that students suffer substantial harm from the School's use of solitary confinement and restraints.

The evidence also confirms that School personnel have known of these problems since at least 2015, but Defendants have failed to take appropriate corrective measures.  For years, School

and DHS officials were well aware that the mental health staff was too small, the mental health budget was inadequate, and the School did not provide medically necessary mental health treatment by qualified mental health professionals.  At depositions, and again at trial, School officials could not testify that the mental health treatment was adequate, stating only that the School did "the best that it could" with the limited resources that it had.  The former Director of DHS, Jerry Foxhoven, has repeatedly claimed that additional funding is necessary to provide adequate mental health services; as late as the close of discovery in this litigation, however, the School had not performed a mental health needs analysis and could not specify how much funding is needed.  The School's part-time psychiatrist, Dr. Augspurger, advised the School that it needed to hire licensed, qualified therapists to provide evidence-based, trauma-focused psychotherapy, and he testified that he hoped that pressure from Disability Rights Iowa would result in the additional funding necessary to pay for that therapy.

The evidence also demonstrates that the School has gone to great lengths to "hide the fact that they are punishing" students with solitary confinement.  Giving lip service only to the legal requirements, Defendants' litigation position is that the Seclusion Room and the BSU are not "solitary confinement," are not used for "punishment," and are used for only a very short period, limited to no more than an hour.  But the trial testimony and the School's own records showed that these assertions simply are untrue.  Defendant Shults admitted the School's use of solitary confinement.  Lynn Allbee acknowledged that the BSU was used to discipline students for breaking School rules, claiming there was some non-existent distinction between "discipline" and "punishment."  She also testified in response to a question by the Court that the Seclusion Room was not used for discipline, but the School's incident reports show this testimony is untrue.  Both the Seclusion Room and the BSU are regularly used to punish even trivial rule infractions, and

School records confirm that students are regularly subjected to solitary confinement for lengthy periods of time, far in excess of an hour.

This evidence is more than sufficient to support a finding that Defendants violated their constitutional and statutory obligations to the Class.  Likewise, the evidence is more than sufficient to support an order requiring Defendants to remedy these violations.  As in similar cases, the final relief here should require Defendants to meet minimum professional standards with respect to mental health care, solitary confinement, and restraints.  The Court should also appoint an independent monitor with appropriate expertise to report to the Court the extent to which Defendants are complying with these standards on an ongoing basis, and the Court should retain jurisdiction until Defendants demonstrate the ability to sustain compliance going forward.

## THE EVIDENCE

The evidence submitted at trial is described at length in Plaintiffs' Proposed Findings of Fact (the "Facts"), which are summarized here only briefly.

### 1.    The Named Plaintiffs.

Considerable evidence demonstrates that the four current or former Named Plaintiffs, like other members of the Class, suffered from serious mental health disorders, failed to receive minimally adequate mental health treatment by the School, were repeatedly subjected to solitary confinement and restraint in the wrap and, as a result, were subjected to a substantial risk of serious harm while incarcerated at the School.

**K.N.X.** is a 17-year-old Named Plaintiff with "severe ADHD and Oppositional Defiant Disorder [ODD] and Conduct Disorder [CD] since early childhood." Facts ¶¶ 1-3. Before arriving at the School at age fourteen (Facts ¶ 1), he was exposed to drugs, weapons, violence, removal from his childhood home, multiple placement moves, and his mother's death from a drug overdose. Facts ¶ 2.  At the School, he would frequently self-harm "to "make [himself] feel better" about his

"situation."  Facts ¶¶ 4-5.  He tried to commit suicide for the first time at the School, with ten placements on suicide watch in just his first year.  Facts ¶ 6.  Suicide watch "made [him] worse," because the staff "just locked [him] in the worst room [the Seclusion Room]" for "a day or two or three … [or] longer than a week." Facts ¶ 7.

Yet K.N.X. failed to receive minimally adequate mental health treatment while at the School.  Dr. McPherson found that his "suicidal ideations and [] self-injury were never fully evaluated, a safety plan was never made, and he was never treated with therapy, such as DBT [dialectical behavioral therapy] to help him cope with his emotions and impulses to harm himself." PX 218 (Dr. McPherson Appendix) at .025; *see* Facts ¶ 10 (same).  She concluded that "[h]ad these steps been taken after any of his first nine [suicide watches], this youth's injury and injuries to staff may have been prevented." Facts ¶ 10.  Despite "specifically request[ing]" it, K.N.X. did not receive regular, recurring appointments with either Mr. Wright (Facts ¶ 11), whose primary duty is dealing with emergencies (Facts ¶¶ 165, 273), or Dr. Augspurger (Facts ¶ 11), whose primary duty is medication management.  Facts ¶¶ 213-214, 273.

Instead of providing him with appropriate treatment, the School often sent K.N.X. to the wrap where he would "yell and cry," "panic," and grow "mad," because the wrap "hurt[]"and made him feel "claustrophobic." Facts ¶¶ 13-17.  The School often sent him to the Seclusion Room, "locked in" a cell that "looked like a dungeon" and "smelled like piss" for "hours and days."  Facts ¶¶ 19-23.  The School sent him to the BSU for over 1500 hours, often for trivial actions symptomatic of his mental illness.  Facts ¶¶ 24-28.  The School would often staff him to Corbett-Miller Hall, where he remained for the "majority of [his] stay."  Facts ¶¶ 29-30.  While there, K.N.X.'s "anxi[ety] and depress[ion] … would turn into [] ang[er] and frustration," he would

hallucinate, he would "bust[] [his knuckles] open" when staff did not respond to communication attempts, and he would be "not [allowed] in school for disciplinary reasons." Facts ¶¶ 31-38.

**C.P.X.** is an 18-year-old Named Plaintiff with ODD, ADHD, a history of OCD and Depressive Symptoms, and at least one report of "Autism Spectrum Disorder (Asperger's)." Facts ¶¶ 39, 41-42. Before arriving at the School at age fifteen (Facts ¶ 39), he survived three major medical operations, many serious medical conditions, and physical abuse in his home. Facts ¶ 40. C.P.X. would often self-harm at the School by "banging his head against" the wall or tying clothing around his neck in solitary. Facts ¶¶ 43-44. He was on suicide watch at least ten times at the School, three of which were not documented with a suicide watch letter. Facts ¶¶ 45-46.

C.P.X. also did not receive minimally adequate mental health care while at the School. *See* Facts ¶¶ 47-52. Dr. McPherson found that C.P.X. did not receive adequate crisis services or adequate treatment for his mental health disorders or trauma. PX 218 (Dr. McPherson Appendix) at .022-.023; *see* Facts ¶¶ 47-52. Upon his admission, the School's psychological note made an "[i]mmediate referral" for C.P.X. to receive "counseling or psychotherapy," but Dr. McPherson found "no indication in the [School's] files that C.P.X. ever received CBT [cognitive behavioral therapy]" or any form of therapy by a licensed mental health professional. PX 218.023; Facts ¶ 49.

C.P.X. would instead attempt to cope with his "sad[ness]" and "anger" by cuddling with a towel that reminded him of his baby blanket. Facts ¶ 52. The School would often demand to take his clothing or place him into the suicide gown; when C.P.X. refused, the School would forcibly remove his clothing and place him into the wrap. Facts ¶¶ 53-54. C.P.X. would scream and "cry a lot," laying there "naked" with his chest strapped down, despite his cardiologist's recommendation to the contrary. Facts ¶¶ 54-57. The School would send him to the Seclusion

Room after his suicidal actions, but he would feel "claustrophobic," and the "small space …
w[ould] drive [him] nuts." Facts ¶¶ 58-59, 65.  The School sent C.P.X. to the "small space" of the
BSU 233 times, often for longer than one hour or one day, and often for trivial reasons, such as
swearing.  Facts ¶¶ 61-62.  The School staffed him to Corbett-Miller Hall many times for up to
three months at a time, where he was often unable to attend school or eat meals outside of his
room.  Facts ¶¶ 67-69.  When permitted to attend the mainstream Midland Park School, he was
often sent to the BSU "from school" and missed classes due to behaviors that the School admitted
were "manifestations" of his disability.  Facts ¶ 70.

**J.S.X.** is an 18-year-old Class member with diagnoses of ADHD, ODD, CD, Bipolar
Disorder, Cannabis Use Disorder, and Anxiety Disorder as well as reported Depression and sleep
disturbance.  Facts ¶¶ 74, 81-82.  Before arriving at the School at age fifteen, his sibling died, he
bounced back and forth between Florida with his father and Iowa with his mother, and he had two
psychiatric hospitalizations.  Facts ¶ 73.  J.S.X. had about "30-40" incidents of self-harm at the
School, frequently cutting his arm with rocks, staples, and glass while in isolation, and frequently
being placed on suicide watch. Facts ¶¶ 76, 78.

Dr. McPherson determined that the School failed to provide him with a mental status
examination, adequate assessment of self-harming behaviors, accommodations by staff, or
psychotherapy to learn how to manage overwhelming emotions and plan for relapse (Facts ¶ 77)
– even though J.S.X. complained to his JCO and the School that he needed more mental health
care such as psychotherapy, and even though a hospital recommended to the School that it provide
"individual psychotherapy." Facts ¶¶ 84-85.  Dr. McPherson found that the School actually "taught
him to engage in more self-harming behaviors," because the School would deduct points when he
managed his emotions in solitary confinement by making noises, but not when he harmed himself.

Facts ¶ 77. After he harmed himself, the School sometimes confined him to the wrap, whereby staff removed his clothing (but not the dangerous objects inside his mouth), refused to allow him to use the restroom, and tied the wrap so "tight[ly]" that he felt "claustrophobic" and "couldn't breathe." Facts ¶¶ 87-89. J.S.X. told School staff that he "struggles being in his room alone," but the School sent him to the Seclusion Room thirty times, often for self-harming behavior. Facts ¶¶ 92-93. J.S.X. threatened suicide if he had to remain in BSU, but the School sent him to BSU at least 150 times, often for trivial words or actions. Facts ¶¶ 93-94. Although J.S.X. "stated [to the School that being in CMH] is too much and causes him to act out," the School staffed J.S.X. to CMH for several-month intervals. Facts ¶ 96. The Midland Park principal directed staff to "use to [their] advantage" the fact that "he hate[s] being by himself with nothing to do," so he was often sent to BSU from class for "manifestations" of his disability or was "not in school for disciplinary reasons." Facts ¶¶ 97-98.

**G.R.X.** is an 18-year-old Class member with Mood Disorder, CD, sleep disturbance, possible psychosis, an intellectual disability, and probable PTSD and Bipolar Disorder. Facts ¶¶ 101, 103-104. Before first arriving at the School at age fourteen, his childhood was characterized by "early and persistent traumatic stress," including a brain injury that the School later attributed to "possible fetal alcohol syndrome and childhood maltreatment syndrome." Facts ¶ 102.

Dr. McPherson testified that G.R.X. "regressed" during both of his two stays at the School. Facts ¶ 105. G.R.X. ended up on suicide watch at least forty-nine times at the School, for several days or several weeks at a time. Facts ¶ 106. His many suicide threats included threatening to "do[] what one of his peers did [to his genitals] with a pencil," and his many suicide attempts included "t[ying] a garbage bag around his head" and "la[ying] down in front of" a car while yelling at staff "to run him over." Facts ¶ 106. Dr. McPherson found that not only did he "never

ha[ve] an appropriate crisis assessment" after these incidents, but "[l]ike all the youth, G.R.X. did not have a comprehensive mental health assessment, he did not have treatment planning … or [a] relapse prevention plan," he did not receive adequate accommodations based on his screening and initial mental health assessment, and he "did not receive the mental health services or the psychotherapy that would have been expected to treat his mental illnesses." Facts ¶¶ 107-110. Instead, the School strapped G.R.X. into the wrap over 100 times, locked G.R.X. in the Seclusion Room over 100 times, and locked G.R.X. in the BSU over 100 times. Facts ¶¶ 111-115.

G.R.X. pursued numerous grievances through all of the School's steps, unsuccessfully complaining about "isolat[ion] in [his] room" for "23 hours a day and a[n] hour out," solitary confinement "ma[king] [his mental health] worse," needing more mental health care, and "being abused" and "hurt[]" from restraints. Facts ¶¶ 116-121. In response to one grievance, Defendant Day directed him to just "discontinue … behaviors which result in [him] being restrained," "including self-harm." Facts ¶ 119. A School supervisor directed staff to "ensure that [G.R.X.] is held as accountable as any other student … and [to] use discipline … including BSU admission," because the School is "not in a position to cater to [his] many accommodations." Facts ¶ 123.

## 2. Defendants Fail to Provide Minimally Adequate Mental Health Care to the Class, Placing Class Members at Substantial Risk of Serious Harm.

The evidence confirms that all members of the Class, and not just the Named Plaintiffs, have a substantial need for mental health care. Approximately half of the students at the School receive psychotropic medication, typically for multiple mental health diagnoses. Facts ¶¶ 124-126. Many Class members often engage in self-harm or express ideations of suicide. Facts ¶ 134. The trial evidence includes a photograph of the bloody underpants of a boy with multiple health disorders—including conduct disorder, mood disorder, ADHD, borderline IQ, and PTSD—who stabbed himself in the penis with a pencil while in solitary confinement. Facts ¶ 134. In 2016 and

2017, there were 472 incidents that led to suicide assessments. Facts ¶ 135.  The mental health disorders diagnosed for boys at the School include Conduct Disorder, Oppositional Defiant Disorder, Post-traumatic Stress Disorder, Depressive Disorder, Attention Deficit Hyperactive Disorder, Anxiety Disorder, Substance Related Disorders, Developmental Learning Disorder, Psychotic Disorder, Bipolar Disorder and others.  Facts ¶ 125.

Despite this need, Defendants fail to provide minimally adequate mental health care that meets professional standards for juvenile correctional facilities, placing Class members at substantial risk of serious harm.  Facts ¶¶ 136-138, 153-168.  Psychotherapy is "almost nonexistent at the school" (Facts ¶¶ 52, 153-154), even though psychotherapy is the "primary treatment modality" for children and adolescents with mental health diagnoses common at the School, and medications alone are inadequate to treat these disorders.  Facts ¶¶ 153-158.  The importance of psychotherapy in treating Class members' mental illness is not in dispute.  The University of Iowa Hospital evaluation of J.S.X. stated that "[t]he primary treatment modality for conduct disorder remains psychotherapy (AACAP, Conduct disorder practice parameter, 1997) and medications serve as an augmentation for ongoing treatment." Facts ¶ 155. Dr. Augspurger likewise confirmed that psychotherapy should be the primary treatment for the mental health disorders prevalent at the School. Facts ¶ 156. Standards promulgated by the National Commission on Correctional Health Care (PX 266) require correctional facilities to provide "comprehensive" mental health services, including psychotherapy, beyond medication management.  Facts ¶ 161.

There also was no serious dispute at trial that the School fails to provide the necessary psychotherapy.  Dr. McPherson reviewed the files for a sample of 33 Class members—comprising over 50% of the youth who were on psychotropic medication at the School.  Based on this review, Dr. McPherson concluded that *none* of the boys had received mental health care services that met

minimal professional standards or any recognized form of psychotherapy. Facts ¶ 154.  Instead, "BSTS failed to provide appropriate mental health treatment to all of them." PX 226 (Dr. McPherson Report) at .003; Facts ¶ 154 (same).   The School's part-time psychiatrist, Dr. Augspurger, advised the School to hire licensed, qualified therapists to provide evidence-based, trauma-focused psychotherapy (PX 344), and he testified at trial that he hoped the School receives additional funding to pay for such therapy. Tr. 6.14.2019 (Augspurger) at 1580:12-24.  Defendants did not call any psychologist contracted or employed by the School to testify at trial, and Defendants proffered no documentation demonstrating that adequate psychotherapy services are provided. Facts ¶ 164.

The School also fails to provide mental health crisis services, despite the "many crisis events documented in the files." Facts ¶¶ 169-185.  The School instead utilizes "force and restraint in place of mental health treatment" (Facts ¶ 186), which Dr. McPherson found to be "particularly egregious." Facts ¶ 188.  The evidence also confirms that the School neglects altogether to conduct any mental health treatment planning, despite the fact that treatment planning is "necessary to ensure that [treatment] goals for each youth are identified and fully addressed." Facts ¶¶ 200-211. Defendants fail to perform a "comprehensive" mental health assessment, instead performing a limited evaluation pertaining only to medication management, and fail to perform periodic mental health re-screenings as standards require. Facts ¶¶ 212-215.  The School does not employ a sufficient number of mental health professionals to serve the needs of youth placed at the School, and it lacks adequate administrative oversight and quality improvement systems. Facts ¶¶ 222-231. The School also fails to maintain appropriate confidentiality for students' mental health records and their communications with mental health professionals.  Facts ¶¶ 216-221.  These failings represent a substantial departure from professional standards, including those set out by

the National Commission on Correctional Health Care, American Correctional Association, and others. Facts ¶¶ 217-218.

Dr. McPherson also concluded that Defendants' failure to provide minimally adequate mental health services places Class members at substantial risk of serious harm.  In particular, she concluded that Defendants' practices place the Class at risk "that their mental health will deteriorate;" risk "that they will engage in self-harming behaviors;" "risk of suicide;" "risk that they will suffer increased length of detention and more punitive placements;" "risk that they would not seek treatment in the future;" "risk for recidivism;" and that "it creates risk of danger to themselves and others." Facts ¶¶ 232-240.

The limited opinions offered by Defendants' experts do not address or refute this substantial evidence.  For example, Dr. Charles Scott offered certain narrow opinions, principally testifying that the medications prescribed by Dr. Augspurger were appropriate, and that Dr. Augspurger's practices regarding the prescription of medications and medication monitoring were consistent, in his view, with the standard of care.  Facts ¶¶ 242-254.  But Plaintiffs do not claim that boys were systematically given the wrong psychotropic medications, the wrong doses of medications, or that medications were not modified when needed. Instead, Plaintiffs have shown that, contrary to well-accepted medical practices, Defendants rely on psychotropic pharmaceuticals almost exclusively, and fail to provide boys with the medically necessary psychotherapy that is required.  Facts ¶¶ 153-168, 243-245.  Dr. Scott fails to address, and certainly does not refute, this principal concern.  Facts ¶¶ 242-254.

In particular, Dr. Scott does not purport to refute the considerable medical literature and other evidence that psychotherapy is the primary treatment modality for the mental health disorders common to Class members and that psychotropic mediation alone is insufficient to address these

mental health disorders. Facts ¶¶ 245-249. Dr. Scott made no effort to address the evidence that psychotherapy is essentially non-existent at the School and offered no opinion on whether boys were receiving the appropriate psychotherapy.  He does not contest Dr. McPherson's conclusion that the School failed to provide the full range of psychotherapeutic mental health services that are required by professional standards applicable to correctional facilities, thus placing Class members at considerable risk of harm.  Facts ¶¶ 245-251.

Dr. Scott also did not address the School's failure to provide adequate mental health crisis services.  He did not review reports of boys who were placed on suicide watch and was not asked to review any work regarding mental health crises supposedly performed by the School's unlicensed psychologist.  Facts ¶ 248.  Dr. Scott did not address the School's use of the wrap and solitary confinement, and provided no opinion justifying the use of the wrap, Seclusion Room or the BSU for boys on suicide watch or experiencing mental health crises. Facts ¶¶ 249-250.   He made no assessment of whether boys received necessary mental health services after being placed in the wrap or in solitary confinement, and made no attempt to refute the testimony of all three of Plaintiffs' experts as to the extensive psychological harm to the Class caused by solitary confinement and the wrap.  Facts ¶ 250.

Dr. Scott also did not address the School's many other failures with regard to mental health services.  His single-minded focus on medication management, and his failure to offer an opinion on nearly every other aspect of the mental health needs of the Class, confirms that  the School improperly relies on psychotropic medication almost exclusively and disregards the mental health needs of boys incarcerated at the school in virtually every other respect. Facts ¶ 252.   And Defendants' other expert, Kirk Heilbrun, to the extent his testimony is credited at all, merely confirmed that psychotherapy is unavailable at the School, and that the School uses solitary

confinement as punishment for even trivial rule violations. Facts ¶¶ 255-259.  Dr. Heilbrun acknowledged that he has not offered any opinion on the mental health of any particular student at the Training School or whether any mental health services were needed but not provided. Facts ¶ 257.

**3.**     **Defendants Have Known for Years That the Mental Health Services Provided at the School Were Inadequate, Yet Have Not Taken the Required Steps to Address the Substantial Risk of Serious Harm.**

Defendants have long known that they need to hire additional mental health staff to meet the needs of boys at the School with mental illnesses.  As early as 2015, Defendants received a report from Dr. Kirk Heilbrun recommending that they "[i]ncrease psychiatric coverage," finding that "staff coverage in both psychology and psychiatry" is inadequate, and concluding that "[o]ne psychologist in a school for 130 youth is insufficient."  Facts ¶ 275.  A more recent report from Next Step Counseling Services confirms that the School needs to hire additional mental health providers.  Facts ¶ 265.  The School's contract psychiatrist has similarly told Defendants that they need to hire a "licensed, qualified therapist to provide evidence based trauma-focused therapy" and testified that "what they needed were more people to provide psychotherapy." Facts ¶ 263.  Defendants themselves have acknowledged that, under the status quo, "[m]ental health/therapeutic staff would be inadequate to adequately service[] the needs of the students." Facts ¶ 268.

Likewise, Defendants have long known that the array of psychological services provided at the School is insufficient to address the needs of students.  Defendants are aware that Dr. Augspurger's primary role at the School is to provide medication management and that School psychologist Louis Wright has very limited time to provide counseling due to the need to deal with students with a high suicide risk. Facts ¶ 273.  The School's staff members and Defendants are aware that psychotherapy is the recommended treatment for many of the mental health disorders which boys at the School have.  Facts ¶¶ 156, 263, 284.  Defendant Foxhoven read Dr.

McPherson's expert report, which advised that the School needs to provide psychotherapy, yet did nothing to determine if boys at the School "receiv[e] the appropriate amount of psychotherapy." Facts ¶ 284.

Defendants also have known that additional resources are necessary "to provide mental health care for the kids who need[] it." Facts ¶ 280. At deposition, the School's staff could not say that the School adequately meets the mental health needs of students. Wright Dep. Video, ECF 299-3 at page 5, transcript 15:23-16:08 (agreeing that mental health treatment at the School is "inadequate"); Allbee Dep. Video, ECF 299-4 at page 4, transcript 166:23–167:15 ("we have used the resources that are available to us to do the best we can"), 167:16–168:09. Yet as of the close of discovery, Defendants have failed to conduct a needs assessment to determine what additional resources they would actually require to improve mental health care. Facts ¶ 286. Similarly, Defendants have not developed a plan for providing individual psychotherapy to students who have been diagnosed with conduct disorder. Facts ¶ 286. Defendant Foxhoven has admitted that without performing a needs assessment, he does not know whether Defendants are meeting the mental health needs of Class members. Facts ¶ 286.

**4.** **Defendants' Extensive Use of Solitary Confinement and Restraints to Punish Students for Behavioral Issues, Including Behavior Resulting from Students' Mental Illness.**

Defendants frequently use both solitary confinement and restraints to punish students for behavioral issues, including behavior resulting from the students' mental illnesses.

With respect to solitary confinement, the School uses the Seclusion Room as an "exceeding[ly] harsh form" of punitive solitary confinement, often in response to minor behavioral infractions. Facts ¶¶ 312-318, 381-388. Students have been sent to the Seclusion Room as punishment for conduct ranging from failure to comply to shredding a pillow to refusing to return

a piece of paper they had stuck down their pants to laying down on the floor and refusing to get up.  Facts ¶¶ 381-382.

The School also uses the BSU for punishment.  Facts ¶¶ 389-416.  School policy dictates that students can be placed in the BSU for a wide range of non-violent and completely benign verbal conduct unrelated to ensuring safety at the School, including "profanity" or "lying," and for fairly adolescent behavior, such as "horseplay" or "arm-wrestling," a fact which even Defendants' expert Dr. Heilbrun acknowledges.  Facts ¶¶ 393, 396-397, 401.  In practice, the School's own records confirm that the School uses the BSU as punishment for offenses as benign as refusing to sit on the proper tier of stairs, refusing to do chores, talking in the TV area, or having two books when School policy only permits one.  Facts ¶ 402.

Additionally, students who reside at Corbett-Miller Hall and are staffed to the restrictive Corbett-Miller Hall Program (the "CMH Program"), are subjected to a disciplinary "points" system, under which their stay in solitary confinement is extended for the most benign and arbitrary of reasons.  Facts ¶¶ 417-434.  Offenses such as "dancing," "drawing unnecessary attention to yourself at anytime," "singing," or "tapping or thumping" can result in a loss of points and an extension of one's confinement in the CMH Program.  Facts ¶¶ 424-425.  Defendant Day admitted that a student can lose a significant amount of points simply for nodding their head instead of using verbal communication when responding to a staff member, explaining that, in his view, "[t]hat's not as good in terms of feedback to me so what that's doing is showing that it wasn't worthy as a conversation."  Facts ¶ 425.

With respect to restraints, the School places students in the wrap in response to anything from refusing to take off one's clothes in front of School staff to scratching the inside of their arm with a small piece of metal to refusing to go the BSU when directed to getting in fights.  Facts ¶¶

365-374.  According to Dr. McPherson, the wrap is used to punish students for exhibiting behaviors caused by their mental illnesses, including self-harm and suicidal threats.  Facts ¶ 371.  For example, the wrap is used when victims of sexual abuse resist having their clothes removed in front of staff, or when students with mental health disorders tie a shirt around their neck.  Facts ¶¶ 235, 369-373.  Tellingly, Dr. Heilbrun admits that there are instances in which the wrap is used as punishment.  Facts ¶¶ 366, 443.

Defendants frequently send boys with mental illnesses to solitary confinement or the wrap due to behavioral manifestations of their mental illnesses.  Facts ¶¶ 492-523.  Unfortunately, the School does not provide them with meaningful access to education or other benefits once they are locked within Corbett-Miller Hall.  Facts ¶¶ 524-537.  Instead, they are often "not in school for disciplinary reasons," sometimes sent to a Corbett-Miller Hall classroom without a licensed teacher, or relegated to sit in their locked cell alone with a worksheet.  Facts ¶¶ 433, 523-533.

## ARGUMENT

### I.    The Legal Standard Under the Fourteenth Amendment.

In its order denying Defendants' motion for summary judgment, the Court recognized that: "An individual's Fourteenth Amendment substantive due process rights are implicated 'when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety.'" Order Denying Mot. Summ. J. ("Order") at 9, *J.S.X. v. Foxhoven*, No. 17-cv-00417 (S.D. Iowa Feb. 19, 2019), ECF 190 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).  The Court also determined that, "[g]iven the expressly non-penal, non-criminal nature of Iowa juvenile delinquency adjudications and dispositions," Order at 11, Plaintiffs' claims would be governed by

the Fourteenth Amendment, which is "more protective" to plaintiffs than the Eighth Amendment's prohibition of cruel and unusual punishment. Order at 11-12.

The Court outlined two alternative standards for establishing liability under the Fourteenth Amendment. Plaintiffs could establish liability by showing that the government action at issue was "(1) intended to punish; (2) lacked legitimate purpose; or (3) objectively, was not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." Order at 12 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015) (internal citations and quotation marks omitted)).

Alternatively, Plaintiffs could establish liability under the "deliberate indifference" standard also applicable to Eighth Amendment claims. With regard to conditions of confinement and medical care, a state official will be liable under the Fourteenth Amendment, as well as the Eighth Amendment, "when he or she is deliberately indifferent to a substantial risk of serious harm." Order at 8-9, 12 (citing *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (en banc)).

## II.     Defendants' Failure to Provide Minimally Adequate Mental Health Care Violates the Fourteenth Amendment.

As this Court recognized in its Order, state officials violate the substantive due process rights of individuals in their custody when they act with deliberate indifference to serious medical needs. Order at 14-15; *see Doe v. Washington Cty.*, 150 F.3d 920, 922-23 (8th Cir. 1998) (applying the deliberate indifference standard to claim by juvenile pretrial detainee); *see also City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). A plaintiff can demonstrate "deliberate indifference" by showing that the defendant was aware of a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. *Nelson*, 583 F.3d at 529;

*see Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Henry A. v. Willden*, 678 F.3d 991, 1000-01 (9th Cir. 2012).

Where, as here, the risk of harm is obvious, the Court can apply an objective standard of deliberate indifference which "permit[s] liability to be premised on obviousness or constructive notice." *Farmer*, 511 U.S. at 841; *see Henry A.*, 678 F.3d at 1001. In other words, a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 841-42; *Nelson*, 583 F.3d at 529 (same); *see Henry A.*, 678 F.3d at 1001 ("awareness inferred from the very fact that the risk of harm is obvious").

State officials who fail to provide a minimally adequate mental health care system despite knowing that inmates have serious mental illnesses are demonstrating deliberate indifference to a substantial risk of serious harm. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1188 (N.D. Ala. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Goff v. Harper*, No. 4-90-CV-50365, 1997 WL 34715292, at *38 (S.D. Iowa 1997) (internal citations omitted) ("Deliberate indifference by prison personnel to an inmate's serious medical needs violates the inmate's eighth amendment right to be free from cruel and unusual punishment. This principle extends to an inmate's mental-health-care needs.") (quoting *Smith v. Jenkins*, 919 F.2d 90, 92-93 (8th Cir. 1990)).

Following the trial in *Goff v. Harper* in the Southern District of Iowa, Judge O'Brien found that state officials violated the constitutional rights of inmates with mental health disorders held in the Iowa State Penitentiary by not providing the inmates with necessary mental health treatment. 1997 WL 34715292, at *40. In analyzing the evidence, the court considered whether the penitentiary met "six essential elements" necessary for a minimally adequate mental health system:

> *First,* there must be a systematic program for screening and evaluating inmates in order to identify those who require mental health treatment.

*Second,* ... treatment must entail more than segregation and close supervision of the inmate patients.

*Third,* treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.

*Fourth,* accurate, complete, and confidential records of the mental health treatment process must be maintained.

*Fifth,* prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment.

*Sixth,* a basic program for the identification, treatment and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program.

*Id.* (quoting *Balla v. Idaho*, 595 F. Supp. 1558, 1577 (D. Idaho 1984) (internal citations omitted)).

The court found that defendants failed to satisfy the third factor because appropriate treatment for inmates' serious mental illness was not provided, even though the penitentiary employed a number of mental health professionals, and administered psychotropic medication in a manner found appropriate. *Id.*, at *41. In addition, although the defendants provided initial mental health screenings, the court found that the defendants failed to satisfy the first factor because they failed to conduct periodic mental health re-screenings. *Id.*

Significantly, the court's analysis in *Goff* emphasizes that the management of psychotropic medications is only one aspect of mental health care that correctional facilities must provide to meet the minimum standards. The court found the defendants liable despite defendants' satisfaction of the fifth element in the analysis. *Id.* (finding that "there was no evidence indicating the [defendant] administers behavior-altering medication in a dangerous manner.").

Other courts have similarly held that "[c]onstitutionally adequate mental-health care in prisons requires more than simply providing psychotropic medications to mentally ill prisoners."

*Braggs*, 257 F. Supp. 3d at 1208.  "Prison systems must provide not only psychotropic medication but also psychotherapy or counseling to prisoners who need it to treat their serious mental-health needs."  *Id.* ("not providing individual or group therapy poses a substantial risk of serious harm, including continued symptoms, pain, and suffering, as well as self-harm and suicide attempts"); *see Madrid v. Gomez*, 889 F. Supp. 1146, 1218 (N.D. Cal. 1995) (prison mental health system violated constitutional standards where mental health staffing was insufficient and "[t]reatment for seriously ill inmates [was] primarily limited to medication management through use of antipsychotic or psychotropic drugs"); *see also Smith*, 919 F.2d at 93 ("inadequate care can constitute deliberate indifference"); *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

There is substantial evidence here that, under the standards set forth in *Goff* and the other cases cited above, Defendants have been, and remain, deliberately indifferent to the substantial risk of serious harm resulting from their failure to provide minimally adequate mental health care to the Class.  Defendants' failure to provide minimally adequate mental health treatment to the Class, their overreliance on psychotropic medications, and their failure to employ a sufficient staff of qualified mental health professionals violates, at the very least, the third *Goff* factor.  Their failure to provide minimally adequate mental health treatment to boys on suicide watch or experiencing other mental health crises violates the sixth *Goff* factor.  Defendants violate the first factor by failing to conduct periodic mental health re-screenings, just as in *Goff* itself, and by failing to conduct "comprehensive" mental health evaluations rather than the limited medication management evaluations performed by Dr. Augspurger.   Defendants' failure to maintain appropriate confidentiality, and their failure to maintain accurate records, also violates the fourth *Goff* factor.  *See, e.g.*, Facts ¶¶ 216-221; Tr. 6.12.19 (Richmond) at 1118:5–1120:2; DX-M (the School's inaccurate Appointments Report) at .004.

21

III.   **Defendants' Use of Solitary Confinement and Restraints Violates the Fourteenth Amendment.**

The evidence presented at trial demonstrates that Defendants' use of solitary confinement and restraints violates the Fourteenth Amendment under both legal standards articulated in this Court's summary judgment order.  Order at 12-13.

A.   **Defendants Use Solitary Confinement and Restraints to Punish.**

"Plaintiffs can establish a violation of the Due Process Clause [of the Fourteenth Amendment] if they can show that the School employs [solitary confinement and restraints] with the intent to punish."  Order at 15 (citing *Kingsley*, 135 S. Ct. at 2473).  Such intent can be proven either with evidence of Defendants' "expressed intent to punish;" or by providing objective evidence "showing that [Defendants'] actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 135 S. Ct. at 2473-74 (quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)).

The evidence presented at trial clearly demonstrates that the School uses solitary confinement excessively, at times for as long as ten months.  Facts ¶¶ 452-473.  An overwhelming consensus of courts have concluded that the subjection of juveniles to solitary confinement—even for short periods of time—is *per se* unconstitutional because it is never rationally related to a legitimate nonpunitive government purpose and falls far outside accepted professional standards. *See, e.g.*, *V.W. v. Conway*, 236 F. Supp. 3d 554, 584 (N.D.N.Y. 2017) (routine imposition of disciplinary solitary confinement not reasonably calculated to restore prison safety); *Feliciano v. Barcelo*, 497 F. Supp. 14, 35 (D.P.R. 1979) ("Solitary confinement of young adults is unconstitutional."); *Reed v. Palmer*, 906 F.3d 540, 550-51 (7th Cir. 2018) (holding that case law "clearly establishes" that keeping juveniles in isolation for excessive amounts of time "could

violate the Fourteenth and/or the Eighth Amendment");[1] *see also* Facts ¶¶ 474-491 (describing accepted national standards and Defendants' departure therefrom).   Likewise, the evidence presented at trial clearly demonstrates that the School excessively employs the wrap, the use of which falls "way outside accepted professional standards."  Facts ¶¶ 444-451; *see also* Facts ¶¶ 474-491 (describing accepted national standards and Defendants' departure therefrom).

Furthermore, the evidence demonstrates not only that the School excessively employs solitary confinement and the wrap, but that it expressly does so for punitive and disciplinary reasons.  Facts ¶¶ 365-434.  School policies expressly permit the placement of students in the BSU for "disciplinary reasons," including for "profanity," "lying," and "horseplay."  Facts ¶¶ 384, 396.  These disciplinary placements in the BSU can be extended beyond an hour in the form of "administrative segregation," and minor infractions can result in extended periods in isolation—sometimes as long as 63 hours.  Facts ¶¶ 323-324, 391, 402, 461.  Defendant Day admitted that children can be held in administrative segregation for disciplinary reasons, and Defendant Shults likewise conceded that the School uses seclusion as a disciplinary measure.  Facts ¶¶ 391-392.  Similarly, in the CMH Program, students are subjected to a strict disciplinary "points" system that punishes even the most benign behavior and all but ensures an extended stay in isolation.  Facts ¶¶ 424-433.  Both the Seclusion Room and the wrap are routinely used as a punishment for behavioral

---

[1] *See also Bradford v. Hanus*, No. 14-cv-131, 2017 WL 4872357, at *1 (N.D. Iowa Oct. 27, 2017) (denial of summary judgment on Fourteenth Amendment claims based on seclusion of youth housed at Iowa Juvenile Home), *recommendation adopted sub nom. Bradford v. Avery*, No. 14-cv-131, 2018 WL 576849 (N.D. Iowa Jan. 26, 2018); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1155 (D. Haw. 2006) (enjoining isolation of juveniles adjudicated delinquent held at state-run facility based in part on expert evidence that "uniformly indicates that long-term segregation or isolation of youth is inherently punitive and is well outside the range of accepted professional practices"); *Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1366-67 (D.R.I. 1972) (ruling that isolation of juveniles in cells with only a toilet and mattress constitutes cruel and unusual punishment; *Turner v. Palmer*, 84 F. Supp. 3d 880, 886 (S.D. Iowa 2015) (ongoing constitutional violations sufficiently alleged upon "systemic and excessive use of isolation cells at [the Iowa Juvenile Home]"); *Doe v. Hommrich*, No. 3-16-0799, 2017 WL 1091864, at *2 (M.D. Tenn. Mar. 22, 2017) (recognizing that "solitary confinement of juveniles in government custody for punitive or disciplinary reasons, especially for extended periods of time and especially for youth who may suffer from mental illness" violates the Eighth Amendment).

infractions, including anything from "failure to comply" to "shredding a pillow." Facts ¶¶ 365-388. Even Defendants' own expert conceded that the wrap was being used as punishment. Facts ¶ 366.

The School's use of solitary confinement and the wrap are not "rationally related to a legitimate nonpunitive governmental purpose" and are "excessive in relation to [any purported] purpose" of School safety and security. *Kingsley*, 135 S. Ct. at 2473-74 (quoting *Bell*, 441 U.S. at 561). In practice, the School uses these tactics to dole out significant punishment in response to minor infractions or trivial disobedience, such as more than 36 hours in solitary confinement for having two books when the School only permits one and placement in the wrap for refusal to change clothes in front of the staff. Facts ¶¶ 370-371, 382-385, 396-397, 400-408, 424-433.

The School also frequently uses solitary confinement and the wrap as disciplinary responses to behaviors caused by Plaintiffs' mental health conditions, such as self-harm and suicidal threats. Facts ¶¶ 494-523. These tactics are particularly inappropriate in light of the unrebutted testimony that Defendants' use of solitary confinement and the wrap on the Class serves to aggravate Class members' mental health conditions. *See, e.g.*, *Madrid*, 889 F. Supp. at 1264 (stating that, "[i]f the particular conditions of segregation . . . greatly exacerbate mental illness, or deprive inmates of their sanity, then defendants have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture"); *see also* Facts ¶¶ 519-520.

### B. Defendants Are Deliberately Indifferent to the Harms That Solitary Confinement and Restraints Have on Plaintiffs' Mental Health.

Alternatively, Plaintiffs can demonstrate a Fourteenth Amendment violation by showing that Defendants are "deliberately indifferent to a substantial risk of serious harm" to Plaintiffs caused by the School's use of solitary confinement and restraints. Order at 8-11, 12-13. Both the

objective and subjective components of this claim are clearly satisfied by the evidence presented at trial.

Plaintiffs have objectively suffered harm due to the School's use of solitary confinement and the wrap. Facts ¶¶ 287-346. Solitary confinement is "utterly destructive" to juveniles with histories of trauma or mental health issues, causing depression, psychosis, hallucinations, stupor, and delirium and posing potentially permanent psychiatric harm, including "literally shrivel[ing] areas of the brain." Facts ¶¶ 330-339.[2] The wrap likewise "can cause serious injury, death, and can re-traumatize youth who have already experienced psychological harm," placing them "at risk of mental deterioration." Facts ¶ 296. Plaintiffs' own mental deterioration demonstrates the objective harm caused by solitary confinement and restraints. Facts ¶¶ 340-346.

Defendants are subjectively aware of the risks posed to Plaintiffs by solitary confinement and restraints, and have consciously disregarded them. The subjective prong is satisfied where there is a general consensus among the accepted national professional standards. *See Paykina v. Lewin*, No. 9:19-cv-00061, 2019 WL 2329688, at *13 (N.D.N.Y May 31, 2019) ("The deleterious effects of solitary confinement on mentally ill juveniles are a matter of common knowledge in the medical and psychiatric communities, including among mental health professionals working in correctional settings."). There is a consensus among national organizations, including the Substance Abuse and Mental Health Services Administration, the National Association of State Mental Health Program Directors, the National Commission on Correctional Health Care, and even the three organizations cited by Defendants' expert—the U.S. Department of Justice, the

---

[2] With respect to solitary confinement, courts have recently found that the objective prong has been satisfied even where a portion of the mentally ill juvenile's isolation was self-imposed, reasoning that the juvenile's refusal to leave a segregated unit and attend programming was evidence of serious mental deterioration. *Paykina v. Lewin*, No. 9:19-cv-00061, 2019 WL 2329688, at *13 (N.D.N.Y May 31, 2019) (granting preliminary injunction enjoining correctional facility from subjecting mentally ill juvenile to solitary confinement based on Eighth Amendment standard).

Annie E. Casey Foundation, and the American Correctional Association—that solitary confinement should never be used on juveniles or mentally ill individuals for punishment, and should only be used in exceptional circumstances.  Facts ¶¶ 474-491; *see also Paykina*, 2019 WL 2329688, at *13 (noting that the "AACAP [American Academy of Child and Adolescent Psychiatry], the APA [American Psychological Association], and the AMA [American Medical Association] all condemn solitary confinement of juveniles and mentally ill individuals for punitive purposes, and they further oppose solitary confinement of juveniles except in exceptional circumstances.  The National Commission on Correctional Health Care is similarly against the use of solitary confinement on juveniles.").  Similarly, accepted national standards all oppose the use of fixed mechanical restraints on juveniles.  Facts ¶¶ 474-491.

Moreover, Defendants were on notice of the "deleterious effects" of solitary confinement and restraints given their involvement in prior litigation regarding the Girls' State Training School. Facts ¶¶ 349, 356*; see Paykina*, 2019 WL 2329688, at *13 (holding defendants were subjectively aware given prior litigation against their state department regarding other in-state facilities: "The inescapable conclusion is that Defendants were aware of the serious risks that solitary confinement pose to mentally ill individuals.").  Furthermore, the fact that some Class members elected to remain in solitary confinement and refused to attend programming put the Defendants on notice of their mental deterioration.  *Paykina*, 2019 WL 2329688, at *13; *see also* Facts ¶ 335.

**IV.   Defendants Violate the ADA and RA When They Place Boys in Solitary Confinement for Behaviors Associated with Mental Health Disabilities and Exclude Them From Schooling and Other Benefits.**

"Title II of the ADA [Americans with Disabilities Act], 42 U.S.C. § 12131 *et seq.*, prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity," or from being subjected to discrimination by any public entity. *See* Order at 17 (quoting *Randolph v. Rodgers*, 170 F.3d 850, 857 (8th Cir.

1999)). The Rehabilitation Act ("RA") prohibits the same activities as long as "any part of [the public entity] is extended Federal financial assistance." 29 U.S.C. § 794(b); *see* Order at 17 ("cases interpreting either [the ADA or the RA] are applicable and interchangeable" except for RA funding requirement) (quoting *Randolph*, 170 F.3d at 858).

"To state a prima facie case under the ADA or the RA, 'a plaintiff must show: 1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; [] 3) he was excluded from the benefit due to discrimination based upon disability;'" and for the RA only, 4) receipt of public funds.  Order at 17 (quoting *Randolph*, 170 F.3d at 858). Here, Defendants violated the ADA and RA, because the trial evidence shows that the federally-funded School subjected boys with mental illnesses to restraints and seclusion due to behavioral manifestations of their disabilities and then excluded them from benefits such as education and other programs.

1. <u>Plaintiffs Are Persons With a Disability.</u>

The Court already determined that "Plaintiffs are qualified individuals with disabilities, because, for instance, they suffer from covered mental illnesses that interfere with at least one major life activity, such as 'learning,' 'concentrating,' 'thinking,' 'communicating,' 'sleeping,' and 'interacting with others.'"  Order at 18 (quoting 28 C.F.R. § 35.108(c)(1)(i)) (relying on documents that the Court has since admitted as trial exhibits: JX 15 (Mental Health PowerPoint) and PX 226 (Dr. McPherson Report)).  Additional trial evidence and records confirm that Plaintiffs suffer from mental impairments interfering with a major life activity.  Facts ¶ 493; *see, e.g.*, Facts ¶¶ 3, 26, 40-43, 74-75, 98, 103-104, 124-133, 496-498, 500, 502-503, 506-507, 509-513, 516-518, 523, 532, 536-537.[3]

---

[3] A person has a disability under the ADA and RA when they have a "physical or mental impairment that substantially limits one or more of the major life activities of such individual," *or* "record of such an impairment," *or* "being

2.       Plaintiffs Qualify for the Benefit(s) and Defendants Excluded Them From Those Benefit(s) Because of Their Disabilities.

The School excluded Plaintiffs from entitled benefits due to their disabilities, because the School punishes them for manifestations of their mental health disorders and excludes them from accessing education and from programs for which they would otherwise qualify.  Facts ¶¶ 495-523, 524-537.

Ample trial evidence and testimony confirmed that the School subjects boys with mental illnesses to solitary confinement or the wrap for behaviors that are symptomatic of their mental illness.  Facts ¶¶ 494-523.   For example, the School's solitary and restraint reports list behaviors linked to boys' mental illnesses as the reason the School placed them in solitary confinement or the wrap.  *See, e.g.*, Facts ¶¶ 497-498, 500-501, 507, 509-513, 516-518.[4]  Such "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999); *see A.T. v. Harder*, 298 F. Supp. 3d 391, 416-17 (N.D.N.Y. 2018) (juvenile plaintiffs "substantially likely to succeed on the merits of [ADA and RA] claim[s]" where plaintiffs alleged that "behavior that leads to juveniles with disabilities being placed in solitary confinement is attributable to their adolescence, or to un- or under-treated mental health … disabilities"); *Biselli v. Cty. of Ventura*, No. 09-cv-08694 CAS, 2012 U.S. Dist. LEXIS 79326, ECF 119, *43-45 (C.D. Cal. June 4, 2012) (inmate with mental illness "housed in [administrative segregation], the most

---

regarded as having such an impairment."  Order at 18 (quoting 28 C.F.R. § 35.108) (physical or mental impairment includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness"); *see also* 28 C.F.R. § 35.108(a)(2)(i) ("The definition of 'disability' shall be construed broadly in favor of expansive coverage… .").

[4] The School imposes these restrictive measures even when the boys' manifestations of mental illness do not pose any imminent "actual risk" to safety.  28 C.F.R. § 35.130(h) (a public entity's so-called "safety requirements [must be] based on actual risks [to safety], not on mere speculation, stereotypes, or generalizations about individuals with disabilities"); Order at 19 (same); *see, e.g.*, Facts ¶¶ 498, 509, 511, 515-516.

restrictive area of the jail, based on conduct that was specifically linked to his mental illness" without input prior from mental health staff may rise to ADA violation).

Once a boy with mental illness is placed in seclusion or the wrap in CMH, he loses "meaningful access" to a variety of School benefits, services, and programs that he could otherwise access. *See* Facts ¶¶ 524-537; 28 C.F.R. § 35.130(b)(1)(i)-(iv); *Randolph*, 170 F.3d at 858 ("[T]he ADA and RA require that otherwise qualified individuals receive 'meaningful access' to programs and activities;" finding that "limited participation" does not suffice) (citation omitted).[5]

For instance, the Court already found that "[t]he record contains evidence that Plaintiffs were denied educational opportunities [to which they are entitled], available to other students without disabilities, while held in isolation at CMH."  Order at 18 (relying on documents that the Court has since admitted as trial exhibits: PX 222 (Dr. Grassian Report) at .020 and PX 224 (Dr. Krisberg Report) at .014).  Boys in seclusion did not typically have "meaningful access" to "actual school" at Midland Park with peers without mental illness, even if they specifically requested it. Facts ¶¶ 525-533; *see e.g.*, Facts ¶¶ 36, 528 (CMH committee denying K.N.X.'s request).  Instead, they were often "not in school for disciplinary reasons."  *See, e.g.*, Facts ¶¶ 38, 99, 525 (citing PX 206 (K.N.X. School Attendance Record) and PX 196 (J.S.X. School Attendance Record)).  During the select times when the School allowed some sort of learning for the boys confined to Corbett-Miller Hall, it was segregated, lesser,  and "not … real school" (Facts ¶ 530), such as chatting with other Corbett-Miller Hall boys in a classroom without a licensed teacher, or trying to teach oneself

---

[5] *See* U.S. Dep't of Justice, Findings of Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation ("DOJ Findings"), 3, 31-37 (May 31, 2013), https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_5-31-13.pdf, accessed July 19, 2019 (U.S. DOJ finding ADA and RA violations on several grounds where facility "unnecessarily and inappropriately places prisoners in solitary confinement because they have serious mental illness" and then "denies those prisoners access to services and programs provided to most other prisoners"); *see also Olmstead*, 527 U.S. at 582-83 ("Because the Department [of Justice] is the agency directed by Congress to issue Title II [ADA] regulations, its views warrant respect.").

a worksheet in one's locked cell.  Facts ¶¶ 530-533; *see Olmstead*, 527 U.S. at 596-97 (public

entity discriminates through segregated, differential access to education or other programs, in

denying those with disabilities the opportunity to participate in mainstream offerings); *Randolph*,

170 F.3d at 858 (public entity must provide accommodations to allow individuals with disabilities

to enjoy "meaningful access" to programs and activities); 28 C.F.R. § 35.130(b)(2) (public entity

may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit

from the aid, benefit, or service that is not equal to that afforded others").  Defendants testified at

length about additional benefits available to boys in the general population, such as the School's

intramural sports program and its peer-based Risks and Decisions group, but Defendants ignored

the fact that the School does not provide access to any of that for a boy in solitary confinement or

the wrap, who seldom even gets fresh air.  Facts ¶¶ 535-537.

Public entities must "make reasonable modifications in policies, practices, or procedures

when . . . necessary to avoid discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(7)(i).

Defendants did no such thing.  They "routinely place [individuals with mental illness] in solitary

without consulting a mental health worker and without assessing whether solitary confinement is

appropriate," *A.T.*, 298 F. Supp. 3d at 416-17, and they never modified any School policies,

practices, or procedures to mandate that staff take mental illness into account when deciding

whether, how, or how long to implement solitary confinement or restraints.  Facts ¶¶ 77, 80, 123,

410-416, 504, 521-523.[6]

---

[6] *See Clark v. California*, 739 F. Supp. 2d 1168, 1179 (N.D. Cal. 2010) (finding that even before a prisoner enters the disciplinary process, "[t]he ADA also requires that prison staff try to counsel [prisoners with intellectual disabilities], rather than subjecting them to the disciplinary process, when they break prison rules that they do not understand"); DOJ FINDINGS at 35 ("The failure to obtain input from mental health staff before prisoners with serious mental illness or intellectual disability are placed in solitary confinement for long periods means that the placement of the prisoner may occur without any consideration of that prisoner's mental health history or needs.").

3.   Plaintiffs Satisfy the Additional RA Element That Defendants Receive Federal Public Funds.

The Court already found that the School receives federal funds through a VOCA grant (Facts ¶¶ 167, 276, 539), and the School admitted that it additionally receives federal funds under the National School Lunch Program.  Facts ¶ 538.  "Because the definition of program or activity covers all the operations of a [public entity] . . . and part of [the School] received federal assistance, the entire [School] is subject to the Rehabilitation Act" and satisfies its public funds element. *Thomlison v. City of Omaha*, 63 F.3d 786, 789 (8th Cir. 1995); *see* 29 U.S.C. § 794(b); Order at 21 ("'program or activity' is broadly defined in the RA so that it applies to the entirety of the recipient's operations").

**V.   The Court Should Order Defendants To Remedy Their Violations, Appoint an Independent Monitor, and Retain Jurisdiction Until Defendants Demonstrate Sustained Compliance with Their Legal Obligations.**

As set forth in Plaintiffs' Trial Brief, Plaintiffs request that the Court issue an order requiring Defendants to remedy these constitutional and statutory violations.  *See* Plaintiffs' Trial Brief at 1-8, Apr. 30, 2019, ECF 209.  In particular, the Court's order should require Defendants to meet minimum standards with respect to mental health care, prohibit the use of solitary confinement and restraints for disciplinary purposes, and require that any use of seclusion and restraints for non-disciplinary purposes be limited to the narrow circumstances specified by well-accepted professional standards for juvenile correctional facilities.  In light of Defendants' long history of deliberate indifference, Plaintiffs also request that the Court appoint an independent monitor to report to the Court the extent to which Defendants are complying with the order and that the Court retain jurisdiction of this matter until Defendants demonstrate sustained compliance.

This narrowly tailored relief has been ordered in any number of similar cases.  For example, in *Goff v. Harper*, the district court found that Iowa officials violated the constitutional rights of

inmates at the Iowa State Penitentiary by the excessive use of solitary confinement and failure to provide minimally adequate mental health care. *Goff*, 1997 WL 34715292, at *52-53 (S.D. Iowa June 5, 1997). The court ordered defendants to develop a plan for remedying the violation, required defendants to consider eight specifically-enumerated factors in formulating the plan, and retained jurisdiction to order further injunctive relief if needed. *Id.*; *see also Braggs v. Dunn*, No. 2:14-cv-601-MHT, 2018 WL 7106346, at *1-2 (M.D. Ala. Feb. 20, 2018) (enjoining and restraining defendants from failing to comply with remedial plan developed by parties post-trial, which included a requirement that defendants comply with deadlines for hiring additional mental health staff for state prisons and submit a quarterly "Mental Health Staffing Report" to the court); *see also* Consent Decree at 5-6, *R.J. v. Bishop* ("*Bishop*"), No. 1:12-cv-07289 (N.D. Ill. Dec. 6, 2012), ECF 33 (stating that remedial plan to address conditions in juvenile facilities must provide sufficient number of trained staff, including "psychiatrists, psychologists, social workers, nurses, [and] other mental health professionals" necessary to implement the plan); Settlement Agreement at 16, *J.H. v. Hinds Cty., Miss.* ("*Hinds*"), No. 3:11-cv-327-DPJ-FKB (S.D. Miss. Mar. 28, 2012), ECF 33 (adopting settlement agreement requiring county to "employ or contract for sufficient psychiatric services" to provide identified services and treatments).

Courts also have enjoined the use of solitary confinement, particularly for juveniles. *See, e.g.*, *Morgan v. Sproat*, 432 F. Supp. 1130, 1140 (S.D. Miss. 1977) (enjoining use of isolation unit in juvenile facility except under delineated "limited conditions . . . necessary to insure that placement therein will not do any emotional or psychological harm to the students"); *Inmates of Boys' Training Sch. v. Affleck*, 346 F. Supp. 1354, 1370 (D.R.I. 1972) (enjoining solitary confinement unit); Stipulation for Consent Decree and Permanent Injunction 2-7, *J.J. v. Litscher* ("*Litscher*"), No. 3:17-cv-00047-jdp (W.D. Wis. June 1, 2018), ECF 98-1 (limiting solitary

confinement, requiring staff to consider youth's mental health needs before using room confinement, and restricting use of mechanical restraints); Settlement Agreement at 5-8, 15-16, *Hinds*, No. 3:11-cv-327-DPJ-FKB, ECF 33 (limiting use of cell confinement in juvenile facility and requiring provision of adequate mental health services, including individualized treatment plans).

Courts have likewise ordered relief appointing an independent monitor to report on Defendants' compliance with consent decrees and other forms of relief. *See, e.g.*, Stipulation for Consent Decree and Permanent Injunction at 10-12, *Litscher*, No. 3:17-cv-0047, ECF 107 (retaining jurisdiction over the case until terms of consent decree are met and requiring monitor to conduct site visits and "produce and send to the Parties' counsel a draft Compliance Status Report assessing the Defendants' compliance with the substantive terms of the Agreement" following each site visit); Consent Decree at 7, *Bishop*, No. 1:12-cv-07289, ECF 33 (requiring the monitors to file a report "[w]ithin 180 days of entry of the final remedial plan . . . regarding the status of defendant's compliance . . . , including the identification of any areas of non-compliance" and noting that "[t]he monitors may file additional reports at their discretion, but must file at least one report every twelve months").

Here, any plan to remedy Defendants' violations should require Defendants to comply with certain standards for minimally adequate mental health care promulgated by the National Commission on Correctional Health Care ("NCCHC"), about which Dr. McPherson testified at length. Facts ¶ 150. These include PX 266 (NCCHC MH-G-01, Basic Mental Health Services); PX 267 (NCCHC MH-G-03, Treatment Plans); PX 265 (NCCHC MH-E-06, Emergency Services); PX 268 (NCCHC MH-G-04, Suicide Prevention Program); PX 264 (NCCHC MH-E-04; Mental Health Assessment and Evaluation); PX 260 (NCCHC MH-A-02, Responsible Mental

Health Authority); PX 261 (NCCHC MH-A-06, Continuous Quality Improvement Program); PX 269 (NCCHC MH-H-02, Confidentiality of Clinical Records and Information); and PX 270 (NCCHC MH-I-04, Informed Consent and Refusal of Mental Health Care).  Defendants' expert Dr. Scott relied on NCCHC standards (DX-TT (Dr. Scott's Final Expert Report) at 3; *see also* Tr. 6.17.19 (Scott) at 1774:23–1775:9, 1781:16-25, 1786:14–1790:2), and neither of Defendants' experts disputed Dr. McPherson's conclusion that the NCCHC standards represent the overwhelming professional consensus as to the minimally adequate services that correctional facilities are expected to provide.

In accordance with these standards, the treatment for all Class members having mental health diagnoses for which psychotherapy is an appropriate treatment modality should include evidence-based psychotherapy of appropriate frequency and duration, to be provided by licensed, qualified mental health professionals.  All treatment should be provided in accordance with an individualized mental health treatment plan for each student needing mental health treatment, prepared by a licensed, qualified mental health professional in accordance with NCCHC standards. All students with mental health needs also should receive a comprehensive mental health assessment in accordance with NCCHC standards, not an assessment limited to medication management, and periodic mental health re-screenings.  Students and their parents should be advised of psychotherapy as a therapeutic option, and that psychotherapy is the primary treatment modality for mental health disorders common to the Class, as part of the process of obtaining informed consent.

For all Class members placed on suicide watch, or in seclusion or restraints, or otherwise experiencing a mental health crisis, Defendants should be required to have a licensed, qualified mental health professional meet with the child during the suicide watch, seclusion, or restraint, or

if that is not possible, immediately thereafter; conduct and document a prompt crisis assessment; document consideration of the need for a higher level of care; identify and treat mental illness that likely contributed to the crisis, and document such treatment; document a crisis management plan; and document a safety plan and need for any follow-up.  Defendants should engage a sufficient number of mental health professionals to provide the services required by NCCHC standards, subject to the supervision of a qualified mental health professional serving as the Mental Health Authority, who should implement a quality control process for Defendants' mental health services. The licensed, qualified mental health professionals providing services to the Class should also maintain patient confidentiality as required by NCCHC standards.

Any plan to remedy Defendants' improper use of solitary confinement and restraints should prohibit Defendants from making any use of the wrap, and from restraining youth to any other fixed objects, including the floor, beds, chairs, or the wall.  With regard to seclusion, the School shall be enjoined from using seclusion for discipline, punishment, administrative convenience, retaliation, or staffing shortages.  The intervention of separating a student from the general population shall be limited to the case of a brief cooling off period in the highly limited circumstance where necessary to prevent immediate harm to a youth or others, and where no other intervention will ameliorate the immediate risk of harm, in which case the student shall be under the care of a qualified, licensed mental health professional.  The Court also should require Defendants to provide reasonable accommodations to students and to ensure that youth are free from discrimination based on disability, including appropriate screening mechanisms to identify and communicate any need for accommodations, equal access to all services and programming, and the consideration of individual students' needs and disabilities in relation to any use of seclusion or restraints.

The substantial evidence of Defendants' deliberate indifference demonstrates the need for an independent monitor to review Defendants' compliance with the requirements listed above, and for the Court to retain jurisdiction until sustained compliance can be shown.  The need for an independent monitor to conduct an ongoing compliance review is also confirmed by the deposition testimony of Defendant Foxhoven, played by video on the first day of trial (Tr. 6.6.2019 (Foxhoven) at 176:14-181:4), regarding the task force he chaired concerning the use of seclusion and restraints at the Iowa Juvenile Home in Toledo (also known as the "Girls School").  Foxhoven Dep. Video, ECF 299 at page 23-26, transcript 52:22-54:09, 54:13-56:07, 56:11-57:02, 57:17-62:20.  In that testimony, Defendant Foxhoven acknowledged his statement that "during the time the task force met, the amount of seclusion went way down.  After we submitted our report the next month, it went way back up."  Foxhoven Dep. Video, ECF 299 at page 26, transcript 61:21-62:8.  Defendant Mark Day, of course, was Acting Superintendent of the Girls School when seclusion went "way down" while the Girls School was under investigation, and remained Acting Superintendent when seclusion went "way back up" after the investigation was concluded. *See* Foxhoven Dep. Video, ECF 299 at page 26, transcript 61:21-62:20.  Without an independent monitor to ensure ongoing compliance, it is equally likely that the use of seclusion and restraints at the Boys State Training School will also go "way back up" once this litigation is concluded.

## **CONCLUSION**

Defendants completely fail to meet their legal obligations to the boys with mental illness who are in their custody, many of whom suffered from childhood abuse, neglect, or other trauma long before they ever set foot in the School. Fortunately, however, the federalist form of government created by our Founding Fathers includes checks and balances designed to protect the legal rights of individuals, such as Class members here, who may have little political influence of their own. On behalf of the Class, Plaintiffs respectfully ask the Court to exercise the long-

established authority of the Federal judiciary to ensure the boys at the School receive minimally adequate mental health care, and to put an end to Defendants' barbaric use of the wrap, the Seclusion Room, the BSU, and other forms of punitive solitary confinement. This relief will provide the Class members with the mental health care they need, reduce the cycle of aggression, and result in a safer environment for students and staff.

Dated:        July 19, 2019

Respectfully Submitted,

CHILDREN'S RIGHTS, INC.

*/s/ Harry Frischer*
Harry Frischer, *admitted pro hac vice*
Marissa C. Nardi, *admitted pro hac vice*
Stephanie Persson, *admitted pro hac vice*
Meetra Mehdizadeh, *admitted pro hac vice*
88 Pine Street, Suite 800
New York, New York 10005
(212) 683-2210
(212) 683-4015 (fax)
hfrischer@childrensrights.org
mnardi@childrensrights.org
spersson@childrensrights.org
mmehdizadeh@childrensrights.org


DISABILITY RIGHTS IOWA

Nathan Kirstein (AT0010967)
Jane Hudson (AT0011646)
400 E. Court Avenue, Suite 300
Des Moines, IA 50309
515-278-2502
(515) 278-0539 (fax)
jhudson@driowa.org
nkirstein@driowa.org


ROPES & GRAY LLP

Nicholas M. Berg, *admitted pro hac vice*
Timothy R. Farrell, *admitted pro hac vice*
Katelyn E. Saner, *admitted pro hac vice*
191 North Wacker Drive
32nd Floor
Chicago, IL 60606
(312) 845-1200
(312) 845-5522 (fax)
Nicholas.Berg@ropesgray.com
Timothy.Farrell@ropesgray.com
Katelyn.Saner@ropesgray.com

ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of Court on July 19, 2019, to be served by operation of the Court's electronic filing system upon all parties.


*/s/ Marissa C. Nardi*

Marissa C. Nardi