IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| C.P.X. through his next friend S.P.X.; and K.N.X. through his next friend Rachel Antonuccio, for themselves and those similarly situated, | ) ) ) ) | Case No. 4:17-cv-00417-SMR-HCA |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| KELLY KENNEDY GARCIA in her official capacity as Director of the Iowa Department of Human Services; CORY TURNER in his official capacity as Interim Mental Health and Disabilities Services Director of Facilities; and MARK DAY in his official capacity as Superintendent of the Boys State Training School, | ) ) ) ) ) ) ) ) ) | TRIAL ORDER |
| Defendants. | ) | |

This case concerns the provision of mental health care to young men adjudicated delinquent and ordered to an out-of-home placement at the Boys State Training School in Eldora, Iowa ("the School"). It raises questions about what care the School must provide, per the values enshrined in the United States Constitution, and what tools it may use to achieve its goals of treatment and rehabilitation. The School's responsibility is a great one; in many ways the School is a final opportunity for delinquent youth to learn the skills necessary to avoid a lifetime of criminal recidivism and, instead, make a meaningful contribution to society. In a time of restricted budgets and where the student population is exceptionally volatile, the School's path to meeting its responsibility is fraught with difficulty. This case clarifies the School's duties as it endeavors to meet the needs of those in its care.

This case was commenced in November 2017 by then-current students at the School against Iowa officials responsible in various ways for the School's administration.  After over a year and a half of contentious—and at times acrimonious—litigation, this matter came before the Court for a nine-day bench trial in June 2019.  During that trial, more than 28,000 pages of exhibits were introduced, along with surveillance videos from the School.  This Order presents the Court's findings of fact and conclusions of law, orders injunctive relief, and creates a framework through which Defendants can ensure the School's students are afforded every opportunity the State can give them to turn their lives around.

TABLE OF CONTENTS

I.  BACKGROUND AND FINDINGS OF FACT...........................................3

    A.  General Information about the School..................................................4

    B.  Mental Health Care Treatment at the School.....................................8

        1.  Responsibilities, staffing, and structure ......................................8

        2.  Screenings and treatment planning ...........................................12

        3.  Treatment .................................................................................19

        4.  Suicidal behavior and mental health emergencies ....................23

        5.  Handling confidential information .............................................25

        6.  Discharge planning....................................................................26

        7.  Structure and supervision .........................................................27

    C.  Solitary Confinement and Restraints ...............................................28

        1.  Solitary confinement ................................................................28

        2.  The wrap...................................................................................39

    D.  Notice and deliberate indifference ..................................................45

    E.  The Parties .......................................................................................50

        1.  Defendants................................................................................50

        2.  Plaintiffs ..................................................................................52

    F.  Grievance Process............................................................................58

        1.  School procedures .....................................................................58

        2.   Other grievance procedures......................................................61

II.      PROCEDURAL HISTORY........................................................62

III.     ANALYSIS AND CONCLUSIONS OF LAW ..........................64

    A.   Affirmative Defense—Failure to Exhaust Administrative Remedies.........................................................................65

    B.   Fourteenth Amendment Substantive Due Process............................70

        1.   Legal standard ................................................................70

        2.   Adequacy of mental health care ................................74

        3.   Solitary confinement ................................................82

        4.   The wrap.........................................................87

    C.   ADA and RA Claims ................................................94

IV.    REMEDIES........................................................100

    A.   Declaratory Judgment ................................................100

    B.   Injunctive Relief........................................................102

        1.   *Dataphase* analysis........................................102

        2.   Relief granted ................................................106

        3.   Monitor........................................................112

        4.   Miscellaneous................................................114

V.     CONCLUSION........................................................115

## I.  BACKGROUND AND FINDINGS OF FACT

Under Rule 52 of the Federal Rules of Civil Procedure, "[i]n an action tried on the facts without a jury . . . , the court must find the facts specifically and state its conclusions of law separately.  The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."  Consistent with the dictates of Rule 52, the Court's findings of fact are set out in this Section I.  The Court's conclusions of law are set out in its legal analysis of Plaintiffs' claims in Section III of this Order.

## A. *General Information about the School*

The School opened in 1873 and is located in Eldora, Iowa. JX008.022.[1]  The Iowa State Department of Human Services ("DHS") operates the School, *id.*, and the School is under the authority of Iowa's Director of Human Services, JX010.001.  The School is an unsecured facility, meaning it is not surrounded by fencing or other external walls, there are no guard towers, and the staff is unarmed.  Tr. 1296:5–16.  The facility itself consists of an administrative building, educational building, nine cottages (five of which are utilized as residential units), and other buildings used for School maintenance and various programs at the School.  Tr. 1295:24–1298:19.

The School provides housing for up to 130 boys adjudicated delinquent between the ages of 12 and 19.6 years old.  JX008.002.  In May 2018, the average daily population of the School over the preceding year was 103 students.  *Id.*  The average age of the students at the School was 16.53 years of age at the time of admission.  *Id.*  The average length of stay for students at the School was ten months and ten days.  *Id.*

Students are placed at the School by order of an Iowa juvenile court.  Tr. 756:14–16.  To be eligible for placement at the School, potential students must fall into one of two categories.  First, a student may be placed at the School if he is at least 12 years of age and a court finds: (1) the student's placement at the School is in his best interest or is necessary to protect the public;

---

[1] As used in this Order, citations beginning with "JX" refer to joint exhibits; citations beginning with "PX" refer to Plaintiffs' exhibits; and citations beginning with "Tr." refer to the trial transcript.  Defendants' exhibits are cited as "Def. Ex.," with the exhibit identifier and page number appearing immediately thereafter.  For example, "Def. Ex. MM at 7," refers to page seven of Defense exhibit MM.  Joint exhibits and Plaintiffs' exhibits are formatted such that the number following the "X" and preceding the decimal point is the exhibit number, and the number following the decimal point is the page number.  For example, "JX008.022" refers to page 22 of joint exhibit 8.  Transcript citations are formatted such that the number preceding the colon is the page number, and the number following the colon is the line number.  So, "Tr. 756:14" refers to line 14 of page 756 of the trial transcript.

and (2) the student has committed one of several specific felonies under Iowa law.  JX014.001.

Alternatively, a court may order a student placed at the School if it finds any one of the following

conditions are met: (1) the student is at least 15 years of age and placement at the School is in his

best interest or necessary to protect the public; (2) the student committed a crime against a person

which would be an aggravated misdemeanor or a felony if an adult committed the same act;

(3) the student was previously found to have committed a delinquent act; or (4) the student had

previously been placed in a treatment facility outside his home or in a supervised community

treatment program through prior delinquency adjudication.  JX014.001–.002.  Over sixty-seven

percent of students at the School are adjudicated felons, and they average seven out-of-home

placements before being placed at the School.  JX008.002.  The School cannot decline a placement,

even if School administrators believe a student will be too difficult to serve.  Tr. 756:20–22.

The School also may not discharge a student for bad behavior or because he presents with serious

medical needs.  Tr. 1173:23–1174:9.  A court order is required to move to another setting any

student who has been placed at the School.  Tr. 1174:11–13.

Generally, the School's program tasks students with maintaining good behavior over a

sustained period.   Students must progress through a three-level system based on weekly

evaluations of their behavior.  *See generally* PX135.006–.007.  Each of these three levels contains

ten steps.  *Id.*  Every student begins at the School at level one, step one; and he usually completes

the program when he reaches level three, step ten.  PX135.007.

To progress through the level system, a student must earn "yes" weeks.  PX135.006.  Each

student's behavior is graded twice every day in his cottage (i.e., the residential unit to which he is

assigned), and he also receives a weekly behavioral grade for every school class, group, vocational

class, and program in which he participates.  *Id.*  Behavioral grades range from one to five, with

grades of one and two being "downgrades"; three being neutral; and grades of four and five being "upgrades." *Id.* Every Wednesday, students undergo an evaluation whereby they present their grades, goal progression, and other information to their "Treatment Team," which consists of their cottage staff, counselor, cottage director, school and vocational teachers, and group leaders. PX.135.007. Each Treatment Team member votes on whether a student has "made" his week—that is, whether the student's behavior warrants his progression to the next step in the three-level system. *Id.* A majority of the Treatment Team must vote "yes" for a student to make his week. *Id.* Generally, a student who receives three or more downgrades is at risk of failing to make his week. PX135.006. Admission to the School's Behavioral Stabilization Unit ("BSU"), described in more detail below, also hinders a student's chances of making his week. PX135.006–.008.

When a majority of a student's Treatment Team votes that a student has made his week, the student earns a "yes" week and progresses to the next step in the three-level system. PX135.006. So, a student who was on level one, step one will progress to level one, step two; a student who was on level one, step ten will progress to level two, step one. Students can also progress additional steps by earning certain achievements at the School, such as a cottage "Man of the Week" award, PX136.006–.007, which is awarded to the student in each cottage who exhibits the best behavior, role modeling, and mentorship, Tr. 1337:2–5. Students who fail to make their week—also described as "losing" a week or earning a "no" week—remain on the same step or possibly move down one or more steps. PX135.007. The three-level system is also tied to privileges. As students progress through the system, they earn more privileges at the School, such as longer family visits and eligibility for off-grounds recreational activities. Def. Ex. S at 23–24.

When a student loses a week, he will lose some of the privileges he previously earned, no matter where he is on the three-level system.  PX135.007.

Typically, a student may be considered for discharge from the School when he progresses to level three, step ten and completes the goals of his individual care plan and individual education plan.  PX135.006; Def. Ex. S at 23.  The School and the student's juvenile court officer ("JCO") make a discharge recommendation to the juvenile court judge overseeing the student's case, and the judge makes the ultimate decision as to whether to order discharge.  PX135.005–.006.  As an alternative to completing the School's programming, the juvenile court can set different objectives for a student that determine his eligibility for discharge.  For example, a judge may order a student placed at the School to earn his high school equivalency; in that case, the student will be discharged upon doing so regardless of where he is in the School's level progression.  Tr. 819:2–14.

For each student, the School develops an Interdisciplinary Care Plan ("ICP").  The ICP sets out in detail a student's social history, educational background, and the results of various intake screenings—including mental health, physical health, and behavioral assessments. *See, e.g.*, Def. Ex. MM at 7–11.  The ICP then sets out a student's behavioral, academic, and special needs goals based on input from his JCO and family (when the family chooses to participate). *See, e.g.*, *id.* at 12; *see also* PX135.015.  The ICP lists all special treatment programs at the School to which the student is assigned. *E.g.*, Def. Ex. MM at 12–13.  Every student is assigned a counselor who drafts a report every thirty days describing the student's progress through the School's programming and toward the goals of his ICP.  PX135.015.

A student's daily life is centered largely on his cottage.  On weekdays, he wakes up at 6:30 a.m., has breakfast and attends to his hygiene.  PX135.018.  By 7:20 a.m., a student will typically attend the Midland Park School—a fully accredited academic institution located on the

School's campus that provides junior high and high school education.   PX135.015, .018. Through Midland Park School, students can earn their high school diploma or participate in HiSET courses (High School Equivalency Testing).  PX135.015.  Midland Park School also offers special education services for qualifying students, services for specific disabilities, and support services for students with hearing, speech, or vision impairments.  *Id.*

A student will attend Midland Park School until roughly 12:15 p.m., at which point he returns to his cottage for lunch.  PX135.018.  He then returns to Midland Park School for one more class period.  *Id.*  For the rest of the day, a student's time is divided between recreational activities, study time, vocational education, and treatment programs.  *Id.*  The School's vocational programs are numerous and focus on subjects such as the culinary arts, welding, and construction. PX135.016.  The School's treatment programs include a mandatory "Risks and Decisions" group, through which students learn about various risk factors related to delinquency, violence, criminal behavior, and gang violence.  *See* Def. Ex. MM at 12.  A student will also have dinner and additional time for hygiene before going to bed at 9:00 p.m.  PX135.018.

### B.  *Mental Health Care Treatment at the School*

#### 1.  Responsibilities, staffing, and structure

Forty to sixty percent of the students at the school need mental health services in that they either have a mental health diagnosis or receive psychotropic medication.  *See* Tr. 1436:7–9, 1966:1–4; PX226.015.  This is consistent with justice-involved youth in general.  Research has shown that sixty to seventy-five percent of justice-involved youth have at least one diagnosed mental health illness.  Tr. 46:18–22.  The mental health diagnoses of children at the school vary and include attention deficit/hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), conduct disorder, affective mood disorders, depressive disorder, bipolar disorder,

anxiety disorder, post-traumatic stress disorder, and psychotic disorders.  *See generally* JX015. The School also houses students with various developmental disorders and substance-related disorders.  *See* JX015.057–.069.   Many—possibly most—of the School's students have experienced trauma at some point prior to their arrival at the School.  Tr. 108:25; Wright Dep. 00:05:17–00:06:02.[2]  Further, at least fifty percent of the students at the School have been victims of physical, sexual, and/or emotion abuse, or victims of crimes—both recently to their admission and over the course of their lives.  Tr. 1435:18–23.

Within DHS's remit is the "treatment and rehabilitation of juvenile offenders" and the "care and treatment of persons with mental illness."  Iowa Code § 217.1.  Consistent with this, the School itself is legislatively mandated "to provide court-committed male juvenile delinquents a program which focuses upon appropriate developmental skills, treatment, placements, and rehabilitation." Iowa Code § 233A.1(1).  This "treatment" includes mental health treatment.  Tr. 1191:15–17. In 2018, Defendants were involved in an effort to amend Iowa Code § 233A.1(1) to remove "treatment from the School's legislative mandate.  Tr. 1230:10–19, 1233:6–14; PX338.001–.003. This effort ultimately failed.  Tr. 1234:21–22.

In accordance with the School's mandate to provide treatment, School policies state the School shall provide "a wide range of services and programs to those students placed in its care," JX010.003, including psychiatric and mental health care services (either through contractors or state personnel), JX005.018.  By policy, the School's provision of mental health care must include the following minimum services: (1) detection, diagnosis, and treatment of mental illness; (2) crisis

---

[2] Excerpts of various depositions were admitted into evidence and played during trial. Where those depositions are cited in this Order, the pincites refer to the time elapsed in the video file played at trial, not any timestamp overlay in the video.  The pincites are in a hh:mm:ss format.

intervention and management of acute psychiatric episodes; (3) stabilization of students with mental illness and prevention of psychiatric deterioration; (4) pharmacotherapy, when necessary; (5) referral to an appropriate licensed mental health facility when treatment needs exceed the capability of the School; and (6) obtaining and documenting informed consent.  JX005.101.

At the close of discovery in November 2018, the School contracted for the services of one psychiatrist, Dr. Terry Augspurger.  Tr.1314:8–23.  Dr. Augspurger's primary responsibility is to provide psychiatric medication management.  *See* Tr. 1503:23–1504:5, 1504:16–17, 1505:4–16, 1509:15–17, 1579:2–6.  Dr. Augspurger resides in Arkansas and provides services to the School one day per week.  Tr. 1504:25, 1571:14–16.  Of those days, he is physically present at the School one day per month; on the remaining days, he provides services via telemedicine.  Tr. 1207:3–7, 1570:22–23.  He is responsive while away from the School, however, and School staff can and do contact him via phone or email if there is a problem with a student's medication outside of Dr. Augspurger's regular working hours.  Tr. 1090:17–23, 1515:22–1516:4.

Dr. Augspurger provides services to the School via a contract between the School and Center Associates, a private, nonprofit mental health center in Marshalltown, Iowa. Tr. 1503:12–17, 1683:23, 1692:2–6, 1693:24–1694:1.   The School also contracts with Center Associates for the services of Roy Metzger, an advanced registered nurse practitioner licensed as such by the State of Iowa.  Tr. 1684:5–14, 1693:2–4.  Metzger works at the School one day per week and primarily provides medication management services.  Tr. 1693:2–4, 19–23. Like Dr. Augspurger, Metzger can be reached by School staff via email and telephone outside of his regular working hours.  Tr. 1092:3–7.  Nick Calzada is a licensed independent social worker who provides mental health counseling services to the School through its contract with Center Associates.  These services include psychotherapy.  Tr. 1314:16–17; PX225.013–.014.

Like Metzger and Dr. Augspurger, Calzada works at the School one day per week.  Tr. 1694:3–4; PX225.013–.014

In addition to these contracted professionals, the School employs two psychologists, Louis Wright and Sabrina Taylor.  Tr. 1227:1–6, 1314:12–14.  Wright acts under a restricted license that allows him to practice psychology at the School; he is otherwise not licensed to provide mental health care in the State of Iowa.  Tr. 102:22–25, 103:1–5; Wright Dep. 00:13:34–00:13:42.[3] Wright's primary responsibility is to perform crisis assessments of students placed on suicide watch.  Tr. 104:9–11, 1195:14–17.  In 2016 and 2017, he performed 472 such assessments. Wright Dep. 00:00:53–00:01:13.  Wright also provides supportive counseling to students at the School at their request; however, he does not provide ongoing therapy or psychotherapy, and he generally does not have time to see students on a regular basis.  Tr. 1195:18–20; PX225.013.

The School hired Taylor in 2018 on grant funding it received through the Victims of Crime Act ("VOCA").  Tr. 835:21–24.  The VOCA grant is earmarked for the treatment of students who have been the victims of crime, Tr. 1227:13–16, and Taylor's services at the School are limited to such students, Tr. 1227:17–19, 23–25.  Like Wright, Taylor is not licensed to provide mental health services in the State of Iowa outside of the School.  Tr. 1227:10–12.

Additionally, the School hired a third psychologist, Dr. Craig Schneider, in April 2018. Schneider Dep. 00:00:10–00:00:28.  He was hired to head the psychology department at the

---

[3] Wright's restricted license was issued by the Iowa Department of Management. Tr. 216:16–17.  In issuing the license, the Department of Management reviewed Wright's credentials and various internal standards and determined he met the tier qualifications for what is considered a Psychologist 3 position.  Tr. 216:16–25.  At trial, Plaintiffs focused heavily on Wright's not being licensed to practice psychology in Iowa outside of the School.  But the record shows Wright's lack of broader licensure is not reflective of his qualifications to practice psychology.  There is insufficient evidence to support a finding that Wright is not qualified to perform the duties for which he is responsible at the School.

School.  PX225.020.  However, he was hired on temporary grant funding and was not a permanent employee.  *Id.*; Tr. 87:1–6.  By June 2019, he was no longer employed at the School.[4] Tr. 1227:1–6.  As with Wright and Taylor, Dr. Schneider was not licensed to provide mental health services in the State of Iowa outside of the School.  Schneider Dep. 00:00:33–00:00:37.  Also like Wright, Dr. Schneider provided supportive counseling to students, but he did not perform psychotherapy, Tr. 87:11–14; PX225.013, nor did he have a caseload of students that he saw on a regular basis.  Schneider Dep. 00:00:38–00:00:51.[5]

2.  Screenings and treatment planning

Upon admission to the School, every student is subject to a battery of assessments, including some geared toward the student's mental health.  Students electronically complete the Massachusetts Youth Screening Instrument II ("MAYSI-II"), which is a standard mental health screening tool used in juvenile correctional facilities.  Tr. 133:13–15; JX005.103; Def. Ex. MM at 21.  It consists of numerous yes-or-no questions pertaining to a student's alcohol and drug use; anger and irritability; somatic complaints related to nervousness and anxiety; suicidal ideation; depression and anxiety; thought disturbances; and traumatic experiences.  Def. Ex. MM at 20–22. If a student's MAYSI-II results indicate potential problem areas, the student is required to complete a second MAYSI-II screening that asks more detailed questions about the problem areas identified in the first exam.  Tr. 1330:19–20; Def. Ex. MM at 87–91.

---

[4] The Court notes Dr. Schneider's departure from the School for reference only.  For the purposes of evaluating Plaintiffs' claims, the Court considers the conditions at the School as of the close of discovery, at which time Dr. Schneider was still employed at the School.

[5] The School also employs an academic educational psychologist who works on individual education plans and similar issues.  Tr. 1314:18–23.  He or she does not appear to have provided counseling services or otherwise performed functions relevant to this litigation.

Staff also complete a health screening of the student (including mental health), which requires them to note if they observe various indicia of potential mental illness—including assaultive or obnoxious behaviors, unusual suspiciousness, auditory or visual hallucinations, and observable signs of depression. *E.g.*, Def. Ex. MM at 19. This form also includes a suicide questionnaire and requires the staff member completing the form to confirm with the individuals who transported the student to the School whether they detected any signs or symptoms of suicidal behavior. *Id.* Staff also complete a separate suicidal-behavior questionnaire with the student, as well as a questionnaire meant to screen for risk of sexual victimization or perpetration. *E.g.* Def. Ex. MM at 24–27. These initial evaluations are performed by "trained staff," as opposed to mental health professionals. JX005.103.

In addition to these initial screenings, the School's psychology assistant is generally required to complete a mental health appraisal for every student within fourteen days of his admission. JX005.104; *see also, e.g.*, Def. Ex. MM at 6. This appraisal is more comprehensive than the initial screenings and, by policy, must include: (1) a review of available mental health and alcohol/substance abuse treatment records; (2) inquiries into educational history, prior mental health and alcohol/substance abuse treatment, and history of emotional, physical, and sexual abuse; (3) assessments of the student's current mental status, alcohol and drug abuse or addiction, and potential for violence, suicide, and self-injury; (4) referrals for treatment (as indicated); and (5) recommendations concerning housing and program participation. JX005.104–.105.

In practice, the appraisal comports with these requirements. *See, e.g.*, Def. Ex. MM at 3–6. This is accomplished in part through various assessments administered during the appraisal—the Wechsler Abbreviated Scale of Intelligence, Second Edition; the Childhood Sexual Abuse Survey; the Suicide Risk Assessment; the Structured Assessment of Violence Risk in

Youth; and the Milton Adolescent Clinical Inventory ("MACI"). *E.g.*, *id.* at 3. The student is also interviewed on various topics, including his familial history, mental status, and history of assaultive behaviors. *E.g.*, *id.* at 3–4. The report generated from these assessments contains a section labeled "Treatment Planning." *E.g.*, *id.* at 5–6. Despite the label, this section provides treatment recommendations rather than an actual treatment plan. The section typically states which rehabilitative programs at the School would be appropriate for the student, provides an excerpt from mental health resources discussing appropriate treatment for adolescents with the student's MACI profile, and identifies (but does not discuss or otherwise detail) types of treatment plans that would be appropriate for an adolescent presenting the mental health conditions of the student. *See, e.g.*, *id.* at 6, 47, 115.

From there, students may be referred to the School's mental health staff for a "Mental Health Evaluation" when the mental health appraisal "indicates that there is a reasonable expectation that the evaluation would serve a therapeutic or disposition function for the student." JX005.105. Such an evaluation must be completed "within thirty days of a referral for evaluation or treatment." *Id.* In practice, such referrals are triggered by medication needs. If a student arrives at the School on medication for a mental illness, they will be referred to Dr. Augspurger as a matter of course. Tr. 1503:24–1504:3, 1504:16–23. Dr. Augspurger will review the prescribed medications and continue the student on those he finds appropriate. Tr. 1504:4–5. He will also arrange for laboratory monitoring if a student is on a medication that calls for such precautions. Tr. 1504:5–10. Students can also be referred to Dr. Augspurger after their admission—be it by a youth counselor at the School, the student's JCO, one of the School's psychologists or medical staff, or someone else—"to do an evaluation, usually with the intention of finding out whether medication might be appropriate or not." Tr. 1505:6–8.

-14-

Generally, these evaluations are not the types of comprehensive evaluations that a mental health professional would typically complete before deciding on a diagnosis and course of treatment.  Tr. 70:15–18, 71:19–20, 1577:21–1578:10.  Such evaluations can take two hours or more and require conducting a mental status evaluation and fully exploring the patient's symptoms, past treatment and education records, and medical information.  Tr. 70:19–71:1, 72:19–22.

Nevertheless, Dr. Augspurger's psychiatric evaluations are robust.  They discuss the student's delinquent history and prior placements.  *E.g.*, Def. Ex. MM at 109.  They detail the student's familial and medical history (including physical and mental health diagnoses and medication history).  *E.g.*, *id.* at 109–10.  The evaluation notes indicate Dr. Augspurger interviews the students in order to assess their mental status—including their mood, speech patterns, suicidal ideation, memory, insight, and judgment.  *E.g.*, *id.* at 110.  The evaluation provides diagnostic impressions and Dr. Augspurger's recommendations.  *E.g.*, *id.* at 111.  These recommendations are limited to the appropriateness of the student's placement at the School, the student's participation in the School's rehabilitative programs, follow-up medical care, medication to address the student's mental health conditions and, in some cases, the appropriateness of psychotherapy.  *See, e.g.*, *id.* at 111, 308, 387, 468, 680, 1535.

From these numerous assessments and evaluations, a mental health care professional is required by School policy to prepare a treatment plan for the student within thirty days of the initiation of treatment.  JX005.105.  This does not happen.  The School does not prepare mental health treatment plans for its students.  Schneider Dep. 00:00:29–00:00:34.  Instead, the School prepares an ICP for each student, which incorporates the various intake assessments—including the mental health appraisal and mental health evaluation (if conducted).  *See, e.g.*, Def. Ex. MM

at 121–27.  However, although the mental health appraisal and evaluation respectively identify and recommend mental health treatments, no course of treatment is adopted in the ICP. *See, e.g.*, *id.*  The ICP assigns the student to rehabilitative group programs at the School, *e.g.*, *id.* at 126, but as discussed in more detail below, these programs do not constitute mental health treatment.  Additionally, the ICP contains a section labeled "STS Treatment Outline/Goals," but this section sets out behavioral goals—such as "complet[ing] tasks in a timely manner" and "engag[ing] in appropriate peer interactions"—not mental health treatment goals.  *Id.* at 127.

Several national organizations have issued guidelines on the provision of mental health care services in correctional facilities, including with respect to screenings and assessments.[6] Guidelines developed by the United States Department of Justice ("DOJ"), the American Correctional Association ("ACA"), and the Annie E. Casey Foundation ("AECF") all call for an initial mental health screening of juveniles upon admission to the facility.  Def. Ex. LL at 26–27. These organizations and the National Commission on Correctional Health Care ("NCCHC") also require a further, more comprehensive mental health assessment—although the time by which this must occur, and the content of these evaluations generally, varies by organization.  *Id.* at 27; PX264.001.  The AECF, NCCHC, and ACA indicate students needing further evaluation and/or treatment should be referred accordingly, although they also differ on the amount of time in which this referral should occur.  *See* PX264.002; Def. Ex. LL at 27–28.

---

[6] The Court makes note of these standards here and elsewhere in this Order to show the various views among professional organizations purporting to be experts in the fields of psychology and juvenile justice.  None of these standards constitute the legal standard applicable to this case, but they are useful as a tool to evaluate the School's practice relative to professional norms.

The goal of these screenings is to identify potential or previously diagnosed mental or substance abuse disorders; and the risk of sexual perpetration/victimization for the purposes of the Prison Rape Elimination Act.  PX226.009.  It is critical that screenings identify such disorders because persons with mental illness, including developmental disabilities and substance use, are at increased risk of experiencing lengthier periods of detention.  *Id.*  This increased risk is due to their inability to participate adequately in programming and difficulty conforming their behavior to institutional expectations.  *Id.*  Further, effective and timely screening can allow an institution to identify youths with serious psychiatric needs and provide them with adequate treatment.  *Id.*  Such screening also helps the institution identify individuals whose needs cannot be met by the facility.  *Id.*

The risks of conducting inadequate mental health screenings and appraisals/evaluations are substantial.  There is a risk that mental illnesses will not be adequately diagnosed. Tr. 73:7–8.  This creates a risk of inappropriate or ineffective treatment, which in turn can lead mentally ill youth to regress and for their behaviors to worsen.  Tr. 73:8–10.  This can cause such a youth to require longer stays at the School or more restrictive placements within the facility.  Tr. 73:11–12.  In more extreme cases, failure to adequately treat mental illness can lead to substantial harm or death to the affected youth and others.  PX226.012.  There is also an increased risk for recidivism in the future.  Tr. 73:13–15.

The School's screening and initial appraisal/evaluation practices differ in some respects from the more robust national standards.  For example, NCCHC standards require that initial mental health assessments inquire into cerebral trauma, seizures, sexual offenses, and emotional response to placement in the institution.  PX226.011.  School policy does not require such inquiries, but some of them are made in practice.  The School's "Health/Mental Health Screening"

form, completed at intake, inquires into the student's history of seizures, and Dr. Augspurger's mental health evaluations indicate whether the student has a history of head trauma or seizures. *E.g.*, Def. Ex. MM at 86, 110.   Similarly, the "Risk of Sexual Victimization/Perpetration Screener," also completed during the intake process, asks whether the student has been arrested on a sexual offense and/or ever engaged in sexually aggressive/violent behavior.   *E.g.*, *id.* at 27. Where a student is identified as having committed a sexual offense, it is noted in his subsequent mental health appraisal and evaluation.   *E.g.*, *id.* at 299, 306–07, 309, 311, 376, 385–86, 388, 390.

On the other hand, the School's failure to develop mental health treatment plans is at odds not only with its own policies, but also with several national standards.   The ACA, DOJ, AECF, and NCCHC all require institutions to formulate a treatment or service plan for youth requiring mental health care.   PX267.001; Def. Ex. LL at 28–29.   According to the NCCHC and AECF, these plans should include, among other things, the youth's mental health needs and how they will be addressed.   PX267.001; Def. Ex. LL at 28–29.   Failure to develop mental health treatment plans increases the risk that a youth's mental health care will not be adequately coordinated or appropriate to meet the youth's needs.   Tr. 74:21–23, 76:12–13.   This in turn increases the risk that the youth's mental health will regress, and they will continue to suffer from the symptoms of their mental illness.   Tr. 76:13–15.

The School's failure to develop mental health treatment plans—whether on their own or integrated into the ICP—is symptomatic of the School's broader failure to adapt its programming to the mental health needs of its students.   Although the School collects a large amount of information pertaining to students' mental health, it is not used in a meaningful way. *See* Tr. 69:20–23.   The ICP does not provide guidance to School staff on students' mental illnesses and how staff should interact with students as a result.   *See, e.g.*, Def. Ex. MM at 7–14, 48–54.

The School's failure to adequately inform its staff of students' mental illnesses (and how to deal with them) can and has led School staff to inadvertently exacerbate students' mental illnesses, such as by triggering students' post-traumatic stress disorders during group counseling sessions. Tr. 131:2–12; PX218.007–.008.

### 3.   Treatment

For students with diagnosed mental illnesses, the School's regular mental health treatment offerings are limited.  With the exception of counseling services by Calzada—who works at the School no more than ten hours per week—the School generally does not offer psychotherapy, be that individual or group psychotherapy.  PX225.012–.014.  Even when students at the School have been specifically referred to therapists for psychotherapy, they have not always received those services.  Tr. 88:22–89:8, 112:10–23.  Psychotherapy is "practically nonexistent" at the School. Tr. 82:18.

Generally, the School's failure to offer psychotherapy necessarily encompasses specific forms of psychotherapy, such as cognitive behavioral therapy ("CBT") or dialectical behavioral therapy ("DBT").  PX226.016.  The School does offer counseling programs that take place in group settings, such as the School's Risks and Decisions group, described above.  Such programs, however, are a form of penological rehabilitation focused on preparing persons to re-integrate into society; they are not a form of psychological treatment.  PX225.014.  Further, correctional staff at the School who lead such programs do not always follow the syllabus and in some cases "wing[] it."  *Id.*[7]  Students are able to request meetings with one of the School's psychologists.

---

[7] Evidence shows the School has made other decisions in its operations that would benefit from the input of mental health professionals.  For example, the School houses sexual offenders in the same cottage as those vulnerable to sexual predation: sexual abuse victims and individuals with low intellectual functioning.  Tr. 1303:13–20.  Although this is done because the cottage in

Tr. 302:11–16; PX225.013.  But these meetings, too, are not psychotherapy and are not conducted on a sufficiently ongoing basis to achieve therapeutic goals.  PX225.013.

In the absence of meaningful therapeutic services, the School relies almost exclusively on psychotropic medication to treat students' mental illnesses.  Half of the students at the School receive such medications.  Tr. 66:16; PX406.001.  There is no "overarching mental authority or any board or group of people" at the School "that monitor the medications."  Tr. 1548:4–5. Still, Metzger and Dr. Augspurger appear to take it upon themselves to closely monitor students for whom they have prescribed psychotropic medications.  Every student who is prescribed psychotropic medication meets with either Metzger or Dr. Augspurger on a regular basis so they can ensure the medications are working as intended and gauge side effects and other potential problems.  Tr. 1514:2–25, 1696:5–8, 1697:8–1698:3.  These meetings are not limited to a review of medication and include discussion aimed at evaluating the student's mental health. Tr. 1525:23–1526:8, 1699:10–1700:1.  The School also regularly draws labs for students whose psychotropic medications require such monitoring.  Tr. 1515:3–21.

Before prescribing any medication, Metzger and Dr. Augspurger (whoever is monitoring the student) discuss the benefits and risks of the medication with the student.  Tr. 1522:25–1524:2, 1698:7–1699:6.  Students are not required to take medications against their will.  Tr. 1529:21; JX005.091.  But although students must consent to medications, the School's practices for documenting that consent have been poor.  In some cases, students were asked to sign consent forms that did not list the medications to which they were consenting.  Tr. 1009:2–8.  As of July 2018, parents must now provide informed consent before their children may be administered

---

question is smaller and allows for more staff supervision, *id.*, surely this would pose challenges for the rehabilitation of sexual offenders and create risks of trauma to vulnerable victims.

psychotropic medication.  JX005.093–.095; PX225.015.  Prior to that time, School administrators signed medication consent forms as legal guardians of the students.  PX225.015.  However, they did not discuss medication recommendations with Dr. Augspurger, indicating they consented to the use of medications without adequate understanding of the target symptoms, side effects, or therapeutic alternatives.  *Id.*

The School's over-reliance on psychotropic medications to treat students' mental illnesses is at odds with various national standards.  Guidance by the American Academy of Child and Adolescent Psychology ("AACAP") concerning the provision of mental health care to youth in child-serving systems recommends that psychotropic medications only be used as part of a comprehensive treatment plan that includes psychotherapy.  Tr. 59:2–11; PX010.010. The AACAP has also recognized that "[a]t the clinical level, the use of psychotropic medication is a significant medical event and should not be an isolated activity.  In the vast majority of cases, psychotropic medication should not be used by itself without concurrent, effective psychosocial interventions."  PX012.033.  Consistent with this, DOJ standards require that youth in detention facilities are provided with "therapeutic mental health services," Def. Ex. LL at 29, and the NCCHC requires facilities to provide "[i]ndividual and group counseling as clinically indicated," PX266.001.

Offering therapy is not merely idealistic or a best practice—the lack of therapeutic services impacts the School's ability to treat students' mental illnesses.  Psychotherapy is the primary treatment modality for high-needs youth with diagnosed mental illnesses—including those common amongst students at the School, such as conduct disorder, substance abuse disorder, and ODD.  Tr. 1568:5–1569:7; PX226.015.  This means psychotherapy would be "the first treatment, the treatment of choice."  Tr. 82:8–9.

Psychotropic medications should rarely be prescribed without accompanying therapy. PX226.015.  This is because psychotropic medication merely lessens mental health symptoms. Tr. 81:19–20.  But this is not treatment.  Unlike psychotherapy, psychotropic medication cannot teach the skills necessary to allow an individual to manage their illness on a long-term basis. Tr. 81:19–82:3; *see also* PX012.009.  Rarely do mental health professionals consider medication alone to be an adequate mental health intervention.  Tr. 82:2–3.

Thus, treatment with psychotropic medication alone can constitute no treatment at all. For example, DBT is highly effective in treating youth with recurrent suicidal ideations or self-harming behaviors.  PX226.016.  Yet, the School does not employ DBT to treat these behaviors.  *Id.*  And indeed, students who exhibited these behaviors and who were treated only with psychotropic medications often exhibited these behaviors on a recurring basis. *E.g.*, PX218.010–.011, .015–.016, .024–.025.  This underscores the importance of developing a thorough mental health treatment plan and having the resources to provide different mental health treatment options when an initial treatment proves ineffective.

Given the seriousness of their mental illnesses and traumatic histories, many students at the School require weekly individual therapy to achieve healthy adolescent development. PX226.017.  To meet these needs, the School would need to employ two full-time therapists.  *Id.* Psychotherapy can be a time-intensive endeavor.  Two forms of psychotherapy—CBT and DBT—typically require a minimum of twenty sessions lasting forty-five to sixty minutes each in order to be effective.  Tr. 1569:8–1570:1.  At the close of discovery, the School lacked the requisite staffing to meet the therapeutic needs of its students.

The School's failure to provide adequate therapeutic services, and therefore adequate mental health treatment, increases the risk that students' mental health will deteriorate while they

are at the School.  Tr. 83:8.  It increases the risk that students will engage in self-harming behaviors; will otherwise harm themselves and others; will suffer longer and more restrictive placements at the School; and will face greater risk of recidivism in the future.  Tr. 83:9–13. The School's failures in this regard also run counter to its policies, which require it to provide services that treat mental illnesses and prevent psychiatric deterioration.  JX005.101.

### 4.  Suicidal behavior and mental health emergencies

The School has a detailed policy concerning its response to students' suicidal behaviors. There has not been a successful suicide attempt at the School since the early 1970s. Tr. 456:10–11.  As discussed above, the School administers various screenings upon intake aimed at identifying students' mental health issues and suicidal ideation.  If a student presents a risk of suicide or self-harm, this information is included in the student's main file, and an email is sent to School staff notifying them of the student.  JX005.110.  The student's name is also maintained on a suicide risk list accessible to all School staff via the School's intranet site.  JX005.111.

When a student expresses suicidal ideation, he can be placed on one of three levels of observation, depending on the severity of the situation.  JX005.111–.116.  He can also be transferred to a single-occupancy room in the BSU, or the School's seclusion room. Tr. 433:21–434:9; JX005.112–.115; Def. Ex. MM at 1685 (student sent to BSU for stabilization and observation after self-harming).  As discussed in more detail below, these rooms are solitary confinement cells.  Students can also be placed in restraints for suicidal behaviors.  Tr. 93:12–15. Although students are monitored while on suicide watch, they are not monitored by the School's mental health staff.  JX005.111–.116.  The School will also remove a student's clothes and have him change into a suicide prevention gown when, for example, the student makes a suicidal gesture involving his clothing.  Tr. 509:18–20.

Students placed on suicide watch eventually meet with Wright for a suicide assessment. Wright Dep. 00:00:50–00:00:58.  These assessments focus on the student's then-current mental state with a view toward determining if the student's suicide watch level remains appropriate. *E.g.*, Def. Ex. A at 2207, 2402; *see also* PX218.010.  Thus, following a suicide assessment, a student may be lowered from a level-two suicide watch to a level-one watch. *E.g.*, PX218.007–.008.  The assessments typically do not explore the causes of the suicidal thoughts or behaviors, nor do they typically include a safety plan or recommend treatment to help prevent the suicidal thoughts or behaviors from recurring.  *E.g.*, Def. Ex. A at 2207, 2402, 2422; Def. Ex. B at 4534; *see also* Tr. 93:8–94:8; PX225.016.  This approach is contrary to AECF standards, which require mental health professionals to formulate a detailed care and support plan following any attempted or actual self-harm.  Def. Ex. LL at 34.  In situations where Wright fails to refer a student for appropriate mental health treatment, his assessments also contradict DOJ standards, which require mental health professionals to make an appropriate evaluation and referral after a student expresses suicidal ideation.  *Id.* at 35.  And because the School has limited capacity to offer psychotherapy, discussed above, students are not offered therapy that would help treat their suicidal ideations.  Numerous students who exhibit suicidal ideations or behaviors do so on a recurring basis.

As to mental health emergencies more broadly, the School does not have qualified mental health staff present at the School at all times.  PX225.017.  As noted above, Dr. Augspurger and others can be contacted for assistance when they are not present on campus.  However, if they cannot be reached, or cannot otherwise assist in the event of an emergency, School staff can send students to the University of Iowa Hospitals and Clinics.  Tr. 455:16–19; JX005.102.  In general, if a student's mental health needs exceed what the School can provide, the School can, with the

DHS Director's permission, transfer a student to an external mental health care facility for a period of time.  Tr. 1449:22–1451:21; JX005.102.

### 5.   Handling confidential information

School policy provides that "[i]nformation regarding a student's mental health diagnosis and treatment shall remain confidential."  JX005.101.  It further states that "[m]ental health professionals shall maintain a separate mental health record and shall determine the appropriate information to be shared with other professionals working with the student."  *Id.*  The School's mental health staff do not generally adhere to this policy.  Dr. Augspurger's psychiatric evaluations and progress notes are placed in the student's School file (as opposed to the student's medical file).  *E.g.*, Def. Ex. MM at 108, 111; *see also* PX226.019 (noting that mental health records appear in students' administrative files).  Although a copy is also placed in the student's medical file, there does not appear to be any separate mental health file; or, if there is, Dr. Augspurger's notes are not filed there.  *E.g.*, Def. Ex. MM at 108, 111.  Mental health records in the students' School file can be and are accessed by non-mental health staff.  For example, entire sections of students' psychometric reports are copied verbatim into their ICP.  *E.g.*, *id.* at 309–12, 323–30.  Additionally, Dr. Augspurger sends his notes in their entirety—rather than a summary or other selection of information—to non-mental health staff, including Defendant Mark Day and the student's cottage counselor/director, as well as individuals not affiliated with the School, such as the student's JCO and juvenile court judge.  *E.g.*, *id.* at 402.  Dr. Augspurger is transparent about this—he informs students at their first meeting that the information they provide will not be kept confidential.  Tr.1509:18–23, 1562:24–1563:4.  In fact, Dr. Augspurger's telemedicine appointments are not even private—a nurse is always present in the room with the student during such appointments.  Tr. 1508:22–24.

Although it is not followed in practice, the School's policy (as written) on handling mental health information in a confidential manner is generally consistent with various national standards, including the AECF and NCCHC. PX226.019; PX269.001–.002. These organizations recommend that mental health information remain confidential. PX226.019. That confidentiality is not absolute and is subject to exceptions in circumstances implicating the safety and security of individuals and the School. *Id.*

The School's failure to ensure the confidentiality of mental health records and information undermines its ability to provide adequate mental health care to students. Students are less likely to be forthcoming to the School's mental health care staff if they know the information will be shared with security and administrative staff. *Id.* It can even make them less likely to seek care altogether. Tr. 107:12–14.

### 6.   Discharge planning

The School arranges with outside organizations to provide an array of programming geared toward helping students transition back into society. Tr. 765:9–768:14. These programs teach students basic life skills (such as how to use personal banking services and shop for one's groceries) and, for eligible students, help them find housing and employment. *Id.* If a student is eligible for Medicaid, his JCO will seek it on his behalf as he nears his discharge date. Tr. 769:9–12. Also, the School contacts the Social Security Administration to arrange for students to receive payments of any funding to which they are entitled. Tr. 769: 13–16.

Generally, just as the School does not use mental health treatment plans for its students, post-discharge care planning is not featured in a student's mental health care at the School. When students are discharged, the School provides them with a thirty-day supply of their medications and a prescription for a refill. Tr. 781:2–3. The School does not, however, schedule mental health

follow-up appointments for students approaching discharge.  PX225.019.  Doing so would be difficult, given that community mental health providers will commonly not schedule outpatient appointments for youth while they are in a secured facility.  *Id.*  National standards differ on whether facilities should arrange follow-up mental health appointments as part of the discharge process.  AECF and DOJ standards indicate that discharge planning should include ensuring continuing care in the community, whereas ACA standards call for aftercare planning only in the case of substance abuse treatment.  *See* PX245.140; Def. Ex. LL at 66.

### 7.   Structure and supervision

There is little overall structure to the School's mental health program.  According to School policy, the School "shall maintain a mental health program approved by the designated mental health authority."  JX005.101.  According to the NCCHC, the mental health authority "functions to ensure that mental health services are organized, adequate, and efficient."  PX260.002.  This is consistent with other national standards, which generally identify the "mental health authority" as an individual with supervisory responsibility over the facility's mental health care program. *See, e.g.*, Def. Ex. Z at 96, 99; Def. Ex. LL at 31 n.134.

Defendant Day, the Superintendent of the School, is the School's mental health authority. Tr. 1436:15–20.  The scope of Day's responsibilities in this role is ambiguous.  He approves policies, *see* JX005.102, but it is otherwise not clear what oversight he provides.  He does not oversee Dr. Augspurger's prescribing of medication.  Tr. 1548:11–12.  Nor does the School have any kind of quality improvement system designed to collect and monitor data that might be used to inform improvements to the School's mental health care program.  PX226.029–.030.

Although Day is the School's mental health authority, he is not a licensed mental health professional. Tr. 1436:21–23.  Ultimately, the School does not have a mental health clinician

supervising the clinical aspects of its mental health care.  The School represented to the ACA during that organization's 2018 audit of the School that Dr. Augspurger oversees the School's mental health services.  *See* Tr. 451:23–452:10; JX008.010.  This was false.  Dr. Augspurger does not supervise anyone at the School, and it is not part of his job description to do so. Tr. 452:12–13, 1548:6–12, 1552:22–25, 1565:7–13, 1567:2–4.  Dr. Augspurger has never signed any document as the School's mental health authority approving the mental health program at the School.  Tr. 453:4–8.[8]

Further, there is no clear hierarchy among the mental health personnel, and they report to different individuals.  According to the School's organization chart, one psychologist reports to Day; one psychologist and one psychology assistant report to Lynn Allbee, the Treatment Program Administrator at the School; and another psychologist reports to Brett Lawrence, the School's Treatment Services Director.  JX013.001.  The organization chart does not list Dr. Augspurger, Metzger, or Calzada (by name or title), *id.*, and indeed, no one at the School oversees Dr. Augspurger's prescribing of medications, Tr. 1548:11–12.

### C.  Solitary Confinement and Restraints

#### 1.  Solitary confinement

Corbett Miller Hall ("CMH") is one of the School's residential units.  Tr. 1297:20–22. CMH has two wings, each with twelve individual locked living units.  Tr. 1234:23–25; PX146.001. Each eight by-ten-foot room is constructed of cinder block.  Def. Ex. LL at 55.  Each room has a

---

[8] In 2018, as part of the budgeting process for State fiscal year 2020, the School requested funding to hire a mental health professional who would perform the functional duties of a mental health authority.  Tr. 1160:15–1161:1.  It is envisioned that this individual will organize, direct, and manage the mental health care services at the School, and he or she will oversee the work of others providing mental health care services at the School.  Tr. 1160:23–1161:7.

concrete slab on which a mattress is placed, as well as a concrete stool, concrete desk, plastic shelving, and a metal combination sink and toilet.  Tr. 266:12–13; Def. Ex. ZZ at 13–14, 17–19. The ceilings are made of stainless steel.  Tr. 266:12–13; Def. Ex. ZZ at 13.  Each room has a narrow window on the exterior wall facing outdoors, and a narrow window on the door facing the hallway.  Def. Ex. ZZ at 17.

One wing of CMH rooms is used for students who are assigned to CMH in order to complete programming offered there.  Students can be assigned to this CMH program for various reasons, including aggressive or assaultive behavior toward other students and staff, consistent failure to demonstrate progress in their current living unit or educational program, or because the student's behavior is impeding the progress of other students.  JX014.014.  Thus, students can be assigned to CMH as a direct punishment for serious rule violations or prolonged bad behavior. Student are assigned to CMH following a staffing, which is a hearing overseen by a panel of three individuals and at which a student can present his case as to why he should not be assigned to CMH.  *See* Tr. 1390:17–1392:7; JX014.025–.026.  For most students assigned to CMH, the assignment lasts only one-to-two weeks.  Tr. 1393:3–5.  However, assignments have lasted as long as six months, and there is no limit to how long a student can be assigned to CMH.  Tr. 671:2–10.

The School's programming in CMH is "designed to provide increased security and structure to help youth stabilize ongoing behavioral problems."  PX132.002.  To this end, there is a higher staff-to-student ratio at CMH, and the students' counselors have smaller caseloads to allow for increased supervision and more individualized attention.  *Id.*  As with the School's programming generally, the CMH program consists primarily of a point-based behavioral assessment system.  PX132.008.  Under this system, each student begins with zero points and can be awarded points for "displaying appropriate behavior and interacting positively with staff and

students." *Id.*  They also lose points for displaying inappropriate behaviors and/or interacting negatively with others.  *Id.*  According to Day, simply nodding one's head when responding to a staff member, rather than responding verbally, is a negative interaction and can lead to the loss of forty points.  Tr. 1334:15–25.  Refusing to go to school or placement in the BSU results in the loss of a significant number of points.  PX132.008.

Students assigned to CMH carry their point sheets with them each day.  Generally, point totals do not reset, meaning they carry over from day to day.  *Id.*  However, if a student's point total falls and remains below zero for an extended period, it will eventually be reset to zero. Tr. 1392:16–19.  Students will have greater or lesser privileges during their assignment at CMH depending on their point totals and whether they have "lost" their week.  PX132.008.  Greater privileges can include additional recreation time and the availability of additional activities during that time.  PX132.008–.009.  Student progress is usually reviewed every one-to-two weeks. Tr. 1392:8–10.

Each student assigned to CMH, regardless of his points, is afforded one hour of recreation and one hour of large muscle activity every day ("LMA").  PX132.009.  If permitted, students may attend classes at the Midland Park School on campus.  Tr. 668:17–21.  Students who are not permitted to attend classes at Midland Park, or who are permitted to do so but refuse to go, can make use of CMH's classroom.  It has desks and computers with access to online educational programming.  Tr. 788:22–25.  Although the School aims to always have a certified teacher available in that classroom, they have not always been able to do so.  Tr. 787:22–788:3.  When a teacher is not available, students are given work to complete from their Midland Park teacher, but there is no live instruction given in the CMH classroom, and their Midland Park teachers do not go to CMH to discuss the work with them.  Jones Dep. 00:04:36–00:05:15, 00:07:38–00:08:43.

Students' work is not returned to them after it has been reviewed.  *Id.* at 00:08:44–00:08:50. Although there is now a teacher whom the School will send to CMH when necessary, it is not clear what that teacher does while assigned to CMH.

Aside from school and the minimum amount of time for recreation and LMA, students assigned to CMH leave their room for hygiene, cleaning assignments, and "extra work." Tr. 666:12–17.  They are also supposed to be able to participate in their weekly Risks and Decisions groups. PX.132.002.  In practice, this does not always happen; rather than meeting in a group setting, students are sometimes merely given worksheets to complete on their own. Tr. 291:3–7.  There is an additional one-hour recreation period each day that all students are eligible for, but students can lose their eligibility through bad behavior.  PX132.009, .012. There are also other hour-long recreational activities that students are eligible for based on their point totals.  PX132.010, .012.  Unless students have accumulated enough points, they eat their meals in their rooms.  Tr. 669:9–11.

Thus, depending on their progress through CMH's point-based program, students assigned to CMH can spend a significant amount of time in their rooms.  Students' doors are locked, and the lights are always on when students are in their rooms.  PX132.004, .007.  At night, the rooms are lit with a red light, rather than a white light.  Tr. 1395:3–7.  In their rooms, students are permitted one Bible and one other book, school books for only one subject at a time, three pictures, a toothbrush, clothes, bedding, paper, letters, and writing instruments (which must be turned in to CMH staff at bedtime).  PX132.006–.007.  Students may not have magazines or newspapers. PX132.007.  Students may exercise quietly, but may not sing, tap, or engage in other "disruptive" behavior.  *Id.*  Students in their rooms at CMH are meant to be isolated from other CMH students.

Communication between rooms (verbal or nonverbal) is prohibited, and students passing through the hallway are not permitted to stop in front of another student's room. *Id.*

Whereas half of the rooms at CMH are committed to students assigned to that residence, the other half constitutes the BSU. Def. Ex. LL at 55. According to School policy, the BSU is utilized "when the student's behaviors are such that the safety or security of other students or staff is threatened." JX014.027. Students are typically sent to the BSU for a temporary room restriction until their "behavior is stable." JX014.029. This takes place in a CMH room, but students are generally not permitted any of the personal effects afforded to students assigned to CMH. PX222.020. Students are sometimes permitted to take a book with them to the BSU if staff allow it. Tr. 286: 11–17. BSU rooms do not have bedding during the day. PX222.020.

BSU room restriction is, by policy, limited to sixty minutes, and the status of students who still pose a threat after that period (or refuse to return to their cottage) is supposed to be changed to administrative segregation in CMH, discussed in more detail below. JX014.030. The BSU's sixty-minute limitation, however, is and has been easily skirted. School policy allows students to be re-admitted to the BSU if they commit rule violations while on restricted status, including innocuous rules such as banging on or talking under the door of their BSU room. Tr. 284:19–23; JX014.031. Whether by re-admission or otherwise, School records show that students frequently spend more than sixty minutes at a time in the BSU. *See, e.g.*, PX511. Students may not leave their rooms when on BSU room restriction. Tr. 284:24–25.

The BSU was formerly called the "disciplinary segregation unit." Tr. 1241:17–19. However, in 2016, the School made policy changes aimed at limiting use of the BSU to situations threatening the safety and security of School students and staff. Tr. 1178:5–13; JX014.027. Thus, for example, assaults upon other students or School staff are punishable by placement in the

BSU.  JX014.036; Def. Ex. C at 2440; Def. Ex. MM at 848.  But both in policy and practice, the School uses the BSU to punish less severe, and in some cases harmless, behavior.  This includes lying, inappropriate language, horseplay, and insubordination.  JX014.034.  Although School policy defines these acts such that they implicate others' safety—for example, "lying" involves giving untruthful statements "that may put others in jeopardy," JX014.034—School records show students are sent to the BSU under the guise of these behaviors even when they create no discernable risk of harm to others.[9]  *See* PX182.001 (sitting on top step when ordered to sit on bottom step); Def. Ex. C at 2430 (refusing to stop talking during class); Def. Ex. MM at 403 (laughing while students in the cottage were supposed to be silent); *id.* at 407 (arguing with staff about putting a folder in a locker during meals); *id.* at 412 (refusing to complete a cleaning task not originally assigned to the student); *id.* at 418 (refusing to do assigned chores); *id.* at 515 (arguing with a counselor away from the general population about responding sarcastically to directives); *id.* at 1252 (accessing unauthorized websites); *id.* at 1464 (flatulence).  The School also uses the BSU to punish theft, even when there is no indication the act caused harm to others.  JX014.035; PX181.001  (stealing candy);  PX538.013  (stealing  a  School  DVD  player);  Def. Ex. MM at 1261 (same); PX542.001 (stealing cookies).

---

[9] In contrast to the language used in the School's official polices, the School's Student Handbook lacks language indicating that BSU placement is limited to rule violations that threaten the safety or security of the School.  Although the handbook states that "[s]evere or repeated behavior problems or rule violations may result in" BSU admission, such "serious" behavior problems or rule violations are not defined.  PX135.008.  Further, where the handbook lists the various categories of rule violations—many of which do not implicate safety or security concerns—the handbook notes that violation of said rules could result in BSU placement.  *Id.*  Thus, it is not clear to what extent the intended limited use of the BSU is communicated to School students, if at all.

If a student is placed in administrative segregation following a period in the BSU, he is transferred to the CMH program until a staffing can be held, typically the next business day. Tr. 663:17–664:11; JX014.030–.031.  This transfer is not necessarily a physical one; sometimes a student will remain in his BSU room, even though he has been temporarily assigned to the CMH program.  Tr. 663:17–20.  A student will also be placed on administrative segregation following a period in the BSU if the student is sent there after 8:00 p.m.  JX014.030.  The student then sleeps overnight in his BSU room.  Additionally, students can be placed on administrative segregation for other reasons, including the pendency of criminal investigations or for unspecified "disciplinary" reasons.  *Id.*

CMH also houses a separate room, known as the "seclusion room."  Unlike the other CMH rooms, it has no outside window; it has no shelving; it has no desk or stool.  Def. Ex. ZZ at 15. It has a metal ceiling and a metal combination sink and toilet.  *Id.*  It has a low concrete slab along the back wall.  *Id.*  That is all.  Students sent to the seclusion room are not permitted to bring or have anything with them.  Tr. 983:3–5.  Students sent to the seclusion room do not typically stay there for more than thirty minutes, but they can be kept there for more than an hour and even overnight.  *See* PX493; PX496; PX497.

The School uses the seclusion room, at least in part, as a more severe punishment for students who continue to act out after other disciplinary measures have failed to achieve their desired result.  Like with admissions to the BSU, students are sent to the seclusion room for rule violations that do not clearly implicate the safety or security of students or staff.  For example, students have been sent to the seclusion room for laying down on the floor of their BSU room and refusing to get up, Def. Ex. C. at 2011; refusing to leave the BSU dayroom when directed to do so, Def. Ex. B. at 242; and refusing to return parts of newspapers, Def. Ex. A at 2317.  Even when

a student acts in a way that conceivably creates a safety or security concern, the seclusion room is often used as a means of progressive discipline for discipline's sake. So, a student has been sent to the seclusion room from the BSU for shredding a pillow (presumably, the student could use the fabric to create a ligature to place around his or another's neck); but it is unclear why the threat could not have been neutralized by seizing the shredded pillow. *See* Def. Ex. A at 2258–59. A student was sent to the seclusion room after he covered the security camera in his BSU room; but he also covered the security camera in the seclusion room. PX293.031. Another student was escorted to the seclusion room upon admission to the BSU when he refused to be searched; but it is not clear why it was necessary to place him in the seclusion room rather than another empty room where he could be monitored until he agreed to the search. Def. Ex. B at 4028.

The School's use of CMH—be it the CMH program, administrative segregation, the BSU, or the seclusion room—constitutes varying degrees of solitary confinement. Solitary confinement is generally defined as "the housing of an individual alone in a relatively small cell (usually in the range of 80–100 square feet) with minimal opportunity for social, perceptual and occupational stimulation." PX222.005. Although conditions of solitary confinement differ depending on the institution, some common traits include: (1) the inmate is allowed out to exercise for one-to-two hours per day; (2) outdoor exercise is generally alone, or inmates can communicate with each other through some kind of barrier; (3) the walls, floors, and ceiling of the inmate's room are generally made of cement and concrete; (4) there is a narrow window looking out onto the outside world; (5) the door is usually a solid steel door containing a small window and a horizontal slot where a food tray may be passed; (6) the room usually contains a sink and toilet and a platform on which a relatively thin mattress is placed; (7) there is usually shelving, a small desk, and a stool or other

place to sit near the desk; (8) some personal items are allowed in the room, though these may vary; and (9) paper, writing instruments, and stamps are permitted. PX22.005–.006.

Solitary confinement "imposes harsh and sterile conditions which provide exceedingly little stimulation or opportunity for productive engagement. It also imposes perceptual deprivation, forced idleness and social isolation." PX222.006 (footnote omitted). This "perceptual deprivation" refers to a lack of "meaningful, anchoring[] stimulation," rather than the absence of all stimulation whatsoever. PX222.006 n.2. Solitary confinement inevitably increases an individual's "sense of powerlessness, fear, paranoia, and will create intense mutual hostility between" facility staff and the individual confined. PX222.007. It can increase an individual's risk of suicide. Wright Dep. 00:09:14–00:09:23. Additionally, it has a "profoundly deleterious effect on mental functioning." PX222.007. The psychopathological effects of solitary confinement can include: (1) "[p]erceptual distortions, illusions and hallucinations in multiple spheres (visual, auditory, olfactory, somatosensory, etc.)"; (2) "[a]ffective disturbances—especially intense anxiety and panic attacks"; (3) "[d]ifficulties with thinking, concentration and memory, at times resulting in overt confusional states"; (4) "[o]bsessive, intrusive thoughts, at times accompanied by compulsive behaviors"; and (5) "[i]mpulsive, chaotic violence, either self-directed or directed outward." PX222.011. Although the effects of solitary confinement will vary depending on the individual, even those "who are less severely affected will still experience substantial psychiatric harm," including difficulties with thinking and concentration, intense anxiety, agitation, and random violence. PX222.012.

Solitary confinement is more harmful to juveniles than it is to adults. *Id.* Due to their "developmental vulnerability," youth are "at a particular danger of adverse reactions—including depression, anxiety, and psychosis—when exposed to prolonged isolation and solitary

confinement.   PX226.025–.026.   The stress caused by solitary confinement can "derail[]" a juvenile's brain development and cause severe, lasting effects.  PX222.013.  It can impact a youth's ability to manage stress and to maintain goal-directed behavior.  *Id.*  The depression and stress caused by solitary confinement can "literally shrivel areas of the brain," including those involved in memory, spatial orientation, and the control of emotions.  PX222.014.  The psychological impacts of solitary confinement on a youth can be both immediate and long-lasting.  Tr. 884:2–4. Placement in solitary confinement is no less detrimental to a youth while he or she is asleep. *See* Tr. 1026:12–20.

Juveniles in detention facilities are "exquisitely vulnerable to psychiatric and behavioral decompensation when housed in solitary confinement."  PX222.017.  This is due in large part to the mental health issues and traumatic backgrounds that are pervasive amongst juveniles in detention.  PX222.015–.016.  Their disruptive behavior "is not governed by a rational calculation of its likely consequences, but rather by impulsive reaction to explosive emotions."  PX222.017. This makes them more likely to commit disciplinary infractions and be placed in solitary confinement.  *Id.*  But they are "least capable of tolerating the stresses and the perceptual, occupational, and social deprivations of solitary confinement."  *Id.*  Thus, for these individuals, solitary confinement is likely to make their behavior worse.  *Id.*  This pattern whereby a youth's mental illness leads him to act out, which causes him to be placed in solitary confinement, which starts the process all over again, has played out at the School.  *See* PX218.003, .012, .023, .026. Dr. Schneider, the School's own psychologist, recognized that placing students in the BSU or seclusion room was not "good for a student's mental health."  Schneider Dep. 00:01:11–00:01:26.

Some national standards prohibit the use of solitary confinement on juveniles.  The NCCHC, for example, counsels that juveniles and mentally ill individuals should be excluded from

solitary confinement of any duration.  PX271.005.  Most other standards, however, allow its use in limited circumstances.  The DOJ does not allow juveniles to be placed in solitary confinement, except as a temporary response when juveniles exhibit behavior that poses a "serious and immediate risk of physical harm to any person."  Def. Ex. LL at 20.  Even then, the juvenile is isolated only for a brief "cool down" period that should be carried out only in consultation with a mental health professional.  *Id.*  Similarly, the AECF allows for solitary confinement to be used as a "temporary response to behavior that threatens immediate harm to the youth or others."  PX245.191.  Institution staff must not use solitary confinement for any other reason, including "discipline, punishment, administrative convenience, retaliation, [or] staffing shortages," and they must first exhaust less restrictive alternatives, including bringing in qualified mental health professionals to talk with the youth.  *Id.*  Recent changes to the ACA standards now state that solitary confinement "shall never be the result of a disciplinary sanction," PX316.005, and require facilities to specify "an area for the purpose of regaining self-control for brief periods up to, but not to exceed, one hour," PX316.028.  These standards also require facilities to address recurring behavioral problems with individualized programing.  *See* PX245.192; PX316.031.

Despite the mental health risks of solitary confinement, the School does not require mental health staff to evaluate students placed in the BSU or the seclusion room.  PX226.026.  Nor are students' records reviewed to determine whether their mental health needs contraindicate placement in solitary confinement or require accommodation.  *Id.*; Tr. 1246:13–1247:1.  One of the School's psychologists "walks through" CMH every morning, but it is not clear if he or she is conducting mental health evaluations.  Tr. 1397:23–1398:3.  As with the School's mental health offerings generally, the School's solitary confinement programs do not include treatment interventions that would help students with serious mental illness or intellectual disabilities avoid

future segregation.  PX226.026.  School records show that students who are sent to the BSU and the seclusion room are often sent there repeatedly.  PX398.001–.004.

The School undermines its safety and security goals when it uses solitary confinement to punish behavior that does not threaten a person's safety or security.  In addition to causing mental deterioration that can have adverse impacts on a student's behavior (as discussed above), such use of solitary confinement agitates and frustrates youth more.  PX535.031.  "Studies have repeatedly shown that youths' behavior gets worse when they are locked up in punitive settings."  PX138.019.  "Contrary to common assumptions, youth do not tend to view placement in [solitary confinement] as a deterrent to breaking major rules, and placement in these restrictive settings can increase misbehavior."  *Id.*; Tr. 891:16–19.  Reforms adopted by facilities to eliminate the use of solitary confinement have led to positive outcomes for facility discipline and security.  PX535.028.

### 2.   The wrap

CMH also houses the restraint device known as "the wrap."  The wrap is located down the hall from the seclusion room, in a room designated as "linen storage" in CMH's floor plan.  PX146.001; *see also* Tr. 406:14–23.  It is a mechanical restraint device consisting of a mattress on a metal bed frame and various Velcro straps.  Tr. 705:18–22, 1364:2–4; PX151.001; PX222.021.  It is a fourteen-point restraint device, meaning there are fourteen points where it restrains an individual's movement.  There are six wraps for the ankle/calf (three on each side of the body); four wraps for the wrist (two on each side of the body); one elbow wrap; one chest wrap; two knee wraps; and two chest wraps.  PX151.001.  The wrap allows for less movement than typical four-or five-point fixed restraints and, relative to those other forms of restraints, creates less risk of skin or joint injuries while a student is restrained.  Tr. 1366:20–1367:24.

Placing a student in the wrap involves at least five staff members—four to secure the student and a fifth person to observe the situation. Tr. 1365: 15–19. Further, at least in situations where a student has refused to wear a suicide smock, School staff cut off the student's clothes while he is in the wrap to force the student to put on the smock after he is released from the device. Tr. 95:24–96:4, 293:16–294:16, 1364:9–18.[10] The School even employs such tactics on students with histories of sexual abuse who, in light of that history, resist removing their clothes in front of staff. Tr. 95:24–96:4. While in the wrap, students are constantly monitored by a staff member who may be outside of the room where the student is restrained. Tr. 493:24–494:13, 1369:13–17. While the student is in the wrap, the overhead light in the center of the room is always on. Tr. 298:15–19.

Generally, the wrap's use must be authorized by Lawrence, Day or, in their absence, DHS's Mental Health and Disabilities Services Director of Facilities. Tr. 1369:21–1370:3. It is ostensibly only to be used in situations where a student poses an imminent risk of harm to himself, others, or School property. Tr. 456:12–16, 1364:2–4; JX002.036. However, in many instances when it has been used, the immediate safety threat has already been contained. This includes situations where students who are already wearing wrist and leg restraints are sent to the wrap for threatening to assault staff *if the restraints are removed*. *E.g.*, PX455.002; Def. Ex. C at 2135. It also includes situations where staff confiscate from a student a sheet or clothing with which he tried to choke himself, but then send him to the wrap when he refuses to put on a suicide gown. *E.g.*, Def. Ex. B.

---

[10] Logistically, the clothes are removed piecemeal, such that when one part of the student's body is restrained, staff remove the clothing from the unrestrained part of the body. *See* Tr. 294:10–16. This process is repeated until all of the student's clothes are removed. *Id.*

at 3161–62; Def. Ex. C. at 2207.  In such situations, the wrap is used for staff convenience as a coercive tool to force students to quickly submit to orders they are resisting.

There are other notable examples of this coercive use of the wrap.  In September 2017, Plaintiff K.N.X. was observed in his room with a large piece of plastic, which he later described to School staff as a "shank."  Def. Ex. C at 2045.  When asked by School staff to relinquish the plastic, K.N.X. denied possessing it and was consequently removed from his room and placed in the seclusion room.  *Id.*  When he continued to deny possession of the plastic, he was placed in the wrap for over an hour.  *Id.*  When released, he refused to consent to a search, so he was again sent to the wrap for nearly an hour until he agreed to a search.  *Id.*  For all of that, no plastic was recovered from the search.  *Id.*  That K.N.X. was repeatedly placed in the wrap and only released when he complied with staff directives by agreeing to a search shows he was subjected to the wrap to force his compliance with those directives.  The incident report for this episode states K.N.X. was "threatening to use [the plastic] to hurt himself or staff," but no such threats are documented in the notes of the incident.

As another example, in November 2017, former Plaintiff J.S.X. managed to smuggle a metal locknut into his room, which he threw at the camera in his room.  Def. Ex. A at 2320.  When staff confronted J.S.X. to confiscate the locknut, J.S.X. placed it in his mouth.  *Id.*  School records do not show J.S.X. threatened to use the locknut in an assaultive manner or to self-harm; the restraint report for this incident states only that School personnel did not know whether J.S.X. would use the locknut in such a way.  *Id.*  When J.S.X. refused to give up the locknut, School staff—rather than taking the time to continue using less-restrictive alternatives—sought Day's approval to place J.S.X. in the wrap.  *Id.*  Day approved its use.  *Id.*; *see also id.* at 2361.  Staff then ordered J.S.X. to the wrap with the locknut in his mouth.  *Id.* at 2321.  He was in the wrap for

fourteen minutes until he agreed to give up the locknut. *Id.* As with the example above with K.N.X., that J.S.X. was only released from the wrap after yielding to School staff's directive to give up the locknut shows the wrap was used to coerce his compliance with that directive. Records indicate School staff placed rolled-up blankets underneath J.S.X.'s head to prop it up and help prevent him from swallowing the locknut. *Id.* Assuming this would prevent swallowing, it is not clear this would have been enough to prevent J.S.X. from *choking* on the locknut, and it is less clear what School staff would have done to rescue J.S.X. had he choked on it while fully secured in the wrap.

School policy limits the time a student can be placed in the wrap to sixty minutes per incident. Tr. 389:20–22; JX002.041. But if a student misbehaves while being removed from the wrap, he can immediately be restrained for an additional sixty-minute period. Tr. 389:15–18. There are no limitations on how long a student may be restrained in a twenty-four-hour period. Tr. 391:12–15. Thus, the sixty-minute limitation is effectively meaningless because incidents can be strung together indefinitely. Indeed, School records show students have been kept in the wrap for several hours at a time. Tr. 389:12–392:8; PX495.

In 2015, the School hired forensic and clinical psychologist Dr. Kirk Heilbrun to provide a consultation on the School's operations, including identifying its strengths, weaknesses, and areas for improvement. Tr. 1898:11–13, 1921:2–6; PX136. Concerns about the wrap had been shared with the School, including that it had not been investigated or described in professional literature and was thus "novel" or "untested." PX136.004–.005. Dr. Heilbrun recommended that the School "collaborate with an adolescence researcher with an interest in restraint to determine whether the wrap is actually an advance in terms of being more humane and less likely to result in

an injury to the youth being restrained or the staff doing the restraining." PX136.005. Such a collaboration never happened.

The wrap is physically uncomfortable. It is hot, and a student is restrained so tightly that he can only move his head and feet. Tr. 226:12–23. The School does not properly account for potential medical complications before placing a student in the wrap. For example, the School repeatedly subjected named Plaintiff C.P.X. to the wrap, despite his having three medical conditions that could each cause its use to be fatal. Tr. 1016:11–1017:17. In particular, C.P.X. suffered from a heart condition, and at the time he entered the School, his cardiologist recommended that he be limited to light exercise and that the School try to avoid "restraints that put pressure on the chest wall." Def. Ex. B at 1958; *see also id.* at 1971. Although this restriction appears to have been lifted in May 2018, C.P.X. was placed in the wrap at least four times in 2017. Additionally, C.P.X. suffered from cirrhosis of the liver, and the pressure the wrap put on his abdomen could have caused life-ending ruptures in his esophageal varices. Tr. 1016:25–1017:17. In another example, a diabetic student was noted to have significantly elevated blood sugar while in the wrap. PX218.004. Although medical protocol required that his urine ketone level be checked, this could not be done because the student was in the wrap. *Id.*

The wrap is detrimental to a youth's mental health. It triggers feelings of panic, duress, and claustrophobia. Tr. 226:15–16, 1371:11–12. It can not only traumatize a youth, Tr. 1371:11–12, but retraumatize them as well, Tr. 885:22–886:6, 892:21–893:6; PX226.028. It exacerbates a youth's sense of powerlessness, fear, and paranoia. PX222.007. For youth who have been physically or sexually abused, the complete loss of control they feel in the wrap replicates the same feelings they suffered while abused. Tr. 886:2–6. The wrap is not

rehabilitative, and youths face an increased risk of mental deterioration while in the device. Tr. 887:2–7; PX226.027.  The wrap "crushes both body and spirit."  PX222.007.

The School is aware of the wrap's adverse impacts on a youth's mental health. Defendant Day knows it can cause trauma and duress, so much so that he "hate[s] using the wrap . . . [w]ith every fiber of [his] being."  Tr. 1371:11–13.  Wright does not like the wrap.  He believes it "is absolutely the last piece of treatment" he wants to use on students. Wright Dep. 00:08:23–00:08:28.  He believes it can both exacerbate symptoms of mental illness and can deteriorate a student's mental health.  *Id.* at 00:08:31–00:09:00.  Dr. Schneider similarly "adamant[ly]" believed the wrap was not good for a student's mental health and that "no one should be in there."  Schneider Dep. 00:01:11–00:01:20 (discussing the BSU, seclusion room, and the wrap).

Yet, the School's mental health professionals generally do not meet with students while in the wrap.  Tr. 224: 10–25, 295:5–13, 719:13–720:4.  School policy does not require that they do so.  JX002.040–.042.[11]  More frequently, but not always, mental health staff meet with students the business day after they are released from the wrap.  *See, e.g.*, PX455.002–.003; Def. Ex. A at 2322; Def. Ex. B at 3122, 3163, 3193.  School policy requires that any use of the wrap be reviewed by a mental health professional, who "shall determine whether or not the student needs more intensive mental health treatment and, if needed, such treatment shall be provided consistent with the [professional's] opinion."  JX002.042.  There are numerous restraint reports involving the

---

[11] This differs from the policies applicable to the mental health institutions operated by the State's Mental Health and Disabilities Services.  Those policies, for example, provide that an individual can only be placed in mechanical restraints for a limited amount of time without being directly observed by a mental health professional.  Tr. 1178:23–1179:10.

wrap that contain no indication that such an assessment was conducted. *E.g.*, Def. Ex. B at 3114–155, 3120–22, 3155–57, 3191–95; Def. Ex. C at 2045–46, 2134–37, 2164–71.

The wrap's adverse impacts on students is consistent with the adverse impacts of fixed mechanical restraints on juveniles in general. Such restraints can cause injuries, asphyxiation, cardiac arrest, and can traumatize (or re-traumatize) a youth, especially those with histories of abuse. PX535.025. Youth with pre-existing medical or mental health conditions face even higher risks when subjected to these restraints, especially when those risks are unknown or disregarded by staff. *Id.* Given that many youth in juvenile corrections custody have experienced serious trauma in their lives or have undiagnosed or untreated mental illness, they are particularly vulnerable to these harms. *Id.*

Furthermore, like with the School's use of solitary confinement, the School's use of the wrap does not promote safety at the School. The School's use of the wrap recapitulates traumatic experiences students have already experienced and leads to further misbehavior upon release from the device. Tr. 892:21–24. As with solitary confinement, reforms adopted by facilities to eliminate the use of fixed mechanical restraints have led to positive outcomes for facility discipline and security. PX535.028.

### D. Notice and deliberate indifference

Under School policy, the "health authority, nurse supervisor and superintendent shall review the facility's staffing plan to determine if the number and type of health care staff is adequate for essential positions to provide health care services," including mental health and psychiatric care. JX005.018. "The superintendent, in consultation with the department heads, shall forward any additional staffing requests in the form of a budget request to the division administrator of mental health and disability services." *Id.*

The School has long been aware of potential deficiencies in the provision of its mental health care services, particularly as it pertains to staffing.  In 2015, Disability Rights Iowa ("DRI")[12] contracted with Next Step Counseling Services, Inc. ("NSC")—a mental health agency serving Central Iowa—to review the School's mental health services to ensure the mental health needs of the School's students were being met.  PX278.004.  NSC's findings were wide-ranging, but included in relevant part that "there [was] no evidence of adequate or evidence based mental health services being provided at [the School]" and that the School's services "including group, counseling, and psychology sessions appear[ed] to be grossly inadequate to the needs of the population [at the School]."  PX278.028.  NSC also found that the workload of the lone School psychologist (with up to 130 potential "clients" at the School) was "significantly more demanding than that of an outpatient mental health therapist with one third the caseload of the psychologist at the [School]."  PX278.021–.022.  DRI incorporated these findings in a report that it issued in 2017, and also criticized therein what it perceived to be the School's overreliance on seclusion and restraints.  *See generally* PX279; *see also* PX279.006 (discussing NSC's findings and noting that its 2015 report was attached to DRI's 2017 report).

Additionally, among Dr. Heilbrun's recommendations from his 2015 consultation with the School were that the School should: (1) increase psychiatric coverage (in part due to the possibility

---

[12] DRI is a protection and advocacy system under the Developmental Disabilities Assistance and Bill of Rights Act of 2000, Pub. L. No. 106-402, § 401, 114 Stat 1677, 1737 (2000) (codified as amended at 42 U.S.C. § 15001 *et seq*.), and the Protection and Advocacy for Mentally Ill Individuals Act, Pub. L. No. 99-319, 100 Stat. 478 (1986) (codified as amended at 42 U.S.C. § 10801 *et seq*.).  *See Iowa Prot. & Advocacy Servs., Inc. v. Rasmussen*, 206 F.R.D. 630, 632 (S.D. Iowa 2001).  In that capacity, DRI has been tasked both by Congress and the State of Iowa with protecting and advocating for individuals with mental illnesses and developmental disabilities.  Nathan Kirstein, a lawyer working for DRI, is one of the attorneys representing Plaintiffs in this matter.

that Dr. Augspurger might retire); and (2) hire one, possibly two, psychologists.   JX009.004.
Whether through contractors or full-time employees, he "strongly recommended increasing the
staff coverage in both psychology and psychiatry."   JX009.012.   Day and former Defendant
Richard Shults were involved in engaging Dr. Heilbrun to perform his 2015 assessment at the
School, and both reviewed his final report.   Tr. 1202:14–19, 1203:15–18, 1386:16–20, 1388:3–13.

In addition to these external sources, in June 2015, Dr. Augspurger sent an email to various
School administrators and staff, including Day, in which he reported he was seeing so many
students for medication management that he was unable to see them all in a timely manner.
PX370.001.  He noted that he might need to stop seeing "Court Evaluation cases" if he continued
to receive referrals for medication management.   *Id.*   Day forwarded this email to Shults, then
acting as the Administrator for Mental Health and Disability Services for DHS, adding that he
believed the School would continue to receive "more mental health referrals[,] putting continued
pressure on Dr. [Augspurger]."   *Id.*   In May 2016, Day wrote in an internal email that the School's
"lack of [qualified mental health professionals]" is "problematic."  PX320.001  In 2017, after DRI
published its report criticizing the School's mental health care offerings and use of isolation and
restraints, Dr. Augspurger advised School officials—including Day—that the School needed to
seek out a therapist, not merely a prescriber, to provide the therapy services the School was "being
pressured to provide."  PX344.001.

In another example of the School's institutional awareness of its staffing needs, in a
document he authored in August 2017, Day wrote that the School had "[e]xtremely high special
needs mental health admits" that the School was "inadequately resourced to effectively serve."
PX337.004.   Similarly, a December 2017 internal School document listing talking points for
internal budget discussions noted that if the School's budget did not increase and the School's

population remained the same, the School's "[m]ental [h]ealth/therapeutic staff would be inadequate to adequately serve the needs of the students." PX347.107; *see also* Tr. 1452:2–17.

For his part, former Defendant Jerry Foxhoven was also aware of the deficiencies in the School's mental health care offerings. He admitted that "something does need to be done to improve the mental health services [at the School]" and that additional resources were necessary to provide mental health care for students at the School who needed it. Foxhoven Dep. 01:01:50–1:02:43. He was also familiar with the multiple reports critical of the mental health care services at the School, including Dr. Heilbrun's 2015 report and DRI's 2017 report (which, as noted above, incorporated NSC's findings from its 2015 report). *Id.* at 00:17:08–00:18:02.

The School was unable to address its mental health staffing needs until 2018, due in large part to budgetary restraints. The School's operations are funded primarily from state appropriations. Each year, DHS formulates a budget proposal which it submits to the Governor through the State's Department of Management. *See* Tr. 1145. The Governor incorporates this into his or her formal budget proposal to the State Legislature, which crafts the appropriations bill that ultimately becomes law. *See* Tr. 1145–1146. Nearly every year since 2011, however, DHS has received "status quo requests" from the Department of Management—that is, it has been asked to maintain funding levels at those set for the then-current fiscal year. Tr. 1146:17–1147:2, 1148:21–24. Notwithstanding this, DHS has received some increases in legislative appropriations. Tr. 1148:25–1149:2. Beginning in fiscal year 2018, DHS also gained the ability to shift funds to the School from other facilities it operates. Tr. 1148:1–14.

Within these constraints, the School has made various efforts to add mental health care staff, with mixed results. Tr. 1153:4–7. In 2017 (as part of the budgeting process for State fiscal

year 2019), DHS requested funding to hire an additional psychologist at the School, but the State Legislature did not appropriate the funding.  Tr. 1150:4–20.  However, that same year, the School began a request-for-proposal ("RFP") process that resulted in it contracting with Center Associates for the mental health services of Metzger and Calzada.  Tr. 1154:16–21, 1155:12–15.  The School also obtained grant funding through VOCA, which it used to hire Taylor in 2018.  Tr. 835:21–24, 1157:10–19, 1158:25.[13]  The School hired Dr. Schneider that year as well. Schneider Dep. 00:00:10–00:00:28.

Still, although the School made efforts to hire additional mental health professionals, there appears to have been little effort to direct that hiring at the School's mental health care needs. Foxhoven testified the School did not conduct a needs analysis to determine what services are necessary to meet the mental health needs of the students and the School, and he thus did not know whether those needs were being met.  Foxhoven Dep. 01:06:02–01:06:27, 01:07:09–01:07:20. He further admitted he did not know how much funding was necessary to meet those needs.  *Id*. at 01:06:27–01:06:40.  Additionally, the RFP for the School's contract with Center Associates—over which Day would have had primary responsibility—stated that mental health professionals at the School perform only two to four psychiatric evaluations and assessments per month.  Tr. 1208:20–25; PX335.054.  This would be insufficient to meet the therapeutic needs of the students at the School.  At the close of discovery, the School had made no changes to its programming, or developed a plan, to provide psychotherapy on the regular basis needed to constitute treatment.  *See* Tr. 450:16–20.

---

[13] The services Taylor, Calzada, and Metzger provided the School are discussed in more detail in Section I.B.1, *supra*.

### E. The Parties

#### 1. Defendants

Defendant Kelly Garcia is the Director of DHS, a role she assumed in November 2019, after the close of trial. *See* Press Release, Office of the Governor of Iowa, *Gov. Reynolds appoints Kelly Kennedy Garcia as director of Iowa Department of Human Services* (Sept. 5, 2019).[14] She was preceded by former Defendant Jerry Foxhoven, who was DHS's director from 2017 until he was abruptly forced to resign in June 2019. *See* Tr. 1268:10–11; Karen Zraick, *Iowa Official, 66, Says His Love of Tupac Wasn't What Got Him Fired*, N.Y. Times (July 17, 2019).[15]

The Director of DHS has ultimate responsibility over the six institutions that DHS operates, along with the State's child welfare system. Tr. 1271:12–21. The Director oversees 4,000 employees and directly supervises DHS's Administrator for Mental Health and Disability Services (formerly Shults). Tr. 1272:5–6, 1273:6–10. Foxhoven, as Director of DHS, generally attended the monthly meeting of superintendents of DHS institutions. Tr. 1273:22–25. He largely gave the facilities which he oversaw autonomy over their respective operations; but he was accessible and notified of incidents at the School, and he sometimes commented on School polices. Tr. 1274:1–4, 1275:16–18, 1277:4–11. He was also heavily involved in the budgeting process and lobbied the State Legislature to allocate more funding to DHS. Tr. 1272:10–24.

At the commencement of this case, former Defendant Shults was the Administrator for Mental Health and Disability Services for DHS, a position he held for over eleven years. Tr. 1139:4–7. He retired from the position in January 2020. *See* Editorial, *Outrage at DHS in*

---

[14] *Available at* https://governor.iowa.gov/2019/09/gov-reynolds-appoints-kelly-kennedy-garcia-as-director-of-iowa-department-of-human-services (last visited Mar. 30, 2020).

[15] *Available at* https://www.nytimes.com/2019/07/17/us/tupac-lyrics-email-jerry-foxhoven.html (last visited Mar. 30, 2020).

*Glenwood*, The Waterloo Cedar Falls Courier (Feb. 19, 2020).[16]  In his former official capacity, Shults was responsible for the six facilities that DHS operates, including the School. Tr. 1139:23–1440:5.  The superintendents of those facilities reported to Shults, and he in turn reported to Foxhoven. Tr. 1140:6–7, 1273:6–10.  His supervisory responsibilities over the School encompassed its entire operations, including its polices and procedures. Tr. 1188:15–20.  He also had general oversight over the provision of mental health care for students at the School. Tr. 1188:21–23.  After Shults's retirement, DHS divided his post into two different positions, one with responsibility over DHS facilities, and the other with responsibility over DHS's community-based services.  *See* [ECF No. 326]; Michaela Ramm*, Iowa's mental health services seeks two leaders instead of one to replace outgoing administrator*, The Gazette (Jan. 8, 2020).[17] The former of these two positions, the Mental Health and Disabilities Services Director of Facilities, covers Shults' responsibilities relevant to this litigation.  [ECF No. 326].  Defendant Cory Turner presently serves in that position on an interim basis.  *Id.*

Defendant Day has held the position of Superintendent of the School since 2009. Tr. 1295:10–12.  By statute, the School's superintendent "has charge and custody of the juveniles committed to the [School]" and "shall administer the [School] and direct the staff in order to provide a positive living experience designed to prepare the juveniles for a productive future." Iowa Code § 233A.2.  In practice, Day is responsible for the School's institutional operations. Def. Ex. QQ.  His responsibilities are numerous and include the care and custody of the students

---

[16]    *Available at* https://wcfcourier.com/opinion/editorial/editorial-outrage-at-dhs-in-glenwood/article_2ccdbe22-24e3-559b-a0cd-ffc55e6916da.html (last visited Mar. 30, 2020).

[17]    *Available at* https://www.thegazette.com/subject/news/government/iowa-dhs-mental-health-services-rick-shults-department-of-human-services-20200109 (last visited Mar. 30, 2020.

at the School; the daily management and operation of the facility; developing and managing the School's annual budget; developing and implementing policies and procedures; developing training and education programs for students; hiring and training staff; and directing staff in the execution of their duties.  JX010.003–.004; *see also* JX010.006–.008.  He is also responsible for ensuring the School's compliance with applicable state, federal, and organizational standards. Def. Ex. QQ.

## 2.   Plaintiffs

### a.   C.P.X.

C.P.X. was admitted to the School in July 2016 after being adjudicated delinquent for committing Domestic Assault, Interference with Official Acts, and Assault with Intent to Commit Sexual Abuse.  Def. Ex. B. at 2, 4.  He was fifteen years old on his date of admission.  *Id.* at 177. Prior to his admission at the School, C.P.X. had two out-of-home placements.  *Id.*

C.P.X. entered the School with several medical issues.  Most severely, he was born with congenital heart anomalies with respect to which he underwent three different heart surgeries before the age of three.  *Id.* at 119, 182; Tr. 86:9–13.  Consequently, he has pulmonary hypertension and hepatosplenomegaly.  Def. Ex. B. at 182.  These conditions require that he use a portable oxygen machine and a BiPap machine at night when he sleeps in order to increase his oxygen levels.  *Id.*  While at the School, C.P.X. was treated by cardiologists at the University of Iowa Hospital and Clinics.  *See id.*  As discussed above, due to his heart conditions, C.P.X.'s doctors instructed the School to limit any pressure applied to C.P.X.'s chest, a directive that was often not followed.

In addition to his heart problems, C.P.X. has cirrhosis of the liver, severe psoriasis, asthma, sleep apnea, gastroesophageal reflux disease, and esophageal varices.  *Id.*  In terms of mental

health, C.P.X. came to the School with diagnoses of ADHD, ODD, and obsessive-compulsive disorder, and he had a history of depressive symptoms and reported suicidal ideation. *Id.* at 119, 121.   During his initial psychiatric review of C.P.X., Dr. Augspurger also believed C.P.X. met the criteria for conduct disorder, having noted his problems with lying, stealing, and threatening others, among additional indicia of the disorder. *Id.* at 119.

C.P.X. struggled at the School almost immediately.   In the roughly one month between his intake and the preparation of his ICP, he was admitted to the BSU four times.  *Id.* at 183.   He was ultimately admitted to the BSU over 200 times over the course of his stay at the School, at times for insubordinate behavior that did not pose a discernable threat to the safety or security of students or staff.  *See* PX117; PX118; PX121; PX122; PX123; PX124; Def. Ex. AAAAAA at 2.[18]   He was also sent to the seclusion room fifteen times between his admission and May 2018.  *See* PX493; PX496; PX497.   He was routinely assigned to the CMH program.  *See, e.g.*, Def. Ex. B at 157, 187, 193, 199, 211, 222.   Despite two-and-a-half years at the School, C.P.X. was only at level one, step one of the School's program at the time he was discharged.  Def. Ex. AAAAAA at 2.   He was at level one, step one for 119 of his 136 weeks at the School.  *Id.*

For his mental health conditions, C.P.X. regularly saw Dr. Augspurger for medication management.  *See, e.g.*, Def. Ex. B at 386.   However, he received limited mental health treatment beyond medication.   This is true despite the fact that he received a psychological referral during intake that requested ongoing "[c]ouseling or [p]sychotherapy" in connection with "high vulnerability and propensity scores."  *Id.* at 392.   The School also failed to consider mental health therapy after it was clear that C.P.X.'s oppositional and defiant behaviors were hindering his progress at the School.  *See id.* at 386; PX218.023.   Despite C.P.X.'s MACI profile indicating that

---

[18] There is no typographical error in the Court's citation of Def. Ex. AAAAAA.

he should have received CBT, there is no indication that he did.  PX218.023.  The School also failed to provide C.P.X. trauma-informed care, despite his traumatic background.  *Id.*  Between September 2016 and October 2017, C.P.X. was on suicide watch ten times.  PX218.024.  Yet, the School never performed a thorough assessment of his self-harming behavior or developed a plan to help C.P.X. manage future thoughts of self harm.  *Id.*

While at the School, C.P.X. was placed in the wrap at least four times.  *See* Def. Ex. B at 263, 268, 296, 298.  In one incident in October 2017, C.P.X. tied a sheet around his neck when he was not allowed to have a hard-cover book in his room at CMH.  *See* Def. Ex. B at 3191.  He got into a physical altercation with staff when they tried to remove the sheet from around his neck. *Id.* at 3192.  CMH staff removed the sheet and informed C.P.X. that he needed to change into a suicide gown.  *Id.*  He refused.  *Id.*  After further physical altercation, staff carried C.P.X. to the seclusion room, where he again refused to change into the suicide gown.  *Id.*  Lawrence approved use of the wrap because of C.P.X.'s suicidal gesture and refusal to change into the suicide gown. *Id.* at 3193.  C.P.X. was handcuffed, and a safety helmet was placed on his head to prevent him from biting staff.  *Id.*  C.P.X. was then carried to the room containing the wrap.  *Id.*  There, parts of his body were secured in the wrap while School staff cut the clothes off the unrestrained parts of his body.  PX528.  Staff then strapped down his exposed body parts, released clothed body parts and cut the clothes from them using a seatbelt cutter or a box cutter.  *Id.*; Tr. 117:16–19; Def. Ex. B at 3193.  They repeated this process until C.P.X. was completely naked and secured in the wrap. PX528.  Video of the incident shows C.P.X. visibly upset.  *Id.*  He was crying because he felt violated.  Tr. 293:24–294:5.  It bears noting that C.P.X.'s issues with sexual abuse may have amplified these feelings.  *See* Tr. 117:2–23.  After roughly twenty minutes, C.P.X. was released

from the wrap, but only after he agreed to put on the suicide gown.   Def. Ex. B at 3193.
Day testified this incident "[was not] an anomaly" at the School.   Tr. 1374:6–25.

C.P.X. did not see a mental health professional before, during, or immediately after his
placement in the wrap.   Tr. 295:5–13.   Dr. Augspurger assessed C.P.X. via telephone the day after
this incident as it related to C.P.X.'s suicide watch level.   *See* Def. Ex. B at 4071.   There is no
indication from that record that Dr. Augspurger assessed any mental harm to C.P.X. from being
placed in the wrap.

### b.   K.N.X.

K.N.X. was admitted to the School in September 2016 at the age of fifteen upon being
adjudicated delinquent on numerous charges—including but not limited to Second Degree
Burglary, Third Degree Burglary, Carrying Weapons, Serious Assault, and Fourth Degree Theft.
Def. Ex. C. at 2.   K.N.X. had run away from an out-of-home placement and was arrested while
waving weapons out of the window of a stolen car.   *Id.* at 3.   Prior to admission at the School,
K.N.X. had "almost continual placement out of home in treatment facilities since nine years of age
and ha[d] run away from almost all of them."   *Id.* at 312.

Unlike C.P.X., K.N.X. did not have any physical health conditions upon entering the
School.   *See id.* at 315.   However, he did enter with previous mental health diagnoses of childhood
onset conduct disorder and ADHD.   *Id.* at 314.   He demonstrated behavior consistent with these
conditions in early childhood and had been taking medication for those conditions since an early
age.   *Id.*   Symptoms of his conduct disorder included lying, stealing, fighting, destroying property,
carrying weapons, and repeated attempts to run away from out-of-home placements.   *Id.*

But like C.P.X., K.N.X. struggled almost immediately at the School.   In the two months
between his admission to the School and the preparation of his ICP, he had been placed in the BSU

four times and was still on level one, step one of the School's three-tiered progression system. *Id.* at 315–16.  His behavior never improved.  Over the course of twenty months spanning his arrival at the School until May 2018, K.N.X. was sent to the BSU over 120 times, and those admissions frequently lasted more than one hour.  *See* PX509; PX510; PX511.  Over that same period, he was also sent to the seclusion room forty-seven times, with many of those placements also exceeding one hour.  *See* PX493; PX496; PX497.  Many of K.N.X.'s BSU placements were for reasons that did not clearly implicate safety or security concerns.  *See, e.g.*, Def. Ex. C at 2430, 2460, 2469.

To be clear, K.N.X. often violated School rules and engaged in conduct that created serious health and safety risks.  He frequently assaulted other students and staff.  *Id.* at 7.  In August 2017, he absconded from the School.  *Id.*  In the process of doing so, he stabbed a School staff member three times in the head with a pen.  *Id.*  He incited riots.  *Id.* at 8.  He climbed into the ceiling of his room at CMH and refused to come down.  *Id.*  His School incident and BSU reports indicate he was calculating in his antagonism of staff and other students.  *See, e.g.*, *id.* at 1978, 1982, 2465, 2592, 2626.

Yet, he received minimal mental health treatment while at the School.  As with most students at the School with mental health illnesses, K.N.X. saw Dr. Augspurger for medication management; however, School records show K.N.X. met with him fewer than ten times during his two-year stay at the School (and never in 2018).  *See generally id.* (K.N.X. School record containing only one psychiatric evaluation and seven psychiatric progress notes by Dr. Augspurger, all dated prior to 2018); *see also* Tr. 232:11–13.  K.N.X. also did not have regular, recurring appointments with Wright, and most conversations they did have were informal and not

therapeutic.  Tr. 233:3–16.  However, K.N.X. did start meeting with Calzada shortly before July 2018, but he ultimately saw him no more than seven times.  Tr. 233:17–234:4; PX019.

K.N.X.'s intake evaluation showed superior IQ scores but a relative learning disability for working memory.  PX218.025.  Medication for his ADHD would have been expected to treat these issues.  *Id.*  For a while it did, but K.N.X. discontinued his ADHD medication because it gave him the feeling that he needed to be constantly doing something.  *Id.*  While he was without stimulation in solitary confinement, this feeling caused him to "freak out."  Tr. 214:16–215:12.  Any number of a dozen ADHD medications might have produced benefits without the side effects about which K.N.X. complained.  PX218.025.  But Dr. Augspurger abandoned exploration of such options.  *Compare* Def. Ex. C at 206, *with id.* at 200.  Additionally, motivational interviewing may have helped K.N.X. maintain better medication continuity, but such therapy was not utilized.  PX218.025.

Additionally, K.N.X. was placed on suicide watch at least ten times between September 2016 and February 2018.  PX218.025.  Some of K.N.X.'s suicidal gestures were elaborate.  For example, in March 2017, K.N.X. tied a piece of cloth through the holes of the speaker in his room.  Def. Ex. C at 1993.  He then stood on his toilet and loosely draped the cloth around his neck.  *Id.*  A staff member witnessed this on camera and immediately rushed to K.N.X.'s room.  *Id.*  K.N.X. jumped down from the toilet and insisted the gesture was a joke.  At no time in relation to K.N.X.'s placements on suicide watch were his suicidal ideations and non-suicidal self-injuries fully evaluated; no safety plan was made; and he was never treated with therapy, such as DBT, to help him cope with his emotions and impulses to harm himself.  PX218.025.  He was sent to the wrap at least 16 times while at the School, sometimes because of his threats of self-harm.  *See* PX494; PX495; Def. Ex. C at 2086–89, 2458, 2932.  He would yell and cry while in the wrap.

Tr. 227:20–23. Being in the wrap never made him feel better. Tr. 228:10–12. It would make him panic and feel claustrophobic. Tr. 226:12–16. He was often restrained in the wrap for more than an hour. *See* PX494; PX495. K.N.X. did not see a mental health professional during or immediately after placement in the wrap. Tr. 224:13–25.

### c. Former Plaintiffs

Two other former students at the School, G.R.X. and J.S.X., were originally named Plaintiffs in this case. *See* [ECF No. 1]. Both were students at the School at the time the Complaint was filed, and both had multiple mental health diagnoses. *See* [ECF Nos. 1; 33 ¶ 53; 39 ¶ 53]; Tr. 1118:5–13; JX015.031; Def. Ex. A at 57, 3742. However, roughly eight months after commencing this action (and almost a year before trial), G.R.X. sought voluntary dismissal from the case, citing personal circumstances and mental health issues. *See* [ECF No. 107]. J.S.X. sought voluntary dismissal during trial, citing severe anxiety and mental health issues related to traveling to Iowa to testify at trial. *See* [ECF No. 235]. The Court granted both requests for dismissal. *See* [ECF Nos. 108; 245].

### F. Grievance Process

#### 1. School procedures

The School has established a grievance process whereby students can raise complaints regarding "the application of facility policy or procedures, the student's treatment or academic services or health and safety concerns." JX014.042. The grievance process can be summarized as follows. Students are given access to grievance forms that they may complete and place in designated locked boxes in each cottage. JX014.043. Grievances must not be anonymous or contain abusive, profane or obscene language; threatening statements; gang references; lying, misrepresentations, or bullying statements; or a grievance for or about another student. *Id.*

School policy does not require grievances to list or even focus on specific events. *See id.* Within fourteen days of the date of the grievance, the student and a counselor meet and determine if the grievance shall be upheld, mediated, denied, or not pursued. *Id.* If the grievance is not resolved, the student is given an appeal form which he must complete within seven days. JX014.044. After the student completes the appeal form and places it in the grievance box, the Treatment Services Director (in this case, Lawrence) meets with the student within fourteen days to hear the appeal. *Id.* If the appeal is still unresolved, the student is given a second appellate form, which he must complete within seven days. *Id.* The third step is similar to the second step, except that the student meets with the Superintendent (Day), whose decision is final. JX014.045.

Prior to initiating this lawsuit, former Plaintiff G.R.X. strictly adhered to this three-step process as to grievances concerning the School's: (1) lack of mental health care; (2) use of restraints; and (3) use of solitary confinement. In August 2017, G.R.X. filed two complaints that the School treated as a single complaint for the purposes of appeal. First, he complained that he did not have access to regularly scheduled meetings with a mental health professional, which he deemed necessary to meeting his mental health care needs. PX291.002. Second, roughly one week later, he complained that he was not receiving proper mental health care, he was being isolated in his room and assigned to CMH for "no reason," and "most of all" he was being abused. PX291.004. The consolidated grievance was initially denied, and then denied twice more on appeal. PX291.004–.006. Relatedly, in September 2017, G.R.X. filed a grievance concerning the fact that he was forced to sign medical consent forms, and the School did not obtain his father's consent before altering his medication regimen. PX148.004. The grievance was denied at all three stages of the grievance process. PX148.001, .003.

Additionally, again in September 2017, G.R.X. complained that the School's use of restraints was improper and caused pain when administered.  PX147.004.  Also that month, G.R.X. complained the School overused the BSU and for improper reasons.  PX149.005.  He noted that he was in his room "too much especially on weekends," during which he was in his room for twenty-three hours per day.  *Id.*  He also expressed concern over the impact extended periods of isolation had on his health, noting that the School's overuse of isolation was "not good for [students'] mental health."  PX149.002.  Both of these grievances were denied at all three stages of the School's grievance process.  PX147.001; PX149.001.

The other named Plaintiffs in this case (current and former) did not complete the School's grievance process as it relates to their claims in this litigation.  Plaintiff J.S.X. filed grievances complaining that "staff need more training [on] how to restrain the right way," PX039.001, and he "need[ed] medical help by a licensed therapist," PX073.001.  However, he did not pursue these grievances past the first step.  *See* PX039.001; PX073.001.  The School records of C.P.X. and K.N.X. are devoid of grievances related to the School's mental health care services or the School's use of isolation and restraints.  *See generally* Def. Ex. B; Def. Ex. C.; *see also* Tr. 247:6–17, 247:18–248:1.  No present or former Plaintiff filed grievances through the School's grievance process with respect to the School's failure to alter its programming to accommodate students' mental illnesses.  Clearly, Plaintiffs knew how to navigate the grievance process; in addition to the grievances already cited above, J.S.X., C.P.X., and K.N.X. filed numerous grievances about matters not related to this litigation, such as not being allowed to go to the gym, Def. Ex. A at 222, School staff confiscating lollipops, Def. Ex. B at 254, and not having enough food, Def. Ex. C at 2602.  They generally did not pursue these grievances past the first step because they thought doing so would be futile.  Tr. 244:16–18.

2.   Other grievance procedures

The Iowa Administrative Code describes an alternative grievance procedure applicable to the School.

> Any individual who believes the individual's rights have been violated by the state training school or who has a complaint concerning the individual's treatment at the state training school may file a grievance. The individual's parent, family, or legal representative may file a grievance on behalf of the individual by submitting the grievance in writing to the superintendent.

Iowa Admin. Code r. 441-103.8(218).  Although there is overlap between this process and that appearing in the School's policies in terms of the appropriate subject matter of grievances, the two processes differ in that grievances pursuant to the Iowa Administrative Code may be submitted directly to the School Superintendent and may be submitted by a student's representative. In addition, there is no prohibition on anonymous grievances or grievances about other students.

Complying with the grievance process set out in rule 441-103.8(218), in October 2017, DRI—as legal representative of J.S.X., C.P.X., K.N.X., and another student at the School—submitted a grievance letter setting out four complaints.  In summary, the grievance complained that: (1) there was insufficient mental health care at the School, including a lack of available mental health therapy, inadequate staffing, and a lack of individual therapy plans; (2) there was insufficient oversight of the administration of psychotropic drugs, including no meaningful informed consent process and no involvement of parents or legal guardians pertaining to decisions concerning the administration of psychotropic medication; (3) the School overused restraints through methods that were unreasonable and harmful to its students, including the School's use of the wrap; and (4) the School overused solitary confinement through methods that are unreasonable and harmful to its students, including through use of the BSU, the School's seclusion room, and staffing to CMH.  PX285.002–.003.  With respect to the School's use of

isolation and restraints, the grievance letter expressly noted that "[t]hese practices are often employed against youth with mental illnesses as a result of their disability and are particularly harmful to these residents." PX285.002, .003. The letter, however, did not raise a complaint about services or programming students at the School were denied because of their mental illnesses.

The School denied this grievance because it did not comply with procedures set out in School's grievance policy. PX285.005. The letter denying the grievance made no mention of the procedure set out in rule 441-103.8(218). Rule 441-103.8(218) does not provide for an appellate process for denied grievances. And, indeed, no appeal was taken.

## II.   PROCEDURAL HISTORY

Plaintiff C.P.X., along with former Plaintiffs J.S.X. and G.R.X., commenced this action in November 2017. [ECF No. 1]. Their Amended Complaint asserts four claims against Defendants in their official capacities. In Count I, Plaintiffs allege the School's failure to provide them adequate mental health care and its improper use of isolation and restraints violated their right to substantive due process under the Fourteenth Amendment to the United States Constitution. In Count II, Plaintiffs allege these same failures violated their right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution. In Counts III and IV, Plaintiffs allege the School punished them for behavioral manifestations of their mental illnesses and denied them the same programming and opportunities as boys without such disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, respectively. *See* [ECF No. 33].

Plaintiffs ask the Court to declare the acts and practices underlying their claims as unconstitutional and/or violative of the ADA and RA.  They also seek permanent injunctive relief, specifically that the Court:

> i. Order Defendants to ensure the provision of adequate mental health care at the School including by, but not limited to, ensuring adequate mental health staffing, the provision of emergency mental health treatment, individualized therapy plans and treatment, and adequate discharge planning;
>
> ii. Order Defendants to ensure appropriate oversight of the administration of psychotropic medications, including by, but not limited to, obtaining and documenting informed consent for the use of psychotropic medications, administering psychotropic medications only as part of comprehensive treatment plans, and adequately monitoring for and treating adverse side effects that result from the administration of psychotropic medications;
>
> iii. Enjoin Defendants from placing members of the Class in solitary confinement for disciplinary or punitive purposes or for any reason other than a rare and temporary response to avoid imminent serious physical harm to persons; and
>
> iv. Enjoin Defendants from employing mechanical restraints within the institution except as rare and temporary responses necessary to prevent imminent and serious physical harm to persons and as ordered by a medical or mental health professional.

*Id.* at 60.  Plaintiffs ask the Court to appoint a monitor to oversee implementation of any injunctive relief awarded.  They also seek an award of reasonable attorney's fees and costs under 28 U.S.C. § 1920, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h).  Defendants filed counterclaims against all Plaintiffs seeking reasonable attorney's fees under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and Rule 54(d)(2).  [ECF No. 39 at 20].

Plaintiff K.N.X. joined this matter as a named Plaintiff in February 2018.  [ECF No. 33]. As noted above, G.R.X. sought voluntary dismissal from the case in July 2018, and dismissal was granted.  [ECF Nos. 107; 108].  Shortly thereafter, Plaintiffs filed a Motion for Class Certification

under Rule 23(b)(2).   [ECF No. 114].   Before the Court could issue a ruling on that motion,

Defendants filed a Motion for Summary Judgment.   [ECF No. 148].   The Court granted that motion

in part, dismissing Plaintiffs' Eighth Amendment claims, but otherwise denied the motion.   [ECF

No. 190].   The Court then granted Plaintiffs' Motion for Class Certification.   [ECF No. 196].

In doing so, the Court certified the following class under Rule 23(b)(2):

> all boys confined to the School since the filing of the Complaint,
> now, or in the future, who have received psychotropic medications
> or a diagnosis for a mental health disorder specified in the
> Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition
> ("DSM-V") or Fourth Edition ("DSM-IV"), as determined by a
> mental health professional.

[ECF No. 196 at 38].   The Court also named K.N.X., C.P.X., and J.S.X. as class representatives,

and appointed Plaintiffs' attorneys—from Children's Rights, DRI, and Ropes & Gray LLP—as

class counsel.

The matter proceeded to a bench trial, which was held over nine days between

June 6–18, 2019.   As noted above, J.S.X. sought voluntarily dismissal from the case during trial,

which the Court granted.   [ECF Nos. 235; 245].   Shortly after trial, Foxhoven ceased to be the

Director of DHS and, earlier this year, Shults retired from his role as DHS's Administrator for

Mental Health and Disability Services.   In an Order dated March 27, 2020, Garcia and Turner were

substituted for Foxhoven and Shults, respectively, pursuant to Rule 25(d).   [ECF No. 327].

### III.   ANALYSIS AND CONCLUSIONS OF LAW

In their Answer, Defendants asserted the affirmative defense that Plaintiffs failed to

exhaust their administrative remedies as required under the Prison Litigation Reform Act

("PLRA").   *See* [ECF No. 39 at 17].   Because of its potentially dispositive nature, the Court will

first address this affirmative defense before turning to Plaintiffs' claims.

### A. *Affirmative Defense—Failure to Exhaust Administrative Remedies*

Before a prisoner may bring a civil action with respect to prison conditions, the PLRA requires that he or she exhaust any available administrative remedies. 42 U.S.C. § 1997e(a). The students at the School are considered "prisoners" for the purposes of the PLRA and are subject to its exhaustion requirement. *See id.* § 1997e(h) (defining "prisoner" in relevant part as "any person incarcerated or detained in any facility who is . . . adjudicated delinquent for . . . violations of criminal law"); *see also id.* § 1997(1)(B)(iv) (defining "institution" in relevant part as any facility or institution owned, operated, or managed by a State for juveniles "residing in such facility or institution for purposes of receiving care or treatment" or who reside in such a facility or institution "for any State purpose" other than certain educational purposes). "Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015).

"An inmate must exhaust all available administrative remedies" before bringing suit. *Id.* An "available" remedy is one that is "capable of use for the accomplishment of a purpose: immediately utilizable [and] accessible." *Id.* (alteration in original) (citation omitted). To properly exhaust available administrative remedies, prisoners must "complete the administrative review process in accordance with the applicable procedural rules," *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)), and he or she must pursue that process "'to its final stage' to 'an adverse decision on the merits,'" *Porter*, 781 F.3d at 451. (citation omitted). It is irrelevant whether the prisoner "subjectively believed that there was no point in his [or her] pursuing administrative remedies." *Porter*, 791 F.3d at 451 (citation omitted). The applicable procedural rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218. A prison's rules also dictate the level of detail

a grievance must show in order to satisfy the PLRA's exhaustion requirement.  *Muhammad v. Mayfield*, 933 F.3d 993, 1001 (8th Cir. 2019).  Nevertheless, even a procedurally flawed grievance satisfies the exhaustion requirement "if prison officials decide [the] flawed grievance on the merits."  *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014) (citation omitted).

Where alternative grievance procedures exist, a prisoner need only complete one such procedure in order to satisfy the PLRA's exhaustion requirement.  *See Marvin v. Goord*, 255 F.3d 40, 43 n.3 (2d Cir. 2001) (per curiam) (finding that resolution of a grievance through a prison's informal grievance process satisfies the PLRA, where the prison had both formal and informal grievance procedures, and applicable state law indicated that the formal procedures were meant to supplement, not replace, any informal procedures).  However, a prisoner generally will not be able to claim administrative remedies were unavailable to him unless such is the case for each applicable grievance procedure.  *See, e.g.*, *Cabot v. Fed. Bureau of Prisons*, Civil Action No. 3:17-0710, 2018 WL 4291747, at *5 (M.D. Pa. Sept. 7, 2018) (finding that even if prison grievance procedure was not available to prisoner because his grievances were being discarded and he feared retaliation, prisoner did not exhaust administrative remedies because applicable federal regulations allowed him to file a complaint directly to the Federal Bureau of Prisons' Regional Director in such circumstances, which he did not do).

The goal of the PLRA's exhaustion requirement is to allow correctional officers "to address complaints internally before allowing the initiation of a federal case."  *Woodford*, 458 U.S. at 93 (citation omitted).  To comport with this goal, a prisoner must exhaust available administrative remedies for every claim he or she brings in a civil action.  For example, in *Burns*, the United States Court of Appeals for the Eighth Circuit held that a prisoner did not exhaust his administrative remedies with respect to a claim against a defendant who, although involved in the incident in

question, was not named in the prisoner's formal grievance.  *See Burns*, 752 F.3d at 1141–42. The court noted that although the defendant was "involved in the incident," he "had different responsibilities and took different actions" than the individual named in the grievance, and thus the prison had not been asked to evaluate his conduct.  *Id.* at 1141.  Put another way, the prison had not been asked to evaluate the prisoner's claims against that defendant, which first appeared in the prisoner's amended complaint in federal court.  *Id.*  If a prisoner exhausts some but not all of the claims he or she brings in a civil action, the entire action need not be dismissed; rather, the prisoner may proceed only on those claims that were properly exhausted.  *See Jones*, 549 U.S. at 219–24.

Thus, before commencing this action, Plaintiffs were required to exhaust their constitutional claims, as well as their claims under the ADA and RA.  *See Porter*, 781 F.3d at 451 ("An inmate must exhaust all available administrative remedies before bringing a [42 U.S.C.] § 1983 suit."); *Jackson v. Fed. Bureau of Prisons*, Civ. No. 06-1347 (MJD/RLE), 2007 WL 843839, at *19 (D. Minn. Mar. 16, 2007) (collecting cases from the United States Courts of Appeals for the Fifth, Sixth, and Ninth Circuits and concluding that the PLRA's exhaustion requirement applies to ADA claims); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], *or any other Federal law . . .* until such administrative remedies as are available are exhausted." (emphasis added)).  The Court finds Plaintiffs have exhausted their administrative remedies with respect to their Fourteenth Amendment claims, but only partially as to their ADA and RA claims.

Before initiating this lawsuit, G.R.X.—who was a named Plaintiff at the commencement of this action—completed the School's grievance process with respect to the provision of mental health care at the School, the School's use of isolation and restraints, and its procedures for

obtaining consent to administer medications.  In these grievances, G.R.X. complained he was not receiving regularly scheduled appointments with a licensed mental health therapist; the School was relying on solitary confinement in lieu of adequate health care; that he was forced to sign consents for medication and that his father was not required to do the same; and the School overused restraints and solitary confinement in a manner that caused him harm.  Whatever procedural flaws these grievances may have had, the School allowed them to proceed to the third and final step, where they were ultimately denied on the merits.  Thus, G.R.X. exhausted his available administrative remedies with respect to Plaintiffs' Fourteenth Amendment claims.

However, the PLRA is silent on which parties must exhaust administrative remedies in class action prisoner lawsuits.  Faced with this issue, courts have applied the rule of "vicarious exhaustion" from employment discrimination law to prison litigation cases where a class is certified.  So applied, this rule requires that only one class member exhaust his or her administrative remedies.  *See, e.g.*, *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (holding that if one or more class members exhausted their administrative remedies, the PLRA's exhaustion requirement has been satisfied for all class members); *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004) (stating that one class member's exhaustion "is enough to satisfy [the PLRA's exhaustion] requirement for the class"); *Jackson v. District of Columbia*, 254 F.3d 262, 269 (D.C. Cir. 2001) (explaining that so long as one member of the prisoner class pursued the available administrative remedies, "the plaintiff class has met the filing prerequisite" (citation omitted)); *Decoteau v. Raemisch*, 304 F.R.D. 683, 687–88 (D. Col. 2014); *Phipps v. Sheriff of Cook County*, 681 F. Supp. 2d 899, 908 (N.D. Ill. 2009).

Justifying the application of vicarious exhaustion to prison litigation cases, the United States Court of Appeals for the Eleventh Circuit explained:

> First, this rule advances the purpose of administrative exhaustion, which, we have stated (albeit in the employment context), "is to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues." Once the "prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons." Second, a different rule, e.g., one requiring all class members to exhaust their administrative remedies, "could impose an intolerable burden upon the inmate complaint review system." This is true both for the inmates and the prison officials. In this case, the Florida Department of Corrections would have been taxed with the duty to respond to complaints from over three hundred death row inmates. Moreover, in cases like this one, where the composition of the class is subject to constant change beyond the class members' control, it could be extraordinarily difficult for all class members to exhaust administrative remedies before filing suit.

*Chandler*, 379 F.3d at 1287 (alterations in original) (citations omitted).

There is no Eighth Circuit authority directly on point, but the Court finds the Eleventh Circuit's reasoning to be persuasive and joins the numerous courts that have applied vicarious exhaustion to prison litigation class actions. Accordingly, Plaintiffs will have exhausted their administrative remedies if any one class member exhausted his remedies with respect to every claim presented in this action.

Here, although G.R.X. was dismissed as a named Plaintiff, he was nevertheless a class member, as he was enrolled at the School at the time the Complaint was filed, and he satisfied the mental health diagnostic criteria specified in the Court's Order granting class certification. Thus, the Plaintiff-class exhausted their administrative remedies with respect to their Fourteenth Amendment claims by virtue of G.R.X.'s grievances.

Additionally, Plaintiffs C.P.X. and K.N.X., and former Plaintiff J.S.X., fully complied with and completed the grievance procedure set out in Iowa Administrative Code r. 441-103.8(218). As it relates to Plaintiffs' Fourteenth Amendment claims, the October 2017 grievance submitted

to Day by DRI as legal representative of C.P.X., K.N.X., J.S.X., and others, articulated complaints as to the School's mental health care offerings and its use of isolation and restraints.  The letter raised these complaints in terms mirroring the constitutional claims that later appeared in the Complaint.  Neither the School's rules nor the Iowa Administrative Code indicate the relationship between the grievance procedures set out in the School's policies and rule 441-103.8(218).  Absent evidence the contrary, the Court finds the grievance procedure in rule 441-103.8(218) is an independent, alternative grievance procedure to that set out in the School's policies.  By completing the grievance procedure in rule 441-103.8(218), Plaintiffs exhausted their administrative remedies with respect to the complaints raised in the October 2017 grievance letter.

However, as it concerns Plaintiffs' ADA and RA claims, the grievances only raise such claims with respect to the School's alleged use of isolation and restraints "as a result of [students' mental health] disabilit[ies]."  PX285.002, .003.  To the extent Plaintiffs' ADA and RA claims in this action encompass broader issues such as students' lack of access to certain programming or the School's failure to make other accommodations, such claims were not exhausted and are thus not actionable.  Therefore, the Court will only consider Plaintiffs' ADA and RA claims as they relate to the disability-related discrimination articulated in the October 2017 grievance letter.

Having found that Plaintiffs and the class have exhausted their administrative remedies as required by the PLRA, the Court now turns to Plaintiffs' claims.

## B.  Fourteenth Amendment Substantive Due Process

### 1.  Legal standard

Plaintiffs assert a claim under the Substantive Due Process Clause of the Fourteenth Amendment, arguing Defendants have violated the constitutional rights of the class by:

(1) providing inadequate mental health treatment to the students at the School; and (2) employing isolation and restraints against mentally ill youth both excessively and as a tool for punishment.

The Fourteenth Amendment provides in relevant part that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The right to substantive due process under the Fourteenth Amendment "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (citation omitted). That right is implicated in circumstances where, as in the case of students at the School, "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders [the individual] unable to care for himself [or herself], and at the same time fails to provide for [the individual's] basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

Generally, "[i]n the context of substantive due process, an individual must overcome a very heavy burden to show a violation of the Fourteenth Amendment." *Hall v. Ramsey Cty.*, 801 F.3d 912, 917 (8th Cir. 2015). To do so, a plaintiff must show both that: (1) the state official's conduct shocks the conscience; and (2) the official violated "one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Norris*, 494 F.3d at 638 (citation omitted). In order for conduct to shock the conscience, the alleged conduct must be "so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Karsjens v. Piper*, 845 F.3d 394, 408 (8th Cir. 2017) (citation omitted).

But the broader "shocks-the-conscience" test yields to more particular standards when warranted by the claims involved in a given case.  Relevantly, the Eighth Circuit has "repeatedly applied" the Eighth Amendment's "deliberate indifference" standard to due process claims that prison officials unconstitutionally ignored a serious medical need or failed to protect a detainee from a serious risk of harm.  *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).  In support of this approach, the Eighth Circuit has reasoned that "the due process rights of [non-convicted detainees] are at least as great as the Eighth Amendment rights of a convicted prisoner," *Doe v. Washington Cty.*, 150 F.3d 920, 922 (8th Cir. 1998).[19]

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."  *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991) (quoting U.S. Const. amend. VIII).  In cases involving conditions of confinement and the provision of medical care, "the constitutional question . . . is whether [prison officials] acted with 'deliberate indifference.'" *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Wilson*, 501 U.S. at 303).  "A prison official is deliberately indifferent if [he or] she 'knows of and disregards' a serious medical need or a substantial risk of an inmate's health or safety."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

---

[19] Ordinarily, the Eighth Amendment only applies after "the State . . . has secured a formal adjudication of guilt in accordance with due process of law."  *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1997); *see also Revels v. Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("[B]ecause an involuntarily committed psychiatric patient is confined for treatment rather than incarceration for the purpose of punishment following conviction, the Eighth Amendment does not apply.").  In Iowa, adjudications or dispositions in juvenile delinquency proceedings are not deemed criminal convictions, *see* Iowa Code § 232.55(1), and such adjudications are viewed as "special proceedings that serve as an alternative to the criminal prosecution of a child," *In re A.K.*, 825 N.W.2d 46, 49 (Iowa 2013).  Thus, the Eighth Amendment is not typically applicable to claims of students at the School concerning the conditions of their confinement.  But where such claims involve inadequate medical treatment or conditions creating risks of harm, they are properly viewed as arising under the Fourteenth Amendment's Due Process Clause, and a court may analyze them under the Eighth Amendment's deliberate indifference standard.  *See Butler*, 465 F.3d at 344.

A deliberate indifference claim thus has objective and subjective components.  Objectively, a plaintiff must show he or she had a serious medical need or there existed a substantial risk to his or her health or safety.  *See id.* at 529.  Then, the plaintiff must show prison officials subjectively: (1) knew of the serious medical need or substantial health risk; and (2) disregarded it. *See id.* at 528–29.  A prison official's knowledge of a "substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842 (citation omitted); *see also Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) ("A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." (citations omitted)); *Nelson*, 583 F.3d at 529 ("To establish an Eighth Amendment violation . . . 'it is enough that the official acted or failed to act despite [his or her] knowledge of a substantial risk of serious harm.'" (citation omitted)).  Additionally, in cases involving inadequate medical care but "where some medical care is provided, a plaintiff 'is entitled to prove his [or her] case by establishing [the] course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference.'"  *Allard*, 779 F.3d at 772 (second alteration in original) (citation omitted).

Also applicable to this case—and as a second alternative to the shocks-the-conscience standard—the Fourteenth Amendment also prohibits punishing a detainee prior to an adjudication of guilt.  *Bell v. Woflish*, 441 U.S. 520, 535 (1979); *see also Reed v. Palmer*, 906 F.3d 540, 550 (7th Cir. 2018) (applying the *Bell* Fourteenth Amendment anti-punishment standard to claims involving the excessive use of solitary confinement and restraints at the Iowa Girls State Training

School).  This prohibition applies to any punishments that rise above "a *de minimis* level." *Bell*,

441 U.S. at 539 n.21.  However, "[n]ot every disability imposed during . . . detention amounts to

'punishment' in the constitutional sense." *Id.* at 537.  Consequently, "[a] court must decide

whether the disability is imposed for the purpose of punishment or whether it is but an incident of

some other legitimate governmental purpose."  *Id.* at 538; *see also Youngberg v. Romeo*,

457 U.S. 307, 320 (1982) (noting that "restrictions on liberty" are permissible so long as they are

"reasonably related to legitimate government objectives and not tantamount to punishment").

     The relationship between the condition or restriction and nonpunitive government purposes

is key. As the Supreme Court has explained:

> Absent a showing of an expressed intent to punish on the part of
> detention facility officials, that determination generally will turn on
> "whether an alternative purpose to which [the restriction] may
> rationally be connected is assignable for it, and whether it appears
> excessive in relation to the alternative purpose assigned [to it]."
> Thus, if a particular condition or restriction of pretrial detention
> is reasonably related to a legitimate governmental objective, it does
> not, without more, amount to "punishment."  Conversely, if a
> restriction or condition is not reasonably related to a legitimate
> goal—if it is arbitrary or purposeless—a court permissibly may infer
> that the purpose of the governmental action is punishment that may
> not constitutionally be inflicted upon detainees *qua* detainees.

*Bell*, 441 U.S. at 538–39 (alterations in original) (citations omitted) (footnotes omitted).

     Against these standards, the Court now turns to Plaintiffs' substantive due process claims.

### 2.   Adequacy of mental health care

     Plaintiffs claim the mental health care at the School is so deficient that it presents a

substantial risk of serious harm to the class, and Defendants are aware of—and deliberately

indifferent to—that risk.  In advancing this claim, Plaintiffs home in on eight particular failures.

They argue the School creates serious risks of harm to mentally ill students by: (1) failing to

maintain the mental health staff necessary to meet the mental health needs of the students at the

School; (2) failing to provide adequate mental health crisis services; (3) failing to provide mental health treatment plans; (4) failing to provide adequate discharge planning; (5) over-relying on psychotropic medication rather than providing necessary therapeutic services; (6) failing to obtain informed consent for the use of psychotropic medication; (7) failing to adequately monitor students on psychotropic medication; and (8) failing to maintain the confidentiality of mental health records. *See* [ECF No. 33 ¶¶ 85–140].

Having weighed the evidence, the Court agrees the mental health care at the School creates a substantial risk of serious harm to the class. The School's principal failing is that, for many students, the School cannot be said to offer mental health treatment at all. The overwhelming consensus of authorities is that psychotherapy should be the "primary treatment modality" for the mental health disorders common at institutions like the School—including conduct disorder, substance abuse disorder, and ODD—and psychotropic medications should be used only to augment psychotherapeutic treatment. PX226.015; *see also* Tr. 1568:5–1569:7. This means psychotherapy should be "the first treatment, the treatment of choice." Tr. 82:8–10. Psychotropic medication can lesson the symptoms of an illness, but it does nothing to treat it. Unlike psychotherapy, psychotropic medication cannot teach the skills or offer the insights necessary to manage mental illness on a long-term basis. For this reason, it is only in rare cases that mental health professionals consider medication alone to be an adequate mental health intervention. Indeed, the guidelines and standards issued by the AACAP, DOJ, and NCCHC, reflect the principle that therapeutic services must be offered to detained juveniles as part of a facility's mental health treatment program.

Yet, psychotherapy is "practically nonexistent" at the School. Tr. 82:18. This is the case even when psychotherapy is expressly recommended for particular students. Other than Calzada,

who is only at the School one day per week, no mental health staff provide psychotherapy to students on a regular basis.  Based on the record in this case, the Court joins other courts that have found a facility does not meet its constitutional obligation to provide medical care to detainees when, in the case of mental illness, it fails to augment psychotropic medication with necessary psychotherapy.  *See, e.g.*, *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1208 (MD. Ala. 2017); *Madrid v. Gomez*, 889 F. Supp. 1146, 1218, 1237 (N.D. Cal. 1995).

Not only does the School fail to provide psychotherapy to its students, it lacks the structure needed to do so.  Psychotherapy is no small undertaking.  Two forms of psychotherapy—CBT and DBT—typically require a minimum of twenty sessions lasting forty-five to sixty minutes each in order to be effective.  The School would have to hire two full-time mental health professionals to meet the psychotherapy needs of its students, but it does not maintain the necessary headcount.  The mental health staff at the School have various responsibilities that take away from the time they might have to offer psychotherapy, and the School does not account for this.  Metzger and Dr. Augspurger focus exclusively on medication management and, to their credit, excel in that capacity.  But they do not provide psychotherapy.  Similarly, Wright is burdened with suicide assessments and does not have the time to maintain a regular caseload of students, let alone provide psychotherapy.  Calzada performs psychotherapy but, again, he is only at the School one day per week.  The record is not clear what Taylor does at the School.

The problem goes beyond headcount.  Of the relevant mental health professionals at the School during the course of this litigation—Dr. Augspurger, Metzger, Wright, Taylor, Dr. Schneider, and Calzada—only Calzada provides psychotherapy with some regularity.  However, he is present at the School on only a limited basis.  As discussed several times already, Dr. Augspurger, Metzger, Wright, and Dr. Schneider do not provide psychotherapy and do not

have regular therapeutic (as opposed to medication management) caseloads.  Psychotherapy is simply not part of the School's programming.

And that is consistent with the disjointed, wholly inadequate design of the School's mental health programming.  The School's counseling programs, which are not psychotherapy, are generally not run by mental health professionals, but rather counselors who sometimes "wing[] it." PX225.014.  The School does not formulate mental health treatment plans.  Perhaps this reflects there is no treatment at the School to plan, but it at least shows the School does not seriously consider students' illnesses and how to treat them while they are in the School's care.  As a matter of common sense, it is difficult to conceive how the School could treat a student's mental illness—or any medical ailment for that matter—without a plan that considers the student's condition and the tools to treat it.  Similarly, the School cannot provide adequate crisis services to students who have self-harmed or expressed suicidal ideation because it lacks the capacity to provide the psychotherapy needed to treat the underlying mental illness.  As a result, students who self-harm do so repeatedly.

Separately, the School's practices with respect to confidentiality also pose a barrier to minimally adequate treatment.  Students have no basis to trust the School's mental health staff because the School expressly does not keep discussions between students and mental health staff confidential.  Given the nature of the School as a quasi-penological institution, confidentiality should clearly be limited in situations where information must be shared to ensure the safety of a student.  However, the School makes no effort to implement such an approach and instead comingles students' mental health records with their School files.  Further, consistent with the School's failure to provide basic therapeutic services, the School does not arrange for continuing care in the community post-discharge.  This is dangerous in and of itself for students on medication

because they could suddenly be cut off from powerful psychotropic drugs.  But it is also troubling that the School's mental health professionals would introduce students to the tools necessary to cope with their illnesses but give them no way to continue receiving the therapy they need to master those tools.  Oddly enough, this is hypothetical in a sense; the School does not provide psychotherapy, so there is no therapy to continue.

These systemic failures start at the top.  At the close of discovery, Day was the School's mental health authority, but he has no mental health background, and he has failed to exercise any central authority over the School's mental health programs.  The School's mental health professionals appear to have operated independently of one another within a few fixed parameters, such as Wright having responsibility for suicide assessments.  But no one supervised Dr. Augspurger's prescribing of medications; no one systemically ensured students were receiving the mental health treatment they needed.  The School's mental health programming checked a box—obviously the School could not get away with offering nothing—but it is as ineffective as it is ill-thought.  Not surprisingly, then, the School tried to hide this lack of central authority from the ACA by misrepresenting to it that Dr. Augspurger oversees the School's mental health services.  He does not.

The culmination of the School's many failures to treat students' mental illnesses, taken together, create substantial risks of serious harm.  Failure to treat mental illness increases the risks of deterioration of mental health, self-harm or suicide, more restrictive (and thus more harmful) placements, and criminal or delinquent recidivism.  These risks play themselves out at the School.  Students who self-harm, do so repeatedly.  K.N.X., who was diagnosed with childhood onset conduct disorder and received only sporadic psychotherapy toward the end of his stay at the School, had over 120 BSU admissions.  C.P.X.—who was diagnosed with ODD, obsessive

compulsive disorder, and had a history of depressive symptoms and suicidal ideation—did not receive psychotherapy, was admitted to the BSU over 200 times while at the School, and graduated at the first step of the School's thirty-step program.  Without the mental health care he needed, C.P.X. never had a chance to succeed in the School's rehabilitative programming.

It is obvious that these risks would follow where the School does not provide mental health treatment, and Defendants knew they were not meeting the needs of the School's mentally ill students.  Dr. Heilbrun advised the School in 2015 that its one psychologist was insufficient to meet the needs of its students and recommended the School hire one, if not two, additional psychologists.  That same year, NSC issued a scathing report finding that "there [was] no evidence of adequate or evidence based mental health services" at the School, and that the School's services "including group, counseling, and psychology sessions appear[ed] to be grossly inadequate to the needs of the population [at the School]."  PX278.028.  Internal School communications from 2015 to 2017 also show School administrators, including Day and Shults, knew the School's mental health staffing was inadequate to meet the mental health needs of the students at the School.  Foxhoven stated publicly that "something [had] to be done to improve the mental health services [at the School]."  Foxhoven Dep. 01:01:50–1:01:58.

Yet, for the all this knowledge, Defendants' actions show they were deliberately indifferent to the risks of harm caused by the mental health programming at the School.  The Court acknowledges the School has attempted, and struggled, to acquire funding to hire additional mental health staff.  It has long-been established, however, that lack of funding does not excuse unconstitutional conditions of confinement.  *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 201 (8th Cir. 1974); *see also Moore v. Morgan*, 922 F.2d 1553, 1557 n.4 (11th Cir. 1991); *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983) ("We, of course, recognize that many of these

appalling medical deficiencies are closely related to the lack of funds to support these activities. We understand that prison officials do not set funding levels for the prison.  But, as a matter of constitutional law, a certain minimum level of medical service must be maintained to avoid the imposition of cruel and unusual punishment."); *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934, 944 (E.D. Ark. 2002).

Even so, the hires the School has made do not address its systemic failures to provide mental health treatment to its students.  As a threshold matter, School officials do not appear to have taken any meaningful steps to determine how many mental health professionals are needed to meet students' therapeutic needs, and evidence shows they do not grasp the severity of the problem.  Foxhoven testified the School did not conduct a needs analysis to determine what services are necessary to meet the mental health needs of the students and the School, and he thus did not know whether those needs were being met.  He further admitted he did not know how much funding was necessary to meet those needs.  As a practical matter, it is unclear how one can effectively seek funding without understanding the scope of the problem the funding is meant to address.  Additionally, the RFP for the School's contract with Center Associates stated that mental health professionals at the School perform only two to four psychiatric evaluations and assessments per month.  This is undoubtedly insufficient to meet the needs of the School's students.

Even after the School hired additional mental health staff in 2018, the institution still made no changes to its programming, or developed a plan, to provide psychotherapy on the regular basis needed to constitute treatment.  At the close of discovery, there had been no efforts of develop treatment plans, provide adequate crisis services, change School practices with respect to mental health records and confidentiality, provide adequate discharge planning, or properly structure and

supervise the School's mental health treatment program.  Given the breadth of the School's problems, the Court cannot say Defendants' efforts to hire additional staff, without more, shows something other than deliberate indifference to these problems.  It barely addresses them at all.

What is more is that, faced with the challenge of treating those charged to their care, Defendants made a concerted effort to change the School's legislative mandate to relieve them of their statutory obligation to provide treatment to the School's students, including mental health treatment.  The Court doubts this effort, if successful, would have relieved them of their constitutional obligations.  In any event, it demonstrates an active awareness of their failures to meet these obligations and an approach that goes far beyond mere deliberate indifference.

The Court concludes the School's provision of mental health care violates the class's substantive due process rights.  The violation originates in the School's failure to provide therapeutic services to mentally ill students where clinically indicated, and systemically branches out to related failures.  The Court has discussed them above, but for clarity, these additional failures are the School's failure to: (1) formulate mental health treatment plans; (2) provide adequate crisis services by offering the therapy needed to assess the underlying causes of students' self-harming or suicidal ideations; (3) maintain confidential mental health records; (4) provide adequate discharge planning; and (5) properly oversee the mental health programming at the School, be that through a qualified mental health authority or other structure.

In reaching this conclusion, the Court rejects certain of Plaintiffs' arguments concerning conditions they believe cause a substantial risk of serious harm.  The Court does not find the School's assessment procedures create a substantial risk of serious harm.  They are generally very thorough, and risks that diagnoses might be missed have not been borne out in the evidence (certainly not at a scale that shows a substantial risk of serious harm, at least).  Nor does the Court

agree the School's procedures for managing psychotropic medications create a substantial risk of serious harm. Metzger and Dr. Augspurger meet with students taking psychotropic medications on a regular basis to assess that pharmacological treatment, and they order necessary blood test when indicated. They should be better supervised, but the Court finds that problem is part of the School's broader failure concerning the structure of the mental health programming and should be addressed in the appropriate context. Plaintiffs have criticized School procedures for obtaining informed consent to administer psychotropic medication, but the School's procedures in this regard changed in 2018, and the risks associated with the previous procedures appear to have been addressed.

Finally, Plaintiffs have spent a good deal of time stressing that Wright and others are not licensed to practice psychology in the State of Iowa outside of the School. But the record shows DHS assessed their qualifications and determined they are qualified to provide the services they offer in the course of their employment at the School. Plaintiffs have not put forward sufficient evidence to counter DHS's determination and have not persuaded the Court that a psychologist practicing on a limited license creates a substantial risk of serious harm to the class.

### 3.   Solitary confinement

The Court will separately address Plaintiffs' claims concerning the School's use of isolation and restraints, respectively, and begins with the School's isolation practices. Plaintiffs' arguments are simple: the School employs solitary confinement excessively and as a means of punishment. They argue this violates the class's due process rights under the anti-punishment standard of *Bell v. Woflish*. They further argue Defendants are deliberately indifferent to the substantial risks of serious harm the School's isolation practices cause to the class. The Court agrees.

As set out in great detail in the Court's findings of fact, the School uses solitary confinement in varying capacities in its CMH program, administrative segregation, use of the BSU, and use of the School's seclusion room.  The conditions of solitary confinement move along a sliding scale of severity, with the CMH program being the least severe, and the seclusion room being the most severe.  Solitary confinement produces substantial psychiatric harm, even to those who are less affected by the experience.  It is more harmful to juveniles than it is to adults and can impair their brain development.  Due to their traumatic backgrounds and mental health issues, juveniles in detention facilities are "exquisitely vulnerable to psychiatric and behavioral decompensation when housed in solitary confinement."  PX222.017.  Defendants have not presented any evidence suggesting that solitary confinement is somehow not harmful.  Indeed, it is not clear where such evidence would originate.  Nearly every standard related to solitary confinement in juvenile detention facilities—including those promulgated by the ACA—prohibit its use as punishment and limit its use to no more than one hour.  Many standards require that it only be used as a response to behavior which threatens the health and safety of a juvenile. *See Paykina v.Lewin*, 387 F. Supp. 3d 225, 243–44 (N.D.N.Y 2019) ("The deleterious effects of solitary confinement on mentally ill juveniles are a matter of common knowledge in the medical and psychiatric communities, including among mental health professionals working in correctional settings.").  Even Dr. Schneider, the School's own psychologist, knew the BSU and seclusion room were not "good for a student's mental health."  Schneider Dep. 00:01:11–00:01:26.

Merriam Webster defines punishment as the act of punishing, or, relevantly, "to impose a penalty on for a fault, offense, or violation."   Punishing, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/punishing (last visited Mar. 30, 2020); *see also* Punishment, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/punishment

(last visited Mar. 30, 2020) (defined as "the act of punishing").  Under this commonly understood meaning, the School uses solitary confinement to punish all kinds of behavior at the School, some of which does not pose any risk of harm to students or staff.  Defendants' witnesses tied themselves in knots attempting to testify as to how what is very clearly punishment is, in fact, not. For example, Lynn Allbee, the School's Treatment Program Administrator, testified that the School's use of solitary confinement is a consequence, not a punishment.   Tr. 529:5–7. She distinguished the two by saying a punishment is a type of physical deprivation, whereas a consequence is some action that naturally follows from misconduct.  Tr. 529:9–11.  Setting aside the fact that solitary confinement is a severe physical deprivation, Defendants' semantical posturing demonstrates their acknowledgment that the School's use of solitary confinement to punish students is legally problematic.

From a constitutional perspective, the School improperly punishes students when its use of solitary confinement is not "reasonably related to a legitimate governmental objective" or is "excessive in relation" to that objective.  *Bell*, 441 U.S. at 538–39.  Defendants argue its use of solitary confinement furthers the legitimate objective of protecting the School's students and staff. The Court agrees this is a legitimate interest the School may pursue, and in some cases—such as where a student assaults another student or staff—the School's very brief use of solitary confinement is constitutionally sound.  But the record is full of examples—described or cited in significant numbers (though not exhaustively) in the Court's findings of fact—where the School employed solitary confinement for behavior that did not threaten the safety or security of students or staff.  Simply put, the School uses solitary confinement to discipline harmless behavior and for staff convenience.

Furthermore, the School's use of the BSU and seclusion room in response to such harmless behavior is not rationally related to the School's legitimate interest in protecting students and staff because such use of solitary confinement: (1) does not deter misconduct; and (2) deteriorates a students' mental health and increases the likelihood that his behavior will worsen.  Where the School uses solitary confinement in this manner, it exposes students to serious harm while ultimately impairing its own interests.

Additionally, when the School employs solitary confinement for more than one hour, its use is excessive in relation to the School's legitimate protection goal.  By that point, the risk of harm to a mentally ill student is so acute—and the situation from which he was removed is so distant—that the School's justification for keeping him in solitary confinement can no longer pass constitutional muster.  This is reflected in standards by the ACA and other organizations that limit the maximum amount of time a student can spend in solitary confinement.

As noted above, the School's use of solitary confinement created substantial risks of serious harm to the mental and physical health of its students, and Defendants have mounted no serious effort to counter that finding.  Those risks are obvious and generally well-established among organizations that deal with mental health issues in juvenile detention facilities.  The Court also finds Defendants are deliberately indifferent to those risks.  The record does show Defendants made efforts to change the School's policies, such that the BSU should be used only when the behavior in question threatened the security and/or safety of students and staff; and that BSU placement should not exceed one hour.  But these changes are merely superficial.  Notwithstanding School policy, the School uses isolation to punish behavior that poses no safety or security threat. Furthermore, the one-hour limitation for BSU placement is appropriate on paper.  However, it is subject to a glaring loophole in practice in that it applies only "[p]er incident," Tr. 389:22, and the

record shows students were frequently subjected to BSU placements exceeding one hour in duration.

The superficial fixes to BSU policy also fail to address the use of solitary confinement in the CMH program and administrative segregation.  Before students accumulate sufficient points to earn out-of-room privileges in the CMH program, they spend considerable time in their rooms, which are the same rooms employed for the purposes of the BSU.  While they are in their rooms, students are—by rule and design—isolated from other students at CMH.  The points system used in the CMH program reinforces this uphill climb out of isolation.  Students lose points for the most benign and arbitrary of reasons, such as nodding in response to a question rather than responding verbally.  As for administrative segregation, the transition from a student's placement in the BSU to administrative segregation status can lead to isolation in a BSU cell for well over an hour.  This is most clear when students who are sent to the BSU after 8:00 p.m. must stay in the BSU overnight in administrative segregation status.  The BSU is no less harmful to students when they are "asleep" on a thin mattress atop a concrete slab in a constantly illuminated room.  There is no record of Defendants making any effort to assess or alleviate the substantial risk of serious mental harm created by these extended exposures to solitary confinement.

Defendants have also failed to take steps to screen students exposed to solitary confinement for deterioration of their mental health.  Students sent to the BSU or seclusion room generally do not see a mental health professional who assesses their mental health status or the impact of such a placement.  Although a psychologist walks through CMH every day to talk with the students assigned there, there is no indication that he or she is evaluating the students, or that he or she would have the power to remove a student from the program if it was determined his placement there was detrimental to his mental health.

In sum, Defendants have failed to act in the face of risks posed by the School's use of solitary confinement.  In addition to unconstitutionally using isolation as a means of punishment, the School has created unconstitutionally harmful conditions by subjecting students to solitary confinement for unreasonably dangerous periods of time without any mental health oversight.

4.   The wrap

Like Plaintiffs' arguments with respect to the School's use of solitary confinement, Plaintiffs argue the School improperly uses the wrap to punish, and Defendants are deliberately indifferent to the substantial risk of serious harm caused by the wrap's use.

The Court begins with the harms caused by the wrap.  It is detrimental to a youth's mental health.  It triggers feelings of panic, duress, and claustrophobia.  It can traumatize youth in the first instance, and retraumatize youth that have previously suffered trauma.  It exacerbates a youth's sense of powerlessness, fear, and paranoia.  For students who have been physically or sexually abused, the loss of control they feel in the wrap replicates the feelings they suffered when abused. It is not rehabilitative and creates an increased risk of mental deterioration while students are in the device.  Students weep in the wrap.  It "crushes both body and spirit." PX222.007.

For students with serious health conditions, the wrap can create substantial risks of physical harm as well.  Evidence shows the School fails to take such conditions into account when using the wrap, which in turn heightens those risks.  This is most clearly seen in the case of C.P.X., who had numerous serious health conditions that heightened the dangers of placing him in the wrap. As Plaintiffs' expert explained:

> C.P.X. has three major life-threatening illnesses, physical illnesses, that could have caused his acute death when he was in the wrap.
>
> He has severe asthma.  And it's all three—you know, everyone said it's very hard to breathe when you're in the wrap, it's so tight. I mean, you have an acute asthmatic attack, you can die.

He had a severe, life-threatening heart condition requiring him to have at least three open-heart surgeries before he was 5 years old. He has a very weak heart. Put him in the wrap, his blood pressure is going to rise, his pulse rate's going to skyrocket. I mean, what are you doing to his heart? What if his heart can't take it?

And unfortunately, he has scarring of the liver, a thing called cirrhosis of the liver. He has, obviously, some very severe congenital abnormalities. And he has hepatosplenomegaly and cirrhosis. I don't exactly understand the nature of what caused it, but I gather they were congenital.

And a person with cirrhosis of the liver, the liver is scarred, so blood can't really—the venous blood can't really pass through it properly, and the blood backs up, and where it backs up is into the esophagus and esophogeal varices, venous varices. And you put that—you increase the pressure in that system, sooner or later the varices are going to expand, they're going to get bigger through the pressure, and someday they're going to explode, and that's going to be life—life ending.

And that's what you've done to him. You know, you've put that—his esophagus, esophageal varices, you've put them under a tremendous amount of pressure in the wrap. Why would you do that? There was no medical clearance before they did that, and no one could—would have cleared them.

Tr. 1016:12–1017:17. Despite these dangers, there is no evidence the School avoided use of the wrap or altered the manner of its use with C.P.X. Moreover, even if C.P.X. survived these encounters medically, there can be no question that his fear of dying because of these medical conditions added a layer of terror to the confinements.

This brings the Court to the *Bell* anti-punishment standard. As noted previously, the Court must ask whether or not the School's use of the wrap is "reasonably related to a legitimate governmental objective" or is "excessive in relation" to that objective. *Bell*, 441 U.S. at 538–39. Like with the School's use of solitary confinement, the School purports to use the wrap only when necessary to protect the health and safety of a student from a risk of imminent harm. Given the dangers of the wrap, the Court has not seen in this case an example of its use that was not excessive

in relation to this purpose.  To the contrary, the School often uses the wrap after the imminent risk of harm has already passed.  As discussed in the Court's factual findings, a student wearing wrist and leg restraints was sent to the wrap for threatening to assault staff if the restraints were removed.  *See* PX455.002; Def. Ex. C at 2135.  It is not clear why School staff could not continue to work with the student to calm him down while he continued to wear the wrist and leg restraints.  Instead, by placing him in the wrap, they sharply escalated the risks of harming him while alternative approaches remained viable.  Students are sent to the wrap when they make a suicidal gesture with a piece of clothing and refuse to change into a suicide gown after the piece of clothing has been seized.  *See* PX528; Def. Ex. B at 3161–62, 3193; Def. Ex. C at 2207.  However, once the piece of clothing has been seized and the student is confronted by staff, there is no practical risk that the student is going to commit suicide while School staff are in his room with him.

Evidence also shows the School's use of the wrap is not reasonably related to the School's safety interests.  This is in part because, like with solitary confinement, using the wrap in situations where a student does not pose an immediate risk of harm to a person increases the likelihood that his behavior will worsen.  More importantly, however, the use of the wrap is not reasonably related to the School's safety interests because this rationale is often a sham.  Going back to the example of the suicide gown, once the student is confronted by School staff and there is no longer an immediate risk of him committing suicide, the only apparent explanation for using the wrap in that scenario is to hasten the desired result—i.e., the donning of the suicide gown.  In that scenario, the School uses the wrap to coerce compliance out of an obstinate student.  The coercive nature of the wrap's use when a student refuses to wear a suicide gown is even more pronounced when School staff forcibly cut the student's clothing from his body when he is in the wrap.  Day admitted there is no danger posed by a student's clothing while he is in the wrap.  *See* Tr. 1372:9–20.  The Court

finds the forcible removal of that clothing is purely punishment and a power play. The student must yield to the staff's directive to wear the suicide gown or else remain in the wrap without clothing—a humiliating proposition. The student also emerges from the wrap naked, in the presence of adult men, an additional layer of humiliation that must be borne by students, some of whom are sexual abuse victims.

The Court has highlighted other examples of this coercion, but they bear repeating. *See* Def Ex. C at 2045; Def. Ex. A at 2320. K.N.X. was seen on camera with a large, presumably dangerous piece of plastic in his possession. When confronted by School staff, he denied having the plastic. At that point he was removed to the seclusion room, where he was isolated and under observation. He did not pose a threat to other students or staff. His room could have been searched. But when he continued to deny ever possessing the plastic—which School personnel knew to be false—and refused to consent to a search of his person, he was sent to the wrap for two hours. This was not for his safety or the safety of the staff. It was to compel him to consent to a search or otherwise give up the plastic. This is clear by the fact that he was only finally released from the wrap after he consented to a search. Similarly, J.S.X. was caught by School personnel with a metal locknut. When confronted by School staff, he placed it in his mouth. At that point, J.S.X. was in his room with School personnel with the locknut in his mouth. He had not made any threats to School staff. So, instead of continuing to work with J.S.X. to get him to relinquish the locknut, which would have likely taken time and effort, staff sought the expedient—and exceedingly harsh—alternative of placing J.S.X. in the wrap until he agreed to give up the locknut. Day authorized the wrap's use, and J.S.X. was consequently restrained until he yielded to School staff's directive to give up the locknut.

The United Nations Convention Against Torture, of which the United States is a signatory, defines torture as,

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him . . . information or a confession, punishing him for an act he . . . has committed or is suspected of having committed, or *intimidating or coercing him* . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.  It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 1, *opened for signature* Dec. 10, 1984, 1465 U.N.T.S. 85 (entered into force June 26, 1987) (emphasis added).  The School's use of the wrap in this coercive manner is not reasonably related to, and is excessive in relation to, the School's legitimate safety objectives.   It is thus unconstitutional, and illegal, punishment of detainees.  The School's use of the wrap inflicts severe pain and suffering in an illegal manner intentionally designed to coerce students, and its use is authorized and otherwise sanctioned by School officials, who must approve the use of the wrap.  By using the wrap in this manner, the School tortures its students.

Torture is cruel and unusual punishment for the purposes of the Eighth Amendment. *Graham v. Florida*, 560 U.S. 48, 59 (2010) (stating that "'[p]unishments of torture,' for example, 'are forbidden'" under the Cruel and Unusual Punishments Clause (alteration in original) (citation omitted)).  The Eighth Amendment's prohibition on cruel and unusual punishment is nearly as old as the Republic, and there can be no doubt that the right to be free from torture is one of the "fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Norris*, 494 F.3d at 638 (citation omitted).

It goes without saying—yet it must be said: it shocks the conscience that Defendants would allow the wrap to be used at the School in this manner and that Day would approve its use in such circumstances.  But the conscience-shocking nature of the School's use of the wrap is heightened by Defendants' deliberate indifference to the risks of harm cause by the wrap.  In this way, the deliberate-indifference and shocks-the-conscience standards overlap, and Defendants are liable under both standards (as well as the *Bell* standard).

The evidence shows that by 2015, Day and Shults were aware of concerns over the School's use of the wrap and, consequently, the School asked Dr. Heilbrun to evaluate its use.  He ultimately declined to address whether the wrap was safe or appropriate to use.  Instead, he acknowledged its novelty and recommended the School collaborate with appropriate professionals to evaluate its risks and benefits.  This never happened, even after Foxhoven reviewed Dr. Heilbrun's report some years later, and even after DRI raised further concerns about the wrap in 2017.  Knowing there were potential concerns about the safety of the wrap, Defendants did nothing to evaluate its safety and simply carried on.  Defendants did not even take steps to ensure the mental health of students exposed to the wrap was evaluated before, while, or shortly after being placed in the wrap.

However, Defendants were not just indifferent to the novelty of the wrap.  They were indifferent to its obvious and understood risks.  The risks of the wrap *are* obvious—which is inescapable where students are carried to the wrap in tears, have their clothes cut from their bodies, and are left in the wrap naked and alone.  These obvious risks are confirmed and reinforced by Plaintiffs' expert witnesses, and Defendants mount no serious effort to prove otherwise.  Defendants argue the wrap exposes students to fewer skin and joint injuries than traditional four-or five-point restraints.  But pointing out the risks inherent in other devices does noting to address the risks of mental and physical harm caused by the wrap.  Defendants' other evidence that the

wrap is not harmful is incredible.  At various points during trial, Defendants elicited testimony from adult witnesses that they had been placed in the wrap—fully clothed, for short periods of time—and did not find it traumatic.  The experience of a mentally healthy adult placed in the wrap in a controlled environment is so far removed from the experiences of students at the School that it is very nearly (if not completely) irrelevant.  Defendants' experts offered no evidence that the wrap was not harmful to a student's mental health.

The Court need not rely on the obvious nature of the wrap's dangers, however, because Day testified that he knows the wrap causes trauma and he hates using it with every fiber of his being.  Tr. 1371:11–13.  The Court believes Day is a committed public servant who genuinely cares about the students at the School.  But it is unconscionable and deeply concerning that he, as a public official in the United States of America, would subject individuals assigned to his care to a physical ordeal that he hates with every fiber of his being.  What hope do the students at the School have when the Superintended sanctions conduct that shocks even his own conscience? His approval of the wrap and failure to abate its use constitute deliberate indifference.  *See Nelson*, 583 F.3d at 529 ("To establish an Eighth Amendment violation . . . 'it is enough that the official acted or failed to act despite [his or her] knowledge of a substantial risk of serious harm.'" (citation omitted)).  But it goes further.  It also shows either extraordinarily poor judgment on Day's part as to the legality of the wrap's use, or his utter inefficacy at protecting his charges.

Nor are former Defendants Foxhoven and Shults without blame.  DHS was on notice in 2015 as to the novelty of the wrap and the need to formally examine its risks and benefits.  DRI provided more explicit warnings about the wrap in its 2017 report.  Whatever minimal benefit the wrap may have presented (e.g., less chance of skin chafing), the risks of trauma and severe psychological stress should have been self-evident.  In such circumstances, the proper course of

action is not to burry one's head in the sand and proceed.  The public should be able to rest assured that its officials will properly weigh the risks and benefits of untested courses of action, especially in contexts impacting individuals' health and liberty.  Iowa youth, it seems, do not enjoy this basic comfort.

The students at the School are almost entirely children.  Some of these children are dangerous; some of them are not.  But all deserve our protection.  These children's care was entrusted to the School by well-meaning judges across the State of Iowa.  To learn that the School used the wrap to revictimize already vulnerable, typically mentally ill, children entrusted to their care is disturbing to the Court at a level that is nearly indescribable.  The School's use of the wrap violates the class members' substantive due process rights under the Fourteenth Amendment, and Defendants are liable under each due process standard applicable to this case.

## C.  ADA and RA Claims

Title II of the ADA, applicable to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The RA is "similar in substance" to the ADA and "provides that no otherwise qualified individual with a disability shall be 'excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'"  *Randolph v. Rodgers*, 170 F.3d 850, 857–58 (8th Cir. 1999) (quoting 29 U.S.C. § 794(a)).  "Program or activity" is broadly defined under the RA such that it effectively covers the entirety of the recipient's operations, rather than the specific function for which federal funding is received.  *See* 29 U.S.C. § 794(b) (defining "program or activity," in relevant part, as "all of the operations of . . . a department, agency, special purpose

district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance").   "[W]ith the exception of the RA's federal funding requirement, 'cases interpreting either [the ADA or the RA] are applicable and interchangeable.'" *Randolph*, 170 F.3d at 858 (citation omitted).

To establish a violation of either act, the plaintiff must show: "1) he [or she] is a qualified individual with a disability; 2) he [or she] was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that such exclusion, denial of benefits, or other discrimination, was by reason of his [or her] disability." *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998).[20]   Defendants only contest the third, causational element, arguing Plaintiffs "were not deprived of any benefit *because of*" their disabilities [ECF No. 322 at 25].

Plaintiffs' claims under the ADA and RA fall into two categories.   First, Plaintiffs argue Defendants violate the ADA and RA because the School punishes students through solitary confinement and restraints for behavioral manifestations of their mental health disorders. Second, Plaintiffs argue that, while subjecting students to these punishments, the School excludes them from accessing education and from programs for which they would otherwise qualify. *See* [ECF No. 300 at 33].   As concluded in Section III.A, *supra*, Plaintiffs only raised the former of these two claims through the School's grievance procedures.   They did not exhaust their administrative remedies with respect to their equal-access claim and, therefore, the Court will not consider it here.

---

[20] As a practical matter, Plaintiffs must also show the School receives federal financial assistance to make out a claim under the RA.   *See* 29 U.S.C. § 794(a).   That element is satisfied here, where the School receives funding through a VOCA grant, and it additionally receives federal funds under the National School Lunch Program.   Tr. 1213:18–1214:5, 1444:20–23.

Plaintiffs' manifestation-of-symptoms claim, by its nature, poses a quandary: it acknowledges the School punishes students for their behavior—i.e. manifestations of their mental illnesses—but that does not necessarily mean they punish students for the illnesses themselves. However, Plaintiffs' claim is not entirely novel.  Courts have concluded that prisoner-plaintiffs raise colorable ADA and RA claims where they allege: (1) they have been subject to punishments as a consequence of behavior attributable to their mental health disabilities; and (2) either mental health professionals were not consulted as to the appropriateness of the punishment, or the plaintiff was denied mental health treatment for the behavior in question.  *See A.T. ex rel. Tillman v. Harder*, 298 F. Supp. 3d 391, 416–17 (N.D.N.Y. 2018) (finding that juvenile plaintiffs were "substantially likely to succeed on the merits of [their ADA and RA] claim[s]" where plaintiffs alleged that "behavior that leads to juveniles with disabilities being placed in solitary confinement is attributable to their adolescence, or to un-or under-treated mental health . . . disabilities" and defendants "routinely place[d] [them] in solitary confinement without consulting a mental health worker and without assessing whether solitary confinement is appropriate"); *Brown v. Wash. Dep't of Corr.*, No. C13-5367 RBL-JRC, 2015 WL 4039322, at *11 (D. Wash. May 13, 2015) (finding a reasonable jury could conclude the defendant discriminated against the plaintiff on the basis of his mental illness where evidence showed the defendant's policies resulted in the plaintiff being placed in solitary confinement when he self-harmed and no treatment was "considered or afforded" to the plaintiff in relation to such acts); *Biselli v. Cty. of Ventura*, No. 2:09-cv-08694-CAS-E, slip. op. at 24 (C.D. Cal. June 4, 2012) (denying summary judgment to the defendants on plaintiff's ADA disability discrimination claim after concluding that evidence showing (1) the plaintiff was housed "in the most restrictive area of the jail[] based on conduct that was specifically linked to his mental illness," (2) the housing decision was "made without input from the mental health staff

at the jail," and (3) the plaintiff's isolation "persisted despite indications that segregation housing was adverse to [the plaintiff's] mental health condition," could lead a rational jury to find the plaintiff "had proven he could be housed in more integrated environments without posing a security risk, and that [his] placement in [restricted housing] and disciplinary isolation was punishment for behavior known to be related to his mental illness").

In finding such claims to be viable, courts have relied on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), where the United States Supreme Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597. In *Olmstead*, the Court addressed the institutionalization of mentally ill persons and held the ADA's discrimination provision was violated where an integrated placement was appropriate. The Court emphasized that, in enacting the ADA, Congress recognized the historical tendency of society "to isolate and segregate individuals with disabilities" and that "discrimination against individuals with disabilities persists in such critical areas as institutionalization." *Id.* at 588 (quoting the ADA's legislative findings and purpose, 42 U.S.C. § 12101(a)(2), (3), (5)). The Court noted that the ADA's reasonable-modification and integration regulations reflected the determination that unnecessary segregation of persons with disabilities constitutes a form of discrimination prohibited by the ADA. *Id.* at 596–97. But "unnecessary" is the operative word: the Court ultimately held that to make out a claim of discrimination, a plaintiff has to show: (1) "the State's treatment professionals have determined that community placement is appropriate"; (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual"; and (3) "the

placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* at 587.[21]

Although *Olmstead* concerned institutionalization, the Court's underlying reasoning lends its finding regarding unjustified isolation to other contexts.   Notably, the Court rejected the defendants' arguments that the mentally ill individuals: (1) "encountered no discrimination 'by reason of' their disabilities because they were not denied [an alternative] placement on account of those disabilities"; and (2) were not subjected to "discrimination" because "'discrimination' necessarily requires uneven treatment of similarly situated individuals," and the plaintiffs had not identified any "similarly situated individuals given preferential treatment." *Id.* at 598.  Instead, the Court was "satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.*  This comprehensive view of the Act was reflected in similar statutory provisions, such as the provision of the Developmentally Disabled Assistance and Bill of Rights Act recommending "[t]he treatment, services, and habilitation for a person with developmental disabilities . . . should be provided in the setting that is least restrictive of the person's personal liberty." *Id.* at 599 (alteration in original) (emphasis omitted) (citing 42 U.S.C. § 6010).

The courts applying *Olmstead* in the solitary confinement context have stayed relatively true to the three *Olmstead* factors—a plaintiff makes out a claim for discrimination based on disability when he or she shows: (1) a mental health professional determines that less restrictive settings are appropriate; (2) the plaintiff does not oppose transfer to a less restrictive setting; and (3) the placement can be reasonably accommodated.  On the first factor, public entities have an

---

[21] With respect to this third factor, it is notable that the case "present[ed] no constitutional question," but instead concerned the ACA's statutory construction. *Olmstead*, 527 U.S. at 588.

obligation under ADA regulations to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).  A public entity cannot avoid its responsibility to make such reasonable modifications by not assessing the mental health impacts of solitary confinement on mentally ill detainees.  Thus, courts have appropriately considered the lack of assessment by a mental health professional to satisfy *Olmstead's* first factor.  *Cf. A.T.*, 298 F. Supp. 3d at 417; *Brown*, 2015 WL 4039322, at *11; *Biselli*, slip. op. at 12, 24.  The second factor is self-evident from the fact that the plaintiff is challenging his or her placement in solitary confinement.  As for the third factor, the *Biselli* court acknowledged that the plaintiff would have to prove "he could be housed in more integrated environments without posing a security risk."  *Biselli*, slip. op. at 24. Not every court appears to require a finding on reasonable accommodation, *see e.g.*, *A.T.*, 298 F. Supp. 3d at 417, and even *Biselli* did not "tak[e] into account the resources available to the State and the needs of others with mental disabilities," *Olmstead*, 527 U.S. at 587.  However, *Olmstead* plainly requires such a showing to make out a discrimination claim for unjustified isolation.

Plaintiffs appear to argue that, to establish liability under the ADA and RA, they need only show they were punished based on behavioral manifestations of their mental illnesses.  *See* [ECF No. 300 at 33].  But under *Olmstead*, that is only a threshold inquiry.  Once that is established, Plaintiffs must still satisfy the three *Olmstead* factors in order to show discrimination based on their disabilities.

Plaintiffs fail to establish the third *Olmstead* factor.  Plaintiffs have not indicated what accommodation they seek.  Presumably, they seek the elimination of isolation and restraints for behavioral manifestations of students' mental illnesses—if not entirely, then at least in situations

not posing a threat of harm to students or staff.  Even so, the record does not show this "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  *Olmstead*, 527 U.S. at 587.  Plaintiffs' expert testified that eliminating the use of solitary confinement would require the training of staff on de-escalation techniques, trauma, and mental health.  Tr. 894:10–895:1.  But the School is fiscally restrained, and there is no evidence as to how much this training would cost or how it would be funded.  Ultimately, Plaintiff has the burden to establish the elements of their claim.  They have not established the reasonable accommodation prong under *Olmstead*, and thus they have not shown they have been discriminated against based on their disabilities.  Plaintiffs have therefore failed to establish Defendants' liability under the ADA and RA.[22]

## IV.   REMEDIES

### A.  Declaratory Judgment

In their Amended Complaint, Plaintiffs ask the Court to:

> declare unconstitutional and unlawful Defendants' conduct as alleged herein as a violation of the Plaintiffs' right to be free from harm and substantial risks of serious harm under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution or as a violation of Plaintiffs' right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, as a violation of Plaintiffs' rights under the Americans with Disabilities Act, and as a violation of Plaintiffs' rights under the Rehabilitation Act.

---

[22] It is not clear based on Plaintiffs' briefing whether they also raise a claim under 28 C.F.R. § 35.130(b)(7) for Defendants' alleged failure to make reasonable modifications to avoid discrimination on the basis of disability.  *See* [ECF No. 300 at 35].  If they do, the Court finds the claim was not properly exhausted.  Plaintiffs' statements in their October 2017 grievance letter that the School disciplines students through isolation and restraints for the behavioral manifestations of their mental illnesses, without more, would not put School administrators on notice of what modifications were requested or required, and thus would not have given them an opportunity to "address [the] complaint[] internally" before Plaintiffs commenced litigation asserting a claim under § 35.130(b)(7).  *Woodford*, 548 U.S. at 93.

[ECF No. 33 at 63].  Plaintiffs have only succeeded on their Fourteenth Amendment claim, and so the Court will consider whether the requested declaration is appropriate with respect to that claim.

The Declaratory Judgment Act states, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "District courts are afforded broad discretion" over claims for declaratory relief.  *Marty H. Segelbaum, Inc. v. MW Capital, LLC*, 673 F. Supp. 2d 875, 882 (D. Minn. 2009) (citing *Alsager v. Dist. Court of Polk Cty.*, 518 F.2d 1160, 1163 (8th Cir. 1975)); *see also* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").  A court may deny declaratory relief when the adjudication of other claims in the case necessarily encompasses the declarations sought.  *Compare Simmons v. Butler*, 4:19CV10 HEA, 2019 WL 2231081, at *3 (E.D. Mo. May 22, 2019) (denying declaratory relief after finding the resolution of the plaintiffs' constitutional and wrongful termination claims would "necessarily settle the issues of the parties' rights, status, and legal relationships"), *with Marty H. Segelbaum, Inc.*, 673 F. Supp. 2d at 882 (denying a motion to dismiss a declaratory judgment claim, the scope of which was broader than the plaintiff's accompanying breach of contract claim).

The Court has squarely addressed Defendants' alleged conduct with respect to the School's mental health care program, its use of isolation, and its use of the wrap.  The Court has found, with respect to all three of these programs or practices, that Defendants violated Plaintiffs' rights (and those of the class) under the Substantive Due Process Clause of the Fourteenth Amendment.  The declaration Plaintiffs seek is no broader than the Court's findings on these issues.  Further, as set out in the next section, the Court will issue a permanent injunction that will make clear the class's

rights and Defendants' obligations going forward.  The separate declaratory judgment Plaintiffs seek is unnecessary here, and the Court declines to grant it.

## B.  *Injunctive Relief*[23]

### 1.  *Dataphase* analysis

To remedy Defendants' violations of the Fourteenth Amendment, Plaintiffs seek the following injunctive relief:

> i.   Order Defendants to ensure the provision of adequate mental health care at the School including by, but not limited to, ensuring adequate mental health staffing, the provision of emergency mental health treatment, individualized therapy plans and treatment, and adequate discharge planning;
>
> ii.  Order Defendants to ensure appropriate oversight of the administration of psychotropic medications, including by, but not limited to, obtaining and documenting informed consent for the use of psychotropic medications, administering psychotropic medications only as part of comprehensive treatment plans, and adequately monitoring for and treating adverse side effects that result from the administration of psychotropic medications;
>
> iii. Enjoin Defendants from placing members of the Class in solitary confinement for disciplinary or punitive purposes or for any reason other than a rare and temporary response to avoid imminent serious physical harm to persons; and
>
> iv.  Enjoin Defendants from employing mechanical restraints within the institution except as rare and temporary responses necessary to prevent imminent and serious physical harm to

---

[23] The Court previously indicated that the focus of trial would be on Defendants' liability and that, if liability was found, the Court would "consider whether additional evidence is necessary to craft an appropriate remedy."  [ECF No. 197 at 5].  Given the expansive record in this case, including Defendants' various offers of proof, the Court finds no additional evidence is necessary to craft an appropriate remedy.  The Court will thus address in this Order Plaintiffs' request for injunctive relief.  However, as set out in more detail in Section IV.B.2, *infra*, Defendants will have an opportunity to present evidence of relevant changes to the School with respect to its mental health treatment program.  Further, if Defendants believe new evidence is relevant to other injunctive relief, they may present that evidence in a motion to modify the injunctive relief set out in this Order.  *See* Section IV.B.4, *infra*.

> persons and as ordered by a medical or mental health
> professional.

[ECF No. 33 at 60]. Plaintiffs ask the Court to appoint a monitor to oversee implementation of any injunctive relief awarded. *Id.* In their post-trial brief, Plaintiffs elaborate on their requested injunctive relief. *See* [ECF No. 300 at 36–41]. These elaborations are largely in line with the requests set out above but, notably, Plaintiffs argue "any plan to remedy Defendants' violations should require Defendants to comply with certain standards for minimally adequate mental health care promulgated by the [NCCHC]." *Id.* at 38.

"Consideration of a permanent injunction involves essentially the same factors as for a preliminary injunction." *Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1181 (S.D. Iowa 2016). In the Eighth Circuit, those factors are known as the *Dataphase* factors, based on the case in which they were articulated, *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1991) (en banc). The Court thus considers: (1) whether Plaintiffs have shown success on the merits of their claims; (2) the threat of irreparable harm to Plaintiffs in the absence of an injunction; (3) the balance of harms between Plaintiffs and Defendants; and (4) whether the injunction will serve the public interest. *Gerlich*, 152 F. Supp. 3d at 1181 (citing *Dataphase*, 640 F.2d at 114). The Court has already concluded Plaintiffs have succeeded on the merits of their Fourteenth Amendment claim. The first *Dataphase* factor is therefore satisfied.

Turning to the threat of irreparable harm to Plaintiffs in the absence of an injunction, the Court first notes that, because this is a class action, the Court must analyze the threat of irreparable harm to the class members, not just to Plaintiffs. *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 990 (D. Minn. 2006). Each constitutional violation in this case—the provision of inadequate mental health care, the improper use of solitary confinement, and improper use of the wrap—creates risks that class members' mental health with deteriorate without changes to these

programs or practices.  This deterioration increases the risks that students' mental illnesses will become more severe and difficult to treat, that students will self-harm, that students will be subject to more restrictive placements, and that students will be more prone to criminal or delinquent recidivism.

Defendants argue Plaintiffs must show the unconstitutional conditions existed at the time of trial and are likely to continue into the future.  [ECF No. 322 at 27] (citing *Smith v. Ark. Dep't of Corr.*, 103 F.3d 637, 644–65 (8th Cir. 1996)).  They also argue "[g]iven the change in policy and in law, even if there was a previous concern, there is no basis for seeking additional injunctive relief."  *Id.*  In an Order dated March 13, 2019, the Court held the requirement that unconstitutional conditions exist at the time of trial is necessarily limited to conditions as they existed at the close of discovery.  [ECF No. 197 at 1–5].  The Court incorporates its reasoning in that Order by reference.  Further, the evidence in this case shows the unconstitutional conditions at the School are likely to continue.  At the close of discovery, although the School had hired additional mental health care staff in 2018, it was not providing the necessary psychotherapy to students, and it had implemented no plans to do so.  It was not providing adequate crisis services or discharge planning; it was reckless with confidential information; and the mental health care program at the School lacked adequate oversight, which the School tried to hide from the ACA in its 2018 audit.  The evidence does not show Defendants have taken steps to address the School's failure to treat the mental illnesses of its students.  As for isolation and restraints, Defendants insisted through trial, and continue to do so in their post-trial brief, that the School only employs these devices in situations involving risks of harm to students or staff.  This view ignores overwhelming evidence showing the School frequently punishes or tortures students through these tools for behavior not

meeting such conditions.  The Court concludes that, absent injunctive relief, the unconstitutional conditions at the School will continue into the future.

Defendants' remaining arguments are underdeveloped and cannot be assessed.  They vaguely cite changes in policy and law without discussing what those changes are and how they apply to the constitutional violations in this case.  Although it is not clear, they are perhaps referring to changes that took place after the close of discovery.  If so, this argument fails because, again, the Court has held that conditions at the School will be assessed as of the close of discovery. They also argue Plaintiffs are not entitled to "additional injunctive relief."  [ECF No. 322 at 27]. But the Court did not issue preliminary injunctive relief in this case, and Defendants do not distinguish between any supposed initial relief and the additional relief they argue is inappropriate. Without further elaboration, the Court cannot evaluate this argument.  The Court concludes the second *Dataphase* factor weighs in favor of injunctive relief.

The third *Dataphase* factor requires the Court to balance the harms between the class and Defendants.  The Court has concluded the class would suffer irreparable harm if an injunction is not granted to abate the unconstitutional conditions at the School.  This harm is significant, and it creates a sizeable burden for Defendants to overcome, given that the third *Dataphase* factor is a comparative one.  The injunctive relief Plaintiffs seek will create certain burdens on the School. Some of it may be financial in that the School may need to hire additional mental health or other staff.  But many of the changes Plaintiffs seek require the School to enforce polices as written or make procedural changes that will be possible within the School's existing infrastructures.

More importantly, the School will benefit from the injunctive relief sought in this case. By treating students' mental illnesses and reducing the use of isolation and restraints, the School will improve students' mental health and make the School safer.  Students will be less likely to

take the violent actions the School claims warrant the use of extreme disciplinary measures. The injunction will help the School meet its rehabilitative and treatment goals, and students will be more likely to succeed in the School's broader rehabilitative program.  Comparing the potential burdens the School will face if an injunction is granted—including the benefits it stands to reap—against the harms to the class if injunctive relief is denied, the Court concludes the third *Dataphase* factor weighs in favor of granting injunctive relief.

Finally, before the Court can grant injunctive relief, it must determine if such relief is in the public interest.  As a general matter, the public has a strong interest in ensuring its juvenile detention and rehabilitative facilities do not maintain unconstitutional conditions in the provision of mental health care, or subject detainees to unconstitutional punishments.  As to the School in particular, it is a public institution charged with the rehabilitation and treatment of juveniles entrusted to its care.  The injunctive relief in this case will help the School better achieve those goals and, thus, help promote those public interests.  Accordingly, the Court finds the fourth *Dataphase* factor also favors an injunction in this case.

### 2.   Relief granted

With all four *Dataphase* factors satisfied, the Court finds injunctive relief is appropriate to correct the constitutional deficiencies identified in this Order.  The Court therefore orders the following injunctive relief:

1. Within forty-five days of the date of this Order, Defendants are to submit a plan to the Court to remedy the constitutional deficiencies in the School's mental health treatment programs identified in this Order.  The plan must address how the School will:

   a. identify the treatment that is clinically indicated for students' mental illnesses, including psychotherapy, and formulate treatment plans;

   b. provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective;

c.    ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School;

d.    for students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation;

e.    for students receiving mental health treatment at the School, attempt to arrange mental health care services in the community so students may continue their treatment upon discharge; and

f.    provide institutional oversight and structural coordination of the School's mental health program.[24]

The Court expects this plan to incorporate changes the School has made since the close of discovery. Defendants are strongly encouraged to work with Plaintiffs and experts in developing a plan that will address the constitutional deficiencies in the School's mental health treatment programming.

The Court may adopt this plan in whole or in part, and may make changes to the plan that it deems necessary to ensure the constitutional deficiencies in the School's mental health treatment programming are corrected. This Court-adopted plan will hereafter be referred to as the "Remedial Plan."

2.    Defendants must ensure the School only employs use of the BSU or the seclusion room in situations where a student's behavior poses a serious and immediate risk of physical harm to any person.

a.    "Insubordination" alone will rarely satisfy this criterion. This is because the refusal to follow instructions, or non-threatening expressions of disrespect toward staff, do not without more pose a serious or immediate risk of serious harm.

b.    If a student is sent to the BSU or seclusion room because his words or actions agitate or incite another student such that he creates a serious and immediate risk of physical harm, such agitation or incitement must be manifest in that other

---

[24] For the purposes of this plan, the Court declines to require the School to adopt any particular national standard. Ultimately, the issue in this case is whether the mental health care at the School satisfies the Constitution's minimum standards. By requiring the School to adopt a particular national standard, the Court would implicitly set that standard as the constitutional floor. In the case of the NCCHC, its standards are the most demanding of the various standards in evidence and are likely more stringent than what is necessary to provide constitutionally adequate mental health care in most cases. The Court would almost certainly approve a plan that adopts NCCHC standards, but the School should have the flexibility to correct the constitutional deficiencies in a manner best suited to the needs and challenges of the School.

student's speech or physical action, which must be described with particularity in the corresponding BSU report. That report must also include a statement from the agitated/incited student describing the incident and its impact on his behavior. Such a statement shall be prepared by the agitated/incited student himself, away from School staff. If School staff ask the student to revise his statement, all versions of the statement shall be included in the report.

c. A student may not be placed in the BSU or seclusion room for completed acts of destruction of property. Nor may a student be placed in the BSU or seclusion room for theft. If a student is engaged the continuous destruction of property, he may only be sent to the BSU or seclusion room if the nature of that continuing destruction is such that it presents a serious and immediate risk of harm to a person.

d. If a student is placed in the BSU or seclusion room for an act of self-harm or suicidal ideation, a mental health professional must meet with the student as soon as possible, and such a meeting will take priority over the mental health professional's non-treatment related tasks. For example, a mental health professional would not be required to interrupt a psychotherapy session or assessment with a different student, but must instead attend to the student in isolation as soon as the session or assessment is completed. For this purpose, a mental health professional must be available at all times. If no mental health professional is physically present on the School's campus, such a meeting may take place via telephone or electronic means such as videoconferencing. The mental health professional will assess the student and develop a crisis plan in accordance with the changes to the School's procedures adopted pursuant to the Remedial Plan. The mental health professional will also work with the student until he or she determines the student no longer poses a threat of immediate harm to himself.

  i. This does not require the School to abandon its three-level system of suicide watch. However, given the harm that solitary confinement causes individuals with mental illnesses, the School must present to the Court a plan to minimize the amount of time that students on suicide watch spend isolated in either the seclusion room or the other rooms at CMH. Defendants shall present this plan to the Court no later than forty-five days from the date of this Order.

e. With respect to all other seclusion room or BSU placements:

  i. the purpose of the BSU or seclusion room placement will be to afford the student an opportunity to "cool off" and return to his normal cottage and programming. While in isolation, School staff shall verbally assist the student in de-escalation. School staff may do so from outside of the room if necessary for their safety.

-108-

ii.   The student must be released from the BSU or seclusion room after no more than one hour, unless staff working with the student determine he is likely upon release to engage in behavior that poses a serious and immediate risk of physical harm to any person.

iii.   If staff make such a determination, they shall immediately contact a mental health professional to meet with the student. The mental health professional shall meet with the student as soon as possible, and such a meeting will take priority over the mental health professional's non-treatment related tasks. For this purpose, a mental health professional must be available at all times. If no mental health professional is physically present on the School's campus, such a meeting may take place via telephone or electronic means such as videoconferencing.

iv.   The mental health professional will work with the student to restore him to a state where he no longer poses a serious and immediate risk of physical harm to any person. If the mental health professional determines this is not possible due to the student's mental health condition and the School's inability to treat the student in his current state, the School must promptly arrange for transfer of the student to a mental health care facility that can treat the student.

v.   Once the student no longer poses a serious and immediate risk of physical harm to any person, he shall be released to his regular cottage. The student shall not be left in the seclusion room, BSU room, or a CMH room overnight.

vi.   Students who are otherwise eligible to return to their cottage under 2.e.v shall not be held in administrative segregation pending a CMH staffing. This, however, does not impact the School's ability to eventually hold a staffing and assign a student to CMH if it determines such a staffing is appropriate.

vii.   For the purposes of the one-hour limit applicable to 2.e.ii–iii, the limit applies regardless of the number of violations committed either initially or during that hour. In other words, the School cannot avoid the one-hour limitation by "readmitting" a student who is already in the BSU or seclusion room.

viii.   If a student who is released under 2.e.v commits another act that results in his placement in the BSU or seclusion room within two hours of his prior release, his time spent in the seclusion room or BSU shall be considered cumulatively across both placements for the purposes of the one-hour limit and the School's obligations if that limit is reached. For example, if a student spends thirty minutes in the BSU and is released, but then one hour later is again sent to the BSU, the one-hour limit is reached when the student has been in the BSU the second time for thirty minutes.

Additionally, time spent in the BSU and seclusion room shall be treated cumulatively for the purposes of these requirements, such that if a student is moved from a BSU room to the seclusion room, or if a student is sent to the BSU for one infraction and the seclusion room for a second infraction committed within two hours of his initial release from the BSU, that time shall be treated cumulatively for the purposes of the one-hour limit.

f.   The School shall continue to document BSU or seclusion room placement in reports similar to that at PX438 (labeled "STS BSU Report"). However, the School must also include in such reports a written statement from the student sent to the BSU or the seclusion room, in which he describes the behavior that purportedly resulted in the placement. The student shall be permitted to complete his statement privately, away from School staff. If School staff ask the student to revise his statement, all versions of the statement shall be included in the report. For the purposes of oversight by the Court-appointed monitor (see below), the School must also list students that witnessed the incident resulting in the placement, if any. To protect those students from potential reprisals, the School need not collect student-witness statements, except where required under 2.b, above. If the School nevertheless chooses to collect such statements, it must take steps to ensure student-witnesses are protected from reprisals from School staff or the disciplined student.

g.   The School must preserve video evidence of any incident relied upon by the School to justify BSU or seclusion room placement. The School shall preserve such evidence until monitoring in this case ends (as discussed below).

3.   Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted in their room due to a lack of privileges. For example, students may not be required to eat their meals in their CMH rooms, even though they would normally not earn the privilege of eating meals outside of their rooms until they accumulate a certain number of points. Similarly, the School may not deny a student a period of out-of-room recreation time available to other students. Put another way, students in the CMH program or on administrative segregation must be allowed out of their rooms to the same extent as a student on the highest privilege tier of the CMH program. The School shall not change the out-of-room time for that highest tier without first seeking leave from the Court. The School may still restrict the activities available to students while outside of their rooms based on their point totals (e.g., access to television or video games). Further, for the purposes of this paragraph, out-of-room privileges should be distinguished from off-campus privileges, the latter of which are not impacted by this Order.

4.   The requirements in points 2 and 3 shall go into effect no later than forty-five days from the date of this Order.

5.     The School shall not use the wrap.  The wrap shall be removed from the School no later than ten days from the date of this Order, and all students at the School shall be notified immediately, both orally and in writing, that the wrap is no longer to be utilized by the School.  This ten-day time limit governs matters related to the wrap only, and does not otherwise supersede the deadlines discussed by the Court in this Order.

6.     If the School wants to employ other forms of fixed mechanical restraints instead of the wrap, it may only do so with leave of the Court upon a showing that: (1) the restraint is not harmful to a youth's mental health; (2) it will only be used in situations where a student poses a risk of serious and immediate harm to another person after all other interventions have failed; (3) the time limitations for BSU and seclusion room placement in 2.e.ii–iv and 2.e.vii–viii, shall apply to the use of the fixed mechanical restraint; and (4) the School has put in place systems to ensure the restraint is not used for staff convenience or to coerce a student to take an action he is resisting.  If the Court approves the use of such fixed mechanical restraints, a mental health professional must be physically present with the student while he is in the fixed mechanical restraint and attempting to help the student clam down or otherwise regain control of himself.  The School must document, including video documentation, all uses of the fixed mechanical restraints, and the documentation must show that the fixed mechanical restraint's use complies with this Order.  No student's clothing shall be removed while the student is restrained by fixed mechanical restraints.

7.     The School shall arrange for adequate training of staff to ensure their safety and the safety of the School's students with respect to the requirements in points 2–4 above.

8.     A copy of changes to the School's policies implementing the injunctive relief set out in this Order, written in language approved by both parties, shall be posted in each cottage within twenty-four hours of the formal adoption of said changes.

By no later than forty-five days from the date of this Order, Defendants shall submit revised policies to reflect the changes required in points 2, 3, and 5 above.  They shall also provide an analysis of training required under point 7 above, along with a timeline for completing that training.

With respect to all submissions Defendants are required to make under this Order, Plaintiffs may file objections no later than twenty-eight days after Defendants make their final submission.  Plaintiffs' objections should be consolidated into one filing.  Defendants may respond to Plaintiffs' objections, if they choose to do so, by no later than fourteen days after Plaintiffs file their

objections.  The parties may rely on evidence in the record or may request an evidentiary hearing, which the Court will grant only if it is necessary to resolve the issues presented.

### 3.   Monitor

The Court will also appoint a monitor to ensure compliance with this injunction.  The terms of the monitor's appointment are as follows:

<u>Appointment</u>

1.   The parties will report to the Court, in writing, no later than forty-five days from the date of this Order, regarding their efforts to agree on a court monitor to oversee implementation of the Remedial Plan and compliance with this Order.  If they agree on a monitor, the name of this individual, along with his or her curriculum vitae and a budget, will be submitted at that time.  Appointment of an agreed-upon monitor is subject to the Court's approval.

2.   If the parties are unable to agree on a monitor, each side will submit a list of three names, along with the curriculum vitae of each, no later than forty-five days from the date of this order.  The court will thereafter select a court monitor from the proposed names.  At the time the names are submitted, the parties will also submit a proposed budget for the court monitor.

<u>Substitution</u>

3.   If after initial appointment, the monitor is unwilling or unable to continue to serve, then within 30 days of that occurrence, either:

   a.   the parties shall jointly file with the Court the name of an agreed proposed substitute, subject to the Court's approval, along with the individual's curriculum vitae and any changes to the previously approved monitor's budget; or

   b.   if the parties cannot agree upon the substitute, the parties shall each submit to the Court the name and qualifications of their respective proposed substitute—along with the individuals' curriculum vitae and any changes to the previously approved monitor's budget—and the Court will select the substitute.

<u>Duties</u>

4.   The monitor shall independently monitor the School's compliance with this Order and the Remedial Plan, identify actual and potential areas of non-compliance with this Order and the Remedial Plan, mediate disputes between the parties, and bring issues and recommendations to the Court for resolution.  Until the Court orders monitoring to end, the monitor shall visit the School at least three times in the year

after the Remedial Plan is adopted, at least twice in the subsequent year, and at least once per year thereafter. These visits shall be unannounced. Monitoring visits may last more than one day, if deemed necessary by the monitor. Defendants shall compensate the monitor for his or her reasonable time and expenses.

5.    The monitor may generally exercise his or her independent and professional judgment on what investigation or other actions are necessary throughout the year to ensure compliance with the Remedial Plan and this Order, subject to the following: in ensuring compliance with this Order's limitations on use of the BSU, seclusion room, and fixed mechanical restraints (if the use of such restraints is approved by the Court as set out above), the monitor shall review all written reports and video evidence, and interview relevant staff, witnesses, and the disciplined student, for a minimum of five percent of BSU/seclusion room placements and all placements in fixed mechanical restraints. This does not limit the monitor from reviewing additional evidence or conducting additional interviews if he or she deems it necessary to ensure compliance with this Order.

6.    The monitor may retain consultants. Before doing so, the monitor shall provide written notice to both parties. If a party objects, the party within seven days shall deliver written objections to the monitor and the other party. Within seven days after such delivery, the parties and the monitor shall meet and confer. If the parties and the monitor do not agree, either party or the monitor may file an appropriate motion with the Court. Defendants shall compensate the monitor for the reasonable time and expenses of such consultants. For the purposes of this paragraph "written" notice and objections may be transmitted via electronic means, such as email.

7.    Within 180 days of entry of the Remedial Plan, the monitor shall file with the Court, and deliver to the parties, a report regarding the status of Defendants' compliance with the Remedial Plan and this Order, including identification of any areas of non-compliance (the "Initial Report"). The monitor may file additional reports at his or her discretion, but must file at least one report with respect to each visit to the School, described in paragraph 4 above, that takes place after the monitor files the Initial Report.

Facilitation of Monitoring

8.    To facilitate monitoring, Defendants shall:

    a.    notify the monitor in writing (which includes by electronic means such as email) within twenty-four hours of any student's in-custody death, placement in fixed mechanical restraints, or transfer to a mental health facility;

    b.    provide the monitor with access to all facilities, documents, information, staff, and students at the School, and of any person or agency contracting with the School to provide services of any kind to the School's students, including but not limited to, full and complete access to all physical areas of the School, as

well as to any physical or electronic files or databases maintained by the School about the students and all video archives and security camera monitors;

c.      comply with reasonable requests by the monitor for any information that is related to his or her review and evaluation of Defendants' compliance with the Remedial Plan and this Order;

d.      allow the monitor to conduct private, ex parte interviews of students;

e.      allow the monitor to conduct private, ex parte interviews of the School's staff and School contractors; and

f.      allow the monitor to conduct unannounced visits to any School facility.

<u>Enforcement</u>

9.      At any time, if the monitor believes Defendants are or are reasonably likely to be out of compliance with any provision of the Remedial Plan or this Order, he or she shall promptly notify Defendants and Plaintiffs' counsel in writing. Likewise, if Plaintiffs' counsel believe Defendants are or are reasonably likely to be out of compliance with any provision of the Remedial Plan or this Order, they shall promptly notify Defendants and the monitor in writing. Within seven calendar days of such notice, the parties and the monitor shall meet and confer regarding this alleged non-compliance. If the parties and the monitor agree there is non-compliance, and how to remedy such non-compliance, such agreement shall be submitted to the Court as an agreed order. If the parties and the monitor dispute whether there is non-compliance, and/or how to remedy such non-compliance, the monitor or the Plaintiffs may move the Court for a new order finding non-compliance and ordering compliance. For the purposes of this paragraph, notice given "in writing" includes that which is transmitted via electronic means, such as email.

4.      Miscellaneous

The Court also orders the following with respect to the implementation of the injunctive relief described in this Order:

1.      The Court shall retain jurisdiction of this case until the Court orders monitoring to end. The Court shall order an end to monitoring when the School is found to be in substantial compliance with the Remedial Plan and the other requirements in Section IV.B.2, *supra*, for two full years, except that, for good cause, the monitor may continue such monitoring, subject to either party's request for Court review of the matter. Alternatively, either party may move the Court, upon a showing of good cause, for an order to continue such monitoring. In all events, such continued monitoring shall last for one additional year, subject to possible renewal as set forth in this paragraph.

2.    For the purposes of this Order, substantial compliance means that any violations of the Remedial Plan or this Order are minor and occasional, and are neither systemic nor serious.  However, if a serious violation of the Remedial Plan or this Order occurs, Defendants are in substantial compliance if they: (1) promptly notify the monitor and Plaintiffs' counsel of the violation; and (2) promptly identify the violation and develop and implement a timely and appropriate remedy that results in compliance.

3.    The Remedial Plan shall terminate when monitoring has ended.  If the parties dispute whether Defendants have achieved such substantial compliance, either party may move the Court to resolve the dispute.

4.    Either party may file a motion with the Court to request modification of the Remedial Plan or other injunctive relief set out in this Order.

5.    If any dispute arises under any aspect of the Remedial Plan or other injunctive relief set out in this Order, the parties shall attempt in good faith to resolve the dispute prior to raising the matter with the Court.

6.    The court-appointed monitor may communicate ex parte with the parties and their counsel.  If the monitor provides anything to the Court, he or she must simultaneously serve copies to the parties.  The monitor cannot meet with the Court without prior notice to the parties and an opportunity for the parties to be present.

7.    By no later than forty-five days from the date of this Order, the parties shall jointly submit a draft protective order (or a draft order extending previously granted protective orders) to ensure the confidentiality of the School's students and their School records during the monitoring process.  The monitor and the monitor's consultants shall maintain the confidentiality of all information that they obtain pursuant to this Order and any subsequent orders pertaining to the implantation of injunctive relief, in compliance with the protective order described in this paragraph.

8.    As an alternative to the injunctive relief set out in this Order, the parties may reach an agreement as to injunctive relief, which they must submit to the Court for approval no later than forty-five days from the date of this Order.

## V.    CONCLUSION

For the reasons set forth above, the Court finds in favor of Plaintiffs as to the issue of liability on Count I; it finds in favor of Defendants as to the issue of liability on Counts III and IV. The Court declines to grant Plaintiffs declaratory relief, but the Court imposes injunctive relief as set out in Section IV.B, *supra*.

Because the Court still needs to consider Defendants' proposed plan to remedy the constitutional deficiencies in the School's mental health treatment programs, judgment will not enter at this time, and no action by the Clerk of Court is required in this regard.

IT IS SO ORDERED.

Dated this 30th day of March, 2020.

STEPHANIE M. ROSE, JUDGE
UNITED STATES DISTRICT COURT