# Initial Monitor's Report
## Case 4:17-cv-00417-SMR-HCA

Progress Toward Compliance with the Remedial Plan
For the Iowa Boy's State Training School

February 1, 2021

Kelly Dedel, Ph.D., *Monitor*
Daphne Glindmeyer, MD, *Subject Matter Expert*

One in 37 Research, Inc.
16 Rock Street Cody, WY 82414
(503) 799-0915 Kelly.dedel@gmail.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................4

MENTAL HEALTH CARE.....................................................................................................................7

*MH-I Injunctive Relief Required by Court Order: Identify the treatment that is clinically indicated for student's mental illnesses, including psychotherapy, and formulate treatment plans.* ..................................7

   MH-I.A. Multi-Disciplinary Treatment Team.. ........................................................................................7

   MH-I.B. Mental Health Treatment Plans.. ........................................................................................... 11

   MH-I.C. As-Needed Referrals ............................................................................................................. 16

   MH-I.D. Policy and Procedure............................................................................................................ 18

*MH-II Injunctive Relief Required by Court Order: Provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective.* . 20

   MH-II.A. Therapeutic Services............................................................................................................ 20

   MH-II.B. Skill-based and Rehabilitative Services................................................................................. 25

   MH-II.C. Mental Health Staffing......................................................................................................... 26

   MH-II.D. Policy & Procedure .............................................................................................................. 28

*MH-III Injunctive Relief Required by Court Order: Ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School.* ........................................................................................................................................................ 28

   MH-III.A. Student Records Policy & Procedure .................................................................................. 29

*MH-IV Injunctive Relief Required by Court Order: For students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation.* ........................................................... 30

   MH-IV.A. 24/7 Crisis Response .......................................................................................................... 30

   MH-IV.B. Suicide Prevention and Intervention.................................................................................. 31

   MH-IV.C. Multi-Sensory De-escalation Tools and Spaces .................................................................. 34

   MH-IV.D. Therapeutic Crisis Response Unit ...................................................................................... 35

   MH-IV.E. Hospital Level of Care ........................................................................................................ 36

   MH-IV.F. Suicide Prevention Policy & Procedure .............................................................................. 37

*MH-V Injunctive Relief Required by Court Order: For students receiving MH treatment at the school, attempt to arrange for MH care services in the community so students may continue their treatment upon discharge.* ....................................................................................................................................... 39

   MH-V.A. Discharge Planning Policy & Procedure ............................................................................... 39

*MH-VI Injunctive Relief Required by Court Order: Provide institutional oversight and structural coordination of the School's MH program.* ................................................................................................. 41

   MH-VI.A. Oversight, Observation and Monitoring ............................................................................ 42

   MH-VI.B. Quality Assurance Policy & Procedure................................................................................ 44

MH-VI.C. Ongoing Training .................................................................................................... 45

SECLUSION AND RESTRAINTS ......................................................................................... 46

*RC-I Injunctive Relief Required by Court Order: Defendants must ensure the School only employs use of BSU or the seclusion room in situations where a student' behavior poses a serious and immediate risk of physical harm to any person.* ................................................................................................ 46

RC-I.A. Seclusion Policy. ........................................................................................... 46

RC-I.B. Behavior Management/Motivation. ............................................................... 52

RC-I.C. Direct Care Staffing........................................................................................ 55

*RC-II Injunctive Relief Required by Court Order: Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted to their room due to lack of privileges. Students may not be required to eat their meals in CMH rooms. Students may not be denied out-of-room recreation time available to other students.*................................................................. 56

RC-II. CMH Program. ................................................................................................ 56

*RC-III Injunctive Relief Required by Court Order: The School shall not use the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of this Order. All Students at the School shall be notified immediately, both orally and in writing, that the Wrap is no longer to be used by the School.* 57

RC-III. Restraint Policy and Practice. ....................................................................... 57

*RC-IV Injunctive Relief Required by Court Order: For the School to use fixed mechanical restraints instead of the Wrap, they may only do so with leave from the Court upon showing:*................................................... 58

RC-IV. Fixed Mechanical Restraints.......................................................................... 58

Appendix 1. Compliance Table................................................................................... 59

Appendix 2. Steps Toward Achieving or Maintaining Substantial Compliance ........................................... 61

## INTRODUCTION

In 2017, Plaintiffs' counsel brought suit against Iowa's Department of Human Services (DHS) and the Iowa Boys' State Training School (STS) alleging inadequate mental health care, an overreliance on isolation and the improper use of fixed mechanical restraints. The case went to trial in June 2019 and on March 30, 2020, the Honorable Stephanie Rose issued her order (dkt. 328). The Trial Order required Defendants to draft a Remedial Plan that addresses the various considerations necessary to overcome the deficiencies noted in the Trial Order, including policy, practice, staffing, training and internal oversight. The Trial Order also required the appointment of a Monitor to oversee Defendants' compliance with the Remedial Plan. Defendants and Plaintiffs' counsel jointly proposed Dr. Kelly Dedel, whom Judge Rose appointed on April 22, 2020 (dkt.337). Dr. Dedel selected Dr. Daphne Glindmeyer to serve as her Subject Matter Expert (SME) and both parties approved the selection.

The Court approved Defendants' Remedial Plan—which was drafted in collaboration with the Monitor, SME and Plaintiffs' counsel—on July 27, 2020 (dkt. 354). The Trial Order requires the Monitor to submit an initial report on the conditions at STS within six months of the effective date of the Remedial Plan. The Monitor proposed a slight modification to this timeline, which was accepted by the Court (dkt. 367). This report serves as the "Initial Monitor's Report."

The Remedial Plan includes 19 provisions related to mental health care and 6 provisions related to seclusion [room confinement] and restraints. Most of these provisions are multi-faceted and complex and contain multiple requirements. The Monitor has recommended compliance ratings for each provision for the Court's consideration, based on interviews with administrators, remote observation of facility practices and extensive document review. As noted in the Remedial Plan (VI.B.3.a), these are not legal determinations.

As detailed in the body of this report, of the 19 mental health provisions, the Monitor recommends substantial compliance ratings for 7 provisions and partial compliance ratings for 9 provisions. The Monitor does not recommend a non-compliance rating for any provision. With regard to the other three mental health provisions (MH-IV.D "Therapeutic Crisis Response Unit"; MH-VI.B "Quality Assurance Policy and Procedure"; and MH-VI.C "On-going Training"), the Monitor has not suggested compliance ratings because the provisions are not yet due under the timelines of the Remedial Plan. Of the 6 provisions related to the use of room confinement and restraints, the Monitor recommends a substantial compliance rating for 3 provisions and partial compliance ratings for 2 provisions. The Monitor does not recommend a non-compliance rating for any of the room confinement and restraint provisions. The Monitor has not suggested a compliance rating for one provision (RC-IV "Introduction of Fixed Mechanical Restraints") because it is currently Not Applicable.

Relatedly, it is important to recognize that recommended compliance ratings are not static. Recommended compliance ratings are expected to be upgraded as DHS/STS shores up implementation and service delivery as advised throughout this report. Conversely, recommended compliance ratings may also be downgraded if new information suggests that practice has deteriorated or if information gleaned from youth and staff interviews reveals problems that were not visible via document review, remote observation and administrative interviews.

As is detailed in the following report, STS has developed a robust set of policies and procedures that, once fully implemented, should transform the services available to youth at STS and the tools available to staff who are charged with their care and treatment. In contrast to other reform efforts with which the Monitor/SME have been involved, STS was tasked with not simply improving the *quality* of mental health services, but rather *creating* the mental health department from the ground up. Hiring and scheduling clinicians, establishing lines of communication and structures for clinical supervision, integrating new services into STS's existing operation, introducing services to the boys at STS and developing clinician's skills are all complicated. The STS mental health team is in its infancy, and thus the substance of the treatment plans, therapeutic interventions and multi-disciplinary team meetings designed to assess progress and reflect on the effectiveness of treatment have not yet coalesced to an adequate or substantially compliant level of service informed by professional standards. As is typical of many newly formed systems, effective services are currently hindered by overly complex treatment plans that do not yet appear to efficiently guide treatment delivery. Specific recommendations are provided for improving practice in each area.

With regard to the use of room confinement and restraints, STS quickly abolished the use of fixed mechanical restraints and disbanded its isolation-based disciplinary program, now significantly limiting the use of isolation to circumstances in which a youth poses a serious and immediate risk of physical harm. Some improvements are needed to the documentation surrounding the use of room confinement, but the overall rate of progress is commendable. Changes in practices for incentivizing positive behavior, teaching youth the skills they need to manage their own behavior more effectively and for responding to misconduct when it occurs have only just begun as of the drafting of this report. Subsequent reports will describe and assess the quality of implementation of these various tools.

Immediately upon the Monitor's appointment and continuing thereafter, DHS/STS have facilitated high levels of contact and have provided all documents and meetings requested by the Monitor and SME. As a result, a strong collaborative relationship is well underway. Similarly, the Monitor and SME have developed a solid collaboration with Plaintiffs' counsel by sharing impressions and comments on Defendants' various written products and attending to concerns generated by Plaintiffs' insight into STS's conditions at the time of trial. While the trial was reportedly acrimonious at times, the Monitor is pleased to report that the remedial phase has proceeded efficiently and respectfully, as both parties have made space to hear the other side's perspective.

The COVID-19 pandemic presents significant challenges to STS's operation. Youth, staff and administrators are under significant stress given the concern for their own health and that of their loved ones. Mitigation strategies have impacted staff's availability, admissions procedures, housing flexibility, program delivery, and opportunities for family engagement and have brought new complexities to nearly every facet of the operation. All that to say, this is a difficult time to embark on a comprehensive reform effort. However, even with these and other stressors, DHS and STS have made remarkable progress in the six months since the Remedial Order went into effect. The Monitor's experience in other jurisdictions has shown the pathway to reform to be complex and unpredictable, and too often progress is thwarted by unanticipated challenges. Impressively, Defendants have remained focused, organized, motivated and productive throughout this time, which bodes well for accomplishing the overarching goal of improving

facility conditions and services for the youth at STS and the related goals of providing staff with additional tools and options for ensuring facility safety and increasing youth's readiness for release to the community.

Since the Monitor's appointment, DHS/STS has provided unfettered access by quickly responding to the Monitor's requests for information with extensive, well-organized documentation and scheduling opportunities to observe facility operations and to talk to the variety of stakeholders. While the COVID-19 pandemic brought unique challenges to the task of monitoring compliance with the Remedial Plan, the monitoring strategy was comprehensive. The period under review for this report is approximately five-months, from July 27, 2020 (the effective date of the Remedial Order) through December 31, 2020. In addition to many consultations with DHS/STS administrators, observations of several Multi-Disciplinary Treatment Team meetings and a virtual "tour" of the facility, the Monitor also requested a wide array of documents to review STS's proof of practice between 8/1/20 and 11/15/20.  The early phases of reform are focused on the development of policy and procedure, both of which can be suitably guided from afar by commenting on draft policies, discussing objectives with administrators and providing technical assistance when needed. DHS/STS's responsivity to all requests for information, coupled with the Monitor's and SME's extensive monitoring experience in facilities throughout the country permitted a rigorous analysis of each key requirement. That said, the Monitor's and SME's decision not to travel on-site during the pandemic did impact the extent to which youth and staff's perspectives were integrated into the findings. [1] Once the health risks associated with travel subside, the Monitor and SME look forward to the insight into facility practices that will come with input from the broader array of stakeholders. Subsequent Monitor's reports will include their perspectives.

This report is organized in the following manner. The Remedial Plan includes six sections in response to the Court's Order regarding mental health services (MH-I to MH-VI) and an additional four sections for the parts of the Court's Order pertaining to seclusion and restraints (RC-I to RC-IV). In each section, this report first presents the injunctive relief ordered by the Court, followed by the overall goal of the Remedial Plan that corresponds to that section of the Court's Order. Each section then contains subsections corresponding to the specific requirements of the Remedial Plan. For each subsection, the requirements of the Remedial Plan are presented (paraphrased in some cases) along with a narrative describing Defendants' efforts, to date, to meet the requirements and a suggested compliance rating for the Court's consideration. Each section also includes recommended steps toward achieving and/or sustaining substantial compliance. The Monitor's and SME's methodology and source documents for assessing progress are also listed. Two appendices present 1) a compliance table and 2) a listing of the many recommendations made toward achieving or maintaining substantial compliance.

Overall, the Monitor and SME are pleased with Defendants' progress, appreciative of the collaboration with Plaintiffs' counsel and optimistic about the likelihood of successful reform of the conditions and services at STS in accordance with the Court's orders.

---

[1] The Monitor attempted to visit STS twice. One visit was cancelled due to an outbreak of COVID-19 at the facility and the other was cancelled due to a medical emergency in the Monitor's family. In both cases, STS was—and remains—prepared to provide access to all staff and youth upon the Monitor's request.

## MENTAL HEALTH CARE

**MH-I Injunctive Relief Required by Court Order**: Identify the treatment that is clinically indicated for student's mental illnesses, including psychotherapy, and formulate treatment plans.

**Goal of the Remedial Plan**: BSTS will develop integrated (therapeutic, skills-based, rehabilitative-based and psychiatric care) mental health ["MH"] treatment plans that are based on information obtained from a screening/assessment/evaluation process that is implemented and defined by policy and procedure.

**MH-I.A. Multi-Disciplinary Treatment Team**. BSTS shall utilize a multi-disciplinary treatment team ["MDT"] approach to provide integrated mental health treatment services to students who have mental health treatment plans or are in the process of developing a mental health treatment plan.
MH-I.A.1. MDT Members. The MDT shall be comprised of the Director of the Mental Health Department/Mental Health Authority, psychotherapists, social workers, psychiatric providers and a non-psychiatric medical provider.
MH-I.A.2. MDT Information. The MDT shall ensure that relevant information from other BSTS staff is obtained and considered through in-person or written communication.
MH-I.A.3. Student/Parent. The MDT shall ensure that the student and their parent/guardian are involved in the treatment planning and review process and are aware of treatment progress.
MH-I.A.4. MDT Facilitator. The MDT shall have a facilitator that will ensure that members actively participate to develop, monitor and revise treatments and supports as needed.
MH-I.A.5. Monthly Review. The MDT shall meet regularly and as needed to review cases and discuss treatment progress and planning to ensure that each student's progress toward treatment goals is reviewed at least monthly.

Findings.

STS addressed the composition and function of the Multi-Disciplinary Treatment Team (MDT) required by this provision in the *Mental Health Services* policy approved by the Court on 10/27/20 (dkt. 362). This policy reflects each of the requirements of this provision. The substance of the policy is reviewed in MH-I.D "Policy & Procedure," below, along with the particulars of staff training.

### MH-I.A.1 MDT Members

The purpose of an MDT is to coordinate services so that the clinicians can provide integrated treatment to the youth. Information is needed from as many professionals involved with the youth and his life domains as possible. This is in order to ensure that the youth's treatment attends to peer and family dynamics, experiences in school, medical needs, etc. An in-person meeting among all those involved with the youth's care is essential so that there is a common understanding of the youth's circumstances and challenges and so that care by all these professionals is coordinated. The physical presence of professionals working with the youth is optimal so that there can be an exchange of information and discussion. If one's physical or virtual presence is not possible, a written update of the youth's functioning in the relevant domain is acceptable, but this should be the exception, not the norm.

In order to determine adherence to this requirement, minutes from 13 weekly MDT meetings (9/1/20 to 11/24/20) were reviewed and three MDT meetings were observed by the Monitor/SME.

MDT minutes and observations confirmed that at each meeting, input (whether in-person, via a designee, or via written report) was considered from all of the required participants or their designee.

Given where STS is now, increasing in-person participation from the psychiatrist is necessary to achieve diagnostic clarity, as discussed further in MH-I.B.2 "Treatment Plan Informed by Assessment," below. Even when diagnostic concordance is established, direct participation from the psychiatrist is still needed to increase the cohesion among the various mental health team members so that treatment can be truly integrated.

## MH-I.A.2 MDT Information

In an initial MDT meeting, the youth's assessment results should be presented, and the diagnosis, symptoms and risk factors need to be discussed in order to inform the development of the treatment plan, which is typically written shortly thereafter by the treating clinician. In subsequent MDT meetings, the purpose is to review the youth's progress or lack thereof toward attainment of his treatment goals. For the purpose of efficiency, the MDT's discussion needs to center on the youth's progress toward treatment goals, with relevant information from the various life domains to inform the understanding of the youth's progress or lack thereof.

As evidenced by the MDT minutes and the MDT meetings that were observed, a great deal of information was provided regarding the youth scheduled for review from the youth's primary mental health treatment provider as well as nursing, educational, and cottage staff. At times, the information was anecdotal, and not related to the youth's specific treatment goals or objectives. While additional information can be useful, the MDT needs to focus on reviewing the youth's progress toward the identified treatment goals. It should be noted that the lack of focus on specific goals and objectives is not surprising and is a common occurrence with young (*i.e.*, newly formed) treatment teams, particularly when the treatment plans lack clarity and precision, as described in MH-I.B. "Mental Health Treatment Plans," below. As the team coalesces and becomes more familiar with the MDT structure and the treatment plans evolve into more user-friendly documents, this should improve. In fact, the more recent MDT minutes revealed more focus on the youth's treatment goals. This was good to see.

Following improvement of the treatment planning documents, as discussed below in provision MH-I.B "Mental Health Treatment Plans," the mental health treatment providers and the MDT can use more objective (*i.e.*, data-based) information to determine the youth's progress. These objective criteria should be included in the treatment plan itself (*e.g.*, reductions in fighting, reductions in specific symptoms) as a component of the treatment goals that include metrics and designate specific objective data (*e.g.*, behavioral data, assessment scales normed for this population, Likert scale, mood trackers).

## MH-I.A.3 Student/Parent Participation

In an MDT meeting, participation by the youth is essential to simulate/maintain buy-in to the treatment process, which flows from the youth knowing and understanding what his goals are and talking about his progress toward them, or his objections to the focus of therapy. Parents need to be involved to both inform the understanding of the youth's current circumstances and also as an essential advocate for the youth's continued engagement in the therapeutic process, both while in custody and upon release to the community.

Following technical assistance from the SME, where youth participation in the MDT process was recommended, the youth scheduled for review participated in the second MDT observed. Further, a review of more recent MDT meeting minutes revealed consistent participation by the youth under review. This was good to see. The facility's mental health leadership indicated plans to continue the

youth's participation. In each of the MDTs reviewed, the youth's primary mental health treatment provider reported attempts to contact the youth's parent/guardian to allow for participation, and these were recorded in the mental health progress notes in a few cases. However, parents/guardians did not directly participate in any of the MDT minutes reviewed or meetings observed to inform this report. Moving forward, clinicians should keep a record of every attempt to contact a parent or guardian, and when contact is established, should write a progress note detailing the substance of that conversation. This could be accomplished by the inclusion of a telephone log in the youth's mental health record.

## MH-I.A.4 MDT Facilitator

An MDT meeting needs a leader to guide the discussion, keeping it on track and focused on the goals and objectives, and to ensure that participation from each member of the team is solicited.

In each of the three MDT meetings observed, both the DHS Clinical Director and the facility's Mental Health Authority were present. Meeting facilitation would benefit from efforts to more narrowly tailor the discussion around the youth's treatment goals, objectives and progress, and the need for any changes to the prescribed intervention. In the third MDT meeting observed, the facility's Mental Health Authority more actively facilitated the meeting. This was good to see and is opined to be an indication of her growth into her position as a leader of the facility's treatment team. The MDT's discussion is clearly becoming more focused, but continued improvement is necessary.

The observations and MDT minutes demonstrated some effort to identify necessary adjustments to the youth's treatment plans, but as the team becomes more adept and focused on the goals/objectives/interventions and as the treatment plan documents improve, this should improve as well.

## MH-I.A.5 Monthly Review

Youth's progress needs to be regularly reviewed, to determine the need for adjustments to their goals, objectives and interventions. When a youth is meeting his treatment goals, new goals need to be established in order to further address the youth's symptoms. If a youth is not progressing, the MDT must discern the reason for the lack of progress and adjust the course of treatment accordingly (*e.g.*, making goals more realistic, breaking the objectives into smaller steps, changing interventions). Adjustments to the youth's treatment plans need to be made quickly to ensure that the youth receive the treatment that they need.

A random sample of 15 youth on the mental health caseload was identified and the MDT meeting minutes were reviewed for the 12 youth who were admitted more than 30 days prior to the end date of the sampling frame.[2] Based on this review, it appears that following admission to the facility, there is an approximate six-week period prior to the initial MDT staffing for STS youth. For example, Youth AP was admitted 9/8/20 with an initial MDT on 10/20/20; Youth GS was admitted on 8/24/20 with an initial MDT on 10/6/20, and Youth JG was admitted on 9/14/20 with an initial MDT on 10/27/20. Currently, the facility has a 30-day period within which to complete the youth's initial assessment and treatment plan, then the youth is reviewed by the MDT two weeks later. STS needs to change the order of these events, by 1) assessing the youth promptly upon admission, 2) holding the initial MDT meeting to discuss the assessment results and proposed course of treatment, followed by

---

[2] Youth DqW was admitted on 10/19/20, Youth JR was admitted on 10/14/20, and Youth ND was admitted on 10/21/20. Their mental health files were reviewed, but because of their short length of stay to date, the files did not yet include the full set of documents.

3) the clinician's developing the written treatment plan using the input of the MDT and in collaboration with the youth, all within 30 days as required by provision MH-I.B.1 "Treatment Plan 30-day Timeline," below.

As noted above, three youth who were recently admitted to the facility were not included in the assessment of the monthly review requirement, given that 30 days had not yet elapsed at the time the documents were submitted to the Monitor. During a 13-week review period, approximately three reviews by the MDT would be expected, depending on the date of admission and whether the youth remained in custody throughout the period.[3] Of the 12 youth remaining in the mental health sample:

- Three youth were reviewed one time during the 13-week period. This was reasonable given the date of their admission (late September 2020) and the 30-day timeline for the treatment plan to be developed;

- Five youth were reviewed twice during the 13-week period. For two of these youth, this was an appropriate frequency given their date of admission, <u>however three of these youth (25% of the full sample) were admitted well in advance of the sampling time frame, remained in custody at STS, and thus should have been reviewed one additional time during the 13-week period</u>.;

- Three youth were reviewed three times during the 13-week period; and

- One youth was reviewed four times during the 13-week period.

In summary, three of the 12 youth in the sample (25%) were not reviewed at the required frequency.

In addition, a review of the MDT meeting minutes revealed that on six occasions, youth (some of whom were not in the mental health sample and so not all of these meetings are included in the calculations above) were scheduled for review by the MDT due to a "special concern." This was good to see and indicative of the MDT's responding to emerging symptoms or difficulties the youth may be experiencing.

Summary

Overall, the STS MDT meeting process is in its infancy and is progressing as expected. The facility's Mental Health Authority expressed plans to adjust the MDT process. This will not require a revision to the current *Mental Health Services* policy. The plan is to shift to a new team structure inclusive of the required participants via a cottage-based MDT review. The Mental Health Authority's goal is to incorporate a review of the youth's mental health treatment plan, the youth's progress in the behavioral management/incentive program, and the youth's progress in the facility level/program tracking system. The change in MDT structure is in an effort to conserve staff time and reduce the amount of time staff spend in meetings, all to provide clinicians with more time to provide therapeutic interventions. This new process began December 16, 2020.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Establish routine participation by the psychiatrist in the MDT meetings, either in person or virtually.

---

[3] These data were calculated using STS's current process which, as discussed above, allows for an initial 6-week period.

2) If not attending the MDT meeting in person, continue to solicit information from education and cottage staff to inform the MDT.
3) Focus the MDT on a review of the youth's progress toward the treatment plan's established goals and objectives using more objective data.
4) Continue to ensure youth participation in the MDT process.
5) Continue and document attempts to contact the youth's parent/guardian in an effort to encourage their participation in the MDT process.
6) Complete the admission assessment, initial MDT meeting and treatment plan development within a 30-day time period.
7) Focus on the goals/objectives/interventions and determine alterations to the youth's treatment plan collaboratively via the MDT meeting, in consultation with the youth and their parent/guardian.
8) Ensure that each youth on the mental health caseload is reviewed by the MDT on a monthly basis and that the substance of the review is reflected in the MDT meeting minutes.
9) Continue the MDT response to emerging needs and special concerns.
10) Develop quality assurance measures to review the MDT process and allow for self-monitoring.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Consulted with DHS Clinical Director and STS Mental Health Authority
- Observed MDT meetings (10/27/20, 11/10/20, 11/24/20)
- Provided technical assistance/Case review meetings (11/12/20, 12/4/20, 12/11/20)
- Reviewed MDT meeting minutes from 9/1/20 to 11/24/20
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth

**MH-I.B. Mental Health Treatment Plans**. By 60 days from the effective date, BSTS will develop integrated mental health treatment plans that address the needed interventions including therapeutic and skills-based services that focus on evidence-based practice, rehabilitative services and psychiatric interventions. Note: Psychiatric services to be included at 60 days; otherwise, the below items are in effect on the effective date.

MH-I.B.1. Treatment Plan 30-day Timeline. The Plans shall be completed within 30 days of admission following a complete screening/assessment/evaluation process.

MH-I.B.2. Treatment Plan Informed by Assessment. The Plans shall be directed or informed by the screening/assessment/evaluation information gathered upon admission.

MH-I.B.3. Treatment Plan Development. The Plans shall be developed primarily by the student's assigned psychotherapist in collaboration with the student.

MH-I.B.4. Goals/Objectives. The Plans shall include measurable goals and objectives related to the student's diagnosis(es).

MH-I.B.5. Evidence-Based Interventions. The Plans shall include treatment interventions for individual psychotherapy and group psychotherapy that focus on evidence-based practice.

MH-I.B.6. Rehabilitative/Skill-Based Interventions. The Plans may include rehabilitative and/or skills-based interventions designed to further address the student's clinical needs.

MH-I.B.7. Duration/Frequency. The Plans shall note the duration and frequency at which the recommended interventions or services are expected to occur, as well as the professional responsible for the intervention.

MH-I.B.8. Progress Reviews. The Plans shall be reviewed for progress no later than every 30 days or sooner if the student demonstrates significant progress or lack thereof, significant functional improvements or deterioration, or as needs arise or change based on feedback from the student, parent, JCO, multidisciplinary team members or cottage staff.

Findings.

STS developed procedures for mental health treatment plans in the *Mental Health Services* policy approved by the Court on 10/27/20 (dkt. 362). This policy reflects each of the requirements of this provision. The substance of the policy is reviewed in MH-I.D "Policy & Procedure," below, along with the particulars of staff training.

Mental Health Treatment Plans are documents developed by treatment providers in collaboration with youth and the youth's parent/guardian that outline the proposed goals of treatment including an objective measure of goal attainment, goal-derived objectives or smaller achievable steps toward the ultimate broader goal, and specific interventions to allow an individual to reach his treatment goal. The goals should be specific to the individual as well as realistic and attainable. The goals must be based on the individual's assessment and diagnoses and should include psychiatric goals. The use of SMART goals (*i.e.*, goals that are Specific, Measurable, Attainable, Relevant and Time-Bound) is one way to ensure specific metrics become part of STS's treatment plans. Treatment plans are necessary and important as they act as a road map, guiding both the therapist and the youth and allowing for objective measurement to determine if therapeutic interventions are working (*e.g.* if the youth is achieving his objectives) or to determine if interventions need to be adjusted. The overarching criteria for determining a treatment plan's adequacy is whether it is understandable to both the clinician and youth and whether it can effectively guide treatment.

MH-I.B.1 Treatment Plan 30-day Timeline

Per policy, a youth's treatment plan must be completed within 30 days of admission following the screening, evaluation, and assessment process. This is required so that the youth's course of treatment is determined and proceeds expeditiously. Of the 15 youth included in the random sample of youth on the mental health caseload, 9 youth were admitted to the facility after 9/1/20. The 6 youth admitted prior to that date were excluded from the review of timeliness because they were admitted well prior to the *Mental Health Services* policy being issued. Among the 9 youth reviewed for timeliness, only two youth's treatment plans (22%) were completed within the required 30-day period. One youth (Youth DqW) did not have a treatment plan. This youth refused to attend treatment with the assigned male therapist, stating his preference for a female therapist. The MHA made multiple attempts to engage, which is positive. However, a treatment plan focused on engagement should have been developed. On the whole, treatment plan development needs to occur within the required 30-day timeframe.

MH-I.B.2 Treatment Plan Informed by Assessment

A youth's screening, evaluation and assessment informs the providers about the youth's symptoms, risk factors and diagnosis(es) that should be targeted by the treatment plan. A treatment plan that is not based on assessment information would be random and would include esoteric goals and treatment not tailored to a youth's specific needs. That said, assessment information is multi-faceted and complex. Multiple professionals (*i.e.*, the psychiatrist and psychologist) offer their opinion

about the youth's appropriate diagnosis, and sometimes, these are in conflict. Consensus must be achieved by reviewing the diagnostic criteria of the DSM-5 and identifying which diagnosis(es) best reflect the youth's presenting symptoms.

Treatment planning at STS is challenged by the need for diagnostic clarity. There were youth with multiple, often conflicting, diagnoses that made treatment planning difficult for the treatment providers. For example, youth had diagnoses of unspecified anxiety disorder or unspecified depressive disorder, suggesting the need for further diagnostic clarity. Further, for youth with diagnoses of a mood disorder in combination with oppositional defiant disorder, the presence of a disruptive mood dysregulation disorder could be considered. In other cases, youth were diagnosed with Posttraumatic Stress Disorder (PTSD) in combination with Generalized Anxiety Disorder. Specific criteria for PTSD indicate that an anxiety disorder diagnosis would not be considered if anxiety symptoms are better explained by another mental health disorder such as reminders of traumatic events. In other cases, multiple diagnoses were given, suggesting the need for a reassessment to achieve diagnostic clarity.

Nine of the 14 treatment plans reviewed included interventions and/or goals that were not aligned with the youth's diagnosis or did not address each of the youth's diagnoses. One youth (Youth JG) is diagnosed with a Specific Learning Disorder, with impairment in reading. The treatment plan for this youth was not informed by this diagnosis, as the treatment interventions included options to assign a therapy homework planner. This would be a difficult activity for the youth to complete independently due to his reading impairment. In other examples, the treatment plan focused on behavioral/conduct issues rather than symptoms specific to a mental health diagnosis. For example, Youth LHM's diagnoses included Conduct Disorder, Oppositional Defiant Disorder, PTSD, and Major Depressive Disorder. This youth's treatment goals did not reveal any focus on depressive symptoms or trauma sequelae.

## MH-I.B.3 Treatment Plan Development

The clinician and youth must develop treatment plans collaboratively. They are the two most essential participants in the treatment process. The youth must be aware of his goals, objectives and what interventions will be deployed in order to increase his buy-in. The treatment planning process is also an important opportunity to offer psychoeducation to help the youth understand his symptoms and what his diagnosis means in order to reduce stigma and create a foundation for on-going treatment in the community. Typically, the SME interviews youth about their treatment to discern the youth's level of involvement in the creation of the treatment plan.

A review of treatment plans for the 15 randomly selected youth in the mental health sample revealed that they were developed by the youth's mental health treatment provider, as required. However, given the Monitor/SME's decision not to travel on-site and interview youth, it was not possible to discern the youth's level of participation in the development of the plan. This will be explored further during the Monitor/SME's youth interviews.

## MH-I.B.4 Goals/Objectives

Goals both drive treatment and provide an indicator for measuring treatment progress. They should be selected based on the youth's presenting symptomatology and/or risk factors and should include psychiatric goals. Objectives are required to illustrate the pathway toward goal achievement and to break the goal into its component parts. Measurable goals, underlying objectives and data-based metrics are standard practice, and all are necessary to identify treatment progress or the lack thereof.

While there are specific goals and objectives included in the youth's treatment plans, in many cases they were not clearly measurable and/or exclusively relied upon youth's self-report. However, when reviewing the therapists' case notes, it was apparent that in some cases, therapists *are* using specific rating scales to determine progress. These rating scales should be part of the treatment plan, included as a metric for measuring treatment progress. Further, the objectives were generally not constructed as small steps designed to meet the overall broad goal, but rather as larger, secondary goals. In many examples, the goals and objectives were overly complicated and difficult to follow, which undercuts their usefulness as a tool to guide treatment.

At STS, psychiatric goals are typically included in the treatment plans of youth who are prescribed psychotropic medication. While present in the treatment plans, psychiatric goals would benefit from simplification, deconstructed to their component parts and rephrasing into observable, measurable behaviors (*i.e.*, attend medication management appointments, medication compliance).

MH-I.B.5 Evidence-Based Interventions

Therapy must be grounded in evidence-based interventions, the effectiveness of which have been determined in clinical studies. Adherence to evidence-based practices provides the most efficacious treatment and is the accepted standard of care. As such, treatment plans must designate evidence-based interventions for both individual and group psychotherapeutic interventions.

Evidence-based interventions are available at the facility as discussed below in section MH-II.A "Therapeutic Services." A review of the treatment plans revealed that for individual therapies, cognitive behavioral interventions were designated, which are evidence-based. All youth's treatment plans included an individual therapy intervention. [The delivery of these services is discussed in MH-II.A, below.]

Various therapeutic groups are facilitated by mental health clinicians at STS, some of which are evidence based (*i.e.*, Conquering Negative Thinking for Teens; COPE to Thrive; Power Source-Taking Charge of Your Life). Some STS group therapies utilize evidence-based techniques, even though they are not part of a packaged, evidence-based curriculum (*e.g.*, Pursuing a Meaningful Life Despite Our Trauma, Emotional Masculinity, Yoga and Mindfulness). Such interventions are necessary to respond to the needs of many STS youth and are certainly worthwhile. A variety of therapeutic groups are available at STS, but the youth's treatment plans did not regularly include the specific group psychotherapeutic intervention prescribed.

MH-I.B.6 Rehabilitative/Skill-Based Interventions

Youth may also need interventions that do not necessarily need to be facilitated by a mental health clinician, despite being part of their mental health treatment. These include groups that are designed to teach youth skills needed to address specific risk factors or an opportunity to practice skills taught in individual or group therapy. Some of these may also be evidence-based.

STS has a variety of such groups including Dialectical Behavioral Therapy Skills Training (DBT), Gang Resistance Intervention Program (GRIP), Adolescent Sexual Abuse Program (ASAP), Achieving Maximum Potential (AMP; life skills), Residential Substance Abuse Treatment (RSAT), Applied Community Transition program (ACT; life skills), Rebound group (drug/alcohol education), Essential Instruction (faith-based re-entry), and a Parenting Skills course. Some of these groups were prescribed in youth's treatment plans (*i.e.*, DBT, GRIP, ASAP and RSAT). Other groups listed above, while included on STS's inventory of rehabilitative/skill-based interventions, were not prescribed by any youth's

treatment plan. STS staff members leading these rehabilitative/skill-based interventions have reportedly received the appropriate training to do so.

## MH-I.B.7 Duration/Frequency

Like any prescription for medication that prescribes dosage, frequency and length of time, treatment plans need to specify the frequency and duration of each intervention. This not only creates accountability for service providers, but also informs the youth of the expectations for his involvement in treatment.

For individual psychotherapy interventions, the treatment plans generally included the frequency, duration and practitioner for individual sessions. As noted above, many group interventions were not prescribed on youth's treatment plans, although youth may have been participating in them. Those that were prescribed on the youth's treatment plan did not always include the necessary information regarding duration and frequency. [The delivery of these services is discussed in MH-II.A and MH-II.B.]

## MH-I.B.8 Progress Reviews

It was apparent that when youth were experiencing difficulties, they were scheduled for progress reviews by the MDT, with this designated as "special concern." This was good to see. While the more recent MDT minutes included planned revisions to the youth's treatment plans, it was difficult to discern whether the treatment plans were actually revised because plans were not marked as an "update." This would be a helpful designation in order to easily distinguish the most recent/updated plan so that revisions discussed in the MDT meetings can be verified.

As discussed above in MH-I.A.5 "Monthly MDT Meetings," treatment progress reviews did not occur at the required frequency for 25% of the 12 youth in the mental health sample assessed for timeliness.

## Summary

Overall, the review of the youth's treatment plans revealed a need for simplicity and direction, both from the diagnostic perspective and the treatment planning perspective. Smaller, achievable, measurable goals are important to allow the youth to both understand the goals of treatment and to experience success with goal attainment. Once the initial goal has been achieved, secondary goals can be developed. Further, interventions must include all the prescribed therapies (*e.g.,* individual, therapeutic group, skill-based/rehabilitative services, psychiatry) that a youth will be engaged in.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure diagnostic clarity.
2) Ensure that goals are measurable and attainable, with step-by-step objectives developed collaboratively between the youth and his psychotherapist.
3) Consider the use of behavior observations, rating scales and measurement tools for specific symptom clusters normed for this population.
4) Ensure that all interventions (*e.g.,* psychotherapy group, individual therapy, and skills-based/rehabilitative services, psychiatry) are included in the treatment plan with both frequency, duration and practitioner designated.
5) Identify the revised treatment plans as "updates."
6) Ensure that each youth's treatment plan is reviewed on a monthly basis.

7) Develop quality assurance measures regarding the mental health treatment plans to allow for self-monitoring.

**Methodology.**
- Reviewed *Mental Health Services* policy
- Consulted with DHS Clinical Director and STS Mental Health Authority
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed MDT team meeting minutes
- Observed three MDT team meetings

**MH-I.C. As-Needed Referrals**
MH-I.C.1. As-Needed Referral for Mental Health Evaluation. Students who initially are not referred for therapeutic, skills-based or rehabilitative-based services through the Mental Health Department may be referred for subsequent assessment/evaluation at any time by following the referral process that will be described in Mental Health Services policy below.
MH-I.C.2. As-Needed Referral for Psychiatric Evaluation. Students who were not taking medication upon admission or were not evaluated for medication may be referred for an evaluation at any time by following the referral process that will be described in the Mental Health Services policy below.

**Findings.**

STS addressed as-needed referrals for evaluation as required by this provision in the *Mental Health Services* policy approved by the Court on 10/27/20 (dkt. 362). Per this document:

"Students who are not, upon intake, referred for therapeutic, skills-based, rehabilitative-based, or psychiatric services, may be referred for subsequent evaluation or assessment at any time by completing the Mental Health Services Referral form (872-0018-E [Rev. 8/20]).

i. This referral form may be initiated by student or staff. Staff shall assist the student in requesting mental health services as needed.

The Mental Health Authority/Director of the Mental Health Department (or designee) shall process recommendations for services and referrals within seven (7) business days and document the action taken on the Mental Health Services Referral form (872-0018-E [Rev. 8/20])."

Data received via the Monitor's document request indicated that between 8/1/20 and 11/15/20, youth were referred 17 times for further evaluation/treatment following their initial assessment. As three youth were referred twice, a total of 14 youth were referred. Youth were referred for a psychiatric evaluation, psychiatry medication management appointments, psychotherapy, psychological testing/psychodiagnostic evaluation or a combination of these services.

The analysis of these data suggests that the Mental Health Services Referral form and As-Needed Evaluation Log need to be revised so that performance can be better assessed. In particular, the Mental Health Services Referral from needs to include the date of referral so that the 7-day window for processing by the MHA can be determined. [STS submitted a revised Mental Health Referral Form during the draft report's review period. When fully implemented, this new form will permit the necessary assessment of processing time.] Furthermore, when a youth is referred for

multiple evaluations, the Log should list each referral/evaluation separately so that the evaluations' dates of completion can also be entered separately. This will assist both the facility and Monitor/SME in monitoring performance and progress.

### MH-I.C.1 As-Needed Referral for Mental Health Evaluation

When reviewing the youth's mental health records, it was apparent that all of the evaluations indicated via the referral were performed within a reasonable period of time. The average duration from processing to evaluation was 8 days, with a range of zero to 14 days.

However, as noted above, data were difficult to decipher. For example, data regarding referrals for testing/psychodiagnostic evaluations revealed that while 8 youth were referred, evaluation dates were only provided for the most recently completed evaluation on the As-Needed Evaluation Referral Log for 5 youth. The other 3 youth had dates included for the psychiatric evaluation only. Interestingly, one youth had a date of referral noted after the completion of the evaluation.

The As-Needed Evaluation Referral Log revealed that more than one type of evaluation was indicated for 4 youth, but these data were also confusing. For example,

- Youth LMH was referred on 10/12/20 for psychotherapy, testing/psychodiagnostic evaluation, and psychiatric evaluation. However, the youth's mental health records showed that the testing/psychodiagnostic evaluation was completed on 9/29/20 (before the date of referral), the psychosocial was completed on 10/15/20, and the psychiatric evaluation was performed on 10/13/20. As such, it was not entirely clear what the referral on 10/12/20 was indicating as necessary.

- Youth CD was referred on 10/20/20 for psychotherapy, and testing/psychodiagnostic evaluation. The psychosocial was completed on 11/3/20, the psychometric testing was completed on 10/22/20 and the psychiatric evaluation was dated 11/10/20. Then, on 11/9/20, Youth CD was again referred for psychotherapy, testing/psychodiagnostics evaluation, and psychiatry. It was not clear if this was a referral for updated testing from the original referral or a reminder that testing had been requested, but not yet completed as of 11/9/20.

STS recently revised the Mental Health Referral Form as discussed above and has discussed the protocols for referral with relevant staff to better clarify the type of service or evaluation being requested.

Regardless, as stated above, the mental health records for the youth referred for as-needed evaluations revealed that the indicated evaluations were performed as requested and in a timely manner.

### MH-I.C.2 As-Needed Referral for Psychiatric Evaluation

Ten youth were referred to psychiatry for an evaluation, nine of whom received an evaluation within 30 days of referral.[4] The average duration between referral and psychiatric evaluation was 11 days, with a range of 0 to 26 days. This timeline is within the range of generally accepted practice.

In the future, the Monitor's document request will include a request for copies of the Mental Health Services Referral form (872-0018-E [Rev. 8/20]) in an effort to ensure that the referrals are

---

[4] The other youth, Youth AC, was referred to psychiatry at his request due to having difficulties with sleep initiation and maintenance, but documentation indicated that the referral was cancelled following review of a sleep log.

processed within 7 days as required by policy, and to better understand the disposition or type of evaluation deemed necessary.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Revise the As-Needed Evaluation Log so that it parallels the information on the revised Mental Health Referral Form and is amenable to assessing performance and compliance.
2) Ensure Mental Health Services Referral forms are processed by the Mental Health Authority within seven days as required by the *Mental Health Services* policy. The form should include the disposition (*e.g.*, to whom the testing was referred) for each evaluation requested.
3) Continue to ensure that request evaluations are completed within a reasonable period of time.
4) Develop quality assurance measures to review the as-needed evaluation referral/completion process to allow for self-monitoring.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Reviewed the As-Needed Evaluation Referral log
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth

**MH-I.D. Policy & Procedure**
MH-I.D.1. Mental Health Services Policy. (a) By 30 days from the effective date, BSTS shall create a policy/procedure regarding the delivery of *Mental Health Services*, which will include therapeutic, skills-based, rehabilitative and psychiatric services. (b) By 30 days from the effective date, BSTS will review and revise *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans*.
MH-II.D.2. Institutional Materials. By 30 days from the effective date, BSTS will update institutional materials (e.g., Student Handbook/Orientation materials) to include reference to the varied therapeutic, skill-based and rehabilitation-based services that are incorporated into the overall clinical services provided.[5] [See footnote below regarding the inclusion of MH-II.D.2 in this discussion]
MH-I.D.2. Staff Training on Mental Health Services Policy. By 90 days from the effective date of the policies noted above, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.
MH-I.D.4. Annual Review. These policies shall be reviewed at least annually and updated as needed.

**Findings**.
    The Remedial Plan's proposed timeline for objectives related to policy development was altered slightly by the Court (dkt. 354), requiring Defendants to submit a Court-Review Draft policy to the Monitor and Plaintiffs' counsel by the timelines articulated in the Remedial Plan, to consider input

---

[5] The Remedial Plan includes two provisions related to Mental Health Services Policy & Procedure that are nearly identical (MH-I.D and MH-II.D). The provision in MH-I.D includes three objectives (MH-I.D.1-3), while the one in MH-II.D includes a fourth (MH-II.D.1-4), adding requirements related to Institutional Materials. Otherwise, the provisions are identical. For the sake of completeness and to avoid redundancy, all four objectives are included here. Provision MH-II.D simply refers the reader back to this discussion.

from the Monitor and Plaintiffs' counsel, and then to submit the finalized Court-Review Draft to the Court two weeks later.

With regard to **objective MH-I.D.1 "Mental Health Services Policy,"** Defendants submitted draft policy *4C-01 Mental Health Services*, along with a variety of supplementary materials to the Monitor and Plaintiffs' counsel on 8/26/20, within the required 30-day timeline. Supplementary materials included various screening forms, psychometric testing and psychosocial evaluation templates, a Mental Health Services Referral form, treatment plan template, and Mental Health Crisis Plan template. Procedures for psychological screening and evaluation were integrated into this policy, so a revision to *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans* was not required, and this policy was rescinded. The *Mental Health Services* policy was revised in response to input from the Monitor and Plaintiffs' counsel and submitted timely to the Court on 9/9/20. Neither the Monitor nor Plaintiffs' counsel had any objections to the final version of the policy. The Court approved the *Mental Health Services* policy on 10/27/20 (dkt. 362).

The *Mental Health Services* policy reflects generally accepted practice and professional standards and describes the array of mental health services available to youth at STS. These include:

- Mental health screening and assessment;
- Referrals for mental health services;
- Treatment planning and progress measurement, including review by a multi-disciplinary treatment team;
- Psychotherapeutic services focused on evidence-based practices (individual and group therapies);
- Skill-based and rehabilitative services such as substance use treatment or sex offender treatment;
- Psychiatric services;
- Crisis intervention;
- Hospital level of care; and
- Discharge and transition planning.

With regard to **objective MH-II.D.2 "Institutional Procedures,"** Defendants revised the STS Student Handbook to describe the mental health services now available to youth at STS and submitted it to the Monitor on 8/26/20. The Monitor's few comments were incorporated into the final version. The Handbook was subsequently updated on 11/17/20 and 12/16/20 to bring it current with other new policies.

**Objective MH-I.D.2 "Staff Training on Mental Health Services Policy"** required STS to train all staff on the Mental Health Services policy by 10/26/20.[6] By that date, 156 of the 180 (87%) staff received training, and the remaining 24 staff (13%) were trained by 11/6/20. Non-mental health staff—those less involved in the subject matter covered by this policy given their job responsibilities—completed an "independent read" of the policy document itself, along with a PowerPoint presentation that outlined the policy's key features. Although not ideal, an "independent read" is typical in juvenile correctional facilities when staff do not have a direct role in providing the services covered in the

---

[6] The Monitor's strategy for assessing compliance with training-related provisions is to determine whether the initial training by a date certain was completed as required. Going forward, initial training for new staff and annual training for veteran staff will be assessed on an ongoing basis under this provision. That said, additional training and coaching is often needed to improve the quality of implementation, which is addressed in the provisions related to the implementation of policy and in the provision related to Quality Assurance. As such, even though this report identifies a number of problems with practice, substantial compliance ratings are recommended for those provisions in which the initial training requirements have been met.

policy. The Monitor/SME recommend supplementing the independent read with information passed at shift change or Cottage Team meetings that reinforces youth's right to mental health services and that covers direct care staff's options for referring youth who may be in need of mental health services.

Mental health staff—those who are responsible for delivering the services described in the policy including administrators, mental health professionals, medical staff, cottage directors and cottage counselors—received in-person training on 10/15/20. This training utilized the same policy document and PowerPoint presentation, but also featured an in-depth discussion and Q&A period. Training materials highlighted the key elements of the policy and adequately described the array of services that are now available to STS youth. Each staff person signed a document to acknowledge receipt, review and understanding of the information as it applies to his/her job responsibilities.

The annual review of the Mental Health Services policy required by **objective MH-I.D.3 "Annual Review"** has not yet come due. The **implementation** of this policy is discussed in MH-I.A through MH-I.C and MH-II.A and B, above.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) Consider providing information to staff (*e.g.*, at shift change or Cottage Team meetings) that reinforces youth's right to mental health services and describes direct care staff's options for referring youth who may be in need of mental health services.
2) Review the policy by 9/9/2021 and update as necessary.
3) Ensure staff receive initial or annual refresher *Mental Health Services* training, as appropriate.

**Methodology**.
- Reviewed draft policy and supplementary materials
- Consulted with Plaintiffs' counsel and DHS/STS administrators regarding concerns and feedback
- Reviewed training records for STS staff; reviewed PPT training document; reviewed responses to follow-up inquiries

**MH-II Injunctive Relief Required by Court Order: Provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective.**

**Goal of the Remedial Plan**: BSTS will provide individual and group psychotherapy to students whose screening/assessment/evaluation identifies a diagnosable mental illness or otherwise identifies significant personal distress or functional impairment that may benefit from psychotherapy. The psychotherapy provided will be person-centered and focus on evidence-based therapeutic and skills-based practices that address the student's individual needs. The BSTS will also provide rehabilitative services and supports as needed to further address student's clinical needs.

**MH-II.A. Therapeutic Services.**
II.A.1. Psychotherapy. BSTS shall offer students individual and/or group psychotherapy at the appropriate frequency and duration when their screening/assessment/ evaluation identifies a diagnosable mental illness or other clinical need that can be treated effectively with psychotherapy.
II.A.2. Psychotherapy Upon Request. BSTS shall provide individual and/or group psychotherapy to students who request it at any time throughout their BSTS admission.

II.A.3. Consistency with Treatment Plan. BSTS shall ensure that individual and group psychotherapy provided is consistent with the student's mental health treatment plan.

II.A.4. Treatment Refusals. By 30 days from the effective date, if a student requires individual or group psychotherapeutic services but declines them in full or in part, ongoing attempts at rapport building and motivational engagement will be made and documented to determine and address the student's objections to entering into treatment. The goal of this intervention is to provide psychotherapy at the duration and frequency needed to address their individual needs.

Findings.

STS addressed therapeutic services as required by this provision in the *Mental Health Services* policy approved by the Court on 10/27/20 (dkt. 362). This policy reflects each of the requirements of this provision. The substance of the policy is reviewed in MH-I.D "Policy & Procedure," above, along with the particulars of staff training.

Treatment plans, which prescribe the specific treatment interventions for youth, were developed for 14 of the 15 youth in the mental health sample.[7] The delivery of psychotherapy is the crux of the Court's Order to provide mental health services that are responsive to each youth's individual needs.

MH-II.A.1 Psychotherapy

*Individual Psychotherapy*. Individual psychotherapy was prescribed for each of the 14 youth with treatment plans. The content and quality of psychotherapy progress notes—the key place where insight into the therapists' approach to providing treatment is accessed—varied by clinician. Some were repetitive and did not specify the interventions or tools taught to the youth, but rather included broad general statements such as "assisted him in coming up with coping strategies that may be useful."

The assessment of STS's progress and the discussion of the quality of treatment is somewhat limited by the lack of youth interviews regarding their therapy experience and coping skills/interventions they have learned in therapy. Their perspectives will be included in future Monitor's Reports. As the treatment plans are simplified as recommended above, the progress notes should more clearly delineate the services provided toward each treatment objective and the frequency of those services. Once this occurs, the quality of individual psychotherapy will be easier to discern.

*Group Psychotherapy*. With regard to group therapies, the therapeutic interventions are just beginning to occur with regularity at the facility. A review of the mental health roster revealed that youth were assigned to a variety of group therapy interventions as described above in provision MH-I.B.5 "Evidence-based Interventions." The mental health roster indicated that youth were assigned to the following evidence-based therapeutic group interventions: 7 youth were assigned to participate in COPE, 4 youth to ACT Mental Health Trauma Group, and 3 youth to Conquering Negative Thinking.

To reach substantial compliance, several things need to come together:  1) a youth's treatment plan should prescribe groups indicated by the youth's mental health assessment, 2) the youth's assignment to the group should be noted on the Mental Health Roster and 3) a complete set of group notes should be available to verify the youth's participation. For example, Youth AP had three progress notes from the ACT Mental Health Trauma Group, ACT was listed on the mental health roster and this

---

[7] One youth (Youth DqW) did not have a treatment plan developed and was included in the list of youth who were refusing therapeutic services, discussed below.

group therapy intervention was noted in his treatment plan. This was good to see. However, a comparison of the mental health roster/treatment plans/group progress notes for other youth revealed several inconsistencies, or places where the data were not compatible. For example:

- Youth JG was assigned to COPE per the mental health roster, but this was not included in his treatment plan dated 11/23/20. There were no group therapy progress notes included for this modality.

- Youth GS was assigned to ACT Mental Health Trauma group per the mental health roster, but this was not reflected in his most recent treatment plan and there were no group therapy progress notes in his file.

- Youth MH was listed on the mental health roster as participating in ACT Mental Health Trauma group, but it was not included in his treatment plan and there were no progress notes reflecting participation.

- Youth AM was assigned to Conquering Negative Thinking group per the mental health roster. There was one progress note regarding his participation dated 11/5/20. However, this group therapy intervention was not noted in his treatment plan dated 9/18/20.

These findings indicate the need to ensure that when a youth is referred to or is participating in a specific group therapeutic intervention that the group is included in his mental health treatment plan, and vice versa. This information should then be consistent with the information included on the mental health roster, and progress notes describing the group intervention and the youth's participation should be available to document weekly interventions. In subsequent monitoring periods, group psychotherapy will be observed (either virtually or in-person) and findings will be integrated into the compliance assessment for this provision.

## MH-II.A.2 Psychotherapy Upon Request

STS provided a list of youth who requested mental health services between 8/1/20 and 11/15/20. During this period, only one youth (Youth MN) requested services, on 9/14/20. He began receiving individual psychotherapy eight days later, on 9/22/20. This youth was reviewed by the MDT on 9/15/20, 10/13/20, and 11/10/20. At the initial MDT meeting, and in subsequent team meetings, information from the youth's mother, cottage staff, and vocational program was obtained in order to further inform the team. As of the second MDT meeting, this youth had a treatment plan in place and was engaged in weekly individual psychotherapy. During the second MDT meeting, increasing therapeutic contact to twice weekly and participation in a trauma focused group intervention was added to this youth's treatment plan. As of the third MDT meeting, this youth had a reported reduction in trauma symptoms as evidenced by the use of a self-report assessment scale, improved sleep, and a reduction in nightmares. At this time, this youth was preparing for discharge from the facility, and although he reportedly declined to consider outpatient therapeutic services, referrals to local providers were provided to him.

The case example above was good to see and indicative of what should occur when a youth requests psychotherapeutic intervention. In order to further determine compliance with this portion of the provision, youth perspectives will be included in subsequent Monitor's reports.

## MH-II.A.3 Consistency with Treatment Plan

In general, when youth were recommended for individual psychotherapy per their treatment plan, there was evidence that therapeutic intervention occurred. However, individual sessions did not always occur at the *frequency* designated in the treatment plan. Nine of the 14 mental health files

reviewed evidenced this problem. For example, Youth ND's treatment plan dated 11/9/20 requires weekly psychotherapy. A review of the progress notes regarding therapeutic intervention revealed he was seen 11/9/20, 12/4/20, and 12/7/20. Per the progress notes, the gap in services was due to the therapist being out, but this is not acceptable as there should be coverage when a therapist is out for an extended period of time.

In another example regarding Youth SA, the treatment plan dated 11/3/20 indicated he was to be seen three times weekly for individual psychotherapy. A review of the psychotherapy progress notes did not reveal treatment at the prescribed frequency. He was seen 11/2/20, 11/11/20, and then the next encounter note dated 11/18/20 indicated he was removed from campus unexpectedly following an altercation with staff. Based on the treatment plan's prescription, between 11/3/20 and 11/18/20, five or six individual sessions would be expected.

Further, based on the progress notes regarding the various youth's individual therapy sessions, it was difficult to determine whether therapeutic interventions were consistent with the goals/objectives outlined in the treatment plan. This is likely due to treatment plan issues discussed above and indicative of the need to simplify the treatment plans to make them more functional as a guide or roadmap to providing treatment that is relevant to the individual youth.

As noted above, other problems involved the designation of group therapies. In short, the youth's treatment plans did not always include group therapy interventions that were being provided to youth. Conversely, youth's treatment plans might indicate a group therapeutic intervention, but there were no corresponding progress notes to verify the youth's participation.

## MH-II.A.4 Treatment Refusals

Youth refuse engagement in mental health services for a variety of reasons. It is the responsibility of the clinician to explore the youth's hesitation and to address his objections and resistance to engagement. Treatment refusals are not an infrequent occurrence, and do not necessarily reflect a problem with the quality of the mental health service being offered, but they need to be addressed with attention toward psychoeducation and building rapport.

STS provided a list of youth who refused individual or group therapeutic interventions between 8/1/20 and 11/15/20. Four youth refused therapeutic intervention, and notably, all refusals were for individual therapy.[8] Several problems with the way in which these refusals were labeled and/or addressed were noted:

- Youth AH refused individual psychotherapy on four occasions (9/1/20, 9/16/20, 9/18/20, and 10/27/20). The progress notes regarding these refusals were not detailed and did not include information regarding the therapist's attempts to engage with the youth. Youth AH was reviewed by the MDT on 9/1/20, 9/29/20, and 10/27/20. At the 9/29/20 MDT meeting, despite notation that this individual was periodically refusing to meet for individual therapy, there were no changes recommended for his treatment plan. At the 10/27/20 MDT meeting, there were plans to review this youth's diagnoses and to change his treatment provider.

- Youth LHM was listed as refusing individual psychotherapy on five occasions 10/21/20, 11/7/20, 11/13/20, 11/19/20, and 11/28/20. The progress note regarding the initial

---

[8] There was one youth, Youth GD, included in the refusal log but his refusals occurred outside of the date range (on 6/12/20 and 6/24/20), prior to the *Mental Health Services* policy going into effect. This youth was not included in the review.

refusal was detailed and included information regarding the therapist's attempts to engage with the youth. The session categorized as a refusal on 11/7/20 was not technically a refusal as the youth agreed to participate in the session, but the therapist was unavailable due to "some room confinements around the time we were supposed to meet. Now it is too late…to do a session because of showers and bedtime." Two subsequent refusals attributed to this youth were also not actually refusals. On 11/13/20, the therapist documented a "quick check in" with the youth due to "multiple trainings to both attend and conduct." The next documented refusal was 11/28/20 where the therapist noted "unable to meet with client due to Thanksgiving holidays." In this example, there were three refusals attributed to this youth that were not technically his refusal of treatment. Further, these three therapeutic interactions were not conducted due to conflicts/holidays on the part of the therapist. This is not appropriate and needs to be addressed by mental health administration to ensure that youth receive therapy as indicated in their treatment plans and that refusals are accurately categorized. This youth was reviewed by the MDT team on 11/3/20, at which time therapeutic engagement strategies were discussed.

- Youth DqW refused individual therapy on four occasions (11/13/20, 11/18/20, 11/25/20, and 12/2/20). The documentation regarding all four session refusals was detailed and included the therapist's attempts to engage with the youth. Ultimately, this was an issue of this youth requesting an alternate therapist. This youth had not yet been reviewed by the MDT by the end of the Monitor's sampling time frame.

In summary, when a youth's refusal is accurately categorized as such, appropriate response from the assigned therapist was not consistent across clinicians. In other cases, the lack of participation in a service was miscategorized as a refusal when it should have been recognized as an appointment that needed to be rescheduled or as a need to provide coverage for a clinician who was out. As noted previously, progress notes for group psychotherapy were not provided in most cases, and thus the frequency of group refusals could not be assessed.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that individual and group therapeutic interactions are conducted at the frequency designated by the youth's treatment plan.
2) If the assigned clinician is unavailable, either reschedule the session or provide compensatory services from another clinician.
3) Ensure that group therapeutic interventions are provided consistent with the youth's treatment plan or, conversely, included in the plan as a prescribed intervention when youth participate in them.
4) Implement and conduct mental health group therapeutic interventions on a regularly reoccurring basis.
5) Track therapeutic group enrollment, attendance and refusals.
6) Improve the quality of documentation regarding progress notes for both individual and group psychotherapies.
7) Continue to provide therapy to youth upon their request.
8) Accurately categorize youth's individual and group treatment referrals.
9) Clearly document attempts/interventions utilized to engage with youth who refuse to participate in individual and group therapies.

10) Develop quality assurance measures for psychotherapy to allow for self-monitoring.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Consulted DHS Clinical Director and STS Mental Health Authority
- Reviewed data regarding providing therapy upon request
- Reviewed MDT minutes
- Reviewed the mental health roster
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth Reviewed the listing of available interventions entitled "STS Therapeutic, Skills, and Rehabilitative Services" December 2020 version
- Reviewed the Treatment Refusal log

**MH-II.B. Skill-based and Rehabilitative Services**

MH-II.B. Skill-Based and Rehabilitative Services. The BSTS will assess student's clinical and support needs and develop skills-based and rehabilitation-based services as needed. This review will include consideration of and integration with the behavior management/motivation approach that is discussed in the Room Confinement section below to ensure that the varied clinical-based services offered to students are aligned and supportive of each other.

**Findings.**

STS addressed Skill-based and Rehabilitative Services as required by this provision in the *Mental Health Services* policy approved by the Court on 10/27/20 (dkt. 362). The policy reflects the requirements of this provision. The substance of the policy is reviewed in MH-I.D "Mental Health Services Policy & Procedure," above, along with the particulars of staff training.

As noted above, youth may need interventions that do not necessarily need to be facilitated by a mental health clinician, despite being part of their mental health treatment. These include groups that are designed to teach youth skills needed to address specific risk factors or an opportunity to practice skills taught in individual or group therapy.

STS has a variety of such groups including Dialectical Behavioral Therapy Skills Training (DBT; facilitated by cottage staff), Gang Resistance Intervention Program (GRIP), Adolescent Sexual Abuse Program (ASAP), Achieving Maximum Potential (AMP; life skills), Residential Substance Abuse Treatment (RSAT), Applied Community Transition program (ACT; life skills), Rebound group (drug/alcohol education), Essential Instruction (faith-based re-entry), and a Parenting Skills course. The facility is also planning to implement Aggression Replacement Training (ART), as described in RC-I.B.1 "Identify Program," below.

This robust listing of interventions is encouraging. However, skills-based group notes revealed that both implementation and documentation need to be fortified. Skill-based group notes were provided for 11 youth who participated in DBT, RSAT or ASAP. Notes for the other skills-based groups listed above were not available and thus implementation has not been established. The available group notes suffered from a variety of systemic problems: the specific group was not identified, the theme/topic/session of the group was not listed, the person facilitating the group was not named, and

the number of youth participating in the group was not indicated. STS could resolve these problems by developing a template for group notes that includes this information.

On an individual level, the group notes revealed significant gaps in time between group sessions that were not explained for most of the 11 youth (*e.g.*, Youth AMJ had unexplained gaps in group notes between 6/23/20 and 9/15, and again from 11/17/20 to 12/8/20; Youth SF was admitted on 3/7/30 and had only one note for group held on 10/28/20). If a youth refuses to attend group, has a legitimate reason for absence, or if group is cancelled for some reason, this should be indicated in the group notes. Details regarding youth's engagement and participation in the group process were seen in progress notes regarding only one youth. This needs to be a standard practice. An assessment of whether youth were receiving the array of skills-based and rehabilitative groups at the frequency prescribed by their treatment plans could not be conducted because skills-based and rehabilitative groups were not consistently included in youth's treatment plans, as described in MH-I.B.6, above. Once the Monitor and SME observe skill-based and rehabilitative services groups (either virtually or in-person), findings regarding the quality of service delivery will be included in the assessment of compliance with this provision.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Implement Aggression Replacement Training (ART) as planned.
2) Ensure that youth are attending skills-based and rehabilitative-based groups as prescribed by their treatment plans.
3) Develop and implement a standardized template for group notes that includes the name of the group, the theme/topic/session being explored, the name of the facilitator and the number of youth who attended the session.
4) Ensure the group notes provide individualized information regarding each youth's participation and engagement.
5) Deliver skills-based and rehabilitative groups with fidelity to the model, curriculum or lesson plan.
6) Develop quality assurance measures for self-monitoring.

**Methodology**.
- Reviewed the listing of available interventions entitled "STS Therapeutic, Skills, and Rehabilitative Services" December 2020 version.
- Reviewed the *Mental Health Services* policy
- Consulted DHS Clinical Director and STS Mental Health Authority
- Reviewed the mental health roster
- Reviewed group notes for 11 youth

**MH-II.C. Mental Health Staffing**
MH-II.C. Mental Health Staffing. Throughout the duration of this Remedial Plan, the BSTS will hire and maintain a sufficient number of Professionals in the Mental Health Department ("PMHD") to evaluate/assess students and to provide the individual psychotherapy, group therapy, skills-based and rehabilitative-based services needed to meet their individual needs. For psychotherapeutic services, the BSTS will ensure a psychotherapist-student ratio no greater than 1:15 for the duration of the Remedial Plan.

**Findings**.

    This provision of the Remedial Plan has two requirements—1) to hire and maintain a sufficient number of Professionals in the Mental Health Department (PMHDs) to evaluate/assess students and to provide services to meet their needs; and 2) a specific maximum psychotherapist-student ratio of 1:15, based on total facility population. With regard to the first requirement, at the end of the period of review, STS's complement of mental health staff included:

- Two social workers (who coordinate youth's discharge planning; organize various multi-disciplinary team meetings; coordinate crisis responses and co-facilitate groups);
- One psychology assistant (who conducts part of each youth's mental health assessment);
- Seven full-time psychologists (three Psychologist 3; two Psychologist 2; and two Psychologist 1; some of whom conduct various assessments and all of whom carry a caseload, co-facilitate groups, provide crisis services, and complete other administrative tasks)[9] and a contracted therapist for 8-hours per week; and
- One licensed mental health clinician who functions as STS's Mental Health Authority.

    The psychotherapist-student ratio focuses specifically on those mental health staff who carry a caseload of clients. As shown in the table below, the facility easily met the 1:15 requirement each month, even as the full complement of psychotherapists was being brought on board. Throughout the period of review, each month, STS had one psychotherapist for every 6 to 9 youth.

| Psychotherapist-Student Ratio, August through November, 2020 | | | |
|---|---|---|---|
| Month | # Therapists | ADP | Ratio* |
| August | 6.2 | 54.6 | 1:9 |
| September | 7.07 | 43.0 | 1:6 |
| October | 7.2 | 39.4 | 1:6 |
| November | 7.2 | 39.6 | 1:6 |

*Ratio is calculated using the following formula: Gross ADP/# of therapists = number of therapists per youth. The "Gross ADP" includes youth who are assigned to STS, most of whom are physically present on campus, but some of whom are not (e.g., in detention or jail, AWOL, etc.). The Gross ADP is utilized for the purpose of calculating a ratio because youth who are off campus may return at any time, and some also continue to receive services while elsewhere in the community.

Not all of the youth at STS are on the mental health caseload, so the caseload sizes are smaller than the ratios above would suggest. With the caveat that the content of mental health documentation requires improvement as discussed in MH-I through MH-II.A-B, above, a review of the mental health roster, mental health treatment plans, progress notes and MDT meeting minutes indicates that STS has a sufficient number of psychotherapists to provide the services needed by STS youth. Although there are currently problems with service delivery, the identified problems do not appear to be

---

[9] The differences among the Psychologist 1, 2 and 3 designations are largely Human Resources factors, although in general, Psychologist 1 is a Bachelor's level clinician, and Psychologist 2 and 3 are Master's level clinicians.

related to insufficient staffing but rather stem from a need for procedural improvements or clinicians' skill development and performance improvements.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) Continue to fund and maintain a sufficient number of professionals to evaluate, assess and construct transition plans for youth, and a sufficient number of psychotherapists to meet the required 1:15 ratio.

**Methodology**.
- Reviewed mental health staff roster and staff count
- Reviewed biographies for STS mental health staff
- Reviewed STS ADP from August to December 2020

**MH-II.D. Policy & Procedure**
MH-II.D.1. Mental Health Services Policy. (a) By 30 days from the effective date, BSTS shall create a policy/procedure regarding the delivery of *Mental Health Services*, which will include therapeutic, skills-based, rehabilitative and psychiatric services. (b) By 30 days from the effective date, BSTS will review and revise *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans*.
MH-II.D.2. Institutional Materials. By 30 days from the effective date, BSTS will update institutional materials (e.g., Student Handbook/Orientation materials) to include reference to the varied therapeutic, skill-based and rehabilitation-based services that are incorporated into the overall clinical services provided.
MH-II.D.3. Staff Training on Mental Health Services Policy. By 90 days from the effective date of the policies noted above, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.
MH-II.D.4. Annual Review. These policies shall be reviewed at least annually and updated as needed.

**Findings**.
Please see the discussion of Policy & Procedure in MH-I.D, above. Since the provisions are nearly identical, the discussion is not repeated here.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) Same as MH-I.D, above.

**Methodology**.
- Same as MH-I.D, above

**MH-III Injunctive Relief Required by Court Order: Ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School.**

**Goal of the Remedial Plan**: BSTS will ensure that MH records regarding screening/assessment/evaluation, therapeutic, skills-based, rehabilitation-based and

psychiatric/medication services are defined, stored, protected and shared in a manner that is consistent with policy and procedure, relevant professional standards and state and federal laws.

**MH-III.A. Student Records Policy & Procedure**
MH-III.A.1. Mental Health Records Policy. By 60 days from the effective date, BSTS will revise/develop a Mental Health records policy and procedure that defines Mental Health records, identifies where Mental Health records are stored to ensure they are separate from administrative/main, school and cottage records; established protocols to ensure that access to confidential information is appropriately limited; establishes protocols to ensure that information is shared where appropriate to provide for safety, security, health and continuity of care; and established protocols for the limited release of records to outside entities. The policy and procedure will be consistent with state and federal law.
MH-III.A.2. Staff Training on Mental Health Records Policy. Within 120 days of the effective date, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

Findings.

   The Remedial Plan's proposed timeline for objectives related to policy development was altered slightly by the Court (dkt. 354), requiring Defendants to submit a Court-Review Draft policy to the Monitor and Plaintiffs' counsel by the timelines articulated in the Remedial Plan, to consider input from the Monitor and Plaintiffs' counsel, and then to submit the finalized Court-Review Draft to the Court two-weeks later.

   With regard to **objective MH-III.A.1 "Mental Health Records Policy,"** Defendants submitted draft policy *4B-07 Student Health Records* to the Monitor and Plaintiffs' counsel on 9/28/20, within the 60-day timeline. The Monitor submitted extensive comments to the draft policy and encouraged Defendants to seek an extension from the Court to incorporate an additional round of review and to provide sufficient time for the feedback to be fully integrated. The Court approved this extension (dkt. 360), and Defendants submitted a revised policy to the Court on 11/2/20. Neither the Monitor nor Plaintiffs' counsel had any objections to the final version of the policy. The Court approved the *Student Health Records* policy on 11/9/20 (dkt. 370).

   The policy reflects generally accepted practice and professional standards. It specifies essential information regarding youth's privacy and the confidentiality of medical and mental health information, specifying among other things:

- Procedures for informing youth of their right to and limits of confidentiality;
- Exceptions to confidentiality;
- Those who are authorized to access youth's medical and mental health information;
- Procedures for those without routine access to request single-use access from the Mental Health Authority; and
- Procedures for youth and parents to authorize disclosure of youth's records and to access and amend a youth's own treatment records.

   A notice informing youth of the protections offered by the new policy was posted on 12/16/20, after receiving input from the Monitor.

   **Objective MH-III.A.2 "Staff Training on Mental Health Records Policy"** required STS to train all staff on the *Student Health Records* policy by 11/25/20. Of STS' 189 staff, 170 (90%) received in-person training between 11/16/20 and 11/20/20. Six staff (3%) who were not available on the initial training

dates later conducted an independent read of the training materials, while 13 staff (7%) continued to be out on medical leave. Administrators, mental health staff, medical staff, cottage counselors and cottage directors received more in-depth training on 11/23/20. Training materials corresponded nicely to the policy requirements and appeared sufficient to guide staff's application of the information. STS developed a helpful grid to assist staff in understanding where key information about youths' medical and mental health treatment is stored, who may access it and to whom the information may be distributed. All staff completed a short competency exam to demonstrate their mastery of the information.

Given that staff training was completed at the end of November 2020, sufficient time had not yet passed before this report was drafted to assess the **implementation** of the *Student Health Records* policy. Once the Monitor/SME determine that policy has been properly implemented, STS will be in substantial compliance with this provision.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) Ensure that staff follow the *Student Health Records* policy requirements for protecting the confidentiality of youth's records and for distributing mental health information only to those with a demonstrated "need to know," as prescribed by the policy.
2) Ensure staff receive initial or annual refresher *Student Health Records* training, as appropriate.

**Methodology**.
- Reviewed draft policy and subsequent revisions
- Consulted with Plaintiffs' counsel and DHS/STS administrators regarding concerns and feedback
- Reviewed training records, PPT training document, Records Access Grid and competency exam; reviewed responses to follow-up inquiries

**MH-IV Injunctive Relief Required by Court Order: For students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation.**

**Goal of the Remedial Plan**: BSTS will create a two-prong crisis intervention model and approach that is implemented and defined by policy and procedure. This model will establish coverage and protocols for 24/7 crisis support from PMHD for two types of support: (1) care/support/safety plans that address acute mental health crises such as suicide and self-injurious behavior; and (2) other behavioral crises such as (a) students who present a serious and immediate risk of physical harm to others and cannot stabilize within a one-hour "cool off" period; and (b) a short-term therapeutic crisis response unit/program/space for students who require further clinical assessment/evaluation, targeted and intensive skill development or extra therapeutic intervention or support to stabilize before returning to normal cottage/programming.

**MH-IV.A. 24/7 Crisis Response**
MH-IV.A. 24/7 Crisis Response. BSTS will have a PMHD on call to provide 24/7 crisis intervention during business and non-business hours. During non-business hours, these crisis response and intervention services will be provided through electronic or telephonic means.

**Findings**.

STS has fully implemented a 24/7 on-call schedule. When the Remedial Plan was first put into effect in late July 2020, on-call duties rotated across the therapists on staff. Since then, additional therapists were hired to work nights and weekends. Currently, most of the PMHDs work normal business hours (*i.e.*, until 4 or 5pm) and are available to consult with staff and youth throughout the day. Further, at least one therapist is on grounds every day until 9pm, seven days per week. After 9pm, a PMHD is on-call until 7am the following morning. This therapist is equipped with an iPad and can respond to emergencies via telephone, videoconference or an after-hours return to campus if needed.

STS reports that scheduling therapists to be present on campus until 9pm has significantly reduced the need for off-hours/on-call contact. In fact, a return to campus after hours was needed only once during the period of review (on Christmas Day, to conduct a suicide assessment). Any after-hours contact is recorded via an Incident Report. STS is considering including a metric regarding after-hours contact as part of its Quality Assurance plan that is currently under development.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance.**
1) Continue to provide 24/7 coverage for crisis intervention during business and non-business hours.
2) Track the utilization of after-hours consultation and consider its inclusion as part of the mental health quality assurance program.

**Methodology.**
- Reviewed Master On-Call Schedule, Daily Rotations and Overnight rotations through 11/18/20
- Consulted with DHS/STS administrators on the interpretation of the various schedules

---

**MH-IV.B. Suicide Prevention and Intervention**

MH-IV.B.1. Self-Harm Evaluation. Psychotherapists or the Director/MHA will be primarily responsible for evaluating students who express suicidal ideation, engage in self-harming behavior, or attempt suicide. This response/evaluation will occur as soon as possible barring conflict with other clinical tasks (e.g., therapy session, psychosocial evaluation or other crisis response).

MH-IV.B.2. Evaluation of Youth in Seclusion. If a student is placed in a "seclusion room" (as referenced by the Court Order) for an act of self-harm or suicidal ideation, a PMHD (e.g., psychotherapist) will meet with the student as soon as possible, whether in-person or via telephone or electronic means consistent with the 24/7 coverage plan, and such meetings will take priority over non-clinical tasks.

MH-IV.B.3. Minimize Use of Seclusion. BSTS will minimize the amount of time that students on suicide watch spend isolated in a seclusion room as demonstrated by the protocols for suicide watch levels defined in Policy and Procedure *4C-03 Suicide Prevention/Intervention,* as well as the protocols for RC defined in Policy *4C-06 Room Confinement*.

MH-IV.B.4. Safety Plans. PMHD that respond to students in suicidal/self-harm crisis will develop and implement an individualized care/support/safety plan in a manner consistent with protocols established in Policy *4C-03 Suicide Prevention/Intervention*.

**Findings.**

Multiple risk factors for self-harm regularly occur among youth in juvenile justice facilities (*e.g.*, stress of incarceration, lack of family contact), all of which can by exacerbated by psychiatric or mental

health conditions. In fact, the suicide rate in correctional facilities is four times higher than in the general population. It is the responsibility of mental health clinicians to respond to youth in crisis and assess for suicidality. Following this assessment, clinicians recommend an appropriate level of precaution, monitor the youth to determine the need for on-going intervention, and subsequently develop a Crisis Plan in an attempt to subvert further suicidal ideation and self-harm gestures.

STS addressed Suicide Prevention and Intervention as required by this provision via the *Mental Health Services* policy approved by the Court on 10/27/20 and in the *Suicide Prevention and Intervention* policy approved by the court on 7/27/20. Per the *Mental Health Services* policy:

"Qualified staff in the Mental Health Department shall be responsible for assessing risk of suicide and non-suicidal self-injury, including placing and removing students from suicide watch in a manner consistent with policy *4C-03 Suicide Prevention/Intervention*.

A Mental Health Crisis Plan (Form 872-0596) shall be utilized for all students placed on suicide watch and may be utilized to help students and staff identify individualized warning signs, protective factors, and coping skills. See policy *4C-03 Suicide Prevention/Intervention* for more information."

The requirements were further delineated in the *Suicide Prevention and Intervention* policy as follows:

"Upon notification, a qualified professional in the Mental Health Department shall promptly and within two (2) hours meet with the student to assess the student's risk of suicide/non-suicidal self-injury and determine if suicide watch is appropriate…

Qualified professionals in the Mental Health Department that respond to students in suicidal or self-harm crisis, including students placed on any level of suicide supervision/watch shall utilize a suicide crisis safety plan to help the student better understand their warning signs, triggers, coping skills, and support networks for managing suicidal thoughts and behaviors;

Crisis safety plans shall be documented in the student's mental health file and provided to the cottage director or counselor so mental health and cottage staff can effectively and collaboratively assist the student in managing suicidal or self-harm ideations or behavior in a manner consistent with the plan;

Crisis safety plans may be utilized proactively by professionals in the Mental Health Department for students who, upon intake or during the course of psychotherapy, are identified as being at significant risk for suicide or self-harm;

Crisis safety plans shall be reviewed regularly by the student and their therapist and updated based on progress and as clinically indicated."

## MH-IV.B.1 Self-Harm Evaluation

During the period of review, two youth were assessed due to concerns regarding self-harm, Youth AP and Youth BC.

- Youth AP attempted suicide by hanging on 10/25/20 at 5:30pm. Documentation indicated that a "suicide assessment was conducted directly after the event occurred," performed by mental health staff with temporary LMHC licensure, with an assessment start date/time of 10/25/20 at 5:55pm, within the 2-hour policy timeline. Per the Suicide Event Log and notes from the risk assessment, this youth was placed on Level 3 (high) suicide precautions. The mental health clinician reportedly

inadvertently left the "Suicide Watch Authorized?" checkbox unchecked on the
assessment report, which resulted in the report indicating "no" to this question.

- Youth BC verbalized suicidal ideation on 11/10/20 at 3:43pm. A mental health
  clinician was present with the youth at the time.  A suicide risk assessment was
  conducted at 11/10/20 at 4:45pm by mental health staff with temporary LMHC
  licensure, within the 2-hour policy timeline. Per the Suicide Event Log and notes from
  the risk assessment, this youth was placed on Level 1 (low) suicide precautions. The
  mental health clinician reportedly inadvertently left the "Suicide Watch Authorized?"
  checkbox unchecked on the assessment report, which resulted in the report
  indicating "no" to this question.

In terms of the substance of the assessments, both were of adequate quality and detail and
were performed by an appropriately qualified mental health clinician.

## MH-IV.B.2 Evaluation of Youth in Seclusion

A review of the Room Confinement Log and Room Confinement records indicated that no
youth were placed in room confinement in response to an act of self-harm or suicidal ideation.

## MH-IV.B.3 Minimize Use of Seclusion

The treatment approach for the two youth placed on suicide precautions did not include the
use of room confinement. In fact, one youth was placed in room confinement for behavioral reasons,
after becoming "wildly out of control" during a restraint, but became further distressed while isolated,
and verbalized suicidal ideation at that time. A mental health clinician was present, room confinement
was promptly ended, and the youth was placed on suicide precautions immediately thereafter.

## MH-IV.B.4 Safety Plans

A Crisis Plan was developed for Youth BC on 11/12/20, two days after the event requiring
suicide precautions. A review of his mental health record revealed a progress note from his therapist
dated 11/12/20 where his placement on suicide precautions was processed. However, this youth was
reviewed by the MDT on 11/17/20 and the MDT minutes noted that this youth's "last self-harm was
9/23/20." The MDT minutes also noted that this youth had a "current and recently updated Crisis Plan
that was last updated following suicidal behavior," but did not discuss the particulars of the event or
the substance of the Crisis Plan that was developed 5 days earlier.

A Crisis Plan was developed for Youth AP on 10/26/20, the day after the event requiring suicide
precautions. The youth was reviewed by the MDT on 10/27/20 and 11/17/20, where the event was
discussed in detail. There were no changes to the youth's treatment plan indicated following the
10/27/20 meeting, although issues with medications and "trauma focused CBT work, along with
EMDR" was discussed. After the 11/17/20 MDT meeting, changes included the addition of trauma-
based treatment interventions including "containment, EMDR, and crisis plan management." These
should be included in an upcoming treatment plan revision, which was outside the timeline of the
documentation requested for this report. A review of the mental health treatment plan developed
11/17/20 did not reveal any mention of suicide precautions or crisis interventions for self-harm,
indicating that the Crisis Plan was not integrated into the overall treatment program.

In summary, both youth were reviewed at the next MDT meeting following the initiation of
precautions and this was good to see, but the minutes of the MDT meetings and treatment plans did
not reveal consideration of the self-harm risk or interventions. The next step is to ensure that the

youth's Crisis Plan and self-harm risk reduction techniques are reviewed by the MDT and integrated into the youth's mental health treatment plan.

Both Crisis Plans had a great deal of detail regarding the youth's triggers and coping strategies, but the document could be difficult for cottage staff to follow. The facility could consider the use of a numbered list to accompany the Crisis Plan that specifies the youth's triggers and specific interventions that could be used with the youth. In the future, the Monitor and SME will interview cottage staff regarding the usefulness of the information they receive about youth's Crisis Plans.

In addition, the policy requirement regarding updates to Crisis Plans could not be assessed because the relevant events occurred toward the end of the time period under review. Compliance with monitoring and updating Crisis Plans will be reviewed in subsequent Monitor's Reports.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Review documentation to ensure that all information regarding the self-harming event is correctly documented (*e.g.,* time of event, time of initial evaluation, level of suicide watch authorized).
2) Ensure that the youth's Crisis Plan is addressed at the next MDT meeting with prompt revision of the overall treatment plan in order to integrate this information and develop interventions as necessary.
3) Continue the development of detailed Crisis Plans and consider the addition of brief, easy-to-follow lists of triggers and interventions for ease of use by cottage staff and youth.
4) Monitor, review and update Crisis Plans as required by policy.
5) Develop quality assurance measures for self-monitoring.

**Methodology**.
- Reviewed *Mental Health Services* policy and *Suicide Prevention and Intervention* policy
- Reviewed Suicide Assessment Reports
- Reviewed Crisis Plans
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed Room Confinement Logs and packets for each youth in room confinement

**MH-IV.C. Multi-Sensory De-escalation Tools and Spaces**
MH-IV.C Multi-Sensory Tools and Spaces. By 90 days from the effective date, BSTS will secure sensory-based tools and equipment (to augment materials currently in place) and develop multi-sensory spaces for de-escalation and self-soothing for students to use to assist them in modulating their emotions/behavior and practice coping skills. This trauma-informed service is designed to provide students with a safe, non-adversarial space to "cool-off", refocus, and develop/practice skills for de-escalation.

**Findings**.
Defendants submitted materials related to STS' Multi-Sensory De-escalation Room (MSDR) to the Monitor on 10/26/20, within the 90-day timeline for this objective. Materials include a MSDR User's Manual, MSDR Use Form and MSDR Daily Log. The MSDR is intended to assist youth in de-

escalating and self-regulating through sensory experiences and physical activity. Research has shown that sensory tools can help facilities to reduce their use of isolation and restraint by helping students to de-escalate by stimulating their senses in a routinized manner. Using specially designed tools in dedicated spaces, youth are guided through gross motor activity, fine motor activity and cognitive activity while continuously interacting with staff. Youth rate their level of distress before and after the MSDR intervention, noting which activities were particularly effective in helping them to self-regulate.

STS currently has two rooms outfitted for MSDR interventions—one in Corbett Miller Hall (CMH) and one in the school building. Eventually, STS would like to equip each living unit with its own MSDR space. During the first month of implementation (November 2020), the MSDR was utilized 8 times, by 7 different youth. MSDR records reported a variety of reasons for referral, such as "difficulties with staff," "feeling stressed," "misunderstanding about Levels," or "step down from room confinement". The average length of intervention was 13.5 minutes, ranging from 5 to 22 minutes. All youth reported lower levels of distress upon exiting the intervention, except for one youth who remained escalated and proceeded to have some 1x1 time with other staff members. Youth records demonstrated that interventions proceeded through the anticipated course of gross motor, fine motor and cognitive activities.

Generally accepted practice requires that a youth's clinician should be notified of his/her clients' MSDR usage. At STS, the MSDR Coordinator emails a weekly MSDR report to the youth's therapist and Cottage Counselor. In addition, the new *Behavior Management* policy will also require therapist notification for any MSDR intervention that lasts beyond 30 minutes so that a change in treatment may be considered if necessary. The policy will also require that MSDR usage be shared with the Multi-Disciplinary Treatment Team and Cottage Team to ensure continuity of care. Once the *Behavior Management* policy goes into effect, the implementation of these requirements will be assessed, and the compliance rating may change if indicated.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that a youth's treating clinician, multi-disciplinary team and cottage team is notified of MSDR usage so that the intervention can be integrated into the youth's treatment.

**Methodology**.
- Reviewed MSDR User's Manual, Daily Log and MDSR Use Form, along with photographs of the spaces and equipment available at STS
- Reviewed MSDR Log for November 2020, along with individual records for 8 MSDR uses
- Reviewed progress notes for 4 youth who utilized the MSDR and were included in the mental health sample
- Reviewed DHS/STS response to follow-up questions

**MH-IV.D. Therapeutic Crisis Response Unit**
MH-IV.D.1 Crisis Response Unit. By 180 days from the effective date, BSTS will develop a short-term, crisis response and stabilization unit/program/space for students who experience significant emotional, physical or behavioral distress such that they cannot be safely managed in their cottage and require further assessment/evaluation, targeted and intensive skill development and/or extra therapeutic intervention or support to stabilize before returning to their normal cottage/programming. —The Unit will be operated and facilitated by PMHD in conjunction with the BSTS TPA and TSD.

–Admission criteria will be based solely on acute mental or behavioral health needs such that it will not be used to manage safety and security concerns or act as a consequence or punishment for rule violations or negative behavior.

–Clinical services and interventions will focus on: intensive therapeutic and skill-building sessions based on immediate need or presenting concern; crisis or safety planning; increased therapy or skill-building sessions, ongoing clinical observation across settings, and therapeutic "wrap-around" meetings to reintegrate students into their cottage and programming as soon as they have stabilized or until a higher level of care can be obtained.

–This transitionary, short-term program will be designed to adequately care for students who cannot regain the necessary emotional, cognitive or behavioral control needed to engage in typical programming or services despite attempts at de-escalation and skill building.

MH-IV.D.2. Crisis Response Unit Policy. By 180 days from the effective date, more detailed protocols for admission, services, documentation and oversight of this therapeutic crisis response unit will be documented in policy/procedure.

**Findings**.

        At the time this report was drafted, these objectives were not yet due. Defendants requested an extension to this timeline, with no objection from the Monitor or Plaintiffs' counsel, which the Court approved (dkt. 381). Defendants plan to submit the required materials to the Monitor and Plaintiffs' counsel on 2/8/21.

**Recommended Compliance Rating**. Not Yet Rated.

**Steps Toward Substantial Compliance**.
   1) Not applicable.

**Methodology**.
- Not applicable.

**MH-IV.E. Hospital Level of Care**

MH-IV.E.1. Multi-Agency Coordination. By 60 days from the effective date, the DHS MHDS—Facilities Division/Central Office will coordinate with the MHDS—MH Institutes, county attorney associations, Hardin County Attorney (where BSTS is located) and University of Iowa Hospitals and Clinics regarding the procedures for transfer of a student to a hospital level of care for further evaluation or treatment as needed.

MH-IV.E.2. Toolkit. By 90 days from the effective date, BSTS will develop a toolkit and procedures consistent with Iowa law and relevant stakeholder input for referring students to a hospital level of care if, due to a MH diagnosis/crisis/decompensation, they are unable to be safely and effectively restored to a state where they no longer pose a serious and immediate risk of harm to self or others.

**Findings**.

        Regarding **objective MH-IV.E.1 "Multi-Agency Coordination,"** Defendants submitted a variety of documents demonstrating their efforts to collaborate with other stakeholders to ensure access to a resource for psychiatric evaluation and treatment for youth at STS. These materials were provided to the Monitor on 9/26/20, within the required 60-day timeline. In May 2020, DHS/STS representatives met with court stakeholders including court services and the two judges who would handle requests for involuntary hospitalization from STS. During this meeting, the stakeholders clarified requirements for youth who need a hospital level of care—in short, both a Court Order and findings of "serious

mental impairment" (as defined by State law) are required. Subsequently, in October 2020, DHS/STS representatives also met with representatives from the Child Psychiatry division at University of Iowa Hospitals & Clinical (UIHC) to further clarify requirements and procedures.

These conversations led to the development of the Toolkit, required by **objective MH-IV.E.2 "Toolkit"** which were submitted to the Monitor on 10/26/20, within the required 90-day timeline. In addition to clear guidance regarding admission, discharge and exclusion criteria, the Toolkit includes the variety of documents needed to refer a youth to UIHC from STS:

- Notice of Medication
- Physician's 15-day Report
- Physician's Periodic Report
- Physician's Report of Examination

The Toolkit also includes Instructions for Completing a Section 229 Application[10] Alleging Serious Mental Impairment (memo from the Iowa Assistant Attorney General dated 4/16/2020), a quick guide to the steps (revised 10/20/2020), and the Section 229 Application itself.

The Toolkit is complete, required steps are clear and should effectively guide the procurement of hospital-based treatment for youth at STS. No youth have been referred for hospitalization since the effective date of the Remedial Plan. Should a youth be referred, subsequent Monitor's reports will comment on the extent to which the Toolkit was utilized and the outcome of the referral.

| |
|---|
| **Recommended Compliance Rating**. Substantial Compliance |
| **Steps Toward Maintaining Substantial Compliance**.<br> 1) Should an STS youth be referred for psychiatric hospitalization, ensure that STS staff follow the designated procedures to complete a Section 229 Application. |
| **Methodology**.<br> • Reviewed evidence of correspondence, meeting minutes and Toolkit materials<br> • Consulted with Iowa State Assistant Attorney General<br> • Reviewed STS report of hospitalization referrals (report was negative) |

| |
|---|
| **MH-IV.F. Suicide Prevention Policy & Procedure**<br> <u>MH-IV.F.1. Suicide Prevention Policy</u>. By 30 days from the effective date, BSTS will revise *Policy 4C-03 Suicide Prevention/Intervention* to include, among other things,<br> –protocols for contacting a PMHD during business and non-business hours;<br> –developing and implementing individual crisis/safety plans;<br> –protocols for engaging students in therapeutic or skills-based interventions designed to address the underlying issues of their self-injurious or suicidal behavior; and<br> –requirements for tracking data on suicide watch that are needed for quality assurance, quality improvement and oversight.<br> Upon revision and approval this policy will be used as a stand-alone doctrine until the larger two-prong crisis intervention model is developed and implemented. |

---

[10] "Section 229" refers to Iowa State Law Chapter 229, which provides procedures by which individuals with mental illnesses, both adults and juveniles, can be hospitalized. This chapter includes both voluntary and involuntary commitments.

MH-IV.F.2. Staff Training on Suicide Prevention. Within 90 days from the effective date, BSTS shall provide position-specific training to all staff on *Policy 4C-03 Suicide Prevention/intervention*. Training will include:

–recognizing suicide warning signs and risk factors

–referral, evaluation, treatment, housing and monitoring for specific watch levels

–interdisciplinary communication, intervention and follow-up.

MH-IV.F.3. Post Suicide Prevention Policy Notice. Within 24 hours of this policy being adopted, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting and approved by both Parties.

**Findings**.

Defendants submitted the Remedial Plan to the Court on 6/19/20, along with several related policies, one of which was policy *4C-03 Suicide Prevention and Intervention* (**objective MH-IV.F.1 "Suicide Prevention Policy"**). Along with the Remedial Plan, the Court approved this policy on 7/27/20 (dkt. 354). The Monitor was provided an opportunity to comment on the policy prior to its submission to the Court and gave feedback to better align the content with related requirements of the Remedial Plan (*e.g.*, limiting the use of isolation with youth who are at-risk of suicide and self-harm; limiting the distribution of mental health-related information to those with a demonstrated "need to know"). This feedback was satisfactorily incorporated into the final version of the policy, which includes procedures for:

- Mental health contact during business hours and after-hours;
- Safety Plans for youth on suicide precautions;
- Treating youth who exhibit self-injurious and suicidal behaviors; and
- Tracking data on the use of suicide precautions for quality assurance purposes.

Regarding **objective MH-IV.F.2 "Staff Training on Suicide Prevention,"** position-specific training was provided to all STS staff within the required 90-day timeline. All staff (170 of 170 staff; 100%) received an in-person 2-hour suicide prevention training, either as part of their annual training (most in June/July/August 2020), New Employee Orientation, or during a stand-alone session on 9/14/20. This general training covered the various types of suicidal and self-harming behavior, risk factors and prevalence rates among youth in custody, strategies for responding to suicidal youth, STS levels of precautions and requirements for communication, observation and documentation. All participants completed a quiz that assessed their mastery of the information.

Following that, on 10/15/20, all seven STS psychologists and the STS Mental Health Authority received an additional in-person training, delivered by DHS' Clinical Director. This training focused on conducting suicide risk assessments and reassessments, using the SAFE-T and C-SSRS assessment instruments, documentation requirements, and developing Mental Health Crisis Plans. All participants completed a quiz that assessed their mastery of the information.

Regarding **objective MH-IV.F.3 "Post Suicide Prevention Policy Notice,"** STS posted a notice making students aware of the changes to the suicide prevention policy on 8/10/20. The notice included information about "observation status," assessing youth's risk of self-harm, mental health staff's 24/7 availability, and restrictions on the use of room confinement. Both the Monitor and Plaintiffs' counsel were provided an opportunity to comment on the notice and recommended minor changes.

**Implementation** of this policy is discussed in MH-IV.B "Suicide Prevention and Intervention," above.

| |
|---|
| **Recommended Compliance Rating**. Substantial Compliance |

**Steps Toward Maintaining Substantial Compliance**.
1) Ensure staff receive an initial or annual refresher *Suicide Prevention* training, as appropriate.

**Methodology**.
- Reviewed draft policy and subsequent revisions
- Consulted with Plaintiffs' counsel and DHS/STS administrators regarding comments and feedback
- Reviewed training lesson plans, quizzes, and rosters
- Reviewed and provided feedback on Student Notice regarding policy changes

**MH-V. Injunctive Relief Required by Court Order**: For students receiving mental health treatment at the school, attempt to arrange for mental health care services in the community so students may continue their treatment upon discharge.

**Goal of the Remedial Plan**: BSTS shall engage in a practice that is implemented and defined by policy and procedure, where a PMHD connects with existing discharge and transition planning teams/functions at BSTS to advance continuity of care and ensure that transitionary services earnestly attempt to arrange mental health care services in the community upon discharge.

**MH-V.A. Discharge Planning Policy & Procedure**

MH-V.A.1. Discharge Summaries. By 30 days from the effective date, BSTS will establish protocols for creating standardized mental health treatment progress reports and discharge summaries for the Mental Health Department to share with the student's cottage counselor to include in their discharge planning and transition efforts. These protocols will include appropriate limitations on information being shared. This practice is designed to inform the type of mental health care services that the student may need upon discharge.

MH-V.A.2. MH Services Policy—Discharge. By 30 days from the effective date, BSTS shall include in their Mental Health Service policy, protocols for discharge planning and coordination for students receiving mental health treatment. This policy will require that a mental health discharge summary/plan be created for students that receive mental health (therapy or psychiatric) treatment at BSTS so they may provide it to a community provider upon discharge.

MH-V.A.3. Related Policies—Discharge. Re By 60 days from the effective date, BSTS will review and revise, as needed, other discharge related policies to ensure that

--transition/discharge efforts include identification of community partners and funding sources, including but not limited to juvenile court officers, representatives of the appropriate MH region, and managed care organization care coordinators,

--disbursement of reasonable (e.g. 30 day) supply of medications for those prescribed

--scheduled appointments with community mental health providers; and

--exchange of MH information for appropriate follow up care.

MH-V.A.4. Staff Training on Discharge Policies. By 120 days from the effective date of the policies noted above, BSTS shall provide training to PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

**Findings**.

The timeline for objectives related to policy development was altered slightly by the Court (dkt. 354), requiring Defendants to submit a Court-Review Draft policy to the Monitor and Plaintiffs' counsel by the timelines articulated in the Remedial Plan, to consider input from the Monitor and Plaintiffs' counsel, and then to submit the finalized Court-Review Draft to the Court two-weeks later.

Defendants submitted policy *4C-01 Mental Health Services* (**objective MH-V.A.2 "Mental Health Services Policy—Discharge"**) along with a Discharge Summary template (**objective MH-V.A.1 "Discharge Summaries"**) to the Monitor and Plaintiffs' counsel on 8/26/20, within the 30-day deadline. The Discharge Summary was further updated on 9/9/20. These documents contain the information necessary to guide appropriate discharge planning. More specifically, the *Mental Health Services* policy requires a youth's therapist to create a Discharge Summary that includes:

- Mental health diagnosis, goals, objectives and interventions;
- Summary of the course of mental health treatment, including progress toward treatment goals and treatment outcomes; and
- Recommendations for the type of mental health treatment needed at discharge.

This Mental Health Discharge Summary is submitted to STS' social worker who creates the Community Transition Plan, and the youth's Cottage Counselor who incorporates the information into the youth's Interdisciplinary Care Plan/Discharge Summary. The Court approved the *Mental Health Services* policy on 10/27/20 (dkt. 362).

As required for **objective MH-V.A.3 "Related Policies—Discharge,"** Defendants supplemented the protocols for discharge planning with information related to how this information is utilized to assist the youth's transition to the community, via the Community Transition Plan which includes:

- Mental health appointments scheduled (including the date/time and provider, with contact information);
- Contacts and referrals attempted;
- A list of community mental health treatment providers;
- Funding source information; and
- Psychotropic medications and prescriptions provided to the youth.

Defendants also created a useful Discharge Summary procedure guide, which lays out the job responsibilities for the various professionals involved, timelines and the interaction between and among these individuals. The *Student Health Records* policy (described in MH-III.A "Student Records Policy," above) prescribes appropriate information exchange protocols (and limitations) for sharing confidential mental health information to facilitate youth' discharge and transition to the community. In December 2020, STS created a helpful *Record Keeping Grid* that simplifies the presentation of the rules for creating, accessing and distributing confidential youth information, including that required for discharge and transition planning.

Regarding **objective MH-V.A.4 "Staff Training on Discharge Policy,"** all mental health staff—those who are responsible for delivering the services described in the policy including administrators, mental health professionals, medical staff, cottage directors and cottage counselors—received in-person training on the *Mental Health Services* policy on 10/15/20. This training utilized the policy document and a PowerPoint presentation that highlighted the key services and responsibilities, and also included an in-depth discussion and Q&A period. This training was supplemented on 11/23/20 by training key staff on the Discharge Summary procedure guide described above, along with a draft of

the *Record Keeping Grid*. All training was conducted within the 120-day deadline required by the Remedial Plan.

   **Implementation**. The Monitor/SME reviewed a list of 28 youth discharged from STS between 9/1/20 and 11/16/20, along with each youth's treatment plan, Clinical Discharge Summary, Cottage Discharge Summary and Community Transition Plan. The full records for approximately 50% of the youth on this list were reviewed. The Clinical Discharge Summaries, while they provided the youth's diagnosis, goals and objectives, were sparse in terms of describing the youth's course of treatment. While clinicians are right to respect the youth's privacy and confidentiality, more should be said about the specific skills taught to the youth, and the variety of ways that the youth pursued achievement of his treatment goals. It is worth noting that most of the Clinical Discharge Summaries reviewed were drafted *before* the supplemental training occurred on 11/23/20. The scarcity of detail may also be related to inadequacies in the treatment planning documents, individual and group psychotherapies described above. The Clinical Discharge Summaries were also sometimes in conflict with the description of treatment contained in the Cottage Discharge Summary.

   Community Transition Plans did not include most of the required information. Youth diagnoses were non-specific, often written in shorthand, without specifying the full title of the diagnosis. When youth were prescribed medication, the Community Transition Plans listed the medication, but did not provide the dosage or frequency of administration. The Plans did not indicate whether the youth was provided medication upon release or whether a prescription was written to be filled at a local pharmacy. Finally, follow-up appointments were not scheduled, nor was a list of community mental health providers with contact information included in the Plans. The combination of Clinical and Cottage Summaries and Community Transition Plans are not sufficient to effectively support a youth's reentry to the community.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
   1) Ensure that STS staff follow the various protocols for creating Clinical Discharge Summaries, ensuring consistency with the Cottage Discharge Summary, and integrating the information into the Community Transition Plan and, ultimately, facilitating the continuation of treatment once released to the community.
   2) Ensure staff receive initial or annual refresher *Discharge Summary* training, as appropriate.

**Methodology**.
   - Reviewed draft policies and attachments
   - Consulted Plaintiffs' counsel regarding concerns and recommendations
   - Consulted Defendants about follow-up questions
   - Reviewed STS Discharge List for 9/1/20 to 11/24/20, along with Clinical Discharge Summaries, Treatment Plans and Cottage Discharge Summaries for approximately 15 youth.
   - Reviewed Community Transition Plans for 28 youth released between 9/1/20 and 11/24/20.

**MH-VI. Injunctive Relief Required by Court Order: Provide institutional oversight and structural coordination of the School's MH program.**

**Goal of the Remedial Plan**: BSTS shall develop a two-tiered continuum of quality assurance, quality improvement and oversight by BSTS and DHS/MHDS Facilities-Central Office that focuses on (1)

supervision and training; (2) in-person and data-based observation and monitoring; and (3) review of records/documentation. Overall, this approach will be designed to ensure compliance with relevant MH policy and procedure; ensure MH services are consistent with current, generally accepted professional standards of care for identifying clinical needs, developing integrated MH treatment plans, providing effective psychotherapeutic interventions, safeguarding clinical documentation and records, responding effectively to suicidal/self-harm crises, and coordinating MH care upon discharge to the community, and ensuring that the appropriate corrective steps are implemented.

## MH-VI.A. Oversight, Observation and Monitoring

MH-VI.A.1 Mental Health Authority. A Director of the BSTS Mental Health Department/Mental Health Authority shall be employed to ensure the following:

--organize and oversee the deployment of mental health services at BSTS
--be responsible for the accessibility, timeliness and quality of the mental health treatment program
--liaison with medical/nursing and direct care staff to ensure continuity and integration of care
--arrange and coordinate levels of care, such as crisis and on-call services and coordination with outside providers/agencies
--ensure effective communication between direct care, mental health, medical/nursing and administrative staff
--oversee the development of mental health policies, procedures and programming
--coordinate staff training
--supervise PMHD

MH-VI.A.2 DHS—Clinical Oversight. The Clinical Director for Psychology and Mental Health Therapy Services at DHS Office of Facility Support-Central Office shall

--coordinate with the BSTS MHA at least monthly and shall be available for clinical consultation as needed
-- assist in identifying needs, developing programming and staff training
--facilitating quality assurance, improvement and oversight.

MH-VI.A.3 DHS Monthly Visits. MHDS Facilities Division Administration or Office of Facility Support-Central Office staff will visit the BSTS on a monthly basis to oversee mental health treatment program operations, meet with members of the leadership team, meet with other staff and meet with students. Visits and related oversight observations and actions shall be documented.

## Findings.

Regarding **objective MH-VI.A.1 "Mental Health Authority,"** a Mental Health Authority (MHA) was employed at STS throughout the monitoring period. The job description was originally drafted in May 2019 and revised in December 2020 to realign the position under the Deputy Superintendent (the MHA originally reported to the Superintendent). The MHA is required to be a master's level clinician with "an expansive knowledge of quality and effective mental health and substance abuse treatment services, especially for serious juvenile offenders." The DHS job description (Clinical Administrator) details a full-time position in which the individual provides management, oversight and direction for behavioral health staff at STS. In addition to administrative duties (*e.g.*, approving leave of absence, work schedules and assignments, managing overtime and calling in off-duty employees when understaffed), the MHA oversees the implementation of all behavioral health services (both mental health treatment and substance use treatment) and the interdisciplinary team, along with the documentation of these services. The MHA supervises all STS psychologists and psychology assistants, as well as contracted providers.

The MHA is a member of the facility's executive management team and as the department head, assists in developing policy and procedures that properly infuse the facility's daily practices with the perspective of mental health. The job description requires the MHA to direct staff in the effective use of de-escalation and redirection to reduce the use of restrictive procedures including restraint and isolation.

During the review period, the MHA repeatedly demonstrated her commitment to quality mental health services at STS. Strategic decisions regarding caseload assignments and the functioning of the multi-disciplinary treatment team were designed to better serve the needs of youth and to maximize the PMHDs time available to meet with youth on their caseloads. While the MHA does not currently carry a caseload, she is part of the 24/7 on-call rotation and her input on a variety of practices—not the least of which is the supervision of clinicians providing care and encouraging the appropriate use of room confinement campus-wide—was clearly evident in the documents reviewed by the Monitor/SME. The MHA provides both group and individual supervision of the PMHDs, the structure of which may evolve as DHS develops its Quality Assurance plan (see objective MH-VI.B "Quality Assurance Policy and Procedure," below).

In August 2019, DHS hired an extremely well-qualified Clinical Director of Psychology and Mental Health Therapy Services (Clinical Director) who has considerable clinical experience and who is well-versed in best practices regarding the treatment of youth in the juvenile justice system. In terms of the coordination between the Clinical Director and MHA (**objective MH-VI.A.2 "DHS-Clinical Oversight"**), standing meetings have occurred every other Friday for ongoing/as needed consultation, though some were cancelled if meetings had already occurred during the week and no further consultation was needed. Formal meetings of at least an hour were documented in August (n=3), September (n=2) and October (n=1). In addition, the Clinical Director was on-site at STS 7 times in August, 6 times in September, 9 times in October, and once in November, during which he was directly engaged with the MHA for consultation/oversight regarding clinical needs, program development, staff training and quality improvement. The Monitor/SME observed 3 MDT meetings during which both the Clinical Director and MHA were present and actively guided the team's conversation and identified areas in which the approach to treatment could be strengthened. Furthermore, DHS reports that the Clinical Director reviews youth records, suicide assessments and progress notes when consultation is requested or secondary to questions or concerns that arise during treatment team meetings or following crises. This high-level of engagement meets the requirements of the Remedial Plan.

Regarding **objective MH-VI.A.3 "DHS Monthly Visits,"** DHS's Facilities Division Administrator for Mental Health and Disability Services (Division Administrator) visited STS twice in August (one visit was multi-day), twice in September (once early, once late), and once in November (multi-day). The substance of each visit was documented and submitted to the Monitor for review. Key activities included:

- Facilitation of town hall meetings with staff to discuss pay adjustments among Youth Service Workers (YSW) and Youth Service Technicians (YST); staffing levels, recruitment and retention; and facility/cottage milieu and staff morale;
- Interviews for the new STS Superintendent and orientation for the candidate who was selected;
- Interviews for the STS Deputy Superintendent position (a new position to assist with facility/cottage leadership and compliance with the programmatic requirements of the Remedial Plan);

- Remedial Plan assignments and progress updates and consideration of timeline revisions;
- Consultation with the Monitor/SME;
- Facility walk-throughs that involved interactions with both staff and youth;
- Training for Youth Service Workers (YSW) on physical restraint practices; and
- Review of COVID-19 mitigation efforts.

On several visits, the Division Administrator noted decreased tension among staff and youth, despite the stress of COVID-19 as well as a need for physical plant repair and campus beautification projects. In addition to these on-site visits, the Division Administrator maintained on-going telephone and videoconference contact with STS administrators and participated in meetings regarding progress on the Remedial Plan. This level of engagement with the DHS Division Administrator meets the requirements of this provision.

**Recommended Compliance Rating**. Substantial Compliance.

**Steps Toward Maintaining Substantial Compliance**.
1) Continue to support clinicians and STS administrators with oversight, guidance and decision-making from the DHS Central Office level.

**Methodology**.
- Reviewed MHA job descriptions/revisions
- Reviewed meeting schedules
- Reviewed notes from DHS administrators' site visits
- Observed interactions among STS administrators and DHS administrators

**MH-VI.B. Quality Assurance Policy & Procedure.**
MH-VI.B.1 Quality Assurance Policy & Procedure. By 9 months from the effective date, BSTS and Central Office will collaborate to develop a quality assurance improvement and oversight policy and procedure that:
(a) Involves a two-tiered audit process, the first occurring at BSTS and the second at Central Office level. The frequency of audits at both levels will be designated in policy.
(b) Establishes standards for practice and performance metrics to be developed for MH treatment services and RC.
(c) Establishes protocols for tracking and analyzing data with sufficient particularity to identify trends across, among within and or regarding MH services, as well as RC and Restraint.
(d) Establishes protocols for the development, implementation and dissemination of staff training and/or corrective action plans to address problems identified through the quality assurance, improvement and oversight process.
VI.B.2 Annual Review. Policy shall be reviewed at least annually and updated as needed.

**Findings**.
This objective was not yet due during the period of review covered by this report (due date is nine months from the effective date of the Remedial Plan, or April 26, 2021).

A robust Quality Assurance program is the key to improving the various performance problems noted throughout this report and to maintaining quality services long-term. For the purposes of this provision, DHS/STS will need to develop specific standards that mirror the requirements of the

Remedial Plan, conduct internal audits using a multi-faceted methodology, identify performance deficits and draft and implement Corrective Action or Quality Improvement Plans to improve performance. The Corrective Action or Quality Improvement plans are likely to involve changes to procedure/protocol and on-going efforts to train and coach staff to address both persistent and emerging performance issues. Once DHS/STS develop an internal capacity to identify and resolve problems, external oversight becomes less necessary to ensure that youth receive services to which they are entitled.

**Recommended Compliance Rating**. Not yet rated.

**Steps Toward Substantial Compliance**.
  1)   Not yet applicable.

**Methodology**.
  • Not yet applicable.

---

**MH-VI.C. Ongoing Training**
MH-VI.C Ongoing Training. By 180 days from the effective date, BSTS shall develop a training or didactic program/policy for psychotherapists (Psychologist 1, 2 and 3) in the MHD designed to advance their clinical expertise in providing evidence-based psychotherapy to adolescents in the JJS.
--For fully licensed professionals, proof of relevant continuing education credits may help fulfill this training requirement.
--Temporary/provisionally licensed professionals may use their licensure based clinical supervision to fulfill part of this training requirement.
--Non-licensed professionals shall be required to fulfill this training program by participating in training or didactic sessions as described in policy.

**Findings**.
          This objective was not yet due during the period of review covered in this report. Defendants submitted a plan for ongoing training to the Monitor/SME on 1/25/21, within the timeline required by the Remedial Plan. The quality of the plan and its implementation will be assessed for the Monitor's next report.

**Recommended Compliance Rating**. Not yet rated.

**Steps Toward Substantial Compliance**.
  1)   Not yet applicable.

**Methodology**.
  • Not yet applicable.

## SECLUSION AND RESTRAINTS

**RC-I Injunctive Relief Required by Court Order: Defendants must ensure the School only employs use of BSU or the seclusion room in situations where a student' behavior poses a serious and immediate risk of physical harm to any person.**

**Goal of Remedial Plan**: BSTS shall adopt a practice that is implemented and defined by policy and procedure and supported by staff training and oversight that uses room confinement ["RC"], regardless of building/location, as a time-limited, last resort to help students de-escalate or "cool off" in situations where they pose a serious and immediate risk of physical harm ["SIRH"] to a person when less restrictive interventions have been attempted and found unsuccessful or would be unsafe or otherwise inappropriate given the student's acute risk.

**RC-I.A Seclusion Policy**.
BSTS policy *5B-04 Behavioral Stabilization Unit (BSU)* which specifies the protocols for using seclusion will be revised in the following ways:
(a) Name and focus of the policy will be revised to include a general reference to "room confinement" (RC) and not a singular location of room confinement, such as the BSU. The policy will be named *4C-06 Room Confinement.*
(b) Clarify that the use of RC, regardless of space or building where it occurs, must be based on a SIRH to a person, may not be used as a disciplinary sanction, and may not be used for destruction of property or theft.
(c) Clarify that the use of RC for "insubordination" and other forms of non-compliance with rules will be rare and grounds for RC only if non-compliance involves a SIRH to a person.
(d) Clarify that inciting or agitating others may be grounds for RC only if it creates SIRH. If so, incident report shall (i) demonstrate the serious and immediate nature of the risks as described by the student's speech or action; and (ii) include a statement from the agitated/incited student describing the incident and its impact on his behavior. Statement created away from BSTS staff and all versions shall be in incident report.
(e) Clearly note that the purpose of RC is to provide the student an opportunity to "cool off" and return to his normal cottage programming.
(f) Include the expectation that staff member be present with the student, either in or out of a room depending on the circumstances, to verbally assist the student in de-escalation, and to document the de-escalation efforts or interventions that were made to assist the student in regaining behavioral control as soon as possible.
(g) Include the expectation that student be removed from RC as soon as the student is calm, and no later than 1 hour, unless staff working with the student determines he is likely to engage in behavior that poses a SIRH.
> (i). Staff will be provided guidance via policy and staff training on how to effectively identify and assess SIRH and how to effectively help a student de-escalate.
> (ii) If staff determine that the student continues to present a SIRH after 1 hour, they shall immediately contact administrator for guidance and authorization as well as a PMHD who will meet with the student ASAP baring conflicts with other clinical duties, consistent with the 24/7 coverage plan in the MH treatment section above.
> (iii) The PMHD will work with the student to restore him to a state where he no longer poses SIRH. Protocols for such engagement will be noted in the two-pronged crisis intervention protocol and in the interim in the *Suicide Prevention/intervention* policy.

(h) Prohibit keeping a youth in RC overnight, including for administrative staffing purposes.
(i) Include the aggregation or accumulation of time spent within two hours of an earlier release from RC toward the one-hour limit.
(j) Include the requirement that students placed in RC provide a report in their own words describing the behavior that resulted in the RC and include protocols for securing and recording such reports for internal/external review.
(k) Include the identification of student and staff witnesses in the RC report, which will include adequate protections from reprisal for student witnesses.
(l) Include requirements that BSTS continue to track time spent in RC; that such data be tracked both individual and aggregate; that BSTS reports it to Central Office on a monthly basis per continuum of quality assurance.

Findings.

Policy. Defendants submitted the Remedial Plan to the Court on 6/19/20, along with several related policies, one of which was policy *4C-06 Room Confinement*. The Monitor and Plaintiffs' counsel were provided an opportunity to comment on the policy prior to its submission to the Court. The Monitor gave feedback to better align the content with generally accepted practices, professional standards and the specific language required by the Court Order. This feedback was satisfactorily incorporated into the final version of the policy, and neither the Monitor nor Plaintiffs' counsel had any objections to the final version. The Remedial Plan and *Room Confinement* policy were approved by the Court on 7/27/20 (dkt. 354). Key features of the *Room Confinement* policy include:

- Room confinement is prohibited as a disciplinary sanction. It may only be used when a youth presents a serious and immediate risk of physical harm, and less restrictive alternatives are unsuccessful or would be inappropriate given the acute risk.

- The duration of room confinement is limited to the time required to successfully de-escalate the youth.

- When a youth is in room confinement, staff are continually present and assisting the youth's efforts to regain self-control.

- If a youth has not regained control within one-hour, mental health staff meet with the youth to conduct a mental health review and to further assist with de-escalation. Mental health staff re-assess the youth each hour thereafter.

- A Reintegration and Safety Plan is developed for any youth who remains in Room Confinement for more than one hour.

In addition to these hallmarks, the policy also restricts or prohibits the use of room confinement in a variety of circumstances that were the subject of concern during trial (*e.g.*, room confinement in response to insubordination, non-compliance or property destruction; overnight stays in room confinement; repeated uses of room confinement during a short period of time) and requires additional procedures to ensure its proper utilization (*e.g.*, statements from other youth in the case of inciting a disturbance; identification of youth and staff witnesses). The policy includes a detailed form ("Room Confinement Checklist") to document the practice, along with a protocol for quality assurance and oversight at the facility and Central Office level.

With regard to **objective RC.1.A.(j)** regarding youth statements, the *Room Confinement* policy requires a statement from all youth who are placed in room confinement. If the youth refuses to write a statement, staff are directed to make additional attempts over the next 24 hours. While assessing

implementation via document review (discussed in detail below), the Monitor noted that very few of the youth agreed to write a statement, even after multiple attempts were made by the Cottage Counselor. This is a common problem in the Monitor's experience—once out of room confinement, few youth are willing to provide a statement about something they are "gone from." This obviously subverts the goal of understanding the incident from the youth's perspective. STS is encouraged to reconsider this requirement and to identify another method through which youth might be more willing to provide this insight (*e.g.*, having the youth write or dictate his recounting of the situation to the staff as part of the de-escalation effort/processing the youth out of room confinement).

Training. Of STS's 170 staff[11], 165 (97%) were trained to implement the *Room Confinement* policy. Five staff (3%) did not sign the training roster, so their attendance could not be verified. Most staff were trained in August 2020 and a few were trained in October 2020. Training was delivered in-person by facility administrators. The hour-long training reviewed the new policy and required forms and concluded with a Q&A session, covering all of the key elements of the policy. A competency exam was not utilized for this training but should be included in future annual refresher training and initial training for new staff. In addition to general policy requirements, the proficiency exam should focus specifically on the implementation issues discussed below.

Implementation. To fully understand the progress that STS has made in this area, one must first understand the context within which these changes to practice occurred. Previously, isolation was one of the core behavior management strategies at STS, used to respond to all manner of rule violations and non-compliance both in the BSU and in the longer-term CMH program. Even during the waning days of the practice—while STS was finalizing the new policy and training staff—STS utilized isolation over 400 times during a two-month period (June-July 2020). That said, once staff were trained, STS moved quickly to the new practice, limiting the use of room confinement to those instances where the youth presented a serious and imminent risk of physical harm. The new limitations on the use of room confinement forced staff to be creative in their approach to working with youth who were uncooperative, escalated, threatening, potentially violent, etc. Administrators reported a significant increase in the use of less restrictive options such as removing youth from the area and taking a walk, pulling the youth aside to talk the situation through, taking a time out in the general vicinity, using the multi-sensory de-escalation room, etc. These changes did not occur without skepticism and fear among staff (which is typical of this type of reform effort in the Monitor's experience), but they radically altered the way in which staff respond to youth's behavior. The Monitor anticipates that as STS' mental health program gains momentum, skill-based and treatment-focused responses will become even more prevalent.

To assess the implementation of the *Room Confinement* policy, the Monitor reviewed three samples of room confinement packets:

- June and July 2020. These room confinements occurred before the Remedial Plan went into effect and were sampled for the sole purpose of obtaining a baseline assessment. Aggregate data was analyzed for the full sample of 412 room confinements, and approximately 50 packets and videotaped footage for 15 room confinements were reviewed. Exceptionally high room confinement usage was observed and few of the protections anticipated in the new policy had been implemented. Further, just 8 youth accounted for over 200 room confinements, indicating that certain youth frequently presented challenging behaviors that

---

[11] This number *does not* include 6 staff who function as telephone operators (no youth contact) and 2 staff who were on medical/military leave. That said, other staff with limited youth contact (maintenance staff, kitchen staff, clerical staff, HR staff) *were* trained in the *Room Confinement* policy.

were difficult for staff to manage. One encouraging observation was that the duration of the vast majority (90+%) of room confinements was relatively short—60 minutes or less.

- September 2020. The second sample of room confinements was from the very first month of full implementation of the new policy. The most striking finding of this analysis is the significant decrease in usage—from 200+ in July 2020 to just 14 in September 2020. In the Monitor's experience, jurisdictions often experience an extreme "pendulum swing" when drastic changes in practice are first implemented (*e.g.*, changes in the policy for physical intervention, changes in the use of isolation). Staff are uncertain of the requirements and fear disciplinary action if they misuse the tool—they respond by not using the tool at all, even in circumstances when it would've been permissible or even advisable.

  The Monitor reviewed each of the 14 episodes of room confinement. In each case, once placed in room confinement, youth were under constant observation by staff, who recorded behavioral observations at the prescribed intervals and provided detailed descriptions of their efforts to assist the youth in de-escalating.

  The documents revealed only one deficient area: documenting the imminent threat of physical harm needed to justify the use of room confinement. While the substance of the incident reports suggested that most of the youth were likely aggressive, staff need to hone their skills in *describing, not labeling* the youth's behavior. Adjectives like "aggressive," "threatening," "escalating," and "resisting" are not as helpful as descriptions of what the youth was doing or saying in the moment. That said, the MHA and TPA clearly did a great deal of coaching with staff, and amendments to the documents that better illustrated what occurred prior to placing the youth in room confinement were often noted. Even with this one area in need of improvement, from the Monitor's perspective and experience, the quality of documentation during this first month of implementation is commendable. While the very low utilization of room confinement is likely an anomaly, the short lengths of stay and quality de-escalation efforts bode well for a fulsome shift to other forms of behavior management that do not rely on the use of isolation.

- October and November 2020. A third sample of room confinement documents from 10/1/20 to 11/15/20 was reviewed to obtain the most current performance levels prior to issuing this report. Eight packets were purposefully selected for review (those with lengths of stay longer than 60 minutes (n=2), and those with back-to-back room confinements (n=6)), in addition to a random selection of 30 additional packets. In total, 38 of the 64 room confinement packets (59%) were reviewed. Key findings of this analysis include:

  o  In the aggregate, room confinement was used 64 times during this period (44 in October and 20 in the first half of November). The average length of stay was 25 minutes. Durations ranged from 3 minutes to 110 minutes. Just two of the episodes (3%) lasted longer than 60 minutes (62 and 110 minutes).

  o  A total of 18 youth were involved in the 64 room confinements. Six youth had only one episode, 5 youth and two episodes, and 7 youth had between 4 and 11 episodes. These 7 youth accounted for 75% of the 64 room confinements during the time period. This echoes the finding from the baseline analysis, that a small number of youth frequently engage in behaviors that are difficult to manage. Such youth with frequent challenging behaviors may benefit from individualized behavior management plans.

- o As noted above, 30 room confinement packets were randomly selected for review to assess the extent to which the Room Confinement policy had been properly implemented.

  - The serious and imminent threat of physical harm was adequately described in 60% of the packets reviewed. <u>In the other 40%, the nature of the threat could not be discerned</u>. Some used vague language, such as "escalated" or "aggressive." A few described situations involving kicking doors, destroying property, youth trashing his room, disrespecting staff or tearing up logbooks—all things where room confinement is not permitted by policy *unless* they are accompanied by a serious and imminent risk of physical harm a person, which was not documented (**objective RC-I.A.(c)**). In some cases, the youth was sufficiently agitated/aggressive to require physical intervention, but the youth's response to the restraint did not appear to present an imminent threat (*e.g.*, youth did not resist, or otherwise calmly emerged from the restraint and followed staff's instructions). In those cases, it was unclear why room confinement was necessary.

  - The staff who initiated the room confinement and who observed the youth while in room confinement were identified in 87% of the packets reviewed.

  - <u>Youth witnesses were identified in only 24% of the incident reports</u> accompanying the room confinement forms. This information is needed in the event that administrators want to verify the staff's account of the situation. Staff witnesses were identified in 100% of the packets reviewed.

  - 15-minute checks, behavioral observations and verbal statements were properly recorded in 83% of the packets reviewed. In most cases, the descriptions were quite detailed and clearly described the youth's progress in regaining control while in room confinement.

  - Efforts to de-escalate the youth were described in 66% of the packets reviewed, but the remaining <u>33% used only vague language such as "talked to the youth about the events leading to room confinement" or "tried to de-escalate the youth."</u> More information is needed to understand what triggered the youth and which coping skills were deployed to assist the youth in exiting room confinement.

  - Administrative reviews were timely (*i.e.*, within one business day if the duration was an hour or longer, within two business days if the duration was less than one hour) in 90% of the cases reviewed.

  - In over half of the packets reviewed, multiple staff—including mental health clinicians—were present and helped the youth to regain behavioral control.

  - Several of the youth stepped down from room confinement to utilize the multi-sensory de-escalation room, or to further calm themselves in the common spaces of CMH.

- o Two room confinement episodes were longer than 1-hour, which requires intervention from a mental health clinician (**objective RC-I.A.(ii) and (iii)**). In one case, mental health was notified within 30 minutes of placement and responded promptly, providing two assessments. In the other, the mental health staff entered a late note into the file, confirming involvement, but the time of notification/assessment/interventions were not provided.

- ▪ A Reintegration Plan was not completed for either youth because both were removed from campus by law enforcement at the conclusion of the room confinement episode.

- o In 7 cases, subsequent room confinements occurred within 2 hours of the youth's original release, a situation in which policy requires the duration to accrue (*i.e.*, the 1-hour clock for mental health involvement keeps ticking) from the first room confinement. In 3 of these, the duration was sufficient to trigger the protections afforded youth at the 1-hour mark (**objective RC-I.A.(i), (g)(ii) and (g)(iii)**). In the others, the total accumulated time in room confinement was less than 60 minutes.

  - ▪ Of the 3 cases in which the total time exceeded 60 minutes, two room confinement packets included evidence of mental health involvement (*i.e.*, clinicians were part of de-escalation attempts on the 2nd room confinement episode). However, the mental health notification sections were not complete, and there was no indication that staff or administrators were cognizant of the close-in-time accumulation requirement. In the third case, no mental health involvement was noted.

- o Several youth were released from room confinement after 9pm, but no youth remained in room confinement overnight (**objective RC-1.A.(h)**).

In summary, STS has made excellent progress in reducing its use of isolation and in implementing the specific requirements of the Court Order and the *Room Confinement* policy. Room confinement is utilized most often with the small number of youth who frequently exhibit challenging behaviors and who thus experience room confinement multiple times. Some additional work remains in fully describing (not simply labeling) the nature of the imminent risk of physical harm, documenting the names of youth witnesses, and providing details of staff's de-escalation efforts and youth's responses to them. Although mental health was involved in the majority of back-to-back room confinements, it is not clear whether the facility has a specific focus on this issue or whether the clinicians' involvement was serendipitous.

<u>Oversight and Quality Assurance</u>. In addition to the administrators' (the MHA and TPA) daily reviews, the full STS administrative team conducts Weekly Incident Reviews during which all uses of room confinement are reviewed for accuracy, to ensure the room confinement was justified and to ensure the documentation is complete. The team follows up with staff when errors are noted and considers whether additional counseling/coaching/discipline is needed if usage or documentation remains subpar. The results of the Weekly Reviews are submitted to DHS administrators who also review the incidents and provide feedback when needed. So far, DHS/STS reports that these quality assurance efforts have identified a need for additional training on documentation requirements, which will be added to the annual training curriculum. As noted in MH-VI.B "Quality Assurance Policy," above, DHS/STS is developing a Quality Assurance program which may further detail the oversight protocol.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Consider revising the policy requirements for obtaining a statement from youth who are placed in room confinement in an effort to promote a higher level of receptivity among youth.
2) Ensure staff fully describe (rather than label) the nature of the serious and imminent risk of harm to physical safety that justifies the use of room confinement.
3) Ensure that incident reports include the names of youth witnesses.

4) Ensure staff monitoring youth in room confinement provide the details of their de-escalation efforts and youth's responses to them.

5) Develop a protocol for tracking/notifying staff when a youth has back-to-back room confinements that cause the 1-hour threshold to accumulate.

6) Create Reintegration Plans when required.

7) Continue to provide feedback/coaching/training/discipline to staff when policy requirements have not been met.

8) Ensure staff receive initial or annual refresher *Room Confinement* training, and include a proficiency exam that includes general policy requirements and issues related to current performance deficits.

**Methodology.**
- Reviewed and commented on draft policy and forms
- Reviewed staff training roster and PPT slides used for the training
- Reviewed Room Confinement logs and samples of room confinement packets from June-July 2020, September 2020 and October-November 2020
- Reviewed written description of STS/DHS oversight protocol

**RC-I.B Behavior Management/Motivation**. In addition to the policy changes for RC noted above, BSTS will revise their behavior management approach to focus less singularly on control and compliance and more dynamically on skill building and relationship development to help students better manage stressors, maintain emotional and behavioral control, and engage effectively with others so they are less likely to need RC/restraint to calm down or otherwise control their behavior. This approach will go beyond mere compliance and include a significant focus on motivation. It will align with the therapeutic, crisis-response, skills based and rehabilitative based services the school develops and provides. Overall, this program/approach will be designed to not only help students conform their conduct to School rules and basic societal expectations for purposes of ensuring safety and security but enhance their skills to pro-socially navigate life stressors and reduce the risk of recidivism.

RC-I.B.1 Identify Program. By 60 days from the effective date, BSTS will identify an evidence-based, skills-focused curriculum/program that will establish the overall framework that BSTS will use to help students develop the skills they need to better manage their emotions, control their behavior and interact effectively with others.

RC-I.B.2 Revise Behavior Management Policy. By 90 days from the effective date, BSTS will revise Policy *5B-03 Behavior Management* to align with the practices of the behavior management program/approach that will be developed. Will go into effect once training is complete.

RC-I.B.3 Revise Point/Level System. By 120 days from the effective date, BSTS will review/revise current point/level system to ensure that it

(a) includes a robust incentive-based system that sufficiently focuses on incentives, rewards and skill-development

(b) has a robust continuum of non-seclusion-based sanctions that are used to respond to the full range of violations of rules, including violence against others and destruction of property, and do not involve room restriction or denial of out-of-room recreation

(c) is aligned with the larger evidence-based, skill-focused curriculum that was identified.

RC-I.B.4 Train Key Staff. By 150 days from effective date, senior administration (e.g., superintendent, TPA, TSD), PMHD, and cottage staff will be trained on the policies that are updated, trained on how to

facilitate groups using the curriculum identified and trained to use the curriculum in their day-to-day interactions with students, including the point/level system.

RC-I.B.5 Train Remaining Staff. By 180 days from the effective date, other direct care staff will be trained on the policies and trained on how to utilize the curriculum in their day-to-day interactions with students, including the point/level system

RC-I.B.6 Post Notice. Within 24 hours of the policy being formally adopted/implemented, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting, approved by both Parties

   (a) Student Handbook will also be updated to reflect all changes, students will be provided with updated handbook, changes reviews with them by staff

**Findings**.

   Regarding **objective RC-I.B.1 "Identify Program,"** on 9/28/20, within the 60-day timeline required by this provision, Defendants identified Aggression Replacement Training (ART) as STS's evidence-based, skills-focused curriculum for helping students develop the skills needed to better manage their emotions, control their behavior and interact effectively with others. ART has three components:[12]

- Social Skills Training which teaches youth what to do, helping them replace antisocial behaviors with positive alternatives;

- Anger Control, which teaches participants what not to do, helping them respond to anger in a nonaggressive manner and to rethink anger-provoking situations; and

- Moral Reasoning, which helps to raise participants' level of concern for fairness, justice and the needs and rights of others.

A one-hour session in each of the three components is provided weekly for 10-weeks (for a total of 30 hours). Facilitators must be trained and certified to deliver the curriculum. The Monitor/SME have worked with several juvenile justice agencies that use ART and note that its intensity provides a solid framework for structuring a facility's behavior management program.

   Regarding objective **RC-I.B.2 "Revise Behavior Management Policy**," Defendants submitted a draft of policy *5B-03 Behavior Management* to the Monitor and Plaintiffs' counsel on 10/26/20, within the 90-day timeline established by the Remedial Plan. The Monitor provided extensive feedback, suggestion a re-organization to better illustrate the continuum of tools available and to clarify the intersection between STS' "Levels Program" and its "Incentive Program," which was under development at the time (both are discussed in more detail below). In order to better integrate the various components, the Monitor encouraged Defendants to seek a modification to the required timelines, which the Court approved on 11/10/20 (dkt. 372). Multiple drafts of the policy were exchanged among Defendants, Plaintiffs' counsel and the Monitor/SME, and the final version of the policy was approved by the Court on 1/22/21 (dkt. 378). It is worth noting that a behavior management policy is a particularly complex document, given the broad array of tools and options that are needed to respond to youth with a range of challenging behaviors. Defendants have been receptive to the Monitor's and Plaintiffs' comments and have developed an innovative concept for tracking program progress alongside incentivizing positive behavior.

   **Objective RC-1.B.3 "Revise Point/Level System"** requires STS to reconceptualize its approach to incentivizing positive behavior and responding to misconduct. Not only did the incentive side of the

---

[12] *See* https://aggressionreplacementtraining.com for more information.

equation need to be strengthened in order to be aligned with good practice but, given the change in the way isolation can be used (*i.e.*, it can no longer be used as a disciplinary sanction, only as a tool for de-escalation), STS needed to develop a robust continuum of non-isolation-based sanctions. The 2nd revision to the *Behavior Management* policy included a description of the new Incentive Program and was submitted to the Monitor and Plaintiffs' counsel on 11/24/20, within the 120-day timeline required by the Remedial Plan.

Under the Incentive Program, each day, youth receive points when they meet expectations for the morning routine, school, after-school and evening routine, and overnight. Staff assess the youth's behavior against a set of criteria that include following rules, coping with distress and frustration, respecting others, taking responsibility and self-control—all things that are taught and practiced via the skills-based curriculum, ART, discussed above. Each week, youth are placed on a Tier (Gold, Silver or Bronze), depending on the number of points they accrued throughout the previous week. Higher Tiers have access to a broader array of rewards and privileges. When youth do not meet expectations, they do not accrue points, and depending on the seriousness of the misconduct, may receive a sanction. Sanctions ("Learning Interventions") are a combination of privilege restrictions, cognitive/behavioral assignments and restitution/community service. This three-pronged approach— that (1) restricts youth from desired activities/items for a short period of time; (2) teaches skills that should help to prevent similar behavior from occurring in the future; and (3) incorporates restorative justice, or an opportunity for the youth to "make it right" – reflects best practice and provides the desired incorporation of skill-based treatment into the staff's response to youth's misbehavior. STS smartly decided to pilot test the initial Incentive Program's design in one housing unit in early December 2020 and addressed any implementation problems in the final version of the *Behavior Management* policy, discussed above.

Further, the criteria for STS's existing "Levels Program" are being reconstituted to focus more squarely on program engagement and progress. This will somewhat disentangle programming from the way in which staff respond to negative behaviors. While the two things are obviously related (a youth's negative behaviors suggest he has not acquired the skills he needs via programming), facilities must be cautious to ensure that programming and treatment are not prescribed as or perceived to be punishments. This is a delicate line to walk and, based on the Monitor's extensive knowledge of other systems throughout the county, few models have been developed in this area. That said, once properly calibrated and interfaced, the use of the two systems should provide an excellent structure for effectively managing youth's behavior.

The training components of this provision are underway (**objectives RC-I.B.4 "Train Key Staff" and RC-I.B.5 "Train Remaining Staff"**). In mid-December 2020, 26 STS staff were trained (virtually) by Education & Treatment Alternatives, Inc. (ETA), the group authorized to train staff to facilitate ART. Two of these STS staff will eventually be trained as ART Trainers, ensuring the sustainability of the program at STS over time by training new staff and providing refresher training to staff who were previously certified. STS added some additional in-house training for the initial cohort of staff to increase the number of role-playing sessions and opportunities for feedback. All ART facilitators are required to pass a proficiency exam prior to being certified. Finally, DHS also authorized funds for ETA to monitor the fidelity of implementation at STS, which is very encouraging given that the quality of group facilitation drastically impacts the effectiveness of the intervention.

According to the revised timeline approved by the Court (dkt. 372), STS senior staff will be trained on the Behavior Management policy (to include the Levels Program, the Incentive Program and how ART is related to each one) by 1/25/21, with the remaining staff training to occur by 2/25/21.

[Defendants provided information related to senior staff training as this report was being finalized on 1/25/21.] Notices to youth about the changes to facility policy and practice will be posted shortly thereafter, along with revisions to the Student Handbook (**objective RC-I.B.6 "Post Notice"**).

The Monitor will assess **implementation** in subsequent Monitor's reports, once the Levels Program, Incentive Program and ART program are underway.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Train staff to facilitate ART and schedule each youth/cottage to participate in ART according to design.
2) Train all staff in the *Behavior Management* policy, including the Levels Program and Incentive Program; how to incorporate ART into these structures; and how to utilize other behavior management tools described in the policy (*e.g.*, strategies for vulnerable youth; strategies for youth with aggressive behaviors), as appropriate.
3) Fully implement the *Behavior Management* policy.
4) Ensure staff receive initial or annual refresher *Behavior Management* training and pass a proficiency exam.

**Methodology**.
- Reviewed STS's request for funding for ART implementation
- Review training calendar for initial cohort of 26 STS staff to be trained in ART
- Reviewed multiple drafts of the *Behavior Management* policy and attachments
- Participated in multiple consultations with STS staff regarding the configuration of the policy and its various components

**RC-I.C Direct Care Staffing**. Throughout the duration of this Remedial Plan and monitoring, the BSTS will hire and maintain a sufficient number of professionals to effectively implement and practice this behavior management/motivation approach by helping students develop and practice skills necessary for them and others to remain safe.
RC-I.C Direct Care Staff. For direct care staff, the BSTS will continue to use a 1:8 (daytime) and 1:16 (nighttime) staffing ratio for the general population, consistent with PREA.

**Findings**.
Aggregate data on STS's average daily population and the average number of direct care staff working each of the three shifts was utilized to assess campus-wide staff ratios, as shown in the table below. Given STS's low population, the campus-wide staffing ratio is significantly lower than the 1:8 (daytime) and 1:16 (nighttime) ratios required by the Remedial Plan, as shown in the table below.

| STS Direct Care Staff Ratios, August-December 2020 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | August ADP = 47.2 | | September ADP = 35.0 | | October ADP=31.8 | | November ADP=31.7 | |
| | # | Ratio[1] | # | Ratio | # | Ratio | # | Ratio |
| Day | 17 | 1:3 | 18 | 1:2 | 19 | 1:2 | 19 | 1:2 |
| Evening | 43 | > 1:1 | 42 | >1:1 | 42 | >1:1 | 41 | >1:1 |

| Night | 21 | 1:2 | 20 | 1:2 | 19 | 1:2 | 20 | 1:2 |

[1] *Ratio* = Net ADP/# of staff, rounded to the nearest whole number. The Net ADP is the number of youth who are assigned to, and who are housed at, STS. Some youth may be assigned to STS but are housed elsewhere (*e.g.*, detention, jail, AWOL, hospitalized; "Gross ADP")

Assessing the extent to which staffing ratios are maintained when staff are deployed to the housing units is a more complex task, but one that can be helpful when monitoring the extent to which new practices have been fully implemented. This task is currently even more complex, given STS's various HVAC construction projects and COVID-19 mitigation strategy that requires taking cottages on/offline for quarantine and reception. Further, the central features of the behavior management strategy (*i.e.*, ART groups, Levels Program, Incentive Program) are still under development and so the quality of implementation is as yet unknown. Therefore, an assessment of cottage-level staffing ratios did not appear to be prudent at this time. If implementation problems are observed and/or cottage-level ratios do not meet the 1:8 and 1:16 threshold in the future, the recommended compliance rating may be modified.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) Ensure staff are deployed to housing units in sufficient numbers to properly implement the *Behavior Management* policy.

**Methodology**.
- Reviewed STS population data and staffing levels, August-November 2020

**RC-II Injunctive Relief Required by Court Order: Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted to their room due to lack of privileges. Students may not be required to eat their meals in CMH rooms. Students may not be denied out-of-room recreation time available to other students.**

**Goal of Remedial Plan**: BSTS will disband the CMH program and its practices as described in the Court order (e.g., administrative segregation, extended room confinement, room restrictions, denial of recreation time).

**RC-II CMH Program**. By the Remedial Plan submission deadline, BSTS will abandon the use of the CMH program. The Student Handbook will be revised to reflect the removal of the CMH program and related language.

**Findings**.
Defendants dismantled the program formerly housed in Corbett Miller Hall (CMH) in phases. Shortly after the Trial Order was issued on 3/30/20 (dkt. 328), STS largely disbanded the CMH program, placing limitations on students receiving services and sleeping in CMH, although isolated exceptions were made. The 6/5/20 version of the Student Handbook removed all references to the CMH program. By 6/29/20, students were not permitted to sleep in CMH under any circumstances. Shortly after the Remedial Plan was approved on 7/27/20, STS issued formal notification to staff that the CMH program had been disbanded and that overnight stays in CMH are prohibited (on 8/3/20).

The CMH building has received physical plant upgrades such as paint and new furniture, and has been used for other purposes (*e.g.*, for room confinement, discussed in RC-I "Room Confinement," above; as a space to provide individual programming for youth at high-risk of assaultive behavior; to house one of the facility's Multi-Sensory De-escalation Rooms). None of these uses reportedly include any of the practices that were of concern to the Court (*e.g.*, overnight stays in CMH, administrative segregation, extended isolation, room restriction, meals-in-room, or denial of essential services and programs). This will be confirmed via youth and staff interviews (either virtual or in-person). Furthermore, if a new program is developed and housed in CMH, the Monitor/SME will review the program design and implementation (including staff and youth interviews) to assess compliance with this provision.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) Ensure that any services or programs that take place in CMH effectively prohibit the practices that were central to the CMH program including extended isolation, room restriction, meals-in-room, or the denial of essential services and programs.

**Methodology**.
- Reviewed Student Handbook, revised 6/5/20
- Consulted with DHS/Facility administrators
- Video-tour of CMH building, including all common spaces and individual cells
- Reviewed timeline of CMH Program submitted by STS

**RC-III Injunctive Relief Required by Court Order**: The School shall not use the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of this Order. All Students at the School shall be notified immediately, both orally and in writing, that the Wrap is no longer to be used by the School.

**Goal of Remedial Plan**: The School will remove the Wrap and will provide verbal and written notice to students.

**RC.III. Restraint Policy and Practice**.
RC.III.A. Remove the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of the Court Order.
RC.III.B. Notify Students. All students shall be notified immediately, both orally and in writing.
RC.III.C. Policy. Prohibit the use of the Wrap in *2A-12 Security Restraints* policy.
RC.III.D. Post Notice. Within 24 hours of the policy, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting, and approved by both Parties.

**Findings**.
The Wrap device was removed from the STS campus on 4/1/20, within the timeline required by the Court (**objective RC-III.A "Remove the Wrap"**). Youth were advised about the Wrap's removal verbally and in writing on 4/7/20 (**objective RC-III.B "Notify Students"**). The 6/19/20 version of policy *2A-12 Security Restraints*, Section IV.d, specifically prohibits the use of the Wrap restraint (**objective**

RC-III.C **"Policy"**). The Wrap's removal from the facility's restraint continuum was reiterated in an additional Student Notice, posted on 8/10/20 (**objective RC-III.D "Post Notice"**).

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Maintaining Substantial Compliance**.
1) None needed.

**Methodology**.
- Reviewed Defendant's filing to notify the Court that the Wrap had been removed
- Reviewed Student Notices regarding the removal of the Wrap
- Reviewed draft policy *2A-12 Security Restraints*, made comments, and reviewed the final policy

**RC-IV Injunctive Relief Required by Court Order**: For the School to use fixed mechanical restraints instead of the Wrap, they may only do so with leave from the Court upon showing:
1) The restraint is not harmful to a youth's mental health;
2) It will only be used in situations where a student poses a serious and immediate risk of harm to another person after other interventions have failed;
3) Time limitations (e.g., 1 hour) noted in the Order for BSU/Seclusion Rooms shall apply; and
4) The School has put systems in place to ensure the restraint is not used for staff convenience or to coerce a student to take an action he is resisting.

If a mechanical restraint is approved, a mental health professional must be physically present with the student and attempt to help him calm down or otherwise regain self-control. The School must document, including video, all uses of the fixed mechanical restraint to ensure its use complies with the Court Order. No student's clothing shall be removed while the student is in a fixed mechanical restraint.

**Goal of Remedial Plan**: BSTS will comply with the requirements of the Court Order if they consider adopting a fixed mechanical restraint to respond to students who are at serious and immediate risk of harming a person.

**Findings**.
    The Monitor is unaware of any consideration by DHS to adopt a fixed mechanical restraint device for use at STS.

**Recommended Compliance Rating**. Not Applicable

**Steps Toward Substantial Compliance**.
1) Not Applicable

**Methodology**.
- Consultation with DHS and STS administrators

## APPENDIX 1. COMPLIANCE TABLE

The table below presents the recommended compliance ratings for each provision of the Remedial Plan for the Court's consideration. Recommended ratings for subsequent reporting periods will be added to this table so that progress can be tracked over time.[13] Of the 19 **Mental Health** provisions, the Monitor recommends substantial compliance ratings for 7 provisions (indicated by a ✓) and partial compliance for 9 provisions (indicated by PC). The Monitor does not recommend a non-compliance rating for any provision. The Monitor has not recommended compliance ratings for 3 provisions because they are not yet due under the timelines of the Remedial Plan (Not Yet Rated; NYR).

Of the 6 provisions related to the use of **Room Confinement and Restraints**, the Monitor recommends substantial compliance ratings for 3 provisions (indicated by a ✓) and partial compliance ratings for 2 provisions (indicated by PC). The Monitor has not recommended a compliance rating for one provision because it is currently Not Applicable (N/A). The Monitor does not recommend a non-compliance rating for any of the room confinement and restraint provisions.

| Provision | Monitor's Report | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| **Mental Health** | | | | |
| MH-I.A  Multi-Disciplinary Treatment Team | PC | | | |
| MH-I.B  Mental Health Treatment Plans | PC | | | |
| MH-I.C  As-Needed Referrals | PC | | | |
| MH-I.D MH Services Policy & Procedure | ✓ | | | |
| MH-II.A Therapeutic Services | PC | | | |
| MH-II.B Skill-based and Rehabilitative-based Services | PC | | | |
| MH-II.C Staffing | ✓ | | | |
| MH-II.D MH Services Policy & Procedure | ✓ | | | |
| MH-III.A Student Records Policy & Procedure | PC | | | |
| MH-IV.A 24/7 Crisis Response | ✓ | | | |
| MH-IV.B Suicide Prevention and Intervention | PC | | | |
| MH-IV.C Multi-Sensory De-Escalation Tools and Spaces | PC | | | |
| MH-IV.D Therapeutic Crisis Response Unit | NYR | | | |
| MH-IV.E Hospital Level of Care | ✓ | | | |
| MH-IV.F Suicide Prevention Policy & Procedure | ✓ | | | |

[13] Recommended compliance ratings are expected to improve over time as DHS/STS shores up implementation and service delivery as advised throughout this report. However, recommended compliance ratings may also change in subsequent reviews if new information suggests that performance has deteriorated or if information gleaned from youth and staff interviews reveals problems that were not visible via document review, remote observation and administrative interviews.

| Provision | Monitor's Report | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| MH-V. Discharge Planning Policy & Procedure | PC | | | |
| MH-VI.A Oversight, Observation and Monitoring | ✓ | | | |
| MH-VI.B Quality Assurance Policy & Procedure | NYR | | | |
| MH-VI.C Ongoing Training | NYR | | | |
| Seclusion [Room Confinement] and Restraint | | | | |
| RC-I.A    Seclusion [Room Confinement] Policy | PC | | | |
| RC-I.B    Behavior Management/Motivation | PC | | | |
| RC-I.C    Staffing | ✓ | | | |
| RC-II    CMH Program | ✓ | | | |
| RC-III    Restraint Policy & Practice | ✓ | | | |
| RC-IV    Introduction of Fixed Mechanical Restraints | N/A | | | |

## APPENDIX 2. STEPS TOWARD ACHIEVING OR MAINTAINING SUBSTANTIAL COMPLIANCE

| MENTAL HEALTH PROVISIONS |
| --- |

**MH-I.A Multi-Disciplinary Treatment Team**

1) Establish routine participation by the psychiatrist in the MDT meetings, either in person or virtually.
2) If not attending the MDT meeting in person, continue to solicit information from education and cottage staff to inform the MDT.
3) Focus the MDT on a review of the youth's progress toward the treatment plan's established goals and objectives using more objective data.
4) Continue to ensure youth participation in the MDT process.
5) Continue and document attempts to contact the youth's parent/guardian in an effort to encourage their participation in the MDT process.
6) Complete the admission assessment, initial MDT meeting and treatment plan development within a 30-day time period.
7) Focus on the goals/objectives/interventions and determine alterations to the youth's treatment plan collaboratively via the MDT meeting, in consultation with the youth and their parent/guardian.
8) Ensure that each youth on the mental health caseload is reviewed by the MDT on a monthly basis and that the substance of the review is reflected in the MDT meeting minutes.
9) Continue the MDT response to emerging needs and special concerns.
10) Develop quality assurance measures to review the MDT process and allow for self-monitoring.

**MH-I.B Mental Health Treatment Plans**

1) Ensure diagnostic clarity.
2) Ensure that goals are measurable and attainable, with step-by-step objectives developed collaboratively between the youth and his psychotherapist.
3) Consider the use of behavior observations, rating scales and measurement tools for specific symptom clusters normed for this population.
4) Ensure that all interventions (*e.g.*, psychotherapy group, individual therapy, and skills-based/rehabilitative services, psychiatry) are included in the treatment plan with both frequency, duration and practitioner designated.
5) Identify the revised treatment plans as "updates."
6) Ensure that each youth's treatment plan is reviewed on a monthly basis.
7) Develop quality assurance measures regarding the mental health treatment plans to allow for self-monitoring.

**MH-I.C As-Needed Referrals**

1) Revise the As-Needed Evaluation Log so that it parallels the information on the revised Mental Health Referral Form and is amenable to assessing performance and compliance.
2) Ensure Mental Health Services Referral forms are processed by the Mental Health Authority within seven days as required by the *Mental Health Services* policy. The form should include the disposition (*e.g.*, to whom the testing was referred) for each evaluation requested.
3) Continue to ensure that request evaluations are completed within a reasonable period of time.
4) Develop quality assurance measures to review the as-needed evaluation referral/completion process to allow for self-monitoring.

**MH-I.D Mental Health Services Policy & Procedure**

1) Consider providing information to staff (*e.g.*, at shift change or Cottage Team meetings) that reinforces youth's right to mental health services and describes direct care staff's options for referring youth who may be in need of mental health services.
2) Review the policy by 9/9/2021 and update as necessary.
3) Ensure staff receive initial or annual refresher *Mental Health Services* training, as appropriate.

**MH-II.A Therapeutic Services**

1) Ensure that individual and group therapeutic interactions are conducted at the frequency designated by the youth's treatment plan.
2) If the assigned clinician is unavailable, either reschedule the session or provide compensatory services from another clinician.
3) Ensure that group therapeutic interventions are provided consistent with the youth's treatment plan or, conversely, included in the plan as a prescribed intervention when youth participate in them.
4) Implement and conduct mental health group therapeutic interventions on a regularly reoccurring basis.
5) Track therapeutic group enrollment, attendance and refusals.
6) Improve the quality of documentation regarding progress notes for both individual and group psychotherapies.
7) Continue to provide therapy to youth upon their request.
8) Accurately categorize youth's individual and group treatment referrals.
9) Clearly document attempts/interventions utilized to engage with youth who refuse to participate in individual and group therapies.
10) Develop quality assurance measures for psychotherapy to allow for self-monitoring.

**MH-II.B Skill-based and Rehabilitative-based Services**

1) Implement Aggression Replacement Training (ART) as planned.
2) Ensure that youth are attending skills-based and rehabilitative-based groups as prescribed by their treatment plans.

   3) Develop and implement a standardized template for group notes that includes the name of the group, the theme/topic/session being explored, the name of the facilitator and the number of youth who attended the session.

   4) Ensure the group notes provide individualized information regarding each youth's participation and engagement.

   5) Deliver skills-based and rehabilitative groups with fidelity to the model, curriculum or lesson plan.

   6) Develop quality assurance measures for self-monitoring.

## MH-II.C Mental Health Staffing

   1) Continue to fund and maintain a sufficient number of professionals to evaluate, assess and construct transition plans for youth, and a sufficient number of psychotherapists to meet the required 1:15 ratio.

## MH-II.D Mental Health Services Policy & Procedure

   1) Same as MH-I.D, above.

## MH-III.A Student Records Policy & Procedure

   1) Ensure that staff follow the *Student Health Records* policy requirements for protecting the confidentiality of youth's records and for distributing mental health information only to those with a demonstrated "need to know," as prescribed by the policy.

   2) Ensure staff receive initial or annual refresher *Student Health Records* training, as appropriate.

## MH-IV.A 24/7 Crisis Response

   1) Continue to provide 24/7 coverage for crisis intervention during business and non-business hours.

   2) Track the utilization of after-hours consultation and consider its inclusion as part of the mental health quality assurance program

## MH-IV.B Suicide Prevention and Intervention

   1) Review documentation to ensure that all information regarding the self-harming event is correctly documented (*e.g.,* time of event, time of initial evaluation, level of suicide watch authorized).

   2) Ensure that the youth's Crisis Plan is addressed at the next MDT meeting with prompt revision of the overall treatment plan in order to integrate this information and develop interventions as necessary.

   3) Continue the development of detailed Crisis Plans and consider the addition of brief, easy-to-follow lists of triggers and interventions for ease of use by cottage staff and youth.

   4) Monitor, review and update Crisis Plans as required by policy.

   5) Develop quality assurance measures for self-monitoring.

## MH-IV.C Multi-Sensory De-Escalation Tools and Spaces

1) Ensure that a youth's treating clinician, multi-disciplinary team and cottage team is notified of MSDR usage so that the intervention can be integrated into the youth's treatment.

**MH-IV.D Therapeutic Crisis Response Unit**
1) Not Yet Rated.

**MH-IV.E Hospital Level of Care**
1) Should an STS youth be referred for psychiatric hospitalization, ensure that STS staff follow the designated procedures to complete a Section 229 Application.

**MH-IV.F Suicide Prevention Policy & Procedure**
1) Ensure staff receive an initial or annual refresher *Suicide Prevention* training, as appropriate.

**MH-V. Discharge Planning Policy & Procedure**
1) Ensure that STS staff follow the various protocols for creating Clinical Discharge Summaries, ensuring consistency with the Cottage Discharge Summary, and integrating the information into the Community Transition Plan and, ultimately, facilitating the continuation of treatment once released to the community.
2) Ensure staff receive initial or annual refresher *Discharge Summary* training, as appropriate.

**MH-VI.A Oversight, Observation and Monitoring**
1) Continue to support clinicians and STS administrators with oversight, guidance and decision-making from the DHS Central Office level.

**MH-VI.B Quality Assurance Policy & Procedure**
1) Not Yet Rated

**MH-VI.C On-going Training**
1) Not Yet Rated

**SECLUSION [ROOM CONFINEMENT] AND RESTRAINT PROVISIONS**

**RC-I.A Seclusion [Room Confinement] Policy**
1) Consider revising the policy requirements for obtaining a statement from youth who are placed in room confinement in an effort to promote a higher level of receptivity among youth.
2) Ensure staff fully describe (rather than label) the nature of the serious and imminent risk of harm to physical safety that justifies the use of room confinement.

3) Ensure that incident reports include the names of youth witnesses.

4) Ensure staff monitoring youth in room confinement provide the details of their de-escalation efforts and youth's responses to them.

5) Develop a protocol for tracking/notifying staff when a youth has back-to-back room confinements that cause the 1-hour threshold to accumulate.

6) Create Reintegration Plans when required.

7) Continue to provide feedback/coaching/training/discipline to staff when policy requirements have not been met.

8) Ensure staff receive initial or annual refresher *Room Confinement* training, and include a proficiency exam that includes general policy requirements and issues related to current performance deficits.

## RC-I.B Behavior Management/Motivation

1) Train staff to facilitate ART and schedule each youth/cottage to participate in ART according to design.

2) Train all staff in the *Behavior Management* policy, including the Levels Program and Incentive Program; how to incorporate ART into these structures; and how to utilize other behavior management tools described in the policy (*e.g.*, strategies for vulnerable youth; strategies for youth with aggressive behaviors), as appropriate.

3) Fully implement the *Behavior Management* policy.

4) Ensure staff receive initial or annual refresher *Behavior Management* training and pass a proficiency exam.

## RC-I.C Direct Care Staffing

1) Ensure staff are deployed to housing units in sufficient numbers to properly implement the *Behavior Management* policy.

## RC-II CMH Program

1) Ensure that any services or programs that take place in CMH effectively prohibit the practices that were central to the CMH program including extended isolation, room restriction, meals-in-room, or the denial of essential services and programs.

## RC-III Restraint Policy & Practice

1) None.

## RC-IV Introduction of Fixed Mechanical Restraints

1) None.