# Interim Status Report
## Case 4:17-cv-00417-SMR-HCA

Update on Compliance with the Remedial Plan
For the Iowa Boys' State Training School

June 22, 2021

Kelly Dedel, Ph.D., *Monitor*
Daphne Glindmeyer, MD, *Subject Matter Expert*

One in 37 Research, Inc.
16 Rock Street Cody, WY  82414
(503) 799-0915   kelly.dedel@gmail.com

## Table of Contents

Introduction .................................................................................................................. 3

Mental Health Treatment ............................................................................................. 4

    Availability of Treatment ......................................................................................... 5

    Alignment of Treatment with Treatment Plan Goals............................................. 5

    Clinicians' Perspectives and Mental Health's Integration with Other Disciplines .................. 6

Behavior Management Program .................................................................................. 7

    Incentive Program .................................................................................................. 7

    Level/Step Program................................................................................................ 11

    The Problem of Idle Time....................................................................................... 11

Unsafe Conditions at STS ............................................................................................ 12

    Youth Population, Assaults on Peers and Assaults on Staff ................................. 13

    Dynamics Surrounding the Increase in Youth Violence and Disorder .................. 16

    Response to Aggressive and Disruptive Behavior................................................. 18

    Consequences for Youth and Staff........................................................................ 20

Recommendations to Improve Facility Safety ........................................................... 22

Conclusion ................................................................................................................... 24

## Introduction

The purpose of this report is to update the Court on the current conditions at the Iowa Boys' State Training School (STS) and its progress toward certain requirements of the Remedial Plan. The content and timing for this report was proposed by the Monitor and approved by the Court on February 23, 2021 (dkt. 388). This report is meant to address only a small subset of issues, rather than a comprehensive review of the Remedial Plan, and does not recommend compliance ratings. Instead, it supplements the findings in the Initial Monitor's report with information gleaned from an on-site visit and interviews with youth and staff.

This report first updates the Court on STS's mental health treatment program and behavior management program (Incentive Program and revised Level/Step Program, which had not yet begun at the time of the Initial Monitor's Report dated February 1, 2021).  Next, the report details the Monitor/SME's serious concerns about the level of youth violence and disorder at STS and the resulting injuries, fear and trauma among the youth in custody and staff who work there. It is essential to recognize that youth who frequently exhibit aggressive behaviors also suffer the negative consequences of a facility whose tools are not yet effectively addressing their mental health symptoms and behavior in a manner that could reduce the likelihood of a subsequent occurrence. In short, the current situation at STS is detrimental to everyone, including the youth with extraordinarily complex needs which several components of the Remedial Plan were specifically designed to address, the youth who are currently experiencing success at STS, and STS's staff of all disciplines who are tasked with implementing the Remedial Order. The report concludes with recommendations to improve facility safety, which should also help the facility progress toward full implementation of the Remedial Plan.

In March 2021, once COVID-related public health advisories regarding air travel were modified and Dr. Dedel could safely visit STS, she spent three days on-site at STS. She conducted multiple interviews with DHS Administrators (including Director Garcia), STS Administrators, Youth Service Technicians (YSTs), Youth Service Workers (YSWs), Cottage Directors, Cottage Counselors, the STS Student Council (n=3 youth) and a sample of approximately 5 additional STS youth. She also observed several therapeutic/rehabilitative groups, multi-disciplinary team meetings and met with a group of Juvenile Court Officers (JCOs). Dr. Glindmeyer, the Subject Matter Expert for Mental Health (SME), conducted virtual interviews with the Mental Health Authority, mental health clinicians, YSWs, Cottage Counselors, the school principal and 5 youth on the mental health caseload. The Monitor and

SME also reviewed disciplinary and mental health treatment records for the small subset of youth who exhibit frequent externalizing behavioral problems at STS.[1]

The Monitor and SME carefully selected 12 youth for interviews in order to capture a broad range of perspectives and experiences at STS. Some of the youth (n=4) were experiencing success at STS—they had achieved the highest tiers in the Incentive Program, were progressing through the Level/Step program and were fully engaged in school, treatment and programming. The remaining youth (n=8) were experiencing considerable difficulty at STS—their status in the Incentive Program and Level/Step programs was severely hampered by their frequent involvement in serious misconduct. Eleven of the youth were interviewed once and one youth who exhibited high frequency externalizing behaviors was interviewed by both the Monitor and the SME. Youth interviews lasted between 30 and 60 minutes. The Monitor/SME also reviewed disciplinary records and mental health files for a subset of these youth. It appeared that the youth's conduct arose from a combination of factors, including their mental health symptomatology and the chaotic and disordered facility environment.

The Monitor and SME shared the findings from these activities with DHS/STS administrators and with Plaintiffs' counsel. Furthermore, throughout March/April/May/June 2021, the Monitor/SME collaborated extensively with DHS/STS administrators on potential strategies to stabilize the facility and improve facility safety in order to continue progress toward full implementation of the Remedial Plan.

## Mental Health Treatment

The Court Order and Remedial Plan articulate a vision for a full continuum of mental health services that includes an initial assessment, treatment planning and individual/group/psychiatric services that address each youth's identified needs and that the Monitor/SME fully support. The various documents used to guide and record these services were discussed at length in the Monitor's Initial Report, and STS continues to work to become fully compliant with the Remedial Plan by addressing both process and content. Improvements and continued challenges will be discussed in the upcoming Monitor's Second Report, due to the Court in November 2021. One of the purposes of this Interim Report is to bring the perspectives of STS youth, mental health clinicians and cottage/security staff into the discussion.

As noted above, while the youth who were interviewed were experiencing different levels of success at STS, all of them gave positive reports about the mental health treatment they received. Findings in key areas are discussed below.

---

[1] The phrase "externalizing behaviors" is used to refer to the group of behavioral problems that are manifested in a youth's outward behavior and reflect the youth acting negatively on the external environment. They may include disruption, opposition and defiance, hyperactivity, hostility, verbal and physical aggression.

- **Availability of Treatment**

Mental health services are now widely available at STS. While on site, the Monitor toured the mental health wing of the school building, which is a well-designed, peaceful space where clinicians and youth can engage privately with few distractions. Youth on the mental health caseload reported frequent contact with their assigned clinicians, generally multiple times per week. These contacts took the form of scheduled one-on-one sessions, multi-disciplinary team meetings, assistance during periods of crisis, and more casual encounters on the living units and at school. Universally, youth reported that their mental health treatment was helpful to them.

In terms of group therapies, all youth reported being involved in at least one of STS' therapeutic or rehabilitative groups and gave many of them high marks in terms of their relevance to their daily lives and home circumstances, engagement of the facilitators and high-interest topics. Two youth expressed frustration with other youth for disrupting their group and individual therapeutic experiences. With only one exception, youth who were prescribed psychotropic medications knew which medications they were taking, why they were prescribed and could articulate potential side effects. They described the psychiatrist and nursing staff as being accessible and helpful, and several commented on the psychiatrist's efforts to find the appropriate medication/dosage to improve efficacy in addressing the youth's symptomatology.

While on site, the Monitor observed a variety of therapeutic and rehabilitative groups including Aggression Replacement Training (ART), Consequences of Negative Thinking, Emotional Masculinity and Essential Instruction. Each of the group facilitators was well-prepared, delivered content according to the established curriculum and used an effective mix of teaching styles to present, demonstrate, rehearse and discuss the therapeutic concepts. Facilitators were careful to assist youth who struggled with reading, writing or comprehension. Group sizes were appropriate—if not a little small—and the youth were remarkably engaged. The group spaces were quiet and relatively free of distractions (although Codes were called from other locations requesting staff assistance during three of them, which led to some disarray as staff responded).

- **Alignment of Treatment with Treatment Plan Goals**

While STS youth reported wide access to their mental health clinicians and knew that a treatment plan had been developed, few youth were able to articulate the focus of their treatment goals (e.g. "my behavior" or "my mood"). This is unsurprising given the problems with goal articulation discussed in the Monitor's Initial Report but confirms the need to better streamline these documents and ensure they are written in a manner that youth can comprehend. Given the lack of clarity around treatment goals, the youth's reports of individual treatment sessions that focused on the crisis of the day, rather than cognitive behavioral or

other therapeutic interventions, were also unsurprising. Although STS has laid an appropriate foundation for the required mental health services (hired clinicians, drafted policies and supporting documents, provided office space, training and supervision), STS must alleviate the need to address ongoing and emerging crises so that therapists and youth can engage in true therapeutic interventions.

- **Clinicians' Perspectives and Integration with Other Disciplines**

The Court's mandate to create a mental health department at STS added a key discipline to the team of adults who care for and provide services to youth. STS employs 7 full-time clinicians and one part-time contracted clinician, in addition to the Mental Health Authority (head of STS's mental health department). Interviews were conducted with 4 of these individuals, along with approximately 15 individuals from other disciplines (administrators, school staff, YSTs, YSWs, Cottage Directors and Cottage Counselors).

In terms of their clinical work, the mental health staff clearly care about the youth and are committed to establishing effective therapeutic relationships. However, the chaotic, trauma-filled environment (described in detail below) negatively impacts their work in a variety of ways. First, the need to constantly respond to crises derails them from delivering regularly reoccurring treatment. Second, the problems discussed in the Initial Monitor's Report regarding diagnostic clarity, treatment planning and treatment delivery remain, and improving these clinical skills is difficult if not impossible within the current environment at STS. While each of the clinicians saw the need for individualized behavior plans for STS's youth with recurrent aggressive behaviors, a thoughtful functional behavior assessment will be needed for each youth to identify the function of their specific behavior, to identify antecedents that may trigger the behavior, and to develop individualized strategies for both youth and staff to respond more adaptively when they occur.

Finally, there is an overall lack of integration among clinicians and cottage staff (Cottage Directors, Cottage Counselors and YSWs). Understanding the addition of the mental health staff to the STS team demands an appreciation of the very short tenure of services and lack of widespread knowledge and limited experience with mental health services among staff of other disciplines. Prior to the Court's intervention, STS had only one mental health clinician, who was tasked with providing services to over 100 youth. Obviously, these services in no way approximated what a fully staffed, optimally functioning mental health department can do. As a result, staff at STS had and still have a very limited understanding of the role of mental health disorders in youth's functioning and behavior and have little if any experience working collaboratively with mental health treatment providers. Similarly, very few of STS's current mental health clinicians have had any experience in correctional settings and are therefore unfamiliar with basic security operations and protocols.

In addition to this shared lack of experience, many of the STS staff whose tenure pre-dates the Remedial Plan experienced the trial as a condemnation of the services they provided to youth and many do not understand the difference between the support/coaching/guidance they provide and legitimate/genuine evidence-based mental health treatment. As a result, they have responded to the entry of mental health staff in a variety of ways—some welcome the assistance, but others feel some combination of offense, confusion, and skepticism.

For all of these reasons, the STS staff have not yet gelled into a collaborative multi-disciplinary team. Rather than viewing themselves (or being seen by youth) as a unified entity with clear protocols, many are uncertain about what roles each should play and how to leverage the skills of their counterparts to better manage youth, especially those exhibiting externalizing behaviors. Achieving unity and maximizing their complementary skill sets will take time and would certainly be facilitated by a safer environment in which all staff can pursue coordinated, quality service delivery without the overlay of fear and trauma.

## Behavior Management Program

STS's current behavior management program has two parts: (1) an Incentive Program, designed to encourage safe, positive behavior and to respond constructively to negative behavior; and (2) a Level/Step program, which uses five indicators to track youth's progress in STS's overall rehabilitation program. To be effective, such programs need to be robustly designed, consistently applied and must be supported by an engaging, active daily schedule that minimizes idle time. The Court approved the *Behavior Management* policy in January 2021 and training was completed for most staff by February 2021.

All new behavior management programs take some time to reach optimal implementation. Training—like that required by the Remedial Plan—is the *initial* introduction of the concepts, but *mastery* of the necessary skills only occurs as staff receive ongoing guidance and coaching and figure out how to incorporate the skills into their daily interactions. Similarly, STS has only begun to implement its overarching skills-based program (Aggression Replacement Training; ART). Not all youth receive this group instruction, nor have all staff been trained or had the opportunity to hone their skills in reinforcing ART's core principles. The purpose of this section is to summarize the initial implementation of the Incentive Program and the Level/Step Program and to identify a few areas of improvement that may improve their effectiveness.

- **Incentive Program**

The design of STS's incentive program is similar to that of research-based approaches to shaping youth's behavior such as PBIS (Positive Behavioral Interventions and Supports). Youth earn points throughout the day when they demonstrate safe, positive behavior. These points are tallied each week and, depending on the number of points accrued, youth are

assigned to one of three levels (Bronze, Silver, Gold) with an increasing array of privileges (higher commissary spending, use of unit electronics/MP3 players, use of the incentive cottage). When youth engage in negative behaviors, the response (a "Learning Intervention" or "LI") may have multiple components: a) privilege restriction, the contours of which depend on the severity of the rule violation; b) a skill-development activity, such as a worksheet or assignment from one of the group curricula; and c) a restorative activity, such as a written or verbal apology, or a community service project.

Interviews with youth and staff and observation of Weekly Cottage Meetings (where the youth's incentive tier is reviewed) revealed a full integration of the Incentive Program into daily life at STS. The youth's incentive tier is regularly discussed in meetings, during day-to-day interactions, and is mentioned in incident reports and mental health documents. All youth knew what tier they were on and what was needed to advance to a higher tier. This is particularly impressive given the Incentive Program's short tenure. Its implementation is supported by on-going quality assurance efforts where staff's utilization of the program is reviewed, corrected, guided and coached by the Cottage Director, Treatment Program Administrator, Training Director or Research Analyst, depending on the nature of the issue. This type of on-going quality assurance effort is exactly what the Monitor would recommend to support program implementation and to ensure staff are using the program as intended. Implementing a new behavior management program is challenging even in the best of circumstances, and most facilities find that some recalibration of the program design is needed in order to achieve the desired effect. Youth and staff interviews offered some insight into potential improvements, as discussed below.

On an important foundational level, none of the youth interviewed reported verbal or physical mistreatment by any staff, and most youth could identify several staff whom they trusted and turned to for support. That said, several youth reported that staff seem to have differing expectations for youth and varying interpretations of the Incentive Program's requirements. Staff themselves noted that some hesitate to hold youth accountable when they do not meet expectations, because they worry about "setting the youth off" and spiraling into a confrontation that may result in interpersonal violence. This lack of consistency led some youth to feel that rule enforcement is arbitrary, and the resulting consequences are unfair. A small number of youth said that they were not clear why certain consequences ("Learning Interventions") were imposed, raising questions about whether staff are engaging the youth in discussion about the youth's behavior as required. The Monitor/SME's impression is that while staff may not directly provoke or antagonize, some staff are avoidant and/or when they attempt to talk with youth about their behavior, it doesn't go well. There are a variety of formal structures in place for discussing youth's behavior (e.g., MDT meetings, Weekly Cottage meetings), but the primary mechanism by which youth's behavior is shaped is via their routine, informal interactions with staff. Staff must clearly state expectations and reminders,

offer effusive praise to recognize positive behavior and *also* engage in calm, constructive conversations when youth are struggling to meet expectations. This is the cornerstone of an effective behavior management program, and a variety of things make this essential component of the Remedial Plan difficult for STS to fully achieve. STS has a youth population for whom discussions about their behavior are emotionally laden and potentially triggering. STS also has a relatively unseasoned workforce and many staff have not yet honed the necessary skills. As the facility has chosen Aggression Replacement Training/ART as its overarching skills-based program, it needs to become a consistent part of the facility culture such that it is both understood by youth and reinforced by staff. Finally, as discussed in detail below, STS's current environment is chaotic which may either dissuade staff from engaging at the necessary level altogether or may render such conversations even more difficult to hold.

Regarding the Incentive Program itself, both youth and staff reported that the existing array of incentives was stale. Cottage 8 continues to function as an incentive area, complete with video and table games, a space to play and listen to music, a space for videoconferencing with family, a movie theater, snacks etc. This space is terrific, but adolescents have short attention spans, and it has already started to lose its luster. Cottage 8 needs to be supplemented by a rich array of other incentives that appeal to youth with different interests and that are accessible to youth on the lower tiers of the program.

Several youth and staff complained that the consequences for misbehavior were insufficient. This is a commonly heard concern among staff and youth in facilities that have recently abolished isolation as a disciplinary sanction. Youth on the Student Council (who were interviewed as a group) encouraged the Monitor to find a solution for the youth who are causing problems in the living units and who "make it hard for us to just do our program." Another youth with a lengthy disciplinary record that included serious aggression against both peers and staff also stated that more significant consequences were needed "because kids are acting like fools…there is no punishment…I'm tired of kids and staff getting hurt over dumb stuff because some kids want to do their own program and others don't." To his credit, this youth has improved his behavior over time and is no longer engaging in externalizing behaviors at the same rate as he was previously. As such, his perspective on the issue of accountability is informed by his experiences on both ends of behavior management continuum.

As juvenile facilities across the country rightly and appropriately move away from the use of isolation as a disciplinary sanction, many struggle to find ways to respond to serious misconduct that are 1) effective in reducing subsequent occurrences of that behavior and 2) perceived to be sufficient or fair or "enough" in the eyes of the people in custody and those who work in the facility. This is at the heart of the Court Order, which rightfully removed the harmful practice of isolation, and also at the core of the Remedial Plan, which includes various

tools, services and approaches to effectively and humanely respond to youth's behavior. STS youth's and staff's reports underscore that the strategies required in the Remedial Plan have yet to be fully implemented, and thus have yet to achieve their potential.

The overarching recommendation here is for STS to continue to pursue full, robust implementation of the Remedial Plan. There is also an opportunity to refine certain aspects of the Incentive Program to increase its effectiveness. These include:

- <u>Coach staff to develop the necessary skills to calmly, constructively and consistently provide feedback to youth about their behavior</u>**.** While this is an obvious component of the formal structures for behavior review (e.g., Treatment Team Meetings, Weekly Cottage Meetings), it is essential that staff both offer effusive praise and thoughtful restructuring in their day-to-day interactions with youth. Withholding praise and/or avoiding confrontation will undermine the effectiveness of the Incentive Program. These conversations should be anchored in the language and concepts of the facility's overarching skills-based program, Aggression Replacement Training/ART.

- <u>Refresh the array of incentives and consider the schedule of reinforcement</u>. Continually refreshing incentives and ensuring that compelling incentives are accessible to youth at all tiers will help to ensure that youth remain engaged in the program and may motivate youth to refrain from succumbing to the chaos surrounding the small group of youth with recurrent aggressive behavior. Not only could the type of incentives be refreshed, but the schedule of rewards could also be adapted to provide more frequent reinforcers (e.g., daily) for those youth who require it.

- <u>Modify the point scale for certain youth</u>. Currently, youth must earn 80% of available points to promote to Silver and 90% of available points to promote to Gold. This is simply unachievable for some youth, particularly those with significant mental health or developmental disorders. These youth would benefit from individualized plans that allow them to promote to a higher tier after significant progress (e.g., from 30% to 60%) even when they do not reach the established point thresholds. The *Behavior Management* policy already envisions this type of individualization.

- <u>Reconsider the options for youth with recurrent aggressive behaviors and those who commit serious interpersonal violence</u>**.** The responses to serious misconduct, as currently conceptualized and practiced, do not appear to be effective in reducing the likelihood of subsequent aggressive behavior among a small subset of youth. As discussed in more detail in the remainder of this report, a small subset of youth appears to need more intensive services that address their complex mental health

issues and need a very high degree of structure and guidance throughout the day. This is discussed in more detail in the Recommendations at the end of this report.

▪ <u>Reviewing key program metrics</u>. Now that the Incentive Program has been in place for several months, STS should examine key program metrics to assess whether it is operating as expected. This could include the proportion for youth who achieve Silver/Gold, whether incentives are delivered as required and whether consequences are imposed as expected. These data will highlight whether any modifications to point thresholds, tabulation schedules or procedures supporting incentives and consequences are needed.

- **Level/Step Program**

STS's Level/Step Program is a holistic measure of a youth's progress and engagement in the various components of STS's rehabilitative approach. The system includes 30 steps—youth begin on Level 1, Step 1 (i.e., 1.1) and ideally progress up to Level 3, Step 10 (i.e., 3.10). Each week, youth can be promoted to the next step if they engaged in mental health treatment (if applicable), engaged in programming, engaged in school, are free of major and moderate rule violations, and have earned at least 70% of weekly points in the Incentive Program. If youth have not met these expectations, they have a "neutral week"—their step is not advanced. If a youth committed a major rule violation, they receive 5 neutral weeks, or in other words, stay at the same step for a 5-week period.

Like the Incentive Program, youth and staff interviews and observation of Weekly Cottage Meetings revealed that the Level/Step program is well-integrated into daily life at STS. All youth knew their Level/Step and what needed to be done to advance to the next step. As STS developed its *Behavior Management* policy, they reported that the Juvenile Court Officers/JCOs (who are key decision-makers regarding youth's length of stay) are very much attached to this program as a familiar metric for assessing youth's readiness for release. Notwithstanding the revisions that should be considered to the Incentive Program noted above (given its interplay with determining whether a youth advances in Level/Step each week), the Level/Step program appears to be a reasonable way to balance youth's behavior and program engagement in decisions about readiness for release.

- **The Problem of Idle Time**

Interviews with staff and youth highlighted a key dynamic underlying the level of youth violence and other types of disorder—an excess of idle time during the evenings and on weekends. The lack of structured, engaging activities is a known precursor to youth's misbehavior and is a common shortfall in juvenile justice facilities. While STS has a robust slate of treatment and rehabilitative groups, the daily unit schedules need to be enhanced with additional programming other than self-directed leisure time. This could include activities designed to teach life-skills, to introduce new hobbies, to compete in sports or other

tournaments, etc. Most facilities accomplish this via some combination of activities led by facility staff (including YSWs) and community partners (either paid or volunteer). The reduction of idle time is an essential strategy for stabilizing the environment at STS, which must occur in order for the other program components to flourish.

Thus, the initial implementation of the behavior management program at STS is encouraging and there are a few opportunities for improvement. The structure and concepts reflect best-practice research and both programs are already well-integrated into daily life. That said, such programs are effective only when they are consistently applied, and additional coaching, guidance and staff practice are needed here in addition to some tweaks to the program design as outlined above. Overall, STS's behavior management program appears adequate for responding to most types of misconduct, but the serious, recurrent violence and disorder discussed in the next section of this report indicates that additional energy and resources must be focused on strategies to better address the needs of youth with recurring externalizing behaviors that jeopardize the physical safety of other youth and staff.

## Unsafe Conditions at STS

Although the initial implementation of the mental health treatment program and behavior management program is encouraging, the programs' effectiveness is severely undercut by the facility's unsafe conditions. The facility environment is marked by frequent youth violence and other types of disorder that may not cause injury, but are nonetheless destabilizing, stressful and counterproductive to the consistent, reliable delivery of services required by the Remedial Plan. The Monitor's characterization of the facility as "unsafe" is supported by staff and youth reports, aggregate data, youth records and incident reports that reveal frequent maladaptive behaviors running the full gamut from verbal threats of physical harm; to spitting on others or spraying them with unidentified liquids; to throwing objects (chairs, DVDs, headphones, trashcans) –some of which make contact with another person; to slapping, kicking, and punching others in the body, head and face; to choking another person; to alleged sexual assault (charges are currently pending). These behaviors are frequently preceded by refusals to comply with directions, opposition, defiance, arguments and other behaviors that are not violent, but that still derail the intended schedule of activities and services.

Fear among youth, fear among staff and constant program disruptions caused by the behavior itself and the need for staff to respond to incidents all hinder the ability of both youth and staff to engage in services. At STS, the current level of youth violence and disorder inhibits the ability to make meaningful progress toward compliance with the requirements of the Remedial Plan. Even the highest quality therapeutic and rehabilitative services will have little impact in a chaotic and unsafe environment, which underscores the need for STS to take

immediate steps to improve facility safety. Recommendations toward this end are provided at the end of this report.

- **Youth Population, Assaults on Peers and Assaults on Staff**

Since 2018, STS's youth population has decreased significantly, as shown in the line graph below.



In 2018 and 2019, the average daily population (ADP) averaged about 93 youth, decreased to 61.5 youth in 2020, and averaged just 38 youth in the first quarter of 2021. The population decreases—welcomed by staff and youth alike—occurred during a time of significant stress and transition. In 2019, DHS/JCS effectively limited the number of youth committed to STS. The population was further reduced by freezing admissions as part of DHS/STS's COVID mitigation strategy. At the time this report was drafted, STS had reopened its admissions and its population was approximately 50 youth.

The number of youth-on-youth assaults and youth-on-staff assaults are presented in the graph below. As is typical with most data from juvenile justice systems throughout the country, STS's assault data do not distinguish between assaults of different severities (e.g., throwing an object or a liquid versus punching, hitting or kicking) nor do these data indicate whether an injury was sustained. A review of incident reports describing "assaults" evidenced this type of heterogeneity and also revealed a significant volume of assaults that either had the potential to or actually did cause significant physical injury to another person.

The chart below shows some peaks and valleys, but generally that the number of youth-on-youth assaults ranged between 4 and 22 each month and youth-on-staff assaults ranged between 2 and 34 each month. Added together, during the first quarter of 2021, the facility experienced between 25 and 50 assaults each month—roughly one or two assaults, every day, for three months.



As noted above, STS's population has decreased substantially over the past couple years. In theory, when the size of a facility's population decreases, the number of incidents should also decrease because of the stability that comes with a lower staff—youth ratio, fewer interpersonal dynamics to manage, etc. However, if the decrease in the population is due to the removal of primarily lower-risk youth (i.e., those with a lower risk to public safety and/or lower risk of institutional violence who are more appropriate for community-based programs), the number of incidents often does not decrease as expected and may instead increase. Higher-risk youth are just that—at higher risk of engaging in assaultive behaviors. The concentration of high-risk youth at STS underscores to the need to robustly implement the strategies in the Remedial Plan to address their complex mental health needs and to effectively manage and motivate positive behavior.

Beyond this, looking only at the raw number of events distorts the picture of how facility safety at STS has changed over time. When facilities experience significant fluctuations in the size of the youth population, key metrics are best understood by using a *rate of events* that controls for the change in the size of the population. The rate is calculated using the following formula: *rate = number of events/gross population.*[2] Using this formula provides a standardized scale, accounting for the size of the population and normalizing the variation in the number of days month-to-month. It provides a cleaner, more precise look at changes in the level of assaults than using the raw number of events. The graphs below show the average annual rate for 2018 and 2019 (yellow dots), and also shows monthly rates for 2020 and the first part of 2021.

---

[2] The "gross population" is calculated by tallying the number of youth in custody each day during the time period. It is an additive statistic, rather than a snapshot of the number of youth in custody on any given day during the time period or an average over a period of time, such as the more familiar "average daily population" or ADP. All of these measures are appropriate for use when calculating a rate for the purpose of comparing the incidence of a type of event over a period of time.



The average rate of youth-on-youth assaults in 2020 was 0.78, which is about 2.5 times the rate of youth-on-youth assaults experienced in 2018 and 2019 (0.32 and 0.34, respectively). So far in 2021, the average rate of youth-on-youth assaults is 1.73, which is <u>over 5 times the rate of youth-on-youth assaults experienced in 2018 and 2019.</u> A similar trend is evident in the rate of youth-on-staff assaults, as shown in the graph below.



The average rate of youth-on-staff assaults in 2020 was 0.73, which is nearly two times the rate of assaults on staff experienced in 2018 and 2019 (0.4 and 0.38, respectively). So far in 2021, the average rate of assaults on staff is 1.84, which is <u>over 4 times the rate of assaults on staff experienced in 2018 and 2019</u>.

As is typical in most juvenile justice facilities, a small number of youth are involved in a disproportionate share of the assaultive behavior and disorder at STS. These are the youth for whom the full gamut of strategies required by the Remedial Plan are both the most necessary,

and the most challenging to implement. Shortly after the site visit, the Monitor requested that STS identify the youth with the highest number of violent infractions on their disciplinary records and share both the incident reports and mental health records for these youth. The five youth with the highest level of assaultive behaviors at STS have a history of diagnosed mental health disorders (including PTSD, Generalized Anxiety Disorder, Borderline Intellectual Functioning, ADD/ADHD, Conduct Disorder, Oppositional Defiant Disorder, Cannabis Use Disorder, among others) and frequent externalizing behaviors. Three of the five were interviewed by the SME and their perspectives are included throughout this report along with those of eight other youth, many of whom also struggle to succeed at STS. A review of their mental health records revealed that some of the externalizing behaviors may be directly related to their mental health diagnoses. However, given the level of violence and disorder at the facility and the daily trauma experienced by staff and youth, clinicians' efforts to objectively assess and effectively treat those behaviors derived from youth's mental health diagnoses have not been optimized, as discussed in the "Mental Health Treatment" section, above. All five youth were admitted to STS in late 2020. Over a 6-7 month period, collectively, they were involved in over 70 assaults of peers/staff and were involved in over 170 other major/moderate rule infractions.

When interviewed, staff of all disciplines recognized that despite its early progress in the initial implementation of the requirements of the Remedial Plan, STS currently lacks a viable strategy for addressing the needs of youth who frequently exhibit physical aggression, beyond the universal approaches of individualized mental health treatment and the Incentive Program, neither of which are fully implemented at this time. Not only is quality treatment essential for these five youth themselves, but an effective strategy is also critical for protecting the ability of the other youth to engage in the services they need. This gap also must be filled to protect the safety of the workforce at STS, without whom none of the strategies envisioned by the Remedial Plan can be implemented.

- **Dynamics Surrounding the Increase in Youth Violence and Disorder**

The Court Order appropriately prohibited the use of isolation on an accelerated timeline, which is typical when eliminating harmful practices. This prohibition also meant that the facility had to pivot to new, evidence-based strategies for responding to youth's behavior, also on a very short timeline. The Remedial Plan established essential mental health services and improved strategies for managing youth's behavior to STS, all of which are in the early phases of implementation. Because the components of the Remedial Plan that were designed to replace STS's harmful practices with those that reflect best-practice have not yet been fully implemented, the transition has been very tumultuous. In the Monitor/SME's experience, an increase in violence is a common, unwanted side effect of essential actions to quickly eliminate facilities' reliance on harmful practices such as isolation, because the replacement tools, strategies and services cannot be designed, adopted and implemented as quickly.

STS disbanded the CMH Program, which historically had been used to respond to the full range of youth's misconduct, from minor infractions to serious violence. This program was prioritized for closure by the Remedial Plan because it relied on long periods of isolation that are harmful to the physical and emotional well-being of youth. Unfortunately, the closure of the CMH Program was not accompanied by a specific replacement strategy to address the needs of youth with serious, recurrent behavior problems. The program's closure occurred just as the Remedial Plan was being developed, and the gap had not yet been identified. Once fully implemented, the strategies articulated in the Remedial Plan may be sufficient to support these youth, but in the interim, additional support for these youth is needed.

The CMH Program's use of isolation did not reflect good practice for managing youth with serious, recurrent behavior problems, but it did include two elements that can be useful: richer staffing levels and limited youth movement throughout the facility. Such practices decrease youth's access to potential victims and limit the extent to which youth's misconduct can disrupt programming for the general population. Specialized programs can effectively meet the needs of youth with serious, recurrent behavior problems and can protect other youth's access and opportunity to benefit from services and programming, but they must be highly structured and service intensive. Eliminating the use of prolonged isolation as a behavior management/disciplinary tool is without question an essential and positive change at STS, and the facility remains in need of an effective strategy—grounded in good-practice and evidence-based treatment—to manage youth who frequently exhibit aggressive behaviors.

During this same time (early/mid 2020), STS developed the specific parameters for a full continuum of mental health services and for its new behavior management strategy, both articulated in the Remedial Plan and discussed in some detail, above. The *Mental Health Services* policy was approved by the Court in October 2020 and the *Behavior Management* policy was approved in January 2021. Staff training followed shortly thereafter—training on the *Mental Health Services* policy was completed in November 2020 and training on the *Behavior Management* policy was completed in February 2021. A limited number of STS staff were trained to facilitate Aggression Replacement Training/ART in December 2020, and the program has yet to be rolled out universally among staff and youth.

Training staff on the requirements of a policy or program is only the initial step to transforming practice. Following their introduction to the concepts in each policy, staff must still learn to deliver the required services/program by integrating the new ideas and requirements into their daily work; receiving ongoing feedback, coaching and guidance; and eventually mastering the concepts so that they become cemented in daily practice. Although the new policies and programs have strong potential to transform the care and services available at STS, neither the behavior management strategy nor the mental health program was anywhere close to fully implemented at the time the CMH Program was disbanded.

- **<u>Response to Aggressive and Disruptive Behavior</u>**

When an aggressive or disruptive incident occurs (including violent incidents as well as non-violent behaviors that interrupt service delivery), several things must happen. First, order must be restored at the scene of the incident. Facilities typically broadcast an alert via handheld radio, requesting available staff to report to the location. STS has a system of "Codes" that indicate the severity of the issue (i.e., Code 1 = call for YST assistance, Code 2 = fight in progress, Code 3 = all available staff respond). While this system provides the staff support necessary to regain control following a violent incident, it can also pull staff away from programming and other services and thus compounds the disruption to the facility beyond the incident itself. The Monitor requested data from STS on the number of codes (of any type) each month, presented in the table below:

| Code Count by Month, June 2020 – April 2021 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jun 20 | Jul 20 | Aug 20 | Sep 20 | Oct 20 | Nov 20 | Dec 20 | Jan 21 | Feb 21 | Mar 21 | Apr 21 |
| 29 | 222 | 70 | 48 | 94 | 175 | 198 | 131 | 339 | 389 | 359 |

These data demonstrate the increasing level of disorder at STS over the past six months. In the most recent three-month period, STS staff called an average of 10+ codes per day. These data are congruent with both staff and youth reports of a chaotic facility environment that is the source of fear, trauma and constant program disruptions, discussed in more detail below.

Once the scene of the incident is controlled, staff must address the safety threat by separating those involved and restoring order. The aggressors need to be identified, moved to a different location and fully de-escalated. STS has multiple strategies for de-escalation, such as utilizing its Mental Health clinicians and/or YSTs to process with the youth on the spot, "mobile de-escalation" while walking around campus or riding in one of STS's transportation vans, utilizing one of the common spaces in CMH so that the youth is removed from the scene, utilizing the multi-sensory room or utilizing a short period of isolation to address an imminent risk of physical harm (i.e., room confinement). Data on the use of de-escalation strategies and room confinement in 2021 are presented below.

| De-escalation Count, 2021 | | | |
|---|---|---|---|
| Jan 21 | Feb 21 | Mar 21 | Apr 21 |
| 320 | 497 | 326 | 250 |

The data above show the number of times a youth was de-escalated using one of the less restrictive strategies listed above. For a facility holding only 35-40 youth, these numbers are extraordinarily high. This is not to say that staff overuse the tool and remove youth from programming unnecessarily. Instead, these data highlight the high level of disruption on

campus and also show that staff are utilizing less restrictive means of addressing youth's behavior, which is a contrast to past practice when isolation was the predominant response.

Data on the use of room confinement in 2021 are presented below. Considering the limited circumstances in which room confinement can be used (i.e., only in response to an imminent risk of physical harm to another person), the number of room confinements required to address imminent safety threats among a population of 35-40 youth is unusually high. That said, given that the number of room confinements is considerably smaller than the number of de-escalations, these data do illustrate STS's recent pattern of using less restrictive behavior management tools (de-escalation) far more frequently than isolation (room confinement), which is an important, positive change from past practice.

| Room Confinement Count, 2021 | | | |
|---|---|---|---|
| Jan 21 | Feb 21 | Mar 21 | Apr 21 |
| 33 | 71 | 108 | 84 |

Simultaneously with efforts to respond to the youth exhibiting physically aggressive behavior, order must be restored in the area in which the incident occurred. This includes addressing the need for medical treatment among youth and staff who were involved in the incident if it involved injury or the use of physical restraints; addressing the emotional impact of the event with youth and staff who were directly victimized and who witnessed the assault; assessing whether a continuing risk to safety/retaliation exists; and ultimately returning to normal operations. Neither de-escalating the aggressors, addressing the emotional impact of the event, nor restoring order is a quick affair. All parties need the opportunity to settle, to regain control of their emotions, and to process their feelings about what occurred.

It appears that STS may be rushing this process by returning the aggressors to the milieu before safety has been fully restored. As noted in the Initial Monitor's Report, periods of room confinement are quite short, most in the range of 15-20 minutes and nearly all under an hour. Once aggressive youth are de-escalated to the point that they no longer pose an imminent risk of physical harm, room confinement is rightfully ended. However, staff and youth report that following the conclusion of this period of isolation, youth are quickly returned to the cottage/school/scene of the incident, rather than taking additional steps to ensure that the safety risk has been fully ameliorated. This swift return is traumatizing to the youth and staff who were victimized, sends a false message about the seriousness of the event, and also creates the risk of subsequent violence. Even when a youth is no longer at risk of *imminent* harm to another person's safety, this does not necessarily mean that youth can safely return to the milieu, nor does it mean that the milieu is ready to safely receive them. Instead, various aspects of the youth's environment/schedule must be properly managed to appropriately temper the return to normal programming. This is why the *Room Confinement*

policy includes a template for a methodical "Reintegration Plan," a provision which has not yet been utilized. This is further discussed in the Recommendations below.

- **Consequences for Youth and Staff**

Violence has enormous consequences for both youth and staff. Most obviously, <u>injury</u>, some of which are very serious. Both staff and youth have needed emergency medical treatment as a result of assaults occurring at STS and some reportedly face significant sequelae as a result of their injuries.

The table below uses an OSHA standard metric for injury rates among staff, "Injuries per 100 FTEE (full-time employment equivalent)".

| STS Staff Injury Rates, 2018-2021 | | | |
|---|---|---|---|
| 2 0 1 8 | 2 0 1 9 | 2 0 2 0 | 2 0 2 1 |
| 27.1 | 33.3 | 49.0 | 42.5 |

Injury rates among staff are significantly higher than in previous years. In just the first three months of 2021, from a workforce of approximately 120 staff of all types, a total of 24 staff were injured.

Even more pervasive is the level of <u>fear</u>. In total, approximately 20 staff from several disciplines were interviewed for this report and all of them discussed the high-level of violence and the negative impact it had on their experience at STS. One staff reported that they expected to be injured when they reported to work, and several others reported their experience of fear, agitation, poor sleep, inability to concentrate, irritability—typical symptoms of PTSD. One long-time staff member, described by supervisors as a highly skilled YSW, requested a transfer from the day shift to the night shift because they could no longer tolerate the facility's disorder.

One STS staff member communicated their concerns to the SME in writing. Parts of that note are included here because the staff's words paint a powerful picture and underscore the need to attend to staff trauma:

> *"I have been involved in several restraints, had to call switchboard for Codes, and have witnessed countless assaults on staff, as well as the aftermath of those assaults. I have debriefed with teachers and YSWs routinely after they were threatened and assaulted and can say with full certainty that those people do in fact feel very unsafe at their job. Just today, [one staff told me she is leaving STS] because she feels incredibly unsafe and was threatened to be killed yesterday by a student. I have been in cottages when several students joined together to verbally and physically assault both staff and students and I recall numerous times looking into the eyes of those staff and seeing what I can only describe as profound fear.*

*Many [staff] vent their frustrations to me on a daily basis. Many are looking for employment elsewhere, where they'll not be saddled with intense anxiety going into work, wondering if they'll be severely hurt that night or if their coworker will be injured. Many can show you the scars they bear from injuries they've sustained from students. And nearly all seem to exhibit the clinical signs of PTSD from their time working at STS."*

The safety concerns have had a significant impact on STS's staffing level. STS has budgeted FTE positions for 93 YSWs and 9 YSTs. Between January 2020 and March 2021, 52 YST/YSWs resigned, 6 retired and 20 were terminated. On average, these staff had nearly 8 years of experience at the time they left the facility. This is an enormous proportion of STS's workforce.

When staff leave a facility in large numbers, the facility must increase its recruitment and hiring to ensure adequate numbers of staff to operate the facility. Although STS is fully staffed at the moment, about half of its workforce is new to the field of juvenile justice. They do not yet have deep expertise in working with challenging youth. They've not yet honed their skills in supervising, motivating, encouraging, deescalating or holding youth accountable. They've not yet honed their skills for self-care or coping with the stress and secondary trauma that is typical among correctional staff. These skills are difficult to acquire in the first place, and exponentially more difficult in an environment with so much disorder. The goal is to develop a highly skilled, resilient workforce that has mastered the art of working with challenging youth. This goal will be very difficult to realize without addressing the high level of trauma among those who work at STS under the conditions described in this report.

Youth in juvenile justice facilities—especially adolescent boys—often do not perceive or label conditions such as those described in this report as "unsafe," but nonetheless suggest both verbally and non-verbally that they are on "alert." During youth interviews, many were distracted and sometimes agitated by Codes being called and the sight of staff running down the hallway or across campus to respond to an event. They reported that this occurred multiple times, every day, a perception that is supported by the data above.

The current level of violence and disorder at STS <u>completely derails service delivery</u>, both on the part of those trying to deliver the service and from the perspective of STS youth, all of whom need and are legally entitled to quality services. The reforms required by the Court Order and envisioned in the Remedial Plan simply cannot be achieved without an effective strategy to stabilize the facility and to address the needs of youth with recurrent externalizing behaviors. No matter the number of committed cottage staff, youth service workers and technicians, educators and mental health clinicians, and regardless of the quality of rehabilitative programming, treatment plans and individual and group therapies they may be

able to provide, the youth at STS will be unable to benefit from them without a safe environment.

Finally, the lack of a fully integrated program that properly supports, structures and manages youth with recurrent externalizing behaviors has <u>significant negative consequences for those youth</u>. At the very least, they risk an extended stay at STS which, regardless of the quality of treatment they may receive, further delays their reintegration back to their families and communities. They may spend a few days in a juvenile detention facility following the event, which further disrupts their access to programming at STS. Depending on what occurs, the youth may be charged in the adult system and be confined in an adult jail. These youth also suffer the negative consequences of a facility whose tools are not yet effectively addressing their mental health symptoms and behavior in a manner that could reduce the likelihood of a subsequent occurrence.

As noted in the Initial Monitor's Report, STS did an impressive job designing its new strategies, training staff, and launching new practices. In the Monitor/SME's opinion, the high level of violence and disorder at STS is not due to any recalcitrance or inaction by STS. Instead, the problem appears to be caused by good-faith efforts to eliminate harmful practices without an interim strategy for managing youth with recurrent aggressive behaviors, given the necessary time required to robustly implement the new behavior management and mental health treatment programs. This ushered in a vicious cycle, where violence and disorder impede the development and delivery of the very practices that were designed to improve STS's ability to effectively and safely manage youth's behavior. Eventually, the new behavior management program and mental health treatment program may be sufficient to address the needs of highly aggressive youth, but the current level of disorder makes robust implementation impossible and undercuts their full potential. STS is left with a vacuum marred by violence and disorder with insufficient options for deterring or responding to it. The Monitor/SME strongly recommend that STS take immediate steps to develop and implement strategies to stabilize the facility's environment and to address the complex needs of youth with recurrent aggressive behaviors so that the various tools in the Remedial Plan can be fully implemented.

## Recommendations to Improve Facility Safety

The following recommendations are offered to address the serious concern about youth and staff safety at STS and have been the subject of collaborative discussions with DHS/STS for the past few months.

1. Create additional **resources for addressing staff trauma**, including a resource for emotional support for staff in the immediate aftermath of an incident.

2. Improve **cohesion and collaboration among staff of all disciplines**, particularly cottage staff and mental health staff. STS staff need to meld into a cohesive team that understands, appreciates and utilizes the skills of each discipline.

3. Provide **education and team-building activities** to deepen the level of understanding of the various roles and to promote unity among STS security, cottage, mental health, medical and education staff.  In particular, activities that explain (1) how mental health treatment differs from the counseling and support provided by other disciplines and (2) basic concepts of situational awareness and basic security procedures, would help to better integrate the new clinicians into the existing cottage teams.

4. Expand the availability and delivery of the **overarching skills-based program, Aggression Replacement Training** to imbue the concepts into the facility's culture, teach youth the skills needed to better manage their behavior and provide a framework for staff to reinforce alternatives to aggression.

5. Develop a **program for youth exhibiting highly aggressive behaviors** that addresses their full range of psychological, educational and social needs. The program must not utilize isolation in any situation other than those meeting the strict requirements of the *Room Confinement* policy. It should include individualized behavior management plans guided by a functional behavior assessment that identifies the function of the problem behavior and its antecedents; full-day school with live instruction; intensive mental health treatment; and a planned, predictable daily schedule in which all waking hours are consumed by structured activities led by an adult, minimizing self-directed leisure time. Ideally the program would operate separately from other youth who do not exhibit highly aggressive behaviors in order to protect them from victimization, to minimize program disruptions and to allow full engagement in programming for all youth. To the extent that a youth is exhibiting high levels of aggression in certain environments but not others (for example, is assaultive with peers when in the cottage, but does not regularly exhibit aggressive behaviors in school), effort should be expended to continue the youth's access to and engagement in the environments in which they do well.

6. Utilize **gradual reintegration strategies following a period of room confinement**. The *Room Confinement* policy includes various reintegration strategies that can and should be used to slowly return the youth to the milieu, by providing some additional structure, protection and observation before deciding that the threat to safety has been fully abated. The milieu to which the youth will return should also be assessed to ensure safety has been restored, which should include some form of debriefing for both youth and staff and/or mediation prior to reintegration.

7. **Preserve intensive treatment options** for lower-functioning youth and those with serious mental health disorders. These youth may not exhibit the same level of externalizing behaviors as the highly aggressive youth, but they also need intensive mental health treatment and additional structure in the daily program. They may also need an adaptation of the Incentive Program to recognize success that may be of a different magnitude than other youth, but that is no less remarkable.

8. Regarding the Incentive Program, **refresh the array of incentives, modify the scale and/or increase the frequency of rewards** to increase the likelihood that youth will remain motivated by and engaged in the Incentive Program.

9. Increase the **volume of structured programming** campus wide. Increasing the array of high interest, engaging programs for youth will complement the various mental health treatment services and reduce idle time. Programming, led by an engaged adult, that introduces youth to new hobbies, engages them in competitions and teaches life skills can also help youth advance along the developmental pathway.

## Conclusion

The various components of the Remedial Plan represent a complete, appropriate and necessary overhaul of STS's strategy for addressing the mental health needs of youth in custody and also removed harmful restraint and isolation practices. The newly added mental health services, Incentive Program and proper parameters for the use of room confinement to address a youth's imminent risk of physical harm to another person are essential elements for effectively managing youth's behavior. That said, these new programs and practices are in their infancy and thus their ability to positively impact youth is not fully realized. As discussed throughout this report, the potential to achieve the goals of the Remedial Plan is severely undercut by the current level of violence and disorder at STS.

The significant risk of harm faced by STS youth and staff demands swift action. The violence at STS has grave consequences for the youth and staff who are victimized and injured, both physically and emotionally; for the youth and staff whose daily lives are dominated by fear and traumatic stress; for the youth who are prevented from fully engaging in services; for the staff whose efforts to deliver services and programming are severely weakened; and for the youth who engage in violence and risk further penetration into the juvenile and criminal justice systems.

The current level of violence and disorder prevents DHS/STS from fully implementing the various components of the Remedial Plan and from realizing the potential of the reforms underway. The Monitor/SME have been working intensively with Defendants and Plaintiffs to identify options and interventions to increase the level of facility safety and the resulting trauma experienced by both youth and staff.