# 2nd Comprehensive Monitor's Report
## <u>Case 4:17-cv-00417-SMR-HCA</u>

Progress Toward Compliance with the Remedial Plan
For the Iowa Boys' State Training School

November 1, 2021

Kelly Dedel, Ph.D., *Monitor*
Daphne Glindmeyer, MD, *Subject Matter Expert*

One in 37 Research, Inc.
16 Rock Street Cody, WY 82414
(503) 799-0915 Kelly.dedel@gmail.com

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................4

MENTAL HEALTH CARE................................................................................................................ 10

*MH-I Injunctive Relief Required by Court Order: Identify the treatment that is clinically indicated for student's mental illnesses, including psychotherapy, and formulate treatment plans.* ............................... *10*

MH-I.A. Multi-Disciplinary Treatment Team.. ........................................................................ 10

MH-I.B. Mental Health Treatment Plans.. ............................................................................. 14

MH-I.C. As-Needed Referrals ............................................................................................... 20

MH-I.D. Policy & Procedure ................................................................................................. 21

*MH-II Injunctive Relief Required by Court Order: Provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective. .* *22*

MH-II.A. Therapeutic Services............................................................................................... 22

MH-II.B. Skill-based and Rehabilitative Services..................................................................... 26

MH-II.C. Mental Health Staffing............................................................................................ 28

MH-II.D. Policy & Procedure ................................................................................................. 29

*MH-III Injunctive Relief Required by Court Order: Ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School.* ......................................................................................................................................... *30*

MH-III.A. Student Records Policy & Procedure ...................................................................... 30

*MH-IV Injunctive Relief Required by Court Order: For students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation.* ............................................................ *32*

MH-IV.A. 24/7 Crisis Response ............................................................................................. 32

MH-IV.B. Suicide Prevention and Intervention...................................................................... 33

MH-IV.C. Multi-Sensory De-escalation Tools and Spaces ........................................................ 36

MH-IV.D. Therapeutic Crisis Response Unit ........................................................................... 37

MH-IV.E. Hospital Level of Care ........................................................................................... 40

MH-IV.F. Suicide Prevention Policy & Procedure ................................................................... 41

*MH-V. Injunctive Relief Required by Court Order: For students receiving mental health treatment at the school, attempt to arrange for mental health care services in the community so students may continue their treatment upon discharge.* ................................................................................................................ *43*

MH-V.A. Discharge Planning Policy & Procedure ................................................................... 43

*MH-VI. Injunctive Relief Required by Court Order: Provide institutional oversight and structural coordination of the School's MH program.*................................................................................................ *45*

MH-VI.A. Oversight, Observation and Monitoring ................................................................. 45

MH-VI.B. Quality Assurance Policy & Procedure.................................................................... 47

MH-VI.C. Ongoing Training ........................................................................................................ 48

*SECLUSION AND RESTRAINTS.......................................................................................................... 50*

*RC-I Injunctive Relief Required by Court Order: Defendants must ensure the School only employs use of BSU or the seclusion room in situations where a student' behavior poses a serious and immediate risk of physical harm to any person. ....................................................................................................... 50*

RC-I.A Seclusion Policy. .......................................................................................................... 50

RC-I.B.1 Behavior Management/Motivation. ......................................................................... 55

RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors.. ............................... 64

RC-I.C Direct Care Staffing....................................................................................................... 67

*RC-II Injunctive Relief Required by Court Order: Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted to their room due to lack of privileges. Students may not be required to eat their meals in CMH rooms. Students may not be denied out-of-room recreation time available to other students.................................................................. 70*

RC-II CMH Program. ............................................................................................................... 70

*RC-III Injunctive Relief Required by Court Order: The School shall not use the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of this Order. All Students at the School shall be notified immediately, both orally and in writing, that the Wrap is no longer to be used by the School.  71*

RC.III. Restraint Policy and Practice. ...................................................................................... 71

*RC-IV Injunctive Relief Required by Court Order: For the School to use fixed mechanical restraints instead of the Wrap, they may only do so with leave from the Court upon showing:................................................... 72*

RC-IV. Fixed Mechanical Restraints......................................................................................... 72

Appendix 1. Compliance Table................................................................................................ 73

Appendix 2. Steps Toward Achieving or Maintaining Substantial Compliance ........................... 75

## INTRODUCTION

In 2017, Plaintiffs' counsel brought suit against Iowa's Department of Human Services (DHS) and the Iowa Boys' State Training School (STS) alleging inadequate mental health care, an overreliance on isolation and the improper use of fixed mechanical restraints. The case went to trial in June 2019 and on March 30, 2020, the Honorable Stephanie Rose issued her order (dkt. 328). The Trial Order required Defendants to draft a Remedial Plan that addresses the various considerations necessary to overcome the deficiencies noted in the Trial Order, including policy, practice, staffing, training and internal oversight. The Trial Order also required the appointment of a Monitor to oversee Defendants' compliance with the Remedial Plan. Defendants and Plaintiffs' counsel jointly proposed Dr. Kelly Dedel, whom Judge Rose appointed on April 22, 2020 (dkt.337). Dr. Dedel selected Dr. Daphne Glindmeyer to serve as her Subject Matter Expert (SME) and both parties approved the selection.

The Court approved Defendants' Remedial Plan—which was drafted in collaboration with the Monitor, SME and Plaintiffs' counsel—on July 27, 2020 (dkt. 354). The Remedial Plan includes 19 provisions related to mental health care and 6 provisions related to seclusion [room confinement] and restraints. Most of these provisions are multi-faceted and complex and contain multiple requirements.

The Monitor submitted her Initial Monitor's Report to the Court on 2/1/21 ("the Monitor's February 2021 report," dkt. 386). Subsequently, the Monitor proposed a scope and schedule for the remainder of the year: an Interim Status Report covering a limited range of issues, filed on 6/23/21 ("the Monitor's June 2021 report," dkt. 404) and the current report which is the second comprehensive report on the conditions at STS and Defendants' progress toward compliance with the Remedial Plan. Both Defendants and Plaintiffs' counsel had an opportunity to review, comment on and discuss a draft of this report with the Monitor. Many of their comments were integrated into this final report.

As in her February 2021 report, the Monitor has recommended compliance ratings for each provision for the Court's consideration, based on interviews with administrators, staff and youth; observation of facility practices; and extensive document review. [1]  As noted in the Remedial Plan (VI.B.3.a), these are not legal determinations. Of the 19 mental health provisions, the Monitor recommends substantial compliance ratings for 8 provisions, partial compliance ratings for 10 provisions and non-compliance for 1 provision. Of the 6 original provisions related to the use of room confinement and restraints, the Monitor recommends a substantial compliance rating for 3 provisions and partial compliance ratings for 2 provisions. The Monitor does not recommend a non-compliance rating for any of the room confinement and restraint provisions. The Monitor has not suggested a compliance rating for one provision (RC-IV "Introduction of Fixed Mechanical Restraints") because it is currently Not Applicable. A new provision related to the Amendment to the Remedial Plan was included in this report but has not

---

[1] To identify the expected elements of various practices and to formulate recommended compliance ratings, the Monitor/SME are guided first and foremost by the language of the Court Order and Remedial Plan. That said, some provisions are more specific than others and in these cases the Monitor/SME refer to professional standards (*e.g.*, NCCHC, APA, AACAP, JDAI, many of which are referenced throughout the Court Order) and their extensive knowledge of generally accepted practices in juvenile correctional facilities throughout the country.

yet been rated given that no youth have been admitted to the pilot program. A table presenting these recommended ratings is in Appendix 1.

Recommended compliance ratings are not static. They will be upgraded as DHS/STS shores up implementation and service delivery as advised throughout this report. Conversely, recommended compliance ratings may also be downgraded if new information suggests that practice has deteriorated.

## Summary of Current Status

As noted in the Monitor's February 2021 report, STS quickly abolished the use of fixed mechanical restraints and disbanded its isolation-based disciplinary program. STS continues to limit the use of isolation to circumstances in which a youth poses a serious and immediate risk of physical harm and has implemented a variety of strategies to incentivize positive behavior, encourage program engagement and discourage negative behavior. While a few modifications to the behavior management program are necessary to improve its effectiveness (detailed throughout this report), STS is well on its way to implementing a behavior management program that targets the skill-development needs of its youth and prohibits harmful practices. Recently, the parties negotiated and the Court approved (dkt. 409) a modification to the Remedial Plan to allow the CMH building to be used as a residential unit to house a therapeutic program to address the needs of youth with recurring aggressive behavior. Once the program design is finalized, physical plant upgrades are complete, staff have been selected and trained, and youth are successfully engaged in the program, it is hoped by all parties that STS will see a reduction in violence and disorder and will be able to accelerate its progress toward full compliance with the Remedial Plan.

The facility has also made some tangible improvements to its mental health treatment program, although there is more work to be done. The mental health department remains fully staffed and receives effective oversight from DHS Administrators. Treatment plans are now developed within required timelines, youth are regularly reviewed by the Multi-Disciplinary Team (MDT), and a few of the clinicians have begun to use more objective measures to assess progress. However, treatment plans still suffer from overly complex verbiage and a lack of congruence between the plans' prescriptions and the group interventions that youth are attending. While youth report that their clinicians are readily available to them, the complexity of the treatment plan documents and paucity of references in the progress notes to youth's skill development and symptom alleviation suggest that the substance of the youth's treatment has room for improvement. The facility's crisis response unit (the Intensive Therapeutic Program, or ITP) was implemented during the current monitoring period and appeared to be meeting the needs of youth whose serious mental health issues impacted their behavior such that they could not adapt to the general population setting at STS. Unfortunately, staffing issues caused the self-contained program to be temporarily closed in July 2021, but STS has recognized this as an opportunity to strengthen some of the components of a self-contained program. In the meantime, the needs of youth who require more intensive mental health treatment have been adequately addressed with an ITP day program.

As noted above and discussed in Plaintiff's Motion to the Court on the matter (dkt. 408), STS also intends to develop a therapeutic, specialized program to address the needs of youth with frequent

aggressive behaviors, which should help to reduce the high rates of violence detailed in the Monitor's June 2021 report. Updates to key safety indicators are presented and discussed briefly below.[2]

**Average Daily Population.** The facility's population remains significantly lower than it was at the time of trial (>100 youth in Summer 2019) and when the Court Order was issued (n=79 youth in March 2020). However the facility's population has been slowly increasing and the ADP in September 2021 (n=51) was 38% higher than the ADP at the time of the Monitor's February 2021 report (n= 37 ).



**Youth-on-Youth Assault.** The facility's rate of youth-on-youth assault, shown in the graph below, has continued to increase in the months since the Monitor's June 2021 report and remains at the high level which underlies the Monitor's continuing concern about the level of facility safety. Increasing safety will require full implementation of the many service enhancements required by the Remedial Plan—including mental health treatment driven by the youth's individual needs, an emphasis on skill-development in both mental health treatment and other group interventions, an effective strategy for managing and supporting youth with frequent aggressive behaviors, ensuring adequate staffing levels, and a robust behavior management program that incentivizes positive behavior and effectively responds to negative behavior—all supported by the myriad contextual factors and staff dynamics that contribute to the effectiveness of these strategies.

---

[2] The rate is calculated using the following formula: *rate = number of events/gross population.* The "gross population" is calculated by tallying the number of youth in custody each day during the time period. It is an additive statistic, rather than a snapshot of the number of youth in custody on any given day during the time period or an average over a period of time, such as the more familiar "average daily population." The rate statistic provides a standardized scale, accounting for the size of the population and normalizing the variation in the number of days month-to-month. It provides a cleaner, more precise look at the changes in the level of violence than using the raw number of events.



34

**Youth-on-Staff Assault.** Around the time of the Monitor's February 2021 report, the facility's rate of youth-on-staff assault began a sustained decrease, falling to and remaining below 1.0 for the first time since Summer 2020. This is an encouraging development. As discussed throughout this report, the many changes to facility services during this time and the relatively small number of events/small number of youth at STS make causal attributions difficult.



---

[3] "Assault" data includes fights in which youth slap, punch, hit, kick, or stomp another person; hit a person with an object such as a chair or book; use a weapon such as a piece of wood, metal or glass; or throw a liquid such as water or urine on another person.

[4] While drafting the current report, the Monitor discovered that she reported the youth-on-youth assault rate incorrectly in her June 2021 Interim Report (the data regarding the rate of youth-on-staff assaults were inadvertently superimposed in the youth-on-youth assault line graph). The overall trend is unchanged (i.e., the rate of youth-on-youth assault began to increase in the latter part of 2020 and has remained high since then) but the monthly values for the rate of youth-on-youth assault in the current chart have now been corrected and have been verified by STS.

STS has made progress toward implementing some of the Monitor's recommendations listed in the June 2021 report (see pgs. 22-24), including:

- STS has developed several new resources for addressing staff trauma.
  - In July 2021, STS implemented a staff debriefing process following critical incidents.
  - STS has compiled a Resource Book of local providers and identified a tele-health platform for staff who wish to engage in mental health treatment. STS plans to make the Resource Book more accessible via a variety of channels including staff orientation binders, Share Point, etc.
  - STS has engaged with Desert Waters Correctional Outreach (DWCO), a nationally recognized resource for trauma-specific wellness trainings for correctional staff. DWCO has assisted with the development of a course for STS staff to be delivered in early November 2021. In addition, the MHA has applied to become an instructor for another of DWCO's courses for corrections staff. Instructor training begins in late November 2021.
- STS has taken steps to expand youth and staff's exposure to the overarching skills-based program, Aggression Replacement Training (ART), as discussed in more depth in RC-I.B "Behavior Management Program," below.
- Following a negotiated amendment to the Remedial Plan, STS has taken initial steps to develop and implement a specialized, treatment-focused program for youth exhibiting highly aggressive behaviors. The modification to the Remedial Plan allows CMH to be used temporarily as a residential unit to house this program. DHS/STS is currently developing the program design, selecting/training staff and completing the required improvements to the physical environment. The requirements of the new provision are presented in detail in RC-I.B.2 "Program for Youth with Frequent Aggressive Behaviors."
- Meanwhile, STS will preserve intensive treatment options for youth with serious mental health disorders. This is discussed in more detail in MH-IV.D "Therapeutic Crisis Response Unit," below.
- Two Activity Therapists were hired to increase the volume of structured programming campus wide. The Activity Therapists began work at STS in July/August 2021.
- STS has begun to utilize Reintegration Plans to return youth more gradually to the milieu following a period of room confinement. While the use of these plans could be expanded, these early examples suggest that staff understand the purpose and usefulness of the plans. These are discussed in more detail in RC-I "Seclusion Policy," below.
- STS took an initial step to improve cohesion and collaboration between mental health and cottage staff by hosting a "Mental Health Round Table" in June 2021 with subsequent meetings to be held quarterly.

The recommendation for providing education to cottage and mental health staff have not yet been undertaken. Similarly, efforts to improve the effectiveness of the behavior management program are still needed, as discussed in RC-I.B "Behavior Management," below. STS is also encouraged to track the level of youth-on-youth assaults and youth-on-staff assaults, along with other indicators such as the use of room confinement and de-escalation, in order to assess whether the changes to practice flowing from the Remedial Plan are effectively increasing facility safety.

The Path Forward

DHS/STS are highly engaged with the Monitor/SME and have provided all information, documents and meetings requested by the Monitor and SME. As a result, a strong, collaborative relationship continues. Similarly, the Monitor and SME continue to collaborate with Plaintiffs' counsel by sharing impressions of and comments on Defendants' various written products and discussing the nuances of the modification to the Remedial Plan regarding the use of CMH as a residential unit.

The early phases of Remedial Plan work focused on policy development and the technical aspects of program development. This is a complicated endeavor, and the Monitor is impressed that Defendants produced high-quality drafts, reliably met established timelines and willingly integrated feedback from the Monitor/Plaintiffs' counsel. While the early work on this case was complex and the timelines were ambitious, the difficulty of the next phase of reform should not be underestimated. *Implementing* the various policies is equally complicated and STS will undoubtedly encounter obstacles and setbacks. While the logical, detailed Remedial Plan provides an excellent roadmap for how to achieve the required system reform, the Plan's existence does not magically create the staff skill in core competencies, interdisciplinary coordination or system proficiencies that are required to implement the changes. All parties are anxious for facility conditions to improve, but the system's capacity to develop, test, refine and ultimately execute practices to address the requirements of the Remedial Plan will take time.

This report is organized in the following manner. The Remedial Plan includes six sections in response to the Court's Order regarding mental health services (MH-I to MH-VI) and an additional four sections for the parts of the Court's Order pertaining to seclusion and restraints (RC-I to RC-IV). In each section, this report first presents the injunctive relief ordered by the Court, followed by the overall goal of the Remedial Plan that corresponds to that section of the Court's Order. Each section then contains subsections corresponding to the specific requirements of the Remedial Plan and the recent amendment. For each subsection, the requirements of the Remedial Plan are presented (paraphrased in some cases) along with a narrative describing Defendants' efforts, to date, to meet the requirements and a suggested compliance rating for the Court's consideration. Each section also includes recommended steps toward achieving substantial compliance. The Monitor's and SME's methodology and source documents for assessing progress are also listed. Two appendices present 1) a compliance table and 2) a listing of the many recommendations made toward achieving substantial compliance.

Overall, the Monitor and SME remain pleased with Defendants' progress, appreciative of the collaboration with Plaintiffs' counsel and optimistic about the likelihood of successful reform of the conditions and services at STS in accordance with the Court's orders.

## MENTAL HEALTH CARE

**MH-I Injunctive Relief Required by Court Order**: Identify the treatment that is clinically indicated for student's mental illnesses, including psychotherapy, and formulate treatment plans.

**Goal of the Remedial Plan**: BSTS will develop integrated (therapeutic, skills-based, rehabilitative-based and psychiatric care) mental health ["MH"] treatment plans that are based on information obtained from a screening/assessment/evaluation process that is implemented and defined by policy and procedure.

**MH-I.A. Multi-Disciplinary Treatment Team**. BSTS shall utilize a multi-disciplinary treatment team ["MDT"] approach to provide integrated mental health treatment services to students who have mental health treatment plans or are in the process of developing a mental health treatment plan.
MH-I.A.1. MDT Members. The MDT shall be comprised of the Director of the Mental Health Department/Mental Health Authority, psychotherapists, social workers, psychiatric providers and a non-psychiatric medical provider.
MH-I.A.2. MDT Information. The MDT shall ensure that relevant information from other BSTS staff is obtained and considered through in-person or written communication.
MH-I.A.3. Student/Parent. The MDT shall ensure that the student and their parent/guardian are involved in the treatment planning and review process and are aware of treatment progress.
MH-I.A.4. MDT Facilitator. The MDT shall have a facilitator that will ensure that members actively participate to develop, monitor and revise treatments and supports as needed.
MH-I.A.5. Monthly Review. The MDT shall meet regularly and as needed to review cases and discuss treatment progress and planning to ensure that each student's progress toward treatment goals is reviewed at least monthly.

Findings.

Policy *4C-01 Mental Health Services,* which was approved by the Court on 10/27/20 (dkt.362), addresses the composition and function of the Multi-Disciplinary Treatment Team (MDT) and remains in effect.

## MH-I.A.1 MDT Members

As explained in the Monitor's February 2021 report, the purpose of an MDT is to coordinate services so that the clinicians can provide integrated treatment to the youth. Information is needed from as many professionals involved with the youth and their various life domains. This is in order to ensure that the youth's treatment attends to peer and family dynamics, experiences in school, medical needs, etc. An in-person meeting among all those involved with the youth's care is essential so that there is a common understanding of the youth's circumstances and challenges and so that care by all these professionals is coordinated. The physical presence of professionals working with the youth is optimal so that there can be an exchange of information and discussion. If one's physical or virtual presence is not possible, a written update of the youth's functioning in the relevant domain is acceptable, but this should be the exception, not the norm.

Just before the Monitor's February 2021 report was issued, STS's Mental Health Authority (MHA) made adjustments to the MDT process. There was a shift to a new team structure inclusive of the required participants via a cottage-based MDT review. The change in MDT structure was an effort

to reduce the amount of time staff spend in meetings and thus maximize clinicians' availability to deliver therapeutic interventions. This new process began December 16, 2020.

In order to determine adherence to the requirements of this provision, minutes from 24 weekly MDT meetings (1/6/21 to 6/29/21) were reviewed and three MDT meetings were observed by the Monitor/SME. MDT minutes and observations confirmed that at each meeting, input (whether in-person, via a designee, or via written report) was considered from all of the required participants or their designee.

In the Monitor's February 2021 report, the need for increased psychiatric participation in the MDT meetings was discussed (see p.9). In the intervening period, STS increased MDT participation by the psychiatric treatment providers. The psychiatric providers attended 21 of the 24 MDT meetings held during this monitoring period. For the three meetings that they did not attend, relevant information was provided to the MDT. This was good to see.

## MH-I.A.2 MDT Information

As explained in the Monitor's February 2021 report, in an initial MDT meeting, the youth's assessment results should be presented, and the diagnosis, symptoms and risk factors need to be discussed in order to inform the development of the treatment plan, which is typically written shortly thereafter by the treating clinician. In subsequent MDT meetings, the purpose is to review the youth's progress or lack thereof toward attainment of treatment goals. For the purpose of efficiency, the MDT's discussion needs to center on the youth's progress toward treatment goals, with relevant information from the various life domains to inform the understanding of the youth's progress or lack thereof.

MDT minutes and observations continued to reveal that a great deal of information was provided regarding the youth scheduled for review from the youth's primary mental health treatment provider as well as psychiatry, nursing, educational, and cottage staff. However, the information was often anecdotal, and not related to the youth's specific treatment goals or objectives. While contextual information can be useful, the MDT facilitator needs to elicit information from MDT participants that is more closely tied to the issues the youth is addressing in treatment.

## MH-I.A.3 Student/Parent Participation

As explained in the Monitor's February 2021 report, in an MDT meeting, participation by the youth is essential to simulate/maintain buy-in to the treatment process, which flows from the youth knowing and understanding what their goals are and talking about their progress toward them, or their objections to the focus of therapy. Parents need to be involved to both inform the understanding of the youth's current circumstances and also as an essential advocate for the youth's continued engagement in the therapeutic process, both while in custody and upon release to the community.

Per observations of the MDT meetings, youth interviews, and a review of the weekly MDT minutes, youth are consistently attending and participating in MDT meetings. This was good to see. However, observation of MDT meetings revealed that the interactions with youth were often perfunctory and rarely included a substantive exchange about the youth's experience of or progress in treatment. The MDT minutes revealed a similar, overly general approach to eliciting feedback from the youth. This may be a function of the complexity and questionable utility of the current treatment plan goals as discussed further in MH-I.B. "Mental Health Treatment Plans," below. More pointed questions to youth may help to ensure a more substantive exchange that can then be documented to give a flavor of the conversation.

The MDT meeting minutes reviewed also did not always clearly record attempts to contact the youth's parent or guardian for their input into the MDT meeting. Overall, for the 24 MDT meetings that included a total of 235 case reviews, 84 parent contacts or attempted parent contacts were clearly documented (36%).[5] The MDT meeting template does have a section for "Student/Parent Feedback." However, in the vast majority of meeting minutes, "None at this time" was recorded, which is unclear as to whether the clinician actually made contact with the parent/guardian or not. That said, documentation of contact or attempts to contact parents/guardians increased in the latter part of the monitoring period. For example, the 6/23/21 MDT meeting minutes noted contact with or attempts to contact a youth's parent/ guardian in 15 of the 16 case reviews. This was in contrast to 3/10/21 MDT meeting minutes, where no parent contact/attempts at parent contact were documented.

STS reported that the "None at this time" phrasing is used to indicate that the parent *was* contacted and did not have any feedback or questions. Given that the parent contact issue is not driving the recommended Partial Compliance rating for this provision, the Monitor chose not to verify this assertion via call logs for each youth at this time. Moving forward, using more definitive language to indicate whether the parent was contacted and whether they offered feedback or had questions would ensure that the MDT records offer clear information about the extent of a parent/guardian's active involvement in their child's mental health treatment.

## MH-I.A.4 MDT Facilitator

As explained in the Monitor's February 2021 report, an MDT meeting needs a leader to guide the discussion, keeping it on track and focused on the goals and objectives, and to ensure that participation from each member of the team is solicited.

In each of the MDT meetings observed to inform this report, the facility's Mental Health Authority (MHA) actively led the meeting. While the MHA is a dependable and active facilitator, the MDT would benefit from efforts to tailor the discussion more narrowly around the youth's treatment goals, objectives and progress, and the need for any changes to the prescribed interventions. For example, specific prompts from the facilitator to elicit targeted information, particularly from the clinician and the youth, may be helpful.

## MH-I.A.5 Monthly Review

As explained in the Monitor's February 2021 report, youth's progress needs to be regularly reviewed in order to determine the need for adjustments to their goals, objectives and interventions. When youth are meeting their treatment goals, new goals need to be established in order to further address the youth's symptoms. If a youth is not progressing, the MDT must discern the reason for the lack of progress and adjust the course of treatment accordingly (*e.g.*, making goals more realistic, breaking the objectives into smaller steps, changing interventions). Adjustments to the youth's treatment plans need to be made quickly to ensure that the youth receive the treatment that they need.

---

[5] In one of these cases where three attempts at parent contact were documented, a language barrier was documented for a couple of the attempts. The facility could consider the use of a translator service to allow for meaningful contact.

A random sample of 14 youth on the mental health caseload as of 6/30/21 was identified and the MDT meeting minutes were reviewed for each youth.[6] Nine of the youth were reviewed by the MDT each month, as required (64%). Four youths' records showed that an MDT meeting was not held during one of the months they were in custody (*i.e.*, Youths AE, BG, DM and SN did not have a meeting documented in April 2021), although they were otherwise reviewed monthly as required. STS appears to be meeting its obligations in this regard, which is a notable improvement from the Monitor/SME's previous review.

Furthermore, youth's initial MDT meetings occurred much more quickly than the average six-week/42-day span noted in the Monitor's February 2021 report. Of the 13 youth assessed on this requirement,[7] all but two (85%) had an initial MDT meeting within 30 days of admission. This improvement is due to the MHA's adjusting the order of events at the time of admission to allow for: 1) assessing the youth promptly upon admission, 2) holding the initial MDT meeting to discuss the assessment results and proposed course of treatment, followed by 3) the clinician's developing the written treatment plan using the input of the MDT and in collaboration with the youth. This now occurs within 30 days for most youth, as required by provision MH-I.B.1 "Treatment Plan 30-day Timeline," below, which is also a notable improvement from the Monitor/SME's previous review.

Regarding the *content* of the monthly reviews, in addition to the issues with youth and parent input discussed above, the MDTs would also benefit from more tailored input from clinicians. The MDT's relatively recent tenure and the overly complex verbiage used in the treatment plans (discussed in MH-I.B, below) both make streamlined, yet substantive, discussions of goals/youth progress challenging. When goal discussions were documented, they tended to be general, and more focus is needed on the specific goal, how progress was measured and the appropriateness of the intervention. Whether via simplification of the treatment plan document, more pointed talking points for the various participants in the MDT meetings or another strategy of STS's choosing, the substance of the MDT's discussion needs to focus more squarely on goals for treatment and objective indicators (*e.g.*, reductions in fighting, reductions in specific symptoms) of progress or lack thereof. This is the primary issue driving the recommended Partial Compliance rating for this provision. Finally, the SME's observations and MDT minutes demonstrated some effort to identify necessary adjustments to youth's treatment plans, but the complexity of existing treatment plans (as discussed further in MH-I.B, below) likely makes it difficult to identify specific components which may benefit from modification.

## Summary

Overall, the MDT process at STS is progressing as expected. The shift to cottage-based MDT meetings appears to have effectively reduced the amount of time clinicians spend in meetings. The team continues to mature, meetings are held regularly with all required team members and meetings are facilitated by the MHA. For the most part, all youth are reviewed by the MDT within 30 days of admission and on a monthly basis thereafter. However, the MDT's discussion needs to focus more narrowly on treatment goals/objectives/youth's progress; engage the youth in a more substantive discussion of the same; and ensure that all attempts to contact parents/guardians are recorded in the MDT minutes.

---

[6] One youth who was initially selected, Youth AR, was excluded from most analyses because he was admitted on 6/21/21. The mental health files were reviewed, but because of the short length of stay to date, the youth's file did not yet include the full set of documents.

[7] In addition to the youth (AR) who was admitted toward the end of the sampling frame, another youth (SN) was excluded from the analysis because he was admitted prior to the beginning of the sampling frame.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Focus the MDT on a review of the youth's progress toward the treatment plan's established goals and objectives using more objective data. If progress has not been made, identify appropriate adjustments to the treatment plan collaboratively via the MDT meeting.
2) Engage the youth in the MDT process more substantively perhaps by the use of a structured set of questions; document the substance of exchange with the youth.
3) Ensure that MDT meeting minutes include affirmative statements about whether the clinician attempted to contact the youth's parent/guardian and if contact was made, the substance of the exchange with the parent/guardian.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Consulted with DHS Clinical Director and STS Mental Health Authority
- Observed MDT meetings (2/24/21, 6/2/21, 8/18/21)
- Reviewed MDT meeting minutes from 1/6/21 to 6/29/21
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth

**MH-I.B. Mental Health Treatment Plans**. By 60 days from the effective date, BSTS will develop integrated mental health treatment plans that address the needed interventions including therapeutic and skills-based services that focus on evidence-based practice, rehabilitative services and psychiatric interventions. Note: Psychiatric services to be included at 60 days; otherwise, the below items are in effect on the effective date.

MH-I.B.1. Treatment Plan 30-day Timeline. The Plans shall be completed within 30 days of admission following a complete screening/assessment/evaluation process.

MH-I.B.2. Treatment Plan Informed by Assessment. The Plans shall be directed or informed by the screening/assessment/evaluation information gathered upon admission.

MH-I.B.3. Treatment Plan Development. The Plans shall be developed primarily by the student's assigned psychotherapist in collaboration with the student.

MH-I.B.4. Goals/Objectives. The Plans shall include measurable goals and objectives related to the student's diagnosis(es).

MH-I.B.5. Evidence-Based Interventions. The Plans shall include treatment interventions for individual psychotherapy and group psychotherapy that focus on evidence-based practice.

MH-I.B.6. Rehabilitative/Skill-Based Interventions. The Plans may include rehabilitative and/or skills-based interventions designed to further address the student's clinical needs.

MH-I.B.7. Duration/Frequency. The Plans shall note the duration and frequency at which the recommended interventions or services are expected to occur, as well as the professional responsible for the intervention.

MH-I.B.8. Progress Reviews. The Plans shall be reviewed for progress no later than every 30 days or sooner if the student demonstrates significant progress or lack thereof, significant functional improvements or deterioration, or as needs arise or change based on feedback from the student, parent, JCO, multidisciplinary team members or cottage staff.

**Findings**.

Policy 4C-01 *Mental Health Services,* which was approved by the Court on 10/27/20 (dkt.362), includes procedures for mental health treatment plans and remains in effect.

As explained in the Monitor's February 2021 report, Mental Health Treatment Plans are documents developed by treatment providers in collaboration with youth and the youth's parent/guardian that outline the proposed goals of treatment including an objective measure of goal attainment, goal-derived objectives or smaller achievable steps toward the ultimate broader goal, and specific interventions to allow an individual to reach established treatment goals. The goals should be specific to the individual as well as realistic and attainable. The goals must be based on the individual's assessment and diagnoses and should include psychiatric goals. The use of SMART goals (*i.e.*, goals that are Specific, Measurable, Attainable, Relevant and Time-Bound) is one way to ensure specific metrics become part of STS's treatment plans. Treatment plans are necessary and important as they act as a road map, guiding both the therapist and the youth and allowing for objective measurement to determine if therapeutic interventions are working (*e.g.*, if the youth is achieving the relevant objectives) or to determine if interventions need to be adjusted. The overarching criteria for determining a treatment plan's adequacy is whether it has measurable goals and objectives related to the youth's diagnoses that are understandable to both the clinician and youth and whether it can effectively guide treatment.

## MH-I.B.1 Treatment Plan 30-day Timeline

Per policy, a youth's treatment plan must be completed within 30 days of admission following the screening, evaluation, and assessment process. This is required so that the youth's course of treatment is determined and proceeds expeditiously. Among the 14 youth reviewed for treatment plan timeliness, all youth (100%) had a treatment plan completed within the required 30-day period.[8] This is a significant improvement over the 22% performance level previously observed and reported in the Monitor's February 2021 report.

## MH-I.B.2 Treatment Plan Informed by Assessment

As explained in the Monitor's February 2021 report, a youth's screening, evaluation and assessment informs the providers about the youth's symptoms, risk factors and diagnosis(es) that should be targeted by the treatment plan. A treatment plan that is not based on assessment information would be random and would include esoteric goals and treatment not tailored to a youth's specific needs. That said, assessment information is multi-faceted and complex. Multiple professionals (*i.e.*, the psychiatrist and psychologist) offer their opinion about the youth's appropriate diagnosis, and sometimes, these are in conflict. Consensus must be achieved by reviewing the diagnostic criteria of the DSM-5 and identifying which diagnosis(es) best reflect the youth's presenting symptoms.

In the intervening period since the Monitor's February 2021 report, there were some improvements with regard to diagnoses and diagnostic clarity, including consensus between the psychologists and psychiatrist. While examples of youth with multiple, conflicting diagnoses remain, they are less frequent than observed in the prior monitoring period (4 of the 14 youth reviewed, 29%).

- Three youth were diagnosed with an "adjustment disorder, other specified trauma and stressor related disorder." This type of diagnosis is typically a short-term, preliminary diagnosis, commonly used in emergency psychiatry prior to a full assessment to determine the presence of a specific

---

[8] Of the 15 youth included in the random sample of youth on the mental health caseload, one youth, AR, was admitted 6/21/21 and therefore did not have a treatment plan completed as of the date that documents were submitted to the Monitor/SME.

trauma-related diagnosis (e.g., PTSD). Given that the three youth (Youth KB, RL and SN) with this diagnostic profile had been at STS for several months, refinement is encouraged.

- Another youth (Youth BG) has multiple diagnoses (conduct disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder) alongside a diagnosis of reactive attachment disorder. While these diagnoses are all related, treatment interventions would differ substantially. This youth may benefit from an assessment to determine which of the diagnoses are causing the predominate symptoms. Then, treatments could be targeted to that diagnostic issue.

The issue of diagnostic clarity is not driving the recommended Partial Compliance rating for this provision. However, in cases like those described above, STS is encouraged to clarify and/or refine youth's diagnoses so that the course of treatment can progress more coherently. Although all youth receive a full psychosocial evaluation and psychometric testing upon admission, cases that involve complex or conflicting diagnoses may benefit from further testing and assessment to help clinicians achieve diagnostic clarity.

Further, seven of the 14 treatment plans reviewed (50%) included interventions and/or goals that were not aligned with the youth's diagnosis or did not address each of the youth's diagnoses. This is one of the key issues driving the recommended Partial Compliance rating on this provision. For example:

- Youth CG, TW, and TC had diagnoses including PTSD, but trauma-related sequalae were not addressed via the treatment plan's goals.
- Youth RL had a diagnosis of unspecified depression that was not addressed.
- Youth DM had diagnoses of generalized anxiety disorder, major depressive disorder, and attention deficit hyperactivity disorder that were not addressed via treatment plan goals.
- Youth EJ had a diagnosis of an unspecified depressive disorder, and although the youth was denying any current depressive symptoms, this was not addressed in the plan's goals, where a psychoeducational component should have been considered.
- SN had a diagnosis of an unspecified trauma or stressor related disorder. This was not addressed via a treatment plan and should have been considered for further assessment in order to determine the need for a trauma related diagnosis.

The youth's treatment plan goals need to address the specific diagnosis/primary symptomology in order to ensure that the youth are receiving treatment targeted to their individual needs—this is why diagnostic clarity is so essential. When youth have complicated and interrelated needs, a clinician may appropriately decide to prioritize certain treatment goals—this can be accomplished by indicating on the treatment plan that certain issues or treatment goals are being "deferred" until progress is made on more foundational issues. DHS' planned revisions to the *Mental Health Services* policy clarifies this issue so that the proper balance between simplicity and comprehensiveness can be achieved.

## MH-I.B.3 Treatment Plan Development

As explained in the Monitor's February 2021 report, the clinician and youth must develop treatment plans collaboratively. They are the two most essential participants in the treatment process. The youth must be aware of the plan's goals, objectives and what interventions will be deployed in order to increase buy-in. The treatment planning process is also an important opportunity to offer psychoeducation to help youth understand their symptoms and what their diagnoses means in order to reduce stigma and create a foundation for on-going treatment in the community.

In preparation for this report, seven youth were interviewed by the SME regarding a variety of topics including their treatment plan, treatment plan development, goals and interventions. While

youth reported having a good relationship with their mental health treatment provider and meeting with them regularly, there was marked variability with regard to the youth's report of participating in treatment planning and in their ability to describe their mental health treatment goals. This is not surprising as many of the goals are complex and multifaceted. Specific comments regarding goals reflect this variability, including: "I don't know," "I know I have to complete a program…that is one I remember," "I have to work on my mindset…and getting along with other people…and communication...and impulse control, I need to stop and think before I act," "I have to work on respect…but I don't know about goals," "I have to finish RSAT, ART and a total of 9.5 credits…I have to improve my attitude." While it was clear that each youth knew they had a treatment plan and most knew there were certain things they had to do, they could not always connect to the *reason* for the treatment plan in the first place. While the Monitor/SME do not expect every youth to be able to describe their treatment plan in detail, they do need to understand what is in it. This issue is not driving the recommended Partial Compliance rating but is discussed here as a symptom of the bigger issue that the goals and objectives are not clearly written (discussed below). Simplifying the treatment plans and removing extraneous jargon (a problem that is exacerbated by STS's treatment planning software, TheraNest) could help to improve youth's understanding of the purpose and focus of their treatment.

## MH-I.B.4 Goals/Objectives

As explained in the Monitor's February 2021 report, goals both drive treatment and provide an indicator for measuring treatment progress. They should be selected based on the youth's presenting symptomatology and/or risk factors and should include psychiatric goals. Objectives are required to illustrate the pathway toward goal achievement and to break the goal into its component parts. Measurable goals, underlying objectives and data-based metrics are standard practice, and all are necessary to identify treatment progress or the lack thereof.

This is one of the key issues driving the recommended Partial Compliance rating for this provision. While each of the 14 youth's treatment plans included specific goals and objectives, in many cases they were not clearly measurable and/or exclusively relied upon youth's self-report. That said, compared to the previous review, some improvements were noted. Treatment goals for youth who had conduct disorder or other externalizing behavioral disorders used their progress in the Incentive Program to measure treatment progress. This was good to see and indicates the start of integration between behavioral health and the overall behavioral management program. Further, when reviewing the therapists' case notes, it was apparent that in some cases, therapists *are* using specific rating scales to determine progress. These rating scales should consistently be identified in the treatment plan, included as a metric for measuring treatment progress.

However, many goals utilized overly complex verbiage, did not include specific targets (*e.g.*, frequency, severity) for behavior change/symptom reduction or how those changes would be measured. Often, the goals did not specify the interventions or skills that would be taught in individual therapy to allow the youth to achieve these targets. In addition, objectives were generally not constructed as small steps designed to meet the stated goal, but rather as larger, secondary goals. In many examples, the goals and objectives were overly complicated and difficult to follow, which undercuts their usefulness as a tool to guide treatment. More targeted oversight to the quality of treatment plans may help to improve performance in this area.

## MH-I.B.5 Evidence-Based Interventions

As explained in the Monitor's February 2021 report, therapy must be grounded in evidence-based interventions, the effectiveness of which have been determined in clinical studies. Adherence to

evidence-based practices provides the most efficacious treatment and is the accepted standard of care. As such, treatment plans must designate evidence-based interventions for both individual and group psychotherapeutic interventions.

Evidence-based interventions are available to youth at STS. A review of the treatment plans revealed that for underlined individual therapies, cognitive behavioral interventions were designated, which are evidence-based. All youth's treatment plans included an individual therapy intervention. [The delivery of these services is discussed in MH-II.A, below.]

Various underlined therapeutic groups are facilitated by mental health clinicians at STS, some of which are evidence based (*i.e.*, Conquering Negative Thinking for Teens; COPE to Thrive; Power Source-Taking Charge of Your Life). Some STS group therapies utilize evidence-based techniques, even though they are not part of a packaged, evidence-based curriculum (*e.g.*, Pursuing a Meaningful Life Despite Our Trauma, Emotional Masculinity, Yoga and Mindfulness). Such interventions are necessary to respond to the needs of many STS youth and are certainly worthwhile. While a variety of therapeutic groups are available to youth at STS and despite some information suggesting individual youth's participation in them (*e.g.*, interviews, group rosters), the youth's treatment plans did not regularly include the specific group psychotherapeutic interventions prescribed. This is one of the key issues driving the Partial Compliance rating on this provision and the treatment plans have not substantively improved in this regard. Also, as discussed in more detail below (MH-II.A.1 "Psychotherapy"), cohesion among the treatment plans, group rosters and group progress notes is needed.

## MH-I.B.6 Rehabilitative/Skill-Based Interventions

As discussed in the Monitor's February 2021 report, youth may also need interventions that do not necessarily need to be facilitated by a mental health clinician, despite being part of their mental health treatment. These include groups that are designed to teach youth skills needed to address specific risk factors or an opportunity to practice skills taught in individual or group therapy. Some of these may also be evidence-based.

STS has a variety of such groups including Dialectical Behavioral Therapy Skills Training (DBT), Gang Resistance Intervention Program (GRIP), Adolescent Sexual Abuse Program (ASAP), Achieving Maximum Potential (AMP; life skills), Residential Substance Abuse Treatment (RSAT), Applied Community Transition program (ACT; life skills), Rebound group (drug/alcohol education), Essential Instruction (faith-based re-entry), and a Parenting Skills course. STS staff members leading these rehabilitative/skill-based interventions have reportedly received the appropriate training to do so. Typically, youth are referred to these groups by the Court or their JCO, less often by their assigned mental health clinician.

Some of these groups were prescribed in youth's treatment plans (*i.e.*, DBT, GRIP, ASAP, Rebound and RSAT). Other groups listed above, while included on STS's inventory of rehabilitative/skill-based interventions, were not prescribed by any youth's treatment plan. As discussed in more detail in MH-II.B "Skills-Based and Rehabilitative Groups," below, the Monitor plans to refine the monitoring strategy regarding these groups to narrow the focus to those that are *clinically indicated* and to ensure an appropriate interface with the youth's assigned mental health clinician, along with an indicator of the youth's assignment to the group in the mental health treatment plan.

## MH-I.B.7 Duration/Frequency

As explained in the Monitor's February 2021 report, like any prescription for medication that prescribes dosage, frequency and length of time, treatment plans need to specify the frequency and

duration of each intervention. This not only creates accountability for service providers, but also informs the youth of the expectations for involvement in treatment.

For individual psychotherapy interventions, the treatment plans generally included the frequency, duration and practitioner for individual sessions. As noted above, many psychotherapeutic group interventions were not prescribed on youth's treatment plans, although youth may have been participating in them. Those that were prescribed on the youth's treatment plan rarely included the necessary information regarding duration and frequency. [The delivery of these services is discussed in MH-II.A and MH-II.B.]

MH-I.B.8 Progress Reviews

As noted above in MH-I.A.5 "Monthly MDT Meetings," youth are routinely reviewed by the MDT every 30 days. Furthermore, it was apparent that when youth were experiencing difficulties, they were scheduled for progress reviews by the MDT, with this designated as "special concern." The relevant MDT minutes included a listing of planned adjustments to the youth's treatment plan as appropriate, but these changes were few and far between. This may improve if the treatment plans are simplified and become more user-friendly, as discussed above. On a positive note, since the Monitor's February 2021 report, the facility now ensures that treatment plans are dated at the time they are reviewed, which makes it possible to verify whether revisions discussed in the MDT were transmitted to the treatment plan and so that staff can work with the most up-to-date treatment plan.

Summary

Overall, the review of the youth's treatment plans continued to reveal a need for simplicity and direction, both from the diagnostic perspective and the treatment planning perspective. Also, STS needs to ensure that the youth's diagnoses/primary symptomatology is addressed by specific treatment goals and interventions. In general, smaller, achievable, measurable goals are important to allow the youth to both understand the goals of treatment and to experience success with goal attainment. Once the initial goal has been achieved, secondary goals can be developed. Further, treatment plans must include all of the prescribed interventions (*e.g.,* individual, therapeutic group, skill-based/rehabilitative services, psychiatry) that a youth will be engaged in. This allows for better integration between the various professionals involved in and supporting the youth's mental health treatment. The STS is considering a transition to a Master Service Plan which may facilitate better integration of services, specifically mental health and rehabilitative skills.

Recommended Compliance Rating. Partial Compliance

Steps Toward Achieving Substantial Compliance.
1) Ensure that goals are measurable and attainable, with step-by-step objectives developed collaboratively between the youth and the assigned psychotherapist.
2) Ensure that the youth's primary diagnoses are reflected in the treatment plan with interventions to address these diagnoses and their presenting symptoms.
3) Expand the use of behavior observations, rating scales and measurement tools for specific symptom clusters normed for this population.
4) Ensure that all interventions (*e.g.*, psychotherapy groups, individual therapy, clinically indicated skills-based/rehabilitative services, psychiatry) are included in the treatment plan with frequency, duration and practitioner designated.

Methodology.
• Reviewed *Mental Health Services* policy
• Consulted with DHS Clinical Director and STS Mental Health Authority

- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed meeting minutes for 24 MDT meetings
- Observed three MDT meetings
- Interviewed seven youth receiving mental health services
- Interviewed mental health staff

**MH-I.C. As-Needed Referrals**
MH-I.C.1. As-Needed Referral for Mental Health Evaluation. Students who initially are not referred for therapeutic, skills-based or rehabilitative-based services through the Mental Health Department may be referred for subsequent assessment/evaluation at any time by following the referral process that will be described in Mental Health Services policy below.
MH-I.C.2. As-Needed Referral for Psychiatric Evaluation. Students who were not taking medication upon admission or were not evaluated for medication may be referred for an evaluation at any time by following the referral process that will be described in the Mental Health Services policy below.

**Findings.**

Policy 4C-01 *Mental Health Services,* which was approved by the Court on 10/27/20 (dkt.362), addresses the protocol for as-needed referrals for evaluation and remains in effect. The purpose of this provision is to establish an appropriate process to ensure that youth who were not *initially* identified as needing services upon admission (when all youth are assessed and decisions regarding needed treatment are first made) are able to access mental health care during their stay at STS should circumstances change and/or a need for treatment arise.

By policy, referrals for evaluation must be processed within 7 business days, and the action taken must be documented on the referral form. Between January and June 2021, 14 youth were referred for further evaluation following their initial assessment. The referral was processed within the 7-business day timeline in 13 of 14 cases (93%). This performance level is sufficient.

**MH-I.C.1 As-Needed Referral for Mental Health Evaluation**

STS reported that no youth were referred for an as-needed Mental Health Evaluation between January and June 2021. This is unsurprising given that upon admission, all youth receive a psychological evaluation and approximately 95% are referred for services at that time. As such, very few STS youth (less than 5 given the recent ADP) are not receiving mental health treatment and thus the pool for "as-needed referrals" is very small.

**MH-I.C.2 As-Needed Referral for Psychiatric Evaluation**

Between January and June 2021, fourteen youth were referred for a psychiatric evaluation and 12 (86%) received an evaluation within 30 days of referral (average 20 days; range 4 to 32 days). In the other two cases, one youth initially refused the appointment and was subsequently removed from the facility by law enforcement, and the other youth was evaluated 32 days post-referral. The facility's performance level is sufficient and is aligned with generally accepted practice.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.

1) None.

**Methodology.**
- Reviewed *Mental Health Services* policy
- Reviewed the As-Needed Evaluation Referral log
- Reviewed mental health records for the 14 youth referred for as-needed evaluations
- Consulted with DHS Clinical Director

**MH-I.D. Policy & Procedure**

MH-I.D.1. Mental Health Services Policy. (a) By 30 days from the effective date, BSTS shall create a policy/procedure regarding the delivery of *Mental Health Services*, which will include therapeutic, skills-based, rehabilitative and psychiatric services. (b) By 30 days from the effective date, BSTS will review and revise *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans.*

MH-II.D.2. Institutional Materials. By 30 days from the effective date, BSTS will update institutional materials (e.g., Student Handbook/Orientation materials) to include reference to the varied therapeutic, skill-based and rehabilitation-based services that are incorporated into the overall clinical services provided.[9] [See footnote below regarding the inclusion of MH-II.D.2 in this discussion]

MH-I.D.2. Staff Training on Mental Health Services Policy. By 90 days from the effective date of the policies noted above, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

MH-I.D.4. Annual Review. These policies shall be reviewed at least annually and updated as needed.

**Findings.**

Policy *4C-01 Mental Health Services* was submitted within the required timelines and was approved by the Court on 10/27/20 (dkt. 362). It remains in effect.[10] Similarly, the Student Handbook has been revised multiple times to bring it current as new policies are developed, and existing policies are revised. Most recently, the Handbook was updated on 3/5/21.

The annual review of the Mental Health Services policy required by **objective MH-I.D.3 "Annual Review"** was conducted the first week of September 2021. The managers for each policy area completed a survey that asked about challenges to executing the policy, areas that need revision, whether oversight is appropriate, people who should be consulted regarding proposed revisions, and responsible parties for implementation and performance issues. STS submitted the proposed revisions to the Monitor/Plaintiffs' counsel on 9/14/21, within the annual review timeline. The Monitor conferred with Plaintiffs and provided STS with feedback on proposed policy changes in early October 2021.

STS previously met the requirements for **objective MH-I.D.2 "Staff Training on Mental Health Services Policy"** by training its staff in October/November 2020, as discussed in the Monitor's February

---

[9] The Remedial Plan includes two provisions related to Mental Health Services Policy & Procedure that are nearly identical (MH-I.D and MH-II.D). The provision in MH-I.D includes three objectives (MH-I.D.1-3), while the one in MH-II.D includes a fourth (MH-II.D.1-4), adding requirements related to Institutional Materials. Otherwise, the provisions are identical. For the sake of completeness and to avoid redundancy, all four objectives are included here. Provision MH-II.D simply refers the reader back to this discussion.

[10] Procedures for psychological screening and evaluation were integrated into the *Mental Health Services* policy, so a revision to 4C-02 *Psychometric Testing, Screens, Appraisals, Evaluations and Plans* was not required. This policy was rescinded.

2021 report. The Remedial Plan does not have a specific requirement for annual refresher training on this topic and the *Mental Health Services* policy does not require pre-service or annual refresher training. Therefore, the Monitor does not include that information here. Provision MH-VI.C "On-Going Training," below, discusses the professional development of STS mental health staff.

The **implementation** of this policy is discussed in MH-I.A through MH-I.C and MH-II.A and B, above.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
  1) None.

**Methodology**.
  • Reviewed policy *4C-01 Mental Health Services.*
  • Consulted STS about policy review process/progress.

**MH-II Injunctive Relief Required by Court Order: Provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective.**

**Goal of the Remedial Plan**: BSTS will provide individual and group psychotherapy to students whose screening/assessment/evaluation identifies a diagnosable mental illness or otherwise identifies significant personal distress or functional impairment that may benefit from psychotherapy. The psychotherapy provided will be person-centered and focus on evidence-based therapeutic and skills-based practices that address the student's individual needs. The BSTS will also provide rehabilitative services and supports as needed to further address student's clinical needs.

**MH-II.A. Therapeutic Services.**
<u>II.A.1. Psychotherapy.</u> BSTS shall offer students individual and/or group psychotherapy at the appropriate frequency and duration when their screening/assessment/ evaluation identifies a diagnosable mental illness or other clinical need that can be treated effectively with psychotherapy.
<u>II.A.2. Psychotherapy Upon Request.</u> BSTS shall provide individual and/or group psychotherapy to students who request it at any time throughout their BSTS admission.
<u>II.A.3. Consistency with Treatment Plan.</u> BSTS shall ensure that individual and group psychotherapy provided is consistent with the student's mental health treatment plan.
<u>II.A.4. Treatment Refusals.</u> By 30 days from the effective date, if a student requires individual or group psychotherapeutic services but declines them in full or in part, ongoing attempts at rapport building and motivational engagement will be made and documented to determine and address the student's objections to entering into treatment. The goal of this intervention is to provide psychotherapy at the duration and frequency needed to address their individual needs.

**Findings.**

Policy 4C-01 *Mental Health Services,* which was approved by the Court on 10/27/20 (dkt.362), describes the protocol for therapeutic services and remains in effect.

Treatment plans, which prescribe the specific treatment interventions for youth, were developed for the 14 youth in the mental health sample who had been in custody for at least 30

days.[11] The delivery of psychotherapy is the crux of the Court's Order to provide mental health services that are responsive to each youth's individual needs.

## MH-II.A.1 Psychotherapy

*Individual Psychotherapy*. Individual psychotherapy was prescribed for each of the 14 youth in the mental health sample. The content and quality of psychotherapy progress notes—the key place where insight into the therapists' approach to providing treatment is accessed—revealed a lack of focus on skill development. Several dynamics contribute to this problem. The frequent behavioral crises and interpersonal conflicts amongst peers appear to dominate treatment sessions. While it is essential for clinicians to listen to youth and allow them to vent about these very stressful situations, few clinicians appeared to use the crisis as an opportunity to teach new skills to help youth regulate their emotions and to attempt prevent subsequent crises and interpersonal conflict in the future. Progress notes mostly contained vague references to skills and/or constant reference to rapport-building with scant attention to the specific skills taught and whether the youth is able to utilize them. Typically, progress notes did not specify the interventions or tools taught to the youth, but rather included broad general statements such as "challenged student to work on coping strategies" and "use the coping skills we have discussed so far." While some clinicians' notes did specify the therapeutic approach utilized and what skills the youth was able to demonstrate, these were the rare exception.

The youth who were interviewed to inform this report universally reported a good connection with their primary therapist and indicated that their therapist was readily available to them. However, several youth's descriptions of the therapy they received reflected the same dearth of specificity and skill-focus revealed by the clinician's progress notes. Three of the seven youth interviewed were able to describe specific coping skills or therapeutic tools they learned in therapy (e.g., "we go over coping skills...like how to handle anger and mindfulness...I like journaling"), but four youth were unable to list any specific skills when prompted or dismissed the usefulness of therapy altogether. Many youth reported that the substance of their therapy was focused on conflict at the facility and other stressors in their life, but other than being able to vent to their therapist (which they all found helpful) few reported a focus on specific ways to help them cope or alleviate symptoms of their mental illnesses. Overall, the documentation of individual therapy requires a more specific focus on skill development and the youth's progress toward developing the skills needed to improve adjustment and manage their symptomatology. This is a primary issue driving the recommended Partial Compliance rating.

Overall, the therapists indicated that the facility mental health staff had been operating in crisis mode. They reported challenges with managing crises and clinical responsibilities together. Several admitted to being somewhat passive with regard to youth refusing therapeutic intervention: "therapy is not that high of a priority... [youth] could technically avoid therapy the whole time they are here." More recently, mental health leadership made the decision to assign one clinical staff, on a rotating basis, to address daytime crises, so that clinicians are better able to focus on their own caseloads.

*Group Psychotherapy*. The group roster compiled on 6/30/21, included 24 assignments to a variety of group therapy interventions. More specifically: 4 youth were assigned to CBT Negative Thinking, 5 youth were assigned to ACT ART group, 7 youth were assigned to participate in COPE, 3 youth were assigned to Trauma Group, 9 youth were assigned to Emotional Masculinity, and 2 youth were assigned to Power Source.

---

[11] Youth AR was a new admission as of 6/21/21 and did not yet have a treatment plan developed at the end of the sampling frame, 6/30/21.

As stated in the Monitor's February 2021 report, to reach substantial compliance, several things need to come together: 1) a youth's treatment plan should prescribe groups indicated by the youth's mental health assessment, 2) the youth's assignment to the group should be noted on the group roster and 3) a complete set of group notes should be available to verify the youth's participation. A comparison of the group psychotherapy roster/treatment plans/group psychotherapy progress notes for the 14 youth in the mental health sample revealed multiple inconsistencies, or places where the data were not compatible:

- Youth RL was noted as participating in the COPE group on the group psychotherapy roster. There were progress notes documenting seven weeks of participation, but this intervention was not noted in the treatment plan. The treatment plan indicated the youth should be participating in RSAT, GRIP and ART.

- Youth DM was assigned to the COPE group per the group psychotherapy roster. This was not listed as a directed intervention in response to a goal in the treatment plan; but it was included at the end of the plan. There were two progress notes for COPE group, 4/11/21 and 5/17/21. The reason for the long lag between group sessions was not documented.

- Youth DT was referred to Art Therapy via the youth's treatment plan and this was included on the group psychotherapy roster. A progress note documented the youth's attendance on 5/10/21, but there was no notation that the youth attended further nor a note regarding attempts to engage him in ongoing therapy.

- Youth AE was included on the list of youth participating in CBT Negative Thinking on the group psychotherapy roster. This intervention was not included in the youth's treatment plan. There were five progress notes documenting the youth's participation. In addition, there were two progress notes from COPE and two from Healing Through Hip Hop, but these groups were also not included in the youth's treatment plan.

The cases discussed above are four examples of a larger problem that impacted most of the youth in the mental health sample and is a primary driver of the recommended Partial Compliance rating for this provision. These findings indicate the need to ensure that when a youth is referred to or is participating in a specific group therapeutic intervention that the group is included in the youth's mental health treatment plan, and vice versa. This information should then be consistent with the information included on the group roster, and progress notes describing the group intervention and the youth's participation should be available to document each weekly session. The facility's challenges in this area appear to be similar in scope to that noted in the Monitor/SME's February 2021 review.

During this monitoring period, a COPE group session was observed by the SME. The group was led by a mental health staff member and six youth participated. The therapist utilized the COPE treatment manual and made efforts to engage the youth in the group therapy process. The youth were taught a mindfulness exercise and then discussed situations where using this skill could be helpful. Overall, the therapist did a good job of initially engaging the youth and attempting to keep them engaged. In addition, the Monitor observed an Emotional Masculinity group session that was co-facilitated by two mental health clinicians and attended by seven youth. Following a reportedly intense session from the previous week, this session further debriefed the material and life experiences that were recounted by the group members. The youth were fully engaged and the facilitators' rapport with the youth appeared to allow youth to feel comfortable divulging and discussing very personal details and experiences with the larger group. Finally, the Monitor observed a Conquering Negative Thinking group session that was also co-facilitated by two mental health clinicians and was attended by

four youth. The facilitators worked directly from the treatment manual, assisted youth with comprehending and completing a worksheet, and encouraged all members to participate in a discussion about the relevance of the new skills to their experience in the facility. Overall, the quality of group therapy interventions is high, with facilitators who have clearly mastered the material and also are able to engage youth so they can digest the concepts being introduced.

### MH-II.A.2 Psychotherapy Upon Request

STS reported that no STS youth requested mental health services between January and June 2021.  Important context for interpreting the absence of service requests is that approximately 95% of the youth at STS are already on the mental health caseload and receiving psychotherapy. The availability of mental health services and procedures for accessing them are clearly articulated in the Student Handbook.

### MH-II.A.3 Consistency with Treatment Plan

In general, when youth were recommended for individual psychotherapy per their treatment plan, there was evidence that therapeutic intervention occurred. In the intervening period since the Monitor's February 2021 report, there were improvements with regard to adherence to the individual psychotherapy frequency designated by the youth's treatment plan. Overall, youth were seen at the prescribed frequency. Per the clinicians' progress notes, there were sporadic occasions where a youth who was prescribed weekly therapy skipped a week, but this was not a systemic problem.

Of the 14 youth included in the mental health sample, a lack of consistency in treatment delivery versus the prescribed frequency was a cause for concern for only two youth (14%). One youth (Youth TC) was initially prescribed individual psychotherapy 1-2 times per week. The youth was referred to the Intensive Treatment Program on 4/26/21, but was not admitted to ITP as the youth did not meet the criteria. Following this referral, there was an unexplained gap in individual therapy from 5/6/21 to 5/25/21. TC's assigned clinician attempted an encounter once on 5/21/21, but the youth refused to participate. Given the underlying reason for referral to ITP and the youth's diagnostic profile, this is concerning. Youth EJ was prescribed weekly individual psychotherapy but there was an unexplained gap from 5/3/21 to 5/21/21. EJ's assigned clinician attempted an encounter once on 5/14/21, but the youth refused to participate in the session. Additional contact attempts would be expected in this situation.

Furthermore, based on the progress notes regarding the various youth's individual therapy sessions, it remains difficult to determine whether therapeutic interventions were consistent with the goals/objectives outlined in the treatment plan. This is likely due to treatment plan issues discussed above and indicative of the need to simplify the treatment plans to make them more functional as a guide or roadmap to providing treatment that is relevant to the individual youth. This is a key area in need of improvement to advance progress toward substantial compliance.

Finally, as noted above, the youth's treatment plans did not always include group therapy interventions that were being provided to youth. Conversely, youth's treatment plans might indicate a group therapeutic intervention, but there were no corresponding progress notes to verify the youth's participation. This also needs to be addressed in order to achieve substantial compliance.

### MH-II.A.4 Treatment Refusals

As explained in the Monitor's February 2021 report, youth refuse engagement in mental health services for a variety of reasons. It is the responsibility of the clinician to explore the youth's hesitation and to address objections and resistance to engagement. Treatment refusals are not an infrequent

occurrence, and do not necessarily reflect a problem with the quality of the mental health service being offered, but they need to be addressed with attention toward psychoeducation and building rapport.

STS provided a list of youth who refused individual or group therapeutic interventions between 1/1/21 and 6/30/21. Seven youth refused therapeutic intervention, and notably, all refusals were for individual therapy. Per the documentation regarding these refusals, mental health staff made consistent attempts to engage the youth in the individual therapy process. For these seven youth, staff met with each of them an average of eleven times, with a range of 4 to 16. While the clinicians are clearly attending to the issue, the progress notes need to provide additional detail with regard to *how* the mental health staff attempted to develop rapport and the nature of the youth's objections to attending treatment.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that individual and group therapeutic interactions are conducted at the frequency designated by the youth's treatment plan. If gaps in therapeutic interactions occur, a progress should explain the reason.
2) Ensure that group therapeutic interventions are provided consistent with the youth's treatment plan or, conversely, included in the plan as a prescribed intervention when youth participate in them.
3) Implement and conduct mental health group therapeutic interventions on a regularly reoccurring basis, evidenced by routine group progress notes.
4) Track therapeutic group enrollment, attendance and refusals.
5) Improve the specificity of documentation regarding progress notes for both individual and group psychotherapies, while protecting privacy/confidentiality.
6) Clearly document attempts/interventions utilized to engage with youth who refuse to participate in individual and/or group therapies.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Consulted DHS Clinical Director and STS Mental Health Authority
- Reviewed MDT minutes
- Reviewed the mental health roster
- Reviewed mental health records for a random sample of 14 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed the listing of available interventions entitled "STS Therapeutic, Skills, and Rehabilitative Services" December 2020 version
- Reviewed the Treatment Refusal log
- Observed COPE, Emotional Masculinity and Conquering Negative Thinking groups
- Interviewed youth regarding their experience with mental health treatment at STS

**MH-II.B. Skill-based and Rehabilitative Services**
MH-II.B. Skill-Based and Rehabilitative Services. The BSTS will assess student's clinical and support needs and develop skills-based and rehabilitation-based services as needed. This review will include

consideration of and integration with the behavior management/motivation approach that is discussed in the Room Confinement section below to ensure that the varied clinical-based services offered to students are aligned and supportive of each other.

**Findings.**

Policy 4C-01 *Mental Health Services,* which was approved by the Court on 10/27/20 (dkt.362), describes the protocol for skill-based and rehabilitative services and remains in effect. Furthermore, the facility has also begun the implementation of Aggression Replacement Training (ART), as described in detail in RC-I.B.1 "Identify Program," below.

As explained in the Monitor's February 2021 report, youth may require interventions that do not necessarily need to be facilitated by a mental health clinician, despite being part of their mental health treatment. These interventions include groups that are designed to teach youth skills needed to address specific symptoms or services that address a certain diagnosis (*e.g.*, substance use disorder). STS has a variety of skill/rehabilitative groups including Dialectical Behavioral Therapy Skills Training (DBT; facilitated by cottage staff), Gang Resistance Intervention Program (GRIP), Adolescent Sexual Abuse Program (ASAP), Achieving Maximum Potential (AMP; life skills), Residential Substance Abuse Treatment (RSAT), Applied Community Transition program (ACT; life skills), Rebound group (drug/alcohol education), Essential Instruction (faith-based re-entry), and a Parenting Skills course.

During this monitoring period, STS reported that 3 youth were assigned to the ASAP program, 7 youth were assigned to ACT, 27 youth were assigned to Essential Instruction, 3 youth were participating in Faith-based re-entry, 10 youth were assigned to GRIP, 4 youth were participating in Parenting, and 29 youth were assigned to RSAT. Youth are typically assigned to these groups via the Court or the youth's JCO, rarely by the youth's assigned mental health clinician.

Youth's participation in the various groups and its relationship to the youth's mental health treatment was not always easy to discern. Group notes did not always include sufficient information to identify the youth's participation or level of engagement and documentation from group notes, group rosters and treatment plans did not always hang together. For example:

- Youth BG was assigned to RSAT per the group roster. When interviewed by the SME, the youth confirmed participation in the group. However, the mental health treatment plan did not indicate that the youth was participating in RSAT and there were no RSAT group notes regarding participation.

- Group rosters and an interview with Youth DW indicated participation in ART and RSAT. However, only one progress note was submitted regarding the youth's participation in a single session of a group that could not be identified based on the information provided.

- RL's treatment plan indicated the need for ART, RSAT, and GRIP. Group rosters indicated that the youth was assigned to ART and RSAT. Only a single progress note was provided, and it was not possible to determine what group the progress note pertained to.

The above examples illustrate the need for better cohesion and integration with regard to mental health and rehabilitative/skills groups. Going forward, the Monitor intends to refine the monitoring strategy for this provision to focus more narrowly on those groups that are clinically indicated and related to the youth's diagnoses or treatment goals. For such groups, STS should devise a mechanism for the youth's assigned clinician to be aware of the youth's participation, engagement and progress in the group and a mechanism to indicate the youth's involvement in the group on the mental health treatment plan.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that youth are attending clinically indicated skills-based and rehabilitative-based groups and that these groups are referenced in the youth's treatment plan.
2) Develop a mechanism to support the interface between the skills/rehabilitative group and the youth's assigned clinician.

**Methodology**.
- Reviewed the listing of available interventions entitled "STS Therapeutic, Skills, and Rehabilitative Services" December 2020 version.
- Reviewed the *Mental Health Services* policy
- Consulted DHS Clinical Director and STS Mental Health Authority
- Reviewed the mental health roster
- Reviewed the roster of individuals participating in each rehabilitative skill-based intervention
- Reviewed rehabilitate skill-based group notes for youth included in the mental health sample
- Interviewed youth on the mental health caseload

**MH-II.C. Mental Health Staffing**
MH-II.C. Mental Health Staffing. Throughout the duration of this Remedial Plan, the BSTS will hire and maintain a sufficient number of Professionals in the Mental Health Department ("PMHD") to evaluate/assess students and to provide the individual psychotherapy, group therapy, skills-based and rehabilitative-based services needed to meet their individual needs. For psychotherapeutic services, the BSTS will ensure a psychotherapist-student ratio no greater than 1:15 for the duration of the Remedial Plan.

**Findings**.
　　This provision of the Remedial Plan has two requirements—1) to hire and maintain a sufficient number of Professionals in the Mental Health Department (PMHDs) to evaluate/assess students and to provide services to meet their needs; and 2) a specific maximum psychotherapist-student ratio of 1:15, based on total facility population. With regard to the first requirement, at the end of the period of review, STS's complement of mental health staff included:

- One social worker (who coordinates youth's discharge planning; organize various multi-disciplinary team meetings; coordinate crisis responses and co-facilitate groups) and one vacant social worker position.
- One psychology assistant (who conducts part of each youth's mental health assessment) and a contracted therapist for 8-hours per week (who conducts mental health evaluations and does not currently carry a caseload);
- Seven full-time psychologists (three Psychologist 3 and four Psychologist 2; some of whom conduct various assessments and all of whom carry a caseload, co-facilitate groups, provide crisis services, and complete other administrative tasks)[12]; and

---

[12] The differences among the Psychologist 1, 2 and 3 designations are largely Human Resources factors, although in general, involve a combination of education level and duration of employment with DHS. Since the last review, two psychologists were reclassified from Psychologist 1 to Psychologist 2 positions after one year of service.

- One licensed mental health clinician who functions as STS's Mental Health Authority.

The psychotherapist-student ratio focuses specifically on those mental health staff who carry a caseload of clients. As shown in the table below, the facility easily met the 1:15 requirement each month. Throughout the period of review, each month, STS had one psychotherapist for every 5 to 7 youth at STS. Most, but not all of the youth at STS are on the mental health caseload, so the caseload sizes are slightly smaller than the ratios below would suggest.

| Psychotherapist-Student Ratio, January through June, 2021 | | | |
|---|---|---|---|
| Month | # Therapists | ADP | Ratio* |
| January 2021 | 7 | 34.8 | 1:5 |
| February 2021 | 7 | 36.7 | 1:5 |
| March 2021 | 7 | 42.2 | 1:6 |
| April 2021 | 7 | 44.9 | 1:6 |
| May 2021 | 7 | 48.5 | 1:7 |
| June 2021 | 7 | 50.9 | 1:7 |

*Ratio is calculated using the following formula: Gross ADP/# of therapists = number of therapists per youth. The "Gross ADP" includes youth who are assigned to STS, most of whom are physically present on campus, but some of whom are not (e.g., in detention or jail, AWOL, etc.). The Gross ADP is utilized for the purpose of calculating a ratio because youth who are off campus may return at any time, and some also continue to receive services while elsewhere in the community.

A review of the mental health roster, mental health treatment plans, progress notes and MDT meeting minutes indicates that STS has a sufficient number of psychotherapists to provide the services needed by STS youth. Although some problems with documentation and service delivery remain, the identified problems do not appear to be related to insufficient staffing but rather stem from a need for procedural improvements or clinicians' skill development and performance improvements.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
   1) None.

**Methodology**.
- Reviewed mental health staff roster and staff count as of 6/30/21
- Reviewed licensure for STS mental health staff
- Reviewed STS ADP from January to June 2021

**MH-II.D. Policy & Procedure**
MH-II.D.1. Mental Health Services Policy. (a) By 30 days from the effective date, BSTS shall create a policy/procedure regarding the delivery of *Mental Health Services*, which will include therapeutic, skills-based, rehabilitative and psychiatric services. (b) By 30 days from the effective date, BSTS will review and revise *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans.*

MH-II.D.2. Institutional Materials. By 30 days from the effective date, BSTS will update institutional materials (e.g., Student Handbook/Orientation materials) to include reference to the varied therapeutic, skill-based and rehabilitation-based services that are incorporated into the overall clinical services provided.

MH-II.D.3. Staff Training on Mental Health Services Policy. By 90 days from the effective date of the policies noted above, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

MH-II.D.4. Annual Review. These policies shall be reviewed at least annually and updated as needed.

---

**Findings.**

Please see the discussion of Policy & Procedure in MH-I.D, above. Since the provisions are nearly identical, the discussion is not repeated here.

---

**Recommended Compliance Rating.** Substantial Compliance

---

**Steps Toward Achieving Substantial Compliance.**
1) Same as MH-I.D, above.

---

**Methodology.**
- Same as MH-I.D, above

---

**MH-III Injunctive Relief Required by Court Order: Ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School.**

**Goal of the Remedial Plan:** BSTS will ensure that MH records regarding screening/assessment/evaluation, therapeutic, skills-based, rehabilitation-based and psychiatric/medication services are defined, stored, protected and shared in a manner that is consistent with policy and procedure, relevant professional standards and state and federal laws.

---

**MH-III.A. Student Records Policy & Procedure**

MH-III.A.1. Mental Health Records Policy. By 60 days from the effective date, BSTS will revise/develop a Mental Health records policy and procedure that defines Mental Health records, identifies where Mental Health records are stored to ensure they are separate from administrative/main, school and cottage records; established protocols to ensure that access to confidential information is appropriately limited; establishes protocols to ensure that information is shared where appropriate to provide for safety, security, health and continuity of care; and established protocols for the limited release of records to outside entities. The policy and procedure will be consistent with state and federal law.

MH-III.A.2. Staff Training on Mental Health Records Policy. Within 120 days of the effective date, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

---

**Findings.**

Policy *4B-07 Student Health Records* was submitted within the required timelines and was approved by the Court on 11/9/20 (dkt. 370). It remains in effect. A notice informing youth of the protections offered by the new policy was posted on 12/16/20, after receiving input from the Monitor

and Plaintiffs' counsel. A brief statement about confidentiality is also included in the Student Handbook (3/5/21 version). Although the Remedial Plan does not specifically require an annual review of this policy, STS submitted proposed revisions to the Monitor/Plaintiffs' counsel on 9/14/21. The Monitor conferred with Plaintiffs and provided feedback on proposed changes to Defendants in early October 2021.

STS previously met the requirements for **objective MH-III.A.2 "Staff Training on Mental Health Records Policy"** by training its staff in November 2020. The policy most directly impacts medical staff, mental health staff, Cottage Counselors and Cottage Directors, most of whom received the initial training in November 2020, as discussed in the Monitor's February 2021 report. The Remedial Plan does not have a specific requirement for annual refresher training on this topic, but the *Student Health Records* policy requires new staff to be trained pre-service and existing staff to be trained annually thereafter.

All new employees hired since November 2020 reportedly received instruction on the policy during their orientation to STS's electronic case records system (RiteTrack) and during on-the-job training, but STS reports it has not been documented consistently nor has this topic been included in staff's annual training. Full implementation of the policy requires that all staff are periodically reminded of their obligations regarding student confidentiality and procedures for releasing records.

**Implementation** of this policy was not previously monitored, because the policy had only recently been put into effect at the time of the Monitor's February 2021 report. For the current reporting period, the Monitor confirmed that the following policy elements had been properly implemented:

- Paper copies of student health records are stored in a locked filing cabinet marked "Confidential" and on which a "Privacy and Security of Health Information" notice is posted. This notice lists the staff positions that are authorized to access youth's health records, and briefly the describes the procedure for others' access.
- A paper log is stored near the filing cabinet for authorized staff to sign out/in the paper copies of youth records. Entries are properly dated and signed. The header of each page of the log includes policy language about the signer's responsibility for the security of the record while in his/her possession. The header also briefly describes the procedure for other's access.
- An electronic log is utilized to track requests for student records. The log tracks the youth's name, ID number, date of the request, name of person making the request, date the response was sent, the initials of the person who responded, and the information that was provided by STS to the requestor.
  - Between January and September 2021, 16 requests for student health records were processed. Requests were received from disability services, probation agencies, adult jails and Departments of Correction, lawyers and court officers.
- Copies of the requests for information, the Authorization of Disclosure signed by the youth and/or the youth's parent/guardian, and the list of records submitted in response was properly maintained for each request.

The Monitor also assessed clinician's adherence to the *Student Health Records* policy by considering whether the information included in Mental Health Discharge Summaries maintained appropriate limits. In all cases, the information communicated by clinicians was sufficiently detailed to present a clear picture of the youth's progress and challenges, while also obscuring certain private details as appropriate.

In summary, STS has properly implemented most of the requirements of the *Student Health Records* policy, save for the training issues discussed above.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that this topic is included in annual training for existing STS staff.
2) Properly document the completion of all training modules required by policy/Remedial Plan in staff training files so that they can be monitored to verify compliance.

**Methodology**.
- Interviewed STS Staff Trainer and response to request for training information
- Reviewed photographs of record storage locations and logbook entries
- Reviewed electronic tracking log for requests for students' records.
- Reviewed requests for students' records and responses, January to September 2021
- Reviewed Discharge documents, January to June 2021

**MH-IV Injunctive Relief Required by Court Order: For students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation.**

**Goal of the Remedial Plan**: BSTS will create a two-prong crisis intervention model and approach that is implemented and defined by policy and procedure. This model will establish coverage and protocols for 24/7 crisis support from PMHD for two types of support: (1) care/support/safety plans that address acute mental health crises such as suicide and self-injurious behavior; and (2) other behavioral crises such as (a) students who present a serious and immediate risk of physical harm to others and cannot stabilize within a one-hour "cool off" period; and (b) a short-term therapeutic crisis response unit/program/space for students who require further clinical assessment/evaluation, targeted and intensive skill development or extra therapeutic intervention or support to stabilize before returning to normal cottage/programming.

**MH-IV.A. 24/7 Crisis Response**
MH-IV.A. 24/7 Crisis Response. BSTS will have a PMHD on call to provide 24/7 crisis intervention during business and non-business hours. During non-business hours, these crisis response and intervention services will be provided through electronic or telephonic means.

**Findings**.
STS has fully implemented a 24/7 on-call schedule. When the Remedial Plan was first put into effect in late July 2020, on-call duties rotated across the therapists on staff. Since then, additional therapists were hired to work nights and weekends. Currently, most of the PMHDs work normal business hours (*i.e.*, until 4 or 5pm) and are available to consult with staff and youth throughout the day. In November 2020, STS adjusted the scheduled shifts for some of its clinicians so that at least one therapist is on grounds until 9pm three days per week; until 8pm three days per week; and until 7pm on Sundays. The construction of clinicians' shifts was informed by data on de-escalation and room confinement indicating the day/times with the highest needs. After hours, a PMHD is on-call until 7am

the following morning. This therapist is equipped with an iPad and can respond to emergencies via telephone, videoconference or an after-hours return to campus if needed.

STS reports that scheduling therapists to be present on campus until later in the evening has significantly reduced the need for off-hours/on-call contact. Rather than being called back to campus after hours, STS reports many instances where clinicians stayed past their scheduled shift to continue to assist staff and youth. In fact, the on-call therapist was only contacted five times between January and June 2021, with four calls requiring a return to campus. These five calls were regarding three different youth, with one youth (Youth DB) accounting for three emergency after-hours contacts. All after-hours contact was recorded via an Incident Report and/or progress note.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance.**
   1)  None.

**Methodology**.
-  Reviewed Master On-Call Schedule, Daily Rotations and Overnight rotations through 6/30/21
-  Reviewed the log of youth requiring after-hours consultation.
-  Reviewed the mental health progress notes regarding the after-hours clinical encounters.

---

**MH-IV.B. Suicide Prevention and Intervention**
MH-IV.B.1. Self-Harm Evaluation. Psychotherapists or the Director/MHA will be primarily responsible for evaluating students who express suicidal ideation, engage in self-harming behavior, or attempt suicide. This response/evaluation will occur as soon as possible barring conflict with other clinical tasks (e.g., therapy session, psychosocial evaluation or other crisis response).
MH-IV.B.2. Evaluation of Youth in Seclusion. If a student is placed in a "seclusion room" (as referenced by the Court Order) for an act of self-harm or suicidal ideation, a PMHD (e.g., psychotherapist) will meet with the student as soon as possible, whether in-person or via telephone or electronic means consistent with the 24/7 coverage plan, and such meetings will take priority over non-clinical tasks.
MH-IV.B.3. Minimize Use of Seclusion. BSTS will minimize the amount of time that students on suicide watch spend isolated in a seclusion room as demonstrated by the protocols for suicide watch levels defined in Policy and Procedure *4C-03 Suicide Prevention/Intervention,* as well as the protocols for RC defined in Policy *4C-06 Room Confinement.*
MH-IV.B.4. Safety Plans. PMHD that respond to students in suicidal/self-harm crisis will develop and implement an individualized care/support/safety plan in a manner consistent with protocols established in Policy *4C-03 Suicide Prevention/Intervention.*

**Findings.**

STS addressed Suicide Prevention and Intervention as required by this provision via the *Suicide Prevention and Intervention* policy approved by the Court along with the Remedial Plan on 7/27/20 (dkt. 354) and in the *Mental Health Services* policy approved by the Court on 10/27/20 (dkt. 362). [See pgs. 31-32 of the Monitor's February 2021 report for a description of the suicide prevention protocol.]

**MH-IV.B.1 Self-Harm Evaluation**

During the period of review, suicide precautions were utilized on 17 occasions for 8 youth. Overall, the youth were appropriately assessed following suicidal ideation or self-injurious behavior.

The assessments were detailed and included pertinent risk factors and possible coping skills reviewed with the youth. The assessments also included recommendations (e.g., level of supervision, possessions, etc.) to assure the youth's safety while on precautions. Youth received follow up assessments at the prescribed intervals to determine the need to remain on the current suicide precaution level or whether restrictions could be reduced as the youth's condition improved. The substance of the assessments was thorough and detailed, and they were performed by an appropriately qualified mental health clinician.

Just before this report was filed, the Monitor/SME consulted with DHS/STS to refine clinicians' procedures for documenting their suicide risk assessments and managing situations in which youth refuse to engage in the assessment process. These points of practice were quickly to communicated to STS clinicians in the annual training on suicide risk assessment delivered on 10/13/21.

## MH-IV.B.2 Evaluation of Youth in Seclusion

The review of mental health records and room confinement records did not identify any situations in which youth were placed in room confinement *in response to* an act of self-harm or suicidal ideation (which is the foundation of this requirement of the Remedial Plan, which then requires mental health staff to meet with the youth as soon as possible). That said, there were a few situations in which youth were placed in room confinement for other behaviors (e.g., assaulting staff or peers; behavior that presented an imminent risk of harm to another's safety), and expressed suicidal ideation while confined. In these three cases (involving two youth), mental health records indicated that a mental health clinician promptly initiated the suicide assessment. Room confinement records indicated that each youth was under constant observation and had continual interaction with staff or mental health clinicians throughout the period in room confinement. Further, the periods of confinement ended once the threat of harm to others had abated and/or the assessment of the youth's risk of harm was completed (range = 11 to 68 minutes).

## MH-IV.B.3 Minimize Use of Seclusion

Policy *4C-03 Suicide Prevention and Intervention* states that "isolating, confining or secluding a student with suicidal thoughts or behaviors shall be avoided whenever possible." A review of mental health records confirmed that STS did not utilize room confinement at any time during the period of review for the purpose of limiting the youth's access to environmental hazards. Instead, youth at elevated risk of self-harm were assigned to sleep in rooms in the general population cottages that are closest to the staff's desk with better visibility for observation. In several cases, youth's possessions/clothing/bedding were appropriately limited in response to specific risks of self-harm. While several of the youth on suicide precautions during the period of review (6 of 17, or 35%) subsequently engaged in behaviors that presented an imminent risk of harm to others' safety and were placed in room confinement, their stays in room confinement were relatively short (i.e., between 14 and 48 minutes) and they remained under constant supervision during that time.

## MH-IV.B.4 Safety Plans

The generally accepted practice is to develop a Crisis Plan while a youth is on precautions. Because suicidal ideation and self-injurious behavior are such serious issues, that plan should also be reviewed by the MDT, either at a specially scheduled review or at the next regularly scheduled staffing for that youth. For youth without a serious threat to self-harm or history of self-harming behavior, the treatment plan may not need to be updated. But, for youth with repetitive and serious self-harm gestures or suicidal ideation, the treatment plan should be adjusted to incorporate mechanisms to address crises and to improve distress tolerance and coping skills. Following each subsequent period of

precautions, the original Crisis Plan should be reviewed, assessed for sufficiency, and updated as necessary. Cottage staff must be made aware of the substance of the Crisis Plan and potential interventions so they can identify triggers and implement the suggested interventions. Concerns in this area are what is driving the recommended Partial Compliance rating.

As noted above, suicide precautions were implemented on 17 occasions for 8 youth. A review of these records revealed that the initial Crisis Plans were developed in a timely manner for 4 of the 8 youth (Youth CJ, Youth CG, Youth TN, Youth BP). The initial Crisis Plans were not created in a timely manner for the other youth four youth.

Following an episode of suicide precautions, the MDT minutes did not consistently reveal a discussion of the event or consideration of the Crisis Plan at the youth's next staffing. Further, for serious self-harm attempts/ideation, a "special concern" MDT did not appear to be scheduled so that the event could be reviewed more quickly than the normally scheduled staffing. For example, Youth DB required suicide precautions on 1/10/21, 4/24/21, and 5/15/21. The youth was reviewed by the MDT on 1/27/21, 17 days after the initial event and on 5/26/21, 11 days after the third event. Further, the minutes from these MDT meetings did not include any information regarding the youth's suicidal ideation. In another example, Youth CG required suicide precautions on 5/28/21, but was not reviewed by the MDT until 6/23/21. Again, there was also no mention of this youth's suicidal ideation in the MDT minutes.

Youth's Crisis Plans were also not routinely reviewed/updated following subsequent self-harming behavior or ideation. For example:

- Youth DB was placed on suicide precautions 1/10/21, 4/24/21, and 5/15/21. A Crisis Plan dated 3/1/21 was designated as an "update," but the original plan was not provided for review. Furthermore, the Crisis Plan was not updated after the two subsequent self-harm crises.
- Youth TNe required suicide precautions on 1/3/21, 2/9/21, and 5/8/21. A Crisis Plan dated 12/27/20 was included in the youth's records but was not updated after the subsequent self-harm crises.

Furthermore, the treatment plans for youth with serious or frequent self-harm gestures/ideation were usually not updated to reflect treatment goals, objectives and interventions designed to address the prevention of subsequent harm/ideation.  This is a core requirement of professional standards for suicide prevention in correctional facilities.[13]

In summary, while youth who self-harm/express suicidal ideation are timely and thoroughly assessed and placed on precautions, there is little evidence that their related treatment needs are considered/updated in a Crisis Plan, by the MDT, or via a revision to their treatment plan. More specifically, the youth's Crisis Plan must be reviewed in conjunction with each episode of suicide precautions and updated if appropriate. Further, the youth must be reviewed by the MDT in a timely manner with the requirement for suicide precautions as a focus of the MDT review. Finally, the youths' treatment plan must be updated to include protection from self-harm and the Crisis Plan's intervention. Once the sequence of protections regarding Crisis Plans, MDT Review and treatment plan updates has improved, the Monitor/SME will assess the extent to which cottage staff are made aware of Crisis Plan requirements and their perceptions regarding the utility of the plan to provide guidance when a crisis is developing.

---

[13] National Commission on Correctional Health Care (NCCHC), Standards for Mental Health Services in Correctional Facilities (2015), MH-G-03.

Recommended Compliance Rating. Partial Compliance

Steps Toward Achieving Substantial Compliance.
1)  Ensure that the youth's Crisis Plan is developed timely following the youth's placement on precautions, is reviewed/updated as necessary after subsequent events, is promptly discussed by the MDT, is integrated into the youth's mental health treatment plan, and is shared with cottage staff.

Methodology.
- Reviewed *Mental Health Services* policy and *Suicide Prevention and Intervention* policy
- Reviewed Suicide Assessment Reports for the 8 youth requiring suicide precautions during this monitoring period.
- Reviewed Crisis Plans, MDT minutes and treatment plans for the 8 youth requiring suicide precautions during this monitoring period.
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed Room Confinement Logs and packets for each youth in room confinement

---

**MH-IV.C. Multi-Sensory De-escalation Tools and Spaces**
MH-IV.C Multi-Sensory Tools and Spaces. By 90 days from the effective date, BSTS will secure sensory-based tools and equipment (to augment materials currently in place) and develop multi-sensory spaces for de-escalation and self-soothing for students to use to assist them in modulating their emotions/behavior and practice coping skills. This trauma-informed service is designed to provide students with a safe, non-adversarial space to "cool-off", refocus, and develop/practice skills for de-escalation.

Findings.
    As noted in the Monitor's February 2021 report, Defendants submitted a set of materials related to STS' Multi-Sensory De-escalation Room (MSDR) on 10/26/20, within the required timeline.

    At the beginning of 2021, the MSDR was used relatively frequently, though at a lower level than observed in previous months (i.e., about 25 uses per month, versus 40 in late 2020). The MSDR coordinator noted that many youth appeared to prefer other forms of de-escalation than the MSDR room. Between January and early March 2021, the MSDR room was used 57 times, and youth records for each event demonstrated that interventions proceeded through the anticipated course of gross motor, fine motor and cognitive activities. The original MSDR coordinator was reassigned in January 2021, and several other staff were trained to deliver the intervention.

    Unfortunately, when the HVAC project began in CMH (where one of the MSDR rooms was located), the MSDR program met some obstacles. The CMH room was temporarily closed, and the equipment was distributed to the various cottages so that "comfort rooms" could be utilized during the construction. Once CMH reopened, STS found that much of the equipment had been misplaced or broken. Furthermore, staff often reported difficulty bringing students to the building to use the MSDR in CMH because often, other youth—many of whom were also facing behavioral crises—were utilizing the dayroom or other common spaces in CMH. The MSDR room in CMH was then permanently closed.

    The MSDR room in the school building is available during the day and has a trained facilitator, but STS reported it is underutilized because youth typically want to leave the school building when

trying to de-escalate. Two staff members had also been trained to facilitate MSDR interventions after school hours and on weekends (using the MSDR room in the school building), but both staff members recently resigned. As a result, STS reported that the MSDR intervention was not utilized between early March and mid-September 2021. STS reports that revitalizing the spaces and training staff to facilitate the interventions is a high priority.

The *Behavior Management* policy requires the MSDR coordinator to notify a youth's therapist about any MSDR intervention that lasts beyond 30 minutes so that a change in treatment may be considered if necessary. Only one of the 57 MSDR events in January through March 2021 exceeded 30 minutes, but the youth's therapist was not notified. The *Behavior Management* policy also requires that MSDR usage be shared with the Multi-Disciplinary Treatment Team and Cottage Team to ensure continuity of care. The MSDR Coordinator shared a report with the MDT in January 2021, but not again throughout the monitoring period. Once the MSDR program has been revitalized, these procedures will need to be properly implemented.

**Recommended Compliance Rating**. Non-Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Revitalize the MSDR rooms on campus and ensure the availability of appropriately trained staff to deliver the intervention when needed by youth.
2) Ensure that a youth's treating clinician, multi-disciplinary team and cottage team is notified of MSDR usage so that the intervention can be integrated into the youth's treatment.

**Methodology**.
- Interviewed STS administrators
- Reviewed MSDR Log for January through March 2021, along with individual youth records for MSDR events
- Reviewed January 2021 Monthly MSDR report.

**MH-IV.D. Therapeutic Crisis Response Unit**
MH-IV.D.1 Crisis Response Unit. By 180 days from the effective date, BSTS will develop a short-term, crisis response and stabilization unit/program/space for students who experience significant emotional, physical or behavioral distress such that they cannot be safely managed in their cottage and require further assessment/evaluation, targeted and intensive skill development and/or extra therapeutic intervention or support to stabilize before returning to their normal cottage/programming.
–The Unit will be operated and facilitated by PMHD in conjunction with the BSTS TPA and TSD.
–Admission criteria will be based solely on acute mental or behavioral health needs such that it will not be used to manage safety and security concerns or act as a consequence or punishment for rule violations or negative behavior.
–Clinical services and interventions will focus on: intensive therapeutic and skill-building sessions based on immediate need or presenting concern; crisis or safety planning; increased therapy or skill-building sessions; ongoing clinical observation across settings, and therapeutic "wrap-around" meetings to reintegrate students into their cottage and programming as soon as they have stabilized or until a higher level of care can be obtained.
–This transitional, short-term program will be designed to adequately care for students who cannot regain the necessary emotional, cognitive or behavioral control needed to engage in typical programming or services despite attempts at de-escalation and skill building.

MH-IV.D.2. Crisis Response Unit Policy. By 180 days from the effective date, more detailed protocols for admission, services, documentation and oversight of this therapeutic crisis response unit will be documented in policy/procedure.

Findings.

*Policy.*

Defendants submitted draft policy *4C-07 Intensive Therapeutic Program* describing the crisis response unit ("ITP") to the Monitor and Plaintiffs' counsel on 2/8/21, within the required timeline. The draft policy was revised in response to input from the Monitor and Plaintiffs' counsel and submitted timely to the Court on 2/22/21. Neither the Monitor nor Plaintiffs' counsel had any objections to the final version of the policy. The Court approved the *Intensive Therapeutic Program* policy on 2/24/21 (dkt.391).

*Program Implementation.*

STS originally developed the ITP intervention as a self-contained program housed in Cottage 4 to address the needs of youth with significant mental health symptoms impacting their behavior and ability to adapt to the facility's general population. Between 3/1/21 and 6/30/21, a total of 19 youth were referred to the ITP program and assessed to determine if they were appropriate for admission. Of these, twelve youth were accepted and nine started the ITP program. Some youth were referred and assessed as not appropriate for ITP because the problem was primarily a behavioral issue, not a mental health issue. Other youth were accepted but did not start treatment because they either refused to participate or they were noted to have an improvement in behavior and/or a reduction in symptom expression following the referral.

STS clinicians developed treatment plans for the youth admitted to the ITP program that included clear, easy-to-understand goals with specific objectives that youth could understand. For example, "Goal:...not use physical aggression...Interventions:...develop coping skills he can use...when escalated...use the appropriate de-escalation rooms/staff 3 out of 5 times when escalated." This goal is easy to understand: this youth needs to learn coping skills and use them when escalated. The simple verbiage and streamlined construction of the ITP treatment goals, with the addition of objective measurements, is exactly the type of approach the Monitor/SME encourage for *all* STS treatment plans (discussed in MH-I.B, above).

The main concern with the ITP treatment plans is that although they designated the individual psychotherapy and groups that a youth would be assigned to during their time in ITP, the document did not designate the frequency with which a youth would be required to attend group or the frequency that they were to meet with their individual psychotherapist. These improvements should be relatively easy to make.

A review of progress notes associated with the youth's treatment while in ITP revealed that youth were seen frequently for individual therapy, often several times a week. However, clinicians need to improve the documentation regarding actual coping skills that were taught to the youth as well as information regarding the youth's utilization of these skills. Further, some of the same issues that plague treatment plans for youth in STS's general population were evident in the ITP plans as well, particularly the lack of cohesion between the treatment plan and youth's group participation. For example, per the treatment plan, Youth TD was assigned to the Power Source-Taking Control of Your Life group while participating in ITP. However, per a review of the progress notes associated with this ITP stay, the youth was attending COPE group and attended two of three sessions. This lack of

cohesion between the treatment plan and actual participation group therapies appears to be a systemic problem.

The SME interviewed 4 of the 9 youth who participated in ITP. While the youth indicated that they believed ITP was helpful and provided increased contact with a mental health therapist, they did not understand why, after leaving the ITP program, they did not continue or complete a specific group. Following discharge from ITP, the plan for each youth's reintegration into the general population's mental health treatment program should consider whether continuing the group modality in the general population would be beneficial to the youth to help maintain the progress achieved in ITP and should explain the decision to the youth.

ITP staff met weekly to review each youth's progress toward goal attainment and assessed their ability to safely transition back to their regularly assigned/general population cottage. When youth were exhibiting overall improvement, the ITP team developed a transition plan to guide their reintegration. A Wrap Around Meeting was observed regarding three youth participating in the ITP program. Per the discussion, the staff (including the MHA, mental health clinicians, cottage personnel and education staff) were clearly aware of the youth's individual dynamics and the tension among youth assigned to the ITP. Staff members engaged in detailed discussions regarding appropriate treatment modalities for each youth.

As noted above, the ITP program was originally opened as a specialized program in its own cottage. However, the YSW staffing complement for this program had very slim margins. When two staff became unavailable to work in July 2021,  STS had to close the ITP cottage and modify the approach for youth receiving ITP intensive services. Currently, these youth receive ITP services in a day programming format, while sleeping in their regularly assigned cottage. This closure is intended to be temporary, although a date to re-open the ITP cottage has not been identified. A review of mental health records revealed that the two youth who were placed in the ITP "day program" appeared to be benefitting from treatment and responding positively to the structure of their individualized plans.

The needs of certain youth requiring intensive mental health care *can be* met while they are housed in a General Population housing unit, with their treatment and daily schedule guided by an individualized plan. This "day treatment" approach is tantamount to an intensive outpatient program in the community, where a person receives structured treatment during the day and returns to their home at night. This level of care is appropriate for some but may not be effective for all youth. Some may require a more immersive experience, specifically may need to be separated from other youth who may interfere with their treatment. This would require ITP services in a self-contained cottage for a true immersive experience, with the option for psychiatric hospitalization via the 229 Toolkit if a youth decompensates. When STS reopens the self-contained program, STS youth will have access to each of these options.

### ITP Staff's Perceptions.

Staff interviews revealed a variety of problems with the ITP when it was open in Cottage 4. Cottage staff (YSWs) previously assigned to the ITP program described the ITP program as "chaotic and inconsistent...we were unsure why kids were coming in or what their treatment was...the meetings with mental health were inconsistent as they generally saw the kids while they were at school...in the beginning, there were great plans, but they didn't materialize...then about three months before it closed, we stared to lose staff...there were lots of issues with the kids and as staff didn't feel safe or supported, they left...it was like we had no tools...staff weren't all trained in ART [Aggression Replacement Therapy]...so it was a chaotic system and on top of that the kids had mental illness."

ITP cottage staff were asked for their perceptions regarding an appropriate staffing complement for an ITP cottage. They suggested "dependable YSWs; holding firm boundaries with youth and staff; we need to actually follow the policy, the practice needs to match the policy; it is a mental health program that had a therapist that was only there three days a week…the mental health staff need to be on the unit and available; the kids need to transition out of the program faster…like when they hit their sweet spot; and they need more structured activities, they were watching television and movies…and they would do that instead of going to school."

Interviews with ITP mental health staff revealed a different perspective. The clinicians reported they had good, collaborative relationships with cottage staff, that the YSWs were properly trained in the program and that all staff were aware of the need for structured activities.

These divergent viewpoints illustrate some of the difficulties experienced with the introduction and integration of a full mental health program in a facility where mental health was previously non-existent. The decision to transition ITP from a fully immersive program to a day treatment program was wise, pending the stabilization of staffing patterns and team building among cottage and mental health staff identified for the ITP program. STS reports it has identified a group of staff who will be assigned to the ITP program, when/if it returns to a self-contained program. The SME interviewed these staff and found them to be seasoned and well-aware of the need for consistency, firm boundaries, and structure associated with a program like ITP. Clearly, any subsequent implementation of the ITP program can benefit from these perspectives, and STS appears to have seen the temporary closure as an opportunity to make the necessary improvements.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Determine whether the ITP day program is sufficient to meet youth's needs or whether a self-contained ITP program is needed.
2) Ensure consistency between the youth's ITP treatment plan and services provided.
3) Ensure continuity of therapeutic experiences following transition from ITP.

**Methodology**.
- Reviewed ITP policy and procedure
- Reviewed mental health records for youth admitted to ITP
- Observed of Wrap Around meeting
- Interviewed YSWs and mental health clinicians assigned to the ITP program
- Interviewed youth who participated in the ITP program

**MH-IV.E. Hospital Level of Care**
MH-IV.E.1. Multi-Agency Coordination. By 60 days from the effective date, the DHS MHDS—Facilities Division/Central Office will coordinate with the MHDS—MH Institutes, county attorney associations, Hardin County Attorney (where BSTS is located) and University of Iowa Hospitals and Clinics regarding the procedures for transfer of a student to a hospital level of care for further evaluation or treatment as needed.
MH-IV.E.2. Toolkit. By 90 days from the effective date, BSTS will develop a toolkit and procedures consistent with Iowa law and relevant stakeholder input for referring students to a hospital level of care if, due to a MH diagnosis/crisis/decompensation, they are unable to be safely and effectively restored to a state where they no longer pose a serious and immediate risk of harm to self or others.

**Findings**.

       As noted in the Monitor's February 2021 report, Defendants developed a "229 Toolkit" to assist with the referral of a youth to a hospital level of care if STS is unable to safely house a youth due to a mental health diagnosis/crisis/decompensation. The Toolkit provides clear guidance regarding admission, discharge and exclusion criteria, and includes the variety of documents needed to refer a youth to University of Iowa Hospitals & Clinics (UIHC) from STS. The Toolkit also includes "Instructions for Completing a Section 229 Application[14] Alleging Serious Mental Impairment" (memo from the Iowa Assistant Attorney General dated 4/16/2020), a quick guide to the steps (revised 10/20/2020), and the Section 229 Application itself.

       Between January and June 2021, three youth were referred for care at a psychiatric hospital. Referral packets for all three youth revealed adherence to the requirements of the Toolkit, and contained a complete record of STS's concerns. All three youth were admitted for psychiatric evaluation. Two youth were also treated by the Mental Health Institute (MHI) for approximately one month and then returned to STS for outpatient treatment. The other youth was evaluated by MHI and deemed not to be a danger to self or others, which precluded the Court from making the legal finding that the youth was "seriously mentally impaired." The youth was returned to STS after 5 days. STS obtained discharge summaries for each of the three youth to inform their transition to STS.

       In summary, the 229 Toolkit appears to have accomplished its stated purpose of facilitating access to psychiatric evaluation and treatment for youth at STS who appear to need a hospital level of care.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed evidence of correspondence and 229 Toolkit packets for three youth referred for hospitalization

---

**MH-IV.F. Suicide Prevention Policy & Procedure**
MH-IV.F.1. Suicide Prevention Policy. By 30 days from the effective date, BSTS will revise *Policy 4C-03 Suicide Prevention/Intervention* to include, among other things,
–protocols for contacting a PMHD during business and non-business hours;
–developing and implementing individual crisis/safety plans;
–protocols for engaging students in therapeutic or skills-based interventions designed to address the underlying issues of their self-injurious or suicidal behavior; and
–requirements for tracking data on suicide watch that are needed for quality assurance, quality improvement and oversight.
Upon revision and approval this policy will be used as a stand-alone doctrine until the larger two-prong crisis intervention model is developed and implemented.

---

[14] "Section 229" refers to Iowa State Law Chapter 229, which provides procedures by which individuals with mental illnesses, both adults and juveniles, can be hospitalized. This chapter includes both voluntary and involuntary commitments.

MH-IV.F.2. Staff Training on Suicide Prevention. Within 90 days from the effective date, BSTS shall provide position-specific training to all staff on *Policy 4C-03 Suicide Prevention/intervention*. Training will include:
–recognizing suicide warning signs and risk factors
–referral, evaluation, treatment, housing and monitoring for specific watch levels
–interdisciplinary communication, intervention and follow-up.
MH-IV.F.3. Post Suicide Prevention Policy Notice. Within 24 hours of this policy being adopted, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting and approved by both Parties.

**Findings**.

Policy *4C-03 Suicide Prevention and Intervention*, which was approved by the Court on 7/27/20 (dkt. 354), remains in effect (**objective MH-IV.F.1 "Suicide Prevention Policy"**). A notice informing youth about "observation status," assessing youth's risk of self-harm, mental health staff's 24/7 availability, and restrictions on the use of room confinement was posted on 8/10/20, after receiving input from the Monitor and Plaintiffs' counsel (**objective MH-IV.F.3**). Although the Remedial Plan does not require an annual review of this policy, STS submitted proposed revisions to the Monitor/Plaintiffs' counsel on 9/14/21. The Monitor conferred with Plaintiffs and provided feedback on proposed changes to Defendants in early October 2021.

Regarding **objective MH-IV.F.2 "Staff Training on Suicide Prevention,"** position-specific training was initially provided to all STS staff in June/July/August 2020 and to STS Mental Health clinicians in October 2020, both within required timelines, as discussed in the Monitor's February 2021 report. The Remedial Plan does not have a specific requirement for annual refresher training on this topic, but the *Suicide Prevention and Intervention* policy requires pre-service training for new staff, annual refresher training for existing STS staff, and training for mental health clinicians on suicide risk assessment.

Of the 36 staff hired to youth-facing positions since November 2020, all (100%) completed the suicide prevention module during their pre-service training and completed a proficiency exam. Of the 145 staff on STS's staff roster as of 6/30/21,[15] 93% (all but 10 staff) were current with suicide prevention annual training for 2021 and completed a proficiency exam. STS provided refresher training to the mental health clinicians on 10/13/21, in compliance with the annual training requirement for suicide risk assessment. All clinicians participated and each completed a proficiency exam to demonstrate their understanding of the material.

**Implementation** of this policy is discussed in MH-IV.B "Suicide Prevention and Intervention," above.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
   1)   None.

**Methodology**.
   •   None needed.

---

[15] The Monitor excluded certain staff who are not in student-facing positions from STS' 6/30/21 staff roster when assessing compliance with training provisions. For example, Accounting, Clerk, Custodial, Human Resources, HVAC, Maintenance, Reception, Secretary, Typist, etc. were excluded. Of the 173 on the STS staff roster, 145 staff (84%) were included in analyses related to training completion (e.g., YSWs, YSTs, Educators, Psychologists, Cottage Counselor, Cottage Director, Social Worker, Nurse, etc.).

**MH-V. Injunctive Relief Required by Court Order**: For students receiving mental health treatment at the school, attempt to arrange for mental health care services in the community so students may continue their treatment upon discharge.

**Goal of the Remedial Plan**: BSTS shall engage in a practice that is implemented and defined by policy and procedure, where a PMHD connects with existing discharge and transition planning teams/functions at BSTS to advance continuity of care and ensure that transitionary services earnestly attempt to arrange mental health care services in the community upon discharge.

**MH-V.A. Discharge Planning Policy & Procedure**

MH-V.A.1. Discharge Summaries. By 30 days from the effective date, BSTS will establish protocols for creating standardized mental health treatment progress reports and discharge summaries for the Mental Health Department to share with the student's cottage counselor to include in their discharge planning and transition efforts. These protocols will include appropriate limitations on information being shared. This practice is designed to inform the type of mental health care services that the student may need upon discharge.

MH-V.A.2. MH Services Policy—Discharge. By 30 days from the effective date, BSTS shall include in their Mental Health Service policy, protocols for discharge planning and coordination for students receiving mental health treatment. This policy will require that a mental health discharge summary/plan be created for students that receive mental health (therapy or psychiatric) treatment at BSTS so they may provide it to a community provider upon discharge.

MH-V.A.3. Related Policies—Discharge. Re By 60 days from the effective date, BSTS will review and revise, as needed, other discharge related policies to ensure that
--transition/discharge efforts include identification of community partners and funding sources, including but not limited to juvenile court officers, representatives of the appropriate MH region, and managed care organization care coordinators,
--disbursement of reasonable (e.g. 30 day) supply of medications for those prescribed
--scheduled appointments with community mental health providers; and
--exchange of MH information for appropriate follow up care.

MH-V.A.4. Staff Training on Discharge Policies. By 120 days from the effective date of the policies noted above, BSTS shall provide training to PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

Findings.

       **Policy.** Policy *4C-01 Mental Health Services* includes requirements for therapists to create a Mental Health Discharge Summary, submit it to STS' social worker who creates the Community Transition Plan, and the youth's Cottage Counselor who incorporates the information into the youth's Interdisciplinary Care Plan/Discharge Summary. This policy was approved by the Court on 10/27/20 (dkt. 362) and remains in effect. The Remedial Plan requires the *Mental Health Services* policy to be reviewed annually, which was completed within the required timeline as discussed in MH-I.D, above. The variety of tools utilized for discharge planning are described in the Monitor's February 2021 report at pgs. 39-41.

       **Training.** All STS staff received initial training on the *Mental Health Services* policy and *Student Health Records* policy as discussed in MH-I.D and MH-III.A, above. Also, in November/December 2020, key staff (Mental Health staff, social workers, Cottage Counselors and Cottage Directors) were trained

on the Discharge Summary procedure and the rules for creating, accessing and distributing confidential youth information, including that required for discharge and transition planning. All initial trainings were provided within required timelines, as discussed in the Monitor's February 2021 report.

The Remedial Plan does not have a specific requirement for annual refresher training on this topic and the training requirements within the relevant policies differ. Issues with training are therefore discussed within the relevant provisions and not repeated here (see MH-III.A regarding *Student Health Records* and MH-I.D regarding *Mental Health Services*). Also note that some relevant training is provided under MH-VI.C "On-Going Training for Mental Health Staff," below.

**Implementation.** A total of 22 youth were discharged from STS between 1/1/21 and 6/30/21. Of these, 17 were discharged to their parent/guardian, 3 were discharged to a residential program, and 2 were discharged to jail (they were awaiting trial on charges in the adult criminal justice system). All but one was on the mental health caseload.

Full discharge records were reviewed for 14 of the 22 youth who were discharged (64%). The quality and completeness of the Mental Health Discharge Summary have improved compared to the prior review. All summaries included the youth's diagnoses, medications and dosage, goals and objectives, and a summary of the youth's treatment progress. While the summaries varied in quality, all were individualized and provided a sense of the youth's level of engagement and spoke to the skills developed in therapy.

Community Transition Plans evidenced some improvement, but still lacked important information regarding referrals for mental health treatment to promote continuity of care. This is what is driving the recommended Partial Compliance rating. The full titles of youth's diagnoses were provided, and the names of medications continue to be listed. However, for 9 of the 14 youth (64%), follow-up appointments with community mental health providers were not attempted/scheduled, nor was a list of community mental health providers with contact information included. Further, the required dosage and frequency of administration of the youth's medications was not provided and in a few cases the medication information on the Transition Plans conflicted with the Mental Health Summary and/or the most recent Psychiatric Progress Note. Also, the Community Transition Plans still do not indicate whether the youth was provided medication upon release or whether a prescription was written to be filled at a local pharmacy. Although psychiatric services were deemed adequate by the Court at the time of trial, the Remedial Plan's language for this provision requires discharge planning for youth receiving "therapy or psychiatric treatment" along with particulars about the youth's medications to promote continuity of care. Furthermore, the inclusion of this information in the Community Transition Plans is necessary to achieve the goal of a comprehensive report that includes all facets of the youth's mental health treatment as STS.

While the Mental Health Discharge Summaries have improved and are now adequate, the Community Transition Plans continue to be insufficient to effectively support a youth's reentry to the community and to facilitate continuity of care. Additional training and oversight for the developers of the Community Transition Plans is encouraged. DHS/STS has also discussed making wholesale changes to the service planning process (*i.e.*, transitioning to a Master Service Plan, rather than the variety of plans that are referenced above) that would impact the discharge planning process. The Monitor supports changes that better integrate the perspectives of all disciplines working with the youth and encourages DHS/STS to consider the requirements of this section of the Remedial Plan when structuring any changes to the discharge/transition process and documentation.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that Community Transition Plans include the required information regarding attempts to schedule appointments with community mental health treatment providers, contact information for community providers and youth's medications.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Interviewed STS staff about discharge planning
- Reviewed STS Discharge List for 1/1/21 to 6/30/21, along with Clinical Discharge Summaries, Treatment Plans, Psychiatric Provider Notes, Cottage Discharge Summaries and Community Transition Plans for 14 of 22 youth

---

**MH-VI. Injunctive Relief Required by Court Order: Provide institutional oversight and structural coordination of the School's MH program.**

**Goal of the Remedial Plan**: BSTS shall develop a two-tiered continuum of quality assurance, quality improvement and oversight by BSTS and DHS/MHDS Facilities-Central Office that focuses on (1) supervision and training; (2) in-person and data-based observation and monitoring; and (3) review of records/documentation. Overall, this approach will be designed to ensure compliance with relevant MH policy and procedure; ensure MH services are consistent with current, generally accepted professional standards of care for identifying clinical needs, developing integrated MH treatment plans, providing effective psychotherapeutic interventions, safeguarding clinical documentation and records, responding effectively to suicidal/self-harm crises, and coordinating MH care upon discharge to the community, and ensuring that the appropriate corrective steps are implemented.

---

**MH-VI.A. Oversight, Observation and Monitoring**
MH-VI.A.1 Mental Health Authority. A Director of the BSTS Mental Health Department/Mental Health Authority shall be employed to ensure the following:
--organize and oversee the deployment of mental health services at BSTS
--be responsible for the accessibility, timeliness and quality of the mental health treatment program
--liaison with medical/nursing and direct care staff to ensure continuity and integration of care
--arrange and coordinate levels of care, such as crisis and on-call services and coordination with outside providers/agencies
--ensure effective communication between direct care, mental health, medical/nursing and administrative staff
--oversee the development of mental health policies, procedures and programming
--coordinate staff training
--supervise PMHD
MH-VI.A.2 DHS—Clinical Oversight. The Clinical Director for Psychology and Mental Health Therapy Services at DHS Office of Facility Support-Central Office shall
--coordinate with the BSTS MHA at least monthly and shall be available for clinical consultation as needed
-- assist in identifying needs, developing programming and staff training
--facilitating quality assurance, improvement and oversight.

> MH-VI.A.3 DHS Monthly Visits. MHDS Facilities Division Administration or Office of Facility Support-Central Office staff will visit the BSTS on a monthly basis to oversee mental health treatment program operations, meet with members of the leadership team, meet with other staff and meet with students. Visits and related oversight observations and actions shall be documented.

**Findings**.

Regarding **objective MH-VI.A.1 "Mental Health Authority,"** a Mental Health Authority (MHA) was employed at STS throughout the monitoring period. The job description was originally drafted in May 2019 and revised in December 2020 to realign the position under the Deputy Superintendent (the MHA originally reported to the Superintendent). The job description and reporting structure remain unchanged from the Monitor's February 2021 report.

The MHA is highly competent and well respected among her staff. She is meeting her responsibilities but is also stretched very thin given that she provides clinical leadership, facilitates treatment meetings, ensures the clinical adequacy of the program, leads program development efforts, trains and supervises the clinical staff, manages employees, is the liaison to both the Clinical Director and the Monitor/SME, is an active member of the facility's Administrative Team, and frequently conducts crisis management with individual STS youth. The Monitor/SME recommend greater specificity in the oversight of youth treatment plans and progress notes to address the issues discussed throughout this report.

DHS's Clinical Director has been employed since August 2019 and continues regular coordination with the MHA (**objective MH-VI.A.2 "DHS-Clinical Oversight"**). The Clinical Director and MHA maintained standing telephone/videoconferences on the 2nd/4th Friday each month, in addition to "open-door" consultations as needed. Thirteen such sessions were documented between January and June 2021. The Clinical Director and MHA have a good connection, appear to communicate well and have mutual respect for each other's clinical abilities. Most importantly, the MHA reports that the Clinical Director is both helpful and available.

In addition, the Clinical Director made a total of 12 visits to STS during the January-June 2021 reporting period, at least once per month. During those visits, the Clinical Director:

- Met with the MHA, Lead Psychologist, staff psychologists, STS leadership, cottage staff, educators and social workers.
- Provided oversight and technical assistance to the clinical staff by consulting on specific cases, facilitating skill development among clinicians and social workers, observing group treatment, attending MDT meetings, attending weekly ITP meetings, and coordinating care for youth returning from psychiatric hospitalization.
- Attended to the coordination of cottage life and mental health services by observing youth's Weekly Evaluations (conducted by Cottage Counselor/Director), observing ART groups, participating in team meetings about particularly challenging youth, facilitated ongoing strategic planning for a program for youth with frequent aggressive behaviors, and attended all-staff Town Hall meetings.
- Helped to develop DHS's Quality Assurance indicators, methodology and metrics for Mental Health.

In short, the Clinical Director fully met the responsibilities articulated in the Remedial Plan.

Regarding **objective MH-VI.A.3 "DHS Monthly Visits,"** DHS's Facilities Division Administrator for Mental Health and Disability Services (Division Administrator) visited STS seven times during January-

June 2021, at least once per month. The substance of each visit was documented and submitted to the Monitor for review. Key activities included:

- Meeting with facility leadership to discuss personnel concerns, YSW retention, PREA reporting, ACA accreditation, joining the PbS program;
- Walking through each living unit and facility program and conversing with students and staff;
- Oversight of physical plant improvements/maintenance projects;
- Discussing the quality assurance program required by Remedial Plan;
- Participating in strategic planning to address the needs of youth with frequent aggressive behaviors;
- Attending staff Town Hall meetings to discuss facility improvements, Remedial Plan/Monitor's site visits, and COVID-19; and
- Accompanying the Governor and legislative staff as they toured STS.

This level of engagement with the DHS Division Administrator meets the requirements of this provision.

The MHA, Clinical Director and Division Administrator also consulted with the Monitor/SME on several occasions, participated in a conference with Monitor/Plaintiffs, and were on site for each of the Monitor's site visits.

**Recommended Compliance Rating**. Substantial Compliance.

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed MHA job descriptions/revisions
- Reviewed meeting schedules
- Reviewed notes from DHS administrators' site visits
- Interviewed MHA and Clinical Director regarding their roles/collaboration
- Observed interactions among STS administrators and DHS administrators

---

**MH-VI.B. Quality Assurance Policy & Procedure.**
MH-VI.B.1 Quality Assurance Policy & Procedure. By 9 months from the effective date, BSTS and Central Office will collaborate to develop a quality assurance improvement and oversight policy and procedure that:
(a) Involves a two-tiered audit process, the first occurring at BSTS and the second at Central Office level. The frequency of audits at both levels will be designated in policy.
(b) Establishes standards for practice and performance metrics to be developed for MH treatment services and RC.
(c) Establishes protocols for tracking and analyzing data with sufficient particularity to identify trends across, among within and or regarding MH services, as well as RC and Restraint.
(d) Establishes protocols for the development, implementation and dissemination of staff training and/or corrective action plans to address problems identified through the quality assurance, improvement and oversight process.
VI.B.2 Annual Review. Policy shall be reviewed at least annually and updated as needed.

**Findings.**

The original due date for this objective was 4/26/21, nine months from the effective date of the Remedial Plan. Defendants submitted a draft *Quality Assurance* policy to the Monitor/Plaintiffs' counsel within the required timeline. The policy described the audit procedure and included a set of quality assurance indicators (i.e., standards of practice) for mental health care, behavior management, room confinement and restraints and also included several other topics not related to the Remedial Plan (e.g., administration, nursing). The Monitor asked Defendants to produce a set of metrics by which performance on each of the mental health, discharge planning, behavior management and room confinement quality assurance indicators would be measured and suggested that a six-month extension to the original timeline would be prudent. Defendants filed a motion to extend the deadline for the *Quality Assurance* policy, indicators and metrics to be submitted to the Monitor/Plaintiffs' counsel by 11/10/21, with a two-week comment/revision period before submitting the materials to the Court on 11/24/21. The Court approved this request on 5/10/21 (dkt. 397).

DHS/STS has developed a comprehensive quality assurance (QA) structure that should not only create an internal capacity to identify and solve problems related to staff practice and youth outcomes but that also, if properly implemented, bodes well for the sustainability of reforms required by the Remedial Plan. The QA structure includes:

- A comprehensive set of quality assurance indicators (QAIs) that clearly identify practice standards;
- A robust methodology for each QAI that combines document review, staff interviews, youth interviews and/or direct observation;
- A variety of metrics that make tangible the extent to which practice standards are being met; and
- A protocol for identifying deficiencies and developing and implementing corrective action.

Defendants submitted the draft Quality Assurance indicators, methodology and metrics to the Monitor and Plaintiffs on 10/22/21, well in advance of the required timeline. Once the policy is approved by the Court, the Monitor will begin to assess the quality of implementation of the Quality Assurance program and will include findings in subsequent reports to the Court.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Implement the Quality Assurance policy by conducting regular audits, identifying deficiencies and developing and implementing appropriate corrective action.

**Methodology**.
- Reviewed and provided feedback multiple drafts of QA policy, indicators and metrics.
- Consulted with Plaintiffs' counsel about initial policy draft.
- Interviewed DHS/STS staff involved in developing the policy.

**MH-VI.C. Ongoing Training**
MH-VI.C Ongoing Training. By 180 days from the effective date, BSTS shall develop a training or didactic program/policy for psychotherapists (Psychologist 1, 2 and 3) in the MHD designed to advance their clinical expertise in providing evidence-based psychotherapy to adolescents in the JJS.
--For fully licensed professionals, proof of relevant continuing education credits may help fulfill this training requirement.

--Temporary/provisionally licensed professionals may use their licensure based clinical supervision to fulfill part of this training requirement.
--Non-licensed professionals shall be required to fulfill this training program by participating in training or didactic sessions as described in policy.

**Findings**.

Defendants submitted a plan for ongoing training for psychotherapists to the Monitor/SME on 1/25/21, within the timeline required by the Remedial Plan. The draft was revised to incorporate suggestions from the Monitor/SME to ensure the requirements made clear the distinction between continuing education credits (which are typically earned for participating in courses related to general therapeutic skill development and are required to maintain licensure) and STS-specific training (which focus on developing clinician's mastery of STS procedures and working with the particular circumstances of STS youth and are required as a component of one's employment at the facility). The "Training Requirements for STS Clinicians" was finalized on April 16, 2021.

STS psychotherapists who hold active licenses are required to complete all continuing education hours of credit as required by the Bureau of Professional Licensure to keep their licenses current. Typically, this requires 40 hours of education over a two-year period. In addition, fully licensed clinicians are required to complete all facility-specific training, even if the training hours do not count toward the licensure-based continuing education requirements.

STS clinicians who are not permanently licensed must completed 20 hours of relevant continuing education each year (e.g., workshops, conferences, symposiums, webinars), with at least 1 hour in Ethics. As many as 10 of the 20 hours may be fulfilled by attending facility-specific training that is related to the provision of mental health services (e.g., PREA, Suicide Prevention, Suicide Risk Assessment, Trauma, Behavior Management, Discharge Planning, etc.). Specific training courses may also be prescribed by the MHA or primary supervisor, based on clinician's individual needs.

Because the requirements were promulgated partway through CY2021, they will go into effect beginning with the CY2022 performance evaluation period. Once a critical mass of staff has received their CY2022 evaluations, the Monitor will assess compliance with the professional development requirements.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Annually assess the extent to which each mental health clinician has met the continuing education and facility-based training requirements.

**Methodology**.
- Reviewed drafts and provided feedback to draft "Training Requirements for STS Clinicians"
- Consulted with Clinical Director

## SECLUSION AND RESTRAINTS

> **RC-I Injunctive Relief Required by Court Order: Defendants must ensure the School only employs use of BSU or the seclusion room in situations where a student' behavior poses a serious and immediate risk of physical harm to any person.**
>
> **Goal of Remedial Plan**: BSTS shall adopt a practice that is implemented and defined by policy and procedure and supported by staff training and oversight that uses room confinement ["RC"], regardless of building/location, as a time-limited, last resort to help students de-escalate or "cool off" in situations where they pose a serious and immediate risk of physical harm ["SIRH"] to a person when less restrictive interventions have been attempted and found unsuccessful or would be unsafe or otherwise inappropriate given the student's acute risk.

> **RC-I.A Seclusion Policy**.
> BSTS policy *5B-04 Behavioral Stabilization Unit (BSU)* which specifies the protocols for using seclusion will be revised in the following ways:
> (a) Name and focus of the policy will be revised to include a general reference to "room confinement" (RC) and not a singular location of room confinement, such as the BSU. The policy will be named *4C-06 Room Confinement*.
> (b) Clarify that the use of RC, regardless of space or building where it occurs, must be based on a SIRH to a person, may not be used as a disciplinary sanction, and may not be used for destruction of property or theft.
> (c) Clarify that the use of RC for "insubordination" and other forms of non-compliance with rules will be rare and grounds for RC only if non-compliance involves a SIRH to a person.
> (d) Clarify that inciting or agitating others may be grounds for RC only if it creates SIRH. If so, incident report shall (i) demonstrate the serious and immediate nature of the risks as described by the student's speech or action; and (ii) include a statement from the agitated/incited student describing the incident and its impact on his behavior. Statement created away from BSTS staff and all versions shall be in incident report.
> (e) Clearly note that the purpose of RC is to provide the student an opportunity to "cool off" and return to his normal cottage programming.
> (f) Include the expectation that staff member be present with the student, either in or out of a room depending on the circumstances, to verbally assist the student in de-escalation, and to document the de-escalation efforts or interventions that were made to assist the student in regaining behavioral control as soon as possible.
> (g) Include the expectation that student be removed from RC as soon as the student is calm, and no later than 1 hour, unless staff working with the student determines he is likely to engage in behavior that poses a SIRH.
> > (i). Staff will be provided guidance via policy and staff training on how to effectively identify and assess SIRH and how to effectively help a student de-escalate.
> > (ii) If staff determine that the student continues to present a SIRH after 1 hour, they shall immediately contact administrator for guidance and authorization as well as a PMHD who will meet with the student ASAP baring conflicts with other clinical duties, consistent with the 24/7 coverage plan in the MH treatment section above.

       (iii) The PMHD will work with the student to restore him to a state where he no longer poses SIRH. Protocols for such engagement will be noted in the two-pronged crisis intervention protocol and in the interim in the *Suicide Prevention/intervention* policy.

(h) Prohibit keeping a youth in RC overnight, including for administrative staffing purposes.[16]

(i) Include the aggregation or accumulation of time spent within two hours of an earlier release from RC toward the one-hour limit.

(j) Include the requirement that students placed in RC provide a report in their own words describing the behavior that resulted in the RC and include protocols for securing and recording such reports for internal/external review.

(k) Include the identification of student and staff witnesses in the RC report, which will include adequate protections from reprisal for student witnesses.

(l) Include requirements that BSTS continue to track time spent in RC; that such data be tracked both individual and aggregate; that BSTS reports it to Central Office on a monthly basis per continuum of quality assurance.

**Findings**.

*Policy*.

       Policy *4C-06 Room Confinement*, which was approved by the Court on 7/27/21 (dkt. 354), includes all of the required elements and remains in effect. Although not specifically required by the Remedial Plan, STS conducted an annual review of the policy during the first week of September 2021. The managers for each policy area completed a survey that asked about challenges to executing the policy, areas that need revision, whether oversight is appropriate, people who should be consulted regarding proposed revisions, and responsible parties for implementation and performance issues. On 9/14/21, Defendants submitted proposed revisions to the Monitor and Plaintiff. The Monitor consulted with Plaintiffs and provided feedback on the proposed revisions to Defendants in early October 2021.

*Training*.

       All STS staff were trained to implement the *Room Confinement* policy in August/September/October 2020, as discussed in the Monitor's February 2021 report. The Remedial Plan does not have a specific requirement for annual refresher training on this topic, nor does the *Room Confinement* policy and thus the Monitor has not included this information in the report. However, the Monitor considers training (both formal and on-the-job coaching) as one of the factors impacting current practice when assessing the quality of the implementation of relevant policies. Multiple STS administrators and staff referenced on-going coaching and weekly audits of the quality of implementation of the *Room Confinement* policy.

*Implementation*.

       The Monitor assessed performance levels related to the use of room confinement by reviewing aggregate data and room confinement records and by interviewing STS staff and youth. Between January and June 2021, room confinement was used 438 times, for an average of 73 per month (range of 34 to 108 events per month). Monthly use was higher than the level reported in the Monitor's February 2021 report (Oct/Nov 2020 averaged about 32 uses per month), but far lower than the levels

---

[16] This portion of the Court Order (IV.B.2(2)(e)(v), p. 109) and Remedial Plan (IV.A(1)(h), p. 18) was revised to permit STS to use CMH as a residential unit for the purpose of operating a pilot program in that space. The requirements of that negotiated amendment are discussed in the newly added RC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," below.

witnessed in the months just prior to the new policy being issued (June/July 2020 averaged about 206 uses per month). STS has also reported extensive use of its less restrictive option—"de-escalation"— which involves staff working with a student one-on-one to reduce risk. This could occur while walking or driving around campus, sitting alone in a dayroom or other common space, or other location where the youth is *not* confined in a locked room. STS data on de-escalations show that this type of intervention occurs far more frequently than the use of room confinement (as many as 10 times more often in some months). This underscores the level of disorder at the facility but also indicates that the facility does *not* resort to the use of isolation to address all negative behavior, and instead relies on less restrictive options when it is safe to do so.

Room confinement events tend to be quite short with an average length of stay of just 21 minutes. Duration ranged from 1 minute to 224 minutes. Just 14 of the 438 events (3%) lasted longer than 60 minutes. These durations are quite similar to those reported in the Monitor's February 2021 report and reflect both youth and staff's statements that youth return to their cottage/school from room confinement "after about 15 or 20 minutes." While it is positive that youth are de-escalated and are released from isolation quickly, as noted in the Monitor's June 2021 report, some youth's quick return to full programming (particularly after an assault) likely contributes to the perceived lack of safety, fear and distress reported by many staff and some youth. The Monitor continues to advise that STS utilize Reintegration Plans (which are permitted by current policy) more often in order to pace the youth's return to full programming so that both the youth who originally posed a risk of harm *and* the receiving staff and youth are fully prepared to safely return to programming. A few staff reported that Reintegration Plans are sometimes difficult to implement because staff need to be available to monitor and supervise the youth if they are to engage in activities separate from the larger group.

Similar to what the Monitor reported in February 2021, between January and June 2021, a small number of youth continued to be involved in a disproportionate number of room confinement events. A total of 11 youth were involved in 15 or more events during the time period. Together, they accrued 274 of the 438 room confinement events, or 63% of the total. This underscores the need for STS to develop an effective program for safely managing youth with frequent externalizing behaviors. If the need for room confinement could be substantially reduced among those with high usage, not only would the youth and staff benefit from increased safety, but STS would also experience relief from this staff-intensive procedure.

To assess the extent to which specific policy requirements and protections were properly implemented, the Monitor analyzed room confinement packets for 68 of the 438 events (16%) that occurred between January and June 2021.[17] Various elements of practice have improved from the Monitor's prior review, likely due to the multiple levels of oversight and extensive staff coaching conducted by various STS administrators/supervisors.

- The serious and imminent threat of physical harm was adequately described in 85% of the packets reviewed (58 of 68 packets). This has improved significantly since the previous review when only 60% of the packets reviewed included an adequate description.

- The staff who initiated the room confinement and who observed the youth while in room confinement were identified in 100% of the packets reviewed (compared to 87% from the Monitor's previous review).

---

[17] The sample included a random selection of 45 of the 65 events from June 2021; 7 events that lasted longer than 60 minutes from March-June 2021; and 16 events involved in the 7 cases where subsequent room confinement events accumulated to longer than 60-minutes.

- <u>Youth witnesses are not routinely identified in Incident Reports</u> that accompany the room confinement forms. STS reported it is working to adapt its incident reporting software to capture student witness information in the event it is needed for an investigation into youth or staff behavior.

- Staff witnesses were identified in 100% of the Incident Reports reviewed.

- 15-minute checks, behavioral observations and verbal statements were properly recorded in 85% of the packets reviewed (58 of 68 packets; approximately the same as in the Monitor's previous review). This section of the form also provided evidence that youth were released from room confinement once the imminent threat had dissipated (i.e., when during the check, the staff indicated "no" on each of the three criteria—disturbing behaviors, making threats, aggressive behaviors).

- Efforts to de-escalate the youth were adequately described in 74% of the packets reviewed (50 of 68 packets reviewed; compared to 68% from the Monitor's previous review). <u>The remaining 26% tended to only name the technique(s) used, without describing the youth's response or the verbal exchange</u> (e.g., "asked what happened" without indicating what the youth reported; "used problem-solving" or "active listening" without documenting what the youth was saying). Staff should be encouraged to capture the interaction in more detail so that the youth's perspective is better preserved.

- The facility changed its practice for obtaining youth statements. Previously, the Cottage Counselor attempted to obtain a statement multiple times the following day, but very few youth agreed to submit one. In the June 2021 records, the staff who monitored/de-escalated the youth while in room confinement requested a statement at the conclusion of the event. This resulted in a few more youth sharing their perspectives, sometimes dictating the statement to staff and then signing the form. Low response rates from youth who spend time in isolation is very common in the Monitor's experience. STS's practice of conducting a youth debriefing following all restraints and including a summary on the Restraint Report is another way that youth's perspectives were included in the room confinement packets. This change is aligned with generally accepted practice and should be incorporated into the upcoming policy revision.

- Administrative reviews were timely (i.e., within one business day if the duration was an hour or longer, within two days if the duration was less than one hour) in 100% of the packets reviewed (compared to 90% from the Monitor's previous review).

- In nearly all of the packets reviewed—even for events that were quite short—multiple staff (YSWs, YSTs, mental health clinicians) were present and helped the youth to regain behavioral control.

- In June 2021, three youth remained in room confinement after 9pm, but in all cases, once the youth was released from room confinement (all were released before 10pm), staff identified the cottage to which the youth was transported for sleeping. When interviewed, both youth and staff reported that youth do not remain in room confinement overnight.

In response to objective RC-1.A (d), the Monitor also investigated the extent to which STS complied with policy requirements regarding the use of room confinement with youth who were alleged to be rioting/inciting a riot. A total of 28 youth received an infraction for rioting/inciting between January and June 2021, and 13 of the 28 (46%) were also placed in room confinement.

However, a review of the incident reports and confinement records for each event revealed that riot/inciting was *not* the proximal cause of the room confinement; each of the 13 youth engaged in other behaviors that created an imminent risk of harm (e.g., punching staff, pushing staff, punching another youth, aggressively resisting staff's efforts to guide them away from the situation). These behaviors justified the use of room confinement to allow the youth to safely de-escalate. When the alleged rioting/inciting did not include a behavior that created an imminent risk of harm, room confinement was not used.

The *Room Confinement* policy includes additional protections for youth who are in room confinement for longer than 1-hour. The extended stay must be authorized, a mental health clinician must assist with de-escalation and a Reintegration plan must be completed. Eight of the 14 room confinement events lasting longer than 60 minutes (57%) were sampled for deeper analysis:

- Authorization to extend room confinement was obtained prior to the 60-minute mark in only 3 of the 8 events (38%). The authorization was granted in all cases, but the relevant section was signed *after* the conclusion of the room confinement event in the other 5, suggesting that authorization was not obtained contemporaneously with the extended period in room confinement.

- A mental health clinician was contacted with sufficient time to respond prior to the 60-minute mark in 7 of the 8 events (88%). In 7 of the 8 events (88%), the clinicians summarized their interventions and the youth's response.

- The Reintegration Plan form was present in all packets and modifications were considered/imposed for all youth (100%)

- Only 4 of the 8 (50%) Reintegration Plans articulated goals and objectives.

- Only 1 of the 8 (13%) included commentary by the youth's Counselor each day the plan was in effect. The others contained only rote signatures.

The *Room Confinement* policy requires these same protections (authorization, mental health intervention, Reintegration Plan) when a youth is returned to room confinement within 2 hours of a previous event, and the total time accumulates beyond 60 minutes. Between January and June 2021, youth were returned to room confinement within 2 hours of release 34 times. Only 7 of these accumulated beyond 60 minutes. These 7 events were reviewed to determine whether the required protections were in place. The following findings suggest that the staff involved were unaware of the accumulation requirement for subsequent room confinement events:

- The required approval for room confinement to extend beyond 60 minutes was only obtained in 1 of 7 events (14%), with the same disparity in the timing of the authorization as noted above.

- A mental health clinician was contacted (or already present) in only 4 of the 7 incidents (57%).

- A Reintegration Plan was developed in only 2 of the 7 events (29%). In addition, the two Plans that were developed had similar problems to those noted above.

Oversight and Quality Assurance

In addition to the MHA/TPA's reviews of each room confinement packet, in May 2021, the facility established its 1st Level Quality Assurance audits wherein the Superintendent/Deputy Superintendent reviews all room confinement packets to ensure they meet policy requirements. When a packet fails the audit, the staff's supervisor conducts a Work Directive (which is not a disciplinary

action but rather an opportunity to clarify and educate staff on the expectations) or imposes progressive discipline. Work Directives related to the *Room Confinement* policy were issued to 11 staff in May and June 2021, mostly related to missing incident reports and/or room confinement checklists. In August 2021, the Monitor provided feedback to STS to encourage audits to focus on the issues underlined above, particularly those related to the relatively rare occasions where room confinement extends beyond 60 minutes. As noted in MH-VI.B "Quality Assurance Policy," above, DHS/STS has also developed a quality assurance program with specific quality assurance indicators, methodology and metrics regarding room confinement.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) On the Room Confinement Checklist, expand the discussion of de-escalation techniques to include the youth's response/substance of the verbal exchange.
2) Develop a protocol for capturing the names of youth witness information in the event it is needed for an investigation into youth or staff conduct.
3) Develop a protocol for tracking/notifying mental health staff when youth have back-to-back room confinements that cause the 1-hour timeline to resume.
4) When a longer duration is necessary, obtain approval for room confinement to be extended *prior to* the 60-minute mark.
5) Ensure that Reintegration Plans are developed for all events (both single events and close-in-time events) lasting more than 60 minutes. Consider the use of a Reintegration Plan to more gradually return the youth to full programming once released from isolation.
6) Ensure that goals and objectives are articulated on the Reintegration Plans for each youth (as appropriate) and that Counselors document the youth's progress toward those goals in each daily review.

**Methodology**.
- Reviewed staff roster, training completion dates and proficiency exams.
- Reviewed room confinement log and room confinement packets from January to June, 2021.
- Reviewed Corrective Action Log and Corrective Action Letters
- Interviewed STS administrators, staff and youth regarding room confinement practices.

**RC-I.B.1 Behavior Management/Motivation**. In addition to the policy changes for RC noted above, BSTS will revise their behavior management approach to focus less singularly on control and compliance and more dynamically on skill building and relationship development to help students better manage stressors, maintain emotional and behavioral control, and engage effectively with others so they are less likely to need RC/restraint to calm down or otherwise control their behavior. This approach will go beyond mere compliance and include a significant focus on motivation. It will align with the therapeutic, crisis-response, skills based and rehabilitative based services the school develops and provides. Overall, this program/approach will be designed to not only help students conform their conduct to School rules and basic societal expectations for purposes of ensuring safety and security but enhance their skills to pro-socially navigate life stressors and reduce the risk of recidivism.
RC-I.B.1 Identify Program. By 60 days from the effective date, BSTS will identify an evidence-based, skills-focused curriculum/program that will establish the overall framework that BSTS will use to help students develop the skills they need to better manage their emotions, control their behavior and interact effectively with others.

RC-I.B.2 Revise Behavior Management Policy. By 90 days from the effective date, BSTS will revise Policy *5B-03 Behavior Management* to align with the practices of the behavior management program/approach that will be developed. Will go into effect once training is complete.

RC-I.B.3 Revise Point/Level System. By 120 days from the effective date, BSTS will review/revise current point/level system to ensure that it

> (a) includes a robust incentive-based system that sufficiently focuses on incentives, rewards and skill-development

> (b) has a robust continuum of non-seclusion-based sanctions that are used to respond to the full range of violations of rules, including violence against others and destruction of property, and do not involve room restriction or denial of out-of-room recreation

> (c) is aligned with the larger evidence-based, skill-focused curriculum that was identified.

RC-I.B.4 Train Key Staff. By 150 days from effective date, senior administration (e.g., superintendent, TPA, TSD), PMHD, and cottage staff will be trained on the policies that are updated, trained on how to facilitate groups using the curriculum identified and trained to use the curriculum in their day-to-day interactions with students, including the point/level system.

RC-I.B.5 Train Remaining Staff. By 180 days from the effective date, other direct care staff will be trained on the policies and trained on how to utilize the curriculum in their day-to-day interactions with students, including the point/level system

RC-I.B.6 Post Notice. Within 24 hours of the policy being formally adopted/implemented, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting, approved by both Parties

> (a) Student Handbook will also be updated to reflect all changes, students will be provided with updated handbook, changes reviews with them by staff

**Findings**.

*Aggression Replacement Training (objective RC-I.B.1)*

The facility identified Aggression Replacement Training (ART) as its evidence-based, skills-focused curriculum on 9/28/20, within the timeline required by the Remedial Plan. The purpose of having an overarching skills-based program is so that staff and youth have a common language and common structure for helping youth to develop the skills they need to replace anti-social behaviors with positive alternatives, rethink anger-provoking situations and respond in a nonaggressive manner, and better appreciate the needs and rights of others.[18] Briefly, an integrated model is one where: (1) youth receive an introduction to the key concepts and skills via facilitated ART groups;  (2) mental health clinicians and counselors—who have been taught these same concepts and skills—work with the youth individually to deepen their understanding and skill mastery; and (3) during moments of distress, staff prompt and encourage the youth to utilize the skills learned to resolve the situation without violence. STS continues to pursue full implementation of this framework but has not yet achieved it.

*Facilitators*

As noted in the Monitor's February 2021 report, in December 2020, 26 STS staff were trained (virtually) by Education & Treatment Alternatives, Inc. (ETA), the group authorized to train staff to facilitate ART. The original group included facility leadership, staff who would be certified as ART trainers, and staff who would facilitate ART groups (following the ETA training, some of these decided they were not interested in facilitating and/or left STS). STS's two ART-certified trainers received their

---

[18] *See* https://aggressionreplacementtraining.com for more information.

certification in August 2021. Five additional facilitators were trained in August 2021 so that multiple cycles of ART could run concurrently.

The Monitor reviewed the training materials for ART facilitators and found them to be comprehensive and appropriately targeted to teach the facilitators the core concepts and also how to deliver the program effectively. Each participant was required to pass a detailed proficiency exam and to complete a practicum where their facilitation skills were observed and evaluated.

During their March 2021 and August 2021 site visits, the Monitor and SME observed ART groups facilitated by three different teams (each group is co-facilitated). In all groups, the facilitators had clear mastery of the material, appropriately managed group dynamics, creatively engaged each youth in the exercises and developed role plays and scenarios that were relevant to the youth's experiences in the facility and in the community.

*Youth*

Initially, STS ran its 10-week ART cycles consecutively (meaning, after one cycle ended, another one began). ART is considered a "closed group" (i.e., youth must enter at Week 1, they cannot enter the group midway), which meant that once a group began, youth often had to wait several weeks before they could begin the ART group intervention. The "closed group" format and rule that youth may not continue in the group if they miss more than 2 weeks are both requirements of the ART curriculum and thus are expected for program fidelity. However, as a result, relatively few STS youth have completed ART to date.

- A total of 17 youth began ART in Cycle 1 (spread across 3 groups). Of these, only 11 youth (65%) completed all 30 sessions. The remaining 6 youth were either removed from group due to negative/disruptive behavior, refused to attend, or were discharged prior to the cycle's completion.

- A total of 13 youth began ART in Cycle 2 (spread across 3 groups). Of these, 11 youth (85%) completed all 30 sessions, as one youth was removed from group due to negative/disruptive behavior and one youth was discharged prior to the cycle's completion.

- A total of 24 youth began ART in Cycle 3 (two groups, with staggered start dates). Neither group had completed all 10 weeks by the time this report was drafted. So far, 15 youth remain in the program (63%) as nine youth have been removed from the group, several because they were the aggressors in an assault in which the victim was assigned to the same group, two others due to disruptive/assaultive behaviors, and four youth refused to attend.

As the Monitor has noted on several occasions, the level of violence and disorder at STS undercuts the ability to consistently deliver programming to STS youth. That said, if a youth refuses or is removed from group, STS often enrolls the youth in the next ART Cycle or may deliver individualized instruction if the youth's counselor/mental health clinician has experience with ART.

In order to increase its ART capacity, STS changed the structure of its ART cycles. STS's first two cycles included 3 groups that all started at the same time. For Cycle 3, the start dates for the 2 groups were offset by a few weeks so that going forward, STS youth will have more frequent opportunities to begin the group. The 24 youth originally assigned to Cycle 3 represent about 50% of STS' population (and does not include a number of youth who completed ART in previous Cycles and who remain at the facility). Thus, it appears that the pace of ART program engagement among youth has accelerated.

*Staff Training*

Along with the 31 staff who were trained to facilitate ART in December 2020 and August 2021, an additional 102 facility staff have been trained as ART "Transfer Coaches" (*i.e.*, those who assist youth with integrating the skills learned in group into their day-to-day functioning), which is nearly the entire STS workforce, minus a handful of staff. These trainings occurred in small groups, monthly, from February through October 2021. The instructor (who is an ART group facilitator) used materials produced and provided by ETA, and each training participant completed a proficiency exam that highlighted the core concepts of the training and how they can be applied day-to-day. However, when interviewed, most staff were unable to articulate the way in which ART concepts have been integrated into their daily practice, which suggests that on-going reinforcement of these concepts is needed to facilitate their application.

### Behavior Management Policy (objective RC-I.B.2 and RC-I.B.6)

Policy *5B-03 Behavior Management,* which was approved by the court on 1/22/21 (dkt. 372), remains in effect. After obtaining input from the Monitor and Plaintiffs' counsel, the Student Notice for the new policy was posted on 2/16/21. STS submitted photographs to the Monitor to document the posting of required notices.

Although not specifically required by the Remedial Plan, STS conducted an annual review of the policy during the first week of September 2021. The managers for each policy area completed a survey that asked about challenges to executing the policy, areas that need revision, whether oversight is appropriate, people who should be consulted regarding proposed revisions, and responsible parties for implementation and performance issues. On 9/14/21, Defendants submitted proposed revisions to the Monitor and Plaintiff. The Monitor consulted with Plaintiffs and provided feedback on the proposed revisions to Defendants in early October 2021.

### Behavior Management Training (objectives RC-1.B.4 and 5)

Both the Remedial Plan and the *Behavior Management* policy require staff to receive both pre-service and annual refresher training. STS's behavior management training includes multiple components: (1) the Incentive Program; (2) Learning Interventions ("LIs"; consequences for rule violations); and (3) the revised Level/Step Program. Each component is briefly described on pgs. 53-54 of the Monitor's February 2021 report. The training materials include a description of the program components, Work Instructions for entering each youth's achievements on the Incentive System and for entering Learning Interventions, and examples of some of the Learning Interventions that may be used (e.g., "Control Chain" which is an ART skill development tool). Each training participant was required to pass a proficiency exam that included basic questions about how each tool should be used.

STS conducted staff training in phases, by first training the senior staff (i.e., facility leadership team, Cottage Directors, Cottage Counselors, Treatment Program Administrators and mental health staff). Sign-in rosters and completed proficiency exams verified the attendance of 36 senior staff on 1/21/21 (two staff took the training course on 2/9/21).

From there, STS rolled out the Incentive Program, Learning Interventions and revised Level/Step Program to YSWs assigned to each cottage, YSTs, YSWs on the night shift, school staff, and clinic staff. A total of 104 staff were trained between 12/2/20 and 2/21/21. An additional 14 staff were trained in the subsequent months as they came back from sick leave, FMLA, etc. While on site, the Monitor interviewed staff from a variety of job titles, all of whom confirmed they'd been trained in the program requirements in early 2021, and also commented that, since the initial training, they had received frequent coaching and guidance from the Analyst/TPA/Trainer, all of whom oversee the delivery of the behavior management program.

As new staff were hired (n=34 since November 2020), they received training in the behavior management program (using the same materials and competency exam as the initial training) during both pre-service training and on-the-job training.

**Behavior Management Program (objective RC-I.B.3)**

*Incentive Program*

Interviews with youth and staff and facility observations during the Monitor's March and August 2021 site visits suggest that the Incentive Program is well-integrated into the facility's daily routine. All youth knew what Incentive Tier they were on (Bronze, Silver, Gold) and what was required to advance to the next tier (*i.e.*, accumulating a certain % of available points, which are awarded by staff throughout the day; refraining from major misconduct). Each youth's achievements are reviewed weekly with the Cottage Director/Counselors and their Tier is updated accordingly. A one-day snapshot from 6/30/21 showed that of the 47 youth in custody, 30% were Gold, 19% were Silver and 51% were Bronze. STS reports that the range typically varies +/- 5% from this distribution.

A review of a sample of 10 youth's Incentive Program records verified that weekly evaluations occurred as required and youth's Incentive Tiers were assigned according to the established criteria (% of points earned). This review also illustrated that youth are quite mobile throughout the tiers—while a couple youth remained at Gold throughout their stay, most of the youth (including several of those known to struggle to manage their aggressive behaviors) frequently moved among the three tiers. This is depicted in the graph below, where the time spent at each tier is shown for 9 youth (the 10th youth had only been in the facility for two weeks, and thus was excluded from this analysis). The number of weeks in custody follows the Y for each of the 9 youth (e.g., Y-15 weeks).



As shown above, a couple of the youth spent nearly all of their time at STS on Gold; a couple split their time between Silver and Gold; a couple split their time between Bronze and Silver; and some spent most of their time at Bronze. This wide distribution shows that the Incentive System is capable of

distinguishing among youth with different types of behavior (in contrast to some systems where all youth score at the highest level—and access all of the incentives—despite their involvement in misconduct; or other systems where it is so difficult to achieve the highest level that nearly all youth remain at the bottom with little access to any of the incentives). Thus, STS's system appears to be well-designed and properly implemented.

That said, the Monitor identified several issues that suggest efforts are needed to increase the *effectiveness* of the program. For the most part, youth appeared to appreciate the incentives available if Gold is attained (e.g., late bedtime, multiple Cottage 8 visits and treats), but several commented that the offerings at the Silver level weren't particularly meaningful (the only upgrade from Bronze is a single visit to Cottage 8). Furthermore, even the treats and activities available to youth on Gold had gone stale for some youth and they suggested a range of additional incentives to make the program more engaging. In particular, youth wanted *activities* of all types, of *any* type, essentially something more to do to break up the monotony of non-school hours and weekends. Several veteran staff who were interviewed lamented the loss of activities as well, recalling times when STS ran intramural sports and outside activities every evening. When asked why such things were not provided current day, staff's responses included a combination of insufficient numbers of staff to supervise large groups of youth; staff distrust and fear of youth either fighting or running away; and a large number of new staff who were perceived to feel uncomfortable supervising large groups of youth outside.

Further, STS's high levels of youth-on-youth violence coupled with the fact that approximately half of the facility population typically resides at the lowest Tier suggests that the program's effectiveness needs to be fortified. Decisions about how to do so are STS's to make and the Monitor is available for technical assistance as needed. Experience with other jurisdictions suggests the usefulness of fortifying strategies to: 1) incentivize positive behavior, 2) support youth who have difficulty managing their behavior, 3) discourage and prevent negative conduct and 4) re-engage youth who become demoralized following misconduct that impacts their privilege level.

*Learning Interventions*

STS issues Learning Interventions ("LIs") when youth engage in misconduct, which are categorized according to the severity of the infraction (Mild, Moderate, Major). In June 2021, STS issued a total of 888 Learning Interventions (given that the facility housed approximately 50 youth at that time, the issuing of 888 infractions clearly supports the Monitor's characterization of the facility's high level of disorder):

- 473 (53%) were for Minor misconduct (mostly insubordination, refusing school (1st occurrence), and horseplay).

    o By policy, Minor infractions should result in a Control Chain written assignment with privileges briefly suspended until the assignment is completed.

    o STS reports that the Control Chain and other written assignments were utilized for 3-4 weeks just after implementation, but the process became unmanageable both because the facility's information management system (RiteTrack) was not amenable to having multiple LIs open at the same time, and because students were not engaged in the assignments/not producing a quality response. The facility is contemplating ways to reinvigorate this component of the program so that Minor LIs could involve either a skill-based or community service task. For now, a Minor LI carries a two-hour privilege restriction, beginning at the end of the school day.

- 313 (35%) were for Moderate misconduct (mostly refusing school (2nd occurrence in one day) and interference with staff, along with some threatening assault and bullying).

  o By policy, Moderate infractions should result in a 1- or 2-day privilege restriction.

  o Only 4 of the 313 (1%) exceeded the authorized range.

  o About 25% (~75 LIs) had a duration shorter than what is proposed in policy, some of which had a duration of zero/one minute. STS reports that these were due to staff data entry errors, misunderstanding of the program requirements, or reversal to an old process designed to work-around a glitch in the RiteTrack system. In July 2021, STS built this type of data entry error into its weekly Quality Assurance review and reports that staff are provided targeted training following this type of mistake.

- 102 (11%) were for Major misconduct (n=50 were for assaultive behavior and n=30 were for threatening assault).

  o A sample of 50 of the 102 Major infractions (49%) were reviewed to assess whether the infraction category had been properly applied. The vast majority (90%) were clearly substantiated; most of those that were not as clear were regarding "Threats to Assault" where the staff did not clearly describe the threat.

  o By policy, Major infractions involving assaultive behavior should result in a 3- to 5-day privilege restriction, a written apology, a Control Chain written assignment and Mediation with a Psychologist, Cottage Director or Cottage Counselor.

  o All privilege restrictions fell within the authorized range of 3 to 5 days.

  o None of the other LI types appeared to be utilized.

By policy, responses to Major infractions should include a variety of consequences: privilege restrictions, restorative tasks (mediation, written/verbal apology, community service activity) and skill-development activities (ART worksheets, essays about the behavior of concern). Privilege restrictions of varying lengths are the only LIs that are utilized. STS reported that they have yet to figure out a system for assigning, completing and tracking the other types of sanctions that are slightly more complex because they require specific data entry, staff involvement to ensure a quality response from the youth and communication across shifts to ensure assignments are completed.

As noted above with the Incentive Program, the design of the Learning Intervention system is solid and reflects best practice. The durations of the privilege restrictions generally conform to policy requirements and appear to be reliably tracked and imposed. However, the effectiveness of the Learning Interventions is compromised by the lack of restorative tasks and skill-development activities that were intended to accompany the restrictions. STS is encouraged to develop a system for assigning, supervising, completing and tracking the other types of sanctions so they can be imposed along with the privilege restrictions.

Finally, the Learning Intervention data also highlight an important behavior management dynamic that was mentioned by several of the people interviewed by the Monitor/SME—the issue of school attendance/refusals. While education services are not part of the Remedial Plan, the lack of structured time during the school day is a significant impediment to the facility's behavior management program. The problem appears to have two dimensions: 1) teacher absences that are not covered by a substitute teacher or other strategy for keeping youth occupied during the class period; and 2) youth refusing to go to school. The issue of teacher absence is outside the scope of the

Remedial Plan, but Learning Intervention data revealed that in June 2021, 34% of all minor/moderate infractions were issued for school refusals (270 of 786 minor/moderate infractions in a single month), indicating it is a significant behavioral issue among STS youth that impacts their performance in the Incentive Program.

When the youth's teacher is absent or the youth refuses to attend school, youth remain on the housing unit during the class period and, per reports by both youth and staff, are not engaged in any structured activity and usually spend the time watching television. This creates an incentive for youth to refuse school. There are several ways to address this problem (*e.g.*, better incentivizing the desired behavior, better structuring the time when youth are not in school, utilizing STS's two new Activity Therapists, etc.). While the choice among these and other options is STS's to make, addressing this problem is key to the implementation of an effective behavior management program.

*Level-Step System*

The Level-Step System predates the Remedial Plan as part of STS's approach to behavior management, but it was revised in important ways to integrate it with the new tools and services available at STS. The system involves 30 steps (3 levels, 10 steps each; 1.1 to 3.10) and provides the youth, STS staff and JCOs with a tangible assessment of the youth's progress at STS and readiness for release. Upon admission, youth begin at 1.1 and their level-step is reviewed each week, using 5 criteria for promotion:

- Earning at least 70% of available points in the Incentive Program;

- Refraining from Moderate and Major misconduct;

- Program Engagement (*i.e.*, working toward ICP goals);

- Engagement with Mental Health services, if applicable; and

- School performance.

Interviews with youth and staff and facility observations during the Monitor's March and August 2021 site visits suggested that the Level-Step program is well-integrated into the facility's daily routine. Youth knew what Level-Step they were on and what was required to advance to the next step. They appeared to be even more focused on this part of the behavior management program than the Incentive System, perhaps because it is more closely tied to Temporary Home Visits (youth must reach 2.5 to be eligible) and release from STS.

Progress through the Level-Step program was reviewed for a sample of 10 youth in custody on June 30, 2021. This analysis suggested similar variability as that observed for the Incentive Program—some youth promote to a higher step every week, some youth are retained at a step every once in a while but generally make an upward progression, and some youth struggle to progress at all, remaining stuck on the lower steps of the program for long periods of time.

While on site, several Cottage Counselors and Directors opined that the practice of "neutral weeks" contributes to this problem. While reconfiguring the Level-Step program to fit the contours of the behavior management program described in the Remedial Plan, the practice for how the Level-Step program responded to negative behavior changed. Previously, youth were dropped 5 steps following major misconduct. Guided by best-practice research that discourages taking away points or steps that have been earned, the program was revised to impose 5 "neutral weeks" (*i.e.*, youth stay at the same level) in response to major misconduct. Staff observed that this change had the unintended consequence of disincentivizing positive behavior because the youth feel that there is nothing they can

do to improve their situation and thus stop trying to succeed or make positive choices, spending those 5 weeks at Bronze level. Staff recalled that previously, youth still needed to work to promote week-to-week, to regain the ground they'd lost, and thus they appeared to become somewhat motivated following major misconduct.

Analyzing the interplay between Incentive Tier and Level-Step reveals this dynamic to be true for some youth, but not all. Several youth remained at Bronze throughout the majority of their "neutral weeks" but a couple achieved Gold status at various points when their Step had been frozen. The key to the success of behavior management programs is to ensure that youth *remain engaged* both in the short-term (when they may face a consequence for misconduct) and long-term (so that continuing to achieve at high levels is attractive). STS should consider ways to address the mindset that seems to accompany the "neutral weeks" for some youth, perhaps by building in new contingencies that will allow youth to advance in some way following misconduct, if they meet certain expectations. Given the interplay with the Incentive Program and the youth's reports that many of the incentives had gone stale or were uninteresting, the problem with the "neutral weeks" might also be positively impacted by efforts to revitalize the incentives. Another avenue could be to develop a contingency or reward to advance the youth an additional step if the youth achieves Gold status during some number of the neutral weeks. Because the Level-Step and Incentive System are so intertwined, tinkering with one part of the equation may have an impact on the other. Several staff at STS have deep mastery of these dynamics and their expertise should be deployed toward a solution.

Finally, the review of the Level-Step progression and weekly evaluations revealed generally consistent practice regarding weekly evaluations, but occasional problems with certain Counselors not reviewing on the required weekly schedule, not properly documenting the assessment, or poor communication when youth transfer to a new cottage. STS noticed these same issues when compiling data to respond to the Monitor's request and developed new quality assurance processes to improve practice. This type of vigilance and thoughtful review of data is a rare quality in the Monitor's experience and will serve STS well in making progress toward compliance with the Remedial Plan.

*Program for Youth with Frequent Aggressive Behaviors*

The Monitor's June 2021 report detailed serious concerns about the level of youth violence and disorder at STS and the resulting injuries, fear and trauma among youth in custody and staff who work there. In addition to recommending a range of strategies to address the pervasive negative consequences of the high level of violence (reviewed in the Introduction to this report), the June 2021 report also encouraged STS to better address the needs of youth who frequently exhibit aggressive behaviors by considering a highly structured, treatment-focused specialized program. STS had already been thinking along these lines and stated that they could not properly meet the needs of STS youth without a stand-alone program to address those with repeated aggressive behaviors. Defendants petitioned the Court to amend the Remedial Plan to permit the use of CMH as a residential unit so that the program could be located there. Following extensive negotiation about the core elements of the program (which are attached to Plaintiff's Motion, dkt. 408-1), Plaintiffs and the Monitor supported the request, which was approved by the Court on 8/18/21 (dkt. 409). The amendment to the Remedial Plan has been incorporated into this report in RC-I.B.2, below.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
  1) Supplement the ART all-staff training module with on-going guidance and coaching to help staff incorporate key ART skills in their day-to-day interactions with youth.

2) Pace ART groups so that a maximal number of youth can attend; objective is that 100% of the youth at STS have been taught the basic skills and concepts.
3) Develop strategies to improve the effectiveness of the behavior management program by fortifying incentives for positive behavior, consequences for negative behavior, keeping youth engaged and/or addressing the underlying causes of misconduct.
4) Ensure consistent implementation of Weekly Evaluations and seamless transitions when youth transfer to a new cottage.
5) Develop and implement a highly structured, treatment-focused program for youth with frequent aggressive behaviors. Ensure staff are sufficiently trained to provide the types of structure that is necessary for such a program to be effective.

**Methodology**.
- Interviewed STS administrators, staff and youth.
- Reviewed ART group rosters and staff training documentation, curricula and proficiency exam.
- Observed three ART groups
- Reviewed staff training rosters and proficiency exams for the Incentive System and Level-Step Program.
- Reviewed 6/30/21 snapshot of Incentive Level and Level-Step.
- Reviewed Incentive and Level-Step records for 10 randomly selected youth.
- Reviewed Learning Interventions for June 2021.
- Reviewed 50 Major Infractions from June 2021.
- Participated in multiple consultations with Defendants and Plaintiffs regarding a strategy to address the needs of youth with frequent aggressive behaviors.

**RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors.** Defendants may employ a temporary overnight use of CMH for the purpose of conducting a Tier 3 (T3) Therapeutic Pilot Project only in accordance with the provisions set forth below.

RC-I.B.2(a) <u>Temporary Overnight Use of CMH for the T3 Therapeutic Pilot Project</u>. Defendants may temporarily use CMH during a two (2) year Pilot Period for overnight purposes, but only in connection with intensive therapeutic programming and services for youth designated as Tier 3, and only as set forth in the Intensive Therapeutic Program Policy (ECF No. 387-1, the "ITP Policy")...Defendants' overnight use of CMH between the Effective Date [8/18/21] and the date the T3 policy become effective shall comply with these terms, which shall be incorporated into the written policies:

(1). <u>Therapeutic Environment.</u> STS will maintain a therapeutic environment in CMH at all times.
(2). <u>Not Used as Punishment.</u> The T3 program must not be used as a form of punishment.
(3). <u>Use of Isolation/Restraint Must Comply with STS Policy.</u> Use of isolation, seclusion and restraint is restricted to those practices outlined in policies *4C-Room Confinement* and *2A-12 Security Restraints*. Isolation and/or seclusion includes, but is not limited to, any involuntary placement of youth in any of the 24 CMH individual cells or any seclusion room during waking hours.
(4). <u>Admission Process</u>. STS must base its specific criteria for referral and admission to the T3 program on individualized assessments with a process involving a multi-disciplinary decision-making team...This process shall ensure that the other general population options have been exhausted and that any CMH placement shall be intentionally limited to only that time needed to provide the student with the necessary skills to be successful in a less restrictive setting. If a youth meets the criteria for admission to the T3 program, but that youth was not previously on the MH caseload, STS will provide a

comprehensive MH reassessment and provide the individualized services needed as a result of that assessment.

(5). Individualized Behavior Management Plans. Individualized Plans must be created for each youth and informed by functional behavior management principles that identify the function of the behavior of concern and its antecedents. Plans shall include goals and related services necessary for youth to move to a less restrictive environment, which STS shall explain to the youth in terms that youth would understand. These Plans, and any mental health treatment plan the youth may have, shall guide STS's implementation of the T3 program tailored to each youth. Plans shall be reviewed and updated at regular intervals and any updates shall be explained to youth in terms the youth would understand.

(6). Highly Structured and Intense Services. STS must provide youth in the T3 program with highly structured and intense array of services and supports to help stabilize them when other forms of de-escalation and treatment have been unsuccessful. These intensive services include but are not limited to: targeted clinical or behavioral assessment, evaluation and observation; crisis and safety planning; and increased therapeutic, skills and rehabilitation-based interventions.

(7). Predictable Daily Schedule with Minimal Self-Directed Leisure Time. STS must utilize a predictable daily schedule, approved by the Monitor, whereby most waking hours are consumed by structured activities led by an adult to minimize self-directed leisure time. Staff shall also "check-in" with students often and at least once per shift.

(8) School Services. STS must ensure that youth attend their regular school hours and classes at Midland Park School unless STS determines that doing so would present serious risk of physical harm to themselves or others or a student is recommended to attend school in an alternate setting through the student's IEP process. That determination must be made on an individualized basis. STS staff will ensure that all their educational needs are met and that all services and/or accommodations listed in that youth's IEP and/or 504 Plan are fully implemented.

(9). Program Elements. STS shall implement welcoming, planning, programming, documentation, oversight, supervision, and training requirements for the T3 program.

(10). Personal Items. STS shall allow and encourage a specified list of personal items to remain in all individual rooms.

(11). Limited T3 Rooms. STS shall specify a limited number of individual rooms at CMH and the location of those rooms that shall be dedicated to the T3 program.

(12). Implement the recommendations set forth in the Monitor's Interim Status Report (ECF No. 404).

RC-I.B.2(b) T3 Policy Timeline. Defendants shall provide the first draft policy to the Monitor by 12/1/21; the Monitor shall provide feedback by 12/15/21; Defendants shall provide an updated policy to the Monitor and Plaintiffs by 1/15/22; the Monitor and Plaintiffs shall provide final feedback to Defendants by 2/1/22; Defendants shall submit the proposed policy to the Court by 2/15/22; and Plaintiffs and the Monitor shall file any response to the Court by 3/1/22. The T3 policy will become final upon the Court's approval. If the policy is submitted before the deadline, the related dates for responding will adjust accordingly.

RC-I.B.2(c) Safeguards Prior to the Final T3 Policy. Before the policy becomes final, STS may use CMH as described in section (a), subject to the Monitor's approval and determination that CMH and the Pilot Project are ready to physically admit youth to CMH, provided that BSTS takes the following steps to reasonably ensure compliance with this Agreement:

(1). Implement all the essential components listed in (a).

(2). Affix a sticker to each door in CMH used for T3 that reminds staff of the prohibition of locking youth in a room during waking hours and states that youth may submit a grievance form if they have any concerns, which must be made accessible to the youth and provided to the Monitor.

(3). Hold frequent, routine meetings with the Monitor…to discuss the current status of the program's operation, which the Monitor may elect to continue after the T3 policy becomes final…timely respond to any requests of the Monitor for information related to the T3 program, including requests for video, and timely implement any recommendations.

RC-I.B.2(b) <u>Improvement to CMH for the Pilot Period</u>. Prior to the temporary overnight use of CMH during the pilot period, BSTS must complete implementation of physical improvements to CMH, barring procurement issues, subject to approval by the Monitor, in at least the following ways:

(1). Implement all changes identified in Defendants' "CMH Furnishings Proposal" memorandum;

(2). Allow youth to hang photographs, posters and/or artwork in their individual rooms;

(3). Use the installed red lighting at night to support safety and quality sleep;

(4). Provide comfortable cushions for the stools.

RC-I.B.2(c) <u>Evaluation and Recommendations at the Conclusion of Pilot Period</u>. Eighteen (18) months after the Effective Date, Defendants shall submit to the Monitor and Plaintiffs their written proposal for longer term therapeutic housing for youth designated as T3…Proposal shall include…(1) estimate of the current and near future population, including population of T3 youth and the populations of youth in each cottage; (2) current overall STS and CMH safety; (3) detailed assessment of the quality, fidelity and efficacy of T3 program implementation, using metrics developed by the Monitor; (4) alternatives to continued overnight use of CMH, including the feasibility of modifications to existing cottages or new construction to potentially serve as suitable long-term future therapeutic housing units; and (5) feasibility of modifications, including structural modifications to CMH to potentially service as suitable long-term therapeutic-only housing.

At twenty (20) months after the Effective Date, following a two-month period of collaboration and negotiation, Defendants shall submit their final written proposal to the Court. By twenty-one (21) months after the Effective Date, the Monitor and Plaintiffs may file their responses to Defendants' proposal. Unless the Court issues its ruling on the Defendants' proposal by the conclusion of the pilot period, the Monitor will determine whether the therapeutic overnight use of CMH permitted during the Pilot Period can temporarily continue between the conclusion of the Pilot Period and the Court's ruling.

**Findings**.

      The Amendment to the Remedial Plan was proposed in order to increase housing capacity so that STS could pilot a specialized program for youth with frequent aggressive behaviors. The Amendment's requirements are specified above (paraphrased in some cases). It was approved by the Court on 8/18/21 (dkt. 409).

      While all parties are concerned about facility safety and want to see improvements occur quickly, the development of the program model has taken some time. The program design is not yet finalized, and DHS required some time to sort out the staffing requirements for the program and how they could be met within STS's existing complement of staff. Now that the number of staff required has been determined, they must be selected and trained. While the required physical plant improvements are underway, some of the supplies are caught up in COVID-related supply chain

| |
|---|
| problems. Once the program is implemented, the Monitor will assess its fidelity and effectiveness and report findings to the Court. |
| **Recommended Compliance Rating**. Not Yet Rated |
| **Steps Toward Achieving Substantial Compliance**.<br>　1)　N/A |
| **Methodology**.<br>• Mediated negotiations between Defendants and Plaintiffs' counsel regarding utilizing CMH as a residential unit.<br>• Reviewed the *Amendment to the Remedial Plan*<br>• Consulted with DHS and facility leadership |

---

**RC-I.C Direct Care Staffing**. Throughout the duration of this Remedial Plan and monitoring, the BSTS will hire and maintain a sufficient number of professionals to effectively implement and practice this behavior management/motivation approach by helping students develop and practice skills necessary for them and others to remain safe.

RC-I.C Direct Care Staff. For direct care staff, the BSTS will continue to use a 1:8 (daytime) and 1:16 (nighttime) staffing ratio for the general population, consistent with PREA.

---

Findings.

*Number of Staff*

　　As of 6/30/21, STS reported the following funded positions for FY2021: 92 YSWs, 9 YSTs, 11 Cottage Counselors and 7 Cottage Directors. These allocations are based on a youth population of approximately 80 youth. Given that the STS population is significantly lower (currently about 50 youth) and should not exceed 64 for the next few years given the planned construction project, STS needs somewhat fewer YSWs to operate its program.[19] In October 2021, DHS determined that it needed approximately 76.5 YSWs to properly staff the facility with a youth population of no more than 64 youth. As of 10/14/21, 81 YSW positions were filled, although only 71 YSWs were available to work (the other 10 were either on FMLA, or some other type of leave, or had not yet completed all of the pre-service training).[20] DHS reports that the current shortage (76.5 needed – 71 available = 5.5 YSWs) can be covered by re-arranging shifts/schedules; using other job classifications such as Cottage Directors, Counselors and Youth Service Technicians; and through the application of targeted overtime so as to maintain necessary staffing minimums. These broad numbers are provided as general context, but the assessment of compliance with the requirements of this provision required additional analysis.

　　In the Monitor's February 2021 report, aggregate data on STS's average daily population and the average number of direct care staff working each of three shifts was utilized to assess campus-wide staff ratios. At the time, STS's ADP was approximately 36 youth, and the campus-wide staff-youth ratios were approximately 1 staff for every 2 youth (i.e., 1:2, far richer than that required by the Remedial Plan).  However, these campus-wide ratios are not particularly helpful when assessing the

---

[19] In early 2021, DHS obtained funding from the Iowa Legislature to convert two of its housing units from their current dormitory style housing to individual rooms.

[20] The number of YSWs available to work changes daily as staff return from leave, go on leave and/or complete required pre-service training.

quality of implementation of new behavior management practices as required by this provision of the Remedial Plan and thus more detailed, cottage-level staffing ratios were analyzed for the current monitoring period.

The Monitor requested information on the number of youth in each cottage and the names of the staff who worked the 1st, 5th, 10th, 15th, 20th, 25th of each month, January through June 2021. On any given day, 4 cottages were operational (although the exact cottage changed due to the HVAC project).  This leads to the following subsets:

- 144 events for the AM time period (6 days x 6 months x 4 cottages = 144). During waking hours, the required ratio is at least *1 staff for every 8 youth*.

- 144 events for the PM time period (6 days x 6 months x 4 cottages = 144). During waking hours, the required ratio is at least *1 staff for every 8 youth*.

- 144 events for the Overnight time period (6 days x 6 months x 4 cottages = 144). During sleeping hours, the required ratio is at least *1 staff for every 16 youth*.

For the **144 AM events**, on any given day, if a cottage had 8 or fewer youth assigned and if at least 1 staff was present in the AM, the cottage met the required ratio. This was true for 44 of the AM events (31%). If the cottage had between 9 and 16 youth assigned, if at least 2 staff were present in the AM, the cottage met the required ratio. This was true for 57 of the AM events (40%). The remaining 43 AM events (30%) had between 9 and 16 youth assigned to a cottage but only 1 staff assigned—these at first appeared to be out of ratio. However, STS reported that the standard practice is for at least one staff from the previous Overnight period to be scheduled for a swing shift that overlaps with the AM time period, which would bring the cottage into compliance with the required ratio. While STS' scheduling documentation does not identify the staff person whose shift carried over to the AM time period, the practice can be verified via employee timecards.

For the **144 PM events**, on any given day, if a cottage had 8 or fewer youth assigned and if at least 1 staff was present in the PM the cottage met the required ratio. This was true for 44 of the PM events (31%). If the cottage had between 9 and 16 youth assigned and if at least 2 staff were present in the PM, the cottage met the required ratio. This was true for the other 100 PM events (69%).

For the **144 Overnight events**, since the required ratio is 1 staff for every 16 youth, if a cottage had 16 or fewer youth and if at least 1 staff was present Overnight, the cottage met the required ratio. This was true for all 144 Overnight events (100%).

Taken together, for the 432 cottage-level events reviewed, documentation clearly demonstrated that STS met required ratios for 389 events (90%) but was less definitive for 43 events (10%). These occurred in the AM time period when 9 or more youth were assigned to a cottage but only 1 staff was assigned during that time.

*Staff Tenure and Assignment*

One very positive aspect of STS's staffing structure is that Directors, Counselors, YSWs and mental health clinicians are assigned to a specific cottage, in contrast to many juvenile facilities where staff assignments tend to be more random (i.e., staff are not assigned to a specific post or unit—they are somewhat randomly distributed throughout the facility). STS's model facilitates the formation of cohesive unit teams. These relationships between and among staff are essential for consistent implementation of behavior management practices. Furthermore, assigning the same staff to a cottage

day-to-day is essential for staff-youth rapport, for staff to understand youth's triggers and coping skills, and for youth to begin to trust staff and learn their expectations.

That said, when discussing the implementation of various practices related to behavior management, the Monitor noted in her June 2021 report that a large portion of STS's workforce, particularly the YSWs, were new to the job and thus had not yet mastered many of the skills needed to de-escalate tensions, avoid disruptions, engage groups of youth in highly structured programming, or hold constructive conversations with youth about their negative behavior. To put some context to the statement about many YSW's being "new," the Monitor reviewed the length of time on the job for STS's staff. Among the 67 YSWs on the staffing roster as of 6/30/21, 45% had been on the job less than one year. While on site in August 2021, STS staff noted that approximately 14 staff were about to complete on-the-job training, which further swung the pendulum toward those with less experience (as of August 2021, of the 81 YSWs, 54% had been on the job less than one year). As is typical in most correctional facilities, newer STS staff tend to work during the after-school hours until bedtime (i.e., 2nd shift). This means they are responsible for youth during periods of time that are more unstructured (after school) and during times that can be difficult to manage (e.g., bedtime). This underscores the need for YSWs to have quality supervision during all shifts. Currently, nearly all of STSs Cottage Counselors and Cottage Directors (the YWSs' direct supervisors) work 1st shift, meaning that YSWs on 2nd shift rarely have the benefit of their experience and ability to provide coaching and guidance to help newer staff to hone their skills. STS should consider the options for ensuring quality supervision of YSWs, particularly those who are new to the field.

*Specialized Programs*

STS intends to develop/implement two specialized programs. One of these, the Intensive Treatment Program (described in detail in MH-IV.D, "Therapeutic Crisis Response Unit," above), has a fully developed program design that has been formalized in policy approved by the Court (dkt. 391). In March 2021, STS implemented this specialized program in Cottage 4, separate from the General Population. As discussed in detail in MH-IV.D, above, in July 2021, staffing issues caused the closure of the separate program, and students requiring intensive mental health care were placed in General Population housing units with individualized plans and daily schedules. This is intended to be a temporary phase while the ITP program and staffing complement are refined.

In addition, as noted in RC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," above, STS intends to develop and pilot test a treatment-focused program for youth with frequent aggressive behaviors and sought a modification to the Remedial Plan to permit the use of CMH as a residential unit for this purpose. In addition to needing to fully develop the program model, STS must also identify a sufficient number of appropriately qualified and trained staff to be assigned to that program.

DHS submits that STS has a sufficient number of YSWs to operate the facility—including the specialized programs needed by youth with more complex needs—during the multi-year construction project which will limit the youth population to a maximum of 64. Further, the analysis of staff assignments to specific cottages during the current monitoring period revealed that STS consistently meets the staff ratios required by this provision, and thus the facility is in Substantial Compliance.

**Recommended Compliance Rating**. Substantial Compliance.

**Steps Toward Maintaining Compliance**.
1) Document all staff assignments, including when Overnight staff work a swing shift and assist AM staff with the youth's morning routines.

2) Recruit, select and maintain sufficient numbers of staff to operate both the general population program and any specialized programs needed to meet the needs of youth with specialized mental health or behavioral needs.

**Methodology.**
- Reviewed STS staff roster for 6/30/21, with date of hire.
- Reviewed STS FY2021 allocated positions and number of vacancies
- Reviewed DHS staffing analysis produced on 10/14/21
- Reviewed youth population/staff assignments for the 1st, 5th, 10th, 15th, 20th and 25th of each month, January through June 2021
- Interviewed STS administrators about staffing levels, vacancies and staff assignments
- Consultation with DHS/STS leadership to identify number of YSWs available/needed

---

**RC-II Injunctive Relief Required by Court Order: Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted to their room due to lack of privileges. Students may not be required to eat their meals in CMH rooms. Students may not be denied out-of-room recreation time available to other students.**

**Goal of Remedial Plan**: BSTS will disband the CMH program and its practices as described in the Court order (e.g., administrative segregation, extended room confinement, room restrictions, denial of recreation time).

---

**RC-II CMH Program**. By the Remedial Plan submission deadline, BSTS will abandon the use of the CMH program. The Student Handbook will be revised to reflect the removal of the CMH program and related language.

**Findings**.

Defendants dismantled the program formerly housed in Corbett Miller Hall (CMH) in phases. Shortly after the Trial Order was issued on 3/30/20 (dkt. 328), STS largely disbanded the CMH program, placing limitations on students receiving services and sleeping in CMH, although isolated exceptions were made. The 6/5/20 version of the Student Handbook removed all references to the CMH program. By 6/29/20, students were not permitted to sleep in CMH under any circumstances. Shortly after the Remedial Plan was approved on 7/27/20, STS issued formal notification to staff that the CMH program had been disbanded and that overnight stays in CMH are prohibited (on 8/3/20).

The CMH building has received physical plant upgrades such as paint and new furniture, and has been used for other purposes (*e.g.*, for room confinement, discussed above in RC-I.A "Room Confinement"; as a space to provide individual programming for youth at high-risk of assaultive behavior or those with significant mental health needs). The Monitor has not observed evidence of any practices that were of concern to the Court (*e.g.*, overnight stays in CMH, administrative segregation, extended isolation, room restriction, meals-in-room, or denial of essential services and programs).

As noted above in RC.I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," Defendants petitioned the Court to amend the Remedial Plan to permit the use of CMH as a residential unit so that a program for youth with frequent aggressive behaviors could be located there. Following extensive negotiation about the core elements of the program and DHS's assurances that the program would be primarily therapeutic and would not include any of the practices that were of concern to the

Court (which are described in an attachment to Plaintiffs' Motion, dkt. 408-1), Plaintiffs' counsel and the Monitor supported the request, which was approved by the Court on 8/18/21 (dkt. 409). Once the program is implemented, the Monitor will assess the program to ensure it has effectively prohibited practices that were the subject of the Court Order (e.g., extended isolation, room restriction, etc.).

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Consulted with DHS/Facility administrators
- Interviewed youth who spent time in Room Confinement
- Interviewed staff who work in CMH

**RC-III Injunctive Relief Required by Court Order: The School shall not use the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of this Order. All Students at the School shall be notified immediately, both orally and in writing, that the Wrap is no longer to be used by the School.**

**Goal of Remedial Plan**: The School will remove the Wrap and will provide verbal and written notice to students.

**RC.III. Restraint Policy and Practice.**
RC.III.A. Remove the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of the Court Order.
RC.III.B. Notify Students. All students shall be notified immediately, both orally and in writing.
RC.III.C. Policy. Prohibit the use of the Wrap in *2A-12 Security Restraints* policy.
RC.III.D. Post Notice. Within 24 hours of the policy, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting, and approved by both Parties.

**Findings**.
        The Wrap device was removed from the STS campus on 4/1/20, within the timeline required by the Court (**objective RC-III.A "Remove the Wrap"**). Youth were advised about the Wrap's removal verbally and in writing on 4/7/20 (**objective RC-III.B "Notify Students"**). The 6/19/20 version of policy *2A-12 Security Restraints*, Section IV.d, specifically prohibits the use of the Wrap restraint (**objective RC-III.C "Policy"**). The Wrap's removal from the facility's restraint continuum was reiterated in an additional Student Notice, posted on 8/10/20 (**objective RC-III.D "Post Notice"**).

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
2) None.

**Methodology**.
- Reviewed Defendant's filing to notify the Court that the Wrap had been removed

- Reviewed Student Notices regarding the removal of the Wrap
- Reviewed draft policy *2A-12 Security Restraints*, made comments, and reviewed the final policy

RC-IV Injunctive Relief Required by Court Order: For the School to use fixed mechanical restraints instead of the Wrap, they may only do so with leave from the Court upon showing:
1) The restraint is not harmful to a youth's mental health;
2) It will only be used in situations where a student poses a serious and immediate risk of harm to another person after other interventions have failed;
3) Time limitations (e.g., 1 hour) noted in the Order for BSU/Seclusion Rooms shall apply; and
4) The School has put systems in place to ensure the restraint is not used for staff convenience or to coerce a student to take an action he is resisting.

If a mechanical restraint is approved, a mental health professional must be physically present with the student and attempt to help him calm down or otherwise regain self-control. The School must document, including video, all uses of the fixed mechanical restraint to ensure its use complies with the Court Order. No student's clothing shall be removed while the student is in a fixed mechanical restraint.

Goal of Remedial Plan: BSTS will comply with the requirements of the Court Order if they consider adopting a fixed mechanical restraint to respond to students who are at serious and immediate risk of harming a person.

Findings.
   The Monitor is unaware of any consideration by DHS to adopt a fixed mechanical restraint device for use at STS.

Recommended Compliance Rating. Not Applicable

Steps Toward Substantial Compliance.
   1) Not Applicable

Methodology.
- Consultation with DHS and STS administrators

## APPENDIX 1. COMPLIANCE TABLE

The table below presents the recommended compliance ratings for each provision of the Remedial Plan for the Court's consideration. Recommended ratings for subsequent reporting periods will be added to this table so that progress can be tracked over time.[21] Of the 19 **Mental Health** provisions, the Monitor recommends substantial compliance ratings for 8 provisions (indicated by a ✔), partial compliance for 10 provisions (indicated by PC), and a non-compliance rating for 1 provision.

Of the 6 original provisions related to the use of **Room Confinement and Restraints**, the Monitor recommends substantial compliance ratings for 3 provisions (indicated by a ✔) and partial compliance ratings for 3 provisions (indicated by PC). The Monitor has not recommended a compliance rating for one provision because it is currently Not Applicable (N/A). The Monitor does not recommend a non-compliance rating for any of the room confinement and restraint provisions. A new provision related to the Amendment to the Remedial Plan was included in this report but has not yet been rated given that no youth have been admitted to the program.

| Provision | Monitor's Report | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| **Mental Health** | | | | |
| MH-I.A  Multi-Disciplinary Treatment Team | PC | PC | | |
| MH-I.B  Mental Health Treatment Plans | PC | PC | | |
| MH-I.C  As-Needed Referrals | PC | ✔ | | |
| MH-I.D MH Services Policy & Procedure | ✔ | ✔ | | |
| MH-II.A Therapeutic Services | PC | PC | | |
| MH-II.B Skill-based and Rehabilitative-based Services | PC | PC | | |
| MH-II.C Mental Health Staffing | ✔ | ✔ | | |
| MH-II.D MH Services Policy & Procedure | ✔ | ✔ | | |
| MH-III.A Student Records Policy & Procedure | PC | PC | | |
| MH-IV.A 24/7 Crisis Response | ✔ | ✔ | | |
| MH-IV.B Suicide Prevention and Intervention | PC | PC | | |
| MH-IV.C Multi-Sensory De-Escalation Tools and Spaces | PC | NC | | |
| MH-IV.D Therapeutic Crisis Response Unit | NYR | PC | | |
| MH-IV.E Hospital Level of Care | ✔ | ✔ | | |
| MH-IV.F Suicide Prevention Policy & Procedure | ✔ | ✔ | | |

---

[21] Recommended compliance ratings are expected to improve over time as DHS/STS shores up implementation and service delivery as advised throughout this report. However, recommended compliance ratings may also change in subsequent reviews if new information suggests that performance has deteriorated or if information gleaned from youth and staff interviews reveals problems that were not visible via document review, remote observation and administrative interviews.

| Provision | Monitor's Report | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| MH-V. Discharge Planning Policy & Procedure | PC | PC | | |
| MH-VI.A Oversight, Observation and Monitoring | ✓ | ✓ | | |
| MH-VI.B Quality Assurance Policy & Procedure | NYR | PC | | |
| MH-VI.C Ongoing Training | NYR | PC | | |
| Seclusion [Room Confinement] and Restraint | | | | |
| RC-I.A    Seclusion [Room Confinement] Policy | PC | PC | | |
| RC-I.B.1 Behavior Management/Motivation | PC | PC | | |
| RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors | ~ | NYR | | |
| RC-I.C    Staffing | ✓ | ✓ | | |
| RC-II    CMH Program | ✓ | ✓ | | |
| RC-III    Restraint Policy & Practice | ✓ | ✓ | | |
| RC-IV    Introduction of Fixed Mechanical Restraints | N/A | N/A | | |

APPENDIX 2. STEPS TOWARD ACHIEVING SUBSTANTIAL COMPLIANCE

| MENTAL HEALTH PROVISIONS |
| --- |
| **MH-I.A Multi-Disciplinary Treatment Team**<br>1)  Focus the MDT on a review of the youth's progress toward the treatment plan's established goals and objectives using more objective data. If progress has not been made, identify appropriate adjustments to the treatment plan collaboratively via the MDT meeting.<br>2)  Engage the youth in the MDT process more substantively perhaps by the use of a structured set of questions; document the substance of exchange with the youth.<br>3)  Ensure that MDT meeting minutes include affirmative statements about whether the clinician attempted to contact the youth's parent/guardian and if contact was made, the substance of the exchange with the parent/guardian. |
| **MH-I.B Mental Health Treatment Plans**<br>1)  Ensure that goals are measurable and attainable, with step-by-step objectives developed collaboratively between the youth and the assigned psychotherapist.<br>2)  Ensure that the youth's primary diagnoses are reflected in the treatment plan with interventions to address these diagnoses and their presenting symptoms.<br>3)  Expand the use of behavior observations, rating scales and measurement tools for specific symptom clusters normed for this population.<br>4)  Ensure that all interventions (*e.g.*, psychotherapy groups, individual therapy, clinically indicated skills-based/rehabilitative services, psychiatry) are included in the treatment plan with frequency, duration and practitioner designated. |
| **MH-I.C As-Needed Referrals**<br>1)  None. |
| **MH-I.D Mental Health Services Policy & Procedure**<br>1)  None. |
| **MH-II.A Therapeutic Services**<br>1)  Ensure that individual and group therapeutic interactions are conducted at the frequency designated by the youth's treatment plan. If gaps in therapeutic interactions occur, a progress should explain the reason.<br>2)  Ensure that group therapeutic interventions are provided consistent with the youth's treatment plan or, conversely, included in the plan as a prescribed intervention when youth participate in them. |

3) Implement and conduct mental health group therapeutic interventions on a regularly reoccurring basis, evidenced by routine group progress notes.
4) Track therapeutic group enrollment, attendance and refusals.
5) Improve the specificity of documentation regarding progress notes for both individual and group psychotherapies, while protecting privacy/confidentiality.
6) Clearly document attempts/interventions utilized to engage with youth who refuse to participate in individual and/or group therapies.

**MH-II.B Skill-based and Rehabilitative-based Services**
1) Ensure that youth are attending clinically indicated skills-based and rehabilitative-based groups and that these groups are referenced in the youth's treatment plan.
2) Develop a mechanism to support the interface between the skills/rehabilitative group and the youth's assigned clinician.

**MH-II.C Mental Health Staffing**
1) None.

**MH-II.D Mental Health Services Policy & Procedure**
1) None.

**MH-III.A Student Records Policy & Procedure**
1) Ensure that this topic is included in annual training for existing STS staff.
2) Properly document the completion of all training modules required by policy/Remedial Plan in staff training files so that they can be monitored to verify compliance.

**MH-IV.A 24/7 Crisis Response**
1) None.

**MH-IV.B Suicide Prevention and Intervention**
1) Ensure that the youth's Crisis Plan is developed timely following the youth's placement on precautions, is reviewed/updated as necessary after subsequent events, is promptly discussed by the MDT, is integrated into the youth's mental health treatment plan, and is shared with cottage staff.

**MH-IV.C Multi-Sensory De-Escalation Tools and Spaces**
1) Revitalize the MSDR rooms on campus and ensure the availability of appropriately trained staff to deliver the intervention when needed by youth.

   2)  Ensure that a youth's treating clinician, multi-disciplinary team and cottage team is notified of MSDR usage so that the intervention can be integrated into the youth's treatment.

## MH-IV.D Therapeutic Crisis Response Unit
1) Determine whether the ITP day program is sufficient to meet youth's needs or whether a self-contained ITP program is needed.
2) Ensure consistency between the youth's ITP treatment plan and services provided.
3) Ensure continuity of therapeutic experiences following transition from ITP.

## MH-IV.E Hospital Level of Care
1) None.

## MH-IV.F Suicide Prevention Policy & Procedure
1) None.

## MH-V. Discharge Planning Policy & Procedure
1) Ensure that Community Transition Plans include the required information regarding attempts to schedule appointments with community mental health treatment providers, contact information for community providers and youth's medications.

## MH-VI.A Oversight, Observation and Monitoring
1) None.

## MH-VI.B Quality Assurance Policy & Procedure
1) Implement the Quality Assurance policy by conducting regular audits, identifying deficiencies and developing and implementing appropriate corrective action.

## MH-VI.C On-going Training
1) Annually assess the extent to which each mental health clinician has met the continuing education and facility-based training requirements.

## SECLUSION [ROOM CONFINEMENT] AND RESTRAINT PROVISIONS

## RC-I.A Seclusion [Room Confinement] Policy
1) On the Room Confinement Checklist, expand the discussion of de-escalation techniques to include the youth's response/substance of the verbal exchange.

2) Develop a protocol for capturing the names of youth witness information in the event it is needed for an investigation into youth or staff conduct.
3) Develop a protocol for tracking/notifying mental health staff when youth have back-to-back room confinements that cause the 1-hour timeline to resume.
4) When a longer duration is necessary, obtain approval for room confinement to be extended *prior to* the 60-minute mark.
5) Ensure that Reintegration Plans are developed for all events (both single events and close-in-time events) lasting more than 60 minutes. Consider the use of a Reintegration Plan to more gradually return the youth to full programming once released from isolation.
6) Ensure that goals and objectives are articulated on the Reintegration Plans for each youth (as appropriate) and that Counselors document the youth's progress toward those goals in each daily review.

### RC-I.B.1 Behavior Management/Motivation

1) Supplement the ART all-staff training module with on-going guidance and coaching to help staff incorporate key ART skills in their day-to-day interactions with youth.
2) Pace ART groups so that a maximal number of youth can attend; objective is that 100% of the youth at STS have been taught the basic skills and concepts.
3) Develop strategies to improve the effectiveness of the behavior management program by fortifying incentives for positive behavior, consequences for negative behavior, keeping youth engaged and/or addressing the underlying causes of misconduct.
4) Ensure consistent implementation of Weekly Evaluations and seamless transitions when youth transfer to a new cottage.
5) Develop and implement a highly structured, treatment-focused program for youth with frequent aggressive behaviors. Ensure staff are sufficiently trained to provide the types of structure that is necessary for such a program to be effective.

### RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors

1) N/A

### RC-I.C Direct Care Staffing

1) Document all staff assignments, including when Overnight staff work a swing shift and assist AM staff with the youth's morning routines.
2) Recruit, select and maintain sufficient numbers of staff to operate both the general population program and any specialized programs needed to meet the needs of youth with specialized mental health or behavioral needs.

### RC-II CMH Program

1) None.

### RC-III Restraint Policy & Practice

| |
|---|
| 1)   None. |
| **RC-IV Introduction of Fixed Mechanical Restraints** |
| 1)   None. |