# 3rd Comprehensive Monitor's Report
## <u>Case 4:17-cv-00417-SMR-HCA</u>

Progress Toward Compliance with the Remedial Plan
For the Iowa Boys' State Training School

December 21, 2022

Kelly Dedel, Ph.D., *Monitor*
Daphne Glindmeyer, MD, *Subject Matter Expert*

One in 37 Research, Inc.
16 Rock Street Cody, WY 82414
(503) 799-0915 Kelly.dedel@gmail.com

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................................4

MENTAL HEALTH CARE.................................................................................................................. 14

*MH-I Injunctive Relief Required by Court Order: Identify the treatment that is clinically indicated for student's mental illnesses, including psychotherapy, and formulate treatment plans.* ............................. *14*

    MH-I.A. Multi-Disciplinary Treatment Team.. ......................................................................... 14

    MH-I.B. Mental Health Treatment Plans.. .............................................................................. 19

    MH-I.C. As-Needed Referrals ................................................................................................ 25

    MH-I.D. Policy & Procedure .................................................................................................. 26

*MH-II Injunctive Relief Required by Court Order: Provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective. . 28*

    MH-II.A. Therapeutic Services.............................................................................................. 28

    MH-II.B. Skill-based and Rehabilitative Services................................................................... 33

    MH-II.C. Mental Health Staffing............................................................................................ 35

    MH-II.D. Policy & Procedure ................................................................................................. 36

*MH-III Injunctive Relief Required by Court Order: Ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School.* ........................................................................................................................................ *37*

    MH-III.A. Student Records Policy & Procedure ...................................................................... 37

*MH-IV Injunctive Relief Required by Court Order: For students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation.* ............................................................ *39*

    MH-IV.A. 24/7 Crisis Response ............................................................................................ 40

    MH-IV.B. Suicide Prevention and Intervention...................................................................... 40

    MH-IV.C. Multi-Sensory De-escalation Tools and Spaces ...................................................... 43

    MH-IV.D. Therapeutic Crisis Response Unit .......................................................................... 45

    MH-IV.E. Hospital Level of Care ........................................................................................... 48

    MH-IV.F. Suicide Prevention Policy & Procedure ................................................................... 49

*MH-V. Injunctive Relief Required by Court Order: For students receiving mental health treatment at the school, attempt to arrange for mental health care services in the community so students may continue their treatment upon discharge.* ........................................................................................................ *51*

    MH-V.A. Discharge Planning Policy & Procedure ................................................................... 51

*MH-VI. Injunctive Relief Required by Court Order: Provide institutional oversight and structural coordination of the School's MH program.* .................................................................................. *54*

    MH-VI.A. Oversight, Observation and Monitoring ................................................................ 55

    MH-VI.B. Quality Assurance Policy & Procedure.................................................................... 56

MH-VI.C. Ongoing Training ................................................................................................................ 58

*SECLUSION AND RESTRAINTS*..................................................................................................................... *59*

*RC-I Injunctive Relief Required by Court Order: Defendants must ensure the School only employs use of BSU or the seclusion room in situations where a student' behavior poses a serious and immediate risk of physical harm to any person.* .................................................................................................................. *59*

RC-I.A Seclusion Policy. ...................................................................................................................... 59

RC-I.B.1 Behavior Management/Motivation. .................................................................................... 66

RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors.. ......................................... 78

RC-I.C Direct Care Staffing................................................................................................................. 84

*RC-II Injunctive Relief Required by Court Order: Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted to their room due to lack of privileges. Students may not be required to eat their meals in CMH rooms. Students may not be denied out-of-room recreation time available to other students.*.................................................................. *87*

RC-II CMH Program. ........................................................................................................................... 87

*RC-III Injunctive Relief Required by Court Order: The School shall not use the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of this Order. All Students at the School shall be notified immediately, both orally and in writing, that the Wrap is no longer to be used by the School.* 88

RC.III. Restraint Policy and Practice. ................................................................................................. 88

*RC-IV Injunctive Relief Required by Court Order: For the School to use fixed mechanical restraints instead of the Wrap, they may only do so with leave from the Court upon showing:*.................................................. *88*

RC-IV. Fixed Mechanical Restraints................................................................................................... 88


Appendix 1. Compliance Table........................................................................................................... 90

Appendix 2. Steps Toward Achieving or Maintaining Substantial Compliance ............................................ 92

## INTRODUCTION

In 2017, Plaintiffs' counsel brought suit against Iowa's Department of Human Services (DHS) and the Iowa Boys' State Training School (STS) alleging inadequate mental health care, an overreliance on isolation and the improper use of fixed mechanical restraints. The case went to trial in June 2019 and on March 30, 2020, the Honorable Stephanie Rose issued her order (dkt. 328). The Trial Order required Defendants to draft a Remedial Plan that addresses the various considerations necessary to overcome the deficiencies noted in the Trial Order, including policy, practice, staffing, training and internal oversight. The Trial Order also required the appointment of a Monitor to oversee Defendants' compliance with the Remedial Plan. Defendants and Plaintiffs' counsel jointly proposed Dr. Kelly Dedel, whom Judge Rose appointed on April 22, 2020 (dkt.337). Dr. Dedel selected Dr. Daphne Glindmeyer to serve as her Subject Matter Expert (SME) and both parties approved the selection.

The Court approved Defendants' Remedial Plan—which was drafted in collaboration with the Monitor, SME and Plaintiffs' counsel—on July 27, 2020 (dkt. 354). The Remedial Plan includes 19 provisions related to mental health care and 7 provisions related to seclusion [room confinement] and restraints.[1] Most of these provisions are multi-faceted and complex and contain multiple requirements.

Thus far, the Monitor has submitted the following reports to the Court:

- Initial Comprehensive Monitor's Report, filed on 2/1/21 ("the Monitor's February 2021 report," dkt. 386). This report assessed conditions at the facility during 2020, reported STS's progress toward all requirements of the Remedial Plan, and suggested compliance ratings for the Court's consideration.
- Interim Status Report covering a limited range of issues related to high levels of facility violence, filed on 7/7/21 ("the Monitor's July 2021 report," dkt. 404).
-  Second Comprehensive Monitor's Report, filed on 11/5/21 ("the Monitor's November 2021 report," dkt.410). This report assessed conditions at the facility during 2021, reported STS's progress toward all requirements of the Remedial Plan, and suggested compliance ratings for the Court's consideration.
- Interim Status Report covering the various actions STS is taking to address the level of violence at the facility, filed on 7/12/22 ("the Monitor's July 2022 report," dkt. 424).

This report is the Monitor's Third Comprehensive Monitor's Report, covering conditions at the facility during 2022 and STS's progress toward all requirements of the Remedial Plan. It also suggests compliance ratings for the Court's consideration. Both Defendants and Plaintiffs' counsel had an opportunity to review, comment on and discuss a draft of this report with the Monitor. Many of their comments were integrated into this final report.

The Monitor has recommended compliance ratings for each provision of the Remedial Plan for the Court's consideration, based on interviews with administrators, staff and youth; observation of facility

---

[1] The Remedial Plan originally included 6 provisions related to Room Confinement and Restraints. An additional provision was added to address the needs of youth with frequent aggressive behaviors in August 2021 ("the CMH Amendment," dkt. 409).

practices; and extensive document review.[2] As noted in the Remedial Plan (VI.B.3.a), these are not legal determinations.

- Of the **19 mental health provisions**, the Monitor recommends substantial compliance ratings for 11 provisions and partial compliance ratings for 8 provisions. The Monitor does not recommend a non-compliance rating for any of the mental health provisions.
- Of the **7 provisions related to the use of room confinement and restraints**, the Monitor recommends a substantial compliance rating for 3 provisions and partial compliance ratings for 2 provisions. The Monitor does not recommend a non-compliance rating for any of the room confinement and restraint provisions. The Monitor has not suggested a compliance rating for two provisions: RC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors" (because the requirement for a program evaluation is not yet due) and RC-IV "Introduction of Fixed Mechanical Restraints" (because it is currently not applicable).

A table presenting these recommended ratings can be found in Appendix 1, and Appendix 2 summarizes the steps needed to attain compliance with each provision where substantial compliance has not yet been achieved.

STS continues to make steady and significant progress toward the requirements of the Remedial Plan, although there remain areas needing focused attention and improvement. The number of provisions with recommended Partial Compliance ratings is not indicative of the rate of progress for several reasons. First, most of the provisions of the Remedial Plan are multi-faceted and require multiple, complex processes and procedures to be implemented. As they are implemented, piece-by-piece, the facility remains in partial compliance until *all* of the component parts have been achieved, even as substantive progress is made to design and implement each part. Second, recent issues with new employee training had an oversized impact on the number of recommended Partial Compliance ratings because rather than "Training" being a stand-alone provision, training requirements are incorporated throughout the Remedial Plan. Training issues were either the primary or a contributing deficiency in 5 provisions with recommended Partial Compliance ratings. In other words, the recommended compliance ratings somewhat understate what STS has accomplished to date. What may be a better indicator is the shrinking size of Appendix 2, which lists the steps that must be taken to achieve substantial compliance. While some of the remaining steps are complicated, the number of areas where continued improvement is needed has steadily dwindled over time. The goal of the remainder of this report is to describe the progress STS has made, and to clearly articulate the steps that remain.

Methodology

This report was informed by routine communication with STS administrators, documentation related to each of the Remedial Plan's provisions, activities during Dr. Dedel's three-day site visit in

---

[2] To identify the expected elements of various practices and to formulate recommended compliance ratings, the Monitor/SME are guided first and foremost by the language of the Court Order and Remedial Plan. That said, some provisions are more specific than others and in these cases the Monitor/SME refer to professional standards (*e.g.*, NCCHC, APA, AACAP, JDAI, many of which are referenced throughout the Court Order) and their extensive knowledge of generally accepted practices in juvenile correctional facilities throughout the country.

October 2022, and Dr. Glindmeyer's interviews with STS youth and mental health staff (via video conference) during October/November 2022. More specifically, Drs. Dedel and Glindmeyer conducted the following activities:

- Group meetings with the DHS/STS Administrative Team, Quality Assurance Team, and those responsible for facility training
- Interviews with DHS Division Administrator, DHS Clinical Director and Iowa Assistant Attorney General; and 30 STS staff (Cottage Directors, Cottage Counselors, YSWs and YSTs who worked 1st and 2nd shift in general population cottages and specialized programs; Duty Supervisors; Social Workers; MSDR staff; Mental Health Clinicians; and Activity Specialists)
- Interviews with 20 STS youth who were housed in either general population cottages or specialized programs, all of whom were on the mental health caseload
- Aggregate data on youth population, youth-on-youth assaults, youth-on-staff assaults, room confinements and Learning Interventions
- Observations of 1 MDT meeting and 4 ITP Team meetings
- Video review of all restraints of youth in the ITP program that occurred in areas with stationary video cameras and incident report packets for all restraints of youth in the ITP program
- Document review related to the following topics:
  - Complete mental health records for a sample of 15 youth receiving mental health services as of 8/31/22 (psychological assessment reports, treatment plans, monthly reviews by the MDT, progress notes for all individual and group psychotherapy sessions and clinically indicated rehabilitative or skills-based group sessions, encounter notes, and telephone contact logs)
  - Group psychotherapy and rehabilitative/skill-based group schedules
  - As-needed evaluations, therapy requests and youth refusals to attend therapy
  - Mental health staffing and on-call schedule
  - Mental health oversight and supervision
  - Suicide precautions (assessments, Crisis Plans, treatment plans, MDT minutes and clinicians' progress notes)
  - Use of the multi-sensory de-escalation room ("MSDR")
  - Referrals for psychiatric hospitalization
  - Discharge planning (Community Transition Plans, Mental Health Discharge Summaries and Nursing Summaries)
  - Mental health clinician's professional development
  - Youth grievances related to mental health services, room confinement and/or behavior management
  - Room confinement
  - Aggression Replacement Training ("ART") trainers, staff facilitators, schedules and youth rosters
  - Behavior Management System incentive program and level/step program, learning interventions, and special management plans
  - Referrals and admissions to the ITP program since its inception in March 2022 (ITP log, referral documents, ITP Plans, Treatment Plans, ITP Team meeting minutes, daily evaluations,

> clinicians' progress notes, notes from rehabilitative and skills-based groups, 30-day reviews, room confinement documents, and Learning Interventions)
> o   Direct care staffing levels and cottage staff schedules for July-August 2022
> o   Training, both pre-service and annual (training modules, proficiency exams, and training logs)
> o   STS Student Handbook and notices of policy changes
> o   Internal Quality Assurance reports/plans of correction for January 2022 and July 2022

Preparing for and facilitating the Monitor's/SME's site visit activities and gathering and transmitting the thousands of pages of information requested in order to prepare this report required an extraordinary amount of STS staff's time. In addition, STS administrators, staff, clinicians and youth were abundantly candid when sharing their astute perceptions of the facility. These conversations provided the Monitor/SME with insight into the facility's successes and challenges that would simply not be possible through document review alone. The collaboration and cooperation that STS has demonstrated throughout the Monitor/SME's involvement not only makes the duty to keep the Court informed much easier, but also speaks to DHS's/STS's determination to fully and successfully implement the Remedial Plan.

## Summary of Current Status

Since the time of the Court's order in early 2020, STS has fundamentally altered the way in which youth behavior is managed by implementing routine mental health care and drastically limiting the circumstances under which room confinement can be used and its duration. Nearly all STS youth are on the mental health caseload and are seen regularly by their assigned clinician for individual psychotherapy. Many are also involved in psychotherapeutic groups and other rehabilitative group programing to address their mental health needs. For the most part, treatment plans include measurable goals and objectives along with an initial set of basic interventions to help youth alleviate symptoms and stabilize behavior. A multi-disciplinary treatment team discusses each youth every 30 days. Few of these services were available to STS youth when this case went to trial and their evolution over the past two years has proceeded relatively swiftly. The major task remaining is to ensure that treatment interventions are modified when youth fail to make expected progress toward goals to alleviate symptoms/stabilize behavior. STS staff are extremely well informed about the functions and causes of each youth's problem behaviors, but this knowledge has not yet been adequately harnessed to develop interventions to equip youth with readily accessible skills to use when confronted with frustration, difficult emotions, peer conflict, traumatic stress reactions, etc. This is an essential element that needs to be layered onto the solid foundation of mental health services that has been built at STS over the past two years. In addition, STS could better ensure that treatment plans include goals for each primary diagnosis and reference all rehabilitative and psychotherapeutic group modalities in which youth participate. Efforts to schedule follow-up psychotherapy and medication management appointments in the community upon a youth's discharge also need to be strengthened.

The need for effective interventions to equip youth with skills for self-regulation is conceptually aligned with the few remaining steps needed to meet the requirements of the room confinement and behavior management portions of the Remedial Plan. Like with mental health services, STS has made significant progress in this area by designing and implementing a robust system that incentivizes

engagement in school and treatment and rewards youth when they meet behavioral expectations. Limits to the use of room confinement now bring the practice into alignment with professional standards and result in periods of isolation that are very short in duration and used only for the purpose of de-escalation. In addition, in the past year, STS has carefully implemented an intensive therapeutic program for youth with significant mental health needs and for those who frequently engage in aggressive and violent behavior. During its first seven months of operation, the ITP program appeared to effectively manage these youth in a manner that both addresses their needs for mental health treatment and for structure/supervision. These interventions have alleviated some—but certainly not all—of the disorder that disrupts services and programming among youth in the general population.

Notably, the facility has struggled to fully integrate its overarching skills-based program (Aggression Replacement Training, or ART) into the day-to-day interactions among staff and youth. While progress has been made in ensuring youth are enrolled in the program, the training that staff currently receive appears to be insufficient to the task. As a result, most staff are unable to reinforce or prompt youth to use these essential skills when behavioral crises emerge, which leads some youth to rely heavily on external sources of support to de-escalate these crises (e.g., room confinement, sensory and de-escalation rooms). To the extent that some youth's reliance on these external sources of support is driven by boredom or a desire for individual attention, maximizing efforts to ensure each housing unit has a robust array of engaging activities each day—including the opportunity to go outside, try new activities, engage with peers and staff—continues to be a strong recommendation. Enjoyable, fun, engaging activities are powerful motivators for youth.

One of the most powerful tools for accelerating progress in institutional reform efforts is to develop an internal capacity to assess progress, identify problems and craft solutions, such that the facility is not waiting for the Monitor/SME to issue findings in order to chart its next steps. DHS/STS have designed and implemented an exceptional internal Quality Assurance program. Deploying resources to conduct comprehensive audits in January and July 2022 allowed the facility to refine practice and improve performance in advance of the Monitor's/SME's activities to produce this report. Importantly, the Monitor/SME's findings were aligned with those of the QA program for 90% of the 86 Quality Assurance Indicators. The Monitor/SME and DHS/STS have already begun discussing the relatively few sources of divergence in preparation for the early 2023 QA audit. One overarching area in need of improvement is new employee training. Upon hire, all new staff should receive the full training modules for each of the Remedial Plan areas (i.e., cannot substitute on-the-job training, give credit for previous employment) prior to being deployed into coverage on the housing units. The facility's Quality Assurance Plan of Correction speaks to this issue, and DHS/STS's internal expertise and organizational skill bode well for both the continued progress and sustainability of the overall reform effort. Quality Assurance findings are interpolated throughout the discussion of each provision of the Remedial Plan in this report.

STS's accomplishments and on-going challenges are discussed in each major section of this report, following key updates regarding STS's leadership team, physical plant renovations, and various safety indicators.

**STS Leadership Team and Physical Plant Renovations**

Since the Monitor's November 2021 report (dkt. 410), STS refined its organizational structure and made several changes to its leadership team.

- The Superintendent was formally appointed in January 2022, after serving as the Interim Superintendent since August 2021. He was promoted from the position of Deputy Superintendent and has 20+ years of experience working with adolescents in custody.
- The Deputy Superintendent position had been vacant since August 2021, but in October 2022, the position was filled by the individual who has served as a Treatment Program Administrator/Director of the Mental Health Department for STS since 2019. That DHS has installed someone with deep expertise in mental health in the Deputy Superintendent position is a tribute to the agency's commitment to meeting the youth's treatment needs and infusing the facility's culture with a strong therapeutic influence.
- One of the Treatment Program Administrator positions is now filled by an individual who served for several years as STS's Research Analyst, which infuses the facility's management team with the necessary expertise for data-driven decision-making.
- The other Treatment Program Administrator/Director of Mental Health position became vacant in early November 2022, when the individual previously serving in this role was promoted to Deputy Superintendent. A well-qualified candidate was selected to fill the position on December 16, 2022. This individual will become independently licensed in early 2023, at which time they will assume the duties of the MHA. Until then, the MHA role will continue to be filled by the Deputy Superintendent who is also independently licensed.
- STS's Administrative Team is filled out by a Business Office Manager, Treatment Services Director (who oversees cottage staff), a Security Director (who oversees the Youth Service Technicians/security officers), the School Principal, Nurse Manager, and Social Work Supervisor, among others.

The STS Administrative Team, with support from DHS leaders, continues to demonstrate the expertise, creativity and commitment necessary to reform the facility's practices as required by the Remedial Plan.

In 2021, the Iowa legislature allocated $6.5 million to renovate several of STS's housing units ("cottages"). The project includes the conversion of three cottages from dormitory-style housing to units with individual youth rooms. Such a layout affords youth greater privacy, safety and opportunity to individualize the spaces with photographs, artwork and other elements of personalization. The project will proceed in phases, with each cottage being taken off-line one at a time. Renovation of the first cottage is underway, and the full project is expected to be completed in early-2024. Once complete, the facility will add an additional 16 beds to its capacity, which will increase from 64 to 80 youth.

**Average Daily Population**

The facility's population remains significantly lower than it was at the time of trial (~100 youth in Summer 2019) and when the Court Order was issued (n=79 youth in March 2020). After decreasing significantly as the COVID pandemic struck and the Remedial Plan got underway in late 2020 (to a low of 35 youth in January 2021), the population has slowly increased over time. Since July 2022, the facility's

population has averaged about 55 youth.[3] DHS administrators expressed confidence that the facility would not exceed its current capacity of 64 youth until the renovations have been completed.



### Youth-on-Youth Assault [4]

One of the key metrics typically used to anchor discussions about facility safety is the rate of youth-on-youth assault, shown in the line graph below.[5] To date, each of the Monitor's Comprehensive Reports and Status Reports has endeavored to put the rates in the context of concurrent developments and events at the facility. Because facility violence is affected by so many things, none of these are causal, but they do provide insight into some of the macro influences on youth behavior. For example, when attempting to interpret the rates of violence for 2022, it is helpful to know that in January 2022, STS began requiring all youth and staff to report to the school building each day in response to endemic levels of school refusals that were resulting in large numbers of youth remaining on the housing units. Some youth were not particularly enthusiastic about this change and their behavior deteriorated accordingly. Similarly, in March 2022, staff assignments to the various housing units were reconstituted in preparation for the opening of the Intensive Treatment Program ("ITP") in late March. While a necessary step to set the ITP program up for success, the changes in staff assignments were destabilizing as they disrupted important bonds that had developed among youth and staff. This disruption had a negative effect on some youth's behavior. During this 3-month period, the average monthly rate of youth-on-youth violence

---

[3] The graph below uses the "average gross count" which includes all youth who are physically on campus as well as those who are on Temporary Home Visits or in detention but who remain committed to STS.

[4] "Assault" data includes fights in which youth slap, punch, hit, kick, or stomp another person; hit a person with an object such as a chair or book; use a weapon such as a piece of wood, metal or glass; or throw a liquid such as water or urine on another person.

[5] The rate is calculated using the following formula: *rate = number of events/gross population.* The "gross population" is calculated by tallying the number of youth in custody each day during the time period. It is an additive statistic, rather than a snapshot of the number of youth in custody on any given day during the time period or an average over a period of time, such as the more familiar "average daily population." The rate statistic provides a standardized scale, accounting for the size of the population and normalizing the variation in the number of days month-to-month. It provides a cleaner, more precise look at the changes in the level of violence than using the raw number of events.

reached an all-time high of 3.93. Shortly thereafter, facility safety began to improve, as shown in the graph below.



Generally, in other reform efforts with which the Monitor/SME have been involved, the early phases of reform are marked by significant changes to a facility's program and operations which occur alongside efforts to develop new skill sets among staff, all of which is inherently destabilizing. This often causes a vicious cycle of increases in rates of violence and significant staff turnover, which makes it difficult for new programs and strategies to gain any traction. This is a difficult time for everyone involved, causing the Monitor to observe that "things often get worse before they get better." Fortunately, most facilities eventually turn a corner as gradual improvements to staff practice and facility protocols accumulate. These improvements appear to flow from the combination of once "new" staff accruing a longer time on the job, effectively troubleshooting various new procedures, more reliable and skilled service delivery and greater consistency delivering overarching frameworks like incentive programs or cognitive behavioral therapy programs. Although work to implement the Remedial Plan is not yet complete, it appears that STS may be entering the "things get better" phase of reform. In the most recent 6-month period (April-September 2022), <u>the average monthly rate of youth-on-youth violence has decreased about 46% from its previous high,</u> to an average of 2.12. Previous reductions in violence that occurred in January 2021 and October 2021 proved to be an anomaly, only sustained for a month or two before climbing higher again. The Monitor/SME are hopeful that the recent decreases can be sustained and that further decreases occur as STS' program and services are strengthened in the ways discussed throughout this report.

**Youth-on-Staff Assault [6]**

Frequent violence against staff was a serious concern in late 2020/early 2021. In February 2021, the facility's rate of youth-on-staff assault reached an apex of 2.83 as shown in the graph below. Since then, the average monthly rate of youth-on-staff assault has decreased significantly and has largely been sustained for the past 18 months or so. Over the past 12 months (October 2021 to September 2022), the average monthly rate of youth-on-staff assault was 0.96. When interviewed, cottage staff (i.e., YSWs, YSTs, Counselors and Directors) reported fewer concerns for their own safety compared to interviews conducted in early 2021, although all remained vigilant about the risks involved when working in a correctional facility.



These improvements to facility safety suggest that the facility *may have* emerged from the crisis phase that often accompanies massive changes in policy and practice that are the hallmark of reform. That said, youth and staff continue to be subjected to violence which needs to be addressed. When interviewed, youth and staff who had been at STS for longer periods of time reported that things were "better," but all had ideas about what needed to change to further improve facility safety. These are discussed throughout this report.

**The Path Forward**

DHS/STS remain highly engaged with the Monitor/SME and have provided all information, documents and meetings requested by the Monitor/SME. As a result, a strong, collaborative relationship continues. Similarly, the Monitor/SME continue to collaborate with Plaintiffs' counsel by discussing feedback on Defendants' various written products and sharing impressions about the facility's progress.

As noted in previous Monitor's Reports, the logical, detailed Remedial Plan provides an excellent roadmap for how to achieve the required system reform, but the Plan's existence does not magically create the staff skill in core competencies, interdisciplinary coordination or system proficiencies that are

---

[6] "Assaults" includes incidents in which youth slap, punch, hit, kick, or stomp another person; hit a person with an object such as a chair or book; use a weapon such as a piece of wood, metal or glass; or throw a liquid such as water or urine on another person.

required to implement the changes. Concerted efforts among appropriately qualified and dedicated staff have certainly created momentum in the reform, though some continued patience for some test-and-refinement will be required to address the more intractable problems. Overall, the Monitor and SME remain pleased with Defendants' progress, appreciative of the collaboration with Plaintiffs' counsel and optimistic about the likelihood of successful reform of the conditions and services at STS in accordance with the Court's orders.

This report is organized in the following manner. The Remedial Plan includes six sections in response to the Court's Order regarding mental health services (MH-I to MH-VI) and an additional four sections for the parts of the Court's Order pertaining to seclusion and restraints (RC-I to RC-IV). In each section, this report first presents the injunctive relief ordered by the Court, followed by the overall goal of the Remedial Plan that corresponds to that section of the Court's Order. Each section then contains subsections corresponding to the specific requirements of the Remedial Plan and the August 2021 amendment. For each subsection, the requirements of the Remedial Plan are presented (paraphrased in some cases) along with a narrative describing Defendants' efforts, to date, to meet the requirements and a suggested compliance rating for the Court's consideration. Each section also includes recommended steps toward achieving substantial compliance. The Monitor's/SME's methodology and source documents for assessing progress are also listed. Two appendices present 1) a table showing the recommended compliance ratings from the three comprehensive Monitor's reports and 2) a listing of the recommendations for provisions in which substantial compliance has not yet been achieved.

## MENTAL HEALTH CARE

**MH-I Injunctive Relief Required by Court Order**: Identify the treatment that is clinically indicated for student's mental illnesses, including psychotherapy, and formulate treatment plans.

**Goal of the Remedial Plan**: BSTS will develop integrated (therapeutic, skills-based, rehabilitative-based and psychiatric care) mental health ["MH"] treatment plans that are based on information obtained from a screening/assessment/evaluation process that is implemented and defined by policy and procedure.

**MH-I.A. Multi-Disciplinary Treatment Team**. BSTS shall utilize a multi-disciplinary treatment team ["MDT"] approach to provide integrated mental health treatment services to students who have mental health treatment plans or are in the process of developing a mental health treatment plan.
MH-I.A.1. MDT Members. The MDT shall be comprised of the Director of the Mental Health Department/Mental Health Authority, psychotherapists, social workers, psychiatric providers and a non-psychiatric medical provider.
MH-I.A.2. MDT Information. The MDT shall ensure that relevant information from other BSTS staff is obtained and considered through in-person or written communication.
MH-I.A.3. Student/Parent. The MDT shall ensure that the student and their parent/guardian are involved in the treatment planning and review process and are aware of treatment progress.
MH-I.A.4. MDT Facilitator. The MDT shall have a facilitator that will ensure that members actively participate to develop, monitor and revise treatments and supports as needed.
MH-I.A.5. Monthly Review. The MDT shall meet regularly and as needed to review cases and discuss treatment progress and planning to ensure that each student's progress toward treatment goals is reviewed at least monthly.

Findings.

Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt.362). In late 2021/early 2022, revisions to the policy were negotiated with the Monitor, SME and Plaintiffs, were submitted to the Court and approved on 7/8/22 (dkt. 422). The policy addresses the composition and function of the Multi-Disciplinary Treatment Team (MDT).

## MH-I.A.1 MDT Members

As explained in previous Monitor's reports, the purpose of an MDT is to coordinate services so that clinicians can provide integrated treatment to youth. In order to ensure that the youth's treatment addresses peer and family dynamics, experiences in school, medical needs, etc., information is needed from professionals involved with the youth and their various life domains. An in-person meeting among all those involved with the youth's care is essential so that there is a common understanding of the youth's circumstances and challenges and so that care by all professionals is coordinated. The physical presence of professionals working with the youth is optimal so that information can be exchanged and discussed. If one's physical or virtual presence is not possible, a written update of the youth's functioning in the relevant domain is acceptable, but this should be the exception, not the norm.

In order to determine adherence to the requirements of this provision, minutes from 32 weekly MDT meetings (1/5/22 to 8/31/22) were reviewed and one MDT meeting was observed by the

SME. MDT minutes and observations confirmed that in general, a representative from each of the required disciplines was present with few exceptions.

## MH-I.A.2 MDT Information

At an initial MDT meeting, the youth's assessment results, diagnosis, symptoms and risk factors should be discussed along with the assigned clinician's preliminary formulation of treatment targets. In subsequent MDT meetings, the purpose is to review the youth's progress or lack thereof toward attainment of treatment goals and to discuss whether additional interventions are needed. For the purpose of efficiency, the MDT's discussion needs to center on the youth's progress toward treatment goals, with relevant information from the various life domains used to inform the understanding of the youth's progress or lack thereof.

MDT minutes and observations continued to reveal that a great deal of information was provided regarding the youth scheduled for review from the youth's primary mental health treatment provider as well as psychiatry, nursing, educational, and cottage staff. Each discipline provided input whether in-person, via a designee, or via written report. Both observation and meeting minutes indicated increased attention to the youth's specific treatment goals. This was good to see.

## MH-I.A.3 Student/Parent Participation

Youth participation is essential to the MDT process in order to stimulate/maintain buy-in to the treatment process, which flows from the youth knowing and understanding what their goals are and talking about their progress toward them, or their objections to the focus of therapy. Parents need to be involved to both inform the understanding of the youth's current circumstances and also as an essential advocate for the youth's continued engagement in the therapeutic process, both while in custody and upon release to the community.

Per observation of an MDT meeting, youth interviews, and a review of the weekly MDT minutes, youth were consistently attending and participating in MDT meetings, particularly toward the end of the monitoring period. This was good to see. Direct observation of an MDT meeting, however, revealed interactions with youth that were perfunctory and rarely included a substantive exchange about the youth's experience of or progress in treatment. MDT minutes for the other 32 MDT meeting minutes that took place during the monitoring period revealed a similar, overly general approach to eliciting feedback from the youth, particularly those that occurred during the beginning of 2022. Additional probing for detail in response to youth's customarily short answers may help to ensure a more substantive exchange and allow for better goal/intervention development.

The MDT meeting minutes revealed attempts to contact the youth's parent or guardian and documentation regarding their input into the MDT meeting. The 32 MDT meetings included a total of 399 case reviews.[7] Of these, about 70% included documentation regarding attempts to reach the parent or guardian either by telephone or email, with just over half of these attempts (56%) resulting in actual contact with the parent or guardian. In the other 30% of reviews, attempts to reach the parent or guardian were not documented and the space for "Parent Contact" was generally left blank. Overall, this was a marked improvement over the results from the prior monitoring period where attempts or actual parent/guardian contact were documented in only 36% of case reviews, but still leaves room for improvement.

---

[7] For the purpose of these data, MDT "special concern" emergency team meetings were not included.

Mental Health Telephone Contact Logs were reviewed for the 15 youth included in the mental health sample.[8]  In general, there was documentation of mental health staff attempting to reach a youth's parent or guardian on a monthly basis.[9] These logs indicated that in the vast majority of contacts, the parent or guardian had no questions or concerns. While there was increased evidence of family therapy occurring (i.e., four cases noted in the overall MDT reviews), there was little other evidence of active participation by the youth's family in their mental health treatment. This raises the question of whether clinicians may need to better engage with parents by directly soliciting information and concerns, as the lack of responsiveness per the documentation is suspect give the Monitor/SME's experience in other jurisdictions.

The internal Quality Assurance audit from July 2022 noted similar results for all indicators discussed above, with the only deficiency regarding involvement of the youth's parent or guardian in the treatment planning process. The July 2022 quality assurance review indicated that for 10 meeting minutes between 4/13/22 and 7/6/22, there were 116 youth reviews with only 36% indicating parent/guardian engagement or attempts. As a result, the audit noted a deficiency and STS developed a plan of correction to improve the specificity of documentation.

## MH-I.A.4 MDT Facilitator

As explained in prior Monitor's reports, an MDT meeting needs a leader to guide the discussion, keep it on track and focused on the goals and objectives, and to ensure that participation from each member of the team is solicited.

Per the minutes from the 32 MDT meetings held during this monitoring period, the Director of the Mental Health Department/MHA was documented as the facilitator on 20 (63%) occasions. For the other 12 meetings, the Lead Psychologist chaired the meeting (the Lead Psychologist also chaired the MDT meeting that was observed by the SME). In other words, each of the meetings had a designated facilitator as required. To improve efficiency and substance, the MDTs would benefit from efforts to tailor the discussion more narrowly around the youth's treatment goals, objectives and progress, and the need for any changes to the prescribed interventions. For example, specific prompts from the facilitator to elicit targeted information, particularly from the assigned clinician and the youth, may be helpful.

## MH-I.A.5 Monthly Review

As explained in previous Monitor's reports, a youth's progress needs to be regularly reviewed in order to determine the need for adjustments to treatment goals, objectives and interventions. When youth are meeting their treatment goals, new goals need to be established in order to further address the youth's symptoms. If a youth is not progressing, the MDT and clinician must discern the reason for the lack of progress and adjust the course of treatment accordingly (*e.g.*, making goals more realistic, breaking the objectives into smaller steps, changing interventions). The specific cadence to treatment plan adjustments will depend on the youth/clinician, but over time, adjustments to the interventions in an effort to catalyze progress should be considered and documented accordingly.

---

[8] For in-depth record reviews, 15 youth were randomly selected from the total number of youth on the mental health case load as of 8/31/2022, and their full records (assessments, treatment plans, contact logs, individual and group progress notes, and MDT reviews) were requested, provided and reviewed.

[9] The only exception was youth LG, who requested individual psychotherapy 8/5/22 with the first session dated 8/25/22 immediately prior to the end of the monitoring period.

MDT meeting minutes were reviewed for each of the 15 youth in the mental health sample. All of the youth were reviewed by the MDT on a monthly cadence, as required. Some youth were reviewed by the treatment team more frequently. This occurred when a youth transferred from one cottage to another and arrived at the new cottage in time for the monthly MDT review. In addition, some youth were reviewed more frequently due to experiencing difficulties requiring a review for a "special concern." The frequency of MDT review of youth was good to see.

Furthermore, youth's initial MDT meetings generally occurred within 30 days of admission. Of the 15 youth included in the mental health sample, 13 were assessed in this area as two youth, DM and JS, were admitted prior to 1/1/22, the beginning date of the document request. Twelve of the 13 remaining youth (92%) were reviewed within 30 days of their admission. The only exception was DS, who was admitted 5/23/22 with the initial treatment team meeting dated 6/29/22. Overall, this meets the requirement regarding the *frequency* of review.

Regarding the *content* of the monthly MDT reviews, in addition to the ongoing albeit improved issues with youth and parent input discussed above, the MDTs need a greater focus on treatment interventions in order to meet professional standards. Based on the document review and observation, it is obvious that STS staff know the youth well. They are able to discuss the youth's symptom experience and behavioral challenges in detail. Furthermore, the staff were able to discuss the youth's motivation for engaging in specific behaviors. What was missing was the intervention or adjustments to the youth's treatment plan in order to address the symptom experience or behavioral challenges. When reviewing the 32 MDT meeting minutes that included 399 treatment reviews, adjustments to the treatment plan were recommended on only 44 (11%) occasions. The majority of these adjustments involved the removal of a specific group intervention when the youth had completed the group, the need to begin discharge planning, a change of diagnosis, or a referral to ITP. There were only two treatment plan adjustments documented that addressed specific interventions, in contrast to the large volume of youth for whom frequent externalizing behaviors were discussed. When goal-related discussions were documented, they tended to be overly general, and more focus is needed on the specific goal, how progress was measured, the appropriateness of the intervention, and most importantly the need for adjustments to the interventions and treatment plan in order to catalyze progress. There are various ways to increase clinicians' skill in this area, including team supervision, case conferences, didactic training or professional development focused on treatment interventions to expand clinicians' repertoire of skills. This issue is relevant to not only this provision but also to MH-I.B "Treatment Plans" and MH-II.A "Therapeutic Services," discussed below.

Summary

Overall, the MDT process at STS continues to progress as expected. The shift to cottage-based MDT meetings has effectively reduced the amount of time clinicians spend in meetings. The teams continue to mature, meetings are held regularly with all required team members and meetings are facilitated by a qualified individual. For the most part, all youth are reviewed by the MDT within 30 days of admission and on a monthly cadence thereafter. MDT members share a great deal of information about each youth and the MDT has improved its focus on treatment goals. However, the MDT's discussion needs to focus more narrowly on youth's progress toward treatment goals and must focus on how to intervene or adjust the youth's treatment plan in order to address difficulties, engage the youth in a more substantive discussion of the same, and directly solicit and encourage parent's involvement (both direct and indirect) in the youth's mental health treatment.

More specifically, MDT minutes and observations revealed only infrequent adjustments to the youth's treatment plan. Even when youth were experiencing behavioral difficulties or were failing to

progress in the behavior management system, treatment plan adjustments were not forthcoming. When observing the MDT meeting, it was apparent that staff knew the youth well. They were able to discuss the youth's behavioral challenges, formulate theories regarding the function of the youth's behavior, and discuss the youth's motivation for specific behavioral challenges. Even so, what was missing was a plan to address or intervene in order to assist the youth in moderating their behavior. Given the number of room confinement/behavioral events at the facility, the paucity of treatment plan adjustments was surprising. Currently, the facility utilizes various external loci of control to address youth's behavioral challenges (e.g., room confinement, MSDR and de-escalation room, Learning Interventions). Ideally, treatment should strive to improve the youth's *internal* loci of control or cognitive behavioral skills to address symptoms that ultimately result in externalizing behaviors. One way to support this goal (which may not be fully achievable for all youth) would be to increase staff's focus on ART, the integration of ART into all campus spaces and activities, and the ubiquitous reinforcement of ART/CBT principles with youth (see RC-I.B.1 "Behavior Management/Motivation" for a fulsome discussion of ART).

This is the final piece of a properly functioning MDT. Once it includes all required members and is properly facilitated, reviews youth's progress on a monthly cadence, engages youth and parent in a meaningful way, and demonstrates an understanding of the causes and functions of a youth's behavior, *then* the MDT should help the clinician elucidate appropriate interventions to reduce the frequency of externalizing behaviors which would result in adjustments to the treatment plan. These considerations should be documented in the MDT meeting minutes or in a Progress Note for the youth.

The internal Quality Assurance audit was silent on this issue, suggesting a need to expand the relevant indicator(s) to assess whether the MDT is engaging in problem-solving discussions about the *interventions* needed to catalyze youth progress.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Engage the youth in the MDT process more substantively and then document the substance of exchange with the youth.
2) Ensure that clinicians attempt to engage the parent or guardian in meaningful discourse about the youth's treatment program and document all such attempts (and the outcome) in both the individual youth records and the MDT meeting minutes.
3) When youth are not progressing, consider modifying the treatment interventions in an effort to catalyze behavior change and/or improve symptom experience. Such considerations should be documented in the MDT meeting minutes or in a progress note for the youth.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Consulted with the Director of the Mental Health Department/MHA
- Observed one MDT meeting
- Reviewed 32 MDT meeting minutes from 1/5/22 to 8/31/22
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes, MDT meeting minutes, and telephone call logs regarding each youth
- Reviewed internal Quality Assurance audits from January and July 2022

**MH-I.B. Mental Health Treatment Plans**. By 60 days from the effective date, BSTS will develop integrated mental health treatment plans that address the needed interventions including therapeutic and skills-based services that focus on evidence-based practice, rehabilitative services and psychiatric interventions. Note: Psychiatric services to be included at 60 days; otherwise, the below items are in effect on the effective date.

MH-I.B.1. Treatment Plan 30-day Timeline. The Plans shall be completed within 30 days of admission following a complete screening/assessment/evaluation process.

MH-I.B.2. Treatment Plan Informed by Assessment. The Plans shall be directed or informed by the screening/assessment/evaluation information gathered upon admission.

MH-I.B.3. Treatment Plan Development. The Plans shall be developed primarily by the student's assigned psychotherapist in collaboration with the student.

MH-I.B.4. Goals/Objectives. The Plans shall include measurable goals and objectives related to the student's diagnosis(es).

MH-I.B.5. Evidence-Based Interventions. The Plans shall include treatment interventions for individual psychotherapy and group psychotherapy that focus on evidence-based practice.

MH-I.B.6. Rehabilitative/Skill-Based Interventions. The Plans may include rehabilitative and/or skills-based interventions designed to further address the student's clinical needs.

MH-I.B.7. Duration/Frequency. The Plans shall note the duration and frequency at which the recommended interventions or services are expected to occur, as well as the professional responsible for the intervention.

MH-I.B.8. Progress Reviews. The Plans shall be reviewed for progress no later than every 30 days or sooner if the student demonstrates significant progress or lack thereof, significant functional improvements or deterioration, or as needs arise or change based on feedback from the student, parent, JCO, multidisciplinary team members or cottage staff.

Findings.

Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt.362). In late 2021/early 2022, revisions to the policy were negotiated with the Monitor, SME and Plaintiffs, were submitted to the Court and approved on 7/8/22 (dkt. 422). The policy includes procedures for mental health treatment plans.

Mental Health Treatment Plans are documents developed by treatment providers in collaboration with youth and the youth's parent/guardian that outline the proposed goals of treatment including an objective measure of goal attainment, goal-derived objectives or smaller achievable steps toward the ultimate broader goal, and specific interventions to allow an individual to reach established treatment goals. The goals should be specific to the individual as well as realistic and attainable. The goals must be based on the individual's assessment and diagnoses and should include psychiatric goals. The use of SMART goals (*i.e.*, goals that are Specific, Measurable, Attainable, Relevant and Time-Bound) is one way to ensure specific metrics become part of STS's treatment plans. Treatment plans are necessary and important as they act as a road map, guiding both the therapist and the youth and allowing for objective measurement to determine if therapeutic interventions are working (*e.g.*, if the youth is achieving the relevant objectives) or to determine if interventions need to be adjusted. The overarching criteria for determining a treatment plan's adequacy is whether it has measurable goals and objectives related to the youth's diagnoses that are understandable to both the clinician and youth and whether it can effectively guide treatment.

**MH-I.B.1 Treatment Plan 30-day Timeline**

Per policy, a youth's treatment plan must be completed within 30 days of admission following the screening, evaluation, and assessment process. This is required so that the youth's course of treatment is determined and proceeds expeditiously. Among the 15 youth in the mental health sample reviewed for treatment plan timeliness, three youth (TJ, DM, and JS) were admitted to the facility prior to start date of the sampling frame (1/1/22), so they were not included in the calculation. Each of the remaining 12 youth (100%) had a treatment plan developed within 30 days of admission or 30 days of referral.[10]  This finding is similar to that of the internal Quality Assurance review in July 2022, which reported a compliance rating of 90%.

## MH-I.B.2 Treatment Plan Informed by Assessment

As explained in previous Monitor's reports, a youth's screening, evaluation and assessment informs the providers about the youth's symptoms, risk factors and diagnosis(es) that should be targeted by the treatment plan. A treatment plan that was not based on assessment information would be random and would include esoteric goals and treatments not tailored to a youth's specific needs. That said, assessment information is multi-faceted and complex. Multiple professionals (*i.e.*, the psychiatrist and psychologist) offer their opinion about the youth's appropriate diagnosis, and sometimes, these are in conflict. Consensus must be achieved by reviewing the diagnostic criteria of the DSM-5-TR and identifying which diagnosis(es) best reflect the youth's presenting symptoms.

In the intervening period since the Monitor's November 2021 report, there were marked improvements in the treatment plans regarding diagnoses and diagnostic clarity. Overall, diagnoses were definitive and did not include adjustment disorders or other preliminary diagnoses. Toward the end of the monitoring period, clinicians became more consistent in identifying salient treatment targets/primary diagnoses.[11] These improvements were good to see.

However, of the 15 youth in the mental health sample, 6 youth's treatment plans did not appear to address all relevant diagnoses. These included:

- *The absence of relevant goals for diagnoses that were identified as primary treatment targets (i.e., had not been deferred).* Youth BG had a substance use diagnosis, but his treatment plan did not include relevant goals and the youth was not participating in RSAT. Youth JS's treatment plan identified ADHD as a primary diagnosis but did not include relevant goals. Youth EH's treatment plan identified PTSD as a primary diagnosis but did not include relevant goals.
- *Cases where the clinician appeared to have deferred (or removed) particular diagnoses inappropriately.* Two youth (Youth AW and JS) had psychotic disorder diagnoses that were not addressed in their treatment plans. Psychotic disorders should not be deferred, as ongoing reality testing is needed to determine the youth's symptom experience and their ability to engage in treatment/learn new skills. Another youth's PTSD diagnosis was abruptly removed from his treatment plan, even though the youth's documented symptoms appeared to continue to meet diagnostic criteria. If the clinician/MDT determined that

---

[10] One youth, LG, was admitted 7/13/22, but referred himself for services 8/5/22 and his initial treatment plan was completed on 8/25/22. The treatment plan was appropriately completed within 30 days of *referral* rather than 30 days of *admission*.

[11] In early 2022, consultation between the Monitor/SME and DHS/STS mental health staff clarified that if specific diagnoses were not going to be addressed in the treatment plan (i.e., would be deferred) due to the need to address other issues first (e.g., teaching coping skills or addressing depression prior to addressing trauma), the clinician would add a treatment plan notation that identifies the primary diagnoses/treatment targets.

these diagnoses had been erroneously applied or that the youth no longer met diagnostic criteria, that decision should have been documented in the MDT meeting minutes or in a progress note for the youth.

In addition, several youth were receiving treatment for a substance use disorder via a rehabilitative group (RSAT), but their participation in the RSAT group was not listed on their treatment plans (Youth LG, CM, NM, DS and CW). The delivery of services to address youth's substance use issues is obviously positive, but all treatment modalities must be identified on the youth's treatment plan in order to promote continuity of care should the youth be transferred to another STS clinician's caseload and/or when the youth discharges from STS to the community.

These results depart from the 100% performance level identified in the internal Quality Assurance audit from July 2022. This could be due to sampling differences (wherein the same cases were not reviewed by the QA auditor and the Monitor/SME) or to the interpretation of the requirements. The Monitor/SME are consulting with DHS/STS about this divergence to ensure expectations are aligned and to ensure interrater reliability.

## MH-I.B.3 Treatment Plan Development

As explained in previous Monitor's reports, the clinician and youth must develop treatment plans collaboratively. They are the two most essential participants in the treatment process. The youth must be aware of the plan's goals, objectives and what interventions will be deployed in order to increase buy-in. The treatment planning process is also an important opportunity to offer psychoeducation to help youth understand their symptoms and what their diagnoses means in order to reduce stigma and create a foundation for on-going treatment in the community.

In preparation for this report, 20 youth were interviewed by the Monitor/SME regarding a variety of topics including their treatment plan, treatment plan development, goals and interventions. Compared to the Monitor's previous report, there was improvement noted with regard to youth reporting their participation in treatment planning and their ability to describe their treatment goals. Overall, the simplification of goals and objectives appears to have been beneficial to the youth's comprehension of their Treatment Plans.

## MH-I.B.4 Goals/Objectives

As explained in prior Monitor's reports, goals both drive treatment and provide an indicator for measuring treatment progress. They should be selected based on the youth's presenting symptomatology and/or risk factors and should include psychiatric goals. Objectives are required to illustrate the pathway toward goal achievement and to break the goal into its component parts. Measurable goals, underlying objectives and data-based metrics are standard practice, and all are necessary to identify treatment progress or the lack thereof.

Compared to the previous review, improvements in goal development and progress measurement were noted. Each of the 15 youth's treatment plans included a manageable number of specific goals and objectives that were simpler/more understandable than those previously reviewed by the Monitor/SME. Clinicians continue to use subjective measures, but typically these were combined with either two sources of information (i.e., self and staff) or were combined with a rating scale. This is appropriate. Over time, clinicians have slowly increased the use of objective measures of progress related to mental health treatment goals. These objective measures include rating scales, progress in the Behavior Management System, Learning Interventions and medication adherence. This was good to see. In addition to being measurable/objective, this is also a positive indicator of ongoing integration between behavioral health and the overall behavioral management program at STS. Taken

together, the formulation of goals/objectives in the youth's treatment plans meet muster, but there is an opportunity to fortify the determination of goal acquisition in the following ways:

- Occasionally, progress notes did not specify the intervention or skill that would be taught in therapy to allow youth to achieve these targets, relying instead on a general description of "coping skills." More specific prescriptions would better direct therapy.
- If rating scales, etc. are going to be the measurement of progress, they need to be assessed and reported in the clinician's progress notes on a regular basis. Review of the progress notes revealed only sporadic references to the results of the objective measures.

These results generally comport with the 100% performance level identified in the internal Quality Assurance audit from July 2022.

MH-I.B.5 Evidence-Based Interventions

As explained in the previous Monitor's report, therapy must be grounded in evidence-based interventions, the effectiveness of which have been determined in clinical studies. Adherence to evidence-based practices provides the most efficacious treatment and is the accepted standard of care. As such, treatment plans must designate evidence-based interventions for both individual and group psychotherapeutic interventions.

Evidence-based interventions are available to youth at STS. Treatment plans for the 15 youth in the mental health sample revealed that for individual therapies, cognitive behavioral interventions were designated, which are evidence-based. All youth's treatment plans included an individual therapy intervention. [The delivery of these services is discussed in MH-II.A, below.]

Various therapeutic groups are facilitated by mental health clinicians at STS, some of which are evidence-based (i.e., COPE to Thrive), while others utilize evidence-based techniques, even though they are not part of a packaged, evidence-based curriculum (e.g., ACT Art Therapy, Building Healthy Relationships, Emotional Masculinity, Grief, Learning Resilience Through our Trauma, Mindful Movement). Such interventions are necessary to respond to the needs of many STS youth and are certainly worthwhile. Of the 15 youth in the mental health sample, 5 youth were involved in one or more psychotherapeutic groups per the group rosters. However, in 3 of these, the group intervention itself was not listed on the treatment plan (e.g., JS's treatment plan did not list COPE or ACT Art; AW's treatment did not list Building Healthy Relationships; TJ's treatment plan did not list Healthy Relationships or ART until after the groups had been completed). In addition, overall, these groups appear to be underutilized. Between January and August 2022, only 31 youth were assigned to the variety of group therapy interventions. Given the level of trauma, behavioral challenges and interpersonal relationship deficits that STS youth demonstrate, more frequent use of group therapy modalities would be expected, particularly since so many of the groups available at STS are directly responsive to these issues.

These results regarding correspondence between psychotherapeutic group participation and treatment plans depart from the 90% performance level identified in the internal Quality Assurance audit from July 2022. This could be due to sampling differences (wherein the same cases were not reviewed by the QA auditor and the Monitor/SME) or to the interpretation of the requirements. The Monitor/SME are consulting with DHS/STS about this divergence to ensure expectations are aligned and to ensure interrater reliability.

MH-I.B.6 Rehabilitative/Skill-Based Interventions

As discussed in the previous Monitor's reports, youth may also need interventions that do not necessarily need to be facilitated by a mental health clinician, despite being part of their mental health treatment. These include groups that are designed to teach youth skills needed to address specific risk factors or an opportunity to practice skills taught in individual or group therapy. Some of these may also be evidence-based.

STS has a variety of such groups[12], and those that are *clinically indicated* (such as RSAT and ASAP) should be included on the youth's treatment plan. Among the 15 youth in the mental health sample, eight youth were included on the RSAT roster, and one youth was included on the ASAP roster. For the 8 youth participating in RSAT, this modality was included in the youth's treatment plan in three cases but was not listed on the other five youth's treatment plans. For the one youth participating in ASAP, the modality was included on the treatment plan as required. Across the 9 youth, this equates to a 44% performance level (rehabilitative/skills group was included on treatment plan in only 4 of 9 cases). Improved congruence between clinically indicated rehabilitative group participation and treatment plans is needed to ensure the integration of mental health care across providers and to promote continuity of care upon transfer/discharge, particularly given the salience of substance use as a risk factor for recidivism.

These results regarding correspondence between rehabilitative group participation and the youth's treatment plan depart from the 90% performance level identified in the internal Quality Assurance audit from July 2022. This could be due to sampling differences (wherein the same cases were not reviewed by the QA auditor and the Monitor/SME) or to the interpretation of the requirements. The Monitor/SME are consulting with DHS/STS about this divergence to ensure expectations are aligned and to ensure interrater reliability.

## MH-I.B.7 Duration/Frequency

As explained in the previous Monitor's reports, like any prescription for medication that prescribes dosage, frequency and length of time, treatment plans need to specify the frequency and duration of each intervention. This not only creates accountability for service providers, but also informs the youth of the expectations for involvement in treatment.

For individual psychotherapy interventions, the treatment plans generally included the frequency, duration and practitioner for individual sessions. This was aligned with the finding of the internal Quality Assurance audit in July 2022, which rated the performance level at 100%.

As noted above, some psychotherapeutic and rehabilitative group interventions were not prescribed on youth's treatment plans (and thus, the frequency and duration were also missing), although youth were participating in them. [The delivery of these services is discussed in MH-II.A and MH-II.B.] This was similar to the findings noted in the July 2022 internal Quality Assurance audit, where a score of 75% for this metric was reported. As such, the facility developed a Plan of Correction as follows, "Coaching on including the frequency, duration, and provider for all rehabilitative/skills services will be given on 8/24/22. Therapists will be asked to audit all current mental health treatment plans to ensure frequency, duration and providers of services are noted to policy standard. Any plans

---

[12] Rehabilitative/Skills groups include Gang Resistance Intervention Program (GRIP), Adolescent Sexual Abuse Program (ASAP), Achieving Maximum Potential (AMP; life skills), Residential Substance Abuse Treatment (RSAT), Applied Community Transition program (ACT; life skills), Rebound group (drug/alcohol education), Essential Instruction (faith-based re-entry), and a Parenting Skills course. STS staff members leading these rehabilitative/skill-based interventions have reportedly received the appropriate training to do so. Typically, youth are referred to these groups by the Court or their JCO, less often by their assigned mental health clinician.

that do not include all three elements of each intervention will be revised to meet standard by 9/2/22."

### MH-I.B.8 Progress Reviews

As noted above in MH-I.A.5 "Monthly MDT Meetings," youth are routinely reviewed by the MDT on a monthly cadence. Furthermore, it was apparent that when youth were experiencing difficulties, they were scheduled for progress reviews by the MDT, with this designated as "Special Concern." The relevant MDT minutes occasionally included a listing of planned adjustments to the youth's treatment plan as appropriate, but these changes were few and far between. As discussed in the MDT provision above, substantive changes to the interventions prescribed by the youth's treatment plans in response to behavioral challenges or symptom exacerbation were rare. When youth do not progress or are experiencing increased symptomatology as evidenced by a lack of improvement in objective measures (e.g., rating scales, Behavior Management System, Learning Interventions), the clinician and youth need to review and modify the treatment interventions so that the youth can acquire and access the needed skills.

Regarding the timeliness of progress reviews, in contrast to the 100% performance level identified by the Monitor/SME, the internal Quality Assurance audit from July 2022 assessed a performance level of only 70%.  This appears to be due to the QA auditor using the date the treatment plan revision was signed (electronically) to assess the 30-day interval, while the SME used the MDT dates. This needs to be discussed among the Monitor/SME and the DHS/STS Quality Assurance team to ensure consistency in feedback to STS's clinicians.

### Summary

Overall, the review of the youth's treatment plans revealed marked improvements with regard to simplicity and usability of treatment goals. Youth have also become more informed about the purpose and targets of their treatment. This was good to see. What remains to achieve substantial compliance is to ensure that youth's primary diagnoses are addressed or explicitly deferred and that all interventions and their frequency and duration are included in the treatment plan. Treatment plans should also be modified to include alternative interventions when youth are not progressing as expected.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance.**
1) Ensure that the youth's primary diagnoses are reflected in the treatment plan with interventions to address these diagnoses and their presenting symptoms. If goals related to a certain diagnosis are being outsourced to a rehabilitative group or are being deferred, indicate that on the treatment plan.
2) Ensure that all interventions (*e.g.*, psychotherapy groups, clinically indicated skills-based/rehabilitative services) are included in the treatment plan with frequency, duration and practitioner designated.
3) Consider prescribing group therapeutic interventions more liberally in response to youth's needs.
4) When youth are not progressing, consider modifying the treatment interventions on the Treatment Plan to catalyze behavior change and/or improved symptom experience. Such considerations should be documented in the MDT meeting minutes or in a progress note for the youth.

**Methodology.**

- Reviewed *Mental Health Services* policy
- Consulted with STS Mental Health Authority
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed meeting minutes for 32 MDT meetings
- Observed one MDT meetings
- Interviewed 20 youth receiving mental health services
- Interviewed mental health clinicians
- Reviewed internal Quality Assurance audit from July 2022

**MH-I.C. As-Needed Referrals**
MH-I.C.1. As-Needed Referral for Mental Health Evaluation. Students who initially are not referred for therapeutic, skills-based or rehabilitative-based services through the Mental Health Department may be referred for subsequent assessment/evaluation at any time by following the referral process that will be described in Mental Health Services policy below.
MH-I.C.2. As-Needed Referral for Psychiatric Evaluation. Students who were not taking medication upon admission or were not evaluated for medication may be referred for an evaluation at any time by following the referral process that will be described in the Mental Health Services policy below.

Findings.

Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt.362). In late 2021/early 2022, revisions to the policy were negotiated with the Monitor, SME and Plaintiffs, were submitted to the Court and approved on 7/8/22 (dkt. 422). The policy addresses the protocol for as-needed referrals for evaluation and remains in effect. The purpose of this provision is to establish an appropriate process to ensure that youth who were not *initially* identified as needing mental health services upon admission (when all youth are assessed and decisions regarding treatment needs are first made) are able to access mental health/psychiatric care during their stay at STS should circumstances change and/or a need for treatment arise.

By policy, referrals for evaluation must be processed within 7 business days, and the action taken must be documented on the referral form. Overall, referrals for evaluation are being reviewed by the MHA quickly. Among the 36 referrals, 20 (55%) were reviewed on the date of submission. Only 2 of the 36 referrals (6%) were processed outside the 7 business day window. The average time to review was 2.7 calendar days.

MH-I.C.1 As-Needed Referral for Mental Health Evaluation

STS reported that no youth were referred for an as-needed Mental Health Evaluation between January 1 and August 31, 2022. This is not surprising given that upon admission, all youth receive a psychological evaluation and over 95% are referred for services at that time. As such, very few STS youth (only one youth on the 8/31/22 facility roster) are not receiving mental health treatment and thus the pool for "as-needed referrals" is very small.

MH-I.C.2 As-Needed Referral for Psychiatric Evaluation

Between January 1 and August 31, 2022, 36 youth were referred for a psychiatric evaluation. Two of the 36 youth (6%) were re-admissions to STS and their psychiatric evaluation was dated prior to

the referral because it was completed during the original admission. The psychiatric evaluation should be repeated if a youth is referred upon re-admission because, in the intervening period between discharge and re-admission, significant changes in the youth's status and symptom experience may occur. Among the remaining remaining 34 youth (94%) were interviewed timely.

The internal Quality Assurance audits did not include a performance level for As-Needed Referral for Mental Health Evaluations as there were no youth referred during the audit's sampling frame. The audit did not include findings regarding As-Needed Referral for Psychiatric Evaluation, which was likely an oversight, and the Monitor/SME have recommended adding psychiatric evaluations to the quality assurance methodology given that these referrals are specified in the Remedial Plan.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Reviewed the As-Needed Evaluation Referral Log
- Reviewed the internal Quality Assurance audits from January and July 2022
- Reviewed mental health records for 36 youth referred for as-needed evaluations

---

**MH-I.D. Policy & Procedure**
MH-I.D.1. Mental Health Services Policy. (a) By 30 days from the effective date, BSTS shall create a policy/procedure regarding the delivery of *Mental Health Services*, which will include therapeutic, skills-based, rehabilitative and psychiatric services. (b) By 30 days from the effective date, BSTS will review and revise *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans*.
MH-II.D.2. Institutional Materials. By 30 days from the effective date, BSTS will update institutional materials (e.g., Student Handbook/Orientation materials) to include reference to the varied therapeutic, skill-based and rehabilitation-based services that are incorporated into the overall clinical services provided.[13] [**See footnote below regarding the inclusion of MH-II.D.2 in this discussion**]
MH-I.D.2. Staff Training on Mental Health Services Policy. By 90 days from the effective date of the policies noted above, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.
MH-I.D.4. Annual Review. These policies shall be reviewed at least annually and updated as needed.

**Findings**.
Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt.362).[14] In late 2021/early 2022, revisions to the policy were negotiated with the Monitor, SME and Plaintiffs, were submitted to the Court and approved on 7/8/22 (dkt. 422). Similarly, the Student

---

[13] The Remedial Plan includes two provisions related to Mental Health Services Policy & Procedure that are nearly identical (MH-I.D and MH-II.D). The provision in MH-I.D includes three objectives (MH-I.D.1-3), while the one in MH-II.D includes a fourth (MH-II.D.1-4), adding requirements related to Institutional Materials. Otherwise, the provisions are identical. For the sake of completeness and to avoid redundancy, all four objectives are included here. Provision MH-II.D simply refers the reader back to this discussion.

[14] Procedures for psychological screening and evaluation were integrated into the *Mental Health Services* policy, so a revision to 4C-02 *Psychometric Testing, Screens, Appraisals, Evaluations and Plans* was not required. This policy was rescinded.

Handbook has been revised multiple times to bring it current as new policies are developed, and existing policies are revised. Most recently, the Student Handbook was updated in June 2022.

The annual review of the Mental Health Services policy required by **objective MH-I.D.3 "Annual Review"** was conducted the first week of September 2021. The managers for each policy area completed a survey that asked about challenges to the policy, areas that need revision, whether oversight is appropriate, people who should be consulted regarding proposed revisions, and responsible parties for implementation and performance issues. STS submitted the proposed revisions to the Monitor/Plaintiffs' counsel on 9/14/21, within the annual review timeline. The Monitor conferred with Plaintiffs and provided STS with feedback on proposed policy changes in early October 2021. The proposed changes were negotiated with Plaintiffs throughout late 2021/early 2022 and were ultimately approved by the Court on 7/6/22 (dkt. 422).

STS originally met the requirements for **objective MH-I.D.2 "Staff Training on Mental Health Services Policy"** by training its staff in October/November 2020, as discussed in the Monitor's February 2021 report. The recently revised policy now includes training requirements for new staff, existing staff and psychologists in the Mental Health Department. The *Mental Health Services* training module was revised for the 2022 training year, along with the proficiency exam. The module focuses on the various mental health screenings that occur upon intake and how to interpret their results to inform interactions with the youth. The training also introduces the Intensive Treatment Program (see MH-IV.D "Therapeutic Crisis Response Unit" and RC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," below) and its target populations.

A review of training records revealed:

- *New Employee Training.* Of the 20 staff who were hired in 2022 and still employed as of 8/31/22, documentation was available to demonstrate that only 10 of the 20 received training on the *Mental Health Services* policy (50%) upon hire.[15]

- *Annual Training*. As of 11/11/22, a total of 111 of 126 (88%) direct care staff had completed annual refresher training on the *Mental Health Services* policy.[16] With two months still to go in the training year, STS appears to be on track to meet this requirement by ensuring that the remaining 15 staff complete this training module.

In addition to the annual training on *Mental Health Services* described above, mental health clinicians are also required to complete position-specific training necessary to ensure they can fulfill their job responsibilities (e.g., treatment planning, multi-disciplinary team meetings, evidence-based interventions, discharge summaries, etc.). During 2022, the Director of the Mental Health Department/MHA conducted three trainings with STS clinicians for this purpose. Provision MH-VI.C "On-Going Training," below, discusses additional professional development for STS mental health staff.

Both the January and July 2022 internal Quality Assurance audits noted these same problems regarding evidence of training completion among new direct care staff. While the Training Officer and STS administrators felt confident that new STS staff received some form of training in all components

---

[15] The Monitor considered two factors when assessing training (1) how information was provided (i.e., whether the PPT training curriculum was utilized) and (2) documentation of attendance (i.e., completed proficiency exams (preferred) or sign-in sheets were considered proof of training; a training schedule was not considered adequate proof of training).

[16] "Direct care staff" includes staff from all disciplines who have face-to-face interactions with youth. This includes cottage staff (YSWs, Counselors, Directors), security staff (YSTs), mental health staff (psychologists and social workers), educators and medical staff.

upon hire, proper documentation proved elusive. In March 2022, STS changed its procedure to require a completed proficiency exam as proof that staff completed the required courses. Although this is undoubtedly a more straightforward method than interpreting sign-in sheets, problems remain. While the facility cannot fully remediate the training deficit for new staff (because the "upon employment" period has passed), some staff have attended subsequent training once the gap in their training records was discovered. The problem appears to be multi-faceted, with deficits in scheduling/re-scheduling and documentation. The facility plans to identify additional checkpoints to ensure that all staff receive pre-service and refresher training as required by policy.

The **implementation** of this policy is discussed in MH-I.A through MH-I.C and MH-II.A and B, above.

---

**Recommended Compliance Rating**. Partial Compliance

---

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that new STS staff receive training on the *Mental Health Services* policy prior to being assigned to the housing units to work independently and ensure that the completion of this training is documented.[17]

---

**Methodology**.
- Reviewed policy *4C-01 Mental Health Services* and the training curriculum
- Reviewed Student Handbook, dated June 2022
- Reviewed Training Data for new staff hired in 2022 and veteran STS staff as of 8/31/22
- Consulted Director of Mental Health Department regarding clinician training

---

**MH-II Injunctive Relief Required by Court Order: Provide psychotherapy to students where clinically indicated as treatment for their mental illnesses, at a quantity and regularity necessary to be effective.**

**Goal of the Remedial Plan**: BSTS will provide individual and group psychotherapy to students whose screening/assessment/evaluation identifies a diagnosable mental illness or otherwise identifies significant personal distress or functional impairment that may benefit from psychotherapy. The psychotherapy provided will be person-centered and focus on evidence-based therapeutic and skills-based practices that address the student's individual needs. The BSTS will also provide rehabilitative services and supports as needed to further address student's clinical needs.

---

**MH-II.A. Therapeutic Services.**
II.A.1. Psychotherapy. BSTS shall offer students individual and/or group psychotherapy at the appropriate frequency and duration when their screening/assessment/ evaluation identifies a diagnosable mental illness or other clinical need that can be treated effectively with psychotherapy.
II.A.2. Psychotherapy Upon Request. BSTS shall provide individual and/or group psychotherapy to students who request it at any time throughout their BSTS admission.
II.A.3. Consistency with Treatment Plan. BSTS shall ensure that individual and group psychotherapy provided is consistent with the student's mental health treatment plan.

---

[17] Note: staff are not assigned to either of the Intensive Treatment Program Tiers unless they have completed the *Intensive Treatment Program* training.

<u>II.A.4. Treatment Refusals</u>. By 30 days from the effective date, if a student requires individual or group psychotherapeutic services but declines them in full or in part, ongoing attempts at rapport building and motivational engagement will be made and documented to determine and address the student's objections to entering into treatment. The goal of this intervention is to provide psychotherapy at the duration and frequency needed to address their individual needs.

**Findings.**

Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt. 362). In late 2021/early 2022, revisions to the policy were negotiated with the Monitor, SME and Plaintiffs, were submitted to the Court and approved on 7/8/22 (dkt. 422). The policy describes the protocol for therapeutic services and remains in effect.

Treatment plans, which prescribe the specific treatment interventions for youth, were developed for the each of the 15 youth in the mental health sample, as discussed in MH-I.B "Mental Health Treatment Plans," above. The delivery of psychotherapy is the crux of the Court's Order to provide mental health services that are responsive to each youth's individual needs.

**MH-II.A.1 Psychotherapy**

*Individual Psychotherapy*. Individual psychotherapy was prescribed for each of the 15 youth in the mental health sample. The content and quality of psychotherapy progress notes—the key place where insight into the therapists' approach to providing treatment is accessed—revealed marked improvement with regard to clinicians' focus on skill development. With few exceptions, progress notes were available for sessions at the frequency prescribed on the treatment plan and revealed reliance on evidence-based treatment modalities. As discussed in previous Monitor's reports, behavioral crises and interpersonal conflicts amongst peers continued to dominate treatment sessions. It is essential for clinicians to listen to youth and allow them to vent about these very stressful situations. The review of progress notes indicated that clinicians oftentimes, though not always, used these crises as an opportunity to reinforce skills previously taught in individual therapy. Most of the clinicians' progress notes referenced specific skills although one or two clinicians tended to rely on general/vague language. While there is an opportunity to elevate the work of certain clinicians, overall, the delivery of individual psychotherapy meets the spirit of this part of the provision.

More broadly though, further refinement of the therapeutic approach could help to reduce the level of facility violence and some youth's heavy reliance on an external framework or *external* loci of control for managing symptoms and behavioral challenges (e.g., room confinement, MSDR, de-escalation). More focus on developing these youth's *internal* locus of control (e.g., development of more advanced coping skills such as those that help the youth regulate their emotions in the moment and that are not avoidance/distraction based) may reduce the reliance on external frameworks and better promote successful community reintegration. While many youth may not be able to transition fully to an internal locus of control, such interventions should be discussed by the MDT and adjusted as necessary in the youth's Treatment Plans based on results of youth/staff reports and objective measures, as discussed above. In addition, as discussed in RC-I.B.1 "Behavior Management/Motivation," elevating the cottage staff's skills in ART would allow them to consistently prompt youth to practice these skills in the moment of an impending behavioral exacerbation.

Of the 20 youth who were interviewed to inform this report, all but one reported a good connection with their primary therapist and indicated that their therapist was readily available to them. Youth were able to discuss their treatment targets and could explain or demonstrate specific skills they had learned in therapy. Some of these skills were admittedly basic (e.g., distraction or

avoidance) but nonetheless, the youth could explain them. However, several youth reported they were unable to access these skills in moments of behavioral crisis, which fortifies the recommendations above and those regarding ART in RC-1.B.1 "Behavior Management/Motivation," below.

During this monitoring period, the Director of Mental Health/MHA decided to assign specific clinical staff to address daytime crises. This allowed mental health clinicians to better focus on their caseloads and to avoid crisis-driven interruption of individual psychotherapy. This was apparently effective as youth records revealed consistent individual psychotherapy sessions.

A review of the internal Quality Assurance audit from July 2022 regarding this issue revealed a score of 100% given that progress notes referenced evidence-based therapeutic modalities that were used during treatment, specifically CBT or Motivational Interviewing (MI). This is aligned with the Monitor/SME's findings.

*Group Psychotherapy*. Group progress notes were appropriately labeled with the group title and session/topic, the date of the group, and each progress note discussed the individual youth's behavior and engagement with the substance, or the lack thereof. When interviewed, youth's reviews of the groups were mixed, some indicated they were helpful and interesting, but some expressed frustration with the requirement to participate in the group. Groups were delivering evidence-based interventions or used evidence-based techniques, were generally delivered on a weekly cadence and appeared to be of an appropriate size (generally fewer that 5 youth).

Based on this information, the delivery and documentation of the various psychotherapeutic groups is sufficient, but as noted above in MH.I-B.5 "Evidence-Based Interventions," this intervention appears to be underutilized given the small number of youth enrolled in the various group psychotherapies during the current monitoring period. The internal Quality Assurance audit from July 2022 noted 100% compliance on this indicator, but also noted that only 4 of 10 youth in their sample were referred for mental health groups.

## MH-II.A.2 Psychotherapy Upon Request

STS reported that 16 youth requested mental health services between January and August 2022.  These data were somewhat confusing as over 95% of the youth at STS were already on the mental health caseload and receiving psychotherapy. It is assumed that these requests were for additional contact for a youth already receiving services, and the 15 requests of this type received a response on the same day. The other youth (LG) was noted in MDT minutes to have submitted a request for psychotherapy. This youth was not assigned to individual therapy on admission, but later requested same. The request was submitted 8/5/22 with response and a first therapeutic encounter dated 8/25/22. The availability of mental health services and procedures for accessing them are clearly articulated in the Student Handbook. The internal Quality Assurance audit in July 2022 did not assess performance with this indicator as there were no referrals to review as of that date.

## MH-II.A.3 Consistency with Treatment Plan

In general, when youth were recommended for underlined individual psychotherapy per their treatment plan, there was evidence that therapeutic intervention occurred. In the intervening period since the Monitor's last report, there were improvements with regard to adherence to the individual psychotherapy frequency designated by the youth's treatment plan. Overall, youth were seen at the prescribed frequency. A few exceptions were noted, occasions where a youth who was prescribed

weekly or twice weekly therapy skipped a week.[18] However, these were rare exceptions to the overall pattern of consistent delivery of individual psychotherapy.

Previously, the Monitor/SME noted that based on the progress notes regarding the various youth's individual therapy sessions, it was difficult to determine whether therapeutic interventions were consistent with the goals/objectives outlined in the treatment plan. This has improved overall. The simplification of the treatment plans appears to have given rise to progress notes that are better aligned with the therapeutic goal statements. This was good to see.

Regarding group psychotherapy, roster for group psychotherapies occurring between 1/1/22 and 8/31/22 included 31 assignments to a variety of group therapy interventions. More specifically: 3 youth were assigned to ACT Art group, 5 youth were assigned to Building Healthy Relationships, 4 youth were assigned to participate in COPE to Thrive, 4 youth were assigned to Grief Group, 6 youth were assigned to Emotional Masculinity, 5 youth were assigned to Learning Resilience Through Our Trauma, and 5 youth were assigned to Mindful Movement.

As stated in prior Monitor's reports, to reach substantial compliance, several things need to come together: 1) a youth's treatment plan should prescribe groups indicated by the youth's mental health assessment, 2) the youth's assignment to the group should be noted on the group roster and 3) a complete set of group notes should be available to verify the youth's participation. A comparison of the group psychotherapy roster/treatment plans/group psychotherapy progress notes for the 15 youth in the mental health sample revealed overall improvement with less evidence of inconsistency. Among the 15 youth in the mental health sample, there were 7 group psychotherapy assignments (involving a total of 5 youth).[19] There was correspondence between the roster/treatment plans/progress notes for 3 of the 7 group therapy assignments (43%). However, the following inconsistencies were noted among the other 4 assignments (57%):

- Youth JS was assigned to COPE group. There were progress notes documenting participation in the group, but the group was not prescribed in the youth's treatment plan.

- Youth JS was assigned to ACT Art therapy. There were progress notes documenting participation, but the group was not prescribed in the youth's treatment plan.

- Youth AW was assigned to Building Healthy Relationships. There were progress notes documenting participation, but the group was not prescribed in the youth's treatment plan.

- Youth TJ was assigned to the group Building Healthy Relationships. There were progress notes documenting participation in the group therapy, but the group was not noted in this youth's treatment plan until the group had already been completed.

---

[18] For example, Youth AW was prescribed individual therapy twice weekly. He did not have a progress note or encounter note for the week of 7/3/22, which resulted in 12 days between individual sessions.  Youth JS was prescribed weekly therapy but did not have an individual session during the week of 2/13/22, which resulted in 14 days between individual sessions. His therapy frequency was later increased to twice weekly, but he had only one session during the week of 5/1/22, which resulted in 9 days between sessions, and had only one session during the week of 7/3/22, which resulted in 6 days between sessions.

[19] There were an additional two youth assignments to Emotional Masculinity, but as this group was not planned to start until 8/25/22, there were no progress notes available, and the treatment plans were not reviewed for this specific group.

These findings verify that each youth was indeed participating in the group, but indicate an ongoing need to ensure that, when a youth is referred to or is participating in a specific group therapeutic intervention, the group is included in the youth's mental health treatment plan.

These results depart from the 90% performance level identified in the internal Quality Assurance audit from July 2022. This could be due to sampling differences (wherein the same cases were not reviewed by the QA auditor and the Monitor/SME) or to the interpretation of the requirements. The Monitor/SME are consulting with DHS/STS about this divergence to ensure expectations are aligned and to ensure interrater reliability.

## MH-II.A.4 Treatment Refusals

As explained in previous Monitor's reports, youth refuse engagement in mental health services for a variety of reasons. It is the responsibility of the clinician to explore the youth's hesitation and to address objections and resistance to engagement. Treatment refusals are not an infrequent occurrence, and do not necessarily reflect a problem with the quality of the mental health service being offered, but they need to be addressed with attention toward psychoeducation and building rapport.

STS provided a list of youth who refused individual or group therapeutic interventions between 1/1/22 and 8/31/22. STS reported that only one youth refused individual therapy during the monitoring period, which is aligned with Monitor/SME's youth interviews during which youth reported high levels of engagement in and enthusiasm for their mental health treatment. Records for the youth who frequently refused his bi-weekly individual therapy were reviewed. The frequency of attempts to re-engage the youth was negatively impacted by a variety of usual factors (e.g., COVID diagnoses, therapist's vacation without coverage) but were nonetheless relatively infrequent. In addition, progress notes for the attempts to re-engage did not include the necessary detail on rapport building and/or motivational engagement required by this provision.

The internal Quality Assurance dated July 2022 did not review this issue because at that time, no youth had refused services.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) When youth are not progressing, consider modifying the treatment interventions to catalyze behavior change and/or improved symptom experience. Such considerations should be documented in the MDT meeting minutes or in a progress note for the youth.
2) Ensure that group therapeutic interventions are included in the treatment plan as a prescribed intervention when youth participate in them.
3) Clearly document attempts and the interventions utilized to engage with youth who refuse to participate in individual and/or group therapies.

**Methodology**.
- Reviewed *Mental Health Services* policy
- Consulted STS Direct of Mental Health Department/MHA
- Reviewed MDT minutes from 1/1/22 through 8/31/22
- Reviewed the mental health roster as of 8/31/22
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth

- Reviewed the listing of available interventions entitled "STS Therapeutic, Skills, and Rehabilitative Services"
- Reviewed the Treatment Refusal log
- Interviewed youth regarding their experience with mental health treatment at STS
- Interviewed STS clinicians
- Reviewed internal Quality Assurance audits from January and July 2022

**MH-II.B. Skill-based and Rehabilitative Services**

MH-II.B. Skill-Based and Rehabilitative Services. The BSTS will assess student's clinical and support needs and develop skills-based and rehabilitation-based services as needed. This review will include consideration of and integration with the behavior management/motivation approach that is discussed in the Room Confinement section below to ensure that the varied clinical-based services offered to students are aligned and supportive of each other.

**Findings.**

Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt. 362). In late 2021/early 2022, revisions to the policy were negotiated with the Monitor, SME and Plaintiffs' counsel, were submitted to the Court, and approved on 7/8/22 (dkt. 422). The policy describes the protocol for skill-based and rehabilitative services and remains in effect. In addition, the facility has implemented Aggression Replacement Training (ART), as described in detail in RC-I.B.1 "Identify Program," below.

Youth may require interventions that do not necessarily need to be facilitated by a mental health clinician, despite being part of their mental health treatment. These interventions include groups that are designed to teach youth skills needed to address specific symptoms or services that address a certain diagnosis (*e.g.*, substance use disorder). STS has a variety of skill/rehabilitative groups including Dialectical Behavioral Therapy Skills Training (DBT; facilitated by cottage staff), Gang Resistance Intervention Program (GRIP), Adolescent Sexual Abuse Program (ASAP), Achieving Maximum Potential (AMP; life skills), Residential Substance Abuse Treatment (RSAT), Applied Community Transition program (ACT; life skills), Rebound group (drug/alcohol education), Essential Instruction (faith-based re-entry), and a Parenting Skills course, though only a subset of these is likely to be clinically indicated, most often RSAT and ASAP.

Following discussions with Defendants and Plaintiffs' counsel in late 2021, the Monitor refined the strategy for monitoring this provision to focus more narrowly on those groups that are *clinically indicated* and related to the youth's diagnoses and/or treatment goals. For such groups, STS needed to devise a mechanism for the youth's assigned clinician to be aware of the youth's participation, engagement and progress in the group and a mechanism to indicate the youth's involvement in the group on the mental health treatment plan.

STS reported that between January and August 2022, a total of 15 youth were assigned to the ASAP program. Six youth had completed the program as of 8/31/22, 8 youth continued in the group and one youth had been removed from campus and waived to adult court prior to completion. One of these 15 youth referred to ASAP was included in the mental health sample. The youth was enrolled in the program and completed it on 5/25/22. The assignment to this modality was included in the youth's treatment plan and progress notes and an ASAP Treatment Summary confirmed that the youth

received the group curriculum in an individual modality that was appropriate for his level of cognitive functioning.

For RSAT, STS reported that between January and August 2022, a total of 37 youth were assigned to the RSAT program: 16 youth had completed the program as of 8/31/22, one youth had partially completed the program prior to being discharged, and 20 youth were currently enrolled. Eight of the youth included in the mental health sample were assigned to RSAT. Of these, only 4 of the 8 (50%) youth's treatment plans included this modality. The internal Quality Assurance audit from July 2022 for this item indicated a score of 90% in July 2022, which is inconsistent with the results of the Monitor/SME's review. This could be due to sampling differences (wherein the same cases were not reviewed by the QA auditor and the Monitor/SME) or to the interpretation of the requirements. The Monitor/SME are consulting with DHS/STS about this divergence to ensure expectations are aligned and to ensure interrater reliability.

RSAT group notes were detailed and comprehensive. It was notable that the youth's presentation in RSAT was, in some cases, very different than that documented by mental health staff. For example, Youth DS often refused to engage in individual mental health treatment yet was attending RSAT during this same period. Although he was described in the RSAT notes as engaging in negative and argumentative behavior, he was still attending. In another example (youth CM), RSAT notes described him as exhibiting good behavior in RSAT, yet this youth required ITP level supports. Youth's behavior in RSAT was not mentioned in the MDT minutes or clinicians' progress notes, creating uncertainty about the extent of communication between providers involved in the youth's care.

The above examples illustrate the need for improved integration with regard mental health and rehabilitative/skills groups. Specifically, there is a need to ensure that rehabilitative/skills groups are considered to be part of the youth's treatment program and that information regarding the youth's symptom experience/behavior in a specific program is shared and utilized across providers. A dependable mechanism for the youth's assigned clinician to be aware of the youth's participation, engagement and progress in the group need to be established, along with a dependable mechanism to ensure that each youth's involvement in rehabilitative/skills group is noted on their mental health treatment plan.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that clinically indicated skills-based and rehabilitative-based groups are referenced in the youth's treatment plan, including provider, frequency and duration.
2) Develop a dependable mechanism to support the interface between the skills/rehabilitative group and the youth's assigned clinician.

**Methodology**.
- Reviewed the *Mental Health Services* policy
- Consulted STS Director of Mental Health Department/MHA
- Reviewed the mental health roster as of 8/31/22
- Reviewed the roster of individuals participating in each rehabilitative skill-based intervention
- Reviewed rehabilitative/skill-based group notes for youth included in the mental health sample
- Reviewed the mental health records for youth included in the mental health sample assigned to rehabilitative/skills groups
- Interviewed youth on the mental health caseload
- Reviewed internal Quality Assurance audits from January and July 2022

> **MH-II.C. Mental Health Staffing**
>
> MH-II.C. Mental Health Staffing. Throughout the duration of this Remedial Plan, the BSTS will hire and maintain a sufficient number of Professionals in the Mental Health Department ("PMHD") to evaluate/assess students and to provide the individual psychotherapy, group therapy, skills-based and rehabilitative-based services needed to meet their individual needs. For psychotherapeutic services, the BSTS will ensure a psychotherapist-student ratio no greater than 1:15 for the duration of the Remedial Plan.

Findings.

This provision of the Remedial Plan has two requirements: (1) to hire and maintain a sufficient number of Professionals in the Mental Health Department (PMHDs) to evaluate/assess students and to provide services to meet their needs; and (2) a specific maximum psychotherapist-student ratio of 1:15, based on total facility population. With regard to the first requirement, at the end of the current monitoring period, STS's complement of mental health staff included:

- One Social Work Supervisor and one Social Worker (who coordinate youth's discharge planning; organize various multi-disciplinary team meetings; and co-facilitate groups),
- One Psychology Assistant (who conducts part of each youth's mental health assessment) and a contracted therapist for 8-hours per week (who conducts mental health evaluations and provides clinical supervision but does not currently carry a caseload),
- Five full-time Psychologists (three Psychologist 3, one Psychologist 2 and one Psychologist 1; some of whom conduct various assessments and all of whom carry a caseload, co-facilitate groups, provide crisis services, and complete other administrative tasks),[20]
- One licensed mental health clinician who functions as STS's Mental Health Authority (MHA) and, until recently, was the Director of the Mental Health Department. This individual was promoted to be the Deputy Superintendent in October 2022 and for the time being, will continue to fulfill the MHA role. The Lead Psychologist who functioned as the "designee" will continue to provide clinical leadership. The division of labor may be reassessed once a candidate is selected to fill the vacant Director of Mental Health Department position.

The psychotherapist-student ratio focuses specifically on those mental health staff who carry a caseload of clients. As shown in the table below, the facility easily met the 1:15 requirement each month. Throughout the period of review, each month, STS had one psychotherapist for every 6 to 10 youth at STS. Most, but not all of the youth at STS are on the mental health caseload, so the caseload sizes are slightly smaller than the ratios below would suggest.

| Psychotherapist-Student Ratio, January through August, 2022 | | | |
|---|---|---|---|
| Month | # Therapists | ADP | Ratio* |
| January 2022 | 6 | 44.1 | 1:7.4 |
| February 2022 | 6 | 44.8 | 1:7.5 |
| March 2022 | 7 | 44.6 | 1:6.4 |

---

[20] The differences among the Psychologist 1, 2 and 3 designations are largely Human Resources factors, although in general, involve a combination of education level and duration of employment with DHS.

| April 2022 | 7 | 45.8 | 1:6.5 |
| May 2022 | 6 | 49.3 | 1:8.2 |
| June 2022 | 6 | 48.5 | 1:8.1 |
| July 2022 | 6 | 52.6 | 1:8.8 |
| August 2022 | 5 | 51.4 | 1:10.3 |

*Ratio is calculated using the following formula: Gross ADP/# of therapists = number of therapists per youth. The "Gross ADP" includes youth who are assigned to STS, most of whom are physically present on campus, but some of whom are not (e.g., in detention or jail, AWOL, etc.). The Gross ADP is utilized for the purpose of calculating a ratio because youth who are off campus may return at any time, and some also continue to receive services while elsewhere in the community.

A review of the mental health roster, mental health treatment plans, progress notes and MDT meeting minutes indicates that STS has a sufficient number of psychotherapists to provide the services needed by STS youth. Although a few problems with documentation and service delivery remain, the identified problems do not appear to be related to insufficient staffing but rather stem from a need for procedural improvements or clinicians' skill development and performance improvements.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed mental health youth roster and staff count as of 8/31/22
- Reviewed job titles for STS mental health staff
- Reviewed STS ADP from January to August 2022
- Consulted with DHS/STS administrators about plans for MHA position

**MH-II.D. Policy & Procedure**
MH-II.D.1. Mental Health Services Policy. (a) By 30 days from the effective date, BSTS shall create a policy/procedure regarding the delivery of *Mental Health Services*, which will include therapeutic, skills-based, rehabilitative and psychiatric services. (b) By 30 days from the effective date, BSTS will review and revise *4C-02 Psychometric Testing, Screens, Appraisals, Evaluations and Plans.*
MH-II.D.2. Institutional Materials. By 30 days from the effective date, BSTS will update institutional materials (e.g., Student Handbook/Orientation materials) to include reference to the varied therapeutic, skill-based and rehabilitation-based services that are incorporated into the overall clinical services provided.
MH-II.D.3. Staff Training on Mental Health Services Policy. By 90 days from the effective date of the policies noted above, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.
MH-II.D.4. Annual Review. These policies shall be reviewed at least annually and updated as needed.

**Findings.**

Please see the discussion of Policy & Procedure in MH-I.D, above. Since the provisions are nearly identical, the discussion is not repeated here.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Same as MH-I.D, above.

**Methodology**.
- Same as MH-I.D, above

**MH-III Injunctive Relief Required by Court Order: Ensure the confidentiality of students' mental health records, except where disclosure is necessary to ensure the safety of a student or the security of the School.**

**Goal of the Remedial Plan**: BSTS will ensure that MH records regarding screening/assessment/evaluation, therapeutic, skills-based, rehabilitation-based and psychiatric/medication services are defined, stored, protected and shared in a manner that is consistent with policy and procedure, relevant professional standards and state and federal laws.

**MH-III.A. Student Records Policy & Procedure**
MH-III.A.1. Mental Health Records Policy. By 60 days from the effective date, BSTS will revise/develop a Mental Health records policy and procedure that defines Mental Health records, identifies where Mental Health records are stored to ensure they are separate from administrative/main, school and cottage records; established protocols to ensure that access to confidential information is appropriately limited; establishes protocols to ensure that information is shared where appropriate to provide for safety, security, health and continuity of care; and established protocols for the limited release of records to outside entities. The policy and procedure will be consistent with state and federal law.
MH-III.A.2. Staff Training on Mental Health Records Policy. Within 120 days of the effective date, BSTS shall train PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

**Findings**.
Policy *4B-07 Student Health Records* was originally approved by the Court on 11/9/20 (dkt. 370). After consulting with the Monitor/SME and Plaintiffs' counsel, STS revised the policy which was approved by the Court on 7/8/22 (dkt.422). A notice informing youth of the protections offered by the new policy was posted on 12/16/20, after receiving input from the Monitor and Plaintiffs' counsel, and a brief statement about the confidentiality of mental health services and records is also included in the Student Handbook (June 2022 version).

In response to the Monitor's 2021 recommendation that staff training on confidentiality of student records needed to be more formalized, STS now addresses the requirements for **objective MH-III.A.2 "Staff Training on Mental Health Records Policy"** in the *Mental Health Services* training module. This module and proficiency exam covers the storage of medical and mental health records, procedures for youth to request access to these records, and limitations on the sharing of information contained in medical and mental health records.

Although this provision requires only certain staff to be trained in procedures regarding student records, STS requires all staff to understand the limits on sharing youth's personal information via the *Mental Health Services* training module. A review of training records showed:

- *New Employee Training.* Of the 20 staff who were hired in 2022 and still employed as of 8/31/22, documentation was available to demonstrate that only 10 of the 20 received training on the *Mental Health Services* policy (50%) upon hire.[21]

- *Annual Training.* As of 11/11/22, a total of 111 of 126 (88%) direct care staff had completed annual refresher training on the *Mental Health Services* policy. With two months still to go in the training year, STS appears to be on track to meet this requirement by ensuring that the remaining 15 staff complete this training module.

The problem with new staff training does not impact the recommended compliance rating for this provision since training *all* direct care staff is not required by this provision. Those with more direct responsibility for maintaining confidentiality attended the *Mental Health Services* training and were provided instruction in specific procedures and protocols by their supervisor and/or the Director of the Mental Health Department. When interviewed, all were aware of the limitations on sharing confidential information.

**Implementation** of this policy was assessed to meet the requirements of this provision. More specifically:

- STS utilizes an electronic health record to complete psychosocial evaluations, treatment plans, progress notes, group notes, etc. Only professionals in the Mental Health Department have access to this system, which is granted by the MHA. Other mental health records on shared drives are locked except for users with permission. Staff responsible for compiling records (e.g., to provide to the Monitor/SME) are granted special "Read Only" access by the MHA.

- Paper copies of student health records are stored in a locked filing cabinet marked "Confidential" and on which a "Privacy and Security of Health Information" notice is posted. This notice lists the staff positions that are authorized to access youth's health records, and briefly the describes the procedure for others' access. This was confirmed via photograph.

- A paper log is stored near the filing cabinet for authorized staff to sign out/in the paper copies of youth records. Entries were properly dated and signed. The header of each page of the log includes policy language about the signer's responsibility for the security of the record while in their possession. The header also briefly describes the procedure for other's access.

  - Between January and August 2022, STS clerical staff signed out 22 youth mental health records, nearly all of which were needed to process students for discharge.

- An electronic log is utilized to track requests for student records. The log tracks the youth's name, ID number, date of the request, name of person making the request, date the response was sent, the initials of the person who responded, and the information that was provided by STS to the requester.

---

[21] The Monitor considered two factors when assessing training (1) how information was provided (i.e., whether the PPT training curriculum was utilized) and (2) documentation of attendance (i.e., completed proficiency exams (preferred) or sign-in sheets were considered proof of training; a training schedule was not considered adequate proof of training).

o   A sample of these requests were reviewed. The electronic log showed that records for 12 STS youth were requested during June/July/August 2022. Requests were received from disability services, probation agencies, adult jails and Departments of Corrections, lawyers, court officers and service/treatment providers.

- Ten of these 12 requests were sampled for a thorough review. Copies of the requests for information, the Authorization for Disclosure signed by the youth and/or the youth's parent/guardian, and the list of records submitted in response was properly maintained for all requests with only one exception.[22] Records sent by email had appropriate "Confidential" markings. The review of records sent indicated that records were limited to only what was requested (e.g., STS did not send clinician's progress notes if the request was only for a psychosocial assessment).

The Monitor also assessed clinician's adherence to the *Student Health Records* policy by considering whether the information included in Mental Health Discharge Summaries maintained appropriate limits. In all cases, the information communicated by clinicians was sufficiently detailed to present a picture of the youth's progress and challenges, while also obscuring certain private details as appropriate.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed "Mental Health Services" training curriculum
- Reviewed training data for STS staff through 11/11/22
- Reviewed photographs of record storage locations and logbook entries
- Reviewed electronic tracking log for requests for students' records
- Reviewed requests for students' records and responses, June/July/August 2022
- Reviewed Discharge documents, July/August 2022
- Consulted with MHA regarding access to electronic health record

**MH-IV Injunctive Relief Required by Court Order:** For students who self-harm or express suicidal ideation, formulate a detailed care and support plan, which includes a safety plan and recommended treatment to identify and treat the cause of the self-harm or suicidal ideation.

**Goal of the Remedial Plan**: BSTS will create a two-prong crisis intervention model and approach that is implemented and defined by policy and procedure. This model will establish coverage and protocols for 24/7 crisis support from PMHD for two types of support: (1) care/support/safety plans that address acute mental health crises such as suicide and self-injurious behavior; and (2) other behavioral crises such as (a) students who present a serious and immediate risk of physical harm to others and cannot stabilize within a one-hour "cool off" period; and (b) a short-term therapeutic crisis response unit/program/space for students who require further clinical assessment/evaluation, targeted and

---

[22] The Authorization for Disclosure was missing for one request involving a youth (now adult) who spent time at STS during the 1980's and who is being investigated for a new criminal charge.

intensive skill development or extra therapeutic intervention or support to stabilize before returning to normal cottage/programming.

**MH-IV.A. 24/7 Crisis Response**
MH-IV.A. 24/7 Crisis Response. BSTS will have a PMHD on call to provide 24/7 crisis intervention during business and non-business hours. During non-business hours, these crisis response and intervention services will be provided through electronic or telephonic means.

**Findings**.
STS continues to schedule its psychotherapists to provide evening and weekend coverage. Outside those hours, the Lead Psychologist is on-call until a psychotherapist arrives on campus in the morning. This therapist is equipped with an iPad and can respond to emergencies via telephone, videoconference or an after-hours return to campus if needed.

STS reports that scheduling therapists to be present on campus until later in the evening continued to reduce the need for off-hours/on-call contact. Between January and August 2022, the on-call therapist was contacted 12 times. Half of the calls pertained to a youth's suicidal ideation, 3 were in response to a youth's time in room confinement approaching the 1-hour mark when mental health staff are required to become involved, one was upon a youth's request, one was related to staff's concern about a youth, and one was for an emergency placement in the Intensive Treatment Program. All contacts were recorded via an incident report, encounter note, suicide risk assessment, ITP assessment note or within the room confinement packet.

The Monitor also requested progress notes from the youth's assigned clinicians to ascertain whether the youth's need for crisis response had been properly communicated. In some case, the on-call provider was the same as the youth's assigned clinician. Among the other 7 incidents, all but one were addressed by the youth's clinician within one or two days.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance.**
   1) None.

**Methodology**.
   - Consulted with MHA about therapist scheduling and on-call rotation
   - Reviewed the log of after-hours consultation from January-August 2022.
   - Reviewed the mental health progress notes following the after-hours clinical encounters.

**MH-IV.B. Suicide Prevention and Intervention**
MH-IV.B.1. Self-Harm Evaluation. Psychotherapists or the Director/MHA will be primarily responsible for evaluating students who express suicidal ideation, engage in self-harming behavior, or attempt suicide. This response/evaluation will occur as soon as possible barring conflict with other clinical tasks (e.g., therapy session, psychosocial evaluation or other crisis response).
MH-IV.B.2. Evaluation of Youth in Seclusion. If a student is placed in a "seclusion room" (as referenced by the Court Order) for an act of self-harm or suicidal ideation, a PMHD (e.g., psychotherapist) will meet with the student as soon as possible, whether in-person or via telephone or electronic means consistent with the 24/7 coverage plan, and such meetings will take priority over non-clinical tasks.

MH-IV.B.3. Minimize Use of Seclusion. BSTS will minimize the amount of time that students on suicide watch spend isolated in a seclusion room as demonstrated by the protocols for suicide watch levels defined in Policy and Procedure *4C-03 Suicide Prevention/Intervention,* as well as the protocols for RC defined in Policy *4C-06 Room Confinement.*

MH-IV.B.4. Safety Plans. PMHD that respond to students in suicidal/self-harm crisis will develop and implement an individualized care/support/safety plan in a manner consistent with protocols established in Policy *4C-03 Suicide Prevention/Intervention.*

Findings.

STS addressed Suicide Prevention and Intervention as required by this provision via the *Suicide Prevention and Intervention* policy approved by the Court along with the Remedial Plan on 7/27/20 (dkt. 354) and in the *Mental Health Services* policy originally approved by the Court on 10/27/20 (dkt. 362). After consulting with the Monitor, SME and Plaintiffs' counsel, STS proposed revisions to both the *Suicide Prevention and Intervention* policy and the *Mental Health Services* policy, which were both approved by the Court on 7/8/22 (dkt. 422). [See pgs. 31-32 of the Monitor's February 2021 report (dkt. 386) for a description of the suicide prevention protocol.]

### MH-IV.B.1 Self-Harm Evaluation

During the period of review, suicide precautions were utilized on 19 occasions for 9 youth. In addition, there were 55 self-harm evaluations performed that did not result in suicide precautions. Overall, the youth were appropriately assessed following suicidal ideation or self-injurious behavior. The assessments were detailed and included pertinent risk factors and possible coping skills reviewed with the youth. The assessments also included recommendations (e.g., level of supervision, possessions, etc.) to assure the youth's safety if precaution were required. Youth received follow up assessments at the prescribed intervals to determine the need to remain on the current suicide precaution level or whether restrictions could be reduced as the youth's condition improved. The substance of the assessments was thorough and detailed, and they were performed by a qualified mental health clinician who made appropriate decisions about whether to continue, increase, decrease, and discontinue precautions.

### MH-IV.B.2 Evaluation of Youth in Seclusion

The review of mental health records and room confinement records did not identify any situations in which youth were placed in room confinement *in response to* an act of self-harm or suicidal ideation (which is the foundation of this requirement of the Remedial Plan, which then requires mental health staff to meet with the youth as soon as possible). That said, there were seven situations in which youth were placed in room confinement for other behaviors (e.g., assaulting staff or peers; behavior that presented an imminent risk of harm to another's safety), and expressed suicidal ideation while confined or were already on suicide watch when behaviors required the use of room confinement. In these seven events (involving four different youth), mental health records indicated that a mental health clinician promptly initiated the suicide assessment. Room confinement records indicated that each youth was under constant observation and had continual interaction with staff or mental health clinicians throughout the period in room confinement. Further, the periods of confinement ended once the threat of harm to others had abated and/or the assessment of the youth's risk of harm was completed (range = 14 to 53 minutes).

### MH-IV.B.3 Minimize Use of Seclusion

Policy *4C-03 Suicide Prevention and Intervention* states that "isolating, confining or secluding a student with suicidal thoughts or behaviors shall be avoided whenever possible." A review of mental health records confirmed that STS did not utilize room confinement at any time during the period of review for the purpose of limiting the youth's access to environmental hazards. Instead, youth at elevated risk of self-harm were assigned to sleep in rooms/beds in the general population cottages that are closest to the staff's desk with better visibility for observation. In several cases, youth's possessions/clothing/bedding were appropriately limited in response to specific risks of self-harm. While several of the youth on suicide precautions during the period of review (4 of 9, or 44%) subsequently engaged in behaviors that presented an imminent risk of harm to others' safety and were placed in room confinement, their stays in room confinement were relatively short (i.e., between 14 and 53 minutes) and they remained under constant supervision during that time.

## MH-IV.B.4 Safety Plans

The generally accepted practice is to develop a Crisis Plan while a youth is on precautions. Because suicidal ideation and self-injurious behavior are such serious issues, that plan should also be reviewed by the MDT, either at a specially scheduled review or at the next regularly scheduled staffing for that youth. For youth without a serious threat to self-harm or history of self-harming behavior, the treatment plan may not need to be updated. But, for youth with repetitive and serious self-harm gestures or suicidal ideation, the treatment plan should be adjusted to incorporate mechanisms to address crises and to improve distress tolerance and coping skills. Following each subsequent period of precautions, the original Crisis Plan should be reviewed, assessed for sufficiency, and updated as necessary. Cottage staff must be made aware of the substance of the Crisis Plan and potential interventions so they can identify triggers and implement the suggested interventions.

As noted above, suicide precautions were implemented on 19 occasions for nine youth. A review of these records revealed that the underlined initial Crisis Plans were developed in a timely manner for eight of the nine youth (89%; all except Youth DM).  The self-harm events and Crisis Plans were also reviewed in the subsequent MDT, noted as a "special concern." The substance of the Crisis Plan was also reviewed/potentially updated by the clinicians conducting the follow-up assessments while the youth was on precautions. Sometimes, the youth's primary clinician conducted the initial assessment and/or re-assessment. If not, the primary clinician discussed the Crisis Plan with the youth and was involved in the discussion about the episode during the "special concern" MDT. Finally, treatment plans were updated appropriately. Some targeted suicidality/risk of self-harm directly, while others included goals that were related to the underlying cause of the youth's distress (e.g., depression, medication compliance, victimization by other youth, etc.). The youth's Crisis Plans also addressed the maladaptive coping skill of self-harm and discussed other strategies for managing distress.

Interviews with 24 cottage staff (YSWs, Counselors and Directors) revealed that each understood the purpose of a Crisis Plan, knew where they were located for reference, knew which youth had plans, and identified components of the Crisis Plans that they found helpful in their efforts to supervise and support each youth.

STS's evaluation, planning, collaboration and communication surrounding suicide precautions combine to form a robust strategy for preventing and addressing self-harm and fully meet the requirements of this provision. These findings are aligned with the results of the July 2022 Quality Assurance audit which found a 90% compliance level or better on all aspects of the suicide prevention protocol, save for a small problem with time recording that prevented verification of the two-hour timeline for notification/assessment that is required by policy.

| Recommended Compliance Rating. Substantial Compliance |
| --- |

| Steps Toward Achieving Substantial Compliance. |
| --- |
| 1)   None. |

**Methodology.**
- Reviewed *Mental Health Services* policy and *Suicide Prevention and Intervention* policy
- Reviewed Suicide Assessment Reports for the 9 youth requiring suicide precautions between 1/1/22 and 8/31/22
- Reviewed suicide assessments, Crisis Plans, MDT minutes and treatment plans for the 9 youth requiring suicide precautions between 1/1/22 and 8/31/22
- Reviewed mental health records for a random sample of 15 youth on the mental health caseload, inclusive of assessments, treatment plans, progress notes and MDT meeting minutes regarding each youth
- Reviewed Room Confinement Logs and packets for each youth in room confinement while on suicide precautions
- Reviewed January and July 2022 Quality Assurance audits and Plan of Correction

**MH-IV.C. Multi-Sensory De-escalation Tools and Spaces**

MH-IV.C Multi-Sensory Tools and Spaces. By 90 days from the effective date, BSTS will secure sensory-based tools and equipment (to augment materials currently in place) and develop multi-sensory spaces for de-escalation and self-soothing for students to use to assist them in modulating their emotions/behavior and practice coping skills. This trauma-informed service is designed to provide students with a safe, non-adversarial space to "cool-off", refocus, and develop/practice skills for de-escalation.

**Findings.**

As noted in the Monitor's February 2021 report, Defendants submitted a set of materials related to STS' Multi-Sensory De-escalation Room (MSDR) to the Monitor/SME and Plaintiffs' counsel on 10/26/20. These materials describe the intervention's progression from gross motor to fine motor to cognitive task and include requirements for tracking MSDR usage and communicating with the youth's assigned therapist. As discussed in the Monitor's November 2021 report, due to various interruptions, neither of the MSDR rooms were utilized for most of 2021, leading to a recommended non-compliance rating. However, once a new MSDR supervisor was appointed and a Youth Counselor was assigned, both in January 2022, and additional staff were trained, MSDR usage rebounded and was utilized frequently throughout 2022. STS has two properly equipped MSDR rooms, one at the school and one in CMH for youth in the ITP Tier 3 program.

Several STS staff are trained to facilitate the MSDR intervention, delivered in partnership with a Youth Counselor (and former Special Education teacher) who staffs the MSDR and adjacent De-Escalation Room full time.[23] Three trained YSWs are scheduled to cover the MSDR room in the

---

[23] The De-Escalation Rooms serve a similar function at STS, with dedicated space at the school and within each cottage. Though not required by the Remedial Plan, it is one of several tools for responding to a youth's threatening, aggressive or otherwise distressed behavior. Essentially, youth move to a private space in order to talk through their feelings one-on-one with staff. Youth are not left alone while in the de-escalation rooms. If the youth's behavior continues to escalate to the point that they present an imminent risk of harm, they may be transferred to Room Confinement. Conversely, the De-Escalation Room is sometimes used as a step-down from Room Confinement

afternoon/evening hours. The MSDR Supervisor is one of the facility's psychotherapists and also delivers the MSDR intervention if not otherwise engaged with a youth. Starting in 2022, the MSDR intervention is included as part of the *Mental Health Services* training module so that staff understand how to utilize this resource to assist youth with self-regulation and de-escalation. Provision MH-I.D "Mental Health Services Policy & Procedure," above, discusses issues with the delivery of new employee training.

During the 8-month period January-August 2022, the MSDR was used 1,109 times. Usage was highest during the first 3 months (n=688) compared to the latter 3 months (n=140). STS attributed the high rate of usage during the first part of the year to the facility's changes in movement to school in January 2022 (i.e., requiring all youth and staff to move to the school building each morning) and a staffing reorganization that occurred in preparation for opening the ITP program in March 2022. Across the 8-month period, a total of 70 youth utilized the intervention, although a small subset of youth accounted for most of the MSDR's usage. Eight youth each used the MSDR 50 or more times during this period, accounting for a total of 565 uses (51% of total uses). Seven of the 8 youth also spent time in the ITP program (both Tier 2 and Tier 3) and thus their mental health needs and behavioral challenges were being addressed in a variety of ways.

Over half of the referrals to MSDR came from the school and about one-quarter came from Cottage 3 (which houses youth with more significant mental health needs). About half of the uses were upon a youth's request (n=544), about one-quarter were the result of a code/request for assistance, and the remainder were in response to a teacher's or staff's assessment that the youth would benefit from time away from the milieu. The overall goal of the intervention is to de-escalate the youth in the moment, and to teach the youth skills for self-regulation. Several youth have the MSDR written into their Crisis Plans. Those who do not may still earn a "Meets with Intervention" in the Behavior Management System if they utilize the room and return to the milieu with appropriate behavior. This tie to the behavior management system is intended to reduce the usage of the MSDR to escape boredom or to avoid classroom/cottage responsibilities.

The *Behavior Management* policy requires MSDR usage to be shared with the Multi-Disciplinary Treatment Team and Cottage Team to ensure continuity of care and requires the youth's therapist to be notified about any MSDR intervention that lasts beyond 30 minutes so that a change in treatment may be considered if necessary. Both requirements are fulfilled when the MSDR Supervisor and Youth Counselor attend each cottage's first MDT meeting of each month. Student-specific data is also available on a shared-drive. A review of MSDR monthly MDT minutes showed a consistent review of data along with observations about individual students.

The July 2022 internal Quality Assurance audit found that the MSDR was operating according to policy and program design and that MSDR facilitators communicated regularly with MDTs to ensure that clinicians were properly informed about MSDR use among youth on their caseloads. Furthermore, when interviewed by the Quality Assurance auditor, youth spoke positively about the MSDR and its effectiveness.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
    1)  None.

---

before the youth returns to regular programming. The YST's also provide "Mobile De-escalation" by walking/riding around campus with the youth.

Methodology.
- Interviewed MSDR Supervisor and Youth Counselor
- Reviewed MSDR Log for January through August 2021, along with individual youth records for MSDR events in August 2022
- Reviewed MSDR monthly MDT minutes for January-August 2022
- Reviewed January and July 2022 Quality Assurance audits and Plan of Correction

## MH-IV.D. Therapeutic Crisis Response Unit

MH-IV.D.1 Crisis Response Unit. By 180 days from the effective date, BSTS will develop a short-term, crisis response and stabilization unit/program/space for students who experience significant emotional, physical or behavioral distress such that they cannot be safely managed in their cottage and require further assessment/evaluation, targeted and intensive skill development and/or extra therapeutic intervention or support to stabilize before returning to their normal cottage/programming.

–The Unit will be operated and facilitated by a PMHD in conjunction with the BSTS TPA and TSD.

–Admission criteria will be based solely on acute mental or behavioral health needs such that it will not be used to manage safety and security concerns or act as a consequence or punishment for rule violations or negative behavior.

–Clinical services and interventions will focus on: intensive therapeutic and skill-building sessions based on immediate need or presenting concern; crisis or safety planning; increased therapy or skill-building sessions, ongoing clinical observation across settings, and therapeutic "wrap-around" meetings to reintegrate students into their cottage and programming as soon as they have stabilized or until a higher level of care can be obtained.

–This transitionary, short-term program will be designed to adequately care for students who cannot regain the necessary emotional, cognitive or behavioral control needed to engage in typical programming or services despite attempts at de-escalation and skill building.

MH-IV.D.2. Crisis Response Unit Policy. By 180 days from the effective date, more detailed protocols for admission, services, documentation and oversight of this therapeutic crisis response unit will be documented in policy/procedure.

Findings.

*Policy.*

Policy *4C-07 Intensive Therapeutic Program ("ITP")* was originally approved by the Court on 2/24/21 (dkt. 391). The Monitor's November 2021 report (dkt. 410) described STS's first attempt to implement a program for youth with significant emotional, physical or behavioral distress such that they could not be safely managed in a general population cottage. Due to a variety of implementation problems and a desire to expand the program's therapeutic approach to address youth with frequent aggressive behaviors, the original ITP program was temporarily suspended in June 2021.

Following extensive negotiations with the Monitor, SME and Plaintiffs' counsel, STS expanded the scope of the ITP policy to include two separate programs: Tier 2 is a therapeutic approach to address the needs of youth with significant mental health symptoms impacting their behavior and functioning, and Tier 3 is a therapeutic program to address the needs of youth with frequent aggressive behaviors. Certain program requirements are articulated in the CMH Amendment to the Remedial Plan (the "CMH Amendment", dkt. 409). The program's eligibility criteria, referral and admission process, location, program planning, services and supports, and requirements for program

exit are discussed in the revised policy, *4C-07 Intensive Therapeutic Program,* which was approved by the Court on 3/2/22 (dkt. 419). STS posted a Student Notice about the program (which was approved by both Monitor and Plaintiffs' counsel) on 3/17/22.

The early implementation of both Tier 2 and Tier 3 of the ITP was discussed in the Monitor's July 2022 report (dkt. 424). Because its target population matches that described in this provision of the Remedial Plan, the status of the **Tier 2 program** is discussed here, while the status of the Tier 3 program is discussed in RC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," below. While the Tiers operate separately, it is important to recognize that some youth may meet the admission criteria for both Tiers and thus may, at different times, be admitted to one or the other.

*Program Implementation.*

The Tier 2 ITP intervention is a therapeutic program for youth who experience significant emotional, physical, behavioral or interpersonal distress or functional impairment that prevents them from being effectively treated in the general population. Eligibility criteria include a diagnosable mental illness that is causing significant distress or impairment and a need for additional structure and more intensive services. The multi-disciplinary ITP Team discusses all referrals, with presentations from the youth's Cottage Counselor and assigned psychologist. If accepted, Tier 2 youth are currently housed in Cottage 4, along with youth who have been recently admitted to STS. By policy, Tier 2 youth may be housed in any general population unit (i.e., may not be housed in Corbett Miller Hall/CMH), although units with individual youth rooms are preferred. Upon admission to the program, Tier 2 youth receive an orientation about the services they will receive and collaborate with their Cottage Counselor and psychologist to develop an ITP Plan. The youth's mental health treatment plan, mental health Crisis Plan (if any) and behavior management plan (if any) are integrated and updated accordingly. Youth in Tier 2 generally receive additional hours of psychotherapy and additional skills-based interventions, in a dosage determined by the youth's needs. Rehabilitative programming, recreation and leisure time are highly structured and coordinated via a daily schedule. Youth's progress in Tier 2 is assessed each week, and the ITP Team determines whether the youth would be best supported by continued involvement with the Tier 2 program or by exiting the program to the general population.

Between 3/28/22 (when ITP opened) and 9/30/22, four youth were admitted to Tier 2, one of whom was re-admitted a short time after his original exit. Another youth was admitted to Tier 2 in between two separate admissions to Tier 3, based on the observable behaviors and mental health symptoms they were experiencing at the time. The Monitor/SME reviewed extensive ITP documentation for these 4 youth and found close adherence to policy requirements, as discussed below.

**Referral/Admission**. Information from each youth's Counselor and psychologist indicated that they met criteria regarding diagnosable mental illness (e.g., most had PTSD, ADHD, conduct disorder) and significant emotional, behavioral, or interpersonal distress/impairment. Less intensive alternatives (e.g., increasing services, Crisis Plans, Safety Plans, medication management, Wrap Around meetings, etc.) had not been sufficient to stabilize the youth. All required assessments were completed, and goals/program requirements were articulated in each youth's ITP Plan. Mental health treatment plans were updated to reflect the youth's participation in Tier 2.

**Services and Supports**. Each of the Tier 2 youth was housed in Cottage 4, where they received intensive services from specially trained cottage staff, their assigned psychologist, and the ITP psychologist. Youth participated in daily skill-streaming groups, psychotherapeutic groups, individual psychotherapy, and medication management with a psychiatrist. Most youth were seen approximately every other day by one of the psychologists, although Progress Notes indicated daily sessions for one

of the youth. Progress Notes indicated an appropriate focus on mental health goals, processing daily events while teaching and providing opportunities for practicing skills for managing one's mental health symptoms (e.g., breathing techniques, meditation, mindfulness, distraction).

The Monitor/SME also reviewed the Learning Interventions imposed while each youth was involved in Tier 2. While a couple of the Tier 2 youth continued to display frequent aggressive behaviors, staff's responses reflected appropriate, proportional responses. Several of the youth were on modified behavior management programs which allowed them to accrue points in a "Daily/Hourly" program that provides for more frequent reinforcement and feedback than the standard behavior management program. Tier 2 youth also attended school in the regular school program and participated in a variety of rehabilitative, recreational and leisure time activities each day.

Documents reviewed to assess compliance with the provision related to the MSDR (see MH-IV.C "Multi-Sensory De-Escalation Tools and Spaces," above) revealed that some of the youth in the Tier 2 program regularly utilized this option for de-escalation when they began to lose emotional or behavioral control. Room confinement was used occasionally in accordance with the *Room Confinement* policy, and none of the room confinement events for Tier 2 youth extended beyond 1 hour, with most lasting 30 minutes or less.

**Monitoring Progress/Program Exit**. Progress toward goals was discussed in weekly notes attached to each youth's ITP plan and was also discussed at least once per week in ITP Team meetings (records revealed that most youth were discussed by the ITP Team twice each week). Decisions about program exit were grounded in observations about the youth's behavior, mental health symptomatology and level of stabilization. Among the three youth who had exited the program by 9/30/22, the lengths of stay were 60 days, 63 days and 19 days. One of the youth exited the program to Tier 3 (discussed in PC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," below) due to their violent behavior that required a more structured environment with fewer youth present. The remaining two youth exited the program to a general population cottage, with appropriate supports and modifications designed to perpetuate the stabilization that had been achieved in the Tier 2 program. The longer lengths of stay in Tier 2 appeared completely appropriate, even desirable, given the high-level of support and services that are provided to these youth whose behavior and mental health symptomatology clearly indicate a higher level of need.

In summary, program documentation revealed strong adherence to policy requirements for the ITP Tier 2 program. Interviews with STS administrators, Tier 2 youth, cottage staff and psychologists reinforced the impression that the program is achieving its stated objective and is providing the services and supports required by policy. Youth who had spent time in Tier 2 reported the program was helpful to them, primarily because there was "less chaos" than in the general population cottages and they liked the structured schedule and the increased interface with therapists. A couple youth reported some conflict with non-Tier 2 peers in the same cottage who were perceived to dislike being asked to conform to the Tier 2 schedule and were frustrated with Tier 2 youth as a result.

The temporary closure of the original ITP program in June 2021, triggered by a variety of problems with staffing and the fidelity of implementation, appears to have been used as a learning experience for the various STS professionals involved. With an emphasis on staff training, clarity in referral criteria and a similar but separate option for youth with frequent aggressive behaviors, ITP Tier 2 has shown strong fidelity in its first seven months of implementation. These findings mirror that of the internal Quality Assurance audit completed in July 2022.

**Recommended Compliance Rating**. Substantial Compliance

| |
|---|
| **Steps Toward Achieving Substantial Compliance**.<br>　1)　None. |
| **Methodology**.<br>• Reviewed revised ITP policy and procedure<br>• Reviewed ITP records for youth who entered and exited the ITP Tier 2 program prior to October 31, 2022<br>• Observed ITP Weekly Meetings<br>• Interviewed YSWs and mental health clinicians assigned to the ITP Tier 2 program<br>• Interviewed three of four youth who participated in the ITP Tier 2 program<br>• Reviewed internal Quality Assurance audit conducted in July 2022 |

| |
|---|
| **MH-IV.E. Hospital Level of Care**<br>MH-IV.E.1. Multi-Agency Coordination. By 60 days from the effective date, the DHS MHDS—Facilities Division/Central Office will coordinate with the MHDS—MH Institutes, county attorney associations, Hardin County Attorney (where BSTS is located) and University of Iowa Hospitals and Clinics regarding the procedures for transfer of a student to a hospital level of care for further evaluation or treatment as needed.<br>MH-IV.E.2. Toolkit. By 90 days from the effective date, BSTS will develop a toolkit and procedures consistent with Iowa law and relevant stakeholder input for referring students to a hospital level of care if, due to a MH diagnosis/crisis/decompensation, they are unable to be safely and effectively restored to a state where they no longer pose a serious and immediate risk of harm to self or others. |

| |
|---|
| **Findings**.<br>　　　　Policy *4C-01 Mental Health Services* contains procedures for transferring youth to a hospital level of care for further evaluation or treatment. This policy was originally approved by the Court on 10/27/20 (dkt. 362) and was revised following consultation with the Monitor, SME and Plaintiffs' counsel in late 2021/early 2022. The revised policy was approved by the Court on 7/8/22 (dkt. 422). As noted in the Monitor's February 2021 report, Defendants developed a "229 Toolkit" to assist with the referral of a youth to a hospital level of care if STS is unable to safely house a youth due to a mental health diagnosis/crisis/decompensation. The Toolkit provides clear guidance regarding admission, discharge and exclusion criteria, and includes the variety of documents needed to refer a youth to University of Iowa Hospitals & Clinics (UIHC) from STS. The Toolkit also includes "Instructions for Completing a Section 229 Application[24] Alleging Serious Mental Impairment" (memo from the Iowa Assistant Attorney General dated 4/16/2020), a quick guide to the steps (revised 10/20/2020), and the Section 229 Application itself.<br><br>　　　　Between January and August 2022, one youth was referred for care at a psychiatric hospital on 4/6/22. This youth was referred after commitment to STS, but while the youth was still in detention and before the youth arrived at STS. Reports of extreme behavioral and mental health concerns led the MHA to collaborate with several of the youth's providers including the detention center, STS's psychiatrist, DHS central office, Independence Mental Health Institute ("MHI"), the youth's JCO and JCO supervisor, and the STS psychologist who assessed the youth at the detention center. A 229 |

---

[24] "Section 229" refers to Iowa State Law Chapter 229, which provides procedures by which individuals with mental illnesses, both adults and juveniles, can be hospitalized. This chapter includes both voluntary and involuntary commitments.

referral was submitted to the Court to present the concerns articulated by the group of providers. The referral packet revealed adherence to the requirements of the Toolkit and contained a complete record of STS's concerns. The youth was admitted to MHI on 4/7/22 for evaluation and was discharged from the hospital to STS on 4/22/22. STS obtained a discharge summary from MHI to inform the transition to STS. These actions satisfy the requirements of this provision.

The July 2022 internal Quality Assurance audit found that STS closely coordinated the referral of this youth to a local psychiatric hospital and that email communications confirmed that several meetings were held with court and hospital staff to ensure that the youth could obtain the necessary psychiatric care. Upon release, similar coordination was in effect to ensure admission and transfer procedures to STS were clinically sound.

In summary, the 229 Toolkit appears to have accomplished its stated purpose of facilitating access to psychiatric evaluation and treatment for youth at STS who appear to need a hospital level of care.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed evidence of correspondence and 229 Toolkit packets for one youth referred for hospitalization
- Reviewed the internal Quality Assurance audit from July 2022

---

**MH-IV.F. Suicide Prevention Policy & Procedure**
MH-IV.F.1. Suicide Prevention Policy. By 30 days from the effective date, BSTS will revise *Policy 4C-03 Suicide Prevention/Intervention* to include, among other things,
–protocols for contacting a PMHD during business and non-business hours;
–developing and implementing individual crisis/safety plans;
–protocols for engaging students in therapeutic or skills-based interventions designed to address the underlying issues of their self-injurious or suicidal behavior; and
–requirements for tracking data on suicide watch that are needed for quality assurance, quality improvement and oversight.
Upon revision and approval this policy will be used as a stand-alone doctrine until the larger two-prong crisis intervention model is developed and implemented.
MH-IV.F.2. Staff Training on Suicide Prevention. Within 90 days from the effective date, BSTS shall provide position-specific training to all staff on *Policy 4C-03 Suicide Prevention/intervention*. Training will include:
–recognizing suicide warning signs and risk factors
–referral, evaluation, treatment, housing and monitoring for specific watch levels
–interdisciplinary communication, intervention and follow-up.
MH-IV.F.3. Post Suicide Prevention Policy Notice. Within 24 hours of this policy being adopted, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting and approved by both Parties.

**Findings**.

Policy *4C-03 Suicide Prevention and Intervention* was originally approved by the Court on 7/27/20 (dkt. 354). Revisions to the policy were made in collaboration with the Monitor/SME and Plaintiffs' counsel in late 2021/early 2022 and were approved by the Court on 7/8/22 (dkt. 422) (**objective MH-IV.F.1 "Suicide Prevention Policy"**).

A notice informing youth about "observation status," assessing youth's risk of self-harm, mental health staff's 24/7 availability, and restrictions on the use of room confinement was posted on 8/10/20, after receiving input from the Monitor and Plaintiffs' counsel (**objective MH-IV.F.3**).

Regarding **objective MH-IV.F.2 "Staff Training on Suicide Prevention,"** the revised *Suicide Prevention and Intervention* policy requires all new employees to receive training in suicide prevention upon employment, and to receive training annual thereafter. The Monitor reviewed the 2022 *Suicide Prevention* training module which included information on risk factors, motivations and warning signs; different types of self-harming behavior; appropriate responses to youth who self-harm or have suicidal ideation; and how to properly implement the various suicide precaution levels at STS. All participants are required to pass a proficiency exam that tests their knowledge of core concepts.

A review of training records revealed:

- *New Employee Training.* Of the 20 staff who were hired in 2022 and still employed as of 8/31/22, documentation was available to demonstrate that only 11 of the 20 received training on the *Suicide Prevention and Intervention* policy (55%) upon hire.[25]

- *Annual Training.* As of 11/11/22, a total of 112 of 126 (89%) direct care staff[26] had completed annual refresher training on the *Suicide Prevention* policy. With two months still to go in the training year, STS appears to be on track to meet this requirement by ensuring that the remaining 14 staff complete this training module.

Policy also requires all professionals in the Mental Health Department to complete one-time training on conducting suicide risk assessments and does not require annual refresher. All clinicians employed by STS on 8/31/22 received an initial training on suicide risk assessment in October 2020, a refresher training in October 2021 after collaborating with the Monitor/SME to clarify expectations, and a workshop in April 2022 to tighten up data entry on notification/assessment times.

Both the January and July 2022 internal Quality Assurance audits noted the same problems regarding evidence of training completion among direct care staff. While the Training Officer and STS administrators felt confident that new STS staff received training in all components upon hire, proper documentation proved elusive. In March 2022, STS changed its procedure to require a completed proficiency exam as proof that staff completed the required courses. Although this is undoubtedly a more straightforward method than interpreting sign-in sheets, problems remain. While the facility cannot remediate the training deficit for new staff (because the "upon employment" period has passed), some staff have attended subsequent training once the gap in their training records was discovered. The problem appears to be multi-faceted, with deficits in scheduling/re-scheduling and

---

[25] The Monitor considered two factors when assessing training (1) how information was provided (i.e., whether the PPT training curriculum was utilized) and (2) documentation of attendance (i.e., completed proficiency exams (preferred) or sign-in sheets were considered proof of training; a training schedule was not considered adequate proof of training).

[26] "Direct care staff" includes staff from all disciplines who have face-to-face interactions with youth. This includes cottage staff (YSWs, Counselors, Directors), security staff (YSTs), mental health staff (psychologists and social workers), educators and medical staff.

documentation. The facility plans to identify additional checkpoints to ensure that all staff receive pre-service and refresher training as required by policy.

**Implementation** of this policy is discussed in MH-IV.B "Suicide Prevention and Intervention," above.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that new STS receive training on the *Suicide Prevention and Intervention* policy prior to being assigned to the housing units to work independently and ensure that the completion of this training is documented.

**Methodology**.
- Reviewed *Suicide Prevention* policy and the training curriculum
- Reviewed Training Data for new staff hired in 2022 and veteran STS staff as of 8/31/22
- Consulted MHA regarding clinician training

**MH-V. Injunctive Relief Required by Court Order**: For students receiving mental health treatment at the school, attempt to arrange for mental health care services in the community so students may continue their treatment upon discharge.

**Goal of the Remedial Plan**: BSTS shall engage in a practice that is implemented and defined by policy and procedure, where a PMHD connects with existing discharge and transition planning teams/functions at BSTS to advance continuity of care and ensure that transitionary services earnestly attempt to arrange mental health care services in the community upon discharge.

**MH-V.A. Discharge Planning Policy & Procedure**
MH-V.A.1. Discharge Summaries. By 30 days from the effective date, BSTS will establish protocols for creating standardized mental health treatment progress reports and discharge summaries for the Mental Health Department to share with the student's cottage counselor to include in their discharge planning and transition efforts. These protocols will include appropriate limitations on information being shared. This practice is designed to inform the type of mental health care services that the student may need upon discharge.
MH-V.A.2. MH Services Policy—Discharge. By 30 days from the effective date, BSTS shall include in their Mental Health Service policy, protocols for discharge planning and coordination for students receiving mental health treatment. This policy will require that a mental health discharge summary/plan be created for students that receive mental health (therapy or psychiatric) treatment at BSTS so they may provide it to a community provider upon discharge.
MH-V.A.3. Related Policies—Discharge. Re By 60 days from the effective date, BSTS will review and revise, as needed, other discharge related policies to ensure that
--transition/discharge efforts include identification of community partners and funding sources, including but not limited to juvenile court officers, representatives of the appropriate MH region, and managed care organization care coordinators,
--disbursement of reasonable (e.g. 30 day) supply of medications for those prescribed
--scheduled appointments with community mental health providers; and

--exchange of MH information for appropriate follow up care.

MH-V.A.4. Staff Training on Discharge Policies. By 120 days from the effective date of the policies noted above, BSTS shall provide training to PMHD, cottage counselors, cottage directors, senior administration (Superintendent, TPA, TSD) and other staff as appropriate on the policies.

**Findings.**

 **Policy.** Policy *4C-01 Mental Health Services* was originally approved by the Court on 10/27/20 (dkt. 362). Revisions to the policy were made in collaboration with the Monitor, SME and Plaintiffs' counsel and were approved by the Court on 7/8/22 (dkt. 422).

 The policy designates STS's social worker as the individual primarily responsible for establishing transition services for youth who discharge from STS. The social worker collaborates with the youth's JCO, cottage counselor, school principal, medical staff and mental health clinician to develop a transition plan and attempts to arrange services in the community to promote continuity. The policy requires therapists to create a Mental Health Discharge Summary that includes the youth's diagnosis and goals, summarizes the course of treatment and progress, and provides recommendations for the type of mental health treatment needed upon discharge. This summary must be submitted to STS' social worker who attaches it to the youth's Community Transition Plan. A Nursing Summary is created by STS medical staff and, among other things, identifies the youth's medications and dosages. The Nursing Summary is also attached to the Community Transition Plan. Finally, the Community Transition Plan prepared by the social worker identifies any appointments scheduled with a provider in the community, attempts to schedule appointments and a list of community resources if an appointment could not be scheduled. Along with a 5-day supply of medication and a prescription submitted to the youth's preferred pharmacy, the Community Transition Plan and all attachments are provided to the youth, parent/guardian and JCO upon discharge.

 **Training.** Those with specific job responsibilities for discharge planning are trained to complete required tasks by their immediate supervisor and/or peer with demonstrated competency for the task. This includes the Social Worker (who makes connections for youth to continue education, mental health treatment and medical services; assists the youth will filling out job applications, resumes and obtaining identification, etc.), Cottage Director, nurse manager and assigned psychologist (who each complete summaries of services delivered/progress made while at STS) in collaboration with the youth's JCO (who finalizes Medicaid applications, living situation and legal matters). The social worker responsible for these tasks at the time the Remedial Plan was written has since left STS. The responsibility was transferred to the Social Work Supervisor at that point, and the vacant position was advertised. A new social worker was hired but was needed for cottage coverage during the early part of their tenure. The individual began full-time duties as a social worker during the first week of December 2022.

 **Implementation.** Records for a sample of youth who were discharged from STS were reviewed to determine compliance with this provision. Between June and August 2022, a total of 15 youth were discharged. Of these, 10 youth were discharged to their parent/guardian, 1 was discharged to an independent living program, 3 were discharged to jail/detention, and 1 was discharged when he turned 18 following an AWOL from a home visit. All 15 youth were on the mental health caseload.

 Full discharge records were reviewed for these 15 youth to assess compliance with this provision:

- STS began formulating the <u>Community Transition Plan</u> in advance of the youth's discharge, and STS appeared to have received sufficient notice of the anticipated discharge date from the youth's JCO.

- *Follow-Up Appointments for Psychotherapy.* Of the 15 youth in the sample, 3 were discharged from jail/detention, 1 was AWOL, 1 moved to Colorado, and 2 indicated they did not intend to continue therapy once discharged. This left 8 youth for whom an attempt to schedule follow-up care was expected. Appointments were scheduled for 3 youth (38%) and an unsuccessful attempt was documented for 1 youth (13%). No attempt to schedule services for the remaining 4 youth (50%) was documented although they did receive a list of community resources. All attempts to schedule follow-up care must be documented in order to comply with this section of the Remedial Plan.

- *Follow-Up Appointments for Medication Management.* Of the 15 youth in the sample, 3 were discharged from jail/detention, 1 was AWOL, 1 moved to Colorado, 3 youth were not taking medication, and 1 youth indicated they did not intend to continue with medication once discharged. This left 6 youth for whom an attempt to schedule follow-up medication management was expected. Appointments were scheduled for 4 youth (66%) but no attempt to schedule an appointment was documented for the other 2 youth (33%). All attempts to schedule follow-up care must be documented in order to comply with this section of the Remedial Plan.

- A few minor issues were also noted, but they did not substantively compromise the quality of the plans. These included:

  o Various pieces of information were missing from several plans (e.g., dates of expected discharge or when certain documents were received), but these were not particularly critical to the task of planning for the youth's transition.

  o A few plans contained inaccurate information regarding the need for follow up medication support or mental health services (i.e., the box for these serves was not checked on the Community Transition Plan, but the mental health/nursing summaries indicated that follow-up support was needed). The Mental Health Summary and Nursing Forms made the youth's needs clear, but STS should ensure that Community Transition Plans are consistent with this information.

- <u>Mental Health Discharge Summaries</u> were present for all youth (100%). All summaries listed the youth's diagnoses, mental health treatment goals, and summaries of treatment progress. The quality of the treatment progress summaries ranged from adequate (e.g., had vague descriptions of the youth's engagement) to truly excellent (e.g., had specific descriptions of skills the youth had developed along with individualized descriptions of where the youth continued to struggle and the type of support they would need). For 3 youth, discharge summaries from RSAT providers added additional information to guide and support the youth's follow-up care.

- <u>Nursing Forms</u> were attached for the 7 youth who were on psychotropic medications (100%) and listed the medication and dosage. The summary also identified that the youth had received 5 days' worth of medication and that a prescription had been called into the youth's pharmacy of choice.

Overall, there was a noticeable increase in active planning for the youth's transition among the summaries that were created later in the review period, and the stated activities aligned with the information provided by the Social Work Supervisor who had taken on this responsibility when the previous social worker left STS. The Mental Health Summaries and Nursing Summaries were also more comprehensive than those reviewed for the Monitor's November 2021 report.

The January 2022 internal Quality Assurance audit found a variety of problems among the cases sampled from youth discharged during the 3 months prior to the audit. The Community Transition Plans did not include the full range of information required by the Remedial Plan and *Mental Health Services* policy. The facility's Plan of Correction involved redesigning the form, which was put into use in February 2022. Shortly thereafter, the facility's social worker resigned, and the July 2022 internal Quality Assurance audit identified some additional performance issues, including a failure to utilize the proper form. Since that time, the Social Work Supervisor has fulfilled this responsibility. His experience and skill in this area, along with the scrutiny of the quality assurance process, had a noticeable positive impact on the quality of summaries generated later in the monitoring period.

In summary, when youth discharge from STS, the combination of the Community Transition Plan, Mental Health Summary, and Nursing Summary provide all of the information necessary to plan for continued care in the community. The final step is to clearly document all attempts (whether successful or not) to schedule appointments with community providers for psychotherapy and medication management.

---

**Recommended Compliance Rating**. Partial Compliance

---

**Steps Toward Achieving Substantial Compliance**.
1) Clearly document all attempts (whether successful or not) to schedule appointments with community providers for psychotherapy and medication management.

---

**Methodology**.
- Reviewed *Mental Health Services* policy
- Interviewed Social Work Supervisor about discharge planning
- Reviewed STS Discharge List for 6/1/22 to 8/31/22, and reviewed Community Transition Plans, Mental Health Discharge Summaries, Treatment Plans, Nursing Summaries and RSAT Discharge Summaries for 11 of the 15 youth who were discharged directly from STS.
- Reviewed January 2022 and July 2022 internal Quality Assurance audits

---

**MH-VI. Injunctive Relief Required by Court Order: Provide institutional oversight and structural coordination of the School's MH program.**

**Goal of the Remedial Plan**: BSTS shall develop a two-tiered continuum of quality assurance, quality improvement and oversight by BSTS and DHS/MHDS Facilities-Central Office that focuses on (1) supervision and training; (2) in-person and data-based observation and monitoring; and (3) review of records/documentation. Overall, this approach will be designed to ensure compliance with relevant MH policy and procedure; ensure MH services are consistent with current, generally accepted professional standards of care for identifying clinical needs, developing integrated MH treatment plans, providing effective psychotherapeutic interventions, safeguarding clinical documentation and records, responding effectively to suicidal/self-harm crises, and coordinating MH care upon discharge to the community, and ensuring that the appropriate corrective steps are implemented.

**MH-VI.A. Oversight, Observation and Monitoring**
MH-VI.A.1 Mental Health Authority. A Director of the BSTS Mental Health Department/Mental Health Authority shall be employed to ensure the following:
--organize and oversee the deployment of mental health services at BSTS
--be responsible for the accessibility, timeliness and quality of the mental health treatment program
--liaison with medical/nursing and direct care staff to ensure continuity and integration of care
--arrange and coordinate levels of care, such as crisis and on-call services and coordination with outside providers/agencies
--ensure effective communication between direct care, mental health, medical/nursing and administrative staff
--oversee the development of mental health policies, procedures and programming
--coordinate staff training
--supervise PMHD
MH-VI.A.2 DHS—Clinical Oversight. The Clinical Director for Psychology and Mental Health Therapy Services at DHS Office of Facility Support-Central Office shall
--coordinate with the BSTS MHA at least monthly and shall be available for clinical consultation as needed
-- assist in identifying needs, developing programming and staff training
--facilitating quality assurance, improvement and oversight.
MH-VI.A.3 DHS Monthly Visits. MHDS Facilities Division Administration or Office of Facility Support-Central Office staff will visit the BSTS on a monthly basis to oversee mental health treatment program operations, meet with members of the leadership team, meet with other staff and meet with students. Visits and related oversight observations and actions shall be documented.

Findings.
        Regarding **objective MH-VI.A.1 "Mental Health Authority,"** the individual filling the Mental Health Authority (MHA) role has been employed at STS since 2019. This individual originally held the Director of Mental Health position but was promoted to Deputy Superintendent in October 2022. For the time being, she will continue to serve as the MHA in her new position, but DHS/STS may reconsider the assignment of the MHA role once a candidate to fill the newly vacant Director of Mental Health position has been selected. In the meantime, the MHA continues to address all of the matters listed in the Remedial Plan and is assisted by the Lead Psychologist (a Psychologist 3) who serves as her designee as appropriate.

        DHS's Clinical Director has been employed since August 2019 and maintained regular coordination with the MHA throughout the monitoring period (**objective MH-VI.A.2 "DHS-Clinical Oversight"**). The Clinical Director and MHA maintained standing telephone/videoconferences every other Friday (although that may have been replaced by engagement that occurred earlier in the week if additional consultation was not necessary). A total of 13 virtual meetings and an additional 13 on-site meetings were held between January-August 2022. The Clinical Director and MHA also met weekly (with other DHS/STS administrators) for Remedial Plan meetings throughout the period. In addition, the Clinical Director attended MDT meetings once per month to facilitate skill development among STS clinicians. Both the Clinical Director and MHA reported a high-level of contact that provides sufficient support and oversight. In short, the Clinical Director is fully meeting the responsibilities articulated in the Remedial Plan.

Regarding **objective MH-VI.A.3 "DHS Monthly Visits,"** DHS's Facilities Division Administrator for Mental Health and Disability Services (Division Administrator) visited STS once per month, January-August 2022. Several were multi-day site visits. The substance of each visit was documented and submitted to the Monitor for review. Key activities included:

- 1:1 meetings with the Superintendent to emphasize priorities of violence reduction and staff recruitment/retention and to review key Remedial Plan outcome data.

- Oversight of the ITP Policy development and implementation.

- Facility/cottage walk-throughs, including the renovations to Corbett Miller Hall (CMH) completed in preparation for the Intensive Treatment Program being housed there, and Cottage 7 which is the first to undergo the renovation to convert dormitory housing to single rooms.

- Quality Assurance audits of Admissions and Policy standards.

- Staff Town Halls (with the DHS Director) to discuss leadership, vacancies, legislative updates, STS staffing levels, ITP implementation, Performance-based Standards (PbS), and progress with the Remedial Plan.

- Accompanying the Iowa Juvenile Justice Task Force as they toured STS.

This level of engagement by the DHS Division Administrator meets the requirements of this provision.

The MHA, Clinical Director and Division Administrator also consulted with the Monitor/SME on several occasions and were on site for each of the Monitor's site visits. It is clear from these observations that the Clinical Director and Division Administrator have a strong presence on the STS campus and that they are in near constant communication with the MHA.

**Recommended Compliance Rating**. Substantial Compliance.

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.
- Reviewed MHA job descriptions/revisions
- Met with DHS/STS administrators to discuss changes to STS Leadership Team
- Reviewed meeting schedules
- Reviewed notes from DHS administrators' site visits
- Interviewed MHA and Clinical Director regarding their roles/collaboration
- Observed interactions among STS administrators and DHS administrators

**MH-VI.B. Quality Assurance Policy & Procedure.**
MH-VI.B.1 Quality Assurance Policy & Procedure. By 9 months from the effective date, BSTS and Central Office will collaborate to develop a quality assurance improvement and oversight policy and procedure that:
(a) Involves a two-tiered audit process, the first occurring at BSTS and the second at Central Office level. The frequency of audits at both levels will be designated in policy.
(b) Establishes standards for practice and performance metrics to be developed for MH treatment services and RC.

(c) Establishes protocols for tracking and analyzing data with sufficient particularity to identify trends across, among within and or regarding MH services, as well as RC and Restraint.

(d) Establishes protocols for the development, implementation and dissemination of staff training and/or corrective action plans to address problems identified through the quality assurance, improvement and oversight process.

<u>VI.B.2 Annual Review</u>. Policy shall be reviewed at least annually and updated as needed.

**Findings**.

Following extensive consultation with the Monitor, SME and Plaintiffs' counsel, STS developed policy *1A-09 Quality Assurance* and a set of quality assurance indicators, methodology and metrics which were originally approved by the Court on 11/19/21 (dkt. 412). Following the first quality assurance audit in January 2022, STS proposed some slight revisions to the quality assurance metrics which were supported by the Monitor and Plaintiffs' counsel and approved by the Court on 7/14/22 (dkt. 425).

The DHS/STS internal Quality Assurance structure includes:

- A comprehensive set of quality assurance indicators (QAIs) that clearly identify practice standards,

- A robust methodology for each QAI that combines document review, staff interviews, youth interviews and/or direct observation,

- A variety of metrics that make tangible the extent to which practice standards are being met,

- The deployment of individuals with subject-matter expertise to conduct the audits,

- A protocol for identifying deficiencies and developing a Plan of Correction, and

- Regular updates to the Plan of Correction to ensure that plans are being implemented as required and timelines are being met.

This is one of the most well-developed and well-implemented internal Quality Assurance programs of any with which the Monitor/SME have had experience and certainly bodes well for the sustainability of the reforms achieved under the Remedial Plan.

This internal capacity to identify and solve problems is essential for accelerating progress independent of the Monitor/SME's site visits and audits and for sustaining the reforms. Many of the problems noted in the Monitor's November 2021 report were reassessed during the internal Quality Assurance audit in January 2022, and a Plan of Correction was put in place for identified deficiencies. The July 2022 internal Quality Assurance audit identified deficiencies that had been resolved via those plans, and also identified areas with more intractable deficiencies that require additional corrective action and oversight. The Plan of Correction is routinely updated.

The findings of the internal Quality Assurance audits are interpolated throughout this report. In a few areas, the findings were not completely aligned with the Monitor/SME's assessment and will be dissected prior to the next internal audit (January 2023) to understand the sources of the differences, ensure consistent expectations and promote interrater reliability.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.

1) None

**Methodology**.
- Reviewed and provided feedback multiple drafts of QA policy, indicators and metrics
- Consulted with Plaintiffs' counsel about initial policy and proposed revisions
- Interviewed DHS/STS staff involved in auditing the QAIs in each area
- Reviewed January 2022 and July 2022 QA Audits, Statement of Deficiency, and Plan of Correction (as of 11/7/2022)

**MH-VI.C. Ongoing Training**

MH-VI.C Ongoing Training. By 180 days from the effective date, BSTS shall develop a training or didactic program/policy for psychotherapists (Psychologist 1, 2 and 3) in the MHD designed to advance their clinical expertise in providing evidence-based psychotherapy to adolescents in the JJS.
--For fully licensed professionals, proof of relevant continuing education credits may help fulfill this training requirement.
--Temporary/provisionally licensed professionals may use their licensure based clinical supervision to fulfill part of this training requirement.
--Non-licensed professionals shall be required to fulfill this training program by participating in training or didactic sessions as described in policy.

**Findings**.

As noted in the Monitor's November 2021 report, STS finalized its "Training Requirements for STS Clinicians" on April 16, 2021. Because the requirements were promulgated partway through CY2021, they went into effect beginning with the CY2022 performance evaluation period. Thus, this is the first time that the Monitor has assessed compliance with this provision.

STS psychotherapists who hold active licenses are required to complete all continuing education hours of credit as required by the Bureau of Professional Licensure to keep their licenses current. Typically, this requires 40 hours of education over a two-year period. In addition, fully licensed clinicians are required to complete all facility-specific training, even if the training hours do not count toward the licensure-based continuing education requirements.

STS clinicians who are not permanently licensed must completed 20 hours of relevant continuing education each year (e.g., workshops, conferences, symposiums, webinars), with at least 1 hour in Ethics. As many as 10 of the 20 hours may be fulfilled by attending facility-specific training that is related to the provision of mental health services (e.g., PREA, Suicide Prevention, Suicide Risk Assessment, Trauma, Behavior Management, Discharge Planning, etc.). Specific training courses may also be prescribed by the MHA or primary supervisor, based on clinician's individual needs.

To assess compliance with this requirement, the Monitor reviewed training course completions for each of STS's five clinicians, plus the MHA who holds a permanent, independent license. Of note, two of the five clinicians hold temporary licenses and are expected to become permanently independently licensed within the next few months. Each of the 6 individuals met (usually exceeded) the requirement for 20 training hours in 2022. Three of the 6 had completed training courses in all required areas, while the other 3 had scheduled their last remaining requirement (an Ethics course) in November/December 2022. This meets the requirements of this provision.

The July 2022 internal Quality Assurance audit cited a deficiency in this area because while the facility had developed a matrix for the purpose of tracking continuing education and professional development, data had not yet been entered. These problems were rectified shortly thereafter via the

Plan of Correction, in which STS developed a SharePoint dataset for psychologists to enter their continuing education credits directly into the system, with certificates verified by the Training Specialist. Data for 2022 were entered in a sufficiently timely manner to provide the Monitor/SME with access to the necessary information.

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
   1)   None

**Methodology**.
   - Reviewed "Training Requirements for STS Clinicians"
   - Reviewed CEU table for STS therapists, as of 11/22/22

## SECLUSION AND RESTRAINTS

**RC-I Injunctive Relief Required by Court Order: Defendants must ensure the School only employs use of BSU or the seclusion room in situations where a student' behavior poses a serious and immediate risk of physical harm to any person.**

**Goal of Remedial Plan:** BSTS shall adopt a practice that is implemented and defined by policy and procedure and supported by staff training and oversight that uses room confinement ["RC"], regardless of building/location, as a time-limited, last resort to help students de-escalate or "cool off" in situations where they pose a serious and immediate risk of physical harm ["SIRH"] to a person when less restrictive interventions have been attempted and found unsuccessful or would be unsafe or otherwise inappropriate given the student's acute risk.

**RC-I.A Seclusion Policy**.
BSTS policy *5B-04 Behavioral Stabilization Unit (BSU)* which specifies the protocols for using seclusion will be revised in the following ways:
(a) Name and focus of the policy will be revised to include a general reference to "room confinement" (RC) and not a singular location of room confinement, such as the BSU. The policy will be named *4C-06 Room Confinement.*
(b) Clarify that the use of RC, regardless of space or building where it occurs, must be based on a SIRH to a person, may not be used as a disciplinary sanction, and may not be used for destruction of property or theft.
(c) Clarify that the use of RC for "insubordination" and other forms of non-compliance with rules will be rare and grounds for RC only if non-compliance involves a SIRH to a person.
(d) Clarify that inciting or agitating others may be grounds for RC only if it creates SIRH. If so, incident report shall (i) demonstrate the serious and immediate nature of the risks as described by the student's speech or action; and (ii) include a statement from the agitated/incited student describing the incident and its impact on his behavior. Statement created away from BSTS staff and all versions shall be in incident report.
(e) Clearly note that the purpose of RC is to provide the student an opportunity to "cool off" and return to his normal cottage programming.

(f) Include the expectation that staff member be present with the student, either in or out of a room depending on the circumstances, to verbally assist the student in de-escalation, and to document the de-escalation efforts or interventions that were made to assist the student in regaining behavioral control as soon as possible.

(g) Include the expectation that student be removed from RC as soon as the student is calm, and no later than 1 hour, unless staff working with the student determines he is likely to engage in behavior that poses a SIRH.

(i). Staff will be provided guidance via policy and staff training on how to effectively identify and assess SIRH and how to effectively help a student de-escalate.

(ii) If staff determine that the student continues to present a SIRH after 1 hour, they shall immediately contact administrator for guidance and authorization as well as a PMHD who will meet with the student ASAP baring conflicts with other clinical duties, consistent with the 24/7 coverage plan in the MH treatment section above.

(iii) The PMHD will work with the student to restore him to a state where he no longer poses SIRH. Protocols for such engagement will be noted in the two-pronged crisis intervention protocol and in the interim in the *Suicide Prevention/intervention* policy.

(h) Prohibit keeping a youth in RC overnight, including for administrative staffing purposes.[27]

(i) Include the aggregation or accumulation of time spent within two hours of an earlier release from RC toward the one-hour limit.

(j) Include the requirement that students placed in RC provide a report in their own words describing the behavior that resulted in the RC and include protocols for securing and recording such reports for internal/external review.

(k) Include the identification of student and staff witnesses in the RC report, which will include adequate protections from reprisal for student witnesses.

(l) Include requirements that BSTS continue to track time spent in RC; that such data be tracked both individual and aggregate; that BSTS reports it to Central Office on a monthly basis per continuum of quality assurance.

Findings.

*Policy*.

Policy *4C-06 Room Confinement* was originally approved by the Court on 7/27/20 (dkt. 354). Revisions to the policy were made in collaboration with the Monitor, SME and Plaintiffs' counsel and were approved by the Court on 7/8/22 (dkt. 422). The policy includes all of the required elements and remains in effect.

*Training*.

The revised *Room Confinement* policy requires all STS staff to be trained on the policy requirements upon hire and annually thereafter. The Monitor reviewed the 2022 Room Confinement training module which included: (1) definition, purpose and criteria for using room confinement; (2) documentation requirements (both for describing why room confinement was necessary and for documenting the interventions that occur when a youth is in room confinement); (3) interventions for de-escalating a youth in room confinement; (4) mental health involvement; (5) authorization beyond

---

[27] This portion of the Court Order (IV.B.2(2)(e)(v), p. 109) and Remedial Plan (IV.A(1)(h), p. 18) was revised to permit STS to use CMH as a residential unit for the purpose of operating a pilot program in that space. The requirements of that negotiated amendment are discussed in the newly added RC-I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," below.

one-hour; (6) considerations when reintegrating a youth to the housing unit; and (7) quality assurance process for room confinement packets. Each participant was required to pass a proficiency exam that tested their knowledge on key concepts and procedures.

A review of training records revealed:

- *New Employee Training.* Of the 20 staff who were hired in 2022 and still employed as of 8/31/22, documentation was available to demonstrate that only 10 of the 20 received training on the *Room Confinement* policy (50%) upon hire.[28]

- *Annual Training*. As of 11/11/22, a total of 113 of 126 (90%) direct care staff[29] had completed annual refresher training on the *Room Confinement* policy. With two months still to go in the training year, STS appears to be on track to meet this requirement by ensuring that the remaining 13 staff complete this training module.

- *YSTs* received supplementary training on room confinement procedures in July 2022.

- All 5 *psychotherapists* were retrained in their responsibilities to youth in room confinement on 9/22/2022.

Both the January and July 2022 internal Quality Assurance audits noted these same problems regarding evidence of training completion among direct care staff. While the Training Officer and STS administrators felt confident that new STS staff received training in all components upon hire, proper documentation proved elusive. In March 2022, STS changed its procedure to require a completed proficiency exam as proof that staff completed the required courses. Although this is undoubtedly a more straightforward method than interpreting sign-in sheets, problems remain. While the facility cannot fully remediate the training deficit for new staff (because the "upon employment" period has passed), some staff have attended subsequent training once the gap in their training records was discovered. The problem appears to be multi-faceted, with deficits in scheduling/re-scheduling and documentation. The facility plans to identify additional checkpoints to ensure that all staff receive pre-service and refresher training as required by policy.

*Trends*

Between January-August 2022, room confinement was used 1,047 times at STS, for an average of about 130 times per month. The average room confinement event was very short, with an average length of stay of just 22 minutes. More specifically, 64% of all room confinement events (n=667) lasted 15 minutes or less, while 33% (n=350) were between 16-59 minutes, and 3% (n=29) lasted 60 minutes or longer, with the longest event lasting 169 minutes or about 2.5 hours. This pattern of usage is remarkable for a couple reasons. First, room confinement is used frequently, and documentation clearly demonstrated that an imminent risk of harm was present. This represents a frequent risk of physical harm, although as is the universal pattern in juvenile justice facilities nationwide, a small number of youth at STS frequently escalate to this level. Just 5 youth were involved in 35% of the room

---

[28] The Monitor considered two factors when assessing training (1) how information was provided (i.e., whether the PPT training curriculum was utilized) and (2) documentation of attendance (i.e., completed proficiency exams (preferred) or sign-in sheets were considered proof of training; a training schedule was not considered adequate proof of training).

[29] "Direct care staff" includes staff from all disciplines who have face-to-face interactions with youth. This includes cottage staff (YSWs, Counselors, Directors), security staff (YSTs), mental health staff (psychologists and social workers), educators and medical staff.

confinement events.[30] Second, room confinement events at STS are quite short in duration which is obviously positive in that youth's exposure to the risks inherent in long-term isolation are avoided. It is a positive commentary on STS's level of engagement with its youth that facilitates youth's stabilization. The short duration also speaks to STS's commitment to comply with the Remedial Plan's requirements.

That said, the high frequency of behavior that creates a risk of harm/frequency of room confinement use is connected to the discussion about revising treatment plans to adapt interventions for youth with frequent problem behaviors (in the Mental Health section of this report, above) and also to the need to better integrate the use of ART concepts throughout the facility (discussed in RC-I.B "Behavior Management/Motivation", below).

In addition, the Monitor/SME share a concern voiced by many STS staff that the assessment of youth's risk level to release youth from room confinement may not be as fulsome as desired. More specifically, youth's removal from room confinement and quick return to regular programming sometimes appeared to occur without fully understanding how the youth's behavior that led to room confinement fits into the larger picture of their functioning at STS and the treatment they receive. The Monitor had multiple discussions with DHS/STS leadership on strategies to promote a more fulsome assessment of the incident that resulted in room confinement so that factors that may impact subsequent safety of that youth, their peers and staff can be identified and addressed more comprehensively when needed. In the Monitor's experience, this can certainly be accomplished while still embracing the commitment to limit the risk of harm flowing from long periods of isolation. Once the concept is fully developed, STS will propose a revision to the *Room Confinement* policy that will be discussed with the Monitor/SME and Plaintiffs and then submitted to the Court for approval.

*Implementation*

To assess the extent to which specific policy requirements and protections were properly applied, the Monitor reviewed a random sample of 50 of the 303 room confinement events (17%) that occurred in June and July 2022. The various elements of practice have continued to improve from the Monitor's prior reviews, likely due to the multiple levels of oversight and extensive staff coaching and training conducted by various STS administrators and supervisors.

- The serious and imminent threat of physical harm was adequately described in **90%** of the packets reviewed (45 of 50 packets). Most of the packets in which the rationale for using room confinement did not include the necessary detail were identified by the facility's 1st level quality assurance process and the staff involved received coaching to address the deficiency.

- The staff who initiated the room confinement and who observed the youth while in room confinement were identified in **100**% of the packets reviewed.

- In response to the Monitor's previous finding that documentation did not list youth witnesses, STS modified practice to ensure this information was available should it be needed for an investigation into youth or staff behavior. Youth witnesses must now be listed on the incident report/Learning Intervention that was issued in response to the youth's behavior. Of the 50 packets reviewed, youth witnesses were listed in 40 reports (**80%**). In some of these, staff explained that other youth were not present/did not observe the behavior. In the remaining, a

---

[30] These five youth all received extra support, included increased hours of psychotherapy, individualized behavior management plans, Wrap Around team meetings and admission to the Intensive Treatment Program, in an effort to stabilize their behavior.

Learning Intervention was not issued in response to the youth's behavior and thus the information was not captured. This is an acceptable level of performance.

- Staff witnesses were identified in **100%** of the Incident Reports reviewed.

- 15-minute checks, behavioral observations and the youth's verbal statements were properly recorded in **92%** of the packets reviewed (46 of 50 packets). This section of the form was revised to better capture the exchange between staff and youth regarding the process of de-escalation, which addressed the previous deficiency in this area. This documentation also provided evidence that youth were released from room confinement once the imminent threat had dissipated (i.e., when during the check, the staff indicated "no" on each of the three criteria—disturbing behaviors, making threats, aggressive behaviors).

- All of the packets (**100%**) contained evidence that staff asked the youth to provide a verbal or written statement of their version of the events, although very few youth (in 4 of 50 events, or 8%) took advantage of this opportunity. The revised *Room Confinement* policy articulates procedures for obtaining a youth statement that are aligned with generally accepted practice.

- Administrative reviews were timely (i.e., within one business day if the duration was an hour or longer, within two days if the duration was less than one hour) in **94%** of the packets reviewed (47 of 50). The date of the administrative review in the three packets that were not within timelines appeared to be typographical errors.

- In nearly all of the packets reviewed—even for events that were quite short—multiple staff (YSWs, YSTs, mental health clinicians) were present and helped the youth to regain behavioral control.

- In 3 of the 50 packets reviewed, youth remained in room confinement after 9pm (bedtime), but in all cases, once the youth was released from room confinement (all were released before 11pm), staff identified the cottage to which the youth was transported for sleeping. When interviewed, both youth and staff reported that youth do not remain in room confinement overnight.

In response to objective RC-1.A (d), the Monitor also assessed the extent to which STS complied with policy requirements regarding the use of room confinement with youth who were alleged to be rioting/inciting a riot. Two of the 50 room confinement packets included a Learning Intervention that included an infraction for inciting a riot. However, the Learning Intervention also revealed that riot/inciting was *not* the proximal cause of the room confinement, as both youth had engaged in other behaviors that created an imminent risk of harm (e.g., assaulting youth or aggressively resisting staff's attempt to guide them away from the situation). These behaviors justified the use of room confinement to allow the youth to safely de-escalate.

The *Room Confinement* policy includes additional protections for youth who are in room confinement for longer than 1-hour. The extended stay must be authorized, a mental health clinician must assist with de-escalation and a Reintegration Safety Plan must be completed. Between January-August 2022, 29 room confinement events lasted longer than 60 minutes, which comprises only 3% of all room confinement events. Among these 29 room confinement events, the length of stay ranged from 63 to 169 minutes, with an average of 97 minutes.

A random sample of 20 packets for events lasting longer than 60 minutes was reviewed in depth. Five of the events were extended because staff suspected the youth had dangerous contraband and the youth would not initially consent to a search. The other 15 room confinement packets

provided a detailed description of the youth's behavior (e.g., either continued threats and aggression, or a refusal to discuss the event with staff which obviously provides no information to suggest that the youth has been successfully de-escalated). Regarding the specific authorizations and notifications required by policy:

- Authorization to extend room confinement was obtained prior to the 60-minute mark in 18 of the 20 events (**90%**). An appropriate rationale was documented, and authorization was granted in all cases. This is a significant improvement from the Monitor's pervious report in which only 38% of events lasting longer than 60 minutes obtained authorization prior to the 60-minute mark.

- A mental health clinician was contacted with sufficient time to respond prior to the 60-minute mark in 19 of the 20 events (**95%**). In all 20 events, mental health clinicians described the youth's behavior while in room confinement and the clinicians' efforts to de-escalate the youth.

- <u>A Reintegration Safety Plan was present in only 14 of the 20 packets (**70%**). While several of the plans revealed thoughtful modifications to the youth's activities and provided for additional support (particularly those from August 2022), the plan that was provided in most of the packets was not responsive to the task</u>. While the facility continues to struggle in this area, on-going conversations between STS administrators and the Monitor suggest that the concept may be poorly constructed in policy. In other words, the current requirements and format for the plan may not be properly aligned with the objective of assessing whether modifications to youth's activity/environment following release from room confinement could promote safety. The Monitor has encouraged STS to reconsider this section of the policy and has provided technical assistance to help shape a revision to policy and practice. Once the proposal is finalized, the changes will be submitted for consideration to the Monitor/SME and Plaintiffs' counsel and then submitted to the Court for approval.

The *Room Confinement* policy requires these same protections (authorization, mental health intervention, Reintegration Plan) when a youth is returned to room confinement within 2 hours of a previous room confinement event, and the total time accumulates beyond 60 minutes. Between January and August 2022, youth were returned to room confinement within 2 hours of release 48 times. Only 10 of these accumulated beyond 60 minutes, representing about 1% of all room confinement events. These 10 events were reviewed to determine whether the required protections were in place.

- <u>The required approval for room confinement to extend beyond 60 minutes was obtained timely in only 5 of 10 events (**50%**)</u>.

- <u>A mental health clinician was contacted timely (or already present) in only 5 of the 10 incidents (**50%**)</u>.

- <u>A Reintegration Plan was developed in only 4 of the 10 events (**40%**)</u>. The same deficiencies and recommendations discussed above also apply here.

These 10 events spanned from January to August 2022. Nearly all of the packets that complied with the relevant requirements were from July/August 2022, suggesting that practice improved considerably toward the end of the sampling frame.

**Oversight and Quality Assurance**

In addition to the MHA/TPA's reviews of each room confinement packet that occur a day or two after the fact, the facility continued its 1st Level Quality Assurance audits wherein the Superintendent/Deputy Superintendent reviews all room confinement packets to ensure they meet policy requirements. When a packet fails the audit, the staff's supervisor conducts a counseling session or Work Directive (which is not a disciplinary action but rather an opportunity to clarify and educate staff on the expectations) or imposes progressive discipline.

The vast majority (92%) of room confinement packets passed the first level audit. Of the 80 packets that failed, over half (54%; n=43) were packets from January and February 2022, where monthly failure rate averaged 17%. For the remaining six months of the sample period, the average monthly failure rate was 5%. This suggests that performance is improving, and staff were more closely adhering to policy requirements.

Among the reasons for audit failures:

- 5 packets (6% of failed audits; 0.05% of all room confinement events) failed for an "improper use of intervention [room confinement]" when the behavior described in the documentation was not a permissible reason for room confinement (i.e., horseplay), the description of the behavior did not indicate an imminent risk of harm to others, or the use of room confinement to address an imminent risk of self-harm was not fully explained.

- The remaining 75 packets failed because of inaccurate documentation (e.g., misidentified victim of assault), process failures (e.g., problems with the 15-minute documentation requirement), omissions (e.g., needing more information about verbalized threats), or incomplete documentation (e.g., missing Reintegration Safety Plan, missing incident reports).

These findings largely mirrored the Monitor's findings in both substance and frequency. In response to QA audit failures, the relevant supervisor provided job coaching to those involved in 80% of the audit failures. Most of the staff involved received a Work Directive. Progressive Discipline was warranted for the remaining 20% (n=15), although discipline was not actually imposed for 4 of the 15 audit failures that warranted it (all of which occurred in February 2022 and failed due to a missing incident report).

STS's room confinement procedures have also been audited twice at the agency level, in January and July 2022. The July 2022 audit sampled 36 room confinement events. Per the *Quality Assurance* policy, any metric that did not meet a 90% performance level or higher was found deficient, requiring a plan of correction (POC). The July 2022 audit noted that most room confinement practices were properly implemented and confirmed that appropriate limits are placed on the use of room confinement via youth and staff interviews. More specifically, most youth perceived that room confinement was used fairly, was used only when a youth posed a risk to safety and was not used as punishment. The July 2022 audit identified deficiencies in the following areas:

- Only 3 of the 5 events (60%) that lasted beyond 60 minutes included the required authorization to extend the room confinement, although this was a significant improvement over the 0% performance level in the January 2022 audit.

- Neither of the two room confinements sampled that extended beyond 1 hour included the required Reintegration Safety Plan. The Plan of Correction included retraining for all psychotherapists, duty superintendents and second management staff (i.e., those responsible for the Reintegration Safety Plan in policy). All 25 staff identified for this retraining received it by 9/1/22.

- 30% of corrective actions were not implemented within 7 days of the event that was audited, although the average time-to-correction of 7.8 days was a significant improvement over the average time of 24 days in the January 2022 audit. The Plan of Correction was to bring all documentation current and was nearly complete by 11/7/22.

These findings mirror those of the Monitor and provide ample evidence of a robust quality assurance process that is designed to improve staff practice. The Monitor's review of packets from August 2022 showed significant improvements from those documenting room confinement events from early 2022, suggesting that the various quality assurance efforts are having a positive impact on staff practice.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that newly hired STS staff receive pre-service training on the *Room Confinement* policy prior to being deployed to work on the housing units and ensure that completion of the training is properly documented.
2) Reconsider the protocols surrounding the release from room confinement and the Reintegration Safety Plan during the next policy revision. Once a more useful protocol has been developed, apply it consistently.
3) Closely monitor back-to-back room confinement events to ensure that requirements for mental health involvement, authorization and post-release planning are followed.

**Methodology**.
- Reviewed staff roster, training completion dates and proficiency exams
- Reviewed room confinement log and a sample of room confinement packets from January to August, 2022
- Reviewed the Room Confinement Audit Log
- Interviewed STS administrators, staff and youth regarding room confinement practices
- Reviewed January 2022 and July 2022 internal Quality Assurance audits

**RC-I.B.1 Behavior Management/Motivation**. In addition to the policy changes for RC noted above, BSTS will revise their behavior management approach to focus less singularly on control and compliance and more dynamically on skill building and relationship development to help students better manage stressors, maintain emotional and behavioral control, and engage effectively with others so they are less likely to need RC/restraint to calm down or otherwise control their behavior. This approach will go beyond mere compliance and include a significant focus on motivation. It will align with the therapeutic, crisis-response, skills based and rehabilitative based services the school develops and provides. Overall, this program/approach will be designed to not only help students conform their conduct to School rules and basic societal expectations for purposes of ensuring safety and security but enhance their skills to pro-socially navigate life stressors and reduce the risk of recidivism.
RC-I.B.1 Identify Program. By 60 days from the effective date, BSTS will identify an evidence-based, skills-focused curriculum/program that will establish the overall framework that BSTS will use to help students develop the skills they need to better manage their emotions, control their behavior and interact effectively with others.
RC-I.B.2 Revise Behavior Management Policy. By 90 days from the effective date, BSTS will revise Policy *5B-03 Behavior Management* to align with the practices of the behavior management program/approach that will be developed. Will go into effect once training is complete.

RC-I.B.3 Revise Point/Level System. By 120 days from the effective date, BSTS will review/revise current point/level system to ensure that it
    (a) includes a robust incentive-based system that sufficiently focuses on incentives, rewards and skill-development
    (b) has a robust continuum of non-seclusion-based sanctions that are used to respond to the full range of violations of rules, including violence against others and destruction of property, and do not involve room restriction or denial of out-of-room recreation
    (c) is aligned with the larger evidence-based, skill-focused curriculum that was identified.
RC-I.B.4 Train Key Staff. By 150 days from effective date, senior administration (e.g., superintendent, TPA, TSD), PMHD, and cottage staff will be trained on the policies that are updated, trained on how to facilitate groups using the curriculum identified and trained to use the curriculum in their day-to-day interactions with students, including the point/level system.
RC-I.B.5 Train Remaining Staff. By 180 days from the effective date, other direct care staff will be trained on the policies and trained on how to utilize the curriculum in their day-to-day interactions with students, including the point/level system
RC-I.B.6 Post Notice. Within 24 hours of the policy being formally adopted/implemented, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting, approved by both Parties
    (a) Student Handbook will also be updated to reflect all changes, students will be provided with updated handbook, changes reviews with them by staff

**Findings**.

*Aggression Replacement Training (objective RC-I.B.1)*

    The facility identified Aggression Replacement Training (ART) as its evidence-based, skills-focused curriculum on 9/28/20, within the timeline required by the Remedial Plan. The purpose of having an overarching skills-based program is so that staff and youth have a common language and common structure for helping youth to develop the skills they need to replace maladaptive and aggressive behaviors with appropriate ones, rethink anger-provoking situations and respond in a nonaggressive manner, and better appreciate the needs and rights of others.[31] Briefly, an integrated model is one where: (1) youth receive an introduction to the key concepts and skills via facilitated ART groups;  (2) mental health clinicians and counselors—who have been taught these same concepts and skills—work with the youth to deepen their understanding and skill mastery; and (3) during moments of distress, staff prompt and encourage the youth to utilize the skills learned to resolve the situation without violence. STS continues to pursue full implementation of this framework but has not yet achieved it.

    Full integration of the ART model into routine interactions between staff and youth (and fortifying mental health interventions in the manner discussed in the Mental Health section of this report) *may be* the key to reducing some youth's and staff's reliance on external sources of support (e.g., de-escalation room, MSDR, Learning Interventions, room confinement). The goal is for the youth to identify and utilize an effective skill during a behavioral crisis or for the staff to cue the youth to utilize a specific skill. This could also help to sustain progress that youth make while in the Tier 3 program once they transition to a general population cottage.

*Facilitators*

---

[31] *See* https://aggressionreplacementtraining.com for more information.

The original agency trainers who were certified by Education & Treatment Alternatives, Inc. (ETA; the group authorized to train staff to facilitate ART at STS) in 2021 have since departed the facility but have been replaced by three new agency trainers. Two are now fully certified (one in June 2022 and the other in November 2022), and the other will be fully certified in early 2023. STS currently has 39 staff who are trained to facilitate ART groups, which creates sufficient group capacity to ensure all STS youth can access the group.

The Monitor previously reviewed the training materials for ART facilitators and found them to be comprehensive and appropriately targeted to teach the facilitators the core concepts and how to deliver the program effectively. Each participant was required to pass a detailed proficiency exam and to complete a practicum where their facilitation skills were observed and evaluated.

*Youth*

ART is a 3-times-per-week, 10-week curriculum that operates as a "closed group," meaning that youth must enter the group at Week 1. By design, youth also may not continue in the group if they miss more than 2 weeks. While these are important aspects of ART's effectiveness and are critical for program fidelity, STS found in 2021 that these requirements were making it difficult to ensure that youth completed the ART program timely. In order to increase the group capacity needed to serve all youth, STS began to run concurrent, staggered group cycles in 2022. Generally, a new group cycle starts about every 4-6 weeks, which allows STS to admit youth to groups more quickly. As noted in the Monitor's November 2021 report, the pace of ART enrollment accelerated with this change, and this progress was evident throughout 2022. When interviewed, one of the agency trainers reported that the waitlist for ART was comprised of youth with recent STS admission dates (in previous Monitor's reviews, youth waited several months to be enrolled in ART). The Monitor/SME encourage STS to consider requiring youth who completed ART during a previous admission and those who continue to exhibit frequent behavior problems after ART completion to be reenrolled in another cycle of ART given the demonstrated inability to access ART skills when needed.

To assess progress with youth enrollment, the Monitor reviewed the status of ART enrollment/completion for every youth who had been in custody at any point between 1/1/22 and 8/30/22. Of the 92 youth:

- 48 youth (52%) had completed the 10-week group.

- 21 youth (23%) were currently enrolled.

- 4 youth (4%) were new admissions who were scheduled to attend a subsequent cycle.

- 5 youth (5%) require an alternative modality due to cognitive/developmental abilities or language barriers.

- 8 youth (9%) were removed/not admitted due to high-frequency assaultive behaviors that disrupted the group format and also needed an alternative modality.

- 6 youth (7%) began ART group but were discharged prior to completing the group or were not available due to being AWOL or being transferred to jail.

In other words, about 80% of STS had completed or were in process of completing the ART group. Alternative formats were being delivered (or planned) for the 14% of youth who remained at STS—the quality of these alternative formats is extremely important, since they tend to target the very youth exhibiting the relevant skill deficits which contributes to their maladaptive behaviors. The current ART waitlist consists of those who were recently admitted, which indicates that the facility has caught up to

the backlog of youth who were waiting to enter ART. When interviewed, all youth could recall ART skills and generally gave positive reviews of the group's interest level and facilitators' skills. Unfortunately, youth also reported that cottage staff rarely engaged with them regarding ART skills, and that the discussion of ART skills was largely confined to the group itself. This is indicative of the lack of ART's integration into the day-to-day operation of the facility.

The July 2022 internal Quality Assurance audit found that about 76% of youth were either enrolled, scheduled or had already completed ART. Because the STS Quality Assurance expected performance level is 90%, the facility was found deficient in this area, requiring a Plan of Correction. The strategy includes holding Cottage Directors accountable for identifying alternative modalities for those youth who are not suitable for a group modality and for including "ART Enrollment" on the agenda for monthly Behavior Management Reviews. This should further improve youth's access to the ART intervention.

*Staff Training*

Although a critical mass of STS youth has now completed or been engaged in ART, the ability to draw ART concepts into the day-to-day operation of the facility remains limited. Most staff have completed ART training—either as part of new employee training or annual training.

- *New Employee Training.* Of the 20 staff who were hired in 2022 and still employed as of 8/31/22, documentation was available to demonstrate that only 10 of the 20 staff (50%) received training on *Anger Replacement Training* upon hire.[32] It is unclear how many of these received the full ART module designed to train staff to utilize ART concepts in their routine interactions with youth. Problems with the reliability/documentation of new employee training have been discussed throughout this report.

- *Annual Training.* As of 11/11/22, a total of 113 of 126 (90%) direct care staff[33] had completed annual refresher training on *Anger Replacement Training.* With two months still to go in the training year, STS appears to be on track to meet this requirement by ensuring that the remaining 13 staff complete this training module.

Even though most staff have received ART training, interviews with STS staff revealed that neither of these trainings have helped staff to develop proficiency in ART concepts such that they could be used to recognize, shape or encourage positive behavior among youth in their day-to-day interactions. Most staff could vaguely recall the substance of the training but admitted that they did not use this information routinely in their interactions with youth. The Monitor discussed various strategies for improving staff proficiency in these skills while on site in October 2022 (e.g., scheduling ART groups so that YSWs can observe the groups directly). This is the main issue driving the Partial Compliance rating recommended for this provision.

**Behavior Management Policy (objective RC-I.B.2 and RC-I.B.6)**

---

[32] The Monitor considered two factors when assessing training (1) how information was provided (i.e., whether the PPT training curriculum was utilized) and (2) documentation of attendance (i.e., completed proficiency exams (preferred) or sign-in sheets were considered proof of training; a training schedule was not considered adequate proof of training).

[33] "Direct care staff" includes staff from all disciplines who have face-to-face interactions with youth. This includes cottage staff (YSWs, Counselors, Directors), security staff (YSTs), mental health staff (psychologists and social workers), educators and medical staff.

Policy *5B-03 Behavior Management* was originally approved by the court on 1/22/21 (dkt. 372). Revisions to the policy were discussed with the Monitor, SME and Plaintiffs' counsel throughout late 2021/early 2022 and were approved by the Court on 7/8/22 (dkt. 422). The only modifications were to ensure that gender-neutral pronouns were used throughout and to add a term to the Definitions section.

*Behavior Management Training (objectives RC-1.B.4 and 5)*

Both the Remedial Plan and the *Behavior Management* policy require staff to receive both pre-service and annual refresher training. The Monitor reviewed the 2022 *Behavior Management* training module which features several updates to promote staff skill development in key areas. The module includes a discussion of: (1) key concepts for behavior modification (respect, instruction, rapport building, modeling, reinforcement, and especially consistency); (2) youth expectations for each area/activity (dayroom, dorm, locker room, movement, recreation, during codes); (3) mechanics of the behavior management system; (4) privilege tiers and other rewards; (5) learning interventions and loss of privileges; (6) weekly evaluations; (7) the level system and benchmarks; and (8) more intensive forms of support. Each training participant was required to pass a proficiency exam that tests their knowledge of key concepts.

The revised *Behavior Management* policy requires all STS staff to be trained on the policy requirements upon hire and annually thereafter. A review of training records revealed:

- *New Employee Training.* Of the 20 staff who were hired in 2022 and still employed as of 8/31/22, documentation was available to demonstrate that 16 of the 20 received training on the *Behavior Management* policy (80%) upon hire.[34]

- *Annual Training.* As of 11/11/22, a total of 113 of 126 (90%) direct care staff had completed annual refresher training in the Behavior Management System. With two months still to go in the training year, STS appears to be on track to meet this requirement by ensuring that the remaining 13 staff complete this training module.

The problems with new employee training have been discussed throughout this report, although the *Behavior Management* training had a higher rate of completion than the other training modules. In response to practice issues discovered via routine review and the internal Quality Assurance audit in July 2022, STS administrators also provided informal training to cottage and school staff in September 2022. They were reminded of required practices for notifying youth when Learning Interventions were issued, data entry to ensure youth BMS dashboards are current and complete, collaborating at the end of the shift to assess youth's behavior, making individualized comments for both positive recognition and areas for improvement on each youth's behavior record, and procedures for issuing Mustang Money. This type of "system maintenance" bodes well for sustained compliance with this provision and for continuous improvement.

*Behavior Management Program (objective RC-I.B.3)*

Being far more technologically advanced than a typical juvenile correctional facility, STS has an enormous volume of data available to assess the state of its Behavior Management Program. This is obviously an asset for internal program monitoring, and the facility utilizes a variety of dashboards and

---

[34] The Monitor considered two factors when assessing training (1) how information was provided (i.e., whether the PPT training curriculum was utilized) and (2) documentation of attendance (i.e., completed proficiency exams (preferred) or sign-in sheets were considered proof of training; a training schedule was not considered adequate proof of training).

monitoring tools to identify program strengths and opportunities to strengthen staff practice. The Monitor/SME requested and received a large volume of data about the incentive program, level-step system, weekly cottage evaluations and infractions/Learning Interventions. These data were used to assess the following global indicators of program integrity:

- Whether the program design reflects good practice and whether its structure provides ample mobility in response to youth's behaviors (i.e., that youth are rewarded for demonstrating pro-social behaviors and temporarily lose access to those rewards if they engage in negative or assaultive behaviors),

- Whether staff are adequately trained to deliver the program,

- Whether the program is a centerpiece of day-to-day facility operations utilized to direct both activities and individualized support,

- Whether youth receive the incentives and rewards they've earned (and do not receive rewards they have not earned), and

- Whether proportional consequences are applied following misconduct.

These are the core components of an effective behavior management program. While there will always be opportunities to refine the program's operation to improve practice, the standard here is adequacy, not perfection. Behavior management programs always require "system maintenance" (e.g., ongoing staff training to improve consistency across staff, efforts to refresh incentives to keep youth's interest), and it is encouraging that STS commits significant effort in this area with ongoing coaching and re-training. STS has met the requirements of this part of the Remedial Plan. The implementation of the Incentive Program and the Level-Step System provide a solid foundation for integrating ART concepts and ensuring that mental health treatment more nimbly identifies interventions that reduce problem behaviors, as discussed in the Mental Health section of this report. All of these efforts should help youth to improve their behavior and reduce the reliance on the various tools for responding to threats/acts of violence.

*Incentive Program*

Interviews with youth and staff and facility observations during the Monitor's May and October 2022 site visits continued to indicate that the Incentive Program is well-integrated into the facility's daily routine. All youth knew what incentive tier they were on (Bronze, Silver, Gold) and what was required to advance to the next tier (*i.e.*, accumulating a certain number of "Meets Expectations" behavioral ratings, which are awarded by staff throughout the day; refraining from serious misconduct; engaging in programming; engaging with mental health; obtaining passing grades in school). Further, youth confirmed that they received all of the incentives they earned each week (e.g., trips to the Rec Hall, funds to purchase items at the Rec Hall, later bedtime, etc.). Some youth and staff expressed frustration that youth obtained access to Gold-level rewards even though their behavior did not appear to warrant it (this is discussed further, below). Further, given the short-attention span of most adolescents, constant efforts to refresh the array of rewards will help to maintain youth engagement in the program.

Each youth's achievements are reviewed weekly with the Cottage Director/Counselors and their Tier is updated accordingly. A review of Weekly Cottage Meetings records and individual youth's records confirmed that weekly reviews occur as required. The Monitor's November 2021 report noted that about half of STS youth typically scored at the Bronze Tier each week. More recently, the distribution of the facility's population across the Tiers tends to be weighted toward Gold. While some

of this variation reflects changes in youth behavior, STS is also vigilant about the extent to which staff practice impacts the distribution of youth across the Tiers. The Monitor's July 2021 report discussed some staff's avoidance/hesitation/lack of skill in engaging in calm, constructive conversations with youth who are not meeting behavioral expectations. While some improvement was noted in that youth confirmed that staff reliably inform them when they are being sanctioned for misbehavior, a variety of STS staff (administrators, Directors and Counselors) reported that some staff continue to be overly tolerant of youth's misbehavior and do not sanction minor/moderate misbehavior when it does occur, which artificially inflates their incentive tier each week. This recognition of the impact of staff's behavior/skill level in systems designed to assess youth's behavior is important, as is the frequent retraining and attention that STS has given to this issue. Importantly, as the Behavior Management System becomes more prominent as an objective measure of progress toward treatment goals, inaccuracies can have deleterious effect on the youth's mental health treatment because they obscure the need to adjust the treatment plan when it appears, from this measure, that the youth is succeeding.

A sample of 15 youth's weekly evaluations was analyzed to assess mobility across the BMS levels. This analysis mirrored trends in aggregate data—that the distribution of youth across the tiers skews toward Gold. In the chart below, the number of weeks in custody follows the "Y" for each of the 15 youth (e.g., Y-29 weeks). The colored bars indicate the proportion of the youth's time in custody that was spent at each of the 3 levels. Seven of the 15 youth (47%) were Gold 50% or more of their time in custody, and 3 youth were Bronze during 50% or more of their time in custody. While sanctions for some lower-level behaviors may be avoided by certain staff as discussed above, it is also true that most of STS's youth are achieving some behavioral success in the program. A small subset of youth have more intractable negative behaviors that contribute disproportionately to the level of violence and prevent them from achieving success in the Behavior Management System.



While refinement to staff practice is always encouraged, this varied distribution shows that the Incentive System is capable of identifying youth with predominantly prosocial behavior and those who engage in frequent disruptive behaviors and/or violence.

A variety of tools are utilized to support youth with challenging behaviors who struggle to achieve the higher incentive tiers. These include:

- the Daily/Hourly program, where the behavioral rating periods are shortened in order to create more opportunity for shaping and reinforcement,

- a variety of Special Management Plans that provide additional interventions to youth who consistently struggle in certain locations (e.g., in the dormitory, in the MSDR), or who need additional protections from other youth, or interventions to avoid triggering a traumatic stress response, and

- Wrap Around Meetings that increase service intensity, attempt to engage other sources of support, etc.

The Incentive System and adjacent tools are conceptually sound, well-implemented and meet the requirements of this provision of the Remedial Plan. There are of course multiple opportunities to increase their effectiveness, such as improving the specificity of feedback offered to youth when giving verbal praise/reinforcement (which was noted in the July 2022 internal Quality Assurance audit) and the consistency of expectations and enforcement across staff/cottages discussed above. These problems are common among the behavior management systems—even well-functioning ones—with which the Monitor/SME are familiar and at the current level do not indicate a failure to comply with the requirements of this provision. As discussed in the Mental Health section of this report, focused efforts to modify the interventions utilized in treatment to reduce specific problem behaviors would further fortify the efforts of the Incentive program to help youth better manage their behavior.

Finally, one of the most powerful components of any behavior management system is the extent to which the youth's environment is filled with engaging, high-interest activities. When youth want to engage and are excited about program offerings, they tend to make moment-to-moment choices about how to respond to various stimuli that will allow them to remain in the program. Conversely, when they are bored or given too much unstructured free time, their behavioral choices tend to be motivated by a need for excitement or attention, which can lead to the heavy reliance on de-escalation, MSDR, and room confinement discussed in other sections of this report. To STS's credit, the two Activity Specialists who began working in Summer 2021 appear to have endless creativity and ideas, albeit currently underutilized, for how to increase structure and interest in the daily unit schedules. They have developed a broad range of activities (sporting events, movie nights, off-campus activities, tournaments, etc.), community service opportunities, a Commissary Store, and regular special activities for those who remain violence-free. As reported in the Monitor's July 2022 report, the potential benefit of these individuals' efforts has been limited by their assignment to cover the incentive cottage and other short-staffing situations that prevent broader deployment of small group and outdoor activities. An Activity Aide who will run the incentive cottage is slated to begin working at STS in January 2023. This may help to increase the volume of structured activity available to youth on a more regular basis. As the cottages' daily schedules become more structured and feature an array of engaging activities, the facility may find that youth are more motivated to avoid the behavioral problems that currently cause frequent exits from the regular program.

*Learning Interventions*

When youth engage in misconduct, STS issues Learning Interventions ("LIs"), which are categorized according to the most severe infraction (Mild, Moderate, Major) involved in the incident. The chart below shows that the number of Learning interventions varied month to month, from a low of 488 in February 2022 to a high of 1,027 in June 2022. This variation is in part a reflection of the youths' behavior but is also significantly impacted by staff practice. As discussed above, youth reported some frustration with a lack of consistency across staff, and the Behavior Management Review

Committee has been working to promote consistency in expectations and in accountability practices for several months. Learning Interventions are increasingly used in mental health treatment plans as an objective indicator of progress toward treatment goals, so consistency is key. Monthly reviews among the Treatment Program Administrator who serves as the Behavior Management coordinator, the Treatment Services Director, Cottage Directors, Cottage Counselors and other staff have recently focused on clarifying infraction codes and the importance of their consistent application. Creating consistency among a large number of staff is a challenge common to all behavior management programs, and the Monitor sees STS's efforts in this area as a strength, and not at a level that would indicate a failure to comply with the requirements of this component of the Remedial Plan.



While each month, a variety of serious negative behaviors continue to occur at STS (an average of 97 Major Infractions per month, as shown in the chart above), these constitute a relatively small proportion of all infractions (an average of 13%) compared to the number of Minor/Moderate infractions represented by the blue and orange bars in the chart above. An even smaller proportion involve assaults on peers or staff. Detailed records on Learning Interventions from July/August 2022 revealed that only about 5% of the Major LIs involved assaults on peers or staff, which ranged in severity and the potential for injury. Reducing youth violence is a core objective of the Remedial Plan, as are efforts to shape youth behaviors that reflect prosocial skills such as patience, frustration tolerance, emotional regulation, respect, etc. Again, this is why fully integrating ART is so important.

The 978 LIs from August 2022 were distributed across the three levels of severity as discussed below:

- 376 (38%) were for Minor misconduct (mostly insubordination, inappropriate language and horseplay). The number of school refusals is significantly lower than reported in the Monitor's 2021 report, indicating the effectiveness of the various strategies to resolve this problem.

  o A Minor LI currently carries a two-hour privilege restriction, beginning at the end of the school day.

- 481 (49%) were for Moderate misconduct (e.g., interference with staff, threatening assault and bullying).

  o Moderate infractions result in a 1- or 2-day privilege restriction.

- 121 (12%) were for Major misconduct. Approximately 50 of these involved assaults on peers or staff, and the remainder were group disturbances, interfering with staff, contraband, etc.

  o A random sample of 50 Major infractions from July and August 2022 were reviewed to assess whether the infraction category had been properly applied. The vast majority (80%) were clearly substantiated. Those that were not tended to be (a) "assaults on staff" where the youth threw an object toward staff but the infraction did not indicate intention or that contact was made and (b) "inciting to riot" when the youth was clearly disorderly, but direct efforts to encourage other youth to join the fray were not described. It is unknown whether the infraction codes were used improperly or if the staff failed to provide the essential details of the event in their written reports.

  o By policy, Major infractions involving assaultive behavior should result in a 3- to 5-day privilege restriction, a written apology, a Control Chain written assignment and Mediation with a Psychologist, Cottage Director or Cottage Counselor. However, privilege restrictions of varying lengths continue to be the only LIs that are utilized. This is adequate on its own, but the Monitor has found that integrating the other components can improve the effectiveness of consequences for serious misbehavior. STS has yet to figure out a system for assigning, completing and tracking the other types of sanctions that are slightly more complex because they require specific data entry, staff involvement to ensure a quality response from the youth and communication across shifts to ensure assignments are completed.

The sanctions imposed in response to the variety of infractions appear to be proportional and applied fairly. When interviewed, a few youth voiced frustration about LIs they'd been given, mostly because of their perception that other youth engaged in similar behavior but were not sanctioned. This goes back to the issue of consistency across staff that STS continues to address.

Like the analysis of room confinement, deeper analysis revealed that LIs are not evenly distributed across the population—just 9 youth (about 17% of those in custody) were responsible for 45% of all LIs and 58% of the Major LIs in July/August 2022. This disproportionality is yet another signal that the facility should strive to identify effective strategies/treatment interventions to promote self-regulation skills among the small subset of youth who continually struggle to control their behavior (see the discussion of this issue in the Mental Health section of this report). A scan of individual-level data for youth outside this subset comports with the typical observation that some youth very rarely commit infractions, and some have more frequent disruptive behaviors but are generally not assaultive. These youth may achieve better behavioral control via staff cuing the use of ART concepts and by engaging them in structured, high-interest activities throughout the day.

As noted above with the Incentive Program, while refinements are always encouraged, the implementation of the Learning Intervention process is solid and reflects the generally accepted practice. The durations of the privilege restrictions are proportional to the severity of the misconduct and appear to be reliably tracked and imposed. That said, the effectiveness of the Learning Interventions may be improved by the addition of restorative tasks and skill-development activities that are, by policy, intended to accompany the privilege restrictions. STS is also encouraged to develop a structure for increased scrutiny of infraction codes (e.g., "inciting to riot," "sexual misconduct" and "assault") to ensure that staff properly discern among infraction categories and include all salient details in their Intervention Reports.

*Level-Step System*

The Level-Step System predates the Remedial Plan as part of STS's approach to behavior management, but it was revised in important ways to integrate it with the new tools and services available at STS. The system involves 30 steps (3 levels, 10 steps each; 1.1 to 3.10) and provides the youth, STS staff and JCOs with a tangible assessment of the youth's progress at STS and readiness for release. Upon admission, youth begin at 1.1 and their level-step is reviewed each week, using 5 criteria for promotion:

- Earning at least 70% of available points in the Incentive Program

- Refraining from Moderate and Major misconduct

- Program Engagement (*i.e.*, working toward ICP goals)

- Engagement with Mental Health services, if applicable

- School performance

That the program does not rely solely on the presence or absence of negative behavior, and instead includes an array of indicators of program engagement, is an important feature of the Level-Step System.

Interviews with youth and staff and facility observations during on-site visits suggested that the Level-Step program is well-integrated into the facility's daily routine. Youth knew what Level-Step they were on and what was required to advance to the next step. They appeared to be even more focused on this part of the behavior management program than the Incentive System, perhaps because it is more closely tied to Temporary Home Visits (youth must reach 2.5 to be eligible) and discharge from STS.

Progress through the Level-Step program was reviewed for a sample of 15 youth in custody on 8/31/22. This analysis suggested similar variability as that observed for the Incentive Program—some youth promote to a higher step every week, some youth are occasionally retained at a step but generally make an upward progression, and some youth struggle to progress at all, remaining stuck on the lower steps of the program for long periods of time. The table below illustrates the variability across youth. Of the 15 youth, 7 youth (46%) were promoted one step on 75% or more of their weeks in custody ("positive"). Conversely, 3 of the 15 youth (20%) had significantly more neutral weeks than positive weeks. The remaining youth's progress was more uneven. This aligns with the variability seen in the Incentive Tiers, above, and is also tied to the need to improve the integration of ART (discussed above) which may help some of these youth develop the skills needed to progress more consistently in the BMS.



_Internal Program Monitoring and Quality Assurance_

Evidence of close program monitoring was apparent throughout the documents reviewed by the Monitor. First, corrections were noted in the Level-Step documentation when internal monitoring identified a misstep (generally that the youth advanced two steps in a single week rather than one step). In addition, the Monitor also reviewed youth grievances related to the Incentive Program, Learning Infractions and Level-Step program and found that the Cottage Directors investigated the youth's concern and occasionally ruled in the youth's favor. As discussed above, STS has a Behavior Management Review Team that tackles the difficult challenge of promoting consistency across staff and assessing whether various metrics accurately reflect the staff's day-to-day experience.

Finally, the internal Quality Assurance audits in January and July 2022 reviewed core aspects of the behavior management program. The July 2022 audit found several positive attributes of the program's implementation: BMS logs were current, scores on the BMS were individualized, youth reported that they were aware when LIs were issued and had access to their BMS % and scores, youth reported receiving privileges consistent with their Incentive Tier and appropriate restrictions when they had not earned them, losses of privileges conformed to policy, and Weekly Evaluations were conducted appropriately. However, the audit also noted that staff needed to improve the level of detail in their written behavior assessments that accompany the BMS scores and noted that corrective actions did not appear to be improving staff skill or the level of consistency in implementing the program. Additional coaching and guidance in weekly Cottage Meetings was recommended. These findings are congruent with those of the Monitor, and also highlight STS's continued "system maintenance" of the program to push for better staff practice even when basic program requirements are being met.

**Recommended Compliance Rating**. Partial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) Ensure that newly hired staff receive pre-service training in the _Behavior Management_ policy and _Aggression Replacement Training (ART)_ prior to being deployed to work on the housing units and ensure training completion is properly documented.
2) Supplement the ART all-staff training module with on-going guidance, coaching and other forms of skill development (e.g., additional exposure to ART groups) so that staff incorporate key ART concepts in their routine interactions with youth.

**Methodology**.

- Interviewed STS administrators, staff and youth
- Reviewed ART staff training documentation, curricula and proficiency exam
- Reviewed staff training rosters and proficiency exams for the Incentive System and Level-Step Program
- Reviewed ART completion status of all youth housed at STS since January 2022
- Reviewed aggregate Infraction data from January-August 2022
- Reviewed Special Management Plans put in place between January-August 2022
- Reviewed Incentive and Level-Step records for 15 randomly selected youth
- Reviewed Learning Interventions for July/August 2022.
- Reviewed 50 Major Infractions from July/August 2022.
- Reviewed January and July 2022 internal Quality Assurance audits and Plan of Correction

**RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors.** Defendants may employ a temporary overnight use of CMH for the purpose of conducting a Tier 3 (T3) Therapeutic Pilot Project only in accordance with the provisions set forth below.

RC-I.B.2(a) Temporary Overnight Use of CMH for the T3 Therapeutic Pilot Project. Defendants may temporarily use CMH during a two (2) year Pilot Period for overnight purposes, but only in connection with intensive therapeutic programming and services for youth designated as Tier 3, and only as set forth in the Intensive Therapeutic Program Policy (ECF No. 387-1, the "ITP Policy)...Defendants' overnight use of CMH between the Effective Date [8/18/21] and the date the T3 policy become effective shall comply with these terms, which shall be incorporated into the written policies:

(1). Therapeutic Environment. STS will maintain a therapeutic environment in CMH at all times.
(2). Not Used as Punishment. The T3 program must not be used as a form of punishment.
(3). Use of Isolation/Restraint Must Comply with STS Policy. Use of isolation, seclusion and restraint is restricted to those practices outlined in policies *4C-Room Confinement* and *2A-12 Security Restraints*. Isolation and/or seclusion includes, but is not limited to, any involuntary placement of youth in any of the 24 CMH individual cells or any seclusion room during waking hours.
(4). Admission Process. STS must base its specific criteria for referral and admission to the T3 program on individualized assessments with a process involving a multi-disciplinary decision-making team...This process shall ensure that the other general population options have been exhausted and that any CMH placement shall be intentionally limited to only that time needed to provide the student with the necessary skills to be successful in a less restrictive setting. If a youth meets the criteria for admission to the T3 program, but that youth was not previously on the MH caseload, STS will provide a comprehensive MH reassessment and provide the individualized services needed as a result of that assessment.
(5). Individualized Behavior Management Plans. Individualized Plans must be created for each youth and informed by functional behavior management principles that identify the function of the behavior of concern and its antecedents. Plans shall include goals and related services necessary for youth to move to a less restrictive environment, which STS shall explain to the youth in terms that youth would understand. These Plans, and any mental health treatment plan the youth may have, shall guide STS's implementation of the T3 program tailored to each youth. Plans shall be reviewed and updated at regular intervals and any updates shall be explained to youth in terms the youth would understand.
(6). Highly Structured and Intense Services. STS must provide youth in the T3 program with highly structured and intense array of services and supports to help stabilize them when other forms of de-

escalation and treatment have been unsuccessful. These intensive services include but are not limited to: targeted clinical or behavioral assessment, evaluation and observation; crisis and safety planning; and increased therapeutic, skills and rehabilitation-based interventions.

(7). Predictable Daily Schedule with Minimal Self-Directed Leisure Time. STS must utilize a predictable daily schedule, approved by the Monitor, whereby most waking hours are consumed by structured activities led by an adult to minimize self-directed leisure time. Staff shall also "check-in" with students often and at least once per shift.

(8) School Services. STS must ensure that youth attend their regular school hours and classes at Midland Park School unless STS determines that doing so would present serious risk of physical harm to themselves or others or a student is recommended to attend school in an alternate setting through the student's IEP process. That determination must be made on an individualized basis. STS staff will ensure that all their educational needs are met and that all services and/or accommodations listed in that youth's IEP and/or 504 Plan are fully implemented.

(9). Program Elements. STS shall implement welcoming, planning, programming, documentation, oversight, supervision, and training requirements for the T3 program.

(10). Personal Items. STS shall allow and encourage a specified list of personal items to remain in all individual rooms.

(11). Limited T3 Rooms. STS shall specify a limited number of individual rooms at CMH and the location of those rooms that shall be dedicated to the T3 program.

(12). Implement the recommendations set forth in the Monitor's Interim Status Report (ECF No. 404).

RC-I.B.2(b) T3 Policy Timeline. Defendants shall provide the first draft policy to the Monitor by 12/1/21; the Monitor shall provide feedback by 12/15/21; Defendants shall provide an updated policy to the Monitor and Plaintiffs by 1/15/22; the Monitor and Plaintiffs shall provide final feedback to Defendants by 2/1/22; Defendants shall submit the proposed policy to the Court by 2/15/22; and Plaintiffs and the Monitor shall file any response to the Court by 3/1/22. The T3 policy will become final upon the Court's approval. If the policy is submitted before the deadline, the related dates for responding will adjust accordingly.

RC-I.B.2(c) Safeguards Prior to the Final T3 Policy. Before the policy becomes final, STS may use CMH as described in section (a), subject to the Monitor's approval and determination that CMH and the Pilot Project are ready to physically admit youth to CMH, provided that BSTS takes the following steps to reasonably ensure compliance with this Agreement:

(1). Implement all the essential components listed in (a).

(2). Affix a sticker to each door in CMH used for T3 that reminds staff of the prohibition of locking youth in a room during waking hours and states that youth may submit a grievance form if they have any concerns, which must be made accessible to the youth and provided to the Monitor.

(3). Hold frequent, routine meetings with the Monitor…to discuss the current status of the program's operation, which the Monitor may elect to continue after the T3 policy becomes final…timely respond to any requests of the Monitor for information related to the T3 program, including requests for video, and timely implement any recommendations.

RC-I.B.2(b) Improvement to CMH for the Pilot Period. Prior to the temporary overnight use of CMH during the pilot period, BSTS must complete implementation of physical improvements to CMH, barring procurement issues, subject to approval by the Monitor, in at least the following ways:

(1). Implement all changes identified in Defendants' "CMH Furnishings Proposal" memorandum;

(2). Allow youth to hang photographs, posters and/or artwork in their individual rooms;

(3). Use the installed red lighting at night to support safety and quality sleep;

(4). Provide comfortable cushions for the stools.

RC-I.B.2(c) <u>Evaluation and Recommendations at the Conclusion of Pilot Period</u>. Eighteen (18) months after the Effective Date, Defendants shall submit to the Monitor and Plaintiffs their written proposal for longer term therapeutic housing for youth designated as T3...Proposal shall include...(1) estimate of the current and near future population, including population of T3 youth and the populations of youth in each cottage; (2) current overall STS and CMH safety; (3) detailed assessment of the quality, fidelity and efficacy of T3 program implementation, using metrics developed by the Monitor; (4) alternatives to continued overnight use of CMH, including the feasibility of modifications to existing cottages or new construction to potentially serve as suitable long-term future therapeutic housing units; and (5) feasibility of modifications, including structural modifications to CMH to potentially service as suitable long-term therapeutic-only housing.

At twenty (20) months after the Effective Date, following a two-month period of collaboration and negotiation, Defendants shall submit their final written proposal to the Court. By twenty-one (21) months after the Effective Date, the Monitor and Plaintiffs may file their responses to Defendants' proposal. Unless the Court issues its ruling on the Defendants' proposal by the conclusion of the pilot period, the Monitor will determine whether the therapeutic overnight use of CMH permitted during the Pilot Period can temporarily continue between the conclusion of the Pilot Period and the Court's ruling.

Findings.
        The Amendment to the Remedial Plan was proposed in order to increase housing capacity (i.e., to allow overnight stays in Corbett Miller Hall) so that STS could pilot a specialized program for youth with frequent aggressive behaviors. The Amendment's requirements are specified above (paraphrased in some cases). It was approved by the Court on 8/18/21 (dkt. 409).

        STS revised the original *Intensive Treatment Program* policy (discussed in MH-IV.D "Therapeutic Crisis Response Unit," above) to include a therapeutic program to address the needs of youth with frequent aggressive behaviors. Following extensive consultation with the Monitor, SME and Plaintiffs' counsel, the policy was approved (as amended) by the Court on 3/2/22 (dkt. 419). The program officially opened on 3/28/22. In July 2022, the Monitor reported on the early implementation phase of this program (dkt. 424; see that report for a fulsome discussion about the program's implementation). The discussion here updates that assessment with information from the program's operation in August and September 2022.

        To summarize, the Monitor's July 2022 report found that the ITP staff training; referral/admission process; physical plant; service type, intensity and duration; use of room confinement; psychotherapeutic services; ITP plans, progress monitoring and program exit decisions all conformed to the requirements of the CMH Amendment and to the various protocols, protections and practices required by the *ITP* policy. Interviews with both staff and youth confirmed the impressions obtained through documentation and program operations. All of these initial impressions from the July 2022 report were reconfirmed via the documentation reviewed for youth who were admitted/exited the program in June-September 2022, the Monitor's interviews and observations while on site in October 2022 and the SME's interviews in October/November 2022. Key updates are provided below.

In terms of **Referrals/Admissions,** between 3/28/22 and 9/30/22, the ITP Team processed 36 referrals to the ITP program (both Tier 2 and Tier 3). Of these:

- 8 referrals (22%) were denied admission to ITP, generally because the ITP Team believed that less restrictive interventions had not yet been exhausted
- 4 referrals (11%) resulted in admission to Tier 2 (discussed in MH-IV.D "Therapeutic Crisis Response Unit," above)
- 23 referrals (62%) resulted in admission to the Tier 3 program or transfer between Tier 2 and Tier 3
- 1 referral (3%) resulted in acceptance into the Tier 3 program, but the youth never actually entered the program because he was admitted to jail subsequent to the incident that triggered the referral.

The 23 referrals that resulted in admission to Tier 3 involved a total of 14 youth, 4 of whom had multiple admissions to the program (2 youth were admitted twice, 1 youth was admitted 3 times, and 1 youth was admitted 4 times). One of these youth was transferred from Tier 3 to Tier 2 and back to Tier 3 on a single admission. These patterns are not unusual for this type of program. First, some youth's behavior will stabilize after only one dose of the program, while others with more intractable problem behaviors may need additional intervention in order to stabilize. Further, it is not unusual that some youth may straddle the admission criteria for Tier 2/Tier 3 and so transfers between the two Tiers may be required.

Four of the 36 referrals were made on an **Emergency Basis**, which is permitted by policy in response to an assault that causes a serious injury. Because ITP referrals are typically processed on Tuesdays and Thursdays, an Emergency Referral is intended to expedite admission to Tier 3 in response to a violent incident that occurs, for example, on a Friday. Three of the referrals clearly met criteria because the youth's assault caused a serious injury (one youth stabbed a peer with a sharp object, one youth tore a chunk of hair from a peer's head and violently resisted the resulting restraint, and the other youth punched a peer in the nose causing a visit to the Emergency Room to determine if it was broken—fortunately, it was not). The other emergency referral involved a youth who assaulted a YST, although the level of injury was not well documented. Following a full assessment by a psychologist and the ITP Team's review that occurred within a day or two, three of the four youth were admitted to the program following the emergency referral (and are included in the 23 admissions discussed above). Admission was denied for the other youth, and the ITP Team recommended several less restrictive measures to be implemented in the general population cottage. These procedures are being implemented in accordance with policy.

Given the short tenure of the program at the time of the Monitor's July 2022 report, requirements for **30-day reviews of youth in Tier 3** could not be assessed. By 9/30/22, four 30-day reviews had been completed for two youth.[35] STS developed a format for these reviews in consultation with the Monitor/SME. Each review includes a description of the youth's behavior, particularly assaultive behaviors; a summary of treatment delivered and other behavior management tools that have been applied (e.g., small incentives, individual staff attention, behavior contracts); progress toward ITP tasks (e.g., chain analysis, ART workbooks, restorative activities); current struggles/triggers; and a narrative discussion. Each of the 30-day reviews included all required information and was appropriately individualized. In particular, the narrative discussions included excellent psychodynamic

---

[35] One youth had been in ITP multiple times: the first stay was 58 days (one 30-day review) and the second stay is on-going (two 30-day reviews so far). The other 30-day review was for a youth who ultimately exited the program after 33 days.

formulations that provided a clear understanding of the youth's challenges and what ITP staff have done/intend to do to address them. Finally, each form contained the required approval by the DHS Division Administrator for the youth's continued involvement in Tier 3, along with a set of recommendations and treatment considerations.

Overall, these patterns reflect the work of an ITP Team that closely adheres to policy requirements for admission and that is conscious about whether less restrictive measures have been attempted/exhausted prior to admitting youth to Tier 3. The program has succeeded in providing a highly structured therapeutic environment and has accurately focused on the small subset of youth at STS with extremely challenging behaviors. Although they agreed that the youth in Tier 3 were among the most challenging, several staff from general population cottages expressed their opinion that ITP admission criteria, particularly the criteria for emergency placement, are too strict. It is worth noting that nearly all of the youth who were at first denied admission to ITP were later admitted to the program after less restrictive measures had failed. While the ITP Team's strict interpretation of policy requirements for admission is required for compliance with this provision, it is worth noting that, thus far, youth who have been denied admission have continued to victimize others with their assaultive behavior until their eventual acceptance into the program. Consultation with DHS/STS administrators and ITP Team members also suggested that revisions to emergency admission criteria may be prudent. Given that the ITP program is not punitive and instead provides a higher intensity of therapeutic service, the Monitor/SME would not object to more permissive admission criteria. The Monitor/SME are consulting with DHS/STS about potential revisions to these criteria that would permit more proactive emergency admissions to the program. Once a proposal has been discussed with the Monitor/SME and Plaintiffs' counsel, these criteria will be presented to the Court for approval.

Room Confinement and Security Restraints

The CMH Amendment requires Tier 3 of the ITP program to comply with both the *Room Confinement* and *Security Restraint* policies (RC-I.B.2(a)(3)). Regarding the use of **room confinement**, the Monitor assessed compliance with this requirement by interviewing staff and youth in the Tier 3 program and reviewing all instances of room confinement that occurred while a youth was in the Tier 3 program. The Monitor's July 2022 report found no evidence that room confinement or other isolation was used in the Tier 3 program outside of the circumstances permitted by policy. Subsequent file reviews and interviews with youth and staff in October 2022 continued to demonstrate that isolation is used only as permitted by the *Room Confinement* policy. Most of the youth placed in Tier 3 were either never placed in room confinement or had only a few very short room confinement events during their time in the program. Room confinement events were more frequent for about 20% of the youth who spent time in Tier 3. These youth's ITP records included multiple incident reports/Learning Interventions for violent and threatening behavior, and when room confinement was used, it was an appropriate response to the imminent risk of harm. Not coincidentally, these same youth had longer lengths of stay in Tier 3 given their continued violent behavior. Staff and youth interviews confirmed that, other than for room confinement and at bedtime, youth are not placed alone in a locked room for any reason while in the Tier 3 program.

The Monitor has not previously reported on the use of **restraints** in the ITP program. In order to assess compliance with the requirement to abide by the *Security Restraint* policy, the Monitor interviewed STS's Treatment Services Director (who oversees cottage staff and supervisors), interviewed YSTs (who are involved in nearly all restraints), and youth in the Tier 3 program. The Monitor also reviewed incident reports for all restraints that occurred while a youth was in the Tier 3 program and watched videotaped footage of those that occurred in an area of CMH that has video

camera coverage. In total, this included 27 restraints that occurred between 4/7/22 and 8/30/22. The key inquiry was whether staff's use of physical restraint was limited to situations that are permitted by policy or, conversely, whether physical restraint is being used as a *de facto* behavior management tool in the Tier 3 program. The *Security Restraint* policy specifies that "…restraints shall only be used after less intrusive methods of security control and behavioral management have been tried and failed or would be unsafe given the student's acute risk…They shall not be used as punishment, for staff convenience or to coerce a student to take action which they are resisting."

At the time of the review, 14 youth had spent time in the Tier 3 program, and only 4 of these youth were restrained at any point during their time in the program. In other words, <u>71% of the youth who spent time in Tier 3 were not physically restrained during their time in the program</u>. Collectively, the 4 youth who had been restrained were involved in 27 restraints, all of which were reviewed by the Monitor (10 had both a restraint report and video footage, and 17 only had restraint reports because they occurred in areas without cameras). Overall, 19 of the 27 restraints (70%) were in response to an obvious need to intervene in order to protect someone from harm (e.g., to break up a fight, in response to an assault on staff, in response to a youth throwing an object at another peer or staff).

The remaining 8 incidents were more difficult to assess. Two (7% of the 27) were in response to property destruction in which the imminent risk of harm to another person's safety was not obvious in the written documentation. The 6 others (22% of the 27) began with a situation in which a youth refused to comply with staff's directive (e.g., to hang up the phone, to step away from the staff desk, to proceed to room for bedtime, to complete chores, etc.), and upon refusal, the staff person appropriately initiated a guided escort (e.g., hand on elbow or shoulder, or light pressure on the back) and the youth responded aggressively to the escort and became combative. While physical intervention became necessary at that point, it *may* have been avoidable (e.g., by cuing youth to use learned skills, by reminding the youth about reinforcers/consequences). Given that there was not an immediate need to protect others when the directive was refused, had staff taken the time to verbally intervene or persuade and to obtain the required authorization to initiate a restraint (authorization did not appear to have been requested), the resulting space/time/interaction *may have* permitted the situation to be resolved without physical intervention. STS is encouraged to closely attend to this issue in its routine supervisory reviews of restraints.

Aside from the potential to avoid the use of restraint if a small number of non-threatening situations were handled differently, overall, STS's use of physical intervention in the Tier 3 program appears to be appropriate. Most youth are not restrained while in Tier 3, and for the small number who were, the majority of the physical interventions clearly complied with policy requirements regarding situations in which restraint is permissible.

## Next Steps

Tier 3 of the Intensive Treatment Program, located in CMH, was designed as a pilot program to address the needs of youth with frequent aggressive behaviors. Per document review, program observation, youth and staff interviews and frequent consultation, it is clear that STS has carefully implemented the Tier 3 program according to the requirements of this provision and the ITP policy. STS has demonstrated substantial compliance with all components of this provision, except for the one requirement that is not yet due—RC-I.B.2(c), *Evaluation and Recommendations at the Conclusion of the Pilot Period.* As has been the Monitor's convention since the inception of the Remedial Plan, a recommended compliance rating is not provided for provisions that include requirements with due dates that have not yet passed.

The one outstanding provision requires STS to assess (in collaboration with the Monitor/SME) the implementation and efficacy of the program, to provide an update on the size of the STS population and rate of violence, and to make a proposal about the future location of the Tier 3 program. The evaluation and recommendations will first be negotiated with Plaintiffs' counsel and will then be submitted to the Court for approval, no later than April 17, 2023. The Monitor will continue to audit a sample of ITP records during the interim.

**Recommended Compliance Rating**. Not Yet Rated

**Steps Toward Achieving Substantial Compliance**.
1) Complete the required evaluation of ITP Tier 3 implementation and efficacy described in RC-I.B.2(c), *Evaluation and Recommendations at the Conclusion of the Pilot Period*.

**Methodology**.
- Reviewed the *Intensive Treatment Program* policy
- Reviewed ITP Program records for all youth who entered/exited the program between 3/28/22 and 9/30/22
- Reviewed ITP 30-day reviews
- Observed program operations, including ITP Team meetings, while on site
- Interviewed ITP Cottage Director, Counselor, psychologist, YSWs and YSTs
- Interviewed youth who had been in the ITP program
- Reviewed incident reports and videotaped footage for all restraints that occurred when youth were involved in the ITP program
- Conducted general program and case consultations with ITP Team and STS leadership

**RC-I.C Direct Care Staffing**. Throughout the duration of this Remedial Plan and monitoring, the BSTS will hire and maintain a sufficient number of professionals to effectively implement and practice this behavior management/motivation approach by helping students develop and practice skills necessary for them and others to remain safe.
RC-I.C Direct Care Staff. For direct care staff, the BSTS will continue to use a 1:8 (daytime) and 1:16 (nighttime) staffing ratio for the general population, consistent with PREA.

**Findings**.

*Number of Staff*

STS reported the following funded positions: 92 YSWs, 9 YSTs, 10 Cottage Counselors and 7 Cottage Directors.[36] These allocations are based on a youth population of approximately 80 youth. Given that the STS population should not exceed 64 for the next few years given the renovation project, STS needs somewhat fewer YSWs to operate its program.[37] In October 2021, DHS determined that it needed approximately 76.5 YSWs to properly staff the facility with a youth population of no more than 64 youth. This staffing allocation provides for a staff—youth ratio that is richer than that required by this provision. Cottage capacity of 16 youth in general population would require 2 staff

---

[36] Since the Monitor's November 2021 report, one of the original 11 Counselor positions was converted to an Activity Specialist position.
[37] In early 2021, DHS obtained funding from the Iowa Legislature to convert three of its housing units from their current dormitory-style housing to individual rooms.

during waking hours to meet the required 1:8 ratio, but the staffing plan allocates 3 staff per general population cottage. Similarly, only 1 staff would be needed to meet the required 1:16 ratio overnight, but the staffing plan allocates 2 staff per general population cottage. The ITP program is also richly staffed beyond the requirements of this provision.

As of 8/31/22, 73 YSW positions were filled, although only 70 YSWs were available to work (the other 3 were either on FMLA, or some other type of leave, or had not yet completed all of the pre-service training).[38] Compared to the staffing levels reported in the Monitor's November 2021 report, STS has fewer positions filled (73 versus 81), but has approximately the same number of YSWs available to work (70 versus 71). DHS reported that the current shortfall (76.5 needed – 70 available = 6.5 YSWs) can be covered by re-arranging shifts/schedules; using other job classifications such as Cottage Directors, Counselors and Youth Service Technicians; and through the application of targeted overtime so as to maintain necessary staffing complements. The Monitor's review of Cottage Coverage Workbooks for July and August 2022 confirmed the use of overtime and other job classifications at times when cottage populations were higher and/or staff were out sick or on vacation.

These broad numbers are provided as general context, but the assessment of compliance with the requirements of this provision required deeper analysis. A cottage-level analysis provides better insight into the number of staff present on the units which is important given their central role in implementing the behavior management system and other types of special programs/plans. The cottage-level analysis compared the number of youth assigned to each housing unit and the number of staff on the AM, PM and overnight shifts to determine how often the required 1:8 (AM and PM) and 1:16 (overnight) ratios were met.

The Monitor's November 2021 report included an analysis indicating that the facility met the staffing ratios required by this provision at least 90% of the time. The remaining 10% of shifts reviewed were inconclusive because the records reviewed did not provide sufficient information to identify whether overnight staff remained in the cottages to assist with wake-up and school preparation, as the facility reported was the standard practice. While on site in October 2022, the Monitor clarified her understanding of this practice. First, in contrast to other systems where the three shifts are consecutive (e.g., 6-2, 2-10, 10-6), STS's shifts overlap—overnight staff generally work 10p to 7:30a, AM staff generally work 5:30a to 1:30p, and PM staff generally work 12p-10p. This shift scheduling convention provides for the required coverage at wake up. The Monitor also interviewed YSWs who universally reported that at least one YSW from the overnight shift remained on duty until the youth were transported to school at approximately 7:30am on weekdays and, if needed, until sufficient staff came on shift to meet required ratios on weekends.

Given this clarification, for the 2022 analysis, the Monitor utilized a set of records that showed: 1) the number of youth assigned to each cottage (*Daily Population Sheets)*; and 2) for each cottage, the staff who worked the AM/PM shift and their hours (*Cottage Coverage Workbook AM/PM)* and the staff who worked the overnight shift (*Cottage Coverage Workbook Overnight)*. The Monitor reviewed all three shifts for all 5 cottages (4 general population cottages and the ITP-Tier 3 cottage/CMH) for July/August 2022. This amounted to 945 shifts (5 cottages x 3 shifts x 7 days x 9 weeks = 945). The 1:8 (waking hours) and 1:16 (sleeping hours) staffing ratios required by this provision were met (and in most cases, far exceeded) on 100% of the shifts reviewed.

---

[38] The number of YSWs available to work changes daily as staff return from leave, go on leave and/or complete required pre-service training.

This analysis provided ample evidence that the staff ratios generally far exceed what is required by this provision. All of the general population units had between 8 and 16 youth assigned, so 2 staff were required during the day to meet the 1:8 ratio. Units typically had 2 or 3 YSWs during the AM shift when the youth are in school, and usually had between 3 and 5 YSWs assigned during the PM shift. This provides ample staff to supervise various structured activities and to attend to youth's individual needs. While STS is striving for additional consistency in expectations and ratings in its behavior management system (as discussed in RC-I.B.1 "Behavior Management/Motivation") and staff need to develop a working vocabulary to support the implementation of ART as the overarching skills-based program, the *number* of staff assigned to each housing unit is sufficient for these purposes.

*Staff Tenure and Assignment*

One very positive aspect of STS's staffing structure is that Directors, Counselors, YSWs and mental health clinicians are assigned to a specific cottage, in contrast to some juvenile facilities where staff assignments tend to be more random (i.e., staff are not assigned to a specific post or unit—they are somewhat randomly distributed throughout the facility). STS's model facilitates the formation of cohesive unit teams. These relationships between and among staff are essential for consistent implementation of behavior management practices. Furthermore, assigning the same staff to a cottage day-to-day is essential for staff-youth rapport, for staff to understand youth's triggers and coping skills, and for youth to begin to trust staff and learn their expectations.

Previous Monitor's Reports have discussed the relatively recent tenure of the STS workforce and the impact that has on staff's mastery of skills needed to de-escalate tensions, avoid disruptions, engage groups of youth in highly structured programming, or hold constructive conversations with youth about their negative behavior. Staff turnover has slowed somewhat, which means that staff who were new at the time of the Monitor's earlier reports have now accumulated additional time on the job, along with the skill and confidence development that comes with longer tenure. Among the 73 YSWs on the staffing roster as of 8/31/22, 25% had been on the job for less than one year (compared to 54% in August 2021). Furthermore, STS adjusted the schedules of Counselors/Directors to provide additional coverage on the PM shift, when most of the newer staff work and when the youth's time is more unstructured (after school) and during times that can be difficult to manage (e.g., bedtime). Youth Service Technicians (YSTs) work both the AM and PM shift, are mobile throughout the facility assisting with movement, de-escalation and providing essential support when YSWs call for assistance. In early 2022, STS also assigned a 2nd Manager to the PM shift to provide additional support the Duty Superintendent.

In summary, STS appears to have a sufficient number of YSWs to meet the ratios required by this provision and to properly staff its specialized programs for youth with more complex needs. The cottage-level analysis of staff assignments to specific housing units during the current monitoring period revealed that STS consistently meets the staff ratios required by this provision, and thus the facility remains in Substantial Compliance.

**Recommended Compliance Rating**. Substantial Compliance.

**Steps Toward Maintaining Compliance**.
   1)   None.

**Methodology**.
- Reviewed STS staff roster for 8/31/22, with date of hire.
- Reviewed STS staffing allocation and number of vacancies, dated 8/31/22

- Reviewed Cottage Coverage Workbooks and Daily Population Sheets for July and August 2022
- Interviewed YSWs, YSTs, Counselors, Directors, Duty Supervisor and STS administrators

**RC-II Injunctive Relief Required by Court Order: Students in the CMH program, either due to a CMH staffing or because they are in administrative segregation for any reason, may not be restricted to their room due to lack of privileges. Students may not be required to eat their meals in CMH rooms. Students may not be denied out-of-room recreation time available to other students.**

**Goal of Remedial Plan**: BSTS will disband the CMH program and its practices as described in the Court order (e.g., administrative segregation, extended room confinement, room restrictions, denial of recreation time).

**RC-II CMH Program**. By the Remedial Plan submission deadline, BSTS will abandon the use of the CMH program. The Student Handbook will be revised to reflect the removal of the CMH program and related language.

**Findings**.

Defendants dismantled the program formerly housed in Corbett Miller Hall (CMH) in phases. Shortly after the Trial Order was issued on 3/30/20 (dkt. 328), STS largely disbanded the CMH program, placing limitations on students receiving services and sleeping in CMH, although isolated exceptions were made. The 6/5/20 version of the Student Handbook removed all references to the CMH program. By 6/29/20, students were not permitted to sleep in CMH under any circumstances. Shortly after the Remedial Plan was approved on 7/27/20, STS issued formal notification to staff that the CMH program had been disbanded and that overnight stays in CMH are prohibited (on 8/3/20).

As noted above in RC.I.B.2 "Pilot Program for Youth with Frequent Aggressive Behaviors," Defendants petitioned the Court to amend the Remedial Plan to permit the use of CMH as a residential unit so that a pilot program for youth with frequent aggressive behaviors could be located there. Following extensive negotiation about the core elements of the program and DHS's assurances that the program would be primarily therapeutic and would not include any of the practices that were of concern to the Court (which are described in an attachment to Plaintiffs' Motion, dkt. 408-1), Plaintiffs' counsel and the Monitor supported the request, which was approved by the Court on 8/18/21 (dkt. 409). See RC.I.B.2, "Pilot Program for Youth with Frequent Aggressive Behaviors" above, for an assessment of the program.

The CMH building has received physical plant upgrades such as paint and new furniture and is regularly used for for room confinement and the ITP Tier 3 program. The Monitor has not observed evidence of any practices that were of concern to the Court at the time trial (*e.g.*, overnight stays in room confinement, administrative segregation, extended isolation, room restriction, meals-in-room, or denial of essential services and programs).

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
1) None.

**Methodology**.

- Consulted with DHS/Facility administrators
- Interviewed youth who spent time in Room Confinement and the ITP program
- Interviewed staff who work in CMH

**RC-III Injunctive Relief Required by Court Order**: The School shall not use the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of this Order. All Students at the School shall be notified immediately, both orally and in writing, that the Wrap is no longer to be used by the School.

**Goal of Remedial Plan**: The School will remove the Wrap and will provide verbal and written notice to students.

**RC.III. Restraint Policy and Practice.**
RC.III.A. Remove the Wrap. The Wrap shall be removed from the School no later than 10 days from the date of the Court Order.
RC.III.B. Notify Students. All students shall be notified immediately, both orally and in writing.
RC.III.C. Policy. Prohibit the use of the Wrap in *2A-12 Security Restraints* policy.
RC.III.D. Post Notice. Within 24 hours of the policy, BSTS shall post notices of the policy changes in each cottage, in language that is appropriate for the student-facing nature of the posting, and approved by both Parties.

**Findings**.
The Wrap device was removed from the STS campus on 4/1/20, within the timeline required by the Court (**objective RC-III.A "Remove the Wrap"**). Youth were advised about the Wrap's removal verbally and in writing on 4/7/20 (**objective RC-III.B "Notify Students"**). The 6/19/20 version of policy *2A-12 Security Restraints*, Section IV.d, specifically prohibits the use of the Wrap restraint. Following consultation with the Monitor, SME and Plaintiffs' counsel, sections of the policy unrelated to this provision were revised. The revised policy was approved by the Court on 7/8/22 (dkt. 422) (**objective RC-III.C "Policy"**). The Wrap's removal from the facility's restraint continuum was reiterated in an additional Student Notice, posted on 8/10/20 (**objective RC-III.D "Post Notice"**).

**Recommended Compliance Rating**. Substantial Compliance

**Steps Toward Achieving Substantial Compliance**.
2) None.

**Methodology**.
- Reviewed Defendant's filing to notify the Court that the Wrap had been removed
- Reviewed Student Notices regarding the removal of the Wrap
- Reviewed draft policy *2A-12 Security Restraints*, made comments, and reviewed the final policy

**RC-IV Injunctive Relief Required by Court Order**: For the School to use fixed mechanical restraints instead of the Wrap, they may only do so with leave from the Court upon showing:
1) The restraint is not harmful to a youth's mental health;

2) It will only be used in situations where a student poses a serious and immediate risk of harm to another person after other interventions have failed;

3) Time limitations (e.g., 1 hour) noted in the Order for BSU/Seclusion Rooms shall apply; and

4) The School has put systems in place to ensure the restraint is not used for staff convenience or to coerce a student to take an action he is resisting.

If a mechanical restraint is approved, a mental health professional must be physically present with the student and attempt to help him calm down or otherwise regain self-control. The School must document, including video, all uses of the fixed mechanical restraint to ensure its use complies with the Court Order. No student's clothing shall be removed while the student is in a fixed mechanical restraint.

**Goal of Remedial Plan**: BSTS will comply with the requirements of the Court Order if they consider adopting a fixed mechanical restraint to respond to students who are at serious and immediate risk of harming a person.

**Findings**.
　　The Monitor is unaware of any consideration by DHS to adopt a fixed mechanical restraint device for use at STS.

**Recommended Compliance Rating**. Not Applicable

**Steps Toward Substantial Compliance**.
1) Not Applicable

**Methodology**.
- Consultation with DHS and STS administrators

## APPENDIX 1. COMPLIANCE TABLE

The table below presents the recommended compliance ratings for each provision of the Remedial Plan for the Court's consideration. Recommended ratings for subsequent reporting periods will be added to this table so that progress can be tracked over time.[39] Of the 19 **Mental Health** provisions, the Monitor recommends substantial compliance ratings for 11 provisions (indicated by a ✓), partial compliance for 8 provisions (indicated by PC). The Monitor does not recommend a non-compliance rating for any of the mental health provisions.

Of the 7 provisions related to the use of **Room Confinement and Restraints**, the Monitor recommends substantial compliance ratings for 3 provisions (indicated by a ✓) and partial compliance ratings for 2 provisions (indicated by PC). The Monitor has not recommended a compliance rating for two provisions because all of the requirements are not yet due (NYR, Not Yet Rated) or because they are not applicable (N/A). The Monitor does not recommend a non-compliance rating for any of the room confinement and restraint provisions.

| Provision | Monitor's Report | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| **Mental Health** | | | | |
| MH-I.A  Multi-Disciplinary Treatment Team | PC | PC | PC | |
| MH-I.B  Mental Health Treatment Plans | PC | PC | PC | |
| MH-I.C  As-Needed Referrals | PC | ✓ | ✓ | |
| MH-I.D MH Services Policy & Procedure | ✓ | ✓ | PC | |
| MH-II.A Therapeutic Services | PC | PC | PC | |
| MH-II.B Skill-based and Rehabilitative-based Services | PC | PC | PC | |
| MH-II.C Mental Health Staffing | ✓ | ✓ | ✓ | |
| MH-II.D MH Services Policy & Procedure | ✓ | ✓ | PC | |
| MH-III.A Student Records Policy & Procedure | PC | PC | ✓ | |
| MH-IV.A 24/7 Crisis Response | ✓ | ✓ | ✓ | |
| MH-IV.B Suicide Prevention and Intervention | PC | PC | ✓ | |
| MH-IV.C Multi-Sensory De-Escalation Tools and Spaces | PC | NC | ✓ | |
| MH-IV.D Therapeutic Crisis Response Unit | NYR | PC | ✓ | |
| MH-IV.E Hospital Level of Care | ✓ | ✓ | ✓ | |
| MH-IV.F Suicide Prevention Policy & Procedure | ✓ | ✓ | PC | |

---

[39] Recommended compliance ratings are expected to improve over time as DHS/STS shores up implementation and service delivery as advised throughout this report. However, recommended compliance ratings may also change in subsequent reviews if new information suggests that performance has deteriorated or if information gleaned from youth and staff interviews reveals problems that were not visible via document review, remote observation and administrative interviews.

| Provision | Monitor's Report | | | |
|---|---|---|---|---|
| | 1st | 2nd | 3rd | 4th |
| MH-V. Discharge Planning Policy & Procedure | PC | PC | PC | |
| MH-VI.A Oversight, Observation and Monitoring | ✓ | ✓ | ✓ | |
| MH-VI.B Quality Assurance Policy & Procedure | NYR | PC | ✓ | |
| MH-VI.C Ongoing Training | NYR | PC | ✓ | |
| Seclusion [Room Confinement] and Restraint | | | | |
| RC-I.A   Seclusion [Room Confinement] Policy | PC | PC | PC | |
| RC-I.B.1 Behavior Management/Motivation | PC | PC | PC | |
| RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors | ~ | NYR | NYR | |
| RC-I.C   Staffing | ✓ | ✓ | ✓ | |
| RC-II   CMH Program | ✓ | ✓ | ✓ | |
| RC-III   Restraint Policy & Practice | ✓ | ✓ | ✓ | |
| RC-IV   Introduction of Fixed Mechanical Restraints | N/A | N/A | N/A | |

## APPENDIX 2. STEPS TOWARD ACHIEVING SUBSTANTIAL COMPLIANCE

**MENTAL HEALTH PROVISIONS**

**MH-I.A Multi-Disciplinary Treatment Team**
1) Engage the youth in the MDT process more substantively and then document the substance of exchange with the youth.
2) Ensure that clinicians attempt to engage the parent or guardian in meaningful discourse about the youth's treatment program and document all such attempts (and the outcome) in both the individual youth records and the MDT meeting minutes.
3) When youth are not progressing, consider modifying the treatment interventions to catalyze behavior change and/or improved symptom experience. Such considerations should be documented in the MDT meeting minutes or in a progress note for the youth.

**MH-I.B Mental Health Treatment Plans**
1) Ensure that the youth's primary diagnoses are reflected in the treatment plan with interventions to address these diagnoses and their presenting symptoms. If goals related to a certain diagnosis are being outsourced to a rehabilitative group or are being deferred, indicate that on the treatment plan.
2) Ensure that all interventions (*e.g.*, psychotherapy groups, clinically indicated skills-based/rehabilitative services) are included in the treatment plan with frequency, duration and practitioner designated.
3) Consider prescribing group therapeutic interventions more liberally in response to youth's needs.
4) When youth are not progressing, consider modifying the treatment interventions on the Treatment Plan to catalyze behavior change and/or improved symptom experience. Such considerations should be documented in the MDT meeting minutes or in a progress note for the youth.

**MH-I.C As-Needed Referrals**
1) None.

**MH-I.D Mental Health Services Policy & Procedure**
1) Ensure that new STS staff receive training on the *Mental Health Services* policy prior to being assigned to the housing units to work independently and ensure that the completion of this training is documented.

**MH-II.A Therapeutic Services**
1) When youth are not progressing, consider modifying the treatment interventions to catalyze behavior change and/or improved symptom experience. Such considerations should be documented in the MDT meeting minutes or in a progress note for the youth.
2) Ensure that group therapeutic interventions are included in the treatment plan as a prescribed intervention when youth participate in them.

   3)  Clearly document attempts and the interventions utilized to engage with youth who refuse to participate in individual and/or group therapies.

**MH-II.B Skill-based and Rehabilitative-based Services**
1) Ensure that clinically indicated skills-based and rehabilitative-based groups are referenced in the youth's treatment plan, including provider, frequency and duration.
2) Develop a mechanism to support the interface between the skills/rehabilitative group and the youth's assigned clinician.

**MH-II.C Mental Health Staffing**
1) None.

**MH-II.D Mental Health Services Policy & Procedure**
1) Ensure that new STS staff receive training on the *Mental Health Services* policy prior to being assigned to the housing units to work independently and ensure that the completion of this training is documented. (Same as MH-I.D, above).

**MH-III.A Student Records Policy & Procedure**
1) None.

**MH-IV.A 24/7 Crisis Response**
1) None.

**MH-IV.B Suicide Prevention and Intervention**
1) None.

**MH-IV.C Multi-Sensory De-Escalation Tools and Spaces**
1) None.

**MH-IV.D Therapeutic Crisis Response Unit**
1) None.

**MH-IV.E Hospital Level of Care**
1) None.

**MH-IV.F Suicide Prevention Policy & Procedure**
1) Ensure that new STS receive training on the *Suicide Prevention and Intervention* policy prior to being assigned to the housing units to work independently and ensure that the completion of this training is documented.

**MH-V. Discharge Planning Policy & Procedure**
1) Clearly document all attempts (whether successful or not) to schedule appointments with community providers for psychotherapy and medication management.  .

**MH-VI.A Oversight, Observation and Monitoring**
1) None.

**MH-VI.B Quality Assurance Policy & Procedure**
1) None.

**MH-VI.C On-going Training**
1) None.

**SECLUSION [ROOM CONFINEMENT] AND RESTRAINT PROVISIONS**

**RC-I.A Seclusion [Room Confinement] Policy**
1) Ensure that newly hired STS staff receive pre-service training on the *Room Confinement* policy prior to being deployed to work on the housing units and ensure that completion of the training is properly documented.
2) Reconsider the protocols surrounding the release from room confinement and the Reintegration Safety Plan during the next policy revision. Once a more useful protocol has been developed, apply it consistently.
3) Closely monitor back-to-back room confinement events to ensure that requirements for mental health involvement, authorization and post-release planning are followed.

**RC-I.B.1 Behavior Management/Motivation**
1)  Ensure that newly hired staff receive pre-service training in the *Behavior Management* policy and Aggression Replacement Training (ART) prior to being deployed to work on the housing units and ensure training completion is properly documented.
2) Supplement the ART all-staff training module with on-going guidance, coaching and other forms of skill development so that staff incorporate key ART concepts in their routine interactions with youth.

**RC-I.B.2 Pilot Program for Youth with Frequent Aggressive Behaviors**
1) Complete the required evaluation of ITP Tier 3 implementation and efficacy described in RC-I.B.2(c), *Evaluation and Recommendations at the Conclusion of the Pilot Period*.

**RC-I.C Direct Care Staffing**
1) None.

| |
|---|
| RC-II CMH Program |
|    1)  None. |
| RC-III Restraint Policy & Practice |
|    1)  None. |
| RC-IV Introduction of Fixed Mechanical Restraints |
|    1)  N/A. |